1          IN THE UNITED STATES DISTRICT COURT
            FOR THE DISTRICT OF KANSAS
2                TOPEKA, KANSAS

3

    UNITED STATES OF AMERICA,   ) *ORIGINAL*
4  ------------------ Plaintiff,)
                         ) Case No.
5       vs.              ) 13-40057-DDC
                         )
6  JONATHAN KEARN,         ) App. No.
  ------------------ Defendant.) 15-3121
7

8             TRANSCRIPT OF JURY TRIAL
                (VOLUME 1)
9

10      PROCEEDINGS had before the Honorable

11  Daniel D. Crabtree, United States District

12  Court Judge, for the District of Kansas,

13  Topeka, Kansas, and a jury of 12, on the 5th

14  day of May 2015.

15

    APPEARANCES:
16

    For the Plaintiff:  Christine E. Kenney
17                     Office of the U.S. Attorney
                     290 U.S. Courthouse
18                     444 S.E. Quincy Street
                     Topeka, KS  66683
19

    For the Defendant:  Michael E. Francis
20                     Attorney at Law
                     434 S.W. Topeka Boulevard
21                     Topeka, KS  66603

22                     Jonathan Kearn
                     Defendant
23

    Court Reporter:     Sherry A. Harris, C.S.R.
24

25

1                          I   N   D   E   X

2                         W I T N E S S

3

OPENING STATEMENT                              PAGE

4

By Ms. Kenney                                   255

5        By Mr. Francis                                 259

6

TESTIMONY ON BEHALF OF PLAINTIFF

7

STUART BUTLER

8        Direct Examination by Ms. Kenney               264

9

                         E X H I B I T S

10

PLAINTIFF EX. NO.              OFFERED   RECEIVED

11

1                                  277        278

12

1-1 through 1-10                   283        283

13

14       Certificate ---------------------------- 313

15

16

17

18

19

20

21

22

23

24

25

```
 1                    PROCEEDINGS

 2           THE COURT:  Good morning, everyone.

 3      Please be seated.  All right.  So we're here

 4      on the United States of America against

 5      Jonathan Kearn in case number 13-40057.  Let

 6      me begin with your appearances, please.

 7           MS. KENNEY:  May it please the

 8      Court, the United States appears by Christine

 9      Kenney, Assistant United States Attorney.

10           THE COURT:  Good morning,

11      Ms. Kenney.

12           MS. KENNEY:  Good morning.

13           MR. FRANCIS:  Defendant appears in

14      person through counsel, Mike Francis.

15           THE COURT:  Good morning to you.

16           MR. FRANCIS:  Good morning.

17           THE COURT:  Let me start and get

18      something out of the way first.  Let me ask

19      first of all of the United States,

20      Ms. Kenney, is the United States ready for

21      trial?

22           MS. KENNEY:  We are, Your Honor.

23           THE COURT:  And, Mr. Francis, is the

24      defendant ready for trial?

25           MR. FRANCIS:  Yes, Your Honor.
```

1          THE COURT:  And, Mr. Kearn, are you

2     ready to proceed with trial?

3          THE DEFENDANT:  Yes.

4          THE COURT:  All right.  Very well.

5     I think-- let me get an update.  Ms. Garrett,

6     do you have sense of when the jury will be

7     ready to come up?

8          MS. GARRETT:  I'm waiting for that

9     response.

10          THE COURT:  Okay.  We'll know in a

11     few minutes.  I think we're roughly on time.

12     Trying to get a few more in place.  I think

13     we're going to have between 47 and 50 people.

14     We had hoped to get 50.  So we'll give them a

15     little time to see if we can get to our

16     number.

17          I gave you all last week a copy of

18     the preliminary instructions that I would

19     tend to-- or I plan to read before opening

20     statement.  And so let me ask, first of all,

21     if either party has any comments on those

22     preliminary instructions.  Ms. Kenney?

23          MS. KENNEY:  Your Honor, I have just

24     a few comments, questions that I shared with

25     Mr. Francis.  And if the Court would like me

1          to go ahead?

2                    THE COURT:  Sure.

3                    MS. KENNEY:  On page 2 at the

4          beginning it says, "Certain things that are

5          not in evidence," and it is statements,

6          arguments and questions of lawyers.  I always

7          am sensitive about that because the question

8          sometimes has to be part of the answer.  For

9          example, if the question is a leading

10         question and the answer is yes or no.  I

11         mentioned that to Mr. Francis and I think he

12         had a suggestion that he's used in state

13         court.

14                    MR. FRANCIS:  May I proceed?

15                    THE COURT:  Sure.  If you'd tell me

16         what the parties jointly recommend.

17                    MR. FRANCIS:  The PIK instructions,

18         both civil and criminal, "Statements,

19         arguments and comments of counsel are not

20         evidence."  Then it says something about the

21         evidence in this case is that submitted by

22         the Court.  But I don't know if that's

23         necessary.  But with that little phrase right

24         there, that's the one that's used in the

25         state courts.

1          THE COURT:  So if I substituted the

2     word "comments" for the word "questions",

3     would that be acceptable to both parties?

4     Ms. Kenney?

5          MS. KENNEY:  Yes, Your Honor.

6          THE COURT:  Mr. Francis?

7          MR. FRANCIS:  Yes, sir.

8          THE COURT:  And then the additional

9     comment from the pattern instruction, do the

10     parties want that given or not want that

11     given?

12          MS. KENNEY:  I don't think it's

13     necessary for the preliminary instructions.

14     I think that that's going to be covered in

15     the final instructions, at least to some

16     degree.

17          THE COURT:  I think that's right.

18          MR. FRANCIS:  I think as a whole I

19     don't think it needs to be covered.

20          THE COURT:  I won't add that.  I'll

21     substitute the word "comments" for

22     "questions."

23          Ms. Kenney, do you have other--

24          MS. KENNEY:  Two other.

25          THE COURT:  --things you noticed?

1          MS. KENNEY:  Your Honor, and this is

2     not a change or a problem with the

3     preliminary instructions, but I wondered--

4     you mentioned-- or page 4 is what I'm looking

5     at, conduct of the jury.  And you talk about

6     do not read, listen, do not try to do any

7     research.  I wonder if social media should

8     specifically be mentioned.  And the only

9     reason I raise that is that it seems to me

10    there was some comment or concern or

11    suggestion that the jury should specifically

12    be instructed about social media.  But that

13    may be just during the trial.

14          THE COURT:  Well, it's a good point.

15    I thought I had a social media instruction

16    that we had used before.  But if you all have

17    crafted something that you want to cover

18    there that's jointly acceptable, I would be

19    inclined to give what you want so long as it

20    wasn't outrageous.  And I wouldn't expect it

21    to be if you both agree to it.

22          MS. KENNEY:  And we really didn't

23    get that far, Judge.

24          MR. FRANCIS:  I just thought, Judge,

25    on that something about do not read or listen

1          to anything touching on this case in any way.

2          If you would want to say news accounts or

3          social media-- to include news accounts,

4          social media, for example.

5                    THE COURT:  I think, Ms. Kenney, you

6          were suggesting it as part of the paragraph

7          that's labeled third?

8                    MS. KENNEY:  Not necessarily.  No,

9          not necessarily.

10                   THE COURT:  Let me do this.  I think

11         the point is well taken and I have -- I don't

12         remember, I think I can put my hands on it --

13         a social media instruction that is easily

14         dropped into one of those paragraphs.  When

15         we finish here, I'll go back.  And

16         Ms. Garrett's already trying to find it.

17         We'll get that so that you can look at it and

18         make sure that it doesn't bother you or you

19         can negotiate the language of it.  And then I

20         will drop it into one of those two paragraphs

21         as an additional preliminary instruction

22         about don't be tempted to get in your

23         Blackberry or your iPhone or whatever.  Is

24         that okay?

25                   MS. KENNEY:  That is acceptable,

1          Your Honor.  Thank you.

2                    MR. FRANCIS:  Yes.

3                    THE COURT:  All right.

4                    MS. KENNEY:  And then finally, on

5          page 5, under course of the trial, the second

6          paragraph, the second sentence says,

7          "Following the government's case, the

8          defendant may, if he wishes."  And I believe

9          Mr. Francis and I both agreed--

10                    THE COURT:  Hold on, I've lost you.

11         You're on page 5?

12                    MS. KENNEY:  Page 5.

13                    THE COURT:  Yes.  The last

14         paragraph?

15                    MS. KENNEY:  The last paragraph, the

16         second sentence.

17                    THE COURT:  Yes.

18                    MS. KENNEY:  Where it says, "The

19         defendant may if he wishes."

20                    THE COURT:  Yes.

21                    MS. KENNEY:  Mr. Francis and I both

22         would suggest that the phrase, "but is not

23         required to," be inserted there.

24                    THE COURT:  If he wishes but he is

25         not required to?

1              MS. KENNEY:  Yes.

2              THE COURT:  Mr. Francis, is that

3      acceptable to the defendant?

4              MR. FRANCIS:  It is.  And I'm

5      assuming at the time if my client chooses to

6      testify there's going to be some comments

7      made to the jury about his rights.

8              THE COURT:  Yeah.  I mean, I

9      would-- I mean, I told-- without the jury in

10     the room, of course, I will conduct a

11     colloquy with Mr. Kearn about his right to

12     testify.  But I don't typically instruct on

13     that unless-- until the final instructions.

14     Did you think it's-- were you thinking of

15     something else?

16             MR. FRANCIS:  No.

17             THE COURT:  Or maybe I misunderstood

18     you.

19             MR. FRANCIS:  No.  The more I think

20     about it, it's kind of a moot point if you

21     put in this instruction and then we have the

22     colloquy and he testifies.

23             THE COURT:  Yeah.  That's the-- you

24     sort of call more attention to it and then he

25     testifies and you've diluted the instruction.

1        So I'd be inclined to wait and address it, if

2        it's appropriate, in the last set of

3        instructions that we give before argument.

4                MR. FRANCIS:  That's fine.

5                THE COURT:  Anything else from the

6        government?

7                MS. KENNEY:  No, Your Honor.  Thank

8        you.

9                THE COURT:  Mr. Francis, did the

10       defendant have any comments on the

11       preliminary instructions?

12               MR. FRANCIS:  Not other than what's

13       been raised, Your Honor.

14               THE COURT:  All right.  And then let

15       me just check signals with you.  I also

16       provided to you all-- there's a place in

17       voir dire where I tell the jury in sort of

18       summary fashion what the case is about, and I

19       gave you all language that is a summary of

20       the three charges the government has brought

21       against Mr. Kearn.  And I have-- that's what

22       I plan to use.  But if you all had concerns,

23       I wanted to address them now.  Do you have

24       any concerns, Ms. Kenney?

25               MS. KENNEY:  No concerns or comments

1           as to those instructions.

2                     THE COURT:  Mr. Francis, are you--

3                     MR. FRANCIS:  I didn't have any

4           concerns, Your Honor.

5                     THE COURT:  All right.  Very well.

6           All right.  So that takes care of the

7           homework that was left from last week.  What

8           else should we talk about?

9                     MS. KENNEY:  Just one last thing.

10          As is my typical fashion, Your Honor, I went

11          through one of the exhibits, which is marked

12          as Exhibit 20 and is in the Court's book

13          yesterday--

14                    THE COURT:  Which is still down the

15          hall.  I'm sorry.

16                    MS. KENNEY:  --and I understand this

17          isn't something you need to concern yourself

18          with too much, but I have made changes to

19          that.  I have copies for the Court's notebook

20          and for your law clerk's notebook and I've

21          provided a copy for Mr. Francis.

22                    THE COURT:  And you might provide

23          those to Mr.-- you all haven't met-- this is

24          Carson Hinderks, the law clerk that's

25          relatively new to our chambers, and he'll be

1        helping me with the case.  We'll get those

2        plugged into the notebook that you provided.

3                MR. FRANCIS:  Judge, by way of

4        housekeeping, I do have three exhibits that I

5        intend to use.  I have them here.  I have not

6        given the Court copies.  If I may, I would

7        hand them over at this time.

8                THE COURT:  That would be great.

9                MR. FRANCIS:  And then I also have

10       an exhibit that I believe we've come to an

11       agreement on on the forensic gentleman that

12       we had as to the language he's going to

13       insert, but we haven't got the printout on

14       that yet.

15               THE COURT:  Okay.

16               MR. FRANCIS:  So I wanted that as an

17       additional.  I have the originals here.  Do

18       you want me to give those to the clerk?  This

19       is a copy.

20               THE COURT:  The original exhibits,

21       the ones you're actually going--

22               MR. FRANCIS:  Yes.

23               THE COURT:  --to use in court?  No,

24       you can remain in charge of those.  That's

25       the-- one of the things people ask you:  Do

1           you have any pet peeves?  I mean, just help

2           me with this.  To me, the exhibit is the

3           exhibit that's used with the witness and has

4           the exhibit sticker on it.

5                     MR. FRANCIS:  Right.

6                     THE COURT:  Not photocopies of that.

7           Those are photocopies of the exhibit.  So if

8           you'll help me, when I reference the exhibit

9           I mean the actual exhibit.

10                    MR. FRANCIS:  All right, Your Honor.

11                    THE COURT:  I think in the Navy they

12          say the admiral, actually the admiral, not

13          just the admiral's ship.  So that's what I

14          mean by the exhibit.  All right.  So anything

15          else that we ought to take up before I leave

16          you to your last-minute thinking and we wait

17          to get the jury panel in the room?

18                    MS. KENNEY:  No, Your Honor.  Thank

19          you.

20                    MR. FRANCIS:  I can think of

21          nothing.  Thank you, Judge.

22                    THE COURT:  Very well.  Thanks for

23          being so well prepared.  And I will step down

24          the hall and look for that instruction and

25          try to get that out to you and get that in my

1          notes, and we'll resume and get going on

2          voir dire as soon as we can get the people

3          up.

4                      This will be a very short break.

5          They are on a short break.  They ought to be

6          back in the room and be ready to come up in

7          just four or five minutes.  So as soon as

8          they are we'll let you know, I'll come back

9          out, and we'll and get them up here.  Thank

10         you very much.  We'll be in recess for a

11         moment.

12                      (THEREUPON, a recess was

13         taken).

14                      THE COURT:  Please be seated.  All

15         right.  We're back on the record in the

16         presence of counsel, and Mr. Kearn, the

17         defendant, is present.  And Ms. Garrett

18         informs me that the jury is ready to come up,

19         so I'll ask her to bring them in the room and

20         we'll get started with voir dire.

21                      (THEREUPON, the prospective jurors

22         entered the courtroom).

23                      THE COURT:  Thank you, everyone.

24         Please be seated.  Good morning, everyone.

25         My name is Dan Crabtree and I am the judge

assigned to try this case.  And we're going
to proceed shortly with the jury selection in
the case, the jury selection process.

The first thing we do in that
process, however, is to administer an oath to
all of you.  We will-- we do this because
during the jury selection process I will ask
and then the lawyers may ask some questions
of you.  And so it is an important part of
our process that the members of the
selection-- the jury panel who are going to
participate in jury selection, are placed
under oath.  So if you all will stand at this
time and raise your right hand, I'll ask the
deputy clerk to please administer the oath.

(THEREUPON, the prospective
jurors were sworn).

THE COURT:  All right.  Please be
seated.  And I'll introduce everybody in the
courtroom in a moment, but I think before we
go any farther I want to go ahead and ask the
deputy clerk to call the names of the people
in the order that they have been randomly
selected by the computer program.  And so
when your name or if your name is called, if

1          you will start filling the rows-- the jury

2          box and then the chairs that are in front of

3          the jury box.  If you'll start at the far

4          end, go all the way down that row and when

5          that row is occupied, then start on the

6          second row at this end closest to me and so

7          forth until we reach the end.

8                    So, Ms. Garrett, will you please

9          call the names?

10                        (THEREUPON, Prospective Jurors

11         1, 2, and 3 were seated).

12                   THE COURT:  Did you call Ms. XXXX?

13         I'm sorry, I'm out of order.  Thank you very

14         much.  I got my names wrong.  Thank you very

15         much for being right.

16                        (THEREUPON, Prospective Jurors

17         4, 5, 6, 7, 8, 9, 10, 11, 12, 13, 14, 15, 16,

18         17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27,

19         28, 29, 30, 31, and 32 were seated).

20                   THE COURT:  And the last-- you are

21         Mr. XXXX.

22                   PROSPECTIVE JUROR 32:  Yes.

23                   THE COURT:  All right.  Very well.

24         I got my chart off by one square so I'm

25         catching up.

1          All right.  Very well.  Good morning

2     to all of you again.  Let me-- let me talk to

3     all of you who are here called for jury

4     service today.  We're going to in a moment

5     start asking questions of you to evaluate

6     your fitness to serve on the jury, and I'll

7     explain a little bit about that.  But before

8     we get to that I want to introduce the people

9     in the courtroom who will be here throughout

10    the trial.  I'll introduce the parties and

11    their lawyers in a moment, but I do like for

12    you to know who works here and what they do.

13          As I said, I'm Dan Crabtree and I am

14    the judge who is charged with being the judge

15    at this trial.

16          Seated right below me to my right,

17    your left, is Ms. Harris.  She is the court

18    reporter.  And through a process that I can

19    only describe as magic, she manages to take

20    down every statement that is made in the

21    courtroom and keep up with everyone.  So

22    that's Ms. Harris.

23          To her left, your right, is Megan

24    Garrett.  Ms. Garrett is the courtroom deputy

25    who is in charge of the logistics of this

1          trial and in charge of keeping me straight

2          when I'm off a name or two or I'm directing

3          someone to the wrong chair, as you have

4          already seen I occasionally do.  And she will

5          be your point of contact throughout the trial

6          if you're selected to serve on this jury.

7                    Over to my far left against the wall

8          is one of our court security officers.  And

9          you will see-- the people that are in the

10         blue blazer, you will see them rotate

11         throughout the trial, come and go.  Unlike

12         the jury, they get to come and go.  You have

13         to stay for the whole thing.  But they will

14         rotate in and out just on a regular schedule

15         and you'll see that.

16                   And then to the court security

17         officer's left is Carson Hinderks.

18         Mr. Hinderks is a relatively recent law

19         school graduate who is spending a little more

20         than a year serving as a law clerk for our

21         court.  And what that means is he helps me

22         immensely to find and get the right law

23         applied at the right time.  So that's kind of

24         who the people are in the courtroom.

25                   I want to start now with voir dire

1        and I'll tell you a little bit about that.

2        But just as starters, I want to make sure

3        I've got everybody's name in the right place

4        and make sure-- get a verbal confirmation

5        from you that you are present and took the

6        oath as a prospective juror.  So I'm just

7        going to go kind of on the rolling boulder

8        method down one row and then down the others

9        and make sure that I've got everybody in the

10       right place.

11                   All right.  Starting in the back at

12       the very right in the pole position, as I

13       think they say at the NASCAR races, we have

14       Prospective Juror-- is that you, Prospective

15       Juror 1?

16                   PROSPECTIVE JUROR 1:  XXXX.

17                   THE COURT:  XXXX.  French, right?

18                   PROSPECTIVE JUROR 1:  Yes.

19                   THE COURT:  Prospective Juror 1, can

20       I confirm that you were present and took the

21       oath as a prospective juror this morning?

22                   PROSPECTIVE JUROR 1:  Yes, I did.

23                   THE COURT:  And then seated next to

24       you, Prospective Juror 2?

25                   PROSPECTIVE JUROR 2:  Yes, Your

1       Honor.

2                    THE COURT:  And, Prospective Juror

3       2, were you present and did you take the oath

4       this morning as a prospective juror?

5                    PROSPECTIVE JUROR 2:  Yes, I was,

6       Your Honor.

7                    THE COURT:  Thank you, sir.

8                    Prospective Juror 3, is that you?

9                    PROSPECTIVE JUROR 3:  Yes.

10                   THE COURT:  Prospective Juror 3,

11      were you present in the courtroom and did you

12      take the oath this morning as a prospective

13      juror?

14                   PROSPECTIVE JUROR 3:  Yes.

15                   THE COURT:  Next to you is I guess

16      our first XXXX on the back row.  Prospective

17      Juror 4, is that you?

18                   PROSPECTIVE JUROR 4:  Yes, it is.

19                   THE COURT:  And, Prospective Juror

20      4, were you present in the courtroom and did

21      you take the jury oath this morning?

22                   PROSPECTIVE JUROR 4:  Yes, sir.

23                   THE COURT:  Then on next to you, to

24      your right, Prospective Juror 5?

25                   PROSPECTIVE JUROR 5:  Yes.

1              THE COURT:  Were you present and did

2      you take the jury oath this morning?

3              PROSPECTIVE JUROR 5:  Yes.

4              THE COURT:  Prospective Juror 6, is

5      that you?

6              PROSPECTIVE JUROR 6:  Yes.

7              THE COURT:  And, Prospective Juror

8      6, were you present and did you take the oath

9      as a prospective juror this morning?

10             PROSPECTIVE JUROR 6:  Yes.

11             THE COURT:  And, then our second

12     XXXX on the back row, Prospective Juror 7, is

13     that you in the back corner?

14             PROSPECTIVE JUROR 7:  That's me.

15             THE COURT:  And were you present and

16     did you take the oath as a prospective juror

17     this morning?

18             PROSPECTIVE JUROR 7:  Yes, sir.

19             THE COURT:  Thank you, sir.

20             I'll come back down to you.  Is that

21     you, Prospective Juror 8?

22             PROSPECTIVE JUROR 8:  Correct.

23             THE COURT:  Prospective Juror 8,

24     were you present and did you take the oath as

25     a prospective juror this morning?

1            PROSPECTIVE JUROR 8:  Yes.

2            THE COURT:  Thank you.

3            Prospective Juror 9.

4            PROSPECTIVE JUROR 9:  Yes.

5            THE COURT:  Good morning.  Were you

6      present and did you take the oath as a

7      prospective juror this morning?

8            PROSPECTIVE JUROR 9:  Yes, Your

9      Honor.

10           THE COURT:  Thank you.

11           Prospective Juror 10?

12           PROSPECTIVE JUROR 10:  Yes.

13           THE COURT:  And were you present and

14     did you take the oath as a prospective juror

15     this morning?

16           PROSPECTIVE JUROR 10:  Yes.

17           THE COURT:  All right.  Next to you

18     Prospective Juror 11.

19           PROSPECTIVE JUROR 11:  Yes.

20           THE COURT:  Am I pronouncing it

21     correctly?

22           PROSPECTIVE JUROR 11:  Correct.

23           THE COURT:  Prospective Juror 11,

24     were you present in the courtroom and did you

25     take the oath as a prospective juror this

1     morning?

2              PROSPECTIVE JUROR 11:  Yes, sir.

3              THE COURT:  All right.  And then

4     moving down one chair, is it, Prospective

5     Juror 12?

6              PROSPECTIVE JUROR 12:  Yes.

7              THE COURT:  XXXX or XXXX?

8              PROSPECTIVE JUROR 12:  XXXX.

9              THE COURT:  Prospective Juror 12,

10    were you present and did you take the oath as

11    a prospective juror this morning?

12             PROSPECTIVE JUROR 12:  Yes, I did.

13             THE COURT:  XXXX?

14             PROSPECTIVE JUROR 13:  Yes.

15             THE COURT:  Is that how I say it?

16             PROSPECTIVE JUROR 13:  XXXX.

17             THE COURT:  XXXX.  Prospective Juror

18    13.  Thank you for letting me know.  Were you

19    present and did you take the oath as a

20    prospective juror this morning?

21             PROSPECTIVE JUROR 13:  Yes.

22             THE COURT:  And when I call

23    you-- when I say XXXX again, will you promise

24    to correct me until I get it right?

25             PROSPECTIVE JUROR 13:  Yes.

1          THE COURT:  Seated next to you, is

2     that you, Prospective Juror 14?

3          PROSPECTIVE JUROR 14:  Yes, it is.

4          THE COURT:  And, Prospective Juror

5     14, were you present in the courtroom and did

6     you take the oath as a prospective juror this

7     morning?

8          PROSPECTIVE JUROR 14:  Yes, I did.

9          THE COURT:  Very well.  All right.

10    Now I'm in the first chair just outside the

11    jury box.  And is it Prospective Juror 15?

12         PROSPECTIVE JUROR 15:  XXXX.

13         THE COURT:  XXXX.  As usual,

14    Ms. Garrett had it absolutely correct and I

15    had it wrong.  Prospective Juror 15, were you

16    present in the courtroom and did you take the

17    oath as a prospective juror this morning?

18         PROSPECTIVE JUROR 15:  Yes.

19         THE COURT:  All right.  Is that you,

20    Prospective Juror 16?

21         PROSPECTIVE JUROR 16:  XXXX.

22         THE COURT:  Which one is it?

23         PROSPECTIVE JUROR 16:  XXXX.

24         THE COURT:  XXXX.  I was 0 for two.

25    Prospective Juror 16, were you present--

1          thank you for letting me know.  Were you

2          present and-- in the courtroom this morning

3          and did you take the oath as a prospective

4          juror?

5                    PROSPECTIVE JUROR 16:  Yes, I did

6          Your Honor.

7                    THE COURT:  Thank you.

8                    Prospective Juror 17.

9                    PROSPECTIVE JUROR 17:  XXXX.

10                   THE COURT:  XXXX.  Thank you for

11         letting me know, Prospective Juror 17.  Were

12         you present in the courtroom this morning and

13         did you take the oath as a prospective juror?

14                   PROSPECTIVE JUROR 17:  Yes, sir.

15                   THE COURT:  All right.  Mr.-- I'm on

16         a losing streak here.  I'm going to go with

17         Prospective Juror 18.

18                   PROSPECTIVE JUROR 18:  That's right.

19                   THE COURT:  I got it right.  Losing

20         streak is broken.  Prospective Juror 18, were

21         you present in the courtroom this morning and

22         did you take the oath as a prospective juror?

23                   PROSPECTIVE JUROR 18:  Yes, I did.

24                   THE COURT:  All right.  Prospective

25         Juror 19?

1               PROSPECTIVE JUROR 19:  Yes.

2               THE COURT:  I was confident I could

3       get that.  Prospective Juror 19, were you

4       present in the courtroom this morning and did

5       you take the oath as a prospective juror?

6               PROSPECTIVE JUROR 19:  Yes, sir.

7               THE COURT:  Prospective Juror 20.

8               PROSPECTIVE JUROR 20:  Yes, sir,

9       Your Honor.

10              THE COURT:  Prospective Juror 20,

11      were you present this morning and did you

12      take the oath as a prospective juror?

13              PROSPECTIVE JUROR 20:  Yes, I was,

14      Your Honor.

15              THE COURT:  Thank you so much.

16              Prospective Juror 21.

17              PROSPECTIVE JUROR 21:  Yes.

18              THE COURT:  Were you present and did

19      you take the oath this morning?

20              PROSPECTIVE JUROR 21:  Yes, sir.

21              THE COURT:  All right.  To the

22      second row outside the box.  Prospective

23      Juror 22, were you present and did you take

24      the oath this morning?

25              PROSPECTIVE JUROR 22:  Yes, I did.

1            THE COURT:  Prospective Juror 23?

2            PROSPECTIVE JUROR 23:  Yes.

3            THE COURT:  Were you present and did

4      you take the oath this morning?

5            PROSPECTIVE JUROR 23:  Yes, I did.

6            THE COURT:  Prospective Juror 24,

7      were you present and did you take the oath as

8      a prospective juror this morning?

9            PROSPECTIVE JUROR 24:  Yes, sir.

10            THE COURT:  Prospective Juror 25, is

11      that you?

12            PROSPECTIVE JUROR 25:  Yes.

13            THE COURT:  All right.  Good

14      morning, Prospective Juror 25.  Were you

15      present in the courtroom when Ms. Garrett

16      administered the oath this morning?

17            PROSPECTIVE JUROR 25:  Yes, sir.

18            THE COURT:  And did you take the

19      oath as a prospective juror?

20            PROSPECTIVE JUROR 25:  Yes, sir.

21            THE COURT:  All right.  Thank you

22      for that.

23            Seated next to you, Prospective

24      Juror 26.

25            PROSPECTIVE JUROR 26:  Yes.

1                    THE COURT:  Prospective Juror 26,

2          were you present and did you take the oath

3          this morning?

4                    PROSPECTIVE JUROR 26:  Yes.

5                    THE COURT:  Prospective Juror 27.

6                    PROSPECTIVE JUROR 27:  XXXX.

7                    THE COURT:  50-50 call.  Prospective

8          Juror 27, were you present and did you take

9          the oath this morning as a prospective juror?

10                   PROSPECTIVE JUROR 27:  Yes, I did.

11                   THE COURT:  Thank you.  Prospective

12         Juror 28?

13                   PROSPECTIVE JUROR 28:  Yes, sir.

14                   THE COURT:  Were you present and did

15         you take the oath this morning?

16                   PROSPECTIVE JUROR 28:  Yes, Your

17         Honor.

18                   THE COURT:  Prospective Juror 29?

19                   PROSPECTIVE JUROR 29:  XXXX.

20                   THE COURT:  All right.  Thank you

21         for letting me know.  Prospective Juror 29,

22         were you present and did you take the oath

23         this morning?

24                   PROSPECTIVE JUROR 29:  Yes.

25                   THE COURT:  Prospective Juror 30?

1                    PROSPECTIVE JUROR 30:  Yes.

2               THE COURT:  Did I get it right?

3                    PROSPECTIVE JUROR 30:  Yes.

4               THE COURT:  Congratulations to me.

5          Prospective Juror 30, were you present this

6          morning and did you take the oath?

7                    PROSPECTIVE JUROR 30:  Yes.

8               THE COURT:  Prospective Juror 31,

9          were you present for the oath and did you

10         take it?

11                   PROSPECTIVE JUROR 31:  Yes.

12              THE COURT:  And lastly, Prospective

13         Juror 32.

14                   PROSPECTIVE JUROR 32:  Yes.

15              THE COURT:  Is that right?

16                   PROSPECTIVE JUROR 32:  You are

17         correct again.

18              THE COURT:  I'm on a roll here,

19         Prospective Juror 32.  And were you present

20         for the oath this morning and did you take

21         the oath?

22                   PROSPECTIVE JUROR 32:  Yes, I did to

23         both.

24              THE COURT:  All right.  Very well.

25         Members of the jury panel and people seated

1          in the back, let me emphasize to you it is

2          tempting to think, well, I'm back there and

3          so I don't need to pay close attention to

4          what happens up here.  Let me urge you not to

5          do that.  Because there are circumstances

6          that could lead us to swap one of you out for

7          someone who's been called among this group of

8          the first 32.  And so if that happens we want

9          to be able to go back and cover in sort of an

10         abbreviated fashion the questions that have

11         been covered with this group primarily up

12         here.  So though you're in the back end of

13         the courtroom, it's important for you to give

14         us your full attention so that if we have to

15         substitute one of you out we can play catchup

16         as efficiently as possible.  Make sense?

17                    All right.  Very well.  Thank you

18         for that.  I said we were going to begin jury

19         selection, which our system also refers to as

20         voir dire.  If your French is better than

21         mine, some people say voir dire.  The purpose

22         of this examination is to enable the Court to

23         decide whether any prospective juror should

24         be excused for cause and to enable the

25         parties to use their individual judgments

1          about peremptory challenges to jurors.  That

2          is challenges that require no reason to be

3          given.

4                    This voir dire process is not meant

5          to pry into your private lives or in any way

6          embarrass you.  It is a standard part of the

7          trial and it is aimed at selecting a jury

8          that is as impartial as is possible under the

9          circumstances.

10                   I want to give you some preliminary

11         information about the case.  This is a

12         criminal case.  By that I mean the United

13         States Government has charged the defendant

14         with committing one or more crimes.  These

15         criminal charges have been brought by an

16         indictment that a grand jury returns.  The

17         indictment spells out the charges that are

18         brought against the defendant and informs the

19         defendant about the nature of the offenses

20         that he is charged with.  The defendant has

21         pleaded not guilty to these charges.

22                   Under our Constitution a defendant

23         is presumed to be innocent at all times and

24         unless and until a jury returns a verdict of

25         guilty.  This presumption of innocence

1          remains with the defendant.  The fact that

2          the defendant has been charged with a crime

3          does not mean that he is guilty; and as the

4          defendant sits here in this courtroom right

5          now, you must presume that he is innocent of

6          having committed any crime.

7                    The government, as the prosecutor in

8          this case, has the burden to prove that the

9          defendant is guilty beyond a reasonable

10         doubt.  If the government fails to carry that

11         burden, then you must find the defendant not

12         guilty.

13                   The defendant does not have to

14         testify or present any evidence at all in

15         this case because the burden of proof is on

16         the government to prove the defendant is

17         guilty beyond a reasonable doubt.  You are to

18         draw absolutely no inference or conclusion

19         from the fact that a defendant may or may not

20         testify or may or may not present any

21         evidence.  You also should not draw any

22         inference about a defendant who has chosen to

23         be represented by a lawyer.  It is a

24         defendant's right to have his counsel and his

25         defense conducted by a trained legal

1          professional.  It is simply a matter of

2          choice for the individual who is charged, and

3          you are not to consider the choice he has

4          made in either respect.

5                    The indictment, the piece of paper

6          which notifies the defendant of the charges

7          against him, is not evidence of any guilt at

8          all.  The indictment is informational only

9          and does not carry any weight in satisfying

10         the burden of proof that rests with the

11         government in the case.

12                   The jury that is chosen to serve in

13         this case will be the sole judges of the

14         facts and the credibility and weight to be

15         given to the evidence in the case.  The

16         evidence will consist primarily of testimony,

17         written documents, maybe some stipulations

18         between the parties, and any applicable

19         presumptions.  Those are all things I'll give

20         you instructions about at a later point if

21         you are chosen to serve on the jury in this

22         case.

23                   The lawyers in this case are

24         experienced lawyers, and their best judgment

25         and estimate is that it will take about three

1          or four days to present the evidence in this

2          case.

3                    Now, knowing that much and knowing

4          about the length of the trial that is

5          forecast, I want to inquire of you whether

6          this length of trial, three to four days,

7          presents a special problem for any of you.

8          And let me stop there and say what I mean by

9          special problem.  I don't mean it is

10         inconvenient in your lives to set aside three

11         or four days to come to this building.  I

12         don't mean I'd really rather be doing

13         something else.  But if there is a member of

14         the panel who has a special scheduling issue

15         or personal situation, then I would ask you

16         to raise your hand and I will-- we'll talk

17         further about you.  Does the three or four

18         day timeline present a problem for any member

19         of the jury panel?

20                    All right.  Seeing no hands--

21                    MR. FRANCIS:  Judge.

22                    THE COURT:  I'm sorry.  I did not

23         see the front row.

24                    Prospective Juror 29.

25                    PROSPECTIVE JUROR 29:  Yes.

1          THE COURT:  Is this something you're

2     comfortable talking with from there or--

3          PROSPECTIVE JUROR 29:  Yes, sir.  I

4     have a-- I'm going--

5          THE COURT:  You might stand just

6     so-- it's easier for the court reporter to

7     hear.  I'm sorry to do that to you.  Yes,

8     sir.

9          PROSPECTIVE JUROR 29:  I am

10    currently going to school and I get out of

11    class next week and so this is probably

12    having-- getting ready for finals and stuff.

13          THE COURT:  Okay.

14          PROSPECTIVE JUROR 29:  So I don't

15    know.

16          THE COURT:  And your finals, when do

17    they start?

18          PROSPECTIVE JUROR 29:  Next-- I

19    believe it's next week.  So--

20          THE COURT:  And is the-- tell me

21    where you're in school.

22          PROSPECTIVE JUROR 29:  Washburn

23    Tech.

24          THE COURT:  Okay.  And are there

25    classes you will miss this week?

37

1          PROSPECTIVE JUROR 29:  Yeah.

2          THE COURT:  Okay.  Thank you for

3     letting me know that.

4          And then there was one other on the

5     front row.  It was Prospective Juror 31.

6          PROSPECTIVE JUROR 31:  Yes.

7          THE COURT:  Yes, sir.

8          PROSPECTIVE JUROR 31:  I own my own

9     company and I kind of have to be there.

10          THE COURT:  And tell me, what's the

11     nature of the business you're engaged in?

12          PROSPECTIVE JUROR 31:  Construction.

13          THE COURT:  All right.  And are

14     you-- do you have-- tell me about the

15     structure of your company.

16          PROSPECTIVE JUROR 31:  I'm sorry?

17          THE COURT:  Tell me about the

18     structure of your company.  Do you have

19     people who work for you?

20          PROSPECTIVE JUROR 31:  Yes.  Yeah.

21          THE COURT:  And what-- do you have

22     several jobs going currently?

23          PROSPECTIVE JUROR 31:  Two right

24     now.

25          THE COURT:  Are they both in the

1        Topeka area?

2                    PROSPECTIVE JUROR 31:  Lawrence and

3        Eudora.

4                    THE COURT:  All right.  And how do

5        you structure it, say, when you're going to

6        be away on a family vacation or something

7        like that?

8                    PROSPECTIVE JUROR 31:  I'm usually

9        always in contact.

10                   THE COURT:  All right.  And I would

11       tell you that while you can't use your

12       hand-held device or your phone while we are--

13       if you're selected you couldn't use it while

14       you were in the courtroom, there will be

15       times before court begins in the morning and

16       times during the morning break and of course

17       over the lunch hour where you would be free

18       to look at your E-mail, to look at your

19       texts, and to interact with people on your

20       job sites.

21                   PROSPECTIVE JUROR 31:  Okay.

22                   THE COURT:  Is that something you

23       can manage?

24                   PROSPECTIVE JUROR 31:  Yes, probably

25       so.

1              THE COURT:  All right.  Thank you

2      very much.

3              Yes.  Let me find where you are.

4      Let me just make a couple of notes before I

5      come to you.

6              And you're Prospective Juror 17?

7              PROSPECTIVE JUROR 17:  Yes.

8              THE COURT:  Yes, ma'am.

9              PROSPECTIVE JUROR 17:  I work at the

10     Shawnee County Election Office and I'm the

11     director of voter services in charge of

12     one-half of the office.  And we had two

13     special elections just recently called for

14     437 and 501 and our offices are just recently

15     moving.  And so the election is June 16th but

16     then I'm in charge of half of the office.

17     And I just wanted to mention that.  I think

18     it would be okay since it's only a couple

19     days, but I did want to mention that.

20             THE COURT:  Well, I-- thank you for

21     letting me know.  I am-- given my

22     responsibility to make sure that we have

23     enough jurors to staff this trial, I don't

24     think that is a circumstance that I can

25     excuse you from service.  If it were going to

1          be a longer trial, I certainly would I think,

2          but this is going to be a relatively

3          short-term trial.

4                    PROSPECTIVE JUROR 17:  And I think

5          that will be okay too since it isn't a real

6          long trial.

7                    THE COURT:  Does that seem fair to

8          you?

9                    PROSPECTIVE JUROR 17:  I think so.

10                   THE COURT:  All right.

11                   I am concerned, Prospective Juror

12         29, about your studies.  I commend you for

13         caring about your education.  So I'm going to

14         ask the clerk to call another name and I'm

15         going to let you go back to the back of the

16         room.  You're not getting a free pass out of

17         this, at least not yet, because I don't know

18         where we will end up on numbers.  So I can't

19         excuse you, but I am going to swap out you

20         for another prospective juror at this time.

21         We may have to come back to you and if we do

22         we do.

23                   PROSPECTIVE JUROR 29:  Okay.

24                   THE COURT:  So don't dial out for--

25         don't dial out on me yet, all right?

41

1              PROSPECTIVE JUROR 29:  All right.

2              THE COURT:  All right.  Ms. Garrett,

3      would you please call another name.

4                   (THEREUPON, a prospective juror

5      was called to the jury box).

6              THE COURT:  Prospective Juror 33, if

7      you'll come up and take the seat where

8      Prospective Juror 29 was sitting.  Good

9      morning to you.

10             PROSPECTIVE JUROR 33:  Hi.

11             THE COURT:  Hi.  Let me just ask

12     you, were you present in the courtroom and

13     did you take the oath as a prospective juror

14     this morning?

15             PROSPECTIVE JUROR 33:  Yes, I was,

16     uh-huh.

17             THE COURT:  All right.  I'll ask the

18     question that I asked the others.  Does the

19     three- or four-day timeline present a special

20     problem for you?

21             PROSPECTIVE JUROR 33:  No.

22             THE COURT:  All right.  Thank you

23     for letting me know.

24             Let me turn to a more substantive

25     question.  I want to summarize the three

42

1          charges that the government has brought

2          against the defendant in this case so that

3          you'll have a better feel for what the case

4          is about.  And then once you have that in

5          mind, I'll have some follow-up questions

6          about the case.

7                    First, the government accuses the

8          defendant, as a parent having custody and

9          control of a minor, of knowingly permitting a

10         minor to engage in sexually explicit conduct

11         for the purpose of producing a visual

12         depiction of the conduct.  And the

13         defendant-- the government charges the

14         defendant knew that this visual depiction

15         would be transported or transmitted through

16         interstate commerce or through the mails.

17                    The second charge, the government

18         accuses the defendant of knowingly

19         distributing a visual depiction involving a

20         minor engaging in sexually explicit conduct

21         through a means of interstate or foreign

22         commerce.

23                    And third, the government accuses

24         the defendant of knowingly possessing and

25         accessing with the intention to view at least

1          one matter containing a visual depiction that

2          involved a minor engaging in sexually

3          explicit conduct.

4                    As I said earlier, those are the

5          charges of the government and they are merely

6          the charges that the government has made.  So

7          knowing that much about the case, have any of

8          you as members of the panel heard anything

9          about this case?  If you have, please raise

10         your hand.

11                   All right.  Thank you.  Seeing no

12         hands, let me move to a related question.

13                   Has any member of the panel read

14         anything about this case in any source

15         whatsoever?  If you have, please raise your

16         hand.  All right.  I see no hands.  Thank

17         you.  That's the background of the case.

18                   I've given you an introduction to

19         the court staff that will work in this case.

20         Now I'd like for you to meet the lawyers for

21         the parties in the case.  So let me begin

22         with counsel for the government.  Would you

23         please introduce yourself and the people

24         sitting at the table with you?  And please

25         tell the jury where it is you practice law.

1              MS. KENNEY:  Thank you, Your Honor.

2      My name is Christine Kenney.  I'm an

3      Assistant U.S. Attorney and my office is here

4      in Topeka, Kansas, in this building.  Also at

5      counsel table today is Sean Moore.  He is a

6      paralegal in my office.  He's also employed

7      by the U.S. Attorney's Office.  And finally,

8      Special Agent Cassidy Casner.  She is the

9      case agent in this case and she is a special

10     agent with the Department of Homeland

11     Security.

12             THE COURT:  All right.

13             MS. KENNEY:  Did I cover it?

14             THE COURT:  I think you did.

15             MS. KENNEY:  Thank you.

16             THE COURT:  Thank you, Ms. Kenney.

17             Mr. Francis, would you do the same

18     thing?  And then if you would describe the

19     law firm or your law firm organization.  And

20     I actually will give you a chance to

21     introduce Mr. Kearn in just a moment, but I'd

22     like to just get through questions about you.

23             MR. FRANCIS:  My name is Mike

24     Francis.  I'm a lawyer here in Topeka,

25     Kansas.  I'm in private practice, although I

1          used to practice at one time with the County

2          Attorney in Geary County, Kansas.  I practice

3          primarily criminal law and administrative

4          law.

5                    THE COURT:  All right.  Thank you,

6          Mr. Francis.

7                    Do any of you, to your knowledge, or

8          have any member of your immediate family had

9          any business dealings or been represented by

10         any of the lawyers that have introduced

11         themselves to you?

12                    Yes, in the background.  Prospective

13         Juror 6, which of the lawyers do you know?

14                    PROSPECTIVE JUROR 6:  Mr. Francis.

15                    THE COURT:  All right.  And I'd like

16         to know a little bit more about that.  Is it

17         comfortable for you to talk about from there,

18         or would you like to talk about it privately?

19                    PROSPECTIVE JUROR 6:  I can talk

20         about it from here.

21                    THE COURT:  Okay.  Very well.  Tell

22         me how you know Mr. Francis.

23                    PROSPECTIVE JUROR 6:  I am a trial

24         court clerk at district court.

25                    THE COURT:  In Shawnee County?

1              PROSPECTIVE JUROR 6:  Yes.

2              THE COURT:  So you could have done

3        all this I'm doing this morning quite easily.

4        So I take it you've seen Mr. Francis or know

5        about him being in your courthouse and

6        handling cases there?

7              PROSPECTIVE JUROR 6:  Yes.

8              THE COURT:  Do you have-- I guess an

9        unusually close connection to him in any way,

10       or is he just one of the lawyers that you see

11       or know about?

12             PROSPECTIVE JUROR 6:  He actually

13       represented my son as a juvenile in a case.

14             THE COURT:  All right.  And how long

15       ago was that?

16             PROSPECTIVE JUROR 6:  Maybe six

17       years ago.

18             THE COURT:  All right.  And really

19       you know what kind of the bottom line is on

20       this question.  With that background, the

21       real question is:  Can you decide the case on

22       the evidence and serve impartially in this

23       case, even though you've known of Mr. Francis

24       and he has represented a member of your

25       family?

47

1              PROSPECTIVE JUROR 6:  Yes.

2              THE COURT:  You think you could do

3      that?

4              PROSPECTIVE JUROR 6:  Yes.

5              THE COURT:  All right.  Very well.

6      Thank you for letting me know.

7              Is there anyone else who knows any

8      of the lawyers or has had any business

9      dealing with them or has had a member of

10      their immediate family deal with them in a

11      legal representation or otherwise?

12              All right.  Seeing no hands, I'll

13      move to another subject.

14              Mr. Francis, can I ask you to

15      introduce the defendant and tell them a

16      little bit about where he lives?

17              MR. FRANCIS:  Yes.  This is my

18      client, Jon Kearn.  He was born and raised in

19      Topeka.  Went to school in Topeka.  And he

20      currently owns his own business, All Service

21      Heating & Cooling.

22              THE COURT:  Thank you very much.  Is

23      anyone in the jury panel familiar with

24      Mr. Kearn in any fashion?

25              All right.  Seeing no hands, let me

1          ask if any of you have had any business

2          dealing with All Service Heating & Cooling?

3          Am I saying it right, Mr. Francis?

4                    MR. FRANCIS:  Yes, you are.

5                    THE COURT:  Have any of you perhaps

6          used that company to have work done or know

7          anything about All Service Heating & Cooling?

8          Well, let me broaden the question just a

9          little bit.  I've asked about you.  Now let

10         me just make the question a little broader.

11         Do you know that some member of your

12         immediate family is presently acquainted with

13         Mr. Kearn?  If that's the case, please raise

14         your hand.

15                   Is there anyone-- I see no hands.

16         I'll move to the next question.

17                   Is there anyone on the panel who

18         believes that a member of their family might

19         be related to Mr. Kearn?  If that's the case,

20         would you please raise your hand?

21                   Seeing no hands, let me move to kind

22         of a completely different subject.  And I'm

23         asking about the United States Government

24         specifically.

25                   Has any-- have any of you or any

1          member of your family currently-- I'm asking

2          about-- let me start over.  I was doing a

3          poor job with the question.  Are any of you

4          or is any member of your family currently

5          employed by the United States Government?  If

6          you are or a member of your family is, would

7          you raise your hand?

8                    Prospective Juror 2.

9                    I'll get to you.  Just remind me.

10         Don't let me skip over you.

11                   Yes, Prospective Juror 2.

12                   PROSPECTIVE JUROR 2:  Yes, I'm

13         employed by the Department of Defense.  I

14         work over at Fort Riley.

15                   THE COURT:  And how long have you

16         been employed by the Department of Defense?

17                   PROSPECTIVE JUROR 2:  Since 2008.

18                   THE COURT:  And if I ask you what

19         you do for the DOD, will I be asking you to

20         reveal any state secrets?

21                   PROSPECTIVE JUROR 2:  No, Your

22         Honor.

23                   THE COURT:  Good.  Can I ask you

24         then?

25                   PROSPECTIVE JUROR 2:  I am a project

1          manager and IT specialist.

2                    THE COURT:  All right.  Prospective

3          Juror 2, that's obviously a completely

4          different government agency than the agency

5          that is involved here, the United States

6          Department of Justice.  So it's not a direct

7          relationship but it's one I want to ask

8          because the parties will want to know.  Would

9          you be able to decide this case based solely

10         on the evidence in the case and not be

11         affected by the fact that you work for the

12         United States Government?

13                   PROSPECTIVE JUROR 2:  Yes, Your

14         Honor.

15                   THE COURT:  All right.  Thank you

16         for letting me know that.

17                   I saw then another hand and I think

18         it was you, Prospective Juror 21?

19                   PROSPECTIVE JUROR 21:  Yes.

20                   THE COURT:  And what do you do for

21         the United-- or maybe it's a member of your

22         family.

23                   PROSPECTIVE JUROR 21:  Yes, sir.  My

24         husband is Air National Guard, so he drills

25         one weekend a month three times a year and

1      then Monday through Friday he has a federal

2      position.

3                  THE COURT:  So he is a member of the

4      Guard.  Is he also employed by them?

5                  PROSPECTIVE JUROR 21:  Yes.

6                  THE COURT:  And is it the Kansas

7      National Guard?

8                  PROSPECTIVE JUROR 21:  Kansas Air

9      National Guard.

10                 THE COURT:  Kansas Air National

11     Guard.  And he is out at Forbes?  Is that

12     where he is?

13                 PROSPECTIVE JUROR 21:  No, he's at

14     the Joint Forces Headquarters off of Topeka

15     Boulevard and Kansas Avenue.

16                 THE COURT:  And it's sort of a

17     similar situation to the one I talked about

18     with Prospective Juror 2, although one step

19     removed because it's your husband and not

20     you.  Given that relationship and in fairness

21     to the parties, do you believe you could put

22     that connection aside and decide the case

23     solely based on the evidence presented during

24     the trial?

25                 PROSPECTIVE JUROR 21:  Yes, sir.

1                    THE COURT:  All right.  Thank you

2         for letting me know.

3                    Prospective Juror 20.

4                    PROSPECTIVE JUROR 20:  Yes, Your

5         Honor.  Just for the record, I'm a retired

6         Chief Warrant Officer, United States Army.

7         Has nothing to do with the case, but just in

8         case-- just to let you know.

9                    THE COURT:  Thank you for letting me

10        know that.  And congratulations on your

11        retirement.  Thanks for your service.

12                    PROSPECTIVE JUROR 20:  Thank you,

13        Your Honor.

14                    THE COURT:  Does that present any

15        difficulty for you?  Might favor one party or

16        another?

17                    PROSPECTIVE JUROR 20:  No, Your

18        Honor.

19                    THE COURT:  All right.  Very well.

20        Thanks, Prospective Juror 20.

21                    I really want to get this name

22        right.  It's a personal challenge for me.

23        Give me the first part of it again.

24                    PROSPECTIVE JUROR 1:  XXXX.

25                    THE COURT:  XXXX.

1              PROSPECTIVE JUROR 1:  My husband is

2        a sergeant major in the National Guard.

3        Army.

4              THE COURT:  And I take it-- sort of

5        a similar question--

6              PROSPECTIVE JUROR 1:  Yes.

7              THE COURT:  --to Prospective Juror

8        21.

9              PROSPECTIVE JUROR 1:  Uh-huh.

10             THE COURT:  That won't bias you

11       against either of the parties in the case?

12             PROSPECTIVE JUROR 1:  No.

13             THE COURT:  All right.  Thank you,

14       Prospective Juror 1.

15             And then Prospective Juror 17.

16             PROSPECTIVE JUROR 17:  My husband

17       was retired military.  And then I was Shawnee

18       County election office.

19             THE COURT:  All right.  So you work

20       for the state government currently-- or the

21       county government currently.

22             PROSPECTIVE JUROR 17:  County.

23             THE COURT:  Your husband is retired

24       from the military?

25             PROSPECTIVE JUROR 17:  Yes.

54

1                    THE COURT:  And really the question

2          is what you've already heard.  Is that going

3          to present a problem for you?

4                    PROSPECTIVE JUROR 17:  No.

5                    THE COURT:  Will you favor one party

6          or another because of those histories?

7                    PROSPECTIVE JUROR 17:  I will not.

8                    THE COURT:  All right.  Thank you,

9          Prospective Juror 17.

10                   And then I thought I saw one more

11         hand and maybe-- I did see one more hand.

12         Prospective Juror 16.

13                   PROSPECTIVE JUROR 16:  Yes, sir.

14         I'm employed as a federal technician with the

15         National Guard here in town, full time.

16                   THE COURT:  And how long have you

17         worked in that position?

18                   PROSPECTIVE JUROR 16:  About 40

19         years.

20                   THE COURT:  And this is obviously a

21         different-- that agency is not involved in

22         this case in any way.

23                   PROSPECTIVE JUROR 16:  That's true,

24         sir.

25                   THE COURT:  Does that connection

1          concern you in terms of keeping you from

2          deciding the case based solely on the

3          evidence as presented in this courtroom?

4                    PROSPECTIVE JUROR 16:  No, Your

5          Honor, I don't believe that will be a

6          problem.

7                    THE COURT:  Thank you, Prospective

8          Juror 16.

9                    PROSPECTIVE JUROR 16:  Thank you,

10         sir.

11                   THE COURT:  Did I overlook any

12         hands?

13                   All right.  Seeing no other hands, a

14         slightly different question, and I think this

15         one is probably unlikely but let me make

16         sure.  As you heard, Mr. Kearn, the defendant

17         in the case, has his own business.  Have any

18         of you had any business dealing with that

19         company, All Service Heating & Cooling, or

20         have any of you or a member of your immediate

21         family been employed by Mr. Kearn's company,

22         All Service Heating & Cooling?  If you have,

23         please raise your hand.

24                   Seeing no hands, let me just ask the

25         one variation of that question I didn't ask.

1          To your knowledge, has any member of the

2     panel's immediate family been-- had any

3     business dealings with All Service Heating &

4     Cooling?

5               All right.  Seeing no hands, let me

6     ask a question that's useful for the lawyers

7     to know.  Before you got here today did any

8     of you know each other?  So is there someone

9     else sitting three chairs down or two rows

10    back that you saw this morning and said I've

11    met you or look who's here?

12              Prospective Juror 21, who do you

13    know?

14              PROSPECTIVE JUROR 21:  This lovely

15    lady right here.  She's actually the

16    secretary at my daughter's school.

17              THE COURT:  So Prospective Juror 21

18    and Prospective Juror 27, Prospective Juror

19    27 serves as the secretary where your

20    daughter attends school?

21              PROSPECTIVE JUROR 21:  Uh-huh.

22              THE COURT:  And really the reason

23    that attorneys would want to know this is if

24    there was a relationship between the two

25    people who knew each other that would inhibit

1          or prevent each person or either person from

2          using their individual judgment as a juror in

3          this case.  In other words, are the two

4          people so closely connected that they're

5          really not two jurors, they're really one

6          juror in two different human forms.  Is your

7          relationship with Prospective Juror 27

8          anything like that?

9                    PROSPECTIVE JUROR 21:  No.

10                   THE COURT:  All right.  Thank you

11         for letting me know.

12                   And, Prospective Juror 27, in part

13         because I know I'm going to get your name

14         right but in part because I want to follow

15         up, would it present any difficulty for you

16         to exercise your individual judgment as a

17         juror given that you know Prospective Juror

18         21 at least somewhat before you got here

19         today.

20                   PROSPECTIVE JUROR 27:  No.

21                   THE COURT:  It would not?

22                   PROSPECTIVE JUROR 27:  No, it would

23         not.

24                   THE COURT:  Thank you very much.

25                   I think I saw another hand.

58

1           Prospective Juror 31?

2                     PROSPECTIVE JUROR 31:  I know a lady

3           in the back.

4                     THE COURT:  You know one of the

5           people that's in the back that has not been

6           called?

7                     PROSPECTIVE JUROR 31:  Right.

8                     THE COURT:  Well, I don't think I

9           need to go into that, but if we swap out and

10          that person comes forward-- tell me who it is

11          so I'll make a note.

12                    PROSPECTIVE JUROR 31:  Prospective

13          Juror 40.

14                    THE COURT:  What's the last name?

15                    PROSPECTIVE JUROR 31:  XXXX.

16                    THE COURT:  We'll come back to that

17          if she is charged to fill one of the chairs

18          in the jury panel.

19                    Anybody else that I-- yes, I thought

20          there was another one.  And you are

21          Prospective Juror 23, I believe.

22                    PROSPECTIVE JUROR 23:  Yes.

23                    THE COURT:  Yes, Prospective Juror

24          23, who do you know?

25                    PROSPECTIVE JUROR 23:  I know

1          Prospective Juror 37 in the back.

2                    THE COURT:  Okay.  You know a

3          gentleman that's in the back and it's

4          Prospective Juror 37?

5                    PROSPECTIVE JUROR 23:  Yes.

6                    THE COURT:  Same thing I said with

7          Prospective Juror 31.  I don't think I need

8          to go into that at this time.  But if he

9          comes up to one of the chairs, then I want to

10         talk with you about it and with him.

11                   All right.  And you are Prospective

12         Juror 28, I believe.

13                   PROSPECTIVE JUROR 28:  Yes, sir.

14                   THE COURT:  Prospective Juror 28,

15         who do you know?

16                   PROSPECTIVE JUROR 28:  Prospective

17         Juror 19.

18                   THE COURT:  You and Prospective

19         Juror 19 know each other.  How do you know

20         Prospective Juror 19?

21                   PROSPECTIVE JUROR 28:  We both live

22         in Junction City.  We grew up in Junction

23         City.

24                   THE COURT:  Okay.  So you're both

25         from out there.  So you've known each other

1          how many years?

2                    PROSPECTIVE JUROR 28:  Probably 30

3          years.

4                    THE COURT:  And you now know the

5          reason that judges ask this question and

6          lawyers care about it.  They want to know if

7          the connection between two jurors is so

8          strong that it would inhibit or interfere

9          with their ability to exercise individual

10         judgment.  Is that going to be a problem for

11         you, Prospective Juror 28?

12                   PROSPECTIVE JUROR 28:  No, sir.

13                   THE COURT:  What about you,

14         Prospective Juror 19?  Now knowing that

15         Prospective Juror 28 knows things about you

16         from 30 years back, is it going to be in any

17         way difficult for you to exercise your

18         individual judgment as a juror if you're

19         selected for this jury?

20                   PROSPECTIVE JUROR 19:  No.  No, Your

21         Honor.

22                   THE COURT:  All right.  Thank you

23         both very much.

24                   Anyone else that I've overlooked?

25         And you are Prospective Juror 18?

1              PROSPECTIVE JUROR 18:  Yes.  I just

2      know somebody in the back also.

3              THE COURT:  All right.  I'll make a

4      note.  Who is that?

5              PROSPECTIVE JUROR 18:  Prospective

6      Juror 43.

7              THE COURT:  All right.  So if

8      Prospective Juror 43 comes up to fill one of

9      the chairs, you start waving your hand madly

10     and remind me that I need to go into that,

11     okay?

12             So have I seen all the hands?  Did I

13     overlook anybody?

14             All right.  Seeing no more hands,

15     let me tell you a little bit about the

16     evidence in the case.  Each party has told

17     the Court that they're going to call a number

18     of witnesses.  I want to ask them to read the

19     names of the witnesses they plan to call and

20     then I'm going to ask you to raise your hand

21     if you or a member of your immediate family,

22     so far as you know, are acquainted with any

23     of those witnesses.

24             So I snuck up on you, Ms. Kenney,

25     but could you please read the names of the

1          witnesses that the government plans to call

2          or may call in the case so that the jury

3          panel can determine whether they know any of

4          them?

5                    MS. KENNEY:  Yes, Your Honor.  The

6          government plans to call four witnesses and

7          probably will mention a couple of others.

8          The first is Detective Sergeant Stuart

9          Butler.  He's with the Queensland Police

10         Service.  The second is Special Agent Casner

11         with the Department of Homeland Security.

12         She's-- her duty office is in Kansas City,

13         Missouri.  The third is Patrick Ladd.  He's a

14         detective here in the Topeka Police

15         Department.  And then finally Special Agent

16         Craig Beebe, who is also with the Department

17         of Homeland Security and is currently

18         stationed in Chicago, Illinois.

19                    You may also hear the name Brian

20         Jones, who-- Special Agent Brian Jones is

21         currently with the United States Secret

22         Service and he's stationed in Virginia.

23                    THE COURT:  All right.  Thank you

24         very much for that.  I'll do this one at a

25         time.  Those five names that the prosecutor

1           in the case has mentioned and given you a

2           brief description about their personal

3           geography, is there any member of the panel

4           that is acquainted with any of those people

5           or to your knowledge a member of your

6           immediate family is acquainted with any of

7           those people?  If so, will you please raise

8           your hand?

9                   All right.  Seeing no hands,

10          Mr. Francis, I'll ask you to do the same, to

11          identify witnesses that the defendant will

12          call or might call in the trial.

13                   MR. FRANCIS:  We may call Jon Kearn,

14          but we've gone over that already, Judge.

15                   THE COURT:  Very well.

16                   MR. FRANCIS:  We may call a

17          gentleman by the name of Dreux Doty.

18          Mr. Doty is a computer forensics man who has

19          a business here in Topeka, Kansas.  We may

20          call Deputy Andy Mergen of the Shawnee County

21          Sheriff's Office.  We may call my client's

22          father, Ed Kearn.  Ed Kearn works for Capitol

23          Federal, the main office at 8th and Kansas--

24          at 7th and Kansas here in Topeka.  And

25          finally we may call a lawyer from Overland

64

1          Park, Kansas by the name of Brad Rhodd, I

2          believe at one time was on the Topeka Police

3          Department but now he practices law in

4          Overland Park, Kansas.

5                    THE COURT:  All right.  Very well.

6          Thank you, Mr. Francis.

7                    The defendant has given you five

8          names of people and that doesn't mean they'll

9          necessarily testify in the case but they

10         might.  And so the lawyers would like to know

11         if you have any connection or any knowledge

12         of any of those people.  Does any member of

13         the panel know any of the individuals that

14         Mr. Francis, as the defendant's lawyer, has

15         mentioned?

16                    Prospective Juror 38, in the back,

17         who do you know?

18                    PROSPECTIVE JUROR 38:  I worked with

19         Ed Kearn at Capitol Federal Savings.

20                    THE COURT:  And you say you worked

21         with him.  You used to work with him?

22                    PROSPECTIVE JUROR 38:  Yes.

23                    THE COURT:  How long ago was that?

24                    PROSPECTIVE JUROR 38:  Over 10 years

25         ago when I retired in 2001.

1          THE COURT:  And tell me about-- is

2     he-- did you work directly with him or is he

3     someone you knew?

4          PROSPECTIVE JUROR 38:  Directly with

5     him.  I was in charge of the computer room at

6     Capitol Federal Savings at the time and he

7     was the computer programmer for Capitol

8     Federal Savings.

9          THE COURT:  And I'm sorry, you told

10     me what you did.  What did you say about

11     Mr. Kearn?

12          PROSPECTIVE JUROR 38:  He was a

13     programmer for Capitol Federal Savings.

14     Computer programmer.

15          THE COURT:  Did he report to you?

16          PROSPECTIVE JUROR 38:  No.  No.

17          THE COURT:  Were you in a similar

18     job?

19          PROSPECTIVE JUROR 38:  We were in

20     the information systems department.  He was a

21     programmer; I was in computer operations.

22          THE COURT:  And about how many

23     people were there in that department with the

24     two of you?

25          PROSPECTIVE JUROR 38:  Probably 20

66

1              to 30 of us at that time.  But I was only in

2        charge of the first shifts on this computer.

3                   THE COURT:  Did he work a different

4        shift?

5                   PROSPECTIVE JUROR 38:  He worked day

6        shift; I worked all three.

7                   THE COURT:  I see.  When did you

8        sleep?

9                   PROSPECTIVE JUROR 38:  I didn't.

10                   THE COURT:  Well, I'm glad--

11                   PROSPECTIVE JUROR 38:  Plenty of

12        phone calls.

13                   THE COURT:  You've earned your

14        retirement then.  So did you-- I'm trying to

15        understand how well you knew Mr. Kearn.

16                   PROSPECTIVE JUROR 38:  Business

17        relationship mainly.  Not personal.

18                   THE COURT:  It wasn't something

19        where you guys went to lunch together all the

20        time?

21                   PROSPECTIVE JUROR 38:  No.

22                   THE COURT:  Did you ever, to your

23        knowledge, socialize with Mr. Kearn?

24                   PROSPECTIVE JUROR 38:  At the

25        Capitol Federal functions, yes, sir.

1                    THE COURT:  So like a reception for

2          a retiring employee or the company picnic?

3                    PROSPECTIVE JUROR 38:  Correct.

4                    THE COURT:  But that would be the

5          only social setting you knew him in?

6                    PROSPECTIVE JUROR 38:  Right.

7                    THE COURT:  And I'm trying to--

8          because I think the lawyers may want to ask

9          you questions about this, really they're

10         interested in your best and most honest

11         judgment.  Knowing that you knew the

12         defendant's father from work but you did not

13         have I think what you would call a social

14         relationship with him, it was a business

15         relationship -- is that fair --

16                   PROSPECTIVE JUROR 38:  That is

17         correct, sir.

18                   THE COURT:  --would that, in your

19         best judgment, interfere with your ability to

20         make a judgment about the case based solely

21         on the evidence presented in the courtroom?

22                   PROSPECTIVE JUROR 38:  No, sir.

23                   THE COURT:  All right.  Thank you

24         very much for letting me know that.

25                   Is there anyone else who knew any of

1          the witnesses that Mr. Francis identified?

2          And let me just give you the names again.

3          With your help, it was Mr. Kearn; Mr. Doty;

4          Andy Mergen; Ed Kearn, the defendant's

5          father; and Brad Rhodd.  Those are the names?

6                    MR. FRANCIS:  Yes, they are.

7                    THE COURT:  And, Prospective Juror

8          23, do you think you know somebody or a

9          member of your family knows someone on that

10         list?

11                   PROSPECTIVE JUROR 23:  Yes, Dreux

12         Doty.  He is our IT person at the place I

13         work at now for the past two to three years,

14         I believe.

15                   THE COURT:  And where is it you

16         work?

17                   PROSPECTIVE JUROR 23:  Most Pure

18         Heart of Mary Church and School.

19                   THE COURT:  And Mr. Doty comes in

20         and works on the computers, or is he an

21         employee at the school?

22                   PROSPECTIVE JUROR 23:  No, he comes

23         when we call him.  If we have a problem,

24         he'll come and fix the issue with our

25         network.

1                THE COURT:  I see.  And so how often

2       would he be in your school?

3                PROSPECTIVE JUROR 23:  Only when we

4       call him.  He was recently there last week or

5       the week before.  We had a problem with our

6       network and he changed something out.  That's

7       the last time I've seen him.

8                THE COURT:  All right.  And give us

9       a sense of how long it was before that that

10      you saw Mr. Doty.

11               PROSPECTIVE JUROR 23:  Oh, I haven't

12      seen him.  I mean--

13               THE COURT:  It had been quite a

14      while?

15               PROSPECTIVE JUROR 23:  Yeah.  It

16      would probably have been, I don't know, three

17      or four months maybe when we call him.  My

18      son has borrowed equipment from him because

19      he is a DJ.  I just want to put that out

20      there to be honest.  But I don't have a

21      relationship with him outside of work.

22               THE COURT:  And so the situation

23      is-- let's talk about these kind of in

24      separate installments.  Mr. Doty either-- is

25      it his business or is he employed by the

1          business?

2                    PROSPECTIVE JUROR 23:  It's his.

3          He's a contractor with us.  He's at D & S

4          Solutions.  I think that's what it's called.

5                    THE COURT:  Mr. Doty's company is a

6          vendor that--

7                    PROSPECTIVE JUROR 23:  Yes.

8                    THE COURT:  --sells expertise and

9          services--

10                   PROSPECTIVE JUROR 23:  Yes.

11                   THE COURT:  --to your employer?

12                   PROSPECTIVE JUROR 23:  Yes.

13                   THE COURT:  And so from time to time

14         he will come in and fix things that need

15         fixing or upgrading them?

16                   PROSPECTIVE JUROR 23:  Right.

17                   THE COURT:  Who is it at the school

18         that actually decides we need to call in

19         Mr. Doty's company?

20                   PROSPECTIVE JUROR 23:  Myself and

21         the administrator.  And if I'm not there or

22         she's not there, then one of the other ladies

23         will call him.  One of us is usually the

24         ones--

25                   THE COURT:  And--

1                PROSPECTIVE JUROR 23:  --that reach

2        out.

3                THE COURT:  I'm sorry, I interrupted

4        you.

5                PROSPECTIVE JUROR 23:  No, that's

6        okay.

7                THE COURT:  Are any-- do you have

8        any-- I'm going to talk about your son in

9        just a second.  Is your-- do you have a

10       social friendship, you and your family, with

11       Mr. Doty?

12               PROSPECTIVE JUROR 23:  No.

13               THE COURT:  It's purely a business

14       relationship?

15               PROSPECTIVE JUROR 23:  Business.  I

16       am friends with him on Facebook.  So I want

17       to make sure that's out there, too.

18               THE COURT:  Thank you for telling

19       us.  And how long has Mr. Doty or his company

20       been the vendor for your school?

21               PROSPECTIVE JUROR 23:  Probably two

22       or three years, I think.

23               THE COURT:  Now tell me about this

24       situation, your son's DJ work you referenced.

25               PROSPECTIVE JUROR 23:  Oh, he

```
 1              borrowed the equipment from him a couple of
 2              times and he paid him to use it.  He needed
 3              it for something, a gig, that my son was
 4              doing and my son knew him.
 5                        THE COURT:  I see.
 6                        PROSPECTIVE JUROR 23:  Found out
 7              that he had equipment and so he paid for him
 8              to use it.
 9                        THE COURT:  So your son in effect
10              rented equipment--
11                        PROSPECTIVE JUROR 23:  Yes.
12                        THE COURT:  --from Mr. Doty?
13                        PROSPECTIVE JUROR 23:  Uh-huh.
14                        THE COURT:  And you were--
15                        PROSPECTIVE JUROR 23:  About a year
16              ago.
17                        THE COURT:  It was a one-time thing?
18                        PROSPECTIVE JUROR 23:  He's done it
19              twice in the last three years.
20                        THE COURT:  And is it-- it was a
21              business relationship?
22                        PROSPECTIVE JUROR 23:  Yes.
23                        THE COURT:  He rented a widget and
24              your son used it in his business?
25                        PROSPECTIVE JUROR 23:  Yes.
```

1          THE COURT:  And is your-- to your

2     knowledge, does your son have a social

3     relationship with Mr. Doty, or is it purely

4     an occasional business relationship?

5          PROSPECTIVE JUROR 23:  Just

6     occasional relationship.  I know he hasn't

7     spoken to him since last year.  So--

8          THE COURT:  And sort of where the

9     rubber meets the road on this kind of thing

10    is the lawyers really want to know if that

11    history with Mr. Doty is going to interfere

12    with your ability to decide -- if you're

13    chosen to serve -- to decide the case solely

14    on the evidence that you would hear in this

15    courtroom.  Do you think it would?

16         PROSPECTIVE JUROR 23:  No, it would

17    not.

18         THE COURT:  All right.  Thank you

19    very much.

20         Have I overlooked anyone else?  Are

21    there any other hands who know any of the

22    witnesses that Mr. Francis has identified?

23         All right.  Let me ask a question on

24    a completely different subject.  Are there

25    any members of the panel that have ever

1          served before as a juror or as a member of a

2          grand jury?  So a jury like a grand jury-- or

3          a jury in this case that are-- might be a

4          civil or criminal case, might be in this

5          courthouse, it might be in a county

6          courthouse somewhere, it could be in a

7          completely different state.

8                    So if you have prior jury service or

9          you've served as a grand juror, I think the

10          parties would like to know about that service

11          and I'd like to hear about it.

12                    So let me start with the back row

13          because typically there are a lot of hands

14          that go up on this one.  So starting with

15          Prospective Juror 1's row.  Anybody who has

16          served as a juror or grand juror before?

17                    And you are?  We'll do it right to

18          left.

19                    Prospective Juror 2, tell the

20          lawyers about your prior jury service.

21                    PROSPECTIVE JUROR 2:  Yes, Your

22          Honor.  When I was in the military, I served

23          on a court martial in Germany.

24                    THE COURT:  And it was a criminal

25          matter?

1          PROSPECTIVE JUROR 2:  Yes, Your

2     Honor.

3          THE COURT:  And how long ago was

4     this?

5          PROSPECTIVE JUROR 2:  10, 15 years

6     ago.

7          THE COURT:  And a jury in a United

8     States Court of Military Justice, how many

9     jurors were there on the jury?

10          PROSPECTIVE JUROR 2:  I believe

11     there was 12 officers enlisted.

12          THE COURT:  And do you remember the

13     charge that you all were called upon to

14     decide?

15          PROSPECTIVE JUROR 2:  Excuse me,

16     Your Honor?

17          THE COURT:  What was the crime the

18     soldier was accused of committing?

19          PROSPECTIVE JUROR 2:  It was murder.

20          THE COURT:  A murder.  Did you all

21     deliberate and return a verdict?

22          PROSPECTIVE JUROR 2:  We did, Your

23     Honor.

24          THE COURT:  And what was that

25     verdict?

1          PROSPECTIVE JUROR 2:  Not guilty.

2          THE COURT:  All right.  Very well.

3     And that is your one experience as a juror

4     before today?

5          PROSPECTIVE JUROR 2:  Yes, Your

6     Honor.

7          THE COURT:  All right.  And you said

8     that was how long ago?

9          PROSPECTIVE JUROR 2:  Roughly 10 or

10    15 years ago.

11         THE COURT:  All right.  Thank you,

12    sir.

13         Continuing down Prospective Juror

14    2's row, Prospective Juror 4, would you tell

15    us about your jury service before today?

16         PROSPECTIVE JUROR 4:  Well, it was

17    in the early 80s, probably '83, somewhere

18    around there.  I lived in Olathe and I was

19    summoned for jury duty and selected to serve

20    on the jury for a medical malpractice suit.

21    It lasted around two and a half weeks, I

22    believe.  And I honestly can't remember

23    whether it was federal or state or what it

24    was.  It's been so long ago.

25         THE COURT:  Was it in the courthouse

1          in Olathe?

2                    PROSPECTIVE JUROR 4:  It was, yes.

3                    THE COURT:  All right.  In all

4          likelihood, it was a state court courthouse

5          because there is a state courthouse in

6          Olathe.

7                    PROSPECTIVE JUROR 4:  Okay.

8                    THE COURT:  And you say it was a

9          medical malpractice civil lawsuit?

10                    PROSPECTIVE JUROR 4:  Yes.

11                    THE COURT:  Where some--

12                    PROSPECTIVE JUROR 4:  Well, I guess.

13          I don't remember.  It's been so long.

14                    THE COURT:  Was it a case where

15          somebody was asking for an award of money

16          damages?

17                    PROSPECTIVE JUROR 4:  Yes.

18                    THE COURT:  All right.  And did your

19          jury return a verdict?

20                    PROSPECTIVE JUROR 4:  Yes, we did.

21                    THE COURT:  And what was your

22          verdict?

23                    PROSPECTIVE JUROR 4:  It was a

24          guilty verdict.

25                    THE COURT:  All right.  And do you

1     remember the approximate amount of the award

2     you gave to the plaintiff?

3               PROSPECTIVE JUROR 4:  I think it was

4     one of the highest that was ever awarded in

5     the State of Kansas, and I don't remember for

6     sure the amount.  It was a malpractice suit

7     against Humana Hospital and the doctor

8     involved.

9               THE COURT:  All right.  Prospective

10    Juror 4, were you chosen to serve as the

11    foreperson or presiding juror in that case?

12              PROSPECTIVE JUROR 4:  No.

13              THE COURT:  All right.  Is that your

14    only jury service or experience before today?

15              PROSPECTIVE JUROR 4:  Yes.

16              THE COURT:  Thank you for letting us

17    know.

18              Prospective Juror 2, I neglected to

19    ask you.  I presume, but don't know, that a

20    jury in a Court of Military Justice chooses a

21    foreman, a foreperson, a presiding juror.  Do

22    they?

23              PROSPECTIVE JUROR 2:  They do, Your

24    Honor.

25              THE COURT:  Were you chosen in that

1          court?

2                    PROSPECTIVE JUROR 2:  I was not.

3                    THE COURT:  All right.  Thank you.

4                    All right.  Continuing on the back

5          row with you, Prospective Juror 5.  Can you

6          tell us about your jury service before today.

7                    PROSPECTIVE JUROR 5:  Yes.  I was

8          chosen an alternate on a jury trial about

9          four months ago in Jackson County, Kansas.

10         It was a rape, sodomy, and child endangerment

11         trial.  We were there for about a week and it

12         was a hung jury.

13                   THE COURT:  All right.  And you say

14         this was four months ago?

15                   PROSPECTIVE JUROR 5:  Uh-huh.

16                   THE COURT:  Were you chosen to serve

17         as the presiding juror on that jury?

18                   PROSPECTIVE JUROR 5:  No, I was an

19         alternate.

20                   THE COURT:  You were an alternate.

21         Of course you were not chosen.  Thank you.  I

22         should have known the answer to that myself.

23                   All right.  On the back row, anybody

24         else with prior jury service?

25                   All right.  Let's move down to-- oh,

1          I'm sorry, I overlooked you, Prospective

2     Juror 7.

3                    PROSPECTIVE JUROR 7:  Again.

4                    THE COURT:  Again.

5                    PROSPECTIVE JUROR 7:  It was a civil

6     case back in the 80s where I was chosen to

7     serve on a jury to award compensatory money

8     damages for a power line crossing a rancher's

9     land.

10                    THE COURT:  All right.  And you all

11     were called upon to determine the value of

12     that interest?

13                    PROSPECTIVE JUROR 7:  Yes, sir.

14                    THE COURT:  Do you remember where

15     this was?

16                    PROSPECTIVE JUROR 7:  I'm sorry?

17                    THE COURT:  Where was this?  What

18     courthouse?

19                    PROSPECTIVE JUROR 7:  In the State

20     of Kansas.

21                    THE COURT:  Was it here in Shawnee

22     County?

23                    PROSPECTIVE JUROR 7:  Yes, it was.

24                    THE COURT:  About how long did that

25     trial last?

1          PROSPECTIVE JUROR 7:  I'm sorry?

2          THE COURT:  About how long did that

3     trial last?

4          PROSPECTIVE JUROR 7:  Probably about

5     three days since all we had to decide was the

6     compensatory damages for that.

7          THE COURT:  The value of the

8     property interest?

9          PROSPECTIVE JUROR 7:  Correct.

10          THE COURT:  Do you remember the

11     amount-- approximate amount you awarded the

12     landowner?

13          PROSPECTIVE JUROR 7:  No.  It wasn't

14     that much.  It was under $100,000.

15          THE COURT:  And were you chosen as

16     the presiding juror in that case?

17          PROSPECTIVE JUROR 7:  No, sir.

18          THE COURT:  All right.  And is that

19     your only jury service before today?

20          PROSPECTIVE JUROR 7:  Yes, sir.

21          THE COURT:  Thank you.

22          Now I think we're to your row,

23     Prospective Juror 8.  Is there anybody on

24     that row that has prior service as a juror?

25     Prospective Juror 8, we'll start with you.

1              PROSPECTIVE JUROR 8:  Yeah, I served

2       on a jury trial in Abilene, Kansas.  That was

3       over 20 years ago.  It was a double homicide.

4       It got moved from Junction City to Abilene.

5       And I was an alternate.  It went for two and

6       a half weeks.

7              THE COURT:  And do you know what the

8       jury's verdict was?

9              PROSPECTIVE JUROR 8:  Yeah.  They

10      hung him.

11             THE COURT:  You mean they returned a

12      guilty verdict?

13             PROSPECTIVE JUROR 8:  Yeah.

14             THE COURT:  I thought that's what

15      you meant.

16             PROSPECTIVE JUROR 8:  Yeah.  Guilty,

17      right.  Sorry.

18             THE COURT:  All right.  And so you

19      were chosen and served as an alternate?

20             PROSPECTIVE JUROR 8:  Right.

21             THE COURT:  And you were never moved

22      into an active juror role?

23             PROSPECTIVE JUROR 8:  No.

24             THE COURT:  Thank you very much.  Is

25      that your only jury service?

1            PROSPECTIVE JUROR 8:  Yes.

2            THE COURT:  Continuing down your row

3       with Prospective Juror 10.

4            PROSPECTIVE JUROR 10:  Uh-huh.

5            THE COURT:  Yes, ma'am.  Will you

6       tell us about your prior jury service?

7            PROSPECTIVE JUROR 10:  I was on a

8       one-day jury in Lyon County, Emporia, Kansas.

9       It was for stealing-- it was somebody for--

10      was accused of stealing gas.  We said not

11      guilty.

12           THE COURT:  And were you chosen to

13      serve as the presiding juror in the case?

14           PROSPECTIVE JUROR 10:  No.

15           THE COURT:  Is that your only

16      experience before today?

17           PROSPECTIVE JUROR 10:  Yes.

18           THE COURT:  Thank you very much.

19           To your neighbor, Prospective Juror

20      11.

21           PROSPECTIVE JUROR 11:  Yes.  I

22      served on two juries in Lyon County also.

23      One was a criminal case involving arson and a

24      few other charges I don't remember.  I was

25      the foreperson of the jury, and the defendant

1          was found not guilty.

2                    THE COURT:  How long ago was this,

3          about?

4                    PROSPECTIVE JUROR 11:  20 plus years

5          ago.

6                    THE COURT:  Do you remember how long

7          the trial ran?

8                    PROSPECTIVE JUROR 11:  Roughly two

9          or three days.

10                   THE COURT:  All right.  So that's

11         one experience.  And then it sounded like you

12         had another.

13                   PROSPECTIVE JUROR 11:  Yes.  We had

14         a civil case where an insurance company was

15         disputing a claim by a plaintiff and then we

16         had to decide whether to pay the full amount

17         or a partial amount, and we paid a partial

18         amount of two to $3,000.

19                   THE COURT:  Were you the presiding

20         juror in that trial?

21                   PROSPECTIVE JUROR 11:  No, sir.

22                   THE COURT:  About how long did that

23         trial run?

24                   PROSPECTIVE JUROR 11:  Again, two or

25         three days.

1              THE COURT:  Okay.  Did you tell me

2       that already?

3              PROSPECTIVE JUROR 11:  No.

4              THE COURT:  Your specialty is two-

5       to three-day trials.

6              PROSPECTIVE JUROR 11:  Yes.

7              THE COURT:  All right.  I've got it.

8       Thank you, sir.  And by the way, Prospective

9       Juror 11, those two trials, those are your

10      prior only experience as a juror before

11      today?

12             PROSPECTIVE JUROR 11:  Correct.

13             THE COURT:  All right.  Anybody else

14      on that second row?

15             All right.  Let's move then to

16      Prospective Juror 15's row.  Anybody on that

17      row with experience as a juror?  Prospective

18      Juror 15.

19             PROSPECTIVE JUROR 15:  It was a

20      civil trial and I was a juror for Shawnee

21      County.  And it was an altercation between

22      two teenage girls that had a dispute at a

23      grocery store, calling names, you know, and I

24      served on that.

25             THE COURT:  But it was a civil case?

1              PROSPECTIVE JUROR 15:  Yeah.  Well,

2       yeah.  It went to trial and I was a juror.

3              THE COURT:  Were you chosen to serve

4       as the foreperson or presiding juror in the

5       trial?

6              PROSPECTIVE JUROR 15:  Yes.

7              THE COURT:  And do you remember

8       how-- what verdict did you all return?

9              PROSPECTIVE JUROR 15:  Guilty.

10             THE COURT:  So you award-- I'm

11      mixing terms on you here.  You think it was a

12      trial where the plaintiff was seeking money

13      damages from the defendant?

14             PROSPECTIVE JUROR 15:  I don't

15      remember about even what the-- if there was

16      any money awarded.  I mean, it was just an

17      altercation of name-calling and it was

18      probably about 10 years ago.

19             THE COURT:  And so it was a civil

20      case--

21             PROSPECTIVE JUROR 15:  Um-hum.

22             THE COURT:  --is that right?

23             PROSPECTIVE JUROR 15:  I believe so,

24      yes.

25             THE COURT:  And you found for the

1          plaintiff in the case?  That was your

2          verdict?

3                    PROSPECTIVE JUROR 15:  Yes.

4                    THE COURT:  But you don't remember

5          the amount, if any, you awarded?

6                    PROSPECTIVE JUROR 15:  No.

7                    THE COURT:  How long did that trial

8          last?

9                    PROSPECTIVE JUROR 15:  Probably

10         maybe day and a half.

11                   THE COURT:  Is that your only

12         experience before today as a juror?

13                   PROSPECTIVE JUROR 15:  Yes.

14                   THE COURT:  Thank you, Prospective

15         Juror 15.  Anyone else on Prospective Juror

16         15's row?

17                   Prospective Juror 16.

18                   PROSPECTIVE JUROR 16:  Yes, Your

19         Honor.  About three years ago in the Shawnee

20         County courthouse, a criminal matter, lasted

21         two days.  The defendant was found not

22         guilty.

23                   THE COURT:  What was the charge or

24         charges against him?

25                   PROSPECTIVE JUROR 16:  I believe it

1          was eluding the police.  He had been told to

2          stop and instead chose to run.

3                    THE COURT:  Were you chosen to serve

4          as the presiding juror or foreperson?

5                    PROSPECTIVE JUROR 16:  No, Your

6          Honor.

7                    THE COURT:  Is that your only prior

8          experience before today?

9                    PROSPECTIVE JUROR 16:  Yes.  Yes,

10         Your Honor.

11                   THE COURT:  Thank you.  Prospective

12         Juror 15, I think I neglected to ask you:

13         Were you chosen as the presiding juror in

14         that trial that you served?

15                   PROSPECTIVE JUROR 15:  Yes.

16                   THE COURT:  I did ask that and you

17         told me that already.  I now see it in my

18         notes.

19                   All right.  On Prospective Juror

20         15's row, anyone else who served as a juror

21         besides her and Prospective Juror 16?

22                   All right.  Then we move forward to

23         the row starting with Prospective Juror 22.

24         Anyone on that row with prior experience as a

25         juror?

1                    Okay.  Let me get to you.  I believe

2         you're Prospective Juror 26.

3                    PROSPECTIVE JUROR 26:  Yes.

4                    THE COURT:  Prospective Juror 26,

5         can you stand and tell us about your prior

6         service as a juror?

7                    PROSPECTIVE JUROR 26:  It was a

8         civil case in Manhattan, Kansas, about two or

9         three years ago.  Eminent domain.

10                    THE COURT:  And so were you called

11         upon to value a landowner's interest?

12                    PROSPECTIVE JUROR 26:  Yes.

13                    THE COURT:  And what was the nature

14         of the interest that was being taken?  Was it

15         power lines?  Was it a highway?

16                    PROSPECTIVE JUROR 26:  It was for a

17         highway.

18                    THE COURT:  Were you the presiding

19         juror in the case?

20                    PROSPECTIVE JUROR 26:  No.

21                    THE COURT:  How long did that trial

22         run?

23                    PROSPECTIVE JUROR 26:  Three days, I

24         think.

25                    THE COURT:  And do you remember the

Case 5:13-cr-40057-DDC   Document 143   Filed 05/31/16   Page 90 of 313

90

1          amount of the award?

2                    PROSPECTIVE JUROR 26:  No.

3                    THE COURT:  All right.  Any other

4          experience as a juror before that and today?

5                    PROSPECTIVE JUROR 26:  No, that's

6          it.

7                    THE COURT:  All right.  Thank you,

8          Prospective Juror 26.

9                    Prospective Juror 28, did you have

10         your hand-- oh, no, I skipped over

11         Prospective Juror 27.  Prospective Juror 27,

12         will you stand and tell us about your

13         experience, please?

14                    PROSPECTIVE JUROR 27:  It was about

15         20 years ago.  I was on a criminal trial for

16         murder and we convicted.

17                    THE COURT:  Where was this?

18                    PROSPECTIVE JUROR 27:  Shawnee

19         County.

20                    THE COURT:  Over in the state

21         courthouse?

22                    PROSPECTIVE JUROR 27:  Yes.

23                    THE COURT:  And how long did the

24         trial last?

25                    PROSPECTIVE JUROR 27:  A week.

1          THE COURT:  Were you the presiding

2     juror in the case?

3          PROSPECTIVE JUROR 27:  No.

4          THE COURT:  All right.  Any other

5     experience before today besides that?

6          PROSPECTIVE JUROR 27:  No.

7          THE COURT:  Thank you, Prospective

8     Juror 27.

9          Prospective Juror 28, now we're to

10    you.

11         PROSPECTIVE JUROR 28:  Yes, sir.  I

12    was on the Randall Sheridan murder case in

13    Geary County.

14         THE COURT:  Say it again.  I

15    couldn't hear you.

16         PROSPECTIVE JUROR 28:  On the

17    Randall Sheridan murder case in Geary County

18    in early to mid 1990s.

19         THE COURT:  I'm not-- at least from

20    that name, I'm not familiar with that murder

21    case.  Tell me just a little bit--

22         PROSPECTIVE JUROR 28:  It was a male

23    and female that were accused of the murder,

24    and we convicted them.

25         THE COURT:  So they were tried

1          together, the man and the woman?

2                    PROSPECTIVE JUROR 28:  Yes,

3          together.

4                    THE COURT:  And the jury convicted

5          both of them?

6                    PROSPECTIVE JUROR 28:  Yes, sir.

7                    THE COURT:  How long did that trial

8          last?

9                    PROSPECTIVE JUROR 28:  I think two

10         or three or four days.  I don't remember for

11         sure.

12                   THE COURT:  And you say the jury

13         returned a guilty verdict against both

14         defendants.  Were you the presiding juror?

15                   PROSPECTIVE JUROR 28:  No, sir.

16                   THE COURT:  All right.  Before today

17         any experience as a juror other than that

18         one?

19                   PROSPECTIVE JUROR 28:  Yeah, one.

20         But it was so long ago I don't remember other

21         than the one I just mentioned.

22                   THE COURT:  So the long-- the one a

23         long time ago, you're not even-- are you

24         sure-- was it a civil case or a criminal

25         case?

1              PROSPECTIVE JUROR 28:  No clue.

2              THE COURT:  Don't recall?

3              PROSPECTIVE JUROR 28:  No clue.

4              THE COURT:  Do you remember, was it

5       here in Kansas?

6              PROSPECTIVE JUROR 28:  It was in

7       Geary County.

8              THE COURT:  Okay.  So it was in the

9       same courthouse--

10             PROSPECTIVE JUROR 28:  Yes.

11             THE COURT:  --the Geary County

12      Courthouse?

13             PROSPECTIVE JUROR 28:  Yes, sir.

14             THE COURT:  And in terms of

15      details--

16             PROSPECTIVE JUROR 28:  All I can

17      tell you is what I already told you.  I don't

18      remember anything else.

19             THE COURT:  You know, sometimes

20      lawyers, even recovering lawyers, will keep

21      asking you even after you told them.  So I

22      apologize.  Thank you very much for that.

23             And then on the very front row, any

24      experience there-- prior experience before

25      today as a juror?

1              All right.  Very well.  I ask this

2       but it's easy to get lost in that question.

3       In the federal system, the federal court

4       system, and in some states grand juries are

5       used.  Have any of you been called upon to

6       serve as a grand juror before?

7              All right.  Seeing no hands, that

8       takes care of that subject.

9              I want to ask of the people that

10      have had experience as a juror before,

11      because I think this is something the lawyers

12      and the parties in the case would want to

13      know, so I ask it of all of you who have

14      stood and told me about your jury service.

15      Was there anything about that experience that

16      made you question the judicial system?  If

17      there is, I'd like to visit with you about

18      what that was.  And so in lieu of asking that

19      individually, I ask that of the whole group;

20      and if there is, I'd ask you to raise your

21      hand and we'll talk about that.

22              Yes, Prospective Juror 15.

23              PROSPECTIVE JUROR 15:  At-- toward

24      the end-- at the end of the trial each of the

25      jury had to stand up and give our first and

1    last name and our address.  And I was not

2    really comfortable with that because I felt

3    like the person was guilty, will they come

4    looking me up, that type of thing.  I was

5    very uncomfortable with that line of

6    questioning.

7              THE COURT:  All right.  Very well.

8    Thank you for telling me.  I will tell you

9    that we have-- and most courts these days

10    follow a very different practice.  And so

11    while we're talking to you by name and later

12    on I'll ask you generally to describe what

13    part of Kansas you live in, the parties will

14    not have your address and you will not be

15    asked that question at any time during this

16    trial.

17              PROSPECTIVE JUROR 15:  Good.

18              THE COURT:  Thank you for sharing

19    that with us.

20              Is there anyone else with that-- who

21    had a prior-- during their prior experience

22    as a juror who had-- some part of that made

23    them call into question the judicial system?

24              All right.  Very well.  I want to

25    really move to a kind of a three-part

1          question.  And what I think I'll do is I'm

2          going to put these together.  And if you

3          would raise your hand on any three of these

4          questions then I'm going to invite you

5          individually to come right over here and

6          we'll talk about it privately.  And the

7          lawyers will listen in because these are

8          questions that I think, in fairness to each

9          of you, deserve to be discussed in private,

10         but they are things that I think also the

11         lawyers are entitled to know about and the

12         parties, too.

13                  So here are the three questions.

14         And just keep them in mind and then I'll go

15         through much like I did on the jury service.

16         So the first question is:  Have any of you

17         been involved in a criminal case in any court

18         that involved you, a member of your immediate

19         family, or someone you consider a close

20         friend, either as a defendant, a witness, or

21         a victim?

22                  The second question is whether any

23         of you has any experience involving you, a

24         member of your family or a close friend that

25         is connected in any way to involvement with

1          child pornography?

2                    And then the third question is this:

3          Have any of you had some experience in your

4          life that in your judgment would make it

5          unusually difficult to sit as a juror in a

6          case involving charges like the ones that are

7          involved in this case?  And you'll remember

8          what I told you the case was about.  So it's

9          really a three-part question.

10                   First part-- and all of the

11         questions except the last one go to you, a

12         member of your immediate family or a close

13         personal friend.  So involved in a criminal

14         matter, whether it's as a defendant, a

15         witness, or a victim; had any involvement in

16         any way that involves an assertion of child

17         pornography; or, third, a personal

18         experience, even if it's unconnected to a

19         legal proceeding, that you think would make

20         it difficult to serve as a juror in a case

21         involving charges like the ones that are

22         involved in this case.

23                   So I'm just going to sort of work

24         one row at a time.  And if you have a "I

25         raise my hand on any three of those

1    subjects," then I'll see you over here, we'll

2    talk through those privately, and the lawyers

3    will participate in that conversation because

4    they'll want to know what that background is

5    and may have follow-up questions.

6              So with those three questions in

7    mind, I'll start with Prospective Juror 1's

8    row.  Is there any of you that would raise

9    your hand on any of those three questions?

10             All right.  Then, Prospective Juror

11   5, I'll ask you to come over and I'll ask the

12   lawyers to approach.  And when they get here

13   we're going to turn on the static machine.

14   It's a little bit rude because we turn it on

15   so you can't hear us, but it's a lot more

16   efficient than sending everyone out.  So

17   forgive us for turning on the machine, but we

18   do it in the kindest way possible.

19             (THEREUPON, a bench conference

20   was had out of the hearing of the prospective

21   jurors and the defendant).

22             THE COURT:  Now, this enables the

23   court reporter to hear us so we're going to

24   treat it a little bit like a microphone.  And

25   by the way, Mr. Francis, I'll invite you, if

1     Mr. Kearn wants to be present for these

2     conferences, I will permit him to be here.

3              MR. FRANCIS:  I don't think that's

4     necessary--

5              THE COURT:  Very well.

6              MR. FRANCIS:  --Judge.  And I think

7     maybe they'd feel more comfortable and--

8              THE COURT:  That's fine.

9              MR. FRANCIS:  --not have somebody

10    else up here.

11             THE COURT:  I understand.

12             MR. FRANCIS:  I don't think that

13    would be necessary at this time.  Thank you.

14             THE COURT:  All right.

15             So now-- you're Prospective Juror 5,

16    right?

17             PROSPECTIVE JUROR 5:  XXXX, yes.

18             THE COURT:  Tell us about which one

19    of those questions.

20             PROSPECTIVE JUROR 5:  Well, a little

21    over a year ago my son and his wife were

22    accused of child abuse on my grandson, and we

23    spent a year in and out of court with the SRS

24    and local police officers.  It was in

25    Leavenworth County in Kansas.  It came down

1          to a trial.  And they were found innocent of

2          it, but it was the most trying episode of

3          that.

4                    And then also just the fact that

5          four months ago I was-- sat as an alternate

6          on a rape/sodomy with children.  That was

7          extremely trying, even though I was an

8          alternate and didn't really have any say in

9          it.  So--

10                    THE COURT:  Well, let's take these

11          one at a time.  And I'll ask some questions

12          and I'll invite you all as counsel to ask any

13          follow-ups.  The experience involving your

14          child and daughter-in-law or son-in-law--

15                    PROSPECTIVE JUROR 5:  Yes.

16                    THE COURT:  --whichever it is, it's

17          a different kind of case than this one.

18                    PROSPECTIVE JUROR 5:  It is.

19                    THE COURT:  And I appreciate--

20          that's exactly what the question asked--

21                    PROSPECTIVE JUROR 5:  Yes.

22                    THE COURT:  --so I'm glad you told

23          me.  But isolating part of it, do you think

24          that experience would interfere with your

25          ability to serve as a juror in this case and

1          decide the case solely based on the evidence

2          that's presented in the courtroom?

3                    PROSPECTIVE JUROR 5:  No.

4                    THE COURT:  All right.

5                    PROSPECTIVE JUROR 5:  I don't think

6          so.

7                    THE COURT:  And then moving to your

8          recent jury service, I understand it's recent

9          and it's fresh in your mind.

10                   PROSPECTIVE JUROR 5:  Yeah, it is.

11                   THE COURT:  The charges here are

12         different.

13                   PROSPECTIVE JUROR 5:  Yes.

14                   THE COURT:  And--

15                   PROSPECTIVE JUROR 5:  Different but

16         somewhat the same with what was found and

17         presented in evidence and all.

18                   THE COURT:  And I guess-- you know,

19         this is-- I guess I'd say to you cases of

20         this kind, you know, need to be-- they have

21         to be decided by jurors.

22                   PROSPECTIVE JUROR 5:  Right.

23                   THE COURT:  And I'm just trying to

24         gauge your level of comfort serving.

25                   PROSPECTIVE JUROR 5:  Yes.  I-- I

1          would be fine to serve.  I-- I mean, I-- I

2          would be fine.  I just-- it's just difficult

3          to think about, you know, taking-- I mean,

4          that was-- I don't know, it was just a-- not

5          a good experience at all.

6                    THE COURT:  All right.

7                    PROSPECTIVE JUROR 5:  I almost put

8          my hand up when you asked about our court

9          system and the burden of the state and the

10         defense.  And in a rape case it's totally

11         different, you know, how they have to

12         have-- they didn't have to have a lot of

13         evidence.  They just had hearsay.  And so it

14         was kind of a tough one.  But, yes, I can

15         make a decision.  I'm a good decision-maker.

16                    THE COURT:  All right.  And you

17         can-- we don't find you in an emotionally

18         fragile state?

19                    PROSPECTIVE JUROR 5:  No, no.

20                    THE COURT:  That was really my

21         concern--

22                    PROSPECTIVE JUROR 5:  It's--

23                    THE COURT:  --about the second

24         experience.

25                    PROSPECTIVE JUROR 5:  --just

1            frustrating.

2                    THE COURT:  Ms. Kenney, do you have

3            questions you'd like to ask of Prospective

4            Juror 5?

5                    MS. KENNEY:  Just a couple.  And I'm

6            going to get close--

7                    MR. FRANCIS:  And I'm going to move

8            over here.  I can hear and you can talk.

9                    MS. KENNEY:  --so I don't get yelled

10           at.  You've had a lot of experience, and not

11           necessarily positive, dealing with law

12           enforcement.  Is that fair to say?

13                   PROSPECTIVE JUROR 5:  Yes.

14                   MS. KENNEY:  And I'm sorry, was that

15           here in Topeka?  I can't remember.

16                   PROSPECTIVE JUROR 5:  Leavenworth

17           County.

18                   MS. KENNEY:  Leavenworth County.

19           You did say that.

20                   PROSPECTIVE JUROR 5:  Bonner Springs

21           area.

22                   MS. KENNEY:  Was there anything

23           about the experience -- and I'm really

24           thinking more of the case involving your son

25           and daughter-in-law -- that just left a

1          really bad taste in your mouth with law

2          enforcement?

3                    PROSPECTIVE JUROR 5:  Yes,

4          absolutely.  There was an adoption in the

5          process and they gloated that they were able

6          to stop the adoption.

7                    MS. KENNEY:  Would that transfer--

8          because, as you heard, the witness-- there's

9          going to be a lot of law enforcement

10         witnesses in this case.  Would that bad taste

11         for those law enforcement officers translate

12         to just a general--

13                   PROSPECTIVE JUROR 5:  No, not if

14         they did their job-- or I felt they did their

15         job correctly, no.

16                   MS. KENNEY:  Okay.

17                   THE COURT:  Anything else?

18                   MS. KENNEY:  The only-- I guess the

19         only question is, do you have any concern

20         about being a fair and impartial juror in

21         this case?

22                   PROSPECTIVE JUROR 5:  No.

23                   MS. KENNEY:  Okay.

24                   PROSPECTIVE JUROR 5:  I don't.

25                   THE COURT:  Mr. Francis, do you have

1        questions?

2                    MR. FRANCIS:  Not in light of what's

3        been asked by the Court and by Ms. Kenney.

4        I-- she said she could be fair and impartial.

5                    THE COURT:  Thank you, Prospective

6        Juror 5.  I'll ask you to go back to your

7        seat.

8                    And if I can just visit with you all

9        a second about--

10                   (THEREUPON, Prospective Juror 5

11       returned to the jury box).

12                   THE COURT:  I didn't hear anything

13       that makes me think we need to excuse her.

14       If you feel differently, I'd like to know it.

15                   MR. FRANCIS:  I didn't hear

16       anything.

17                   MS. KENNEY:  I don't think there's a

18       cause to challenge, Your Honor.

19                   THE COURT:  All right.  That's my

20       take as well.  Thank you very much.

21                   (THEREUPON, the following

22       proceedings were had in the presence and

23       hearing of the jury and the defendant).

24                   THE COURT:  All right.  So is the

25       static machine as pleasant as I promised?

1                    So we've been going for a while this

2          morning and I want to give you all a chance

3          to stretch your legs and the court reporter

4          time to stretch her hands and relax.  So

5          we're going to take a recess.  You need--

6          during this recess when you are finished

7          getting a drink of water and so forth, you

8          need to return to the room where you reported

9          this morning.  I think it's, Ms. Garrett,

10         385?  385 down on the third floor.  And then

11         we'll come back as a group, including all of

12         you in the back.

13                    I do want to give you an instruction

14         that if you're chosen to serve in the case

15         you will hear over and over.  But it is an

16         important one.  Until the trial is completed

17         -- and obviously we really are just in the

18         very early stages -- you are not to talk

19         about this case with anyone.  Whether that be

20         members of your family, people involved in

21         the trial, or anyone else.  And that includes

22         your fellow prospective jurors.  So if anyone

23         approaches you to talk about the case or try

24         to talk to you about the case, please let

25         Ms. Garrett know immediately and she will let

1          me know.

2                    I don't know whether there will be

3          any coverage in the media about a trial like

4          this, but do not go looking for it and if you

5          see something that appears to be about the

6          case, do not read it, do not listen to it.

7          And remember that you must not talk about the

8          case with any person who's involved in the

9          trial, even if it's something that has

10         nothing to do with the trial.

11                   So seated at the counsel table in

12         this case are people who are involved in the

13         trial.  They are affable people and in a

14         normal setting if they pass you on the street

15         or in the hall, I suspect they would greet

16         you and say good morning.  They're not going

17         to do that in this setting because of this

18         instruction.  And don't think less of them.

19         But the simplest way is a complete separation

20         from anyone that's involved in the trial.

21                   If any of you needs to speak with me

22         about anything, you can simply give a note to

23         Ms. Garrett, the courtroom deputy, or to

24         Mr. Hinderks, the law clerk, and they will

25         let me know that there's an issue we need to

```
1          take up.
2                    I will repeat this in summary
3          fashion before every break in the trial.  But
4          it applies now even though the trial-- the
5          evidence in the trial has not yet started.
6                    So it's about a quarter till 11.
7          I'm going to ask you to try to be in room 385
8          by 11 o'clock and we'll be back up here
9          shortly after that.  I will tell you that the
10         rest rooms on this fourth floor -- you
11         probably already heard this -- are not
12         operational.  They're being upgraded, and so
13         you'll have to use the rest room facilities
14         on one of the other floors.
15                   So with that I will dismiss you and
16         let you all-- and ask you to regather in 385
17         at 11 o'clock.
18                         (THEREUPON, a recess was
19         taken).
20                         (THEREUPON, the following
21         proceedings were had in the presence and
22         hearing of the defendant).
23                   THE COURT:  Please be seated.  Are
24         we ready for the jury to come back in?
25                   All right.  We're on the record in
```

1          the presence of defendant and counsel, and

2          we'll ask the deputy clerk to return the jury

3          panel.

4                         (THEREUPON, the following

5          proceedings were had in the presence and

6          hearing of the prospective jurors and the

7          defendant).

8                         THE COURT:  All right.  We're

9          standing out of respect for you so we'll sit

10         when you sit.

11                        All right.  I hope you found your

12         way around the courthouse effectively.  And

13         so let me remind you of the three questions

14         that I had put to you before we took the

15         break and then I want to resume where we left

16         off.  And this is if you have-- if any of

17         these three questions, any one of them, would

18         lead you to raise your hand, then I want you

19         to raise it and we'll talk privately at the

20         bench with the noise machine on so that the

21         attorneys can participate in the

22         conversation.

23                        So the three questions are:  Have

24         any of you been involved in a criminal matter

25         in any court that involved yourself, a member

1          of your family, or a close personal friend?

2          And by involved I mean either as a defendant,

3          a witness in the case, or as a victim of the

4          crime.

5                    Second, has any member of the panel,

6          any of you, had any experience that involves

7          you, a member of your family, or a close

8          personal friend that is connected in any way

9          to alleged involvement with child

10          pornography?

11                   And then the third question is:  If

12          any of you has had some experience in your

13          life that would make it unusually difficult

14          for you to serve as a juror in a case

15          involving charges like the ones I told you

16          were involved in this case, then I would want

17          to hear from you about that, as would the

18          lawyers.

19                   So with those three questions I was

20          still moving along Prospective Juror 1's row

21          and I think I had gotten as far as

22          Prospective Juror 5.  Anybody else on the

23          back row that would raise their hand for any

24          of those three questions?

25                   All right.  Seeing no hands, then

1        I'll move down to Prospective Juror 8's row,

2   the second row of the jury box, and ask you

3   to raise your hand.  And so I'll just start

4   down on this end with you, Prospective

5   Juror 9.  If I can ask you please to approach

6   and counsel as well.  And we will make the

7   static available for you all to listen to.

8                    (THEREUPON, a bench conference

9   was had out of the hearing of the prospective

10  jurors and the defendant).

11                THE COURT:  All right.  So you are

12  Prospective Juror 9, correct?

13                PROSPECTIVE JUROR 9:  Correct.

14                THE COURT:  And so what I want you

15  to do is to talk toward this because that

16  enables our court reporter to hear.

17                PROSPECTIVE JUROR 9:  Okay.

18                THE COURT:  So which of those

19  questions?

20                PROSPECTIVE JUROR 9:  The first

21  question.

22                THE COURT:  All right.  So this is

23  the involvement either as a defendant or a

24  witness or a--

25                PROSPECTIVE JUROR 9:  Right.

1                    THE COURT:  --victim in a criminal

2          case?  Can you tell us the situation?

3                    PROSPECTIVE JUROR 9:  Oh, it was

4          about-- about 1995 and my ex-husband was

5          accused of misconduct-- sexual misconduct

6          with a minor.  And basically my part in that

7          was that I-- I went to Jefferson City,

8          Missouri, and was in the court-- it was a

9          very-- not like a regular courtroom type

10         hearing, but a closed hearing where I let

11         them-- expressed my concerns as far as my

12         children and-- and my belief in his

13         innocence.

14                   THE COURT:  Okay.  So you were

15         called as a witness on a case involving

16         allegations against your husband?

17                   PROSPECTIVE JUROR 9:  Right.

18                   THE COURT:  You say this has been

19         about 20 years ago?

20                   PROSPECTIVE JUROR 9:  It was 1995,

21         yes.

22                   THE COURT:  And I think the parties

23         and the lawyers in the case would like to

24         know how that case turned out.

25                   PROSPECTIVE JUROR 9:  Well, first of

1          all, it was my ex-- it's my ex-husband.

2                    THE COURT:  He's not your husband

3          any longer?

4                    PROSPECTIVE JUROR 9:  And--

5                    THE COURT:  He was your husband at

6          the time?

7                    PROSPECTIVE JUROR 9:  Yes.  And it

8          came out that he did have to sign up with

9          the-- the-- what do they call it, the list

10         where they-- where they put their name on

11         the list-- the sex offender list for 10

12         years.  But they could not prove that he

13         actually did what they were accusing him of.

14         So he-- he did not spend any time or have any

15         kind of jail time or probation or anything on

16         it.

17                   THE COURT:  Okay.  Let me see if I

18         am following.  Was this a criminal proceeding

19         or was it a juvenile court proceeding or--

20                   PROSPECTIVE JUROR 9:  I don't

21         honestly know.

22                   THE COURT:  Right.

23                   PROSPECTIVE JUROR 9:  I just-- you

24         know, like for my part in it was I just went

25         and expressed to them how I felt about the

1          situation, how he treated my kids.

2                    THE COURT:  Okay.

3                    PROSPECTIVE JUROR 9:  And then that

4          was the end of it.  And it was just that one

5          day that I went to Jefferson City and-- and

6          expressed my-- my concerns or things on it.

7                    THE COURT:  And, Prospective Juror

8          9, the claims that were made about your

9          husband's conduct, did it involve your

10         family's children or was it a claim that he

11         had done something inappropriate with some

12         other children?

13                   PROSPECTIVE JUROR 9:  It was his

14         previous stepdaughter.

15                   THE COURT:  Okay.  So it was a

16         stepdaughter--

17                   PROSPECTIVE JUROR 9:  It was his

18         wife's daughter.

19                   THE COURT:  --of his--

20                   PROSPECTIVE JUROR 9:  Yes.

21                   THE COURT:  --in a prior marriage?

22                   PROSPECTIVE JUROR 9:  Yes.

23                   THE COURT:  Okay.  And how old was

24         that stepdaughter at the time?

25                   PROSPECTIVE JUROR 9:  Approximately

1          12.

2                    THE COURT:  Okay.  And really where

3          the bottom line is in these questions -- and

4          I kind of like to get to that -- is in your

5          heart do you think that experience would

6          interfere with your ability to decide, if you

7          were chosen, to serve in this case?

8                    PROSPECTIVE JUROR 9:  No.  And so--

9                    THE COURT:  To decide this case

10         based solely on the evidence presented in

11         this courtroom during this trial.  That's the

12         real question.

13                    PROSPECTIVE JUROR 9:  Right.  I do

14         not feel that it would because simply until

15         you asked the question I had totally forgot

16         all about it.

17                    THE COURT:  Okay.  Can I hear from

18         you, Ms. Kenney, if you have follow-up

19         questions.

20                    MS. KENNEY:  I'm sorry, I have to

21         get close.

22                    THE COURT:  She needs to be talking

23         into this.

24                    MS. KENNEY:  I guess my only

25         follow-up question is is did the experience

1        with the -- whatever system it was -- did

2        that leave you with any negative opinion

3        about the system or law enforcement or any

4        lawyers that were involved?

5                    PROSPECTIVE JUROR 9:  Not at all.

6                    MS. KENNEY:  Okay.  Okay.

7                    THE COURT:  Mr. Francis, do you have

8        questions?

9                    MR. FRANCIS:  I have none in light

10       of what's been asked.

11                   THE COURT:  All right.  You may

12       return to your seat.  Thank you so much.

13                        (THEREUPON, Prospective Juror 9

14       returned to the jury box).

15                   THE COURT:  I think from what she

16       said that she is-- there's not a reason to

17       excuse her for cause.  Do you feel

18       differently?

19                   MS. KENNEY:  No, I agree.

20                   THE COURT:  Mr. Francis?

21                   MR. FRANCIS:  I agree, Judge.

22                   THE COURT:  Very well.  Thank you.

23                        (THEREUPON, the following

24       proceedings were had in the presence and

25       hearing of the prospective jurors and the

1      defendant).

2                  THE COURT:  All right.  So returning

3      to that second row that's headed on this end

4      by Prospective Juror 8, moving down I saw at

5      least one other hand and I think that was

6      you, Prospective Juror 11.  Can I ask you to

7      come up?

8                  (THEREUPON, a bench conference

9      was had out of the hearing of the prospective

10     jurors and the defendant).

11                 THE COURT:  Hi.

12                 PROSPECTIVE JUROR 11:  Hi.

13                 THE COURT:  So of the-- I would ask

14     you when you talk to talk sort of at this,

15     and that will allow the court reporter to

16     hear.

17                 PROSPECTIVE JUROR 11:  Okay.

18                 THE COURT:  Which of the three

19     questions was it that would have gotten you--

20                 PROSPECTIVE JUROR 11:  The first--

21                 THE COURT:  --to raise your hand?

22                 PROSPECTIVE JUROR 11:  --one.  My

23     son was charged with a DUI about four and a

24     half years ago.  Took a diversion.  I really

25     didn't have anything to do with it.  I've

1          also testified in a court case as a witness.

2                    THE COURT:  Was it a criminal case?

3                    PROSPECTIVE JUROR 11:  Yes.

4                    THE COURT:  What was the nature of

5          the crime?

6                    PROSPECTIVE JUROR 11:  It was

7          somebody stole a purse.  I'm a pharmacist.

8          They wanted to know what-- she said she had

9          medication in it.  Wanted to know what the

10         value was, the medicine.  And then I

11         testified one other time when I adopted my

12         daughter.  Judge Rudolph was the judge.

13                   THE COURT:  Okay.  All right.  Those

14         are all reasonably far apart from the kind of

15         case we have here.  So let me get to the

16         bottom of this.  Is there anything about any

17         of those--

18                   PROSPECTIVE JUROR 11:  No.

19                   THE COURT:  --experiences that you

20         think would make it hard for you to serve--

21                   PROSPECTIVE JUROR 11:  No.

22                   THE COURT:  --impartially and decide

23         this case based solely on what the evidence

24         is in this case?

25                   PROSPECTIVE JUROR 11:  No.

1           THE COURT:  Questions from the

2     government?

3           MS. KENNEY:  The only question I

4     would have is was there anything about your

5     experiences with the court system or with law

6     enforcement or the attorneys that left you

7     with a negative opinion of any of that?

8           PROSPECTIVE JUROR 11:  No.  I

9     thought they all did their job as what they

10    were required to do.

11          MS. KENNEY:  Okay.  Thank you.

12          THE COURT:  Mr. Francis?

13          MR. FRANCIS:  No questions, Judge.

14          THE COURT:  All right.  Thank you

15    very much.

16                (THEREUPON, Prospective Juror

17    11 returned to the jury box).

18          THE COURT:  I think it's evident he

19    is able to serve.  Does anybody feel

20    differently?

21          MR. FRANCIS:  No, Your Honor.

22          MS. KENNEY:  No, sir.

23          THE COURT:  All right.  Very well.

24                (THEREUPON, the following

25    proceedings were had in the presence and

1          hearing of the prospective jurors and the

2          defendant).

3                    THE COURT:  All right.  So

4          continuing with that second row, is there

5          anyone else who would have raised their hand

6          to those-- any of those three questions?

7                    All right.  Then we'll move to the

8          third row.  Prospective Juror 15, tell me how

9          I want to pronounce the name.

10                   PROSPECTIVE JUROR 15:  XXXX.

11                   THE COURT:  XXXX.  I picked two

12         choices, neither one was right.  Prospective

13         Juror 15's row.  Is there anybody on that row

14         who would have raised their hand to any of

15         those three questions?

16                   All right.  Prospective Juror 16, if

17         I can ask you to come over and we'll visit

18         briefly about it with the noise on.  By the

19         way, while you're waiting for these

20         conversations to take place, if it-- sitting

21         can get old.  If you want to stand and

22         stretch, you're free to do that.  Don't

23         wander off.

24                   (THEREUPON, a bench conference

25         was had out of the hearing of the prospective

1        jurors and the defendant).

2                THE COURT:  All right, Prospective

3        Juror 16, which of those questions was it?

4        Can I ask you to talk to the microphone.

5                PROSPECTIVE JUROR 16:  Yes.  The

6        first question.  I was a defendant back about

7        1974.  I had written a couple of bad checks

8        just out of high school.  Young, dumb kid.

9        Was taken to court.  Was allowed to pay

10       restitution, placed on diversion, and that

11       was the end of that process.

12               THE COURT:  All right.  You say that

13       was back in the mid 70s or so?

14               PROSPECTIVE JUROR 16:  Yes.  Early--

15       early 70s.

16               THE COURT:  Anything about that

17       experience that left you--

18               PROSPECTIVE JUROR 16:  Gave me a

19       great appreciation to not be in the court as

20       a defendant.

21               THE COURT:  All right.  Anything

22       that left you with, I guess, a bad taste

23       about law enforcement, the courts?

24               PROSPECTIVE JUROR 16:  No, sir.  No,

25       sir.

1          THE COURT:  All right.

2          PROSPECTIVE JUROR 16:  No, sir.

3          THE COURT:  And obviously very

4     different, I take it you feel-- let me ask

5     you, not lead you.  You feel like you could

6     serve as an impartial juror in this case and

7     decide it, if you're chosen to serve, solely

8     based on the evidence presented in this

9     courtroom?

10          PROSPECTIVE JUROR 16:  Yes, sir, I

11    could.

12          THE COURT:  Any questions from the

13    government?

14          MS. KENNEY:  No questions.

15          THE COURT:  Mr. Francis?

16          MR. FRANCIS:  No questions, Your

17    Honor.

18          THE COURT:  Thank you very much for

19    letting us know.

20              (THEREUPON, Prospective Juror

21    16 returned to the jury box).

22          THE COURT:  If somebody wants to

23    make a cause for him being excused for cause,

24    I'd like to hear it.

25          MR. FRANCIS:  I know of none.

1              MS. KENNEY:  It would not be me.

2              THE COURT:  Me either.  I think he's

3       fine.

4                   (THEREUPON, the following

5       proceedings were had in the presence and

6       hearing of the prospective jurors and the

7       defendant).

8              THE COURT:  All right.  Continuing

9       then down that third row.  Anyone else on

10      that row?

11             All right.  Then with Prospective

12      Juror 22's row, the front-- Prospective Juror

13      22, why don't we start with you.

14                   (THEREUPON, a bench conference

15      was had out of the hearing of the prospective

16      jurors and the defendant).

17             THE COURT:  Good morning.  How are

18      you?

19             PROSPECTIVE JUROR 22:  Fine.

20             THE COURT:  We're going to talk into

21      that--

22             PROSPECTIVE JUROR 22:  Okay.

23             THE COURT:  --so that the court

24      reporter can hear what we're saying.  So

25      which of the three questions or--

1            PROSPECTIVE JUROR 22:  My son, when

2      he was a juvenile, was involved with smashing

3      some mailboxes.

4            THE COURT:  All right.

5            PROSPECTIVE JUROR 22:  I-- you know,

6      it was a long time ago, but--

7            THE COURT:  How long ago was it?

8            PROSPECTIVE JUROR 22:  17 years ago.

9            THE COURT:  All right.  And

10     obviously a very different circumstance here.

11     But I think what the lawyers and the parties

12     would want to know is whether there was

13     anything about your connection to that case

14     that left you with a sour taste about law

15     enforcement, the court system--

16            PROSPECTIVE JUROR 22:  No.

17            THE COURT:  --the lawyers in the

18     job--

19            PROSPECTIVE JUROR 22:  No.

20            THE COURT:  --the witnesses in the

21     case?

22            PROSPECTIVE JUROR 22:  No.  It

23     didn't go to trial or anything.  I just felt

24     like, well, maybe I should say something.  I

25     don't know.

1           THE COURT:  And do you feel like you

2      could serve impartially in this case?

3           PROSPECTIVE JUROR 22:  Oh, sure.

4           THE COURT:  And make a decision, if

5      you're chosen to serve, based solely on the

6      evidence in the case?

7           PROSPECTIVE JUROR 22:  Absolutely.

8           THE COURT:  All right.  Any

9      questions from you all?

10          MR. FRANCIS:  No, sir.

11          MS. KENNEY:  No.

12          THE COURT:  All right.  Thank you

13     very much for letting us know, Prospective

14     Juror 22.

15               (THEREUPON, Prospective Juror

16     22 returned to the jury box).

17          THE COURT:  I obviously don't hear

18     anything in her that presents an issue for

19     cause.

20          MS. KENNEY:  No, Your Honor.  And if

21     the Court's not opposed, I saw some other

22     hands.  We were just going to stay up here.

23          THE COURT:  Yeah, yeah, that makes

24     sense to me.

25               (THEREUPON, the following

1          proceedings were had in the presence and

2          hearing of the prospective jurors and the

3          defendant).

4                    THE COURT:  All right.  Continuing

5          down that row.  And I see you, Prospective

6          Juror 26.

7                    Is there anyone else on that row?

8                    All right.  Why don't you come

9          forward, sir.

10                    (THEREUPON, a bench conference

11          was had out of the hearing of the prospective

12          jurors and the defendant).

13                    THE COURT:  Hi.  How are you?  I'm

14          going to ask you to talk into this because it

15          enables the court reporter to hear.  And so

16          tell us about which of the question or

17          questions.

18                    PROSPECTIVE JUROR 26:  The first

19          one.

20                    THE COURT:  Yes, sir.

21                    PROSPECTIVE JUROR 26:  My brother,

22          growing up, dealt with alcohol and depression

23          so he was going into the court system.

24                    THE COURT:  Okay.  Were these on

25          criminal cases?

1          PROSPECTIVE JUROR 26:  Yeah,

2     criminal cases.

3          THE COURT:  All right.  Were you

4     involved as a witness in any of them?

5          PROSPECTIVE JUROR 26:  No.

6          THE COURT:  Just a family member

7     who--

8          PROSPECTIVE JUROR 26:  Yeah, just a

9     family member.

10          THE COURT:  All right.  And give us

11     a feel for the range of kind of the

12     allegations or claims that were made against

13     him.

14          PROSPECTIVE JUROR 26:  I know at one

15     point he stole a pack of prescription forms.

16          THE COURT:  Okay.

17          PROSPECTIVE JUROR 26:  And then

18     another one was just doing, you know, odd

19     things.  Pouring sugar in people's gas

20     tanks--

21          THE COURT:  Okay.

22          PROSPECTIVE JUROR 26:  --that kind

23     of thing.  So--

24          THE COURT:  Anything about any of

25     those experiences, understanding that you

1          were the sibling in the story, you may not

2          have been involved directly-- were you

3          involved directly in any of--

4                    PROSPECTIVE JUROR 26:  No.

5                    THE COURT:  --the court proceedings?

6                    PROSPECTIVE JUROR 26:  No, I was

7          not.

8                    THE COURT:  Anything about it from

9          the vantage point that you had that left you

10         with a bad taste for the courts, for lawyers

11         who work in the court, for law enforcement?

12                   PROSPECTIVE JUROR 26:  No.

13                   THE COURT:  Is there anything about

14         that experience that you think would

15         interfere with your ability to decide this

16         case, if you're chosen, based solely on the

17         evidence that's presented?

18                   PROSPECTIVE JUROR 26:  No.

19                   THE COURT:  All right.  Thank you

20         very much for letting us know.

21                   (THEREUPON, Prospective Juror

22         26 returned to the jury box).

23                   THE COURT:  I don't hear any reason

24         for cause.

25                   MS. KENNEY:  No.

1               (THEREUPON, the following

2       proceedings were had in the presence and

3       hearing of the prospective jurors and the

4       defendant).

5               THE COURT:  All right.  The

6       remainder of that row, Prospective Juror 26's

7       row, any other hands that would come up for

8       any of those three questions?

9               And then we'll move to our short row

10      here of four chairs.

11              Prospective Juror 33, can I ask you

12      to approach, please?

13              (THEREUPON, a bench conference

14      was had out of the hearing of the prospective

15      jurors and the defendant).

16              THE COURT:  Good morning.

17              PROSPECTIVE JUROR 33:  Hi.

18              THE COURT:  And if you'll just talk

19      directly into that, it will allow the court

20      reporter to hear.

21              PROSPECTIVE JUROR 33:  The first

22      question.

23              THE COURT:  Okay.  About a criminal

24      proceeding?

25              PROSPECTIVE JUROR 33:  I was a

```
1              victim of domestic abuse and it went to Riley

2              County court.

3                        THE COURT:  Well, first of all, I'm

4              very sorry for that experience.  Secondly,

5              let me ask about how long ago that was.

6                        PROSPECTIVE JUROR 33:  2002.

7                        THE COURT:  And you were-- you were

8              the person that--

9                        PROSPECTIVE JUROR 33:  I was--

10                       THE COURT:  --was the victim?

11                       PROSPECTIVE JUROR 33:  --the victim,

12             uh-huh.

13                       THE COURT:  And how far into the

14             system did the case go?

15                       PROSPECTIVE JUROR 33:  He had to

16             serve jail time and he was on parole and

17             stuff like that.  So--

18                       THE COURT:  Okay.  And this was in

19             the early-- so 2002?

20                       PROSPECTIVE JUROR 33:  Uh-huh.

21                       THE COURT:  Yes?

22                       PROSPECTIVE JUROR 33:  Yes.  Sorry.

23                       THE COURT:  That's all right.

24                       PROSPECTIVE JUROR 33:  Summer of

25             2002.
```

131

1              THE COURT:  Were you actually called

2         to testify?

3              PROSPECTIVE JUROR 33:  I wasn't, no.

4         He just was on the stand and stuff but I

5         wasn't called.  I was just sat in the back.

6         So-- but I wasn't on the stand or anything.

7         But I was the victim.

8              THE COURT:  Okay.  Did you come away

9         from that experience with a bad feeling or a

10         sour taste maybe for the court system, for

11         law enforcement, for any of the lawyers that

12         were involved in the case?  Anything like

13         that?

14              PROSPECTIVE JUROR 33:  Wow.  They

15         listened to what I wanted to happen and

16         they-- they abided by it.  But in the end he

17         did commit suicide and-- I don't-- I don't

18         know.  I mean, I wasn't disappointed.  I

19         think they handled it the way they should

20         have.  I think maybe they could have done

21         something a little different.  Instead of

22         putting him in jail they could have got him

23         other help.  But they didn't and so it

24         resulted in what it did.

25              THE COURT:  Okay.  It's obvious that

1          that was a difficult experience.

2                    PROSPECTIVE JUROR 33:  Very

3          difficult.

4                    THE COURT:  I understand it's been

5          some time ago.  And this case is different

6          than that.

7                    PROSPECTIVE JUROR 33:  Way-- yeah.

8                    THE COURT:  Way different.

9                    PROSPECTIVE JUROR 33:  Way

10         different.

11                   THE COURT:  But nonetheless, I think

12         what really everybody wants to know is

13         whether in your heart you feel like if you're

14         chosen to serve as a juror can you decide

15         this case based on the evidence that's

16         presented here and the law that the Court

17         would give to you?

18                   PROSPECTIVE JUROR 33:  Yes.

19                   THE COURT:  And not be dragging

20         along--

21                   PROSPECTIVE JUROR 33:  My luggage.

22                   THE COURT:  --this luggage.

23                   PROSPECTIVE JUROR 33:  Yeah.

24                   THE COURT:  That luggage from that

25         experience into this case.

133

```
 1                    PROSPECTIVE JUROR 33:  Yeah, I can
 2        do a fair decision.
 3                    THE COURT:  All right.  You feel
 4        like you can do that--
 5                    PROSPECTIVE JUROR 33:  Yeah.
 6                    THE COURT:  --in an impartial
 7        fashion?
 8                    PROSPECTIVE JUROR 33:  Yes.
 9                    THE COURT:  Well, any questions from
10        you, Ms. Kenney?
11                    MS. KENNEY:  No.
12                    THE COURT:  Mr. Francis?
13                    MR. FRANCIS:  No.
14                    THE COURT:  All right.  Thank you
15        for letting us know.
16                    PROSPECTIVE JUROR 33:  Yeah.
17                    THE COURT:  I'm sorry to make you go
18        through that.
19                    PROSPECTIVE JUROR 33:  Oh, no, it's
20        okay.  I just had to be honest.
21                    THE COURT:  I appreciate it very
22        much.
23                        (THEREUPON, Prospective Juror
24        33 returned to the jury box).
25                    THE COURT:  Sad story, but I don't
```

1      think it creates a basis for a cause

2      challenge.

3                    MS. KENNEY:  No.

4                    MR. FRANCIS:  I don't either.

5                         (THEREUPON, the following

6      proceedings were had in the presence and

7      hearing of the prospective jurors and the

8      defendant).

9                    THE COURT:  All right.  So

10     continuing down Prospective Juror 33's row,

11     is there anyone else in that row who raised

12     their hand to any of the three questions?

13                    Prospective Juror 32.

14                    PROSPECTIVE JUROR 32:  Yes.

15                    THE COURT:  Can I ask you to come

16     forward?

17                         (THEREUPON, a bench conference

18     was had out of the hearing of the prospective

19     jurors and the defendant).

20                    THE COURT:  Good morning.

21                    PROSPECTIVE JUROR 32:  Morning.

22                    THE COURT:  So we're all going to

23     look at that when we talk.  And we don't mean

24     to be rude; we're just trying to make sure

25     the court reporter hears.

1          PROSPECTIVE JUROR 32:  That's fine.

2          THE COURT:  That's how she does it.

3          PROSPECTIVE JUROR 32:  That's fine.

4          THE COURT:  So you would have raised

5     your hand to one of the three questions?

6          PROSPECTIVE JUROR 32:  Just the

7     first one.

8          THE COURT:  And tell us about that

9     experience.

10         PROSPECTIVE JUROR 32:  I was-- I

11    was-- I pled guilty to a misdemeanor in a

12    federal court in Wichita because I knew

13    that-- well, I didn't know until they told

14    me, but I used my mother's VA benefits to pay

15    off her mortgage and do other things with it.

16    And, you know, I hold no animosity to anybody

17    except for maybe the funeral home.

18         THE COURT:  Not telling you--

19         PROSPECTIVE JUROR 32:  Not telling

20    me that I need to take care of that too and

21    not-- not just Social Security and all the

22    other retirement benefits that she got from

23    the federal government.  So I-- I-- I pled

24    guilty.

25         THE COURT:  To a misdemeanor?

136

1          PROSPECTIVE JUROR 32:  To a

2     misdemeanor.

3          THE COURT:  How long ago was this?

4          PROSPECTIVE JUROR 32:  Five years

5     ago.

6          THE COURT:  Okay.  And do you

7     remember what the misdemeanor crime was that

8     you pleaded guilty to?

9          PROSPECTIVE JUROR 32:  I cannot

10    remember.  I know it was theft.  Theft of

11    government property or theft of government

12    benefits.  I can't re-- honestly, I don't

13    remember the word.  But--

14         THE COURT:  And you've been very

15    candid about your feelings toward the funeral

16    home, that maybe they should have told you,

17    hey--

18         PROSPECTIVE JUROR 32:  Right.  Yeah,

19    I mean, seriously.

20         THE COURT:  But let's broaden the

21    question a little bit because obviously the

22    funeral home is not involved in this case.

23         PROSPECTIVE JUROR 32:  No.

24         THE COURT:  But there are law

25    enforcement officials that are involved and

1          so-- and lawyers and judges--

2                    PROSPECTIVE JUROR 32:  Yeah.

3                    THE COURT:  --and courts.  So I

4          think the lawyers on behalf of the parties

5          want to know do you come here with a bad

6          taste in your mouth toward any of the people

7          who are likely to be involved or related to

8          people who are involved in this case?

9                    PROSPECTIVE JUROR 32:  No, sir.

10         None at all.  None at all.

11                   THE COURT:  All right.

12                   PROSPECTIVE JUROR 32:  None at all.

13                   THE COURT:  And then the bottom-line

14         question--

15                   PROSPECTIVE JUROR 32:  Yes.

16                   THE COURT:  --if you're chosen to

17         serve, in your heart do you believe you could

18         serve as an impartial juror deciding the case

19         solely on the evidence in this case?

20                   PROSPECTIVE JUROR 32:  Basically on

21         the facts, yes, sir.  That's all.

22                   THE COURT:  Ms. Kenney, do you have

23         questions?

24                   MS. KENNEY:  I don't.

25                   THE COURT:  Mr. Francis?

1              MR. FRANCIS:  None.

2              THE COURT:  Thank you very much for

3       letting us know.

4              PROSPECTIVE JUROR 32:  Thank you.

5              (THEREUPON, Prospective Juror 32

6       returned to the jury box).

7              THE COURT:  And I would hear from

8       you if you had some argument, but I don't

9       believe there's a cause challenge.

10             MS. KENNEY:  Thank you.

11             (THEREUPON, the following

12      proceedings were had in the presence and

13      hearing of the prospective jurors and the

14      defendant).

15             THE COURT:  All right.  So we've

16      kind of gone from A to Z here, not literally,

17      but figuratively, and I want to make sure I

18      didn't skip over anybody.  Or I want to make

19      sure that no one, on reflection, thinks I

20      should have raised my hand now that I think

21      about it.

22             So the three questions one last

23      time:  Been involved in a criminal matter in

24      any court in the country that involved you, a

25      member of your family or a close friend in a

1           role either as a defendant, a victim in the

2           case or a witness?  Anybody I haven't talked

3           to have that experience in their life?

4                   All right.  Seeing no hands, let me

5           ask-- move to the second question.  Have any

6           of you had any experience involving you, any

7           member of your family or a close personal

8           friend that is connected in any way to any

9           allegations or charges of child pornography?

10          If you have, please raise your hand.  And if

11          I haven't talked to you already.

12                  All right.  Last, if any of you

13          believe you have some experience in your life

14          that would make it unusually difficult for

15          you to serve as a juror in a trial involving

16          the charges that I told you about that are

17          made in this case, I'd ask you to raise your

18          hand.

19                  And seeing no hands, to any of those

20          three questions, I will move on to new

21          subjects.

22                  I'm going to read a proposition to

23          you and ask if there is anyone who has

24          difficulty with it or thinks they could not

25          fit this bill.  If you're selected to sit on

1        this case, will you be able to render a

2        verdict solely on the evidence that's

3        presented at the trial in this courtroom and

4        on the law as I give it to you in my

5        instructions, disregarding any of the notions

6        or ideas or beliefs that you may have about

7        what the law is or what it should be based

8        upon your life's experience?  If there's

9        anyone who thinks that they would have

10       difficulty returning a verdict solely on the

11       evidence and the instructions as I give them

12       to you, please raise your hand at this time.

13              There may be evidence in this case

14       that's in the form of visual or demonstrative

15       charts or pictures or audio clips in this

16       case.  So I want to know if any of you have

17       any difficulty with your hearing or your

18       sight or any other medical challenge that

19       might interfere with your ability to see the

20       evidence and hear it and devote your full

21       attention to the trial?

22              If you have a situation like that, I

23       will want to visit with you.  And if you

24       wish, we can talk about it privately.  I will

25       tell you that there will be one of those--

1      you see the two monitors, they would be

2      rolled around and be at either end of the

3      jury box.  So you'd really just have to see

4      from kind of the middle of the jury box to

5      that screen at either end.  That's the way

6      that evidence would be displayed.

7               Is there anybody who thinks they

8      have a hearing or vision or other medical

9      challenge that would make it hard for them to

10     hear and evaluate the evidence?

11               Prospective Juror 28.

12               PROSPECTIVE JUROR 28:  I have

13     tinnitus, ringing in the ear constantly.

14               THE COURT:  All right.

15               PROSPECTIVE JUROR 28:  As long the

16     attorneys don't turn around and walk away

17     from me and speak, I can hear fine.

18               THE COURT:  And are you able-- have

19     you been able to hear me?

20               PROSPECTIVE JUROR 28:  Yes, sir,

21     just fine.

22               THE COURT:  All right.  When the

23     lawyers were talking to you doing the

24     introductions of themselves and the--

25               PROSPECTIVE JUROR 28:  Yes, sir.

1              THE COURT:  --people they're working

2       with, could you hear them?

3              PROSPECTIVE JUROR 28:  Yes, sir.

4              THE COURT:  All right.  Thank you

5       for letting us know.  Appreciate it.

6              Anyone else with any condition that

7       they think might interfere with their ability

8       to hear and to see the evidence?

9              All right.  I'm going to put up on

10      this screen a sheet that's just going to ask

11      you, when it comes up, and it's-- we just

12      simply want to hear from each one of you with

13      a little background about the city where you

14      currently reside.  That's all.  Not any

15      address identifying information.  What you do

16      for a living.  And if you're retired, what

17      you did before you retired.  A little bit

18      about your family, who they are, what their

19      education is, what your education is, and

20      what members of your family are doing in

21      their lives, whether they're employed or

22      whether they're students.

23              We'd like to hear where you went to

24      high school-- or to school rather, including

25      high school and any special training,

1          certifications, and degrees.  And then

2          something about what you like to do with your

3          spare time and your interests and your

4          hobbies.

5                    So those topics will be up there for

6          you to refer back to as you answer these

7          questions.  So, you know, Prospective Juror

8          1, you now know the drill.  Everything starts

9          with you.

10                   PROSPECTIVE JUROR 1:  Yeah, me.

11                   THE COURT:  So if I could ask you to

12         please stand so the court reporter can hear

13         you, and refer to those topics and just give

14         us a little personal information.

15                   PROSPECTIVE JUROR 1:  I live in

16         Manhattan, and I am an office manager for a

17         family pest control company.  My husband's in

18         the military.  He's a sergeant major in

19         Hiawatha, but he also has a civilian job in

20         Manhattan as well.  He has a-- two bachelor--

21         two master's degrees.  I started some

22         college.  I never finished it.  I went to

23         Manhattan High School.  Certified pest

24         controller here.  And I like to read and play

25         with animals, and I do like to gamble

1          occasionally, too.

2                    THE COURT:  It's legal in this

3          state.

4                    PROSPECTIVE JUROR 1:  That's about

5          it.

6                    THE COURT:  All right.  Thank you

7          very much.

8                    Prospective Juror 2.

9                    PROSPECTIVE JUROR 2:  I currently

10         reside in North Topeka.  I'm an IT specialist

11         in policy and plans for Fort Riley, Kansas.

12         Also retired from the military.  I'm

13         currently separated.  I have a bachelor's

14         degree in IT management.  And I went to

15         school at K-State and high school in Passaic

16         Valley, New Jersey.  Just pretty much like to

17         spend my time working around the house and

18         riding my motorcycle.

19                    THE COURT:  All right.  Thank you,

20         Prospective Juror 2.

21                    Prospective Juror 3.

22                    PROSPECTIVE JUROR 3:  I'm currently

23         living in Manhattan.  Grew up in Harrington,

24         small town.  I go to school right now at

25         K-State.  Ag business is what my major is.

1          Graduated from Harrington High School.  I

2     work at Mid Kansas Co-op right now.  My

3     parents-- my dad works for Cargill Cattle

4     Feeders.  He just buys cattle.  And my mom

5     works in Harrington.  She works at a co-op

6     there.

7               THE COURT:  A co-op?

8               PROSPECTIVE JUROR 3:  And that's

9     really about it.  I like to fish and hunt.

10              THE COURT:  Thank you, sir.

11              Prospective Juror 4.

12              PROSPECTIVE JUROR 4:  I currently

13    reside in Topeka.  I retired last October

14    from the Cotton-O'Neil Clinic business

15    office.  I was an account representative.  I

16    have been divorced for 16 years and I've not

17    remarried.  And I have four daughters.

18    They're all college graduates.  Oh, I went to

19    school-- graduated from high school in

20    Council Grove, Kansas and attended what was

21    then Kansas State Teachers' College in

22    Emporia.  My daughters are all college

23    graduates.  Two of them work in the insurance

24    industry.  One of them is a-- works for the

25    Purdue University communications department,

1         and the other is a hairstylist here in

2         Topeka.  And I like to garden, I like to

3         spend time with my grandchildren, and I read

4         a lot.

5                   THE COURT:  All right.  Thank you,

6         Prospective Juror 4.

7                   Prospective Juror 5.

8                   PROSPECTIVE JUROR 5:  I reside in

9         Hoyt, Kansas.  I am semiretired.  My husband

10        and I have a small building inspection

11        business so I travel with him on that.  My

12        job before I retired was director of

13        marketing in an insurance company.  I was an

14        insurance agent, licensed in several states.

15        I have a son and a daughter.  My daughter's

16        an RN.  My son is in computers.  He does

17        programming and tech.  I have eight

18        grandchildren.  So you know what part of my

19        interests are there.  I graduated from high

20        school in Chanute, Kansas.  Special training,

21        I, again, was an insurance agent so I had

22        several certificates there.  I like to read

23        and garden.

24                  THE COURT:  All right.

25                  Prospective Juror 6.

1          PROSPECTIVE JUROR 6:  I currently

2     live here in Topeka.  Been here all my life.

3     I work at District Court.  I've been there

4     for the last 10 years.  I'm married with four

5     children.  I went to school at Topeka High.

6     Graduated there in '89.  A lot of my time is

7     spent travelling.  I've got a son that's in

8     high school and we do a lot of travel with

9     basketball.  So we travel to different states

10    for different tournaments.

11          THE COURT:  Thank you, Prospective

12    Juror 6.

13          Prospective Juror 7.

14          PROSPECTIVE JUROR 7:  Yes.  I worked

15    at Capitol Federal Savings for 35 years.

16    Retired there in 2004.  Before that I worked

17    construction for 15 years.  Graduated 8th

18    grade, one-room schoolhouse.  Took my GED

19    test and passed it the first time through.

20    Two years of college and then went to Capitol

21    Federal.

22          THE COURT:  Where was the one-room

23    schoolhouse?

24          PROSPECTIVE JUROR 7:  It was in

25    Pleasant Ridge Schoolhouse in Wabaunsee

1          County.  Right on the Morris County line.

2                    THE COURT:  I think I interrupted

3          you.  I don't know that you got to your

4          interests and hobbies.

5                    PROSPECTIVE JUROR 7:  Hunting,

6          fishing, computers.  I was into computers

7          before Washburn even knew what they were.

8          And that's the reason why I got into Capitol

9          Federal Savings, because I started with

10         Santa Fe for two weeks and then I decided

11         that wasn't for me.

12                   THE COURT:  And how long were you at

13         Capitol Federal?

14                   PROSPECTIVE JUROR 7:  35 years, sir.

15                   THE COURT:  Thank you, Prospective

16         Juror 7.

17                   Prospective Juror 8.

18                   PROSPECTIVE JUROR 8:  I'm from the

19         little town of Hope.  400 people, now 399.  I

20         was a machinist for almost 40 years.  And

21         I've never been married.  And what I did, I

22         went to-- graduated from Hope High and then

23         went to Hutchinson Junior College and spent

24         one semester at MU, Missouri.  Majored in

25         forestry.

1              THE COURT:  And the name of the town

2       you referenced is Hope?

3              PROSPECTIVE JUROR 8:  Hope, yeah.

4              THE COURT:  Where is Hope?

5              PROSPECTIVE JUROR 8:  It's about 100

6       miles west of here, by Abilene and

7       Harrington.

8              THE COURT:  And your hobbies and

9       interests?

10             PROSPECTIVE JUROR 8:  I collect

11      coins and I go fishing sometimes and mainly

12      I'm hunting big bucks.

13             THE COURT:  All right.  Thank you,

14      Prospective Juror 8.

15             Prospective Juror 9.

16             PROSPECTIVE JUROR 9:  I currently

17      reside in Meriden, Kansas.  I am married.  I

18      actually have multiple careers.  I am a

19      facilities coordinator for Payless Shoe

20      Stores.  I also have a small karaoke DJ

21      business.  My husband is unemployed.  He

22      helps me a little bit with my karaoke DJ

23      business.  I have two adult children.  My

24      daughter is a stay-at-home mom.  Her and her

25      husband live in North Dakota, and he is a

1           supervisor for Exxon.  My son lives in-- just

2           south of New Orleans, and he is an offshore

3           sandblaster and painter.  I have three

4           grandsons that I don't get to see as often as

5           I would like.  I went to school in Southeast

6           Missouri.  Graduated with an associate's

7           degree from in office management.  And in my

8           spare time, which I have very little, I like

9           to spend time with my Boston terriers and we

10          have a little farm, what I call a mini farm.

11          We have a few cows and a few chickens.

12          That's the luxury.

13                    THE COURT:  All right.  Thank you,

14          Prospective Juror 9.

15                    Prospective Juror 10.

16                    PROSPECTIVE JUROR 10:  I live in

17          Emporia, Kansas.  I am currently the

18          department chair for health, physical

19          recreation and recreation at Emporia State

20          University.  I am a widow.  And after my

21          husband passed away I decided to adopt.  So I

22          adopted my first son, who now is 18 months;

23          but when we went to finalize his adoption

24          they said the birth mother was pregnant

25          again, so I have an 18-month-old and a

1          6-month-old.  But my husband was also a

2          business owner so I guess I am a business

3          owner also besides teaching.  I went to high

4          school in Olathe, Kansas.  Got my bachelor's

5          at Emporia State, got my doctorate at KU.

6          Spend my time-- well, before I added two

7          babies, I golfed, I gambled, I do watch the

8          Royals still.  But the babies keep me busy

9          right now.

10                    THE COURT:  And then you said your

11         husband had owned a business that you're an

12         owner of now.  What is that business?

13                    PROSPECTIVE JUROR 10:  Sporting

14         goods.

15                    THE COURT:  Thank you very much.

16                    Prospective Juror 11.

17                    PROSPECTIVE JUROR 11:  I live in

18         Emporia, Kansas.  Been a registered

19         pharmacist for 35 years.  Work at Wal-Mart.

20         My wife is a registered nurse that works at

21         the student health center at Emporia State.

22         Have three children.  Two girls that are both

23         registered nurses, one in New York, one in

24         Omaha.  She's semi-- or retired at home with

25         four children, our four grandchildren.  I

1          have a son who just got married and lives in

2          Seattle, helping put his wife through

3          graduate school at Seattle Pacific.

4          Graduated from McPherson High School, went to

5          JUCO and then went and got my bachelor of

6          science in pharmacy at KU.  Hobby, like to

7          travel, visit the children, grandchildren,

8          follow KU, read.

9                    THE COURT:  So were the McPherson

10         Bull Pups, did they win the state tournament

11         the year you were there in high school?

12                   PROSPECTIVE JUROR 11:  Three out of

13         four years.

14                   THE COURT:  I thought the odds were

15         pretty good they had.

16                   Prospective Juror 12.

17                   PROSPECTIVE JUROR 12:  I live in

18         Dwight.  And I am a teacher at Fort Riley.

19         And I have a husband who is a manager of a

20         car parts store in Manhattan.  I have a

21         master's in reading and literacy from

22         K-State.  I have two boys, one that will

23         graduate in a week and a half in information

24         technology and one who travels around

25         building, I believe, grain bins.  And a

1      stepdaughter who works in a vet place.

2              THE COURT:  And your hobbies and

3      interests, what do you do when you have spare

4      time?

5              PROSPECTIVE JUROR 12:  Reading,

6      walking, garden.

7              THE COURT:  Okay.  Thank you.

8              Prospective Juror 13.

9              PROSPECTIVE JUROR 13:  XXXX.  Told

10     me to remind you so I figured I would.

11             THE COURT:  I even wrote down and

12     just misread my writing.  So I did want you

13     to correct me, please.

14             PROSPECTIVE JUROR 13:  Currently

15     reside in Topeka, Kansas.  I am a substations

16     physical design engineer at Westar Energy.

17     My family, my mom and my dad, both just

18     graduated high school.  They've actually both

19     worked for the same company their entire

20     careers after they graduated high school.  My

21     mom is an administrative assistant at the

22     insurance department and my dad is a senior

23     sales manager at a plastics company here in

24     Topeka.  I graduated from Topeka High in

25     2007.  I graduated from KU in 2011 with a

1        bachelor's degree in electrical engineering.

2        And then as far as how I like to spend my

3        time, hunting, fishing, watching and playing

4        any and every sport.  Die-hard KU basketball

5        fan.  And that's about it.

6                THE COURT:  Thank you, Prospective

7        Juror 13.

8                Prospective Juror 14.

9                PROSPECTIVE JUROR 14.  Currently

10       reside in Strong City, Kansas.  Work for the

11       local government there, the county

12       government.  My husband is retired.  Spends

13       time at home with the dog.  And went to

14       Peabody High School, Wichita Business

15       College.  And we go fishing in Minnesota

16       whenever we get the chance.

17               THE COURT:  Thank you very much.

18               And so to you, Prospective Juror 15.

19               PROSPECTIVE JUROR 15:  XXXX.

20               THE COURT:  XXXX.

21               PROSPECTIVE JUROR 15:  I currently

22       live in Topeka.  I'm a widow.  I have three

23       children.  Two-- my two girls are nurses and

24       my son works for a distribution center.  I

25       went to school at North Dakota.  And I spend

155

1          my time with my seven grandchildren and

2          maintaining my home.

3                    THE COURT:  All right.  Thank you

4          very much.

5                    Prospective Juror 16.

6                    PROSPECTIVE JUROR 16:  Yes, sir.

7          Live here in Topeka.  I'm a transportation

8          specialist for the Department of Defense.  My

9          wife works for the state, what used to be

10         known as the SRS.  They keep changing their

11         name.  Oldest daughter teaches French in

12         South Carolina.  Youngest daughter is a

13         registered nurse at Stormont.  Bachelor's

14         degree from Pittsburg.  Some graduate work

15         from K-State.  I'm also a hazardous material

16         certifier, transportation of that type of

17         material.  When I have some spare time if

18         it's warm out I garden, and if it's not I do

19         some woodworking.

20                   THE COURT:  And Prospective Juror

21         16, your wife at-- the one that works at--

22         what is the modern equivalent of SRS?  What

23         is her line of work there?

24                   PROSPECTIVE JUROR 16:  She's

25         actually in food distribution.

1              THE COURT:  Thank you very much.

2              Prospective Juror 17.

3              PROSPECTIVE JUROR 17:  I live in

4     Berryton, Kansas in a little town outside of

5     Berryton.  And married and I have two grown

6     daughters and a couple of grandkids.  And I

7     work at the Shawnee County Election Office.

8     I've been there 10 years.  I'm the director

9     of voter services in charge of half of the

10    office.  And I grew up in Lansing, Iowa and I

11    went to school at North Iowa Area Community

12    College in Mason City, a two-year AS degree

13    in business.  And my husband is lieutenant

14    colonel, retired military.  He's currently

15    going to school to be a teacher.  And I like

16    to spend time with the grandkids and reading.

17             THE COURT:  Thank you very much,

18    Prospective Juror 17.

19             Prospective Juror 18.

20             PROSPECTIVE JUROR 18:  I currently

21    live here in Topeka.  I work for Blue Cross

22    and Blue Shield of Kansas in the IS

23    department.  I have a wife and four kids.  My

24    wife works at Federal Home Loan Bank in the

25    administration department.  I have, like I

1     say, four kids.  Three of them are in college

2     right now so I have no money.  My oldest

3     daughter is getting ready to graduate from

4     Emporia State.  I have a son at Washburn and

5     a daughter at Johnson County.  And then my

6     youngest is going to be a freshman.  I

7     graduated from the University of Nebraska at

8     Kearney, played baseball up there.  And my

9     free time, I enjoy the outdoors, hunting,

10    fishing, boating, those kinds of things.

11              THE COURT:  All right.  Thank you,

12    Prospective Juror 18.

13              Prospective Juror 19.

14              PROSPECTIVE JUROR 19:  I live in

15    Junction City.  I work at a-- been a

16    mechanic, car dealership service manager now.

17    I'm divorced.  My oldest son is in sales and

18    my daughter just got married and she's a

19    dental assistant.  And I do have a son that

20    passed away two years ago.  Went to school in

21    Chapman, high school.  Went to Salina Vo-Tech

22    years and years ago.  And what free time I

23    have I like to be on a boat.

24              THE COURT:  Prospective Juror 20.

25              PROSPECTIVE JUROR 20:  Yes, sir.  I

1    currently live here in Topeka, Kansas.  I'm a

2    homeowner.  I retired from the United States

3    Army, chief warrant officer for 20 years.

4    And then I worked 25 years as a technician,

5    hydraulics.  I have one son.  He's 43 years

6    old.  He's a graduate from Washburn and a

7    graduate from KU.  He's an aerospace

8    engineer.  And I'm a graduate from Central

9    Texas College in Killeen, Texas.  I'm

10   originally from Texas.  And I like to spend

11   my time helping the veterans with their

12   vehicles and whatever.

13              THE COURT:  Thank you, Prospective

14   Juror 20.

15              Prospective Juror 21.

16              PROSPECTIVE JUROR 21:  I currently

17   live here in Topeka, Kansas.  Right now I'm a

18   stay-at-home mom.  Prior to that I was an IT

19   project manager for an annuity company.  I'm

20   happily married, and my husband is prior

21   active duty Air Force and now he is a master

22   sergeant in the Kansas Air National Guard and

23   he is a aero technician.  He doesn't have any

24   degrees, but he is taking school through the

25   Air Force.  I went to Highland Park High

1      School here in Topeka and I did do one

2      semester at KU under an ROTC scholarship, but

3      I decided being in the military wasn't for me

4      so I married military instead.  And then I

5      did a-- I have a certification in veterinary

6      technology from Long Technical College in

7      Phoenix, Arizona.  And my kids, I have a

8      seven-year-old daughter and a

9      two-and-a-half-year-old son, and so taking

10     care of them and my family keeps me pretty

11     busy.  But we do like to camp during the

12     summer.  And I do volunteer at my daughter's

13     school a lot.  I'm really active in my

14     church.  And I love to write so I'm taking a

15     correspondence course to learn to write for

16     children.

17             THE COURT:  Thank you, Prospective

18     Juror 21.

19             Prospective Juror 22.

20             PROSPECTIVE JUROR 22:  My name is

21     XXXX XXXX.  I live in rural Jefferson County

22     outside of Meriden.  I'm a registered nurse.

23     I've been a registered nurse for a long time.

24     I work at Saints.  And I'm in charge of three

25     departments there.  My kids are grown and

160

1      have families of their own.  My daughter

2      graduated from KU and my son works in

3      construction.  And I like to travel in my

4      spare time and garden.  Work a lot of hours.

5              THE COURT:  Thank you, Prospective

6      Juror 22.

7              Prospective Juror 23.

8              PROSPECTIVE JUROR 23:  Hi.  I

9      currently reside in Topeka, Kansas.  I am

10     employed with Most Pure Heart of Mary Church

11     and School as a finance administrator.  My

12     husband is a pharmaceutical sales rep.  I

13     graduated from Emporia State University.  And

14     my husband did also.  I have four children.

15     My son attends Washburn and works part time

16     at McAlisters.  I have two daughters at

17     Topeka High and I have a daughter in

18     elementary school at St. Matthew.  And I like

19     to read and walk outside and teach a spinning

20     class.

21             THE COURT:  Thank you, Prospective

22     Juror 23.

23             Prospective Juror 24.

24             PROSPECTIVE JUROR 24:  I currently

25     reside in Holton.  Grew up here in Topeka.

1          Assistant store manager for Walgreen's for 16

2          years.  I've got-- I'm divorced.  I have five

3          children:  Four daughters and one son.  All

4          school age except the oldest one who just

5          went into college.  Went to Topeka West High

6          School.  My interests are woodworking and

7          fishing and canoeing.

8                    THE COURT:  Thank you, Prospective

9          Juror 24.

10                   Prospective Juror 25, am I saying it

11         correctly?

12                   PROSPECTIVE JUROR 25:  Pardon me?

13                   THE COURT:  XXXX is the right

14         pronunciation?

15                   PROSPECTIVE JUROR 25:  Yes.

16                   THE COURT:  Would you tell us a

17         little bit about yourself?

18                   PROSPECTIVE JUROR 25:  I'm from

19         Thailand and I meet my husband in the Army.

20         And then we stop in Junction City.  But he

21         retire.  And I have one son and I like to

22         bowling and shoot pool.

23                   THE COURT:  Okay.  All right.  Thank

24         you, Prospective Juror 25.

25                   PROSPECTIVE JUROR 25:  Thank you.

1          THE COURT:  Prospective Juror 26.

2          PROSPECTIVE JUROR 26:  I live in

3     Manhattan.  I'm an associate professor at

4     K-State where I teach landscape architecture

5     and I teach the freshman the graphics and

6     drawing courses in our program.  I went to

7     Syracuse University for my undergraduate

8     degree, which was in drawing.  And my

9     master's degree in landscape architecture

10    from the University of Colorado.  And I spend

11    my time with print making, drawing, sketching

12    landscapes.

13          THE COURT:  Thank you, Prospective

14    Juror 26.

15          Prospective Juror 27.  I get it

16    right?

17          PROSPECTIVE JUROR 27:  Yes, you did.

18          THE COURT:  All right.

19          PROSPECTIVE JUROR 27:  I currently

20    live in Topeka.  I worked 35 years at AT&T as

21    an information technology specialist.

22    Retired for about two months, decided I

23    wasn't that tired, went to work at the

24    Department of Labor as an adjudicator for two

25    years.  And now I am currently a secretary at

1        Wanamaker Elementary.  My husband is a

2        retired journeyman electrician.  I have two

3        children, a daughter who is an educator for

4        the nurses in an OR in Florida in a hospital,

5        and my son is-- works at the trade school up

6        in Kansas City.  I went to school at

7        Highland Park.  I like to spend my time

8        playing with my grandchildren, walking, and

9        traveling.

10               THE COURT:  Thank you so much.

11               Prospective Juror 28.

12               PROSPECTIVE JUROR 28:  I currently

13       live in Junction City.  I work for Geary

14       County Public Works for the past year

15       building mains.  The past 36 years before

16       that I run heavy equipment.  My wife works

17       for the Geary County Appraiser's Office.

18       She's a personal property appraiser.  And I

19       have two stepchildren.  One is a maintenance

20       man at a local apartment building, the other

21       is a CO for the sheriff's department.  I have

22       two grandchildren, two boys.  I went to high

23       school at Junction City High School.  And any

24       time I get I spend with my grandchildren and

25       ride my motorcycles.

1          THE COURT:  Let me ask about your--

2    I think it's your-- your stepson that works

3    for-- is a CO?

4          PROSPECTIVE JUROR 28:  Yes, Geary--

5    Geary County.

6          THE COURT:  And who does he work for

7    at Geary County?

8          PROSPECTIVE JUROR 28:  Tony Wolf.

9          THE COURT:  No, what department?

10         PROSPECTIVE JUROR 28:  Oh.  The

11   sheriff.

12         THE COURT:  The sheriff?

13         PROSPECTIVE JUROR 28:  He works as a

14   CO in the jail.

15         THE COURT:  I got it.  And the CO

16   part is he's a corrections officer?

17         PROSPECTIVE JUROR 28:  Yes, sir.

18         THE COURT:  Thank you, Prospective

19   Juror 28.

20         Prospective Juror 33, start the

21   final row for us.

22         PROSPECTIVE JUROR 33:  I live in

23   Manhattan and I am a sales associate for

24   Stifel Nicolaus Investment Company.  My

25   parents, my mom is retired from Farm Bureau

1        of 30 years.  My dad is public works at

2        Fort Riley.  I went to Manhattan High and

3        graduated.  I have a bachelor's degree in

4        cosmetology.  I'm a certified phlebotomist.

5        And I like to spend my time in the garden,

6        rescuing pets, and shopping.

7                    THE COURT:  Thank you, Prospective

8        Juror 33.

9                    Prospective Juror 30.

10                   PROSPECTIVE JUROR 30:  My husband

11       and I reside on a farm by Hanover, Kansas.

12       We both graduated from Hanover High School.

13       I did get a certificate from Manhattan

14       vo-tech.  I work at the Hanover Hospital in

15       the laundry department.  My husband is a

16       heavy equipment operator, farms, and we have

17       a few head of cattle.  We have three

18       children.  Our son is married.  He has an

19       associate's degree from Southwest-- Southeast

20       Community College in mechanics, and him and

21       his wife live in Alaska.  He welds there.

22       She is in education.  Our oldest daughter is

23       in the warranty department at an agricultural

24       firm.  She has a bachelor's degree in

25       business.  And our youngest daughter is in ag

1          business at K-State.  And I like to read and

2          sew and do crafts.  My husband will say

3          shopping is a hobby.

4                    THE COURT:  Prospective Juror 30,

5          I'm failing on my Kansas geography.  Tell me

6          how I would get to Hanover.  Where is it?

7                    PROSPECTIVE JUROR 30:  Do you know

8          where Marysville or Washington, Kansas are?

9                    THE COURT:  I do.

10                   PROSPECTIVE JUROR 30:  We are smack

11         dab in the middle, about nine miles from

12         Nebraska.

13                   THE COURT:  All right.  Thank you.

14                   Prospective Juror 31.

15                   PROSPECTIVE JUROR 31:  I live and

16         graduated from Valley Falls High School.  And

17         I own my own construction company, along with

18         my brother.  And I've been in construction

19         for 25 years.  My wife is a secretary of

20         another construction company.  I have two

21         boys that love the outdoors and that's where

22         I spend most of my time.

23                   THE COURT:  And what kind of things

24         does your construction company construct?

25         What do you build?

1              PROSPECTIVE JUROR 31:  We do a lot

2        of industrial construction.  Dog food plants

3        like-- or things like that.

4              THE COURT:  Thank you, Prospective

5        Juror 31.

6              And Prospective Juror 32.

7              PROSPECTIVE JUROR 32:  Yes, sir.  I

8        currently live in Hiawatha, Kansas with my

9        two teenage boys.  One's a sophomore and

10       one's a junior.  I have a daughter, married,

11       that lives here in Topeka, from a previous

12       marriage.  I've been married 21 years to my

13       current wife.  My wife works as a para

14       educator at Hiawatha Public Schools.  She

15       went to K-State, as I did.  She went in for a

16       journalism degree and then I was in education

17       and retired from that.

18              And now I'm working-- she's still

19       working as a para educator and I am working

20       with a company called the XIM Group up in

21       Sabetha, Kansas that does plastic

22       manufacturing as well as chemicals for the

23       pet food and human food industry.  Also I

24       am-- have worked on computers.  I was a

25       technology integration specialist for school

1          districts and I'm also certified as an Apple

2          McIntosh technician.  And I like to spend my

3          time with my boys on Xbox.  My interest is my

4          family.  And hobbies obviously is just

5          working on computers.  And I-- and I've

6          worked with computers from two Nebraska

7          schools, I worked on the repair of those

8          during kids' break.

9                    THE COURT:  All right.  Thank you

10         for that.  Thank you all for telling us a

11         little bit about you.  It's really useful for

12         lawyers who have to make decisions about the

13         jury to know a little bit about things that

14         don't necessarily have anything to do with

15         the case but what your daily experiences are.

16         So I'm grateful that you would share those.

17                    Let me give you a little bit of an

18         update on where we stand in the process.

19         It's a little past the noon hour.  I'm going

20         to let you take your lunch recess now and

21         when we come back we'll finish the jury

22         selection questioning.  I have some more

23         questions to ask of you and then the lawyers

24         for each side may have a few questions that

25         they will want to ask as well.

1            I can't give you an ETA on when

2      we'll finish with the selection process, but

3      we still have some work to go.  I-- from

4      personal experience sitting on the end of

5      this process where you are as a prospective

6      juror, it sometimes feels like this part of

7      the process moves a little slowly.  There are

8      simply-- there are 32 of you that we need to

9      hear about and so it takes a bit of time.

10      It's a crucially important part of the trial

11      process and so I'm grateful for your patience

12      with us and we'll complete it just as quickly

13      as we can.

14            I'd like for you to regather down in

15      the jury room that-- where you appeared this

16      morning on 385 on the third floor and then

17      Ms. Garrett will come down and meet you,

18      along with Ms. Hill, the jury coordinator.

19      And come back in as we have, come back to

20      your seats.

21            I'll give you the instruction that I

22      gave you at our earlier recess.  Again, until

23      the trial is over -- and we are just at the

24      start of it -- do not discuss this case with

25      anyone.  Not members of your family, not

1          friends, not people at work, certainly not

2          people involved in the trial, not anyone.

3          This includes each other, your fellow

4          prospective jurors.  So if anyone approaches

5          you and tries to discuss the trial or the

6          experiences this morning, please let me know

7          about it by letting Ms. Garrett know about

8          it.

9                    Again, don't know whether there will

10         be any reports about the trial, but do not

11         listen or read them.  Again, don't talk with

12         any of the people who are involved in the

13         trial.  As I told you, they are going to not

14         make eye contact with you, not speak to you.

15         It's not because they're unfriendly people

16         but because of this restriction.

17                    I suspect most of you carry around a

18         little computer in your pocket or your purse

19         that has access to the whole world.  Don't be

20         tempted to use it to try to do any research

21         about the case or the judicial system or the

22         lawyers or anything having to do with this

23         experience.

24                    Goes without saying but I'll say it

25         nonetheless:  If you're a Twitter person,

1          don't be tempted to tweet about it, don't be

2          tempted to post on your Facebook page.  Those

3          things are talking about the trial and

4          they're out of bounds until the trial is

5          completely over.

6                    If you need to speak to me about

7          something, just let Ms. Garrett know or the

8          law clerk, Mr. Hinderks, and they'll make

9          sure I'm aware of it.

10                    So again, we'll be in recess.  I'd

11         like for you to be back to your jury room at

12         about 1:15 and they'll bring you up.  In

13         terms of lunch places to go, there is a

14         cafeteria on the east side of the first floor

15         of this building.  You can see what the fare

16         is.  It is not a far walk to get out of the

17         building and go up on Kansas Avenue where

18         there are a number of choices along each side

19         of the street.

20                    So see you back at the jury room at

21         1:15, and thank you for your patience.  We'll

22         see you then.

23                    (THEREUPON, a recess was

24         taken).

25                    (THEREUPON, the following

172

1          proceedings were had in the presence of the

2          defendant).

3                    THE COURT:  Just a couple of

4          things-- housekeeping things quickly.  I'm

5          going to take my projected voir dire back.

6          And based on what we've heard, I found it to

7          be a very forthcoming group and so I'm

8          probably going to eliminate some of the

9          things that are in there to try to generate

10         additional conversation with the panel

11         because I found them to be pretty

12         conversational and so I don't want to overdo

13         it.

14                   When I get to the end of my

15         questions I'll ask each of you if you have--

16         to approach, if you have questions that you'd

17         like for me to ask.  You know, sometimes

18         there's a question you want to know the

19         answer to but you'd rather it not come from

20         your table.  You can write that down, give it

21         to me, and I'll consider asking it so it'll

22         come from a neutral source.  And then if

23         there-- if there are some of those, we'll

24         complete that; if there are not, then I'll

25         turn to you for any questions that you have.

1       I hope you'll be on the lean side as well.

2               I just wanted to raise with you a

3       question about juror number 25, Prospective

4       Juror 25, in the middle of the first full

5       row.  And I just wanted to get your

6       temperature on something.  There was a little

7       bit of concern in the administrative process

8       about whether she was tracking the English

9       language.  That was one of the reasons I

10      asked everybody if they'd been sworn.  I

11      believe she is tracking the conversation.

12      She's not-- she obviously speaks English.  It

13      may not be the clearest diction you'll ever

14      hear, but she's not really required to say

15      very much.

16              And so I'm not inclined to excuse

17      her for that reason, but if any of you have a

18      concern I'd like to hear about it now or when

19      we come back from the break.  Are either of

20      you concerned about Prospective Juror 25?

21              MS. KENNEY:  Not at the moment, Your

22      Honor.  But I don't think I really have a lot

23      of information.  I mean, most of what she

24      said was there in response to the questions

25      you put up.

1          THE COURT:  Okay.  I get it.

2     Mr. Francis?

3          MR. FRANCIS:  My experience, I

4     understand there's a large Asian group there

5     and a lot of them although they have trouble

6     speaking, they don't have any trouble

7     understanding.  And I didn't get any

8     impression that she wasn't tracking with what

9     was going on.

10          THE COURT:  That was my sense of it.

11     She seems to understand everything.  It's

12     just that her diction is not as clear as it

13     might be.  So I'll let you follow up and

14     engage her in questioning if you think that

15     would help illuminate your view of her

16     qualifications and if you have concerns I'll

17     hear from you then when we get ready to pass

18     the panel for cause.

19          All right.  Anything else you want

20     to talk about before we break for lunch?

21          MR. FRANCIS:  No, Your Honor.

22          MS. KENNEY:  No, Your Honor.

23          THE COURT:  All right.  See you at

24     1:15.  Thank you.

25          (THEREUPON, the lunch recess

1          was taken).

2                    (THEREUPON, the following

3          proceedings were had in the presence and

4          hearing of the defendant).

5                THE COURT:  Good afternoon,

6          everyone.  Be seated.  We're back on the

7          record in court with the defendant and

8          counsel present.  Is there anything any party

9          needs to raise before we get the jury panel

10         back in the room?

11               MR. FRANCIS:  None from defendant,

12         Judge.

13               MS. KENNEY:  No.  Your Honor, the

14         only thing I was going to mention, I assume

15         we'll have a little time after we pick the

16         jury to clean up the courtroom and get

17         electronics set up and everything.  But

18         otherwise, no.

19               THE COURT:  Yeah, we will.  Let's

20         just see-- we'll talk about that as we have

21         our various conferences through the

22         peremptory challenges.

23               MS. KENNEY:  Okay.

24               THE COURT:  And we'll kind of see

25         where the trial-- what's left on the clock

1          this afternoon and how to best sequence the

2          courtroom.  I'll take my cue in large measure

3          from you all.

4                    So with that, Ms. Garrett, will you

5          please bring in the members of the panel?

6                    (THEREUPON, the following

7          proceedings were had in the presence and

8          hearing of the prospective jurors and the

9          defendant).

10                   THE COURT:  All right.  We'll sit

11         when you sit.  I hope you found sustenance

12         somewhere nearby on Topeka Avenue or thereby.

13         Kansas Avenue I should say or nearby.

14                   Just to give you kind of a look

15         ahead.  I have a few more questions for you

16         and then we'll hear from the lawyers if they

17         have questions for you and then we'll proceed

18         to get the jury selected and let those of you

19         who are not chosen to serve to head out of

20         here.

21                   Let me ask a question about possible

22         witnesses in the case.  As you heard, there

23         may be testimony during this trial from

24         federal agents or local police officers who

25         were involved in investigating the case, and

1          in some instances those law enforcement

2          officials may have used undercover

3          identities.  Is there any member of the panel

4          who thinks it's unethical or unfair for law

5          enforcement to use undercover agents to

6          investigate crimes?  If you do, please raise

7          your hand.

8                    All right.  Seeing no hands, I'll

9          move to another question.  I've asked a

10         related question but this one is a little

11         narrower.  Are there any members of the panel

12         or relatives of yours or close personal

13         friends who have been a party to some kind of

14         legal proceeding that involved the federal

15         government as one of the parties to the case,

16         one of the litigants to the case, or involved

17         an employer agent of the federal government?

18         If anybody has an experience that fits that

19         description, I'd like for you to raise your

20         hand and I'll ask you questions.  So do you

21         have the question in mind?  Does it make

22         sense to everyone?

23                    PROSPECTIVE JUROR 32:  Could you

24         repeat that question?

25                    THE COURT:  I'll be glad to.  Is

1          there anybody on the panel who personally

2          themselves or a close relative or a close

3          personal friend that has been a party, a

4          participant, in a legal proceeding of some

5          kind against the federal government or one of

6          its agencies or one of its employees?

7          Anybody have an experience that fits that

8          description?  If you do, would you raise your

9          hand, please?

10                  All right.  I don't see any hands.

11         Is there--

12                  THE REPORTER:  Who asked that

13         question?

14                  THE COURT:  I'm sorry.  Who was it

15         that asked for me to repeat-- Prospective

16         Juror 32.  I'm sorry.  I forgot that she

17         needed a name or I should have--

18                  PROSPECTIVE JUROR 32:  And I forgot

19         when I stood up.

20                  THE COURT:  Does-- do-- are there

21         any of you-- and this is a related question.

22         Are there any of you that currently a

23         department or agency of the federal

24         government is making a claim against you in

25         some capacity?  Anybody that has currently a

1          claim being asserted against them by a

2          federal agency or a department of the federal

3          government?

4                    Prospective Juror 32.

5                    PROSPECTIVE JUROR 32:  Yes.

6                    THE COURT:  Is this something we can

7          talk about from there, or would you rather

8          talk in private?

9                    PROSPECTIVE JUROR 32:  Well, I had

10         talked about what it related earlier.

11                   THE COURT:  Is that what you're

12         referencing?

13                   PROSPECTIVE JUROR 32:  That's what

14         I'm talking about.  Is that what you--

15                   THE COURT:  I do understand that

16         situation.  Don't feel the need to go into it

17         again.

18                   PROSPECTIVE JUROR 32:  Okay.

19                   THE COURT:  But thank you very much

20         for reminding me.

21                   Anybody else?

22                   All right.  Seeing no other hands.

23                   As I referenced earlier in my

24         initial comments, in our system the law

25         presumes that every defendant in a criminal

1          case is innocent until proven guilty beyond a

2          reasonable doubt based on the evidence.  Is

3          there anybody among you who believes that a

4          defendant is guilty just because he has been

5          charged with a crime?  Is there anybody who

6          thinks that way?  If you do, I'd ask you to

7          raise your hand.

8                    I will talk about the burden of

9          proof later in the case.  The law, as I will

10         talk about later, does not require the

11         government to prove its case beyond all

12         conceivable doubt.  I think the law

13         recognizes that the human mind can create or

14         conceive some doubt about almost any

15         proposition.  But the law requires the

16         government to prove its case beyond a

17         reasonable doubt.  Is there anybody who

18         believes if they were picked to serve on this

19         jury would require the government to prove

20         its case beyond any doubt whatsoever?

21         Anybody feel that way?  All right.  See no

22         hands on that.

23                    Are there any of you who thinks,

24         well, I would give more weight or more

25         consideration to testimony that a law

1          enforcement officer or official might give

2          versus testimony by others?  Is there anybody

3          who feels like a law enforcement-- a witness

4          who comes to you from a law enforcement

5          background ought to be given more credit just

6          because they are engaged in law enforcement?

7          Anybody feel that way?  All right.  I see no

8          hands.

9                    Is there anybody on the panel who

10         personally or has had a member of their

11         family that has provided assistance to the

12         United States Government or one of its

13         agencies during a criminal investigation of

14         any kind?  In other words, has assisted the

15         United States Government in a criminal

16         investigation?  And I'm talking about, you

17         know, more than just perhaps being a witness

18         in a case.  I'm talking about actively

19         providing assistance during an ongoing

20         investigation.  Anybody with that kind of

21         experience?  I see no hands to that question.

22                    Let me broaden the question just

23         slightly and take the United States

24         Government out of that.  Is there anybody on

25         the panel who has provided assistance to any

1        government -- federal government, state

2        government, county government -- in some sort

3        of ongoing criminal investigation?  Anyone

4        with any experience like that?  All right.  I

5        don't see any hands.

6               Have any of you or your relatives or

7        close friends ever been charged or convicted

8        or investigated by-- for actions that involve

9        a claim involving sexually explicit images of

10       a minor?  Anyone have an experience, not

11       necessarily personally, but a member of your

12       family or a close friend that's ever been

13       charged or investigated in any way that

14       involved sexually explicit images of a minor?

15       All right.  I don't see any hands.

16               Do any of you know anyone who

17       works-- you heard me-- heard Ms. Kenney

18       introduce herself as a member of the United

19       States Attorney's Office here in Kansas.  Do

20       any of you know anyone who works in the

21       United States Attorney's Office in Kansas?

22       If you do, would you please raise your hand?

23               Prospective Juror 32, yes, sir.

24               PROSPECTIVE JUROR 32:  Yes, I do.

25               THE COURT:  And is that in

183

1          connection with the matter that we discussed?

2                    PROSPECTIVE JUROR 32:  Yes.  Yes.

3                    THE COURT:  And I think we've talked

4          about that.

5                    PROSPECTIVE JUROR 32:  Yes, sir.

6                    THE COURT:  Anyone else-- you know

7          any member of the United States Attorney's

8          Office in any other connection, sir?

9                    PROSPECTIVE JUROR 32:  No, sir.

10                    THE COURT:  Let me broaden the

11          question and ask whether any of you know

12          someone who works in the United States

13          Probation Office here in Kansas.  Do any of

14          you know anyone who works in that office?

15                    Do any of you know someone who works

16          in a district attorney's office here in

17          Kansas or a prosecuting attorney's office in

18          Kansas?  Anybody that fits that bill?

19                    Prospective Juror 6, I take it you

20          know some members from your work at the

21          Shawnee County Court?

22                    PROSPECTIVE JUROR 6:  Yes.

23                    THE COURT:  And those are members of

24          that DA's office over in Shawnee County?

25                    PROSPECTIVE JUROR 6:  Yes.  Correct.

1              THE COURT:  And do you consider any

2      of those members of that office close

3      personal friends?

4              PROSPECTIVE JUROR 6:  No.

5              THE COURT:  Do you think anything

6      about your familiarity with members of the

7      district attorney's office here in Shawnee

8      County would interfere with your ability to

9      serve as a judge of the facts in this case

10     independently?

11             PROSPECTIVE JUROR 6:  No.

12             THE COURT:  All right.  Thank you

13     very much.

14             Is there anybody in the panel who

15     has a member of their immediate family who

16     works in law enforcement?  All right.  I

17     thought we might have a few of those.

18             So I'll start with your row,

19     Prospective Juror 8.  Who is it that you

20     know-- I'm sorry, who is it in your family

21     that works in law enforcement?

22             PROSPECTIVE JUROR 8:  My brother's

23     an undersheriff for Morris County.

24             THE COURT:  Here in Kansas?

25             PROSPECTIVE JUROR 8:  Right.

1            THE COURT:  How long has he been

2      involved in that?

3            PROSPECTIVE JUROR 8:  His whole life

4      since he could.  30 years, I suppose.

5            THE COURT:  You think that would in

6      any way keep you from judging the facts as

7      they're presented in this case, from judging

8      them independently based on the evidence

9      here?

10            PROSPECTIVE JUROR 8:  No.

11            THE COURT:  All right.  Thank you,

12      sir.

13            Prospective Juror 10, did you have

14      your hand up?  I thought you did.

15            PROSPECTIVE JUROR 10:  Yes.

16            THE COURT:  Who is it in your family

17      that works in law enforcement?

18            PROSPECTIVE JUROR 10:  My brother is

19      with the Overland Park Police Department.

20            THE COURT:  Okay.  And what does he

21      do for them?  Is he a patrol officer?

22            PROSPECTIVE JUROR 10:  He used to be

23      vice squad.

24            THE COURT:  All right.  And what

25      does he do now?

1           PROSPECTIVE JUROR 10:  He's with

2    vice squad.

3           THE COURT:  Still is.  All right.

4           PROSPECTIVE JUROR 10:  Been there

5    over 20 years.

6           THE COURT:  And do you think knowing

7    that your brother works in law enforcement

8    would tilt you one direction or another as a

9    judge of the evidence in this case?

10          PROSPECTIVE JUROR 10:  No.

11          THE COURT:  All right.  Thank you,

12   Prospective Juror 10.

13          Was there another hand on that row?

14   Okay, I don't see any.

15          And let me come down to you,

16   Prospective Juror 22.

17          PROSPECTIVE JUROR 22:  I have a

18   brother in the Overland Park Police

19   Department as well.

20          THE COURT:  And what kind of work

21   does he do?

22          PROSPECTIVE JUROR 22:  Undercover.

23          THE COURT:  And how long has he--

24          PROSPECTIVE JUROR 22:  I know he

25   does undercover, but he's also in patrol cars

1          and stuff, too.  So I'm not sure just what he

2          does.

3                    THE COURT:  This is your brother?

4                    PROSPECTIVE JUROR 22:  Yes.

5                    THE COURT:  How long has he been in

6          that job?

7                    PROSPECTIVE JUROR 22:  Let's see,

8          probably 25 years.

9                    THE COURT:  And do you think there's

10         anything about that that would interfere with

11         your ability to be an independent, impartial

12         evaluator judging the facts in this case?

13                    PROSPECTIVE JUROR 22:  No.

14                    THE COURT:  All right.  Anyone else

15         on the panel that I missed?

16                    Prospective Juror 28.

17                    PROSPECTIVE JUROR 28:  Yes, sir.  My

18         stepson, as I stated earlier, is a CO in

19         Geary County.

20                    THE COURT:  And he works in the

21         jail?  Is that what he does?

22                    PROSPECTIVE JUROR 28:  As I

23         understand.

24                    THE COURT:  Do you think that would

25         interfere with your ability to judge the

1          facts in this case impartially?

2                    PROSPECTIVE JUROR 28:  No, sir, I

3          would be impartial.

4                    THE COURT:  Okay.  Anybody else?

5          Did I miss any other hands?  Oh, I did.  I'm

6          sorry.

7                    Prospective Juror 16.

8                    PROSPECTIVE JUROR 16:  Yes, sir.  My

9          son-in-law is with the sheriff's office.  Has

10         been there for the past six years.  My nephew

11         is with the highway patrol.  Has been with

12         them for 20 plus years.

13                    THE COURT:  So your son-in-law works

14         for the sheriff here in Shawnee County?

15                    PROSPECTIVE JUROR 16:  Yes, sir,

16         that's correct.

17                    THE COURT:  How long has he been

18         with them?

19                    PROSPECTIVE JUROR 16:  About six

20         years.

21                    THE COURT:  And what does he do for

22         them?  Is he a deputy sheriff?

23                    PROSPECTIVE JUROR 16:  Deputy school

24         resource officer at Washburn Rural.

25                    THE COURT:  And your nephew, remind

1          me.

2                      PROSPECTIVE JUROR 16:  Is in the

3          highway patrol.

4                      THE COURT:  How long has he-- for

5          the Kansas Highway Patrol?

6                      PROSPECTIVE JUROR 16:  Yes, sir.

7                      THE COURT:  How long has he worked

8          for the KHP?

9                      PROSPECTIVE JUROR 16:  20 plus

10         years.

11                     THE COURT:  And is he a patrol

12         officer or the equivalent of trooper?

13                     PROSPECTIVE JUROR 16:  Yes, sir.

14                     THE COURT:  Is there anything about

15         your relationship with those people and the

16         experiences they may or may not have related

17         to you that make you think would prevent you

18         from judging the evidence and the facts

19         impartially in this case?

20                     PROSPECTIVE JUROR 16:  No.  I

21         believe I would be able to look at the facts

22         and make a decision based solely on those

23         facts.

24                     THE COURT:  All right.  Thank you,

25         Prospective Juror 16.

1                    Prospective Juror 20.

2                    PROSPECTIVE JUROR 20:  Yes, Your

3        Honor.  I was a corrections officer for

4        Shawnee County previously.  It was just for

5        six months.  I had to leave because of my

6        wife's health.

7                    THE COURT:  Because of your wife?

8                    PROSPECTIVE JUROR 20:  Yes, sir.

9        She's deceased.

10                   THE COURT:  Prospective Juror 20,

11       it's a little different situation because you

12       were actually the law enforcement official.

13       And so I want you to search your heart and

14       tell me if you believe anything about that

15       experience would keep you from judging the

16       facts and the evidence in this case

17       impartially.

18                   PROSPECTIVE JUROR 20:  Nothing.

19                   THE COURT:  Did I miss any other

20       hands?

21                   I talked a little bit ago this

22       morning about the fact that our system

23       presumes a person who is accused of a crime--

24       presumes that that person is innocent of the

25       crime until and unless the jury concludes

1          that the prosecutor has proved them guilty

2          beyond a reasonable doubt.  So this is a

3          related question.  Do all of you understand

4          that the defendant, Mr. Kearn, as he sits

5          here now, is no more guilty of anything than

6          any member of this jury panel or any other

7          participant in this trial?  Do you all

8          understand that?  Are there any of you that

9          has difficulty accepting that idea?  If you

10         do, please raise your hand.

11                  Do you understand that because of

12         that presumption of innocence if I asked you

13         right now to vote whether the defendant is

14         innocent-- I'm sorry, is guilty or not

15         guilty, that because of that presumption of

16         innocence you would have to vote that the

17         defendant is not guilty?  Do you understand

18         that?

19                  Now, I'm not going to ask you to

20         vote now.  In fact, I'm not going to-- there

21         will be a trial with evidence.  But I wanted

22         to be clear with all of you that that

23         presumption of innocence exists.  Does

24         everyone have that in mind?

25                  Is there anyone that has discussed

1        this case, the United States against Jonathan

2        Kearn, are there any of you who have

3        discussed this case with anyone?  If you

4        have, this is the time to find out about it.

5        So please raise your hand.

6                You have been in the courthouse now

7        for four and a half, five hours or so.  While

8        you've been here waiting to be called to the

9        courtroom and been waiting during breaks or

10       at the lunch break, are there any of you that

11       have heard anyone say anything about this

12       case?  Anybody have an experience like that?

13               Ladies and gentlemen, I've asked

14       probably as many questions as I can think of

15       a way to ask, probably to the point where it

16       wore on you a little bit.  But it's very

17       important that the case start with a jury

18       that is comprised of people who start out

19       right in the middle.  And so I've tried to

20       ask in as many ways as I can think of if

21       there is any experience in your lives, in

22       your close family members' lives, your close

23       friend's lives, that you think would keep you

24       from starting this trial, if you're chosen to

25       serve, as-- from a neutral starting point.

1          I've asked about everything I can think of.

2                  But there is always the possibility

3     there's something that I should have thought

4     of but I didn't.  And so I just ask the

5     broadest question I can dream up and that is:

6     Is there anything that any of you know about

7     in your background or experiences or values

8     that you believe in your heart would prevent

9     you from serving as a neutral truly impartial

10    judge of the facts and the evidence in this

11    case?  Is there anyone that has anything at

12    all, even if I haven't asked about it

13    specifically, that in fairness you would want

14    the participants in the trial to know about

15    before it started?  If so, please just raise

16    your hand.  All right.  I don't see any

17    hands.

18                  Counsel, can I see you briefly?

19    Give us just a second to check signals with

20    the lawyers.  We'll turn the noise machine on

21    because I know you like it very much, and

22    then we'll be ready to go ahead in this

23    process.

24                  (THEREUPON, a bench conference

25    was had out of the hearing of the prospective

194

1       jurors and the defendant).

2               THE COURT:  I'm finished with the

3       questions I came to ask.  Are there any

4       questions that you all have that you would

5       like me to ask that I haven't asked?

6               MS. KENNEY:  Well, I'm not sure if

7       you have a preference.  There are some areas

8       that I was going to go into.

9               THE COURT:  I'm going to give you

10      all a chance to conduct your own voir dire.

11      I know there are judges in this courthouse

12      who think I shouldn't, but I happen to think

13      lawyers ought to be lawyers so I'm going to

14      let you question.  I hope you will be brief.

15              MS. KENNEY:  Yes.

16              THE COURT:  I think I've worn out

17      the welcome with them.

18              MS. KENNEY:  I've scratched out a

19      lot of questions.

20              THE COURT:  But sometimes there's a

21      question you'd rather come from somebody

22      other than yourself.

23              MR. FRANCIS:  I don't have one that

24      comes to mind that I would prefer someone

25      else to ask.

1          THE COURT:  You?

2          MS. KENNEY:  The only area, but I'm

3     comfortable asking it, is I'm not sure we've

4     really addressed with them the nature of the

5     evidence.  And I'm happy to go into that,

6     Your Honor.  But if you think you would

7     rather do it-- and I'm not talking about

8     details, just a general kind of warning, if

9     you will.

10          THE COURT:  I think I'm going to let

11     you all handle that because I'm a little

12     concerned that once I start to describe it

13     the wrong word comes out.  And I think even

14     if the wrong word comes out from one of you

15     the other is plenty skilled at neutralizing

16     it.  And it's harder to neutralize it if I

17     make that mistake.  So I think I'm going to

18     let you all.  And I will let you ask about

19     that.  And then if that raises a concern--

20     I've asked the question if any of them think

21     they have something in their background--

22          MS. KENNEY:  Right.

23          THE COURT:  --that would make it

24     difficult.  If something comes up, then we'll

25     have a bench conference and let them unpack

1          that.

2                    MS. KENNEY:  And I don't plan on

3          going into a lot of detail.

4                    THE COURT:  Well, I will tell them

5          now that I'll hear-- I'll recognize you and

6          then go to you and then we'll come back and

7          I'll ask you at the bench about cause.  And

8          then I'm inclined to take a break at that

9          point to let you sort of organize your

10         peremptory strategies and then bring them

11         back in for the actual exercise of it.

12                   MR. FRANCIS:  Are you going to put

13         them all back in the gallery and then call

14         them up once we get through?

15                   THE COURT:  No, I'm going to put

16         them back in the spot.  I'll give you a few

17         minutes, I'll let them just let their hair

18         down while you look and make sure, you can

19         kind of think about them within the box, then

20         I'm going to send them back, give you a

21         little more time, ask you if you feel like

22         you can do your peremptory challenges with

23         them out of the room, and then I'll put them

24         in the box and move from the strike.  That

25         method is not perfect, but they won't get

1          their feelings hurt.

2                    (THEREUPON, the following

3          proceedings were had in the presence and

4          hearing of the prospective jurors and the

5          defendant).

6                    THE COURT:  All right.  Members of

7          the jury panel, I've completed my questions

8          and I thank you for your close attention to

9          that.  At this part of the trial, the lawyers

10         for each side are given an opportunity to ask

11         questions along the related lines, things

12         that they feel like they need to know to

13         represent their client's interest.

14                    Like I said, they are not going to

15         ask you any questions that are designed to

16         pry needlessly.  Every question pries a

17         little bit, but they're not going to pry

18         needlessly.  They're going to strive not to

19         lead you into an embarrassing subject.  But

20         if there is a subject that they ask about

21         that you, in respect of your oath as a

22         prospective juror, feel more comfortable

23         talking about in private, just raise your

24         hand and say that and we'll do it like we did

25         at the side of the bench on the other

1          subjects.  So I hope you'll give them your

2          close attention like you gave me.

3                    And so, Ms. Kenney, I'll recognize

4          you for the government's voir dire questions.

5                    MS. KENNEY:  Thank you, Your Honor.

6                    Good afternoon, everyone.  Judge

7          Crabtree has been very thorough today in

8          asking questions so that will make my job a

9          lot shorter here.  Hopefully I won't keep you

10         too much longer.  There are some areas that I

11         want to touch base on.  And as Judge Crabtree

12         said and I just want to remind you, if I

13         bring up a topic that you would prefer to

14         discuss outside the presence of everyone,

15         just please let us know and we will

16         accommodate that.

17                    This is the part of the trial where

18         the attorneys and the Court get to talk

19         directly to you.  It's the only time during

20         the trial that we can have a conversation.

21         After this part is over you're going to have

22         to sit there and listen to us do all the

23         talking.  So we really encourage you to speak

24         up.  If you think you have anything that you

25         want to contribute, please don't be shy,

1              please don't hesitate to speak up because

2              this is your only chance to do it.

3                      And at any time if you think about

4              something that we've-- you talked about

5              earlier, this is a great time to bring it up.

6              After this, as I mentioned, not only are you

7              going to have to just listen to us talk here

8              in the courtroom, but we won't-- we probably

9              won't even-- we will try to avoid you, for

10             lack of a better description, if you're

11             selected to sit on this jury and we run into

12             you in the hall or on the elevator, you know,

13             we may let you take the elevator and we'll

14             get the next one.  So we don't want

15             anything-- any of our actions to be offensive

16             to you.  We just-- we will not be allowed to

17             interact with you after this.

18                      Our goal here is to pick the best 12

19             people to hear the facts of this particular

20             case.  So if you're not selected to hear the

21             evidence in this case, that is no reflection

22             on you.  It is just a decision that the

23             attorneys have made about you as a panel as a

24             whole.  And as many of you know, there will

25             be another opportunity for you to sit on a

1        jury.  In fact, I think some of you sat on a

2        jury very recently.  So--

3                  Is there anyone here who's nervous?

4        Now, you've been here all day so any jitters

5        you might have had when you first got in here

6        should have gotten a little better.  But is

7        there anyone here that's just nervous about

8        being here?  Nervous about what's going on in

9        your lives while you're here?

10                  I know, Prospective Juror 31, you

11       mentioned your job.  I'm sure that you're

12       thinking about that.  Is that correct?

13                  PROSPECTIVE JUROR 31:  Yes.

14                  MS. KENNEY:  So I don't think you're

15       the only one.  I think there's probably

16       several people here.  I see lots of heads

17       nodding.  So that's understandable.  That's

18       completely understandable.

19                  If you think you get to the point

20       where you're thinking about what's going on

21       in your life while you're not there and

22       you're not paying attention to the courtroom,

23       that becomes a concern.  So I know we talked

24       about this earlier, but I just want to

25       emphasize how important it is for you to

1        really pay attention to what we're doing

2        here.  And if you get to the point where you

3        think that that's not going to be a

4        possibility, you need to let us know.

5                I want to talk just a little bit

6        about the evidence in the case.  Not in

7        specifics, but just in general terms.  The

8        Judge advised you a summary of the charges

9        against the defendant.  The defendant, Jon

10       Kearn, is charged with production,

11       distribution and possession of child

12       pornography.  And the evidence in this case

13       is going to include images of minors in

14       various stages of undress or nude that may

15       well make you uncomfortable.

16               And understanding that you're all in

17       the same situation, this is probably not

18       evidence that you would see, is there anyone

19       here who might be so uncomfortable, so

20       anxious about this type of evidence that you

21       may not be able to put it in its perspective,

22       give it the weight that it may deserve, and

23       decide the case only on the evidence and the

24       law that the judge will instruct you at the

25       end of the case?  Is there anyone that thinks

1          that they might have so much trouble just

2          with the mere fact of the type of evidence,

3          not what it means in terms of the whole case?

4                    Okay.  And I'm sorry, I'm going to--

5          Prospective Juror 17; is that right?

6                    PROSPECTIVE JUROR 17:  I might have

7          a little bit of trouble because I have two

8          kids at home.

9                    THE COURT:  Okay.  And just from the

10         conversation that we had with the panel

11         earlier when you were answering questions,

12         there's a lot of people on this panel I think

13         have children and grandchildren.  So--

14                   PROSPECTIVE JUROR 17:  I know I'm

15         not alone.

16                   MS. KENNEY:  Right.

17                   PROSPECTIVE JUROR 17:  But I mean I

18         just-- you asked and I had to be truthful.

19                   MS. KENNEY:  Well, and the question

20         is and the question that we always keep

21         coming back to is, are you going to be so

22         uncomfortable that you think you cannot be a

23         fair and impartial juror in this case, listen

24         to all the evidence, not just whatever

25         pictures might be introduced but all the

1            evidence that goes along with that, and make

2            your decision based on all of that evidence?

3                      PROSPECTIVE JUROR 17:  I might have

4            a little bit of trouble.

5                      MS. KENNEY:  Okay.  Your Honor, I

6            don't know if you would like to inquire.

7                      THE COURT:  Prospective Juror 17,

8            why don't you come up and we'll talk about

9            this, okay?

10                      (THEREUPON, a bench conference

11            was had out of the hearing of the prospective

12            jurors and the defendant).

13                      THE COURT:  Come on up so she can

14            hear you.  Yeah.  And I think what the

15            question that was just asked is really the

16            key.  This is not, we understand, necessarily

17            the kind of thing that-- this evidence is

18            probably not the kind of thing that people

19            customarily see.  The real question is:  Is

20            it going to be so uncomfortable for you that

21            it would keep you from doing the job that a

22            juror is sworn to do; and that is evaluate

23            the evidence's significance as it applies to

24            this trial?  This case is not going to be a

25            referendum of any kind on whether you like

1          the photographs or think they're something

2          that ought to be seen.  And so the real

3          question is:  Even though you may feel

4          uncomfortable, do you feel like you can do

5          your job as a juror?

6                    PROSPECTIVE JUROR 17:  For this

7          particular subject matter, I don't know if I

8          could be impartial.  I will try to be a fair

9          person, but with my grandkids I would be

10         thinking about them.  They're only two and

11         three.

12                    THE COURT:  I see.

13                    PROSPECTIVE JUROR 17:  I mean, I

14         would always try to be an impartial person,

15         but in this subject matter I don't know if I

16         could be fair.

17                    THE COURT:  All right.  Do you wish

18         to inquire further, Ms. Kenney?

19                    MS. KENNEY:  Well, first I want to

20         apologize because I think I've upset you or

21         the subject matter's upset you because I can

22         see you're shaking so I do apologize.

23                    PROSPECTIVE JUROR 17:  Well, I'm

24         glad you brought it up because you do have to

25         be truthful about what's happening and what's

1          going to come.  And I can't help but feel

2          that way.

3                    MS. KENNEY:  And I guess my only

4          question is just to make sure that it's just

5          the relationship that you have with your

6          grandchildren and not something else that has

7          occurred that you would be concerned about?

8          It's just the fact that it would be children

9          and you have grandchildren?  Is that-- I'm

10         just trying to understand.

11                   PROSPECTIVE JUROR 17:  My daughter

12         sometimes gets beaten and she's with him.

13         And she--

14                   THE COURT:  This is your daughter?

15                   PROSPECTIVE JUROR 17:  --chooses to

16         be with him.

17                   THE COURT:  Okay.  Mr. Francis, do

18         you have questions?

19                   MR. FRANCIS:  This is kind of

20         awkward in these kinds of cases.  I don't

21         want to step on toes.  But do you feel you're

22         in such a frame of mind that if you were

23         seated where my client was you would want

24         someone with your frame of mind judging this

25         case or not?

1            PROSPECTIVE JUROR 17:  I don't think

2       I would be fair.

3                 MR. FRANCIS:  Okay.

4                 PROSPECTIVE JUROR 17:  I mean--

5                 MR. FRANCIS:  Thank you for your

6       candor.

7                 PROSPECTIVE JUROR 17:  I'm sorry.  I

8       just--

9                 MR. FRANCIS:  Oh, no, no, no.

10                THE COURT:  You don't need to be

11      sorry at all.

12                PROSPECTIVE JUROR 17:  Because I try

13      to do the best I can and be fair with

14      everybody.  But this particular matter and

15      the background is-- because I would always

16      try to do the right thing.  But I don't want

17      to be unfair either.

18                THE COURT:  All right.  Thank you

19      very much for--

20                PROSPECTIVE JUROR 17:  I'm sorry.

21                THE COURT:  You don't need to

22      apologize.  Just don't--

23                PROSPECTIVE JUROR 17:  Okay.

24                THE COURT:  We ask you these

25      questions for a reason.  You're just to give

1          honest responses and not feel like--

2                    PROSPECTIVE JUROR 17:  And it's not

3          to try to get out of jury service.

4                    THE COURT:  I know.  Prospective

5          Juror 17, I-- I haven't been doing this job

6          all that long, but it's pretty apparent when

7          somebody's trying to get out of jury duty.

8          You do not strike me as that at all.

9                    PROSPECTIVE JUROR 17:  Okay.

10                    THE COURT:  And I don't want you to

11          worry about that.  We asked for your honest

12          responses and we're grateful you gave it to

13          us.

14                    PROSPECTIVE JUROR 17:  Okay.

15                    THE COURT:  If I can ask you for

16          just a moment to go back to your seat.  I

17          want to visit with the lawyers about--

18                    PROSPECTIVE JUROR 17:  Okay.

19                    THE COURT:  --what we do in this

20          situation.

21                    PROSPECTIVE JUROR 17:  All right.

22                    THE COURT:  Thanks so much.

23                    (THEREUPON, Prospective Juror

24          17 returned to the jury box).

25                    THE COURT:  It's my inclination to

1       excuse her.  I'm not sure that either one of

2       you wants her in the case.  You tell me if

3       you have a different reaction.

4                   MS. KENNEY:  No, I don't know, Your

5       Honor.  I guess my concern is and perhaps I

6       asked the question badly but I just--

7                   THE COURT:  There's not a

8       particularly easy way to ask this question.

9                   MS. KENNEY:  No, it's-- but I--

10      there's a lot of people on this jury panel

11      that have children or grandchildren.  That's

12      my only-- in terms of handling it.  But, no,

13      as far as she's concerned I think she's too

14      upset.

15                  THE COURT:  And you agree,

16      Mr. Francis?

17                  MR. FRANCIS:  I do.  She's been

18      looking pretty pensive pretty much throughout

19      this whole--

20                  THE COURT:  She seems nervous about

21      things.  I think what I will do is not excuse

22      her because I don't-- I'm not sure we're to a

23      point where I would have to sustain an

24      objection to strike her for cause.  I'm going

25      to let her move to the back, tell her we're

1          not going to release her, maybe that will

2          stem the tide that you're concerned about and

3          we'll bring somebody up in her place and I'll

4          do some background on the things I've covered

5          with them and then I'll let you resume

6          questioning.  All right?

7                    MS. KENNEY:  Thank you.

8                         (THEREUPON, the following

9          proceedings were had in the presence and

10         hearing of the prospective jurors and the

11         defendant).

12                   THE COURT:  All right.  Prospective

13         Juror 17, if I can, can I ask you to take a

14         seat back in the gallery.  I can't excuse you

15         at this time.

16                   PROSPECTIVE JUROR 17:  Okay.

17                   THE COURT:  But I am going to let

18         you move back there.

19                        And I want to ask the deputy clerk

20         to call a name to occupy that chair.

21                        (THEREUPON, a prospective juror

22         was called to the jury box).

23                   THE COURT:  Prospective Juror 34, if

24         you could come forward.  If you will come to

25         the-- well, it's the only spot that's open.

210

1          Good afternoon, Prospective Juror 34.  Let me

2     start-- and I'm not going to put it up on the

3     screen.  I'm just going to kind of cover

4     these subjects with you.  If you wouldn't

5     mind standing.  I'm sorry to put you on the

6     spot.  It makes it easier for the court

7     reporter--

8               PROSPECTIVE JUROR 34:  No problem.

9               THE COURT:  --to hear.  Can you tell

10    us the city where you live now?

11              PROSPECTIVE JUROR 34:  I live here

12    in Topeka, born and raised here for 38 years.

13    I currently work at BNSF, diesel and

14    locomotives.

15              THE COURT:  And what do you do for

16    BNSF?

17              PROSPECTIVE JUROR 34:  I rebuild

18    locomotives when they come in.  And my

19    fiancée works as a Health Wave consultant for

20    the state.  I've got three little boys and a

21    stepdaughter and in my spare time I like to

22    go fishing and playing softball and go to the

23    racetrack.

24              THE COURT:  All right.  Tell us

25    about your education and your family's

1        education.

2                    PROSPECTIVE JUROR 34:  Oh, I

3        graduated--

4                    THE COURT:  Because you did an

5        amazing job of remembering what was up

6        before.  I thought I was going to ask each

7        question.  Not so much need for me.

8                    PROSPECTIVE JUROR 34:  I graduated

9        from Topeka High School in 1996 and I-- I

10        just got on-the-job training from there on.

11                    THE COURT:  And your fiancée, what

12        did--

13                    PROSPECTIVE JUROR 34:  She graduated

14        from K-State.

15                    THE COURT:  And what's her degree

16        in?

17                    PROSPECTIVE JUROR 34:  Behavioral

18        sciences.

19                    THE COURT:  And then just tell us a

20        little bit about your family.  What have your

21        parents done in their careers?

22                    PROSPECTIVE JUROR 34:  My mom, she

23        was a dry cleaner and she was divorced with

24        my stepdad.  And then we had-- he was a

25        construction worker.  And my mom was very

1          active in keeping us in sports and the whole

2          nine yards.  So we stayed busy with stuff

3          instead of just getting in trouble.  She

4          wanted to make sure we did the right thing.

5                    THE COURT:  And let me ask you if

6          you have ever served as a-- before today a

7          juror or a grand juror?

8                    PROSPECTIVE JUROR 34:  No, sir.

9                    THE COURT:  Okay.  Now, there's been

10         something short of a million questions asked,

11         but not quite a million.  Let me ask a

12         couple-- well, first of all, you've listened,

13         it's obvious from the way you handled kind of

14         part of the discussion.  Are there particular

15         questions I've asked where you would have

16         raised your hand that you remember?

17                   PROSPECTIVE JUROR 34:  Yes.

18                   THE COURT:  Are you comfortable

19         talking about it from there, or would you

20         like to come up here?

21                   PROSPECTIVE JUROR 34:  I'm okay with

22         it here.

23                   THE COURT:  All right.  And which

24         question would have gotten a hand raised by

25         you?

213

1          PROSPECTIVE JUROR 34:  Well, my

2     sister had been involved in a case with the

3     Supreme Court.  So it was with forgery and--

4     and bank stuff.

5          THE COURT:  All right.

6          PROSPECTIVE JUROR 34:  With making

7     false writings and checks and stuff.  But

8     that was-- and she's currently on probation

9     for that.

10          THE COURT:  Your sister was charged

11     in that case?

12          PROSPECTIVE JUROR 34:  Yes, charged

13     and convicted.  She--

14          THE COURT:  How long ago was this?

15          PROSPECTIVE JUROR 34:  Well, she's

16     still on-- I think it was a couple years ago

17     by the time she did her prison time and now

18     she's doing her probation.

19          THE COURT:  And were you called upon

20     to be a witness--

21          PROSPECTIVE JUROR 34:  No.

22          THE COURT:  --or any kind of

23     participant in that case?

24          PROSPECTIVE JUROR 34:  No, I was not

25     involved in the case in any way.

1          THE COURT:  Thank you for telling us

2     about that.  Are there other questions where

3     you would have raised your hand?

4          PROSPECTIVE JUROR 34:  My cousin is

5     law enforcement in Jackson County, sheriff.

6          THE COURT:  He works for the sheriff

7     or he is the sheriff?

8          PROSPECTIVE JUROR 34:  He works for

9     the sheriff.  Sorry.

10          THE COURT:  And what does he do for

11     the sheriff's department?

12          PROSPECTIVE JUROR 34:  As far as I

13     know, he's just an officer, patrol officer.

14     He just goes out and I might see him from

15     time to time out and about when I go up to

16     the racetrack when he comes out on call, but

17     that's about it.  I don't really--

18          THE COURT:  How long has he been

19     doing that?

20          PROSPECTIVE JUROR 34:  It's been--

21     between there and the reservation, it's been

22     over 10 years that he's been doing that.

23          THE COURT:  Okay.  And then to bring

24     the questions back closer to the subject

25     matter of this particular case.  Do you know

1           any of the lawyers or Mr. Kearn or anybody?

2                   PROSPECTIVE JUROR 34:  No.

3                   THE COURT:  Do you know anybody who

4           works for the United States Attorney's

5           Office?

6                   PROSPECTIVE JUROR 34:  No.

7                   THE COURT:  Do you have a family

8           member or a close friend who works for a

9           prosecutor's office anywhere?

10                  PROSPECTIVE JUROR 34:  No, sir.

11                  THE COURT:  Has any member of your

12          family or a close friend or have you ever

13          been involved-- connected in any way to

14          allegations of-- involving child pornography

15          or sexually explicit images of a minor?

16                  PROSPECTIVE JUROR 34:  No.

17                  THE COURT:  Can you think of

18          anything else-- this is kind of that

19          open-ended question that I asked at the end.

20          Is there anything about your background, your

21          experiences, your own values that you would

22          want, in fairness if you were a party in this

23          case, to know about you and your background

24          and how it might affect you?

25                  PROSPECTIVE JUROR 34:  Yes.  And I

1      would rather discuss it in private.

2                    THE COURT:  Please.  If you would

3      come up.

4                         (THEREUPON, a bench conference

5      was had out of the hearing of the prospective

6      jurors and the defendant).

7                    THE COURT:  So--

8                    PROSPECTIVE JUROR 34:  Well, when I

9      was three, I was sexually molested by my

10     uncle.  But that was-- that was 35 years ago.

11     But I just want, in all fairness, to let

12     everybody know that that had happened to me.

13                   THE COURT:  Yeah.

14                   PROSPECTIVE JUROR 34:  It hasn't

15     affected my life in any way because luckily

16     I-- it was put to the background for-- till I

17     was 20 when it all came out.  So--

18                   THE COURT:  And is that

19     experience-- does it make you, do you think,

20     favor one side--

21                   PROSPECTIVE JUROR 34:  No.

22                   THE COURT:  --in this case--

23                   PROSPECTIVE JUROR 34:  No.

24                   THE COURT:  --over the other?

25                   PROSPECTIVE JUROR 34:  No.  It was

1          my own-- it's my own deal that I've--

2          luckily, like I said, I put it away a long

3          time ago and that's pretty much where it's

4          stayed.  So--

5                    THE COURT:  In this case, you'll

6          hear me say this later, I mean, I don't have

7          any investment in how this case turns out, my

8          job is to make sure that both sides in this

9          case get a fair trial.

10                   PROSPECTIVE JUROR 34:  Uh-huh.

11                   THE COURT:  So I guess the real

12         question that these people need to know the

13         answer to to do their job is when the case

14         starts, if you're chosen for the jury, are

15         you going to start out somewhere other than

16         the middle?

17                   PROSPECTIVE JUROR:  Oh, absolutely

18         not, no.

19                   THE COURT:  Ms. Kenney, do you have

20         questions on this subject that you would like

21         to ask?

22                   MS. KENNEY:  I don't.  Thank you.

23                   THE COURT:  Mr. Francis?

24                   MR. FRANCIS:  No.

25                   THE COURT:  All right.  I'll ask you

218

1           to go back to your seat there and we'll just

2           visit a second and then we'll resume.

3                       (THEREUPON, Prospective Juror

4           34 returned to the jury box).

5                       THE COURT:  Anybody want to-- think

6           we ought to dismiss him?

7                       MR. FRANCIS:  No.

8                       MS. KENNEY:  No.  Thank you.

9                       THE COURT:  Thank you very much.

10                      (THEREUPON, the following

11          proceedings were had in the presence and

12          hearing of the prospective jurors and the

13          defendant).

14                      THE COURT:  All right.  Thank you,

15          Prospective Juror 34.  Are there any other

16          questions that you heard during that time

17          when you were paying close attention to the

18          many questions--

19                      PROSPECTIVE JUROR 34:  No.

20                      THE COURT:  --I asked that we

21          haven't covered?

22                      PROSPECTIVE JUROR 34:  No, sir.

23                      THE COURT:  All right.  Ms. Kenney,

24          if you would like to resume your questions of

25          the panel.

219

1              Thank you very much, Prospective

2      Juror 34.

3              MS. KENNEY:  So I just want to take

4      up where I left off.  Is there anyone else

5      who thinks that they will just not be able to

6      listen to all the evidence in this case and

7      render your decision based on all of the

8      evidence and the law that the Court will give

9      you?  Is there anyone else who thinks that

10     they may have trouble with the subject matter

11     in this case?

12             I want to talk a little bit about

13     computers and mobile phones.  And I'm going

14     to ask this backwards than I would have asked

15     this question 10 years ago.  Is there anyone

16     here who does not have a cellular phone or a

17     mobile phone?

18             Prospective Juror 8.

19             PROSPECTIVE JUROR 8:  Right.

20             MS. KENNEY:  No mobile phone

21     whatsoever?

22             PROSPECTIVE JUROR 8:  No computer.

23             MS. KENNEY:  No computer.  I have to

24     say I'm thoroughly impressed.  I-- I don't

25     ever feel like I can get away from my

1    computer.  So there'll be a lot of evidence

2    in this case talking about mobile phones,

3    E-mails, computers, that kind of thing.  So

4    that's why I'm asking this question.  Is

5    there anyone on the panel whose cellular or

6    mobile phone does not have internet

7    capabilities or E-mail capabilities?

8              I'm going to try to guess this.  I'm

9    sorry.  XXXX.

10             PROSPECTIVE JUROR 1:  Very good.

11             MS. KENNEY:  Well, I want to say

12   that I listened to Judge Crabtree and so I

13   have all your names right, but I promise you

14   I'm going to-- I'm going to mess some up.  So

15   you have like just a regular phone that makes

16   a phone call?

17             PROSPECTIVE JUROR 1:  Just a regular

18   old phone.  That's it.

19             MS. KENNEY:  Do you have computer

20   access otherwise, use E-mail, that kind of

21   thing?

22             PROSPECTIVE JUROR 1:  Yes.

23             MS. KENNEY:  There was another hand.

24   Oh, couple hands.

25             Okay.  Prospective Juror 28.

1          PROSPECTIVE JUROR 28:  Yes, ma'am.

2     My phone has-- I'm not smart enough to work

3     it.

4          MS. KENNEY:  Fair enough.  You use a

5     computer otherwise?

6          PROSPECTIVE JUROR 28:  Yes, ma'am.

7          MS. KENNEY:  E-mail?

8          PROSPECTIVE JUROR 28:  Yes.

9          MS. KENNEY:  Okay.  And XXXX.

10          PROSPECTIVE JUROR 27:  XXXX.

11          MS. KENNEY:  XXXX.  I can't-- that's

12     my fault.  I can't read my writing.  You have

13     a mobile phone but--

14          PROSPECTIVE JUROR 27:  Yes.  It's

15     basically just for emergencies.  But I have a

16     computer.

17          MS. KENNEY:  Okay.  So E-mail,

18     internet, that whole thing?

19          PROSPECTIVE JUROR 27:  Uh-huh.

20          MS. KENNEY:  Okay.  I guess I should

21     also ask, because I just made this

22     presumption, that if you have a mobile phone

23     with internet access that you also have a

24     computer.  Is anyone who does not have a

25     computer or doesn't use a computer regularly?

1              Is it XXXX?

2              PROSPECTIVE JUROR 14:  I use one.

3              MS. KENNEY:  Okay.  All right.

4              Is there anyone-- because as I was

5    sitting here listening there is a lot of

6    people on this panel, which I may try to

7    touch base on a little bit, but a lot of

8    people on this panel I think work in the

9    information technology area.  Is there anyone

10   on this panel who would consider themselves

11   to be an expert in computers?

12             Prospective Juror 32.

13             PROSPECTIVE JUROR 32:  Yes.

14             MS. KENNEY:  You mentioned Macs and

15   Apple.

16             PROSPECTIVE JUROR 32:  Yes.  But not

17   Windows.  I abhor Windows.  I mean-- you

18   know, so it's just those.

19             MS. KENNEY:  Okay.  Okay.  All

20   right.  That's fair.

21             Anyone else?

22             I want to just try-- there's just

23   some questions that came up that I just

24   wanted to follow up on.

25             And is it Prospective Juror 10?

1              PROSPECTIVE JUROR 10:  Yes.

2              MS. KENNEY:  You're an associate

3      professor at Emporia State; is that correct?

4              PROSPECTIVE JUROR 10:  Correct.

5              MS. KENNEY:  Did you ever have

6      contact or know a person named Leslie Kenney?

7              PROSPECTIVE JUROR 10:  Yes.

8              MS. KENNEY:  A sports trainer?

9              PROSPECTIVE JUROR 10:  Yes.

10              THE COURT:  That's my niece.

11              PROSPECTIVE JUROR 10:  Well, I did

12      not know that.

13              MS. KENNEY:  That's okay.

14              PROSPECTIVE JUROR 10:  I do now.

15              MS. KENNEY:  And she's not there

16      anymore.

17              PROSPECTIVE JUROR 10:  Yes.

18              MS. KENNEY:  I just want to-- I

19      don't have a clue-- I've not met you and I

20      don't have a clue what your relationship was

21      with my niece.  But knowing that, is there

22      any-- would that in any way affect your

23      ability to be a fair and impartial juror in

24      this case?

25              PROSPECTIVE JUROR 10:  No.

1              MS. KENNEY:  Okay.  You could give

2      the defendant as well as the United States a

3      fair trial?

4              PROSPECTIVE JUROR 10:  Yes.  Yes.

5              MS. KENNEY:  Okay.  And I just

6      wanted to bring that out because--

7              PROSPECTIVE JUROR 10:  Small world.

8              MS. KENNEY:  Yeah.  And Emporia

9      State is kind of a small community.  So it is

10     a small world.

11             XXXX, did I get that right?

12             PROSPECTIVE JUROR 13:  XXXX.

13             MS. KENNEY:  XXXX.  I knew it.  And

14     I even put a long bar over the X.  I am just

15     curious to know what a substation physical

16     design engineer does.

17             PROSPECTIVE JUROR 13:  Essentially--

18     I don't know how familiar people are with

19     substations, but you have transformers,

20     switches, breakers.  Pretty much we would

21     design the layout of everything above ground,

22     foundations as well as the equipment, the

23     conductors, the steel piping that you see, as

24     well as underground conduits and cabling.

25     Other than that--

1          MS. KENNEY:  So you design it-- you

2     design the layout but you don't fix it?

3          PROSPECTIVE JUROR 13:  Essentially,

4     yes.  It would be the maintenance-- the

5     maintenance side that does that, yes.

6          MS. KENNEY:  Okay.  All right.

7          Okay.  Prospective Juror 21?

8          PROSPECTIVE JUROR 21:  Yes.

9          MS. KENNEY:  I just missed it when

10     you were talking earlier, trying to listen

11     and write at the same time and I don't do

12     that very well.  What was your prior job

13     prior to your full-time job now?

14          PROSPECTIVE JUROR 21:  I was an IT

15     project manager.

16          MS. KENNEY:  Project manager.  And

17     what exactly does that involve?

18          PROSPECTIVE JUROR 21:  It was for an

19     annuities company here in Topeka.  And so I

20     would just manage projects that had to do

21     with IT systems.  So it would be products on

22     the system, programming, things like that.

23          MS. KENNEY:  Okay.  All right.

24     Okay.  Thank you.

25          Prospective Juror 22, you're an RN?

1          PROSPECTIVE JUROR 22:  I am.

2          MS. KENNEY:  And I missed it.  You

3     said you worked at Saints?

4          PROSPECTIVE JUROR 22:  St. Francis

5     Hospital.

6          MS. KENNEY:  I'm sorry, I should

7     have known that.  And you said you were in

8     charge of three departments?

9          PROSPECTIVE JUROR 22:  I am.

10         MS. KENNEY:  What does that mean, to

11    be in charge of a department-- or three

12    departments?

13         PROSPECTIVE JUROR 22:  Manage a lot

14    of other nurses as well as running schedules

15    and taking care of patients as well.

16         MS. KENNEY:  All right.  So you have

17    more personnel responsibilities than a nurse

18    that would just be in one of those

19    departments.  Is that a fair statement?

20         PROSPECTIVE JUROR 22:  Correct.

21         MS. KENNEY:  Okay.  All right.

22         Okay.  We've all been here a very

23    long time and really appreciate how attentive

24    you have been.  My only question would be to

25    each of you is if you can think of any reason

1          that you could not be a fair and impartial

2          juror and give both the defendant and the

3          United States a fair trial.  If you can think

4          of any reason, I would ask that you let us

5          know now.  And again, if it's something that

6          we should take up at the bench, we can make

7          that arrangement.

8                    Thank you, Your Honor.

9                    THE COURT:  All right.  Thanks very

10         much, Ms. Kenney.

11                   Mr. Francis, would you like to

12         question the panel?

13                   MR. FRANCIS:  Let me see if I can

14         find at least one stone that has not been

15         turned.  And actually I have two.  One of

16         them deals with the IT thing.  I know that

17         Prospective Juror 7 and Prospective Juror 2

18         and Prospective Juror 21 all dealt with IT.

19         But did your jobs include, for example,

20         programming computers?  And if it didn't,

21         raise your hand.

22                   Prospective Juror 7.

23                   PROSPECTIVE JUROR 7:  Mine was

24         computer operations, but I did work with

25         programmers.

1          MR. FRANCIS:  Prospective Juror 32,

2     you talked about Apples and I believe you

3     mentioned you had an iPhone.  You had a cell

4     phone.  Is it an iPhone?

5          PROSPECTIVE JUROR 7:  Yes.

6          MR. FRANCIS:  Is it an Apple?

7          PROSPECTIVE JUROR 7:  Yes, it is.

8          MR. FRANCIS:  And do you put apps on

9     that iPhone?

10          PROSPECTIVE JUROR 7:  Yes.

11          MR. FRANCIS:  All right.  Are you

12     familiar with how those different apps can

13     work depending on how they operate and

14     everything?

15          PROSPECTIVE JUROR 7:  Honestly, no.

16     I'm more into the hardware as opposed to the

17     software.

18          MR. FRANCIS:  Okay.  All right.

19          PROSPECTIVE JUROR 7:  If that makes

20     sense.

21          MR. FRANCIS:  It does.

22          And then, Prospective Juror 22, I

23     know you manage three different departments,

24     but is there a particular area of nursing

25     that you engage in?  Like, say, neonatal or--

1              PROSPECTIVE JUROR 22:  Well, it's

2       surgery, it's preop area, the recovery room,

3       and then GI.  But I also have a specialty in

4       electrophysiology, which involves the

5       electrical rhythm of the heart.

6              MR. FRANCIS:  I have no further

7       questions, Judge.

8              THE COURT:  All right.  Thank you

9       very much.  Can I see counsel very quickly at

10      the bench, please?

11              (THEREUPON, a bench conference

12      was had out of the hearing of the prospective

13      jurors and the defendant).

14              THE COURT:  All right.  Are you

15      prepared to pass the panel for cause?

16      Ms. Kenney?

17              MS. KENNEY:  I am.

18              THE COURT:  And, Mr. Francis?

19              MR. FRANCIS:  Yes, sir.

20              THE COURT:  All right.  Very well.

21      What I think I will do is I'll let you go

22      back, look at your notes, confer with your

23      table.  I'm going to ask them to stay put for

24      a second so that you can have names and faces

25      to go with that and let you formulate your

230

1            strategy for your peremptory challenges.  And

2            then I'm going to let them take a break while

3            you finalize that.  If you tell me you're

4            able to do the challenges without them in the

5            room, then I'd let them stay out because it's

6            not very interesting to sit there and watch

7            you.

8                      MR. FRANCIS:  I don't have a problem

9            with that.

10                     THE COURT:  You okay with that?

11                     MS. KENNEY:  I'm okay with that.

12                     THE COURT:  That's terrific.  I'll

13           let you have a few minutes looking at them

14           and I'll watch for some sign from you that

15           you've completed what you need with them

16           present and then I'll let them go.

17                     (THEREUPON, the following

18           proceedings were had in the presence and

19           hearing of the prospective jurors and the

20           defendant).

21                     THE COURT:  Ladies and gentlemen,

22           members of the panel, we're finished asking

23           you questions.  So the process now is that

24           our system, our rules, permit each side to

25           use what are called peremptory challenges.

1          It's a fancy way of saying challenges that

2          require no explanation.  Each side gets a

3          certain number and they get to exercise them

4          as they see fit.

5                  It is helpful to them-- though

6          they've been listening and taking notes, it's

7          often helpful for them for you to sit there

8          and have a mental-- sort of a cue for their

9          memory of, oh, yeah, this juror is the one

10         that said that.  So I'm going to give them a

11         few minutes now to look at their notes and

12         confer with their colleagues at the table

13         while you really do no more than sit there.

14                 It's not the most efficient use of

15         your time, but it's-- I think it will enable

16         us to take a break when they give me eye

17         contact and say they've had enough time for

18         that and then you can go out and they can do

19         the actual work of striking, exercising their

20         peremptory challenges.  Then we'll bring you

21         back in after a break, we'll announce who has

22         been selected to serve on the jury.  And then

23         we'll excuse the others of you to go back

24         down to the jury room and see if you're

25         needed for further service this week.

232

1              So you can be darn near as loud as

2      you want talking to your neighbor or doing

3      whatever.  It's even permissible to-- this is

4      the one time, the only time in the courtroom

5      you can look at your phone unless your phone

6      just is a phone.  You don't have your phones.

7      They took them away, I forgot.  That wasn't

8      my idea.  It's the only-- I was going to say

9      I would permit you to do that.  But our court

10     long ago adopted the practice of lack of

11     access is the best answer to temptation.  So

12     you'll have to talk.  You'll have to visit

13     with one another in the old-fashioned actual

14     words.

15              So take a few minutes while they do

16     their work and then when they're finished

17     they give me the sign, I'll excuse you, and

18     you can have your afternoon break.  And then

19     we'll bring you back in and announce who's

20     serving on the jury.  All right?

21              All right.  Members of the panel,

22     the attorneys and the parties have completed

23     their work that they need you sitting in your

24     seats.  They've completed that part of the

25     work.  So we're going to take a recess.  This

1        one's going to be about 20 minutes.  And so

2        I'll ask you to be back in the jury assembly

3        room at 10 till 3:00.  And then Ms. Hill or

4        Ms. Garrett will bring you up and we'll

5        conclude jury selection and get on with the

6        trial and excuse those who are not chosen to

7        serve.

8              So we'll be in recess for about 20

9        minutes.  Please remember that you're not to

10       talk about the case with anyone, you're not

11       to read anything about the case.  If anyone

12       tries to talk with you about the case, you

13       want to let Ms. Garrett know.  No researching

14       of any information.  And that will continue

15       to apply for the balance of the trial.  All

16       right.  Please.

17             (THEREUPON, the following

18       proceedings were had in the presence and

19       hearing of the defendant).

20             THE COURT:  Counsel, did Ms. Garrett

21       give you the sheet that we use to trade back

22       and forth for the striking of the jurors?

23             MR. FRANCIS:  No, sir.

24             THE COURT:  All right.  With any

25       luck, she'll be back in a moment and give

234

1          that to you.  And what I will do from there

2          is I'm going to leave you here on the record

3          in effect to do that.  You obviously are just

4          going to be trading back and forth.  Once

5          you've completed your strikes and each of you

6          has had the chance to look at it, I want to

7          ask you about Batson and McCollum challenges.

8          If there are any problems with that, we'll

9          take it up.  If there are not, then we'll

10         bring them back in and we will seat them all,

11         I think, back there and call the people who

12         are chosen to seats 1 through 14.  All right?

13                   Any problems from your end?

14                   MS. KENNEY:  No, Your Honor.

15                   MR. FRANCIS:  No.

16                   THE COURT:  Are you ready to

17         exercise your peremptories then?

18                   Ms. Garrett, can you provide them

19         with the sheet for the peremptory challenges.

20                   MS. GARRETT:  Certainly.

21                   THE COURT:  All right.  So I'll be

22         up here if you need me, but I'll let you do

23         your work.

24                   (THEREUPON, a recess was

25         taken).

235

1                    (THEREUPON, the following

2           proceedings were had in the presence and

3           hearing of the defendant).

4                    THE COURT:  We're on the record

5           outside the hearing of the jury.  And,

6           counsel, Ms. Garrett is going to provide you

7           the way we have in effect transcribed your

8           strikes against the seating chart.  And I

9           want you to examine it to make sure that it

10          shows the elimination of the people you meant

11          to eliminate by your strikes, and it will

12          show the people who will be seated on the

13          jury and then as alternates.

14                    I am not going to say to the

15          alternates you're alternates.  They usually

16          figure it out.  But I find no reason to make

17          that announcement now.  But after you've

18          reviewed it, I want to make sure that we're

19          all in agreement of the 12 that will serve as

20          the jurors and the two who are alternates.

21          So I'll ask Ms. Garrett to provide that to

22          you and then I'll call on you when you've had

23          a chance to look at it.

24                    Ms. Kenney, have you reviewed the

25          application of your strikes and it's the

1          chart that reflects the jurors-- or the

2          prospective jurors chosen to serve?  Is that

3          correct?

4                    MS. KENNEY:  Yes, Your Honor.

5                    THE COURT:  And, Mr. Francis, the

6          same questions for you.

7                    MR. FRANCIS:  Same answer, Judge.

8          It's correct.

9                    THE COURT:  All right.  Then I'll

10          ask Ms. Garrett and Ms. Hill to bring the

11          jury back in.  We'll seat them up here.

12          Contrary to what I said before the break, I

13          will read the names of those chosen to serve

14          and we will then excuse and thank the others.

15          That's going to make it 3:15ish or so.  I

16          presume that we can get our opening

17          statements in today?  I don't see any reason

18          to--

19                    MR. FRANCIS:  They're pretty short.

20                    THE COURT:  I guess the question

21          then it will be-- let's say it's 4 o'clock.

22          It probably won't be that late but let's say

23          at 4 o'clock are you prepared to go straight

24          to evidence, or do you want to send them home

25          and start with the evidence in the morning?

1           MS. KENNEY:  Your Honor, I'd rather

2      not open and send them home.  And we do have

3      our first witness here.  The only thing, as I

4      mentioned before, we need is to get the

5      electronic stuff set up and get the courtroom

6      cleared.  So I guess that wasn't really a

7      straight answer.

8           THE COURT:  Actually it was an

9      answer that I understood but it went both

10     directions.

11          MS. KENNEY:  Well, no, we're ready

12     to go.  The only--

13          THE COURT:  You need to set up.

14          MS. KENNEY:  We do need to set up.

15     And I don't think that's going to take that

16     long, but-- that's all.

17          THE COURT:  Mr. Francis, do you have

18     a strong say in this?

19          MR. FRANCIS:  No, sir.

20          THE COURT:  All right.  Well, let's

21     plan to go on and get the evidence started.

22     I think they feel like that they've gotten

23     something accomplished if they start to hear

24     evidence on the first day.  If I have a sense

25     that they're sick of us, I'll call an audible

1           and we'll start the evidence in the morning.

2           But at the very least, plan to get the

3           opening statements in, the preliminary

4           instructions.

5                    I would at this time remind you that

6           the Rule 615 has been invoked and so-- now I

7           don't think we've had any witnesses in but if

8           they've been in they should be out now.  I

9           said I wanted to remind you to inform your

10          witnesses that the-- under our court's

11          construction of the rule it means that people

12          who are witnesses or potential witnesses

13          cannot testify with other-- or cannot discuss

14          the case with other witnesses about what

15          their testimony has been or will be or

16          anything that has-- happens in the courtroom.

17          Naturally, a witness can discuss the case

18          with an attorney from either side.

19                    This rule against sharing

20          information that I just described applies

21          face-to-face, E-mail, electronic text, any

22          form that would be used to communicate

23          those forbidden-- that forbidden contact.

24          And I would direct each side, the counsel for

25          each side, to inform their witnesses or

1    potential witnesses of this restriction and

2    how it is applied in this courthouse.

3              So we'll get the jury back up and

4    we'll get them seated and then we'll

5    move-- we'll get them seated, sworn, move to

6    opening statement after some preliminary

7    instructions.

8              Maybe we can do this while they're

9    coming up.  Counsel and-- Ms. Kenney, did you

10   have any concerns or objections to the way

11   that the defendant exercised his peremptory

12   challenges under the case authorities such as

13   Batson or McCollum?

14             MS. KENNEY:  I do not, Your Honor.

15             THE COURT:  And, Mr. Francis, the

16   same question of you.  Do you have any

17   concern or objection to the way the

18   government exercised its peremptory

19   challenges under the principles recognized in

20   Batson, McCollum and like cases?

21             MR. FRANCIS:  No, sir.

22             THE COURT:  Very well.  That will

23   take care of that then.

24             The one thing I haven't done--

25   actually, could I ask you to stop Megan

1          before she starts into the courtroom.

2                    The one thing that I haven't done

3          that I meant to do is that I told you I

4          wanted you to address any Lafler or Frye

5          concerns by identifying the content of any

6          plea offers that have been made available to

7          the defendant.

8                    Mr. Francis, I have every confidence

9          that you have relayed those, as I would

10         expect a professional of your experience to

11         do, but--

12                   MR. FRANCIS:  We-- we did have an

13         offer.  It kind of came in through

14         Mr. Slinkard actually because Ms. Kenney was

15         preparing.  And I forwarded that to my

16         client, we discussed that, and we turned that

17         down.

18                   THE COURT:  Ms. Kenney, can you just

19         simply recite the terms of that offer, and

20         then I'll ask Mr. Kearn to acknowledge

21         whether he was advised of that offer.

22                   MS. KENNEY:  Yes, Your Honor.  As I

23         understand it -- and I confirmed this in an

24         E-mail to Mr. Francis so I think he would

25         have corrected me -- the offer was a

1          (c)(1)(C), a binding plea agreement to a

2          10-year sentence to Count 3.

3                    THE COURT:  Can you give us just a

4          second?  Yes, I'm sorry.  Go ahead.  You're

5          fine.

6                    MS. KENNEY:  Count 3, the possession

7          charge.

8                    THE COURT:  And, Mr. Kearn, can you

9          confirm for us that you were made aware of

10         that plea offer from the government?

11                   THE DEFENDANT:  I was last week,

12         yes, sir.

13                   THE COURT:  All right.  Very well.

14         Thank you.  I think we're ready to bring the

15         jury in unless either of you has anything

16         else.

17                   MS. KENNEY:  No, Your Honor.

18                   THE COURT:  All right.  Ms. Garrett,

19         please.

20                        (THEREUPON, the following

21         proceedings were had in the presence and

22         hearing of the prospective jurors and the

23         defendant).

24                   THE COURT:  All right.  Looks like

25         we have a full house.  We'll be seated when

1          you are.  All right.  Ladies and gentlemen,

2          welcome back.  We're back on the record in

3          the presence of the prospective jurors, and I

4          would ask at this time-- I can tell you that

5          the attorneys have completed their process of

6          using their peremptory challenges and so

7          we've arrived at the composition of the jury.

8          And I will ask the deputy clerk if she will

9          call the names of those who have been chosen.

10         So listen for your name.  If you hear your

11         name, it means you have been selected to

12         serve on this jury.  If you don't hear your

13         name, it means you have not.

14                  Ms. Garrett, can you call those

15         please?

16                  (THEREUPON, the jury was

17         announced).

18                  THE COURT:  All right.  So if you

19         heard your name, you've been chosen; if you

20         did not hear your name, it means you've not

21         been chosen.  What I can tell you if you

22         didn't-- yes, there's one more name we need

23         to call.

24                  (THEREUPON, the additional

25         juror was called).

1              THE COURT:  So now we should have 12

2        and two.  If you did not hear your name, you

3        are excused today.  You don't need to go back

4        down to the room where you reported unless

5        you have personal articles you want to pick

6        up there.  You are not released, at least not

7        yet, from your jury summons and you need to

8        call the phone number that is on the jury

9        summons on Friday to see whether you need to

10       come back for further service.  So there will

11       be a recording that will go up on that line

12       on Friday.

13              Ms. Garrett, do you know about what

14       time it goes up?  Late in the day?

15              MS. GARRETT:  Late in the day.

16              THE COURT:  Late in the day.  Call

17       at the end of the business day or Friday

18       evening to check your status under your

19       summons and it should be clear at that time.

20              That last part goes for all of you

21       in the gallery.  You are released for today.

22       You too will need to call the number on the

23       jury summons on Friday to see if further

24       service is required under your jury summons.

25              I do want to say to those of you who

1          are being released today, those of you who

2          weren't chosen, it is, I suppose, easy to

3          think that today was a waste of your time.  I

4          hope you won't feel that way.  Much like

5          creating a perfect sculpture, we had to have

6          the whole block of granite.  We needed

7          everybody here to start the process, and your

8          presence and your honoring the jury summons

9          that you received contributed quite

10         meaningfully to the cause of justice.  So you

11         leave this courtroom and the building, at

12         least for today, with my thanks and the

13         Court's thanks for your participation in the

14         process.  So we'll excuse those of you whose

15         name was not called.  And again, thank you so

16         much.

17              All right.  I'm going to ask

18         Ms. Garrett to call your names in the order

19         that we would like for you to be seated in

20         the jury box.  We're now to a point where

21         everybody will fit in the jury box proper and

22         so we'll start up where Juror 1 is.  You will

23         continue to occupy the pole position and

24         we'll move down from there.  And so please

25         listen to Ms. Garrett as she calls your name

1        and she'll direct you where you should go in

2        the jury box.

3                    (THEREUPON, the jury was seated

4        in the jury box).

5                    THE COURT:  All right.  These are

6        the seats that you will occupy for the

7        balance of the trial.  So it was like your

8        schoolhouse growing up, you're going to

9        return to your assigned seat each day.  This

10       is not a Southwest flight.

11                   Can I call upon Ms. Garrett to

12       administer the oath to the members of the

13       jury.  And if you will at this time please

14       stand and raise your right hand for your

15       oath.

16                   (THEREUPON, the jury was

17       sworn).

18                   THE COURT:  Members of the jury, now

19       that you have been sworn as jurors I want to

20       give you some preliminary instructions to

21       guide you during the trial.  First let me

22       talk to you about the duty of the jury.  It

23       will be your duty to find from the evidence

24       what the facts are.  You and you alone are

25       the judges of the facts in this case.  You

1          have to apply-- you will have to apply to the

2          facts the law as the Court will give it to

3          you.  You must follow the law whether you

4          agree with it or not.

5                    Nothing that I say or do during the

6          course of this trial is meant to indicate or

7          should be taken by you to indicate what your

8          verdict should be.

9                    The evidence.  The evidence from

10         which you will find the facts will consist of

11         the testimony of witnesses, documents and

12         other things that are received into the

13         record called exhibits, and any facts that

14         the lawyers agree to or stipulate to or any

15         other facts that the Court may instruct you

16         that you must find.

17                    Certain things, though, are not

18         evidence and must not be considered by you.

19         I will list them for you now.  First,

20         statements, arguments and comments by lawyers

21         are not evidence.

22                    Second, objections to questions are

23         not evidence.  Lawyers have an obligation to

24         their clients to make an objection when they

25         believe evidence is being offered that is

1        improper under the rules of evidence.  You

2        should not be influenced by the objection or

3        by the Court's ruling on the objection.  If

4        the objection is sustained, ignore the

5        question.  If the objection is overruled,

6        treat the answer like you would any other

7        answer.  If you are instructed that some item

8        of evidence is received for a limited purpose

9        only, you must follow that instruction.

10              Three, testimony that the Court has

11       excluded or told you to disregard is not

12       evidence and you must not consider it.

13              Four, anything you may have seen or

14       heard outside the courtroom is not evidence

15       and must be disregarded.  You are to decide

16       the case solely on the evidence presented

17       here in this courtroom.  There are two kinds

18       of evidence, direct and circumstantial.

19       Direct evidence is direct proof of a fact

20       such as testimony by an eyewitness.

21       Circumstantial evidence is proof of facts

22       from which you may infer or conclude that

23       other facts exist.  I will give you

24       additional instructions on these as well as

25       other matters at the end of the case, but

1       please keep in mind that you may consider

2       both kinds of evidence.

3              It will be up to you to decide which

4       witnesses to believe, which witnesses not to

5       believe, and how much of any witness's

6       testimony to accept or to reject.  I will

7       give you some guidelines for determining the

8       credibility of witnesses at the end of the

9       trial.

10             As you know, this is a criminal

11      case.  There are three basic rules about a

12      criminal case that you must keep in mind.

13      First, the defendant is presumed innocent

14      until proven guilty.  The indictment against

15      the defendant brought by the government is

16      only an accusation.  It is nothing more.  It

17      is not proof of guilt or anything else.  The

18      defendant therefore begins this trial with a

19      clean slate.

20             Second, the burden of proof is on

21      the government until the very end of the

22      case.  The defendant has no burden to prove

23      his innocence or to present any evidence or

24      to testify.  Since the defendant has the

25      right to remain silent, the law prohibits you

1          when arriving at your verdict from

2          considering the fact that the defendant may

3          not have testified.

4                    Third, the government must prove the

5          defendant's guilt beyond a reasonable doubt.

6          I will give you further instructions on this

7          point later.  But bear in mind that in this

8          respect a criminal case is different from a

9          civil case.  I will give you detailed

10         instructions about the law at the end of the

11         case, and those instructions will control

12         your deliberations and your decisions.

13                   Now I want to share a few words with

14         you about your conduct as jurors.  First, I

15         instruct you that during the trial you are

16         not to discuss this case with anyone or

17         permit anyone to discuss it with you.  Until

18         you retire to the jury room at the end of the

19         trial to deliberate on the verdict, you

20         simply are not to talk about the case.

21                   Second, do not read or listen to

22         anything touching on this case in any way.

23         If anyone should try to talk to you about the

24         case, please bring it to my attention

25         promptly.

1              Third, do not try to do any research

2       or make any investigation about the case on

3       your own.  This rule includes handheld

4       electronic devices and social media.  I know

5       that many of you use cell phones,

6       BlackBerries, the internet and other tools of

7       technology.  You must not talk to anyone at

8       any time about this case or use these tools

9       to communicate electronically with anyone

10      else about the case.

11              This prohibition includes your

12      family and your friends.  You may not

13      communicate with anyone about the case on

14      your cell phone, by E-mail, by iPhone or text

15      messaging or on Twitter, through a blog or a

16      website or on Facebook, Google+, Myspace,

17      LinkedIn, YouTube or anything else that's

18      like those things.  Simply, you may not use

19      any kind of technology or social media even

20      if I have not mentioned it specifically.

21              Finally, do not form any opinion

22      about the evidence until all the evidence is

23      in.  Keep an open mind until you start your

24      deliberations in the jury room at the end of

25      the trial.

1          If you wish, you may take notes.

2     But if you do, leave them in the jury room

3     when you leave at night.  And remember, these

4     notes, they are for personal use only.  They

5     are not to be given or read to anyone else.

6          Ms. Harris, the court reporter, is

7     making an official record of the trial.  This

8     record is prepared basically to assist if

9     there are appeals.  A typewritten copy of the

10    testimony will not be available to you to use

11    during deliberations.

12          The trial will now begin.  In a few

13    minutes the government will make an opening

14    statement, which is simply an outline to help

15    you understand the evidence as it comes in.

16    After that defendant's counsel may, but does

17    not have to, make an opening statement.

18    Opening statements are not evidence, nor are

19    they arguments.

20          The government will then present its

21    witnesses and evidence and counsel for the

22    defendant may cross-examine those witnesses.

23    Following the government's case the defendant

24    may, if he wishes, but he is not required to,

25    present witnesses whom the government may

1          cross-examine.

2                    After all the evidence is in, the

3          Court will instruct you on the law and then

4          the attorneys will present their closing

5          arguments to summarize and interpret the

6          evidence for you.  After that, you will

7          retire to the jury room to deliberate about

8          your verdict.

9                    Ladies and gentlemen, those are my

10         preliminary instructions to you.  I know that

11         we just had a short recess.  I'm going to ask

12         for you to take another short one while we

13         get rid of the extra chairs so that they

14         won't present a hazard in the courtroom.  And

15         at that time Ms. Garrett will show you where

16         your notebooks are that you can use to take

17         notes and you will be-- when you come back

18         into the courtroom you can bring those with

19         you and take notes on them if you wish.  But

20         in no way are you required to take notes.

21                   So we'll take a very brief recess

22         while we clean up the courtroom.

23         Ms. Garrett, as I said, will be in charge of

24         your care throughout the trial.  This time

25         you're not going to go through that door.

1              She's going to take you to your jury room,

2         which is where you will congregate in the

3         morning before trial and where you will go

4         during recesses.

5                   Please remember the instruction that

6         I have given frequently enough today that you

7         can probably give it to yourself.  But just

8         in case, remember, until the trial is

9         completed do not discuss it with anyone, not

10        members of your family, not each other, not

11        people involved in the trial.  If anyone

12        tries to talk to you about the trial, please

13        let me know about it immediately.  Please do

14        not access any media reports, if there are

15        any.  And you cannot talk with any of the

16        people involved in the trial, even if it's on

17        a subject that's unrelated to the trial.

18                   So we'll take a short recess while

19        we clean up the courtroom, get you familiar

20        with your surroundings in the jury room.

21        This will just be about 10 minutes.  All

22        right.  We'll be in recess until then.

23                   (THEREUPON, the jury exited the

24        courtroom and the following proceedings were

25        had in the presence and hearing of the

1          defendant).

2                    THE COURT:  Counsel, let me just

3          confirm with you.  The jury as empanelled and

4          seated, does it conform to your selections,

5          and is the jury properly seated?

6                    Ms. Kenney?

7                    MS. KENNEY:  Yes, Your Honor.

8                    THE COURT:  Mr. Francis?

9                    MR. FRANCIS:  Yes.

10                   THE COURT:  All right.  Take 10

11         minutes.  We'll get the courtroom cleared up

12         and then we'll hear from you on opening

13         statements.

14                        (THEREUPON, a recess was

15         taken).

16                        (THEREUPON, the following

17         proceedings were had in the presence and

18         hearing of the defendant).

19                   THE COURT:  All right.  I'll ask

20         Ms. Garrett to bring the jury in if you're

21         ready.

22                        (THEREUPON, the following

23         proceedings were had in the presence and

24         hearing of the jury and the defendant).

25                   THE COURT:  All right.  We'll sit

1          when you sit.  We are back in the courtroom

2          in the presence of the jury and of the

3          parties and counsel.

4                    And, Ms. Kenney, are you ready to

5          make an opening statement?

6                    MS. KENNEY:  Yes, Your Honor.

7                    THE COURT:  You may proceed.

8                         OPENING STATEMENT

9          BY MS. KENNEY:

10                    May it please the Court--

11                    THE COURT:  Counsel.

12                    MS. KENNEY:  --counsel, members of

13         the jury.  Over the last decade the use of

14         mobile phones with cameras and internet

15         capabilities has become commonplace.  And

16         these devices have made nationwide and

17         worldwide communication and the sharing of

18         information extremely simple.  And although

19         the vast majority of these communications are

20         for legitimate purposes, these tools have

21         also made it easier to share pictures that

22         are not legitimate.

23                    The evidence in this case will show

24         that in April of 2013 the defendant, Jonathan

25         Kearn, took pictures of his youngest

1    daughter, age four and a half at the time,

2    with an iPhone 4S and used that same iPhone

3    to E-mail those pictures to an individual in

4    Australia.  One of these pictures was of this

5    daughter's vaginal area, exposed by an adult

6    male's hand, which is identified by a

7    fingerprint examiner as the defendant.

8           However, the person in Australia who

9    received the photos was actually Detective

10   Sergeant Stuart Butler of the Queensland

11   Police Department.  His job responsibility

12   included conducting online investigations of

13   child exploitation crimes.  And you will hear

14   Detective Butler explain how he captured the

15   evidence contained in these E-mails that were

16   sent using the E-mail address

17   cheyenneandliberty@yahoo.com.  This also

18   happens to be the first names of the

19   defendant's twin 10-year-old daughters.

20          Now, based upon some information

21   contained in these E-mails, investigators

22   were able to connect some of the E-mails to

23   an AT&T account belonging to the defendant

24   and assigned to the defendant's home address.

25   Law enforcement executed a search warrant at

1          the defendant's residence here in Topeka and

2          were able to observe the girls that they had

3          seen in some of these pictures that were sent

4          to Detective Butler.

5                   They also seized an iPhone 4S the

6          defendant had in his possession.  The

7          evidence shows that some of the images

8          E-mailed from cheyenneandliberty were found

9          on the defendant's iPhone in a password

10         protected folder or application.  The

11         evidence will show that the E-mail address,

12         cheyenneandliberty@yahoo.com, was found on

13         the defendant's iPhone.  The evidence will

14         show that some of the images sent to

15         Detective Sergeant Butler were taken using

16         that same iPhone shortly before the images

17         were E-mailed to Detective Butler.

18                   The evidence will show that some of

19         the E-mails were sent using an IP address

20         that was assigned to the defendant's home

21         internet service.  And the evidence will also

22         be that there were other images of child

23         pornography on the defendant's iPhone that

24         were not E-mailed to Detective Butler.

25                   Most of the evidence that you will

1          hear over the next day and a half or so will

2          come from those E-mails and from examination

3          of that iPhone.  But there will be additional

4          evidence that will come from the defendant's

5          surveillance system showing him with his

6          daughters and with a phone at times that

7          corresponds to E-mails that were sent to

8          Detective Butler.

9                  At the close of the evidence, the

10         Court will instruct you in the law that you

11         must apply to the facts and the evidence that

12         you hear in this courtroom.  You will decide

13         whether the government has proved beyond a

14         reasonable doubt that the defendant is guilty

15         of the crimes charged.  At the end of this

16         trial, I will return and ask you to find that

17         the defendant used his iPhone to produce

18         sexually explicit images of his youngest

19         daughter, that the defendant intentionally

20         distributed these E-mails to a person he

21         believed was also interested in child

22         pornography, and the defendant possessed

23         other sexually explicit images of children

24         that he had stored on that iPhone 4S.

25                 At the end of this trial, I will ask

1          you to render a verdict based on the evidence

2          presented here in this case and the law that

3          the Court will instruct you at the end of

4          this case and I will ask you to return

5          verdicts of guilty as charged.  Thank you.

6                    THE COURT:  Mr. Francis, does the

7          defendant wish to make an opening statement

8          at this time?

9                    MR. FRANCIS:  We do.

10                    THE COURT:  Please proceed.

11                         OPENING STATEMENT

12     BY MR. FRANCIS:

13                    Thank you.  If it please the Court

14     and counsel.  Ladies and gentlemen, one thing

15     you are going to hear in this trial is that

16     Jonathan Kearn is going to tell you he took

17     the photograph of his daughter that was

18     referred to in the case by the government's

19     attorney.  What you're going to hear about

20     that is that he took the photograph to

21     preserve evidence of his daughter's vaginal

22     area after she, as-a-four-year-old, reported

23     that Jon's ex-wife's boyfriend had molested

24     her.

25                    You're also going to hear that after

260

1          that was made known to Jon, Jon went to the

2          Shawnee County Sheriff's Office and Jon

3          reported this molestation to Deputy Andy

4          Mergen.  This was in July of 2012.  Jon will

5          tell you that the photograph they say was

6          taken in April of 2013 was taken in 2012,

7          along with the time the report came up of

8          molestation.

9                  You're going to find also that Jon,

10         after discussing this matter with his lawyer,

11         made a recording of his daughter's statement

12         about the molestation, and at the time he

13         reported this to the sheriff's department Jon

14         allowed the sheriff's department to listen to

15         the recording and tape.

16                 Jon is expected to testify that of

17         course he did not send this picture to

18         Queensland, Australia, and he does not know

19         who did that.

20                 What you will hear about Jon is that

21         all during this period and for some period of

22         time before this, Jon operated his own

23         business of a heating and cooling,

24         air-conditioning company.  He installed these

25         heaters and air conditioners and worked on

1          other people's homes.  That he ran this

2          business out of his house over on Taylor

3          Street, just about four or five blocks away

4          from here.

5                    Living in that home were at one time

6          or another two of his employees.  He fired

7          those employees.  And you're going to hear

8          one of those employees who lived in the

9          basement was the man that took care of all of

10         Jon's business computer work.  He set up

11         Jon's computers for his business, he set up

12         Jon's computers that his daughters used and

13         that he used.  He put passwords on their

14         iPhones, he put applications on their

15         iPhones.  You're going to hear that Jon, when

16         he was interviewed by the police, told the

17         police in May of 2013 about these men that

18         were there that had access to the phones that

19         lived in his basement.

20                   And what you're going to hear is

21         that Jon didn't know anything about this

22         yahoo.com account that was taken out in the

23         name of his two twin daughters until the time

24         he was arrested.  Never knew that account

25         even existed.

1                    What Jon is going to tell you and

2          what the evidence is going to show is that

3          after some research being done mainly by the

4          government is that this E-mail account was

5          opened on December 27th of 2012 and that

6          account was used up until January 20th, 2013.

7          And Jon's going to get on the stand and tell

8          you what happened on January 20, 2013, so

9          I'll wait until that comes up for you to find

10         out about that.

11                   But what you'll also hear about

12         January 20, 2013 is that although there's

13         some traffic on this internet account at

14         yahoo.com from the end of December to the

15         20th of January, there's nothing on there

16         about exchanging any sexually explicit

17         pictures.  That account, according to Yahoo

18         records, was dead from about the time of

19         January 20th to mid-April when all of a

20         sudden there's E-mails that were sent from

21         that account to the officer in Australia.

22         You will hear that someone sent those E-mails

23         over there to that officer; but Jon, again,

24         will tell you he did not send them.

25                   You will hear that Jon's phone was

1          searched in May and you'll find out what it

2          all was that the officers took.  But in line

3          of the things and what they took, you'll also

4          hear evidence of the things that they did not

5          take and things they did not do in their

6          investigation.  You will hear from Dreux

7          Doty, who's the forensic examiner of

8          computers in Topeka, who looked at Jon's

9          phone and Jon's computer that were in the

10         custody of the government, and he's going to

11         tell you what his opinions were after he

12         searched through these pieces of hardware.

13                    At the conclusion of this trial,

14         based on the evidence that you will have

15         heard and the exhibits you will have seen,

16         we're going to ask you to return a verdict of

17         not guilty.  Thank you for your time.

18                    Thank you, Judge.

19                    THE COURT:  Ms. Kenney, are you

20         ready to proceed with your first witness?

21                    MS. KENNEY:  We are, Your Honor.

22                    THE COURT:  You may call your

23         witness.

24                    MS. KENNEY:  Your Honor, the

25         government calls Stuart Butler.

1          THE COURT:  Mr. Butler, if you'll
2     come up next to the witness stand and when
3     you arrive there if you'll remain standing
4     and raise your right hand, the deputy clerk
5     will administer the oath.
6               STUART BUTLER,
7     called as a witness on behalf of the
8     plaintiff, was sworn, and testified as
9     follows:
10          THE COURT:  Sir, if you'll be seated
11    and just adjust the chair and the microphone
12    so it will be sure to amplify your voice, and
13    then if you will state and spell your name
14    for the court reporter, please.
15          THE WITNESS:  My name is Stuart
16    Andrew Butler.  Butler is spelled
17    B-U-T-L-E-R.  Stuart is S-T-U-A-R-T.  Andrew
18    second given name.
19          THE COURT:  All right.
20          All right.  Ms. Kenney, you may
21    proceed.
22          MS. KENNEY:  Thank you, Your Honor.
23               DIRECT EXAMINATION
24    BY MS. KENNEY:
25    Q.   Good afternoon.

1    A.    Hi, Ms. Kenney.

2    Q.    How are you?

3    A.    Fine, thank you.

4    Q.    You've told the jury your name.  Tell us what

5          you do for a living.

6    A.    I'm a police officer in Queensland,

7          Australia.  I'm a detective sergeant by rank.

8          Excuse my accent if it doesn't get through to

9          you or whatever and, please, I'll repeat it

10         as many times as needed.  I've been a police

11         officer for 24 years in Queensland, which is

12         a state police service.  It's not a federal

13         police agency.  Over that time I've done

14         different duties including--

15   Q.    Let me stop you because I'm going to ask you

16         to slow down just a little bit.

17   A.    Okay.

18   Q.    You speak very clearly but with your accent I

19         want to make sure that the court reporter can

20         take down everything that you say.  Okay?

21         All right.  Thank you.

22              And you said-- I'm sorry, how long

23         did you say you'd been with the Queensland

24         Police Service?

25   A.    24 years.

1    Q.    24 years.  What are your current job

2          responsibilities as a detective sergeant with

3          the Queensland Police Service?

4    A.    I work in a unit called Task Force Argos,

5          A-R-G-O-S.  We're a specialist unit that

6          targets online pedophilia, child sex

7          offenders that operate on the internet.  My

8          particular team is called the Victim

9          Identification Team and it focuses on

10         identifying child victims on the internet.

11         And as part of that identifying child sex

12         offenders who are targeting these victims.

13               So we do look into the background of

14         pictures and videos, which includes child

15         exploitation, which is child pornography in

16         American law.  And we're looking to identify

17         the child victims that are in those pictures

18         and those videos so that we can rescue them

19         and save them from further child abuse.

20   Q.    Okay.  So tell us -- and maybe you mentioned

21         this -- where is your duty office?

22   A.    It's in Brisbane.

23   Q.    Brisbane?

24   A.    Yes.

25   Q.    Do you know the time difference between

1              Brisbane and Topeka, Kansas?

2       A.     It's right about 15 hours.  I didn't realize

3              there was daylight savings here.  Right about

4              15 hours.

5       Q.     So it could be 14 hours or 15 hours depending

6              on whether we're in daylight savings time

7              here?

8       A.     Yeah.  'Cause we're ahead 15 hours.

9       Q.     So it's early morning of tomorrow where

10             you're from?

11      A.     Yes, it's 10 to 7 a.m.  And I'm feeling it.

12      Q.     I'll bet you are.  Do you have an estimate of

13             the number of online investigations that you

14             have conducted?  You or your unit?

15      A.     In relation to the particular websites that

16             I'm going to discuss today my team and myself

17             have been responsible for sending out for

18             investigation.  So we've had contact

19             investigating them to a certain point and

20             sent out over probably hundreds, if not

21             thousands of these jobs that we're going to

22             discuss today.

23      Q.     Okay.  And when you say you send out, do you

24             make referrals to other law enforcement

25             agencies?

268

1    A.   Yes, we do.

2    Q.   Worldwide?

3    A.   Yes, worldwide and within my own country.

4    Q.   Okay.  And you mentioned individuals on this

5         particular Russian website.  Do you focus

6         exclusively on this particular website?

7    A.   We have been doing that lately, yes.  My--

8         my-- my office or my state police service is

9         fairly unique in this area.  We believe that

10        child victims are very important, no matter

11        where they are in the world.  There are a

12        number-- or hundreds of Australians on this

13        website but there are also a lot more

14        international targets on the website as well.

15        But we found there's a lot of contact child

16        sex offenders on this website.  And by-- what

17        I mean by that comment, I'll explain it, that

18        means they're actually abusing their own

19        children.  They're not just traders of

20        material, child pornography material, they're

21        actually having contact with children.  So we

22        discovered that and that is why we targeted

23        it.

24   Q.   And can we talk about-- can we disclose the

25        name of this website?

1  A.   Yes.  It's called Image Source, so it's

2       imgsrc.iu.

3  Q.   Okay.  And do you have an-- I think you

4       mentioned this, but do you have an estimate

5       of the number of referrals that you've made

6       to other law enforcement agencies outside of

7       Australia?

8  A.   Probably in the vicinity of 2,000.

9  Q.   I'm sorry, did I ask you how long you've been

10      operating this unit?

11 A.   No, you didn't.

12 Q.   Okay.

13 A.   Within this team I've been conducting

14      investigations since late 2012.

15 Q.   Okay.  Do you have any specialized training

16      and/or education in investigating these child

17      exploitation crimes?

18 A.   Yes.  To conduct online investigations to

19      become an undercover office like I am, we

20      have to do a week-long course within our

21      unit, which-- which trains us to be an

22      undercover officer.  We're also-- before we

23      can conduct-- because sometimes online we may

24      be considered to be committing offenses on

25      there with what we might say to our targets.

1           So we also have to get authorization to-- to

2           take part in a controlled operation as such.

3           That's what it's called in my country is

4           controlled operation.

5   Q.    Okay.

6   A.    So you have to be-- you have to get specific

7           authority to take part in an operation like

8           that.

9   Q.    Okay.  Does this training and education, in

10          your experience, include how to recognize

11          what we refer to as child pornography or--

12  A.    That-- that training happens earlier on.

13          Because I'm a detective, we have to do

14          detective training as well.  So that comes in

15          basic training to become a plainclothes

16          detective as such.  So through-- and that is

17          over a lot more courses.  Through years of

18          analysis of all groups of evidence, the court

19          evidence that you give, you have to go to a

20          detective training school over those three

21          years and-- and do exams and assignments.  So

22          learning what child exploitation is or what

23          child pornography is happens early on.

24  Q.    Do you-- when you are conducting these

25          investigations, do you use any fake profiles

1              to conceal your true identity?

2    A.    Yes, I do.

3    Q.    Okay.  And do you-- you do not reveal that

4          you are a law enforcement officer?

5    A.    I do not, no.

6    Q.    How would you describe your online persona?

7          Maybe I should first ask, do you have more

8          than one profile?

9    A.    No, not in-- not in relation to this website

10         I don't, no.

11   Q.    Okay.  How would you describe this online

12         profile?

13   A.    It isn't so much a profile.  I guess the

14         original profile was-- was taken over or

15         taken from an offender that we arrested in my

16         state.  Because they-- they can-- they give

17         us permission for us to take over their

18         identity or whatever they had on this

19         particular website.  So we did that.  He-- he

20         allowed us to take over his identity, which

21         is the one I have been using ever since.  And

22         the-- and the profile that's on the website,

23         it really didn't say too much.  It's changed

24         now because it got taken down by the website,

25         but back then in 2013 it just had pictures of

1          the Barrier Reef on there.

2                    And I can explain what the website

3          is all about because it doesn't make much

4          sense to the jury unless that happens.  But

5          my profile, because it's a picture sharing

6          website, it just had pictures of the Barrier

7          Reef on there.  There are administrators on

8          the website that can take you down, take down

9          your profile and ban you from the website if

10         you put child pornography on there.  And

11         people know that who-- who join that website.

12                   So you put pictures on there and

13         then all you do is state in your profile what

14         you're interested in.  So in my case I would

15         have said I'm interested in girls, boys, age

16         between two and 14 years.  Please contact me

17         to trade or chat.  And that's generally what

18         I do.

19                   But you can also make comments on

20         the website as well to other people's

21         pictures that they've posted in their albums

22         on the website.  So I can make a comment to

23         whoever's picture is on there and I can say,

24         love your pictures, please contact me to

25         trade or chat.  And my E-mail address is

273

1           visible on my profile and I can also leave my

2           E-mail address with any comments that I have

3           in other people's albums.

4    Q.     Okay.  So let's talk about this website,

5           Image Source.  How is this set up?  You

6           mentioned-- I don't know if you mentioned the

7           account, but do you have to have an account

8           to use this website?

9    A.     No, you don't.  You can view it anonymously.

10          You just can't make comments on other

11          people's albums.

12   Q.     So what is this website?  Does it have a

13          legitimate purpose?

14   A.     Yes, it does.  It does have a legitimate

15          purpose.  But if you compared the two--

16          there's different sections to the websites

17          for picture-- picture sharing.  So there's

18          holidays, there's cars and so on and so

19          forth.  But when you-- when you compare the

20          two where the child sex offenders go, which

21          is the kids section, and you have a look at

22          the kids section, you'll notice that there's

23          regular updates, even a few hours, so it's

24          coming out every hour or so and there's

25          thousands of users on there, but when you

1          look at the legitimate side of things it's

2          only happening every couple of days there's

3          some uploads in albums.

4                    Now, on the website too there's an

5          area where I-- I normally go.  It's the new

6          joiners to the website.  And every day I

7          review the new joiners on there.  And just

8          last week it was averaging 350 new joiners of

9          this website on that day.  And I would go

10         through the majority of those that upload a

11         new album to that website.  And they don't

12         upload new albums all the time.  They just

13         create an account.  If they don't create an

14         account, you know, I'm going to view their

15         pictures and I review them to see whether I

16         think they're a contact child sex offender or

17         whether they were Italian or whether they're

18         Australian.  They're not all Australian based

19         on where I'm from.  So that's-- that's pretty

20         much the way it works.

21   Q.    Okay.  And when you are posting comments or

22         if you actually engage in a conversation --

23         and when I say conversation I mean like an

24         E-mail exchange with another individual -- is

25         the content of that conversation sometimes

1          explicit?

2    A.    It-- it-- and maybe later you'll see some of

3          my conversations or I may read it out, I'm

4          not sure.  But it is explicit because what

5          I'm dealing with here is not the general

6          public.  I'm not targeting the legitimate

7          users on the website.  I'm targeting the

8          child sex offenders.  And it's-- it's part of

9          my facade, it's part of my undercover

10         identity to-- to act as though I'm one of

11         them and to be-- and to be very forward with

12         what I'm saying because it-- it-- it brings

13         me a certain degree of rapport among the

14         child sex offenders I'm talking to and-- and

15         will also enable me to-- to get the things I

16         need, which is evidence, to enable a law

17         enforcement officer to get-- to gain a search

18         warrant to get in through the door and as

19         such to save the children that are involved

20         in these cases that I've got.

21               So I apologize for my-- for the jury

22         having to hear it later on, my explicitness.

23   Q.    That's okay.  You don't have to apologize.

24   A.    It's all to do with my work and what I do.

25   Q.    That's fine.  We're just giving them some

1          background right now.

2                    I'm going to put in front of you

3          Exhibit-- and for the record it is Government

4          Exhibit 1, Exhibit 1-1, 1-2, 1-3, 1-4, 1-5,

5          1-6, 1-7, 1-8, 1-9, and 1-10.  Would you take

6          a moment and look at those and let me know

7          when you're done?  And take your time if you

8          need to.

9                    Now just some background questions.

10         Did you-- in 2013 did you participate in an

11         investigation of an individual identifying

12         themselves as being from Kansas who was

13         potentially producing and distributing child

14         pornography?

15   A.    Yes, I did.

16   Q.    Okay.  And was the E-mail of that individual

17         cheyenneandliberty@yahoo.com?

18   A.    Yes, it was.

19   Q.    Did you ever meet this individual during the

20         course of your investigation?

21   A.    No.

22   Q.    Did you capture the communications with this

23         individual in some manner?

24   A.    Yes, I did.

25   Q.    Can you just explain to us how you did that?

1    A.    I used my undercover E-mail account.  It

2          captured all the E-mails to it.  I also

3          downloaded the images that were sent to me.

4          And also in relation to a dropbox which was

5          online I actually downloaded all the videos--

6          or the three videos that were involved in

7          that as well.  And I used Screen Capture

8          software to do that.

9    Q.    So that was somehow you took a picture of

10         what you were actually looking at on your

11         screen?

12   A.    Yes.

13   Q.    Okay.  Now, would you take a look at

14         Exhibit 1 and tell me if you recognize that

15         exhibit?

16   A.    Yeah.  I believe that refers to the image

17         that was sent to me.

18   Q.    And this exhibit pertains to your

19         communications with cheyenneandliberty?

20   A.    Yes, it does.

21              MS. KENNEY:  Your Honor, I'd move to

22         admit Exhibit 1.

23              THE COURT:  Is there an objection?

24              MR. FRANCIS:  No, there's not,

25         Judge.

1              THE COURT:  Hearing no objection,

2         Exhibit 1 is received.

3              MS. KENNEY:  Can you pull that up?

4    Q.   (By Ms. Kenney)  That might be as clear as

5         we're going to get.  We're looking at

6         Exhibit 1.  The very beginning of that

7         exhibit is an E-mail.  It appears to be from

8         cheyenneandliberty@yahoo.com.  Do you see

9         that?

10   A.   Yes.

11   Q.   And it says, "Dad of four, found you in

12        imgsru.  Be fun to talk, swap, or whatnot,

13        smiley face, Jeff."  And then it's signed

14        "ProudPapa" with an emoticon heart.  Would

15        you agree?

16   A.   Yes.

17   Q.   And there's a picture of a little girl on a

18        merry go round?

19   A.   Yes.

20   Q.   Is this the first contact that you had from

21        cheyenneandliberty?

22   A.   Yes, it was.

23   Q.   Now, when this E-mail first came in, were you

24        actively conducting investigations?

25   A.   Yes, I was.

```
1    Q.   Okay.  And were you-- let me ask it this way.

2         Do you ever check your undercover

3         investigations when you're not physically at

4         your office?

5    A.   No, I don't.  Separate to work and my home

6         life.  They're two different things.  So, no,

7         I never check them at home.

8    Q.   Okay.  So when this E-mail came in, did you

9         respond to it?

10   A.   Yes, I would have responded to it.  At the

11        time during my conversations with this person

12        I did have days off from work and I also had

13        other responsibilities to attend to, so

14        you'll notice some difference between the

15        person sending me the E-mail and me answering

16        the E-mail.  So that's the reason behind it.

17   Q.   Okay.  So it appears, as we scroll down on

18        this exhibit, that there's a response from an

19        individual named Neve Nightshade, the E-mail

20        address man69girl@gmail.com.

21   A.   Yes.  That's me.

22   Q.   Is this the persona, the online persona that

23        you said you took over from another

24        individual?

25   A.   Yes, it is.
```

1    Q.   Okay.  You responded.  Tell us what your

2         response was.

3    A.   I said, "Sure, C, where you from?  I'm from

4         Australia.  Send me some pics, dude, and I'll

5         return the favor.  Talk soon, Neve."

6    Q.   Neve.  Thank you.  Listening to you here a

7         little bit in the courtroom, this sounds a

8         little different-- this E-mail sounds a

9         little different than the way you would

10        normally carry on a conversation.  Is that a

11        fair statement?

12   A.   You mean in my real life?

13   Q.   Yes.

14   A.   It is.

15   Q.   Okay.  The section of the Exhibit 1 that's up

16        on the screen right now also includes the

17        initial E-mail from cheyenneandliberty,

18        correct?

19   A.   Yes.

20   Q.   And here we can see a date and time, correct?

21   A.   Yes.

22   Q.   And the-- it appears that the time is April

23        16, 2013 at 5:56 p.m.  Do you know whether

24        that was Australian time or Topeka time?

25   A.   That would have been Australian time.

1    Q.    Okay.  Okay.  Now, is it fair to say that

2          while you were-- that you were communicating

3          with cheyenneandliberty over a course of

4          several days?

5    A.    Yes.

6    Q.    Or receiving-- I should say receiving

7          communications?

8    A.    Yes.  I believe it went from April 16 to

9          April 29, I think was the last time.

10   Q.    And you are welcome, Detective Butler, to

11         look at the physical exhibit.  That might be

12         easier for you than looking at the screen.

13         Exhibit 1.  There you go.

14   A.    Yeah.  When I initially did this catch, it

15         was sent out April 28th because that's when I

16         sent it.  I referred it on to Homeland

17         Security.

18   Q.    Okay.

19   A.    And that's probably it.

20   Q.    So it began sometime around April 16th?

21   A.    It did, yes.

22   Q.    And then you say it continued for about 10 or

23         12 days?

24   A.    Yes.

25   Q.    Okay.

```
 1              MS. KENNEY:  I think I need to get

 2         the ELMO.  I'm really sorry.  I'm sorry.  I

 3         feel like I have--

 4    Q.   (By Ms. Kenney)  Detective Butler, let's talk

 5         about Exhibit 1 for a minute.  Would you

 6         agree it is a-- what I would refer to as an

 7         E-mail string?

 8    A.   Yes.

 9    Q.   Begins with a communication from

10         cheyenneandliberty and it has a response from

11         you?

12    A.   Yes.

13    Q.   And then there's additional E-mails from

14         cheyenneandliberty?

15    A.   There are, yes.

16    Q.   And, of course, as we mentioned, over the

17         course of several days?

18    A.   Yes.

19    Q.   Okay.  And the page 1 of this exhibit-- well,

20         let me put it this way.  You had more E-mail

21         communications than what is on page 1 of this

22         exhibit.  Is that a fair statement?

23    A.   Yes, I believe so.

24    Q.   So in fact, if we look at page 7, this E-mail

25         string continued with one or two more
```

1         entries, correct?

2    A.   Yes.

3    Q.   That's not on page 1.  And then in addition,

4         were you receiving E-mails that were not

5         responses to Exhibit 1?  For example, just

6         individual either standalone subjects or

7         no-subject E-mails?

8    A.   From this person?

9    Q.   From this person, cheyenneandliberty.

10   A.   Yes.

11   Q.   Okay.  And would it be fair to say that those

12        are the communications that are contained in

13        Exhibit 1-1 through 1-10?

14   A.   Yes, they are.

15   Q.   Okay.

16             MS. KENNEY:  Your Honor, I think at

17        this time I would like to move to admit

18        Exhibits 1-1 through 1-10.

19             MR. FRANCIS:  No objection, Your

20        Honor.

21             THE COURT:  Without objection,

22        Exhibits 1-1 through 1-10 are offered and

23        received in evidence.

24             MS. KENNEY:  Okay.

25   Q.   (By Ms. Kenney)  Okay.  So you responded to

1          cheyenneandliberty-- or you said, "Send me

2          some pics, dude, and I'll return the favor."

3          The communications continued after that,

4          correct?

5     A.   Yes.

6     Q.   In response to your, "I'm from Australia," it

7          appears cheyenneandliberty said, "I'm from

8          Kansas, get back to you soon"?

9     A.   Yes.

10    Q.   And then a separate E-mail cheyenneandliberty

11         sends to you and asks, "Do you ever make it

12         to the United States," correct?

13    A.   Yes.

14    Q.   You responded to that E-mail?

15    A.   I did.

16    Q.   What was that response?

17    A.   "I am able to travel and very much willing if

18         there is somebody waiting for me at the other

19         end.  What have you got in mind?"

20    Q.   Okay.  Now, when you are beginning this

21         particular investigation, did you also, in

22         addition to the E-mail itself, capture

23         information that might assist you and other

24         law enforcement agencies in identifying the

25         person who is cheyenneandliberty?

285

1    A.    Yes, I did.  I captured the header

2          information of the E-mails that were sent to

3          me.

4    Q.    Okay.  And if we look at page 3 of Exhibit 1,

5          does that contain what you're referring to as

6          the header information?

7    A.    Yes, it is.

8    Q.    And if we look at all of the exhibits,

9          Exhibits 1, Exhibit 1-1 to 1-10, will we find

10         header information such as this in all of

11         those exhibits or most of those exhibits?

12   A.    In most of them you will, yes.

13   Q.    Now, tell us, if you would, what is

14         significant about the header information?

15         There are a couple of items highlighted.  For

16         example, date and time, correct?

17   A.    Yes.

18   Q.    Time, would you agree, may or may not be

19         significant in terms of whether it was

20         Australian time or Topeka time?

21   A.    I couldn't say what it was.  I don't tend to

22         be an expert at headers on this.

23   Q.    I understand.

24   A.    And I use computer programs to identify the

25         actual internet protocol address that's been

1          sent from and that's how I identify.  So I

2          would copy all of that information into a

3          program that I use and it would identify

4          where the E-mail had come from.

5     Q.   Let's talk about internet protocol addresses.

6          What is that?

7     A.   Well, that's a specific number given to a

8          computer when it accesses the internet and it

9          is specific at that time and date to identify

10         a person using it from that specific

11         location.

12    Q.   And how can you identify where the person

13         might be using an internet-- is it fair to

14         call it an IP address?

15    A.   Yes.  Because they're issued to an internet

16         service provider.  And I'm not sure what they

17         call it here in the U.S., but in Australia

18         that's what we call them.  A specific number,

19         IP number, is delegated to an internet

20         service provider.  And on that basis I

21         believe that when I use a computer program as

22         such it will identify which ISP relates to

23         that IP number.  And that's the specific

24         information I get -- I don't get any further

25         than that -- to find out who's actually using

1       that IP number through that internet service

2       provider.  That's a whole nother check that I

3       can't do internationally.  I can do it within

4       my own country but not internationally.

5   Q.  So essentially you try to identify the

6       internet service provider.  So it could be

7       like AT&T--

8   A.  Yes--

9   Q.  --or--

10  A.  --it could be.  I can't remember which it was

11      in this case.

12  Q.  Right.

13  A.  But I'm just trying to identify the country

14      more than anything.  But it does show me the

15      internet service provider.

16  Q.  And how do you connect -- and I'm pointing to

17      what I believe is the internet protocol

18      address, the IP address -- how do you connect

19      that particular address to a specific

20      internet service provider?

21  A.  By using a computer program.

22  Q.  Oh, I'm sorry, that's a program?

23  A.  That's how I do it.  I don't do it manually.

24  Q.  Okay.  And is that-- that's something that

25      you use in all your investigations?

1    A.    I do use the same program.

2    Q.    Okay.  All right.  And in this particular

3          header you captured, it appears to be the

4          very first communication, the IP address is

5          166.147.97.236?

6    A.    Yes.

7    Q.    And if we look further in Exhibit 1, and I'm

8          not going to go through every exhibit with

9          this much detail, but just so we have a feel

10         for these exhibits, you did capture

11         additional header information as it pertained

12         to this string of communications with

13         cheyenneandliberty?

14   A.    Yes, I did.

15   Q.    Okay.  And IP address, which connects to one

16         of the communications?

17   A.    Yes, it does.

18   Q.    Is it fair to say in your-- during the course

19         of your investigation and your communications

20         with cheyenneandliberty that a number of IP

21         addresses were used?

22   A.    Yes, it did appear that way.

23   Q.    Okay.  Now-- and just kind of as a

24         housekeeping matter, when we looked at the

25         E-mail string on page 1 of Exhibit 1 and then

1        we go to the screen capture that is page 7 of

2        Exhibit 1, the date associated to some of the

3        E-mails are different.  They're a day off.

4        Did you notice that?

5  A.    Yes, I did.

6  Q.    And do you have an explanation for that?

7  A.    Yes.  Sometimes I was using Gmail to capture

8        the E-mails, and other times I download them

9        into another program called Thunderbird.  And

10       then that-- and then it would change it to an

11       American date and time rather than an

12       Australian date and time.  So that's the

13       reason.

14  Q.   Now, Detective Butler, if you would take a

15       look at Exhibits 1-1, 1-2, and 1-3 and let me

16       know when you're done.  I think you looked

17       through them, but I just want you to remind

18       yourself of the contents of that

19       communication.

20  A.   Okay.

21  Q.   Okay.  Now as part of this string that is

22       Exhibit 1-- let me back up one.

23       Cheyenneandliberty says, "Do you ever make it

24       to the USA?"  And your response to that was?

25  A.   "I am able to travel and very much willing if

1          there's somebody waiting for me at the other

2          end.  What have you got in mind?"

3   Q.    Now, as the undercover investigator, what are

4          you-- what is the point of your

5          communication?

6   A.    I'm trying to ascertain-- well, what this all

7          was about to start off with because I know

8          nothing about him.  He sent me one picture.

9          And to give you some background in relation

10         to these investigations and child sex

11         offenders in general, they do tell lies like

12         everybody else.  I have to work out whether

13         they're just trying to get something out of

14         me before they send me any as such because

15         that's the way that a lot of these people

16         operate online.

17                    There's also a lot of fakes on

18         there.  They're pretending to be something

19         that they're not.  So I've got to work that

20         out.  I've got to work out whether they are

21         actually abusing children and take action

22         accordingly.  So it's a juggling game.  Plus,

23         I'm targeting other accounts on the

24         particular website as well.  So the name of

25         the game is to-- to figure out who they are

1          and are they legitimate in what they're

2          saying.

3     Q.   Are you trying to do this quickly?

4     A.   I-- I certainly am.  I don't-- these are

5          dissimilar to-- they're not the same as

6          investigations where my other team members or

7          other teams in my unit go on and pretend to

8          be children.  In fact, that can be a very

9          protracted investigation, can go on for a

10         number of weeks, but they pretend to be naive

11         children online and they let the adult

12         progress the conversations, bring it to sex

13         and the like.

14              This is not like that at all.  I've

15         got hundreds of targets that I have to focus

16         on.  So I have to get to the point fast.  I

17         have to gather the evidence fast.  And then

18         refer that to the agency that can take some

19         action in relation to these guys.

20    Q.   Okay.  So in response to your, "What have you

21         got in mind," cheyenneandliberty says, "I am

22         brand-new to this thought process, the beauty

23         I see in the pictures on imgsru and all that.

24         I wouldn't mind getting to know you.  Are you

25         by chance a photographer?  I'm 38, single dad

1          of four girls, 4 1/2, 10-year-old twins, and

2          13.  Tell me a little bit about you and if

3          you have kids yourself."

4                    Is it fair to say that your response

5          to cheyenneandliberty was explicit and to the

6          point?

7     A.   Yes, it certainly was explicit.

8     Q.   Tell us your response.

9     A.   "I'm only an amateur, not a professional

10         photographer.  I don't have kids of my own,

11         but my girlfriend has two girls which I have

12         lots of fun with.  I've managed to slip my

13         dick into both of them as well as teach them

14         how to give head, so it's all good for me.

15         How about you?  You getting any from your

16         kids?  Can you send me some pics or vids cuz

17         I just love new material that no one else has

18         got.  Oh, by the way, I'm 45, single, and

19         bangin' my bitch of a girlfriend to get to

20         her two lovely girls 12 and 14 years old.

21         Life is good."

22    Q.   Now, did you receive any kind of a response

23         to cheyenneandliberty to that particular

24         E-mail you sent?

25    A.   Yes, I did.

293

```
1    Q.   And what was the response at that point?

2    A.   "Wow ... I haven't gotten that far yet but

3         I'm starting out.  Maybe we could get our

4         girls to become friends.  You never know."

5    Q.   Now, some of the other E-mails that are

6         marked separately, would you agree that they

7         were coming in at times that you were still

8         carrying on this E-mail string with

9         cheyenneandliberty?

10   A.   Yes.

11   Q.   That was a bad question, wasn't it?

12   A.   It was.

13   Q.   Okay.  Those E-mails were-- you were

14        receiving other E-mails from

15        cheyenneandliberty at the same time you were

16        engaged in this E-mail string with

17        cheyenneandliberty?

18   A.   You mean that aren't included in this

19        particular lot here?  Is that what you're

20        saying?

21   Q.   Of the other exhibits, Exhibit 1-1.

22   A.   Yes.

23   Q.   So let's talk about-- I think you asked-- I'm

24        sorry, did you ask for a picture?  Oh, no,

25        I'm sorry.  After cheyenneandliberty says
```

```
 1          tell me about you and if you have kids, did

 2          he then send you pictures of the children or

 3          pictures of children?

 4     A.   Yes, he did.

 5     Q.   Okay.  And is that-- if you look at Exhibit

 6          1-1, 1-2, 1-3, are those the pictures that he

 7          sent to you?

 8     A.   Yes, they are.

 9     Q.   Okay.  Let's take a look at those.  And if we

10          look at page 2 of Exhibit 1-1 -- let me make

11          sure I've got that right, there we go -- is

12          this an E-mail that you received from

13          cheyenneandliberty?

14     A.   Yes, it is.

15     Q.   And it's a-- the subject of this E-mail is

16          "Mine"?

17     A.   Yes.

18     Q.   And it includes one image?

19     A.   It does, yes.

20     Q.   And you received this on, apparently, Friday

21          the 19th, at 12:41?  Or the time may be-- we

22          don't know if that's your time or our time?

23     A.   That's probably-- that's probably my time, I

24          would say.

25     Q.   Okay.  Okay.  And this is a picture of three
```

295

1          girls sleeping?

2     A.   Yes.

3     Q.   And then you received two other E-mails that

4          basically had only a subject and an image.

5          Is that a fair statement?  Fair description?

6     A.   Yes, that's correct.

7     Q.   "Four-and-a-half-year-old"?  If we look at

8          Exhibit 1-2, correct, "4.5 year old"?

9     A.   Yes.

10    Q.   And that was received the same date?

11    A.   Yes, it was.

12    Q.   Okay.  And then you received an E-mail,

13         Exhibit 1-3, "Tens"?

14    A.   That's correct, yes.

15    Q.   Subject line is "Tens."  And it appears to be

16         a picture of two young females?

17    A.   Yes, it does.

18    Q.   Received on the same date, April 19th?

19    A.   Yes.

20    Q.   Okay.  Now, after your explicit response, was

21         there a break in the communication between

22         you and cheyenneandliberty?

23    A.   Yes, there probably was due to my days off.

24         And as I was explaining before, I wasn't

25         always at work during that time.  But as

1          you've seen by that, he continued to send me

2          material even in my absence.

3     Q.   And it doesn't look like you responded right

4          away?

5     A.   No.

6     Q.   Okay.  So the next communication from

7          cheyenneandliberty is, "Wow, I haven't gotten

8          that far yet but I'm starting out.  Maybe we

9          can get our girls to become friends.  You

10         never know."  Is that fair?

11    A.   Yes.

12    Q.   And on page 1 of Exhibit 1 we now have

13         switched from date to time.  Is it a correct

14         statement that these times are the date that

15         you would have printed this E-mail off or

16         captured-- I should say captured this E-mail?

17    A.   Yes, it would be.

18    Q.   Okay.  And again, if we look at the last page

19         of Exhibit 1 we see -- I apologize, this is

20         very unwieldy -- we see that that E-mail came

21         in April 28th?

22    A.   Yes.

23    Q.   Okay.  So is it correct to say that the

24         remaining communications with

25         cheyenneandliberty were dated April 28th of

297

1          2013?

2     A.   Yes.

3     Q.   Okay.  So let's look at Exhibits 1-4 through

4          1-7.

5     A.   Okay.

6               MS. KENNEY:  Your Honor, I did move

7          to admit all of these, correct?

8               THE COURT:  Exhibits 1 through-- 1

9          and 1-1 through 1-10 have all been offered

10         and received.

11              MS. KENNEY:  Thank you.

12    Q.   (By Ms. Kenney)  I'm going to show you the

13         front page of Exhibit 1-4.  Can you see that?

14         No, you don't see it.  Can you see that?

15    A.   Yes.

16    Q.   Is this the header information that was

17         attached to the E-mail that is marked 1-4?

18    A.   Yes, it is.

19    Q.   Okay.  And highlighted is an IP address,

20         correct?

21    A.   Yes.

22    Q.   And that IP address is 108.92.113.21,

23         correct?

24    A.   Yes.

25    Q.   Now, would you agree that the next four

```
1              E-mails we're going to look at were all sent

2              not only on the same date but very close in

3              time?

4    A.    Yes, I would agree.

5    Q.    And would you agree -- and you may have to

6              check your exhibits -- that the E-mails were

7              sent from the same IP address?

8    A.    I would have to check that.

9    Q.    Okay.

10   A.    Yes, I would agree with that.

11   Q.    Okay.  So Exhibits 1-4, 1-5, 1-6, 1-7 are all

12             sent from the same IP address?

13   A.    Yes.

14   Q.    So let's take a look at Exhibit-- page 2 of

15             Exhibit 1-4.  Is this a screen capture of the

16             E-mail that you received from

17             cheyenneandliberty?

18   A.    Yes, it is.

19   Q.    And it appears, would you agree, that it

20             contains a photograph of a young child's

21             exposed thigh area?

22   A.    Yes.

23   Q.    Laying on a bed sheet?  Can you tell what the

24             child's wearing?

25   A.    A diaper.
```

299

```
 1    Q.    Okay.  Okay.  And this E-mail was sent we

 2          mentioned April 28th, correct?

 3    A.    Yes.

 4    Q.    If we look at page 5, do you recognize this

 5          information?

 6    A.    Yes, I do.

 7    Q.    Okay.  And explain to us what exactly we're

 8          looking at on this screen.

 9    A.    Well, if we're looking at the middle section

10          there, that's the exif data associated with

11          the image itself.

12    Q.    That I'm pointing to?

13    A.    Yes.

14    Q.    What is exif data?

15    A.    That's embedded information within an image

16          that can sometimes indicate what device was

17          used to take the photo, times and dates of

18          the photo that's been taken.  And sometimes

19          you can even get GPS information which would

20          lead you to where the specific location was

21          that the photograph was taken.  In this case

22          there was no GPS information, but it does

23          indicate that an Apple iPhone 4S was used to

24          take that photograph.

25    Q.    Okay.  Is this information that you rely on
```

```
 1            in your investigation, or at least a tool

 2            that you try to rely on in your

 3            investigation?

 4    A.      It is.  I check all images that are sent to

 5            me along those lines to see if there's exif

 6            information in there.  I can use that to tell

 7            whether a person is being legitimate with me

 8            or telling me lies in communications.  So,

 9            yes, I do use it as a tool.

10    Q.      Okay.  And it appears, at least according to

11            the-- this exif data, the date taken of this

12            photograph is April 28th, 2013 at 2:28 a.m.?

13    A.      Yes.

14    Q.      How does that information relate to the

15            E-mails that you received?

16    A.      When I-- when I saw the information there, I

17            compared it to the E-mail that I received.

18            And from my calculations, it was only within

19            a few minutes that that picture was taken to

20            when it was sent to me via E-mail.

21    Q.      Okay.  Now let's look at Exhibit 1-5, an

22            E-mail.  And these-- none of these E-mails

23            have subject matters, correct?

24    A.      That's correct.

25    Q.      An E-mail to you from-- and when we see C, is
```

1        it correct that that is cheyenneandliberty?

2   A.   Yes, that's correct.

3   Q.   Okay.  This has a second photograph embedded

4        in the E-mail, correct?

5   A.   Yes.

6   Q.   Appears to be similar, but a different angle

7        of a young child on a bed sheet?

8   A.   Yes.

9   Q.   Okay.  And if you look at the last page of

10       that exhibit, we see the same type of

11       information that you referred to as exif

12       data?

13  A.   Yes, that's correct.

14  Q.   Okay.  And looking at page 3, which is a

15       screen-- a different screen capture of this

16       E-mail, there's a time of 5:35 p.m.  Do you

17       see that?

18  A.   Yes.

19  Q.   And then we go to page 5.  The exif data--

20       I'm sorry, 2:28 p.m.  So how does that relate

21       to the E-mail that you received?

22  A.   Once again, it was the same as the previous

23       image.  It indicated to me that the image had

24       been taken only a few minutes before it was

25       sent to me via E-mail.

1   Q.   Now let's look at Exhibit 1-6, please.  Would

2        you agree that the image in 1-6 is a little

3        different than the first two?

4   A.   Yes, I would.

5   Q.   And can you just describe how it differs?

6   A.   Because it shows the female genitalia

7        underneath a diaper and a male adult hand in

8        the picture as well.

9   Q.   Okay.  So if we look at page 3 of Exhibit

10       1-6, that's the E-mail you received from

11       cheyenneandliberty?

12  A.   Yes, it is.

13  Q.   And that's the picture that you were just

14       describing?

15  A.   Yes.

16  Q.   And it appears that this was-- the E-mail

17       time is 5:36 p.m.?

18  A.   Yes.

19  Q.   And if we look at page 5 of that exhibit and

20       we look at the exif data, do you see that?

21  A.   Yes, I do.

22  Q.   We see the same type of information that we

23       saw in the previous two images; is that

24       correct?

25  A.   Yes.

1    Q.   So we also see the time and date.  How do

2         they relate to the E-mail that you received?

3    A.   It was the same as the previous images.  It

4         was only a matter of minutes before the photo

5         was taken and being sent to me via E-mail.

6    Q.   Now, at the time that you received-- or

7         realized that you had received Exhibit 1-6,

8         did you change the focus of your

9         investigation or the purpose of your

10        investigation?  What else did you do as part

11        of your investigation?

12   A.   As soon as I received even the first couple

13        of images I was very alarmed by it and

14        realized that this guy was a contact child

15        sex offender and immediate action had to be

16        taken, so I contacted Homeland Security

17        Investigations in the USA and I referred the

18        matter straight away.

19   Q.   Okay.  Now let's look at Exhibit 1-7.  And we

20        mentioned that this was one of the

21        E-Mails-- one of the four E-mails that you

22        received or was sent fairly close in time,

23        correct?

24   A.   Yes.

25   Q.   Same IP address as the other three?

1   A.   Yes.

2   Q.   And the content of the E-mail from

3        cheyenneandliberty is, "Just took a couple,"

4        correct?

5   A.   Yes.

6   Q.   Now, at some point on April 28th it appears

7        that you did respond to-- or sorry, let me

8        back up.  And I may be getting these E-mails

9        somewhat out of time but I'll try to

10       straighten that out later.  So I apologize to

11       you for that.

12              But after-- if we look back to

13       Exhibit 1, the string of E-mails-- or the

14       string E-mail, it appears that

15       cheyenneandliberty sent you a hyperlink?

16  A.   That's correct.

17  Q.   What exactly is a hyperlink and what does

18       that accomplish?

19  A.   A hyperlink is simply a link to an internet--

20       or to a location on the internet.  In this

21       case to a dropbox.

22  Q.   Okay.

23  A.   Where there was-- do you want me to elaborate

24       on what was stored there?

25  Q.   Did you follow that link--

1    A.    Yes, I did.

2    Q.    --in the dropbox?

3    A.    Yes, I did.  I clicked on the link and went

4          directly to the site.

5    Q.    Okay.  What did you see?

6    A.    There were three videos in the dropbox, and I

7          viewed all-- all three videos.  And my

8          determination was that they-- they breached

9          my local laws in relation to child

10         exploitation material or child pornography.

11   Q.    Okay.  Now there's an E-mail from

12         cheyenneandliberty, "It would be cool to find

13         someone like you to do a photo shoot of each

14         of mine."  Do you see that?

15   A.    Yes, I do.

16   Q.    And you responded to that.  What was your

17         response?

18   A.    "Just name the time and place and I'll be

19         there, dude.  I'm gettin' horny just thinkin'

20         about your kids.  Do you have a family photo

21         or would that be personal for you?"

22   Q.    Now, do you know, if you know, was this

23         response from you, was that sent before or

24         after the picture of the little girl with the

25         diaper?

306

1    A.   I'm not too sure on that.

2    Q.   Okay, that's fine.

3              Now, you say, "Do you have a family

4         photo or is that too personal for you?"  Did

5         you receive a response to that?

6    A.   Yes, I did.  I received a photograph.

7    Q.   Okay.  Would you take a look at Exhibit 1-8

8         and tell me if that is the E-mail that you

9         received in response?

10   A.   Yes, that's correct.

11   Q.   Okay.  We're looking at page 2 from

12        cheyenneandliberty to you.  And can you just

13        describe the photograph, please?

14   A.   One adult male person and four young girls.

15   Q.   And this was received on April 28th?

16   A.   Yes.

17   Q.   And would you agree that there was no exif

18        data attached to that photograph?

19   A.   I don't believe there was, no.

20   Q.   Did you receive additional or further

21        communications from cheyenneandliberty?

22   A.   Yes, I believe I did later on.

23   Q.   Exhibit 1-9, is that an E-mail communication

24        from cheyenneandliberty to you?

25   A.   Yes, it is.

307

1   Q.   Okay.  And if we look at page 2 of that

2        exhibit, no subject, from cheyenneandliberty

3        to you.  Can you describe the photograph?

4   A.   Three young girls appearing to sit on a

5        veranda or a patio.  Whatever you call it

6        here.

7   Q.   Okay.  And again, that's-- we call that one a

8        deck.

9   A.   A deck, okay.

10  Q.   That appears to have come in on April 28th?

11  A.   Yes.

12  Q.   Okay.  And this image, would you agree, did

13       have some exif data?

14  A.   Yes, it did.

15  Q.   Okay.  And what is this information telling

16       you?

17  A.   It's telling me that the picture was taken

18       with an Apple iPhone 4S on the 28th of April,

19       2013 at 2:01 p.m.

20  Q.   Now, going back to-- I'm not going to display

21       them right now, but going back to the three

22       images we saw of the young child wearing a

23       diaper, do you recall the time that those

24       images-- or the exif data on those images was

25       2:30 in the morning?

```
1    A.   Yes.

2    Q.   And this is 2:30 in the afternoon?

3    A.   Yes.  2:01, yes.

4    Q.   Okay.  And then you received one additional

5         image from cheyenneandliberty; is that

6         correct?

7    A.   Yes.

8    Q.   Would you take a look at Exhibit 1-10?

9    A.   Okay.

10   Q.   Okay.  Now if we look at page 2 of Exhibit

11        1-10, is this the final image that you

12        received from cheyenneandliberty?

13   A.   Yes, it is.

14   Q.   And can you describe for the jury the image

15        that you received?

16   A.   A young girl appearing to lean over the

17        backseat of a vehicle displaying her

18        underwear and bare legs, wearing purple

19        boots.

20   Q.   Okay.  And that's April 28th, correct?

21   A.   Yes.

22   Q.   And there was exif data attached to this

23        photograph; is that correct?  If you look at

24        page 4.

25   A.   Yes, there was.
```

1    Q.    What does the exif data on this photograph

2          tell you?

3    A.    It was taken with an Apple iPhone 4S on the

4          28th of April, 2013 at 6:40 p.m.

5                    MS. KENNEY:  Your Honor, I don't

6          know the Court's preference.  If I stop now,

7          I think I can finish up fairly quickly in the

8          morning and then turn Mr. Butler over for

9          cross-examination.

10                   THE COURT:  Well, if you're at a

11         good breaking point.  It is close to 10 till

12         5 and they like for us to be clear of the

13         building by five or ten after 5.  So I think

14         we'll recess for the evening here, give you

15         time to collect your-- go back to your jury

16         room, put your materials, your notebooks and

17         the like, to leave them there.  Of course

18         they don't leave with you.  And then tomorrow

19         morning we'll resume the trial at 9 o'clock.

20         And to just give us a little cushion time to

21         deal with any administrative issues, I'd like

22         to-- I'd be grateful if you would be in your

23         jury room by 8:45 in the morning.

24                   And remind me, Ms. Garrett, they

25         have to clear into the secured hallway?

1          MS. GARRETT:  Right.  I'll give them

2     instructions.

3          THE COURT:  Ms. Garrett will cover

4     how you get into the secured hallway and thus

5     have access to your jury room when she takes

6     you back for the evening.

7          So this is our first long break

8     during the course of the trial.  And so let

9     me remind you of the especially important

10    restrictions that apply to you.  Until the

11    trial is over, do not discuss the case with

12    anyone.  Not members of your family, not

13    people involved in the trial, not anyone

14    else.  And that includes your fellow jurors.

15    If anyone tries to discuss the trial with

16    you, please let me know about it immediately.

17    If there are any media reports about the

18    trial, please do not read or listen to them.

19    And you cannot, of course, talk with any

20    person that's involved in the trial even on a

21    trivial or unrelated topic.

22          If you have concerns about the

23    trial, you may get those to me through

24    Ms. Garrett and we'll take that up.  If you

25    can get her the concern, she'll determine

1        whether it needs to be put in a note or

2        whether it's something we can handle

3        informally.  So thank you very much.  I know

4        it was kind of a long, meandering day.

5        Things will move more efficiently now that

6        we're finished with the jury selection

7        process.  And I hope you have a restful

8        evening, and we'll see you at 8:45 in the

9        morning.

10               Ms. Garrett, will you take charge of

11       the jury, please?

12                    (THEREUPON, the following

13       proceedings were had in the presence and

14       hearing of the defendant).

15               THE COURT:  Sir, you may step down.

16               Counsel, is there anything

17       administratively we need to discuss this

18       evening?

19               MS. KENNEY:  No, Your Honor.

20               MR. FRANCIS:  No, Your Honor.

21               THE COURT:  I'll be here in the

22       morning.  If something comes up overnight, we

23       can take it up before the jury.  Let's try

24       not to keep them waiting.  So I'll plan to

25       see you a few minutes before 9.  If there's

1      something that arises overnight that you

2      think I need to be involved in, get word to

3      Ms. Garrett and I'll get involved with it.

4      All right.  Thank you all.  Have a good

5      evening.

6                  MR. FRANCIS:  Thank you, too.

7                  (THEREUPON, the proceedings

8      concluded for the day).

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1      UNITED STATES OF AMERICA  )
                                 )    ss:
2      DISTRICT OF KANSAS        )

3

4                    C E R T I F I C A T E

5

6          I, Sherry A. Harris, Certified Shorthand

7      Reporter in and for the State of Kansas, do

8      hereby certify that I was present at and

9      reported in machine shorthand the proceedings

10     had the 5th day of May, 2015, in the

11     above-mentioned court; that the foregoing

12     transcript is a true, correct, and complete

13     transcript of the requested proceedings.

14         I further certify that I am not attorney

15     for, nor employed by, nor related to any of

16     the parties or attorneys in this action, nor

17     financially interested in the action.

18         IN WITNESS WHEREOF, I have hereunto set

19     my hand and official seal at Topeka, Kansas,

20     this 20th day of May, 2016.

21

22                        /s/ Sherry A. Harris
                          Certified Shorthand Reporter
23

24

25