```
 1              IN THE UNITED STATES DISTRICT COURT
                FOR THE DISTRICT OF KANSAS
 2                      TOPEKA, KANSAS


 3

        UNITED STATES OF AMERICA,    )  ORIGINAL
 4      ------------------ Plaintiff,)
                                     )  Case No.
 5          vs.                      )  13-40057-DDC
                                     )
 6      JONATHAN KEARN,              )  App. No.
        ------------------ Defendant.)  15-3121
 7


 8                 TRANSCRIPT OF JURY TRIAL
                         (VOLUME 2)
 9

10          PROCEEDINGS had before the Honorable

11      Daniel D. Crabtree, United States District

12      Court Judge, for the District of Kansas,

13      Topeka, Kansas, and a jury of 12, on the 6th

14      day of May 2015.


15      APPEARANCES:

16
        For the Plaintiff:  Christine E. Kenney
17                          Office of the U.S. Attorney
                            290 U.S. Courthouse
18                          444 S.E. Quincy Street
                            Topeka, KS  66683
19
        For the Defendant:  Michael E. Francis
20                          Attorney at Law
                            434 S.W. Topeka Boulevard
21                          Topeka, KS  66603

22                          Jonathan Kearn
                            Defendant
23
        Court Reporter:     Sherry A. Harris, C.S.R.
24

25
```

315

```
 1                    I  N  D  E  X

 2                   W I T N E S S

 3

      TESTIMONY ON BEHALF OF PLAINTIFF          PAGE
 4

      STUART BUTLER
 5    Continued Direct Examination              319
        by Ms. Kenney
 6    Cross-Examination by Mr. Francis          320
      Redirect Examination by Ms. Kenney        327
 7

      CASSIDY CASNER
 8    Direct Examination by Ms. Kenney          333
      Cross-Examination by Mr. Francis          392
 9    Redirect Examination by Ms. Kenney        411
      Recross-Examination by Mr. Francis        411
10

      PATRICK LADD
11    Direct Examination by Ms. Kenney          413
      Cross-Examination by Mr. Francis          430
12

      CRAIG BEEBE
13    Direct Examination by Ms. Kenney          434
      Cross-Examination by Mr. Francis          482
14

15                  E X H I B I T S

16    PLAINTIFF EX. NO.          OFFERED   RECEIVED

17    2                             338       338

18    4                             340       341

19    6                             357       357

20    8                             343       343

21    9                             353       353

22    10                            350       350

23    11                            350       351

24    12                            351       351

25    13                            352       352
```

| | PLAINTIFF EX. NO. | OFFERED | RECEIVED |
|---|---|---|---|
| 1 | | | |
| 2 | 14 | 349 | 349 |
| 3 | 15 | 347 | 347 |
| 4 | 17 | 367 | 368 |
| 5 | 18 | 372 | 372 |
| 6 | 19 | 372 | 372 |
| 7 | 20 | 373 | 373 |
| 8 | 21 | 424 | 424 |
| 9 | 23 | 459 | 459 |
| 10 | 24 | 438 | 439 |
| 11 | 25 | 468 | 469 |
| 12 | 26 | 366 | 366 |
| 13 | 26-1 | 366 | 366 |
| 14 | 29 | 368 | 368 |
| 15 | 31 | 473 | 473 |
| 16 | | | |
| 17 | Certificate ---------------------------- 501 | | |

```
 1                    PROCEEDINGS
 2                    (THEREUPON, the following
 3          proceedings were had in the presence and
 4          hearing of the defendant).
 5                    THE COURT:  Good morning, everyone.
 6          Please be seated.  All right.  We are on the
 7          record in case number 13-40057.  This is a
 8          continuation of the trial United States
 9          against Jon Kearn.  The record should reflect
10          that Mr. Kearn is present in the courtroom
11          with his counsel and then counsel for the
12          United States is also present.
13                    Just a signal check here.  Nothing
14          that we need to take up before we get the
15          jury in the room?
16                    MS. KENNEY:  No, Your Honor.
17                    MR. FRANCIS:  No.
18                    MS. KENNEY:  And just for the
19          Court's information, I'm really done-- couple
20          of cleanup questions, but I'm pretty much
21          done with my direct examination.
22                    THE COURT:  Very well.  And I will
23          just alert you, we'll probably run until
24          10:45 this morning.  I have a hearing I have
25          to do during the morning break and I'm trying
```

1          to sync up our break with that.  So we might

2          stretch the first part of the morning a

3          little longer and have a shorter session

4          between the break and our lunch recess.

5          Ms. Garrett will make sure that the jury

6          knows kind of our timetable and she'll let

7          them know that if there's a problem, if they

8          need to break sooner than that, we'll, of

9          course, accommodate them.  So with that,

10         we'll proceed and get the jury in the room,

11         please.

12                    (THEREUPON, the following

13         proceedings were had in the presence and

14         hearing of the jury and the defendant).

15                    THE COURT:  Good morning, members of

16         the jury.  Please, we'll sit when you do.

17                    Good morning to all of you.  I hope

18         you had a restful evening.  I see you're

19         fully deputized and have your juror badges

20         displayed.  And thank you for wearing those.

21         It does help the participants in the trial

22         identify you as a member of the jury, and of

23         course they'll give you kind of the

24         soundproof bubble around you if they happen

25         to run into you in the courthouse or on the

```
 1          grounds.  So I hope you had a restful
 2          evening.  And we're ready to proceed with the
 3          evidence.
 4                    Ms. Kenney, if you will resume your
 5          examination.
 6                    MS. KENNEY:  Thank you.
 7                    THE COURT:  And, Mr. Butler, I'll
 8          remind you of the oath you took yesterday.
 9                    THE WITNESS:  Yes.
10                    THE COURT:  And it continues to
11          apply, of course, today.
12                    THE WITNESS:  Yes, Your Honor.
13                    CONTINUED DIRECT EXAMINATION
14                        (OF STUART BUTLER)
15     BY MS. KENNEY:
16  Q.   Detective Butler, I just want to make sure
17       that we covered what we needed to cover.  The
18       exhibits that have been introduced as Exhibit
19       1 and 1-1 through 1-10, that is the entirety
20       of the E-mail communications between you and
21       cheyenneandliberty?
22  A.   Yes, it is.
23  Q.   And there was no communication after the
24       exhibit that's marked 1-10?
25  A.   No.  Just check on that.  No, I believe
```

1         that's it.

2    Q.   Okay.  And what-- when you concluded your

3         investigation what, if anything, did you do

4         with the information that you obtained?

5    A.   I captured it, packaged it, and I referred it

6         to Homeland Security in the United States, to

7         my contact there that I send all my referrals

8         to.

9    Q.   Okay.  Thank you.

10             MS. KENNEY:  I don't have any

11        additional questions.

12             THE WITNESS:  Thank you.

13             THE COURT:  All right.

14             Mr. Francis, do you wish to

15        cross-examine?

16             MR. FRANCIS:  I do, Judge.  And I

17        may need assistance with the ELMO.

18             THE COURT:  I'm confident

19        Ms. Garrett can help you.

20             THE COURTROOM DEPUTY:  Do you want

21        that on now?

22             MR. FRANCIS:  If you would.

23                  CROSS-EXAMINATION

24        BY MR. FRANCIS:

25   Q.   Detective, do you have before you the

```
1              Government's Exhibit 1?

2    A.    Yes, I do.

3    Q.    Would you please pull out page 2 of that

4          exhibit?

5    A.    Yes.

6    Q.    Do you have that before you?

7    A.    I do.

8    Q.    In that picture there is no image of any kind

9          of sexual conduct, is there?

10   A.    No, not as far as I can see.

11   Q.    All right.  And there's nothing explicitly

12         sexual about that picture, is there?

13   A.    No, there's nothing explicitly sexual about

14         that picture.

15   Q.    There's no overt sexual conduct of the child

16         in a sexual manner where she's touching

17         herself, is there?

18   A.    No.

19   Q.    And of course, there's no picture of anybody

20         touching the child, is there?

21   A.    No.

22   Q.    If you would, would you go to the third page

23         of Exhibit 1, which is the header?

24   A.    Okay.

25   Q.    Do you have that before you?
```

```
1    A.    Yes.
2    Q.    Do you see a highlighted portion that has a
3          brighter yellow than the other-- I'm sorry,
4          you don't see that because that's not yours.
5          Let me show you.  I'll show you the copy that
6          I highlighted of that same page.  Actually,
7          it's going to be page 4.
8    A.    All right.
9    Q.    And I've highlighted something on page 4 that
10         I want to show you.  It's right here where my
11         hand is.  Do you see that?
12   A.    Yes.
13   Q.    All right.  And is that page a representation
14         of page 4 that you have before you with the
15         exception of my highlighting on that
16         particular line?
17   A.    Yes, it is.
18   Q.    All right.  And where I've highlighted it
19         says, "boundary-Apple-Mail," and then there's
20         a long lengthy number behind that; is there
21         not?
22   A.    That's correct.
23   Q.    And then it says, X-mailer," it says, "iPhone
24         Mail" and then I believe it says "9B206" in
25         parentheses?
```

323

```
1    A.    I can't read the number, but I can see where

2          it says "iPhone Mail."

3    Q.    All right.

4    A.    Says "X-mailer."

5    Q.    And that's on the header that you had done

6          the screen print on what's been marked as

7          Exhibit 1; is that correct?

8    A.    Yes.

9    Q.    Do you have before you Exhibit 1.1?

10   A.    Yes, I do.

11   Q.    And if you would go to page 3.  And it's a

12         picture of, I believe, three girls there?

13   A.    Yes.

14   Q.    There's no image of any sexual contact in

15         that picture, is there?

16   A.    No.

17   Q.    And there's nothing explicitly or implicitly

18         sexual about that picture, is there?

19   A.    No.

20   Q.    And there's no showing of any overt sexual

21         conduct in that picture?

22   A.    No.

23   Q.    And if I were to ask you the same questions

24         regarding the header that appears in that

25         photo, which would be on the very first page
```

1              of Exhibit 1.1, which I will display to you,

2              and again, do you see where my pen is?

3    A.    Yes.

4    Q.    And does that, again, appear to be

5              highlighted-- more particularly down here,

6              does that show that the X-mailer again was an

7              iPhone?

8    A.    Could you just blow it up a bit, please?

9    Q.    I will give it a college try.

10   A.    I don't know if it's my eyesight.  It's kind

11             of hard to read.  It says "iPhone Mail" in

12             the last bit, yes.

13   Q.    All right.  Thank you.  Now, if you would go

14             back to Exhibit 1 again.  And particularly do

15             you find on this exhibit an IP address from

16             whence this text is sent?  And I'll put my

17             pen down here as kind of a hint.  Do you see

18             that address?

19   A.    Yes, I do.

20   Q.    All right.  And does that appear to

21             be-- well, can you read that for us?  Or do

22             you need me to read that for you?

23   A.    It's hard to see.  166.147.97.232.

24   Q.    All right, sir.  You ran a search on that IP

25             internet protocol number, did you not,

1            166.147.97.232?

2    A.    To what are you referring to?  Which-- which

3          search is that?

4    Q.    Did you not do a historical search through

5          imagesource.ru?

6    A.    Yes, I did.

7    Q.    And did you not find, in conducting that

8          search, that the only users using that IPN

9          was tsears and tsears 123?

10   A.    I believe that was it.  Without referring to

11         my document, it does ring a bell that those

12         were the two.

13                 MR. FRANCIS:  May I approach, Judge?

14                 THE COURT:  You may.

15   A.    Yes, that's correct.

16   Q.    (By Mr. Francis)  Thank you.  Did you conduct

17         any type of a search to see whether or not

18         there was any connection between Jon Kearn

19         and this tsears?

20   A.    I-- I didn't know Jon Kearn's name at that--

21         at that stage.  So, no, I didn't conduct a

22         search.

23   Q.    At any time during this period, from the

24         16th, thereabouts, of April to the 28th of

25         April, you didn't know the name of the person

```
 1            who supposedly was sending these E-mails to

 2            you under the name of

 3            cheyenneandliberty@yahoo.com, did you?

 4    A.      I didn't know Jon Kearn's name.  I obviously

 5            knew the E-mail address, yes.

 6    Q.      And you had never met my client, Mr. Kearn?

 7    A.      No, I didn't.

 8    Q.      You'd never spoken to him?

 9    A.      No.

10    Q.      And I believe that you had received as part

11            of the E-mails a picture of a gentleman who

12            was standing in a tie-dyed T-shirt with some

13            young ladies; is that correct?

14    A.      Yes, that's correct.  That was a family

15            photo, I believe.

16    Q.      All right, sir.  On-- do you have

17            Exhibit-- Government's Exhibit 1-3 before

18            you?

19    A.      Yes, I do.

20    Q.      In the copy of that exhibit that I received,

21            I don't have any exif information to indicate

22            when that picture was taken or how that

23            picture was taken.  Do you have any such

24            information?

25    A.      In front of me you mean?
```

327

1    Q.   Well, in front of you, we'll start there.  If

2         you know of any other information--

3    A.   No.

4    Q.   --the whereabouts.

5    A.   No, I don't recall if that had an exif in it.

6         It doesn't appear that it did.

7    Q.   You had used, I think as your name,

8         man69girl?

9    A.   That's correct.  At gmail.com.

10   Q.   Pardon?

11   A.   At gmail.com.

12   Q.   And that was through Gmail that you were

13        receiving that?  That was the server that was

14        providing you with mail; is that correct?

15   A.   Yes.

16   Q.   All right.  All right, sir.

17              MR. FRANCIS:  I don't believe I have

18        any further questions, Your Honor.

19              THE COURT:  All right.  Very well.

20        Is there redirect for the witness?

21              MS. KENNEY:  Very briefly, Your

22        Honor.

23                    REDIRECT EXAMINATION

24   BY MS. KENNEY:

25   Q.   Detective Butler, I believe you testified

```
1              yesterday that-- well, let me ask you.  Did

2              all of the images you received in the E-mails

3              have exif data attached?

4     A.      No, they didn't.

5     Q.      And if there was exif data attached did you

6              capture that?

7     A.      Yes, I did.

8     Q.      Okay.  And so if there are images in the

9              exhibits that have been introduced that do

10             not have exif data, can we conclude that you

11             didn't have any?

12    A.      That's correct.

13    Q.      Okay.  Now, you were asked about the search

14             you did on Image Source regarding the IP

15             addresses?

16    A.      That's correct.

17    Q.      And I think yesterday you referred to that as

18             a database.  Or is that different?

19    A.      That was different.  We-- we do have a

20             database.  Do you want me to explain?

21    Q.      No, I just--

22    A.      All right.

23    Q.      That's fine.  I just wanted to make sure that

24             you weren't talking about the same thing.  In

25             your historical search of that IP address did
```

1        you find that that IP address was assigned to

2        a particular service?

3    A.  When I-- there's-- there's two checks that I

4        did.  The check I did in relation to the--

5        which internet service provider it came back

6        to, yes, I did find a service that it was

7        connected to or related to.  But that actual

8        search in relation to TC is-- that was a

9        separate search altogether that I did on a--

10       a database of historic users of the website

11       imagesource.iu.

12   Q.  I guess my question is did you take that IP

13       address and try to determine who that IP

14       address came back to?  And maybe it was a

15       historical-- historically who that IP

16       address-- or what service that IP address

17       came back to?

18   A.  I'm not sure I understand the question.

19       But--

20   Q.  Okay.

21   A.  --let me--

22   Q.  Well, let me back it up because I'm

23       asking-- you were shown some notes that you

24       prepared as part of your investigation?

25   A.  Yes.

330

```
 1    Q.   And what was the purpose of those notes?

 2    A.   Those notes were there to provide as much

 3         intelligence as possible to the agency that

 4         I'm referring to, in this case Homeland

 5         Security, so that they can conduct further

 6         investigations.

 7    Q.   Okay.  So let me ask another question.  You

 8         talked with Mr. Francis about an IP address.

 9         Did those notes also include an IP net info

10         search that you did to try to identify who

11         that IP address resolved back to?

12    A.   Yes.

13    Q.   And do you recall as you sit there who that

14         resolved back to?

15    A.   No, I don't recall.

16    Q.   If I showed you your report, would that

17         refresh your recollection?

18    A.   Yes, it would.  It came back to Mobile and

19         MySingular.net.

20    Q.   Do you know whether MySingular was purchased

21         by any other companies and is now a different

22         company?

23    A.   No, I don't.

24    Q.   Okay.  Now, the picture which is page 2 of

25         Exhibit 1, you were shown that on
```

```
 1              cross-examination.  Do you recall that?

 2    A.   Yes.

 3    Q.   And you agreed that was the first

 4         picture-- that this picture was attached to

 5         the first E-mail that you received from

 6         cheyenneandliberty?

 7    A.   That's correct.

 8    Q.   Can you describe what is in that picture?

 9    A.   It's a young girl on a piece of playground

10         equipment.  The girl is looking at the

11         camera.  She's wearing boots similar to boots

12         worn by a girl in the pictures later on in

13         the series.

14    Q.   Okay.  And do you have an estimate as to the

15         age of the girl?

16    A.   Under the age of 10, I would say.

17    Q.   Okay.  All right.

18                   MS. KENNEY:  I don't have any

19         additional questions.

20                   THE COURT:  Mr. Francis, recross.

21                   MR. FRANCIS:  No recross, Judge.

22                   THE COURT:  Sir, you may step down.

23                   THE WITNESS:  Thank you, Your Honor.

24                   THE COURT:  Ms. Kenney, you may call

25         your next witness.
```

 1                    MS. KENNEY:  Thank you, Your Honor.

 2          We call Cassidy Casner.

 3                    Your Honor, may Detective Butler be

 4          excused?

 5                    THE COURT:  Is there objection,

 6          Mr. Francis?

 7                    MR. FRANCIS:  No objection.

 8                    THE COURT:  He may be excused.

 9                    MS. KENNEY:  Thank you.

10                    THE COURT:  Please come forward.  As

11          you reach the chair, before sitting in it,

12          would you stop and raise your right hand and

13          the deputy clerk will administer the oath.

14                         CASSIDY CASNER,

15          called as a witness on behalf of the

16          plaintiff, was sworn, and testified as

17          follows:

18                    THE COURT:  Please be seated and

19          adjust the chair and the microphone so it

20          will amplify your voice.  And then if you

21          would, would state your name and spell it for

22          the court reporter, please.

23                    THE WITNESS:  My name is Cassidy

24          Casner.  My first name is spelled

25          C-A-S-S-I-D-Y.  Last name is C-A-S-N-E-R.

```
1                  THE COURT:  Thank you very much.
2              Ms. Kenney, you may proceed.
3              MS. KENNEY:  Thank you.
4                      DIRECT EXAMINATION
5      BY MS. KENNEY:
6   Q.  Good morning.
7   A.  Good morning.
8   Q.  Would you tell the jury your name, please?
9   A.  My name is Cassidy Casner.
10  Q.  And what do you do for a living?
11  A.  I am employed by Department of Homeland
12      Security, Homeland Security Investigations,
13      in Kansas City, Missouri.
14  Q.  Sounds like you're losing your voice.  Would
15      you like a glass of water?
16  A.  I think I'm okay right now.
17  Q.  All right.  Just let us now.  What are your
18      job response-- well, first of all let me ask
19      you, how long have you been with the
20      Department of Homeland Security?
21  A.  I was employed just a month prior to the
22      creation of the Department of Homeland
23      Security, which was in 2003.  So I've been
24      employed with that agency for 12 years.  I've
25      been a criminal investigator with them for
```

1         almost eight.  Since 2007.

2    Q.   Okay.  And was that your first law

3         enforcement professional job?

4    A.   No.  Prior to that I was employed by the

5         State of Missouri Department of Corrections

6         as a probation and parole officer for almost

7         four years.

8    Q.   Okay.  As a federal agent, do you have

9         experience investigating crimes involving

10         child exploitation?

11    A.   Yes.

12    Q.   Does that include crimes that may involve

13         child pornography?

14    A.   Yes.

15    Q.   Have you had any specialized training or

16         experience in investigating child

17         exploitation crimes?

18    A.   I received some training through our basic

19         training after I was employed as a criminal

20         investigator.  A lot of my knowledge and

21         experience have come from working the cases

22         and assisting other agents and other agencies

23         in their investigations.

24    Q.   Okay.  Does your training and experience,

25         does that include the ability to recognize

1          child pornography?

2     A.    Yes.

3     Q.    And would you agree that when we say child

4          pornography we're using a rather generic term

5          and not a legal definition?

6     A.    Yes.

7     Q.    Okay.  Does it include the ability to

8          recognize terminology that is frequently

9          associated with those searching for or

10         trading in child pornography?

11    A.    Yes.

12    Q.    And what is your -- I'm not asking for a

13         legal definition -- what is your working

14         definition of child pornography?

15    A.    It's a visual or video depiction of a child.

16         To me, if I think-- if they're under 18 years

17         of age with an explicit graphic image of the

18         child's genitalia.  It also includes children

19         engaged in sexual activity with other

20         children and children engaged in sexual

21         activity with adults.

22    Q.    Okay.  Were you involved in the investigation

23         of child pornography E-mailed using the

24         address cheyenneandliberty@yahoo.com?

25    A.    Yes.

1    Q.    And those communications were from that

2          E-mail address to Stuart Butler, the

3          investigator in Australia?

4    A.    Yes.

5    Q.    Okay.  When did you become involved in the

6          investigation?

7    A.    I believe we were notified -- I hope I get

8          the exact date right -- around May 1st.

9    Q.    Okay.  Of?

10   A.    2013.

11   Q.    Okay.  And initially were you aware of the

12         basic facts of the investigation?

13   A.    Yes.

14   Q.    Had you seen the communications between

15         cheyenneandliberty and Detective Butler?

16   A.    Yes.

17   Q.    Okay.  And-- well, let me just ask you.  How

18         did you receive this information?  And tell

19         me what all this information included.

20   A.    Okay.  We were notified-- after Detective

21         Butler notified his contacts in our agency,

22         that information was sent to our Cyber Crimes

23         Center which is located in the

24         Washington, D.C. area, I believe in Virginia

25         somewhere.  At that point, when they received

1        the information they issued a subpoena on the

2        E-mail address cheyenneandliberty.  They

3        received that information and from the IP

4        address history associated with that E-mail

5        they pulled I think about four IP addresses.

6        They were able to identify those as belonging

7        to AT&T.  And sent another subpoena to AT&T

8        and found that three of those IP addresses at

9        that time were associated to 429 Southwest

10       Taylor, Topeka, Kansas.

11   Q.  Okay.  I'm going to hand you a series of

12       exhibits.  For your information, it's

13       Exhibits 2 through 9.  I'll put them in front

14       of you, and we're going to talk about them

15       during your testimony.  I'd like you to start

16       with Exhibit 2.  Take a look at that and let

17       me know when you're done.

18   A.  Okay.

19   Q.  And backing up, I'm sorry, did you use the

20       term C3?

21   A.  I said Cyber Crimes Center.

22   Q.  Okay.

23   A.  But we refer to it as C3 as well.

24   Q.  Thank you.  Do you recognize Exhibit 2?

25   A.  Yes.

338

1    Q.   And what do you recognize that to be?

2    A.   This is a return from Yahoo regarding the

3         subscriber information and IP address history

4         as requested from the Cyber Crimes Center,

5         C3, in their subpoena.

6    Q.   And it relates to cheyenneandliberty@yahoo.com?

7    A.   Yes.

8              MS. KENNEY:  Your Honor, I'd move to

9         admit Exhibit 2.

10             MR. FRANCIS:  No objection.

11             THE COURT:  Is there --

12             MR. FRANCIS:  I'm sorry, Judge.

13             THE COURT:  You know the question by

14        now.  Is there objection?  I'm sorry,

15        Mr. Francis.

16             MR. FRANCIS:  No, sir, there isn't.

17             THE COURT:  All right.  Exhibit 2 is

18        received.

19             MS. KENNEY:  Thank you.  Your Honor,

20        when these are admitted does the Court mind

21        if I go ahead and publish?

22             THE COURT:  Not at all.  Once

23        they're in you're free to use them.

24             MS. KENNEY:  Thank you.

25   Q.   (By Ms. Kenney)  Now, we're referring the--

1          just to show the jury, it's called the Yahoo

2          account management tool?

3     A.   Yes.

4     Q.   And the Yahoo E-mail is

5          cheyenneandliberty@yahoo.com?

6     A.   Yes.

7     Q.   There's a registration IP address?

8     A.   99-- do you want me to read that?

9     Q.   Sure.  Go ahead.

10    A.   99.18.221.137.

11    Q.   And it appears the date that the account was

12         created on?

13    A.   Thursday, December 27th, 2012.

14    Q.   Okay.  Now, also attached to Exhibit 2 was a

15         list of IP addresses, correct?

16    A.   Yes.

17    Q.   Can you tell us what this list is?

18    A.   It is a list of IP addresses and log-in times

19         associated with the E-mail address

20         cheyenneandliberty@yahoo.

21    Q.   And there-- I'm sorry, did you say there were

22         time-- dates and times attached to the

23         log-ins?

24    A.   I did not say that; but, yes, there were

25         dates and times attached to it.

340

```
1    Q.   And this was the-- at least part of the

2         information that C3 obtained that led to

3         further subpoenas and the referral of the

4         case to you, correct?

5    A.   Yes.

6    Q.   Okay.  Now, in addition to the-- well, let me

7         ask you to take a look at Exhibit 3 and then

8         we'll talk.  I'm sorry, Exhibit 4.  Are you

9         done?  I'm sorry.

10   A.   Yes.

11   Q.   Do you recognize Exhibit 4?

12   A.   Yes.

13   Q.   And what do you recognize it to be?

14   A.   This is the return from AT&T where C3 had

15        subpoenaed requesting information regarding

16        the IP addresses and their subpoenas.

17             MS. KENNEY:  Okay.  Your Honor, I'd

18        move to admit Exhibit 4.

19             THE COURT:  Is there any objection?

20             MR. FRANCIS:  No objection, Your

21        Honor.

22             THE COURT:  All right.  Exhibit 3 is

23        admitted.

24             MS. KENNEY:  I'm sorry, I'm not

25        offering 3.
```

1                    THE COURT:  You offered 4.  I'm so

2           sorry, I was on the wrong page.  Exhibit 4 is

3           offered and received.

4                    MS. KENNEY:  Thank you, Your Honor.

5                    THE COURT:  Without objection.

6   Q.   (By Ms. Kenney)  Agent Casner, I'm displaying

7           the first page of Exhibit 4.  Can you see

8           that?  And if it's easier for you to look at

9           the document in front of you that's fine,

10          too.  Can you basically explain to us what

11          this document is?

12  A.   At the top it shows-- on the right-hand side

13          there are three IP addresses listed there.

14          And then on the left-hand side there are

15          dates and times for those IP addresses.

16          Those came from Yahoo through-- when she

17          showed you the IP address log-in times and IP

18          addresses.  They submitted that to AT&T and

19          AT&T identified those IP addresses were

20          assigned to Kearn Heating, Jonathan Kearn.

21          And it listed his phone number, the account

22          number and a member ID.

23  Q.   I'm sorry.

24  A.   It's over to the left.  I'm sorry, it's not

25          highlighted.  I apologize.

```
1    Q.   That's okay.  And would you agree that this--
2         the highlighted IP address for December 27th
3         corresponds to the Yahoo first IP address
4         used in Exhibit 2?  I believe you have to go
5         to the last page of the Yahoo exhibit.
6    A.   Yes.
7    Q.   Okay.  Now, at this point what further
8         action, if any, did you take in terms of
9         trying to identify the individual using
10        cheyenneandliberty@yahoo.com?
11   A.   We-- I performed searches on the internet.  I
12        looked for a Facebook page for Jonathan
13        Kearn.  We found a Facebook page.  It
14        contained images of-- actually there were two
15        images, I believe, on the Facebook page that
16        had been sent to Detective Butler in
17        Australia through the E-mail communications
18        that he testified to.  And there were other
19        images of the same-- what would appear to be
20        the same children.
21   Q.   Okay.  I'm going to-- give me one second so I
22        can find this.  I'm going to display for you
23        page 3 of Exhibit 1.  When you said that
24        there were images that were-- had been
25        E-mailed to Detective Butler on the Facebook
```

```
 1          page--
 2    A.    Yes.
 3    Q.    --is this one of them?
 4    A.    Yes.
 5    Q.    Okay.  Okay.  So after you conducted your
 6          additional information did you seek and
 7          obtain a search warrant for the premises of
 8          429 Southwest Taylor Street?
 9    A.    Yes.
10    Q.    And would you take a look, please, at Exhibit
11          8?
12    A.    Yes.
13    Q.    Do you recognize that?
14    A.    Yes.
15    Q.    Okay.  What do you recognize it to be?
16    A.    I believe this is the search warrant to 429
17          Southwest Taylor Street, Topeka, Kansas.
18    Q.    So that's to, T-O, 429, 4 number 2?
19    A.    Yes.
20    Q.    Okay.  Just want to make sure.
21                MS. KENNEY:  Your Honor, I'd move to
22          admit Exhibit 8.
23                MR. FRANCIS:  No objection, Judge.
24                THE COURT:  Exhibit 8 is received,
25          without objection.
```

1    Q.   (By Ms. Kenney)   And just to display this for

2         the jury.   We have the address 429 Southwest

3         Taylor Street, correct?

4    A.   Yes.

5    Q.   And that's the address that you searched?

6    A.   Yes.

7    Q.   And this search warrant was signed on May 7th

8         at 4:40 p.m.; is that correct?

9    A.   Yes.

10   Q.   Okay.  Was the search of 429 conducted

11        shortly after you received this warrant?

12   A.   Yes.

13   Q.   Okay.  Just kind of explain to us how that

14        was set up.  You were actually physically in

15        the courthouse getting the search warrant.

16        Were there other individuals at the

17        residence?

18   A.   Yes.  While I was here and had the search

19        warrant signed, agents from my agency and

20        officers from the Topeka Police Department

21        executed the search warrant at the address

22        429 Southwest Taylor Street.

23   Q.   When you arrived at 429 Southwest Taylor were

24        there any children present?

25   A.   Yes.

1    Q.    And I think at this point we need to discuss

2          their names and their ages.

3    A.    Okay.

4    Q.    Who was present?

5    A.    You want me to just use their first names?

6    Q.    Just the first names.  Thank you.

7    A.    Present were Cemiya.  I think she was

8          approximately 14 years of age at the time.

9          There were two twins, Cheyenne and Liberty,

10         age 10.  And Cassidy.  And she is four-- I

11         think four or four and a half years old at

12         the time.

13   Q.    And did you learn whether or not those

14         children lived at that residence?

15   A.    Yes.

16   Q.    And were they related to the defendant?

17   A.    Yes.  They were his daughters.

18   Q.    Okay.  Did you recognize any of these

19         children from the information that you had

20         received from Detective Butler's

21         investigation?

22   A.    Yes, all but the oldest.

23   Q.    Okay.  Now, let's talk just a little bit

24         about any items that were seized during the

25         course of the search at 429 Taylor.  Did you

1          seize any iPhones?

2     A.   Yes.

3     Q.   And when I say you, you didn't personally

4          seize everything, correct?

5     A.   No.

6     Q.   But you were present?

7     A.   Yes.

8     Q.   And are you aware of anything that other

9          agents or law enforcement officers seized?

10    A.   Yes.

11    Q.   Okay.  Do you understand that an iPhone might

12         have some significance to this investigation?

13    A.   Yes.

14    Q.   And how is that?

15    A.   From the exif data from some of the photos

16         sent to Detective Butler indicated that the

17         photos were taken with an iPhone 4S.

18    Q.   And do you know where the iPhone 4S was

19         found?

20    A.   I believe-- I'm not positive if it was found

21         on him or at least in the master bedroom.

22    Q.   Okay.  To your knowledge, was the device

23         subsequently examined?

24    A.   Yes.

25    Q.   Okay.  I'm going to show you what's been

```
1          marked as Exhibit 15.  Take a look at this
2          and let me know when you're done.  And if we
3          need to open it, I'll get some scissors.  Do
4          you recognize Exhibit 15?
5     A.   Yes.
6     Q.   And do you recognize that to be one of the
7          iPhones that were seized from the residence?
8     A.   Yes.
9     Q.   Are you aware of the condition of any of the
10         other iPhones that were seized?  I'm sorry,
11         how many were there?
12    A.   I believe as far as iPhones, maybe three.
13    Q.   Okay.
14    A.   Two or three.
15    Q.   And were all of the phones examined, to your
16         knowledge?
17    A.   I think all but one.  I believe they tried to
18         examine it but it was broken.  It was unable
19         to be powered up, I guess.
20              MS. KENNEY:  Your Honor, I'd move to
21         admit Exhibit 15.
22              MR. FRANCIS:  No objection, Your
23         Honor.
24              THE COURT:  Exhibit 15 is received,
25         without objection.
```

348

```
 1    Q.    (By Ms. Kenney)  Did you seize any computers?

 2    A.    Yes.

 3    Q.    Take a look at that and let me know when

 4          you're done.

 5                   THE COURT:  I'm sorry, what is the

 6          exhibit number?

 7                   MS. KENNEY:  It's 14, I'm sorry,

 8          Your Honor.

 9                   THE COURT:  Thank you.

10    A.    Okay.

11    Q.    (By Ms. Kenney)  Are you able to recognize

12          Exhibit 14?

13    A.    Yes.

14    Q.    And what is Exhibit 14?

15    A.    It's a desktop computer.

16    Q.    Okay.

17    A.    Tower.

18    Q.    And to your knowledge, was this device

19          subsequently examined?

20    A.    Yes.

21    Q.    Okay.  Yeah, just sit that on the floor.

22          That's fine.  Now, you said you were familiar

23          with the images that had been E-mailed to

24          Detective Butler?

25    A.    Yes.
```

1    Q.    Did you seize any items during the course of

2          this search that you believed were consistent

3          with those images?

4    A.    Yes.

5                   MS. KENNEY:  Your Honor, at this

6          time I'd move to admit Exhibit 14.

7                   MR. FRANCIS:  No objection, Judge.

8                   THE COURT:  Exhibit 14 is received.

9    Q.    (By Ms. Kenney)  Do you recognize-- let's

10         start with Exhibit 10.  Do you recognize

11         Exhibit 10?

12   A.    Oh, yes.

13   Q.    Having trouble finding the sticker?

14   A.    Sorry.

15   Q.    That's okay.  Where was Exhibit 10 found?

16   A.    I believe it was found on the floor in the

17         master bedroom.

18   Q.    And what is Exhibit 10?

19   A.    It is a bed sheet.

20                  MS. KENNEY:  Your Honor, I--

21   Q.    (By Ms. Kenney)  I'm sorry.  And was this bed

22         sheet, in your estimation, relevant to your

23         investigation?

24   A.    Yes.

25                  MS. KENNEY:  Your Honor, I'd move to

350

```
 1          admit Exhibit 10.  I'm sorry-- 10, that's
 2          correct.
 3                    MR. FRANCIS:  Judge, if I might just
 4          have a brief conference with counsel.
 5                    MS. KENNEY:  Sure.
 6                    MR. FRANCIS:  May I take a look?
 7                    THE COURT:  You may.
 8                    MR. FRANCIS:  No objection, Judge.
 9                    THE COURT:  Exhibit 10 is received.
10   Q.    (By Ms. Kenney)  And let's talk about Exhibit
11          11.  Do you recognize that exhibit?
12   A.    Yes.
13   Q.    And where was this exhibit found?
14   A.    I believe it was found on the floor of the
15          bed-- of the master bedroom as well.
16   Q.    Okay.  And did you believe that this was
17          related in some way to your investigation?
18   A.    Yes.
19   Q.    What is Exhibit 11?
20   A.    It's a comforter, a bed comforter.
21   Q.    Okay.
22                    MS. KENNEY:  Your Honor, I'd move to
23          admit Exhibit 11.
24                    MR. FRANCIS:  No objection, Your
25          Honor.
```

1         THE COURT:  Exhibit 11 is received,

2    without objection.

3    Q.   (By Ms. Kenney)  And let's talk about Exhibit

4         12.

5    A.   Okay.

6    Q.   Do you recognize Exhibit 12?

7    A.   Yes.

8    Q.   Where was Exhibit 12 found?

9    A.   I don't remember the exact location.  I

10        believe it was in the master bedroom.  I

11        can't remember if it was found in a drawer or

12        it was also on the floor of the master

13        bedroom.

14   Q.   Okay.  And did you believe Exhibit 12 was

15        related to your investigation?

16   A.   Yes.

17   Q.   What is Exhibit 12?

18   A.   It is a child's dress.

19             MS. KENNEY:  Your Honor, I'd move to

20        admit Exhibit 12.

21             MR. FRANCIS:  No objection, Your

22        Honor.

23             THE COURT:  Without objection,

24        Exhibit 12 is received in evidence.

25   Q.   (By Ms. Kenney)  Exhibit 13, let's talk about

1              that.

2    A.    Okay.

3    Q.    Do you recognize Exhibit 13?

4    A.    Yes.

5    Q.    Where was Exhibit 13 found?

6    A.    It was found in a set of drawers located in

7          the master bedroom of the residence.

8    Q.    What is Exhibit 13?

9    A.    It's a diaper.

10   Q.    It's a clean, unused?

11   A.    A clean diaper.

12   Q.    Okay.

13              MS. KENNEY:  Your Honor, I'd move--

14   Q.    (By Ms. Kenney)  And did you find this to be

15         related to your investigation?

16   A.    Yes.

17              MS. KENNEY:  Your Honor, I'd move to

18         admit Exhibit 13.

19              MR. FRANCIS:  No objection, Your

20         Honor.

21              THE COURT:  Exhibit 13 is received

22         in evidence.

23   Q.    (By Ms. Kenney)  Now I want to-- well, first

24         of all, let's talk about Exhibit 9.  Is that

25         in front of you?

353

1    A.   Yes.

2    Q.   Take a look at that and let me know when

3         you're done, please.

4    A.   Okay.

5    Q.   Do you recognize Exhibit 9?

6    A.   Yes.

7    Q.   And what do you recognize it to be?

8    A.   These are search warrant photos taken at the

9         time we executed the search warrant.

10   Q.   Do these photographs accurately depict the--

11        at least part of the residence of 429 Taylor

12        as you found it on May 7th of 2013?

13   A.   Yes.

14             MS. KENNEY:  Your Honor, I'd move to

15        admit Exhibit 9.

16             MR. FRANCIS:  No objection, Your

17        Honor.

18             THE COURT:  Without objection,

19        Exhibit 9 is received as evidence.

20   Q.   (By Ms. Kenney)  I'm going to show you the

21        first page of Exhibit 9.  And again, if you

22        need to look at the hard copy, that's fine.

23        Tell us what we are looking at in this

24        particular photograph.

25   A.   This is the bed sheet, Exhibit 10--

1    Q.   Okay.

2    A.   --located on the floor.  This is in the

3         master bedroom.

4    Q.   Okay.  Let's look at page 4 of Exhibit 9.

5         What are we looking at here?

6    A.   This is the comforter, Exhibit 11, that was

7         also on the floor in the master bedroom.

8    Q.   And then page 6, what are we looking at here?

9    A.   This is a diaper, an unused diaper, found in

10        a set of drawers in the master bedroom.

11   Q.   And-- well, we'll talk about that in a

12        minute.  And then I'm going to show you page

13        7 of Exhibit 9.  What do you recognize this

14        to be?

15   A.   A child's dress.

16   Q.   And does it relate to one of the physical

17        exhibits you have on your desk up there?

18   A.   Yes.

19   Q.   Which exhibit number?

20   A.   Exhibit 12.

21   Q.   Would you agree that the color in the

22        photograph does not fairly represent the

23        actual color of the dress?

24   A.   No, it does not.

25   Q.   The photograph appears to be pretty red, but

1              the dress is more pink.  Is that a fair

2              statement?

3     A.       Yes.

4     Q.       Okay.  Now, why was it that you seized these

5              particular items?

6     A.       These items were depicted in the images sent

7              to Detective Butler in Australia.

8     Q.       Okay.  So I want you to take a look -- in

9              front of you but I'm going to put it on the

10             screen -- what's been admitted as Exhibit

11             1-4, which is an E-mail from C.  And there's

12             been testimony that C is cheyenneandliberty?

13    A.       Yes.

14    Q.       To Detective Butler.  It's one of the

15             pictures of a young child laying on a bed

16             sheet?

17    A.       Yes.

18    Q.       And if we look at page 4 of that exhibit, can

19             you explain in this image what is significant

20             in this picture as it related to the items

21             you seized during the search warrant?

22    A.       Yes.  Below the child is a bed sheet that

23             appears to be the bed sheet that we took from

24             the residence at the time of search warrant.

25             A little bit over you can see kind of below

```
 1            the child's foot is, you know, a checked
 2            pattern.  And we-- we believe that to be the
 3            same blanket that we seized at the time of
 4            the search warrant.  As well as the diaper
 5            the child is wearing in the photo.  And we
 6            believe the dress, which it's hard to tell in
 7            the photo that's displayed, but is the same
 8            dress that we seized at the time of the
 9            search warrant.
10   Q.   Okay.
11                MS. KENNEY:  I'm sorry, Your Honor.
12   Q.   (By Ms. Kenney)  Agent Casner, do you have
13        Exhibit 6 in front of you?
14   A.   Yes.
15   Q.   Can you take a look at that and let me know
16        when you're done?
17                MR. FRANCIS:  I'm sorry, what was
18        the exhibit number?
19                MS. KENNEY:  6.
20                MR. FRANCIS:  6.
21   A.   Okay.
22   Q.   (By Ms. Kenney)  Do you recognize Exhibit 6?
23   A.   Yes.
24   Q.   Just generally what does Exhibit 6 contain?
25   A.   This is return information from AT&T in
```

1          response to a trial subpoena sent by me.

2    Q.    Okay.

3    A.    Or through the Court.

4    Q.    This is a follow-up.  Is that a fair

5          statement?

6    A.    Yes.

7                MS. KENNEY:  Your Honor, I would--

8    Q.    (By Ms. Kenney)  And does this pertain to--

9          does this pertain to any of the IP addresses

10         that we saw in Exhibit 2, which is the Yahoo

11         account?

12   A.    Yes.

13               MS. KENNEY:  Your Honor, I would

14         move to admit Exhibit 6.

15               MR. FRANCIS:  No objection, Your

16         Honor.

17               THE COURT:  Exhibit 6 is received as

18         evidence, without objection.

19   Q.    (By Ms. Kenney)  Agent Casner, just looking

20         at the first page of Exhibit 6 and the

21         fax-- there's a fax tag line, which is what I

22         call it.  Do you see that?

23   A.    Yes.

24   Q.    And the date on the fax tag line is October

25         11th of 2013?

1    A.    Yes.

2    Q.    Would that have been the date that you

3          received Exhibit 6?

4    A.    Yes.

5    Q.    Tell us what we are looking at.  What does

6          Exhibit 6 contain?

7    A.    We had asked for customer information related

8          to the IP addresses highlighted on the

9          right-hand of the screen, 108.92.13.21 for, I

10         believe, the date of 4-28-13.

11   Q.    And is the search warrant-- or excuse me, the

12         subpoena request attached to Exhibit 6?

13   A.    Yes.

14   Q.    Sorry, I interrupted you.

15   A.    Yes.

16   Q.    So we're looking at an IP address that was

17         assigned by AT&T between April 27th and April

18         28th of 2013; is that correct?

19   A.    Yes.

20   Q.    And it's very hard to read.  Actually it

21         might be a little better on the screen.  The

22         customer name is Kearn Heating?

23   A.    Yes.

24   Q.    And the account number, would you agree, is

25         the same as the account number on the initial

1           AT&T subpoena?

2      A.   Let me check.

3      Q.   Sure.  And I think that's Exhibit 4.

4      A.   Yes, it is.

5      Q.   And the phone number or the BTN is the same,

6           correct?

7      A.   Yes.

8      Q.   Okay.  Agent Casner, I'm going to display

9           Exhibit 1-4, page 1.  And you have seen this

10          exhibit before; have you not?

11     A.   Yes.

12     Q.   It was introduced as one of the E-mails that

13          Detective Butler received?

14     A.   Yes.

15     Q.   And the IP address that sent Exhibit 1-4 is

16          the same as the IP address from AT&T in

17          Exhibit 6?

18     A.   Yes.

19     Q.   All right.  And just to remind the jury,

20          Exhibit 4 was one of the pictures of the

21          child laying on a bed sheet?

22     A.   Yes.

23     Q.   Okay.  And if we look at Exhibit 1-5 and 1-6,

24          which are the other images, would the IP

25          address be the same?

```
 1    A.   Yes.

 2    Q.   And the IP address is the same as is

 3         highlighted in the AT&T record?

 4    A.   Yes.

 5    Q.   Now, there are a number of E-mail-- or excuse

 6         me, IP addresses used during this E-mail

 7         exchange between cheyenneandliberty and

 8         Detective Butler, correct?

 9    A.   Yes.

10    Q.   Showing you the second page of Exhibit 6.

11         Can you explain to the jury the AT&T response

12         to your request to some of these IP

13         addresses?

14    A.   Yes.  Some of the IP addresses in the log-in

15         IP address history started with 166.  Also in

16         our subpoena we asked for this particular IP

17         address from AT&T and this is their response.

18         And from what I understand from speaking with

19         somebody-- somebody at AT&T is that these are

20         very temporary IP addresses usually assigned

21         when you're using a mobile device.  They

22         don't keep records for who those IP addresses

23         are assigned to in their normal course of

24         business.

25    Q.   Okay.  And the response from AT&T
```

1               specifically says, "These blocks of IPs are

2               used by AT&T Wireless for internet access and

3               web-based applications for wireless devices

4               such as web-enabled cell phones and

5               aircards"?

6     A.    Yes.

7     Q.    Now, I want to go back to my question --

8               because I sort of glossed over this -- as to

9               who was there when you showed up at 429

10              Taylor on May 7th, 2013 with your search

11              warrant.  And you said that you saw four

12              girls, three of which at least you recognized

13              from the E-mails between cheyenneandliberty

14              and Detective Butler?

15    A.    Yes.

16    Q.    Who else was present?

17    A.    Mr. Kearn.

18    Q.    So you actually had contact with Jonathan

19              Kearn?

20    A.    I don't know that I ever spoke with him

21              directly.

22    Q.    You saw him I mean?

23    A.    Yes.

24    Q.    Okay.  And would you recognize him if you saw

25              him again?

```
 1    A.    Yes.

 2    Q.    Do you see him here in the courtroom?

 3    A.    Yes, I do.

 4    Q.    Would you point him out for the jury?

 5    A.    He's sitting over at the table, the blue

 6          shirt.

 7    Q.    Sitting next to Mr. Francis?

 8    A.    Yes.

 9                MS. KENNEY:  Your Honor, I'd ask the

10          record reflect that she has identified the

11          defendant.

12                MR. FRANCIS:  No objection.

13                THE COURT:  The record will so

14          reflect.

15                MS. KENNEY:  Thank you.

16    Q.    (By Ms. Kenney)  Now, as part of your

17          investigation did you request that-- let me

18          start that one over.  Did you request any

19          further investigation on any of the pictures

20          that were E-mailed from the

21          cheyenneandliberty E-mail account to

22          Detective Butler?

23    A.    I'm not sure I--

24    Q.    Okay.

25    A.    --understand your question.
```

1    Q.   Did you-- well, let's go to Exhibit 1-7-- or

2         1-6.  Do you have that in front of you?

3    A.   1-6?

4    Q.   Yes.

5    A.   Okay.

6    Q.   All right.  So 1-6 is one of the-- one of the

7         E-mails that has the IP address that AT&T had

8         assigned to the defendant's residence at 429

9         Taylor?

10   A.   Yes.

11   Q.   Okay.  And this was one of the images that

12        has the picture of the small child wearing a

13        diaper?

14   A.   Yes.

15   Q.   Okay.  Now, this image, we really haven't

16        talked a whole lot about it.  In terms of

17        whether or not you would open an

18        investigation, would you have had concerns

19        about any of the other images that we've

20        looked at?

21   A.   No, not necessarily.

22   Q.   Okay.  But would you agree this image is

23        different?

24   A.   Yes.

25   Q.   This image has an adult male's hand in it,

364

```
1          correct?

2     A.   Yes.

3     Q.   And there was a larger picture of this image?

4     A.   Yes.

5     Q.   Okay.  I mean if you clicked on the image you

6          could have a larger picture?

7     A.   Yes.

8     Q.   What, if any, further investigation--

9               MR. FRANCIS:  Excuse me, Judge.

10              I didn't hear the last of what you

11         said, Counsel.  There was a click--

12              MS. KENNEY:  I said if you clicked

13         on it you'd have a larger picture.  If you

14         clicked on--

15              MR. FRANCIS:  Of this--

16              If I might, Judge.

17              Of this particular picture it would

18         be enlarged or there would be more of the

19         picture that we're not seeing?

20              MS. KENNEY:  It would be enlarged.

21              MR. FRANCIS:  Thank you.

22              MS. KENNEY:  Yeah, I'm sorry.

23              MR. FRANCIS:  Thank you.

24              MS. KENNEY:  I didn't mean for that

25         to be a bad question.
```

```
1    Q.   (By Ms. Kenney)  What, if any, further
2         investigation did you do or request be done
3         based upon this image?
4    A.   We believed we might possibly have a
5         fingerprint that we could compare to identify
6         maybe the person who took the photo or who's
7         at least holding the diaper over to display
8         the child's genitals.
9    Q.   Okay.  And did you request that such an
10        examination be done?
11   A.   Yes.
12   Q.   Agent Casner, I'm going to hand you what's
13        been marked as Exhibit 26 and Exhibit 26-1.
14        Take a look at those, please, and let me know
15        when you're done.
16   A.   Okay.
17   Q.   Do you recognize-- let's start with Exhibit
18        26.
19   A.   Okay.
20   Q.   What do you-- do you recognize that?
21   A.   Yes.  These are a set of fingerprints that we
22        took from Mr. Kearn at the time of his
23        arrest.
24   Q.   Okay.  So we would refer to those as known
25        prints?
```

1    A.    Yes.

2    Q.    And were those known prints compared to the

3          picture that is displayed in Exhibit 1-6?

4    A.    Yes.

5    Q.    And--

6                MS. KENNEY:  Your Honor, I would

7          move to-- well, wait a minute.  Let me ask

8          another question.

9    Q.    (By Ms. Kenney)  Was there a report done as

10         to the results of that examination?

11   A.    Yes.

12   Q.    Who did that report?

13   A.    His name is Brian Jones, and he's a senior

14         fingerprint specialist when he was employed

15         by Department of Homeland Security.

16               MS. KENNEY:  Your Honor, I'd move to

17         admit Exhibit 26 and 26-1.

18               MR. FRANCIS:  Judge, I think we've

19         already agreed to its admissibility.  So

20         there's no objection.

21               THE COURT:  All right.  Then without

22         objection, Exhibits 26 and 26-1 are received

23         as evidence.

24   Q.    (By Ms. Kenney)  Agent Casner, what was

25         Special Agent Jones' conclusion regarding the

```
 1            known inked prints of the defendant, Jonathan
 2            Kearn, and the picture of the fingers that
 3            were in Exhibit 1-6?
 4    A.      They were a match.
 5    Q.      Now, going back to the search executed at 429
 6            Southwest Taylor, was there a security system
 7            in place?
 8    A.      Yes.
 9    Q.      And did you seize that security system
10            pursuant to the search warrant?
11    A.      Yes.
12    Q.      Agent Casner, we just put in front of you
13            what's been marked as Exhibit 17.  Do you
14            recognize Exhibit 17?
15    A.      Yes.
16    Q.      What do you recognize it to be?
17    A.      I believe this to be the digital video
18            recorder to the security system.
19    Q.      Okay.  Have you-- have you looked at the
20            contents of that digital security system?
21    A.      Yes.
22    Q.      Okay.
23                    MS. KENNEY:  Your Honor, I'd move to
24            admit Exhibit 17.
25                    MR. FRANCIS:  No objection, Your
```

1              Honor.

2                    THE COURT:  Without objection,

3              Exhibit 17 is received as evidence.

4    Q.    (By Ms. Kenney)  Agent Casner, I'm going to

5              put in front of you Government's Exhibit 18,

6              Exhibit 19 and Exhibit 29.  We're going to

7              talk about those.  I'd like you to first look

8              at Exhibit 29 and let me know when you've had

9              a chance to look at that.

10   A.    Okay.

11   Q.    Did you also follow up with a request to

12             Yahoo for any records they-- or, excuse me,

13             any copies of E-mails they had for

14             cheyenneandliberty?

15   A.    Yes.

16   Q.    And is Exhibit 29 the results of that

17             request?

18   A.    Yes, they appear to be.

19                   MS. KENNEY:  Your Honor, I would

20             move to admit Exhibit 29.

21                   MR. FRANCIS:  No objection, Your

22             Honor.

23                   THE COURT:  Without objection,

24             Exhibit 29 is received as evidence.

25   Q.    (By Ms. Kenney)  Now, what is the procedure

```
 1            that you would follow when you were trying to

 2            get records from a service provider such as

 3            AT&T or Yahoo or any of those?

 4     A.     I mean, we can issue a subpoena--

 5     Q.     Do you--

 6     A.     --through our agency.

 7     Q.     Excuse me for interrupting.  Do you do

 8            anything to try to freeze the account so that

 9            it doesn't change in between the time that

10            you identify the account and the time that

11            you actually are able to get records?

12     A.     Yes.  We can send them a-- what we call a

13            preservation letter.  At that time it will

14            take a snapshot of what's in the account

15            until further legal process is served on

16            them.

17     Q.     Okay.  Now, at some point did you attempt to

18            identify relevant dates and times from the

19            security system as they related to the

20            E-mails sent to Detective Sergeant Butler in

21            Australia?

22     A.     Yes.

23     Q.     Can you tell us all the variables that you

24            considered in trying to put this together?

25            We've already learned there's a-- either a
```

```
 1              14- or 15-hour time difference depending on

 2              whether it's Daylight Savings Time.  So tell

 3              us all the variables that you had to consider

 4              in trying to put this evidence together.

 5   A.    I found there are several time differences in

 6              comparing the information.  Queensland,

 7              during Daylight Savings Time, they're 15

 8              hours ahead of us.  Also, Yahoo, when they

 9              provide information they provide the times in

10              Greenwich Mean Time, which is five hours

11              ahead of us.

12                      After examining the DVR, I found

13              that the DVR settings to the security system,

14              the Daylight Savings Time was turned off.  I

15              compared it to some-- actually the entry of

16              our search warrant, the time that we had

17              documented, and found that the actual time

18              that's stamped on the DVR recording is-- was

19              an actual hour ahead of the actual time here

20              in Topeka.

21   Q.    Okay.  So is it fair to say that you would

22              have looked at all the information that was

23              captured by Detective Sergeant Butler?

24   A.    Yes.

25   Q.    You looked at the production, the E-mails
```

```
 1            that were actually received from Yahoo?
 2    A.    Yes.
 3    Q.    You looked at the DVR itself?
 4    A.    Yes.
 5    Q.    Am I missing anything?
 6    A.    I don't think so.
 7    Q.    Okay.  Well, let us know if I am.
 8    A.    Okay.
 9    Q.    Now, in front of you is also Exhibit 18.
10          Take a look at that and let me know when
11          you're done.
12                  MS. KENNEY:  Oh, I'm sorry, Your
13          Honor.  If I haven't-- did I move to admit
14          Exhibit 29?
15                  THE COURT:  You did offer and
16          Exhibit 29 was admitted.
17                  MS. KENNEY:  Thank you.
18    Q.    (By Ms. Kenney)  Exhibit 18, take a look at
19          that, please.
20    A.    Okay.
21    Q.    And do you recognize Exhibit 18?
22    A.    Yes.
23    Q.    Was Exhibit-- is Exhibit 18 an excerpt of
24          information that was on the-- that you found
25          on the DVR?
```

372

1    A.    Yes.

2    Q.    And I should refer to that by exhibit number.

3          I have 17.  Okay.  And have you viewed the

4          contents of Exhibit 18?

5    A.    Yes.

6                MS. KENNEY:  Your Honor, I'd move to

7          admit Exhibit 18.

8                MR. FRANCIS:  No objection, Your

9          Honor.

10               THE COURT:  Without objection,

11         Exhibit 18 is received as evidence.

12   Q.    (By Ms. Kenney)  And then Exhibit 19, please

13         take a look at that.  Do you recognize the

14         contents of Exhibit 19?

15   A.    Yes.

16   Q.    Do you recognize those as excerpts, images

17         from the security system that is marked as

18         Exhibit 17?

19   A.    Yes.

20               MS. KENNEY:  Your Honor, I'd move to

21         admit Exhibit 19.

22               MR. FRANCIS:  No objection, Your

23         Honor.

24               THE COURT:  Without objection,

25         Exhibit 19 is received as evidence.

373

1    Q.    (By Ms. Kenney)  Agent Casner, I'm going to

2          show you Government's Exhibit 20.  Take a

3          moment to look at that and let me know when

4          you're done.

5    A.    Okay.

6    Q.    Do you recognize Exhibit 20?

7    A.    Yes.

8    Q.    Did you work on Exhibit 20-- well, first of

9          all let me ask you, what is Exhibit 20, just

10         basically?

11   A.    These are printed slides from a PowerPoint

12         showing the information collected from the

13         DVR, the E-mails.

14   Q.    And would Exhibit 20 assist the jury in

15         understanding your testimony?

16   A.    Yes.

17               MS. KENNEY:  Your Honor, I would

18         move to admit Exhibit 20.

19               THE COURT:  Are you offering it as a

20         demonstrative?

21               MS. KENNEY:  Yes, I am, Your Honor.

22               THE COURT:  Is there objection?

23               MR. FRANCIS:  If it's offered as

24         demonstrative, I have no objection, Judge.

25               THE COURT:  All right.  Exhibit 20

1          is received as a demonstrative aid.

2                    MS. KENNEY:  And, Your Honor, I

3          would ask permission to publish Exhibit 20 at

4          this time.

5                    THE COURT:  It is received in

6          evidence and you may do so.

7                    MS. KENNEY:  Thank you.

8     Q.   (By Ms. Kenney)  Agent Casner, can you

9          just-- I don't want you to go into detail

10         right now, but give us an idea of what the

11         demonstrative aid that's Exhibit 20, what

12         does that include?

13    A.   It includes snapshots from the DVR.  I

14         believe that there's a little clip from the

15         DVR system showing the activities around-- I

16         think on April 16th when the first E-mail was

17         sent to the detective and different events

18         that occurred on the 28th of April, 2013.  It

19         includes some of the E-mails sent between the

20         investigator and cheyenneandliberty@yahoo.  I

21         believe there's some exif data information

22         contained in there as well.

23    Q.   Okay.  So let's start with the first slide.

24         And explain to the jury what we're looking at

25         here.

1    A.   This is the initial communication where

2         cheyenneandliberty@yahoo sends an E-mail to

3         Detective Butler in Australia.  "Dad of four,

4         found you in"-- I believe it's Image Source

5         is their abbreviation of it.  "Be fun to

6         talk, swap, or whatnot.  Jeff.  ProudPapa."

7    Q.   And there's a date and time associated with

8         this E-mail?

9    A.   Yes.

10   Q.   Initial E-mail?

11   A.   April 16th, 2013 at 5:56 p.m.

12   Q.   And did you find corresponding information on

13        the security system at approximately the same

14        date and time?

15   A.   Yes.

16   Q.   Okay.  Let's go to the next one.  Now, can

17        you just-- we may have to pause-- pause it

18        here.  I'm sorry.  I knew that was going to

19        happen.  If you could sort of narrate what

20        we're looking at as you understand it.

21   A.   This is a clip from the security system.  As

22        I mentioned earlier, the time, in actuality

23        it was 17:55 on April 16th, 2013.  The DVR

24        was an hour ahead of what the actual time

25        was.  This is the camera that's facing the

```
 1              front door of the residence.  This is showing

 2              Mr. Kearn's four daughters walking out of the

 3              front door and then he followed.

 4     Q.       Okay.  Let's go ahead and play that.  Would

 5              you agree there appears to be something in

 6              his hand?

 7     A.       Yes.  That appears to be a phone.  A

 8              smartphone by the way he's tapping at the

 9              screen.

10     Q.       Okay.  Now, in terms of this presentation,

11              what is the next significant thing-- well,

12              let's go ahead and advance-- in terms of the

13              DVR and the E-mail exchange between

14              cheyenneandliberty and Detective Butler?

15     A.       From here I think we skip ahead to April

16              28th.

17     Q.       Okay.  Let's go ahead and play that.  Okay.

18              And is it fair to say that from this point on

19              you assisted in identifying still shots from

20              the DVR as opposed to actual video clips?

21     A.       Yes.

22     Q.       And what is page 5 of this exhibit?  What are

23              we looking at?

24     A.       This is a still shot from the same camera you

25              saw in the first-- that is the same camera
```

```
 1              showing the front door.  It's 1:49 in the
 2              morning.  This shot shows Mr. Kearn and one
 3              of his daughters at the front door.  They are
 4              getting ready to enter.  They're just getting
 5              home from somewhere.  From looking at the
 6              previous day, it appeared that they had left
 7              earlier in the evening of the 27th, just the
 8              two of them.  The other three girls, from
 9              what I saw, remained inside the home during
10              that time.
11   Q.    Okay.  Let's go to the next page.  Go ahead.
12   A.    And at 1:50 in the morning-- after they go--
13              they go into the residence and then he comes
14              back out.
15   Q.    Okay.
16   A.    About a minute later.
17   Q.    Okay.  And then we jump ahead, the next page,
18              to a time frame of 1:59 to 2:03 in the
19              morning.  Can you tell us-- and this was a
20              six-minute time frame so we did not include
21              the whole clip; is that correct?
22   A.    No, we did not.
23   Q.    What's going on between this-- this time
24              frame?
25   A.    He-- as you saw in the previous shot, that he
```

```
 1              came back out.  And during that time he's

 2              seen on the camera looking through his phone

 3              -- or a phone -- and smoking a cigarette for

 4              that duration of time before he reenters the

 5              house at 2:03.

 6      Q.      And if we go to the next page, April 28th,

 7              around 2:17 in the morning, what is this?

 8      A.      This is an E-mail from

 9              cheyenneandliberty@yahoo to Detective Butler

10              stating, "Wow, I haven't gotten that far

11              yet."  They've got the smiley face.  "But I'm

12              starting out.  Maybe we could get our girls

13              to become friends, smiley face, you never

14              know."

15      Q.      Okay.  And this is probably a good example.

16              You've identified this as 2:17 in the

17              morning.  The E-mail says 5:17 in the

18              evening.  Is this an example of the time

19              difference between Topeka and Australia?

20      A.      Yes.

21      Q.      And where did you get the time 2:17?  Would

22              that have come from the E-mail account?

23      A.      Yes.

24      Q.      Okay.  All right.  Let's go to the next page.

25              Now, I think we should stop.  We looked at
```

1              one E-mail.  Then we're going to see a series

2              of E-mails.  Is that fair?

3      A.     Yes.

4      Q.     That all were sent over a-- what time frame?

5      A.     I believe like 2:28 in the morning to 2:41 in

6              the morning.

7      Q.     All right.  So let's look at-- this is one of

8              the E-mails, Exhibit 1-4, that was sent to

9              Detective Butler?

10     A.     Yes.

11     Q.     Okay.  If we look at the next page, what is

12             this?

13     A.     This is exif data taken from that photo

14             showing that the photo was taken on 4-28,

15             2013, at 2:28 a.m., with an iPhone 4S.

16     Q.     Let's go to the next slide.

17     A.     This is another image sent at 2:35 in the

18             morning on April 28th, 2013.

19     Q.     And then the next slide shows us what?

20     A.     That the image was taken on 4-28-2013 at 2:28

21             with an iPhone 4S.

22     Q.     The next slide is the-- another E-mail that

23             appears to have been sent at about the same

24             time-- during the same frame?

25     A.     Yes, at 2:36 this E-mail was sent.

1    Q.   Okay.  And if we look at the next page, what

2         is it?

3    A.   It was taken 4-28-13 at 2:30 a.m. with an

4         iPhone 4.

5    Q.   And then finally-- I say finally.  The next

6         page?

7    A.   At 2:35 a.m. another E-mail sent from

8         cheyenneandliberty@yahoo to Detective Butler

9         stating, "Smiley face.  Just took a couple,

10        smiley face."

11   Q.   Okay.  And then let's look at the next slide.

12        Tell us what this is.

13   A.   At 2:41 cheyenneandliberty@yahoo sent a link

14        to Dropbox that contained three videos.

15   Q.   Let's look at the next page.  Did you view

16        these videos?

17   A.   Yes, I did.

18   Q.   And without going into a lot of detail, can

19        you just explain to the jury what these

20        videos depicted?

21   A.   The first video to your left was-- there's

22        really nothing you can tell from it, but it

23        appeared to be a child around the age of

24        five.  She is-- it's about 13-minute video

25        where she's doing multiple things.  Jumping

```
 1              on the bed, using a hula-hoop, sitting--
 2              standing in front of a mirror posing.  She's
 3              in various stages of undress.  At times she's
 4              totally nude.  At other times she's wearing
 5              just an orange T-shirt.  During the video the
 6              camera zooms in to show a graphic display of
 7              the child's genitalia.
 8                        The other two videos appear to be
 9              the same child, approximately 9 to 10 years
10              old, you're seeing a child approximately nine
11              or 10 years old--
12       Q.     I'm going to stop you.  Same as each other
13              but different from the first?
14       A.     Yes.
15       Q.     Okay.  Thank you.
16       A.     From the first.  In the middle one the child
17              dancing and posing in a shower.  She's
18              totally nude throughout and during the video
19              she's shown masturbating.
20                        In the one all the way to the right
21              it appears to be the same child as the one in
22              the middle.  She's performing some sort of
23              striptease.  She goes from fully dressed to
24              totally nude and she masturbates in the-- in
25              this video as well.
```

1   Q.   Now let's go to the next slide, please.  And

2        we jump in time, is it fair to say, from 2:41

3        in the morning to 3:08 in the morning?

4   A.   Yes.

5   Q.   In terms of the DVR, have you seen anyone

6        exiting the residence during this time frame?

7   A.   No.

8   Q.   Okay.  So we have-- I'm looking at page 18, a

9        communication between cheyenneandliberty and

10       Detective Butler.

11  A.   Yes.

12  Q.   Okay.  And this-- in this one Detective

13       Butler as Neve Nightshade says at the very

14       end of his communication, "Do you have a

15       family photo or is that too personal for

16       you?"

17  A.   Yes.

18  Q.   Let's go to the next slide, and tell us what

19       we're looking at.

20  A.   This is a photo of Mr. Kearn and his four

21       daughters.

22  Q.   Okay.  And we looked at this earlier as a

23       picture from the Facebook page?

24  A.   Yes.

25  Q.   Now let's go to the next slide, page 20.  Can

1          you explain to the jury what we're looking at

2          now?

3     A.   This is another shot from the camera on the

4          front porch of the residence.  This is

5          showing Mr. Kearn and his youngest daughter

6          exiting the residence.  The dress appears to

7          be the same dress that we seized at the time

8          of the search warrant.

9     Q.   Okay.  Let's go to the next slide, and tell

10         us what this is.

11    A.   This is a-- another camera.  There were four

12         cameras to the residence.  As you saw in the

13         previous shot, that-- you know, the one

14         facing the front door, this one faces the

15         front street.  It's on the front of the

16         residence.  It appears to be from the second

17         story facing the front street.  In this-- in

18         these shots it shows Mr. Kearn and his

19         daughters entering what appears to be a

20         minivan at the front of the-- at the front of

21         the residence on the street.

22    Q.   Okay.  And this is kind of-- I don't know if

23         I can -- oops -- where I put the double

24         arrow, not intentionally, do you

25         recognize-- do you recognize that to be

1        Jonathan Kearn?

2   A.   Yes.

3             MS. KENNEY:  The corner, Megan.  Oh,

4        right.

5             THE COURTROOM DEPUTY:  Do you want

6        them gone?

7             MS. KENNEY:  Yes.  Thank you.

8   Q.   (By Ms. Kenney)  Let's look at the next

9        slide.  Okay.  I'm sorry.  This one is 1307

10       which would-- you would agree, is 1:07 p.m.?

11  A.   Yes.

12  Q.   And the next slide, tell us what this is.

13  A.   This is an image sent from

14       cheyenneandliberty@yahoo to the investigator

15       and it depicts Mr. Kearn's three youngest

16       daughters.  All three girls are wearing the

17       same clothing that they left the house in in

18       the previous videos.  So they were in the

19       same clothing that-- on the same date of the

20       28th.

21  Q.   We go to the next slide and what does that

22       tell us?

23  A.   Says date taken was 4-28, 2013 at 2:01 p.m.

24       with an iPhone 4S.

25  Q.   Let's go to the next slide.  And I believe

```
1              the testimony was that this was the final
2              communication from-- I'm sorry, that's not
3              correct.  This was a subsequent communication
4              between cheyenneandliberty to Detective
5              Butler?
6    A.   Yes.
7    Q.   "Well, I think we are far away from each
8              other, like way far away.  Can I see some
9              pics of your little sweeties there."
10                  Let's look at the next slide.  And
11             what are we looking at?
12   A.   This is a shot where the camera is facing the
13             street.  It shows the minivan pulled up in
14             front of the residence at 1432 or 2:32 p.m.
15             Mr. Kearn was the only person that left the
16             van and walked to the residence by himself.
17             He appears to have a phone in hand as he's
18             walking toward the residence.
19   Q.   Did he enter the residence and stay at that
20             point?
21   A.   Yes.
22   Q.   Okay.  All right.  Let's go to the next
23             slide, and tell us what this is showing.
24   A.   Well, I guess he returned to the van at
25             approximately 2:50 p.m., and the van departed
```

1          a second time for the day.  This shot is

2          showing the van returning.  It returns and

3          parks in the rear of the address, and they

4          arrive at 5:16 p.m. on the 28th.

5     Q.   Okay.  So let's look at the next slide, and

6          tell us what we're looking at.

7     A.   This is Mr. Kearn and his youngest

8          four-year-old daughter exiting the front of

9          the residence at 6:17 p.m. on the 28th.

10         Previously throughout the day and images that

11         were taken the youngest-- and through the

12         DVR, the youngest daughter is shown wearing a

13         set of pastel colored leggings under her

14         dress.  At this point she's no longer wearing

15         leggings, but you can see she has pink cowboy

16         boots on.  And you can't see from this photo,

17         but she's wearing the same dress that we

18         seized at the time of the search warrant.

19         She's also wearing a jacket.  It appears to

20         be zebra striped with bright colors on it.

21         That was taken-- the oldest daughter actually

22         brought that jacket out to her just prior to

23         them leaving.

24    Q.   Okay.  And so the next page, what does this

25         show us?

1   A.   This is-- Mr. Kearn and again his daughter

2        departed the residence alone.  And then this

3        is them returning to the house at 6:54 p.m.

4   Q.   Okay.  And the slide is-- there's a time

5        frame between 6:54 and 6:57.  Can you tell us

6        what was going on on the DVR during that time

7        frame?

8   A.   Yes.  He-- he exits the vehicle in front with

9        the youngest daughter and he walks into the

10       residence and then walks back out to the car

11       to retrieve some grocery bags.  It's not

12       shown in this, but he appears to have a

13       smartphone in his hand when he was returning

14       to the vehicle parked out in front to get the

15       bags.

16  Q.   And what do you base that statement on, that

17       he appeared to have a smartphone in his hand?

18  A.   From the DVR footage.

19  Q.   Okay.  A different angle?

20  A.   Yes.

21  Q.   Okay.  All right.  So let's go to the next

22       slide.  And this was the-- I believe this was

23       the final communication from

24       cheyenneandliberty to Detective Butler,

25       correct?

```
 1    A.    Yes.

 2    Q.    Based on all the information that you

 3          reviewed sent at 6:57?

 4    A.    Yes.

 5    Q.    Okay.  And if we look at the next page, what

 6          is that telling us?

 7    A.    The photo was taken on April 28th at 6:40

 8          p.m. with an iPhone 4S.

 9                THE COURT:  Ms. Kenney, if you are

10          at a stopping point, I owe the jurors and

11          Ms. Harris a break and I'd like to take it at

12          this time.

13                MS. KENNEY:  Yes, Your Honor.  Thank

14          you.

15                THE COURT:  All right.  Very well.

16          Members of the jury, we'll take our

17          mid-morning break.  It's not exactly at

18          mid-morning, but I have to sync this up with

19          another-- with a hearing in another matter

20          that's taking a few minutes.  So our break

21          will be 15 minutes.  If you will be back

22          ready to come into the courtroom at 11

23          o'clock, I'll either be finished with that

24          matter or very close to being finished and

25          won't keep you waiting at all, I hope.
```

1                    Remember the instruction, the

2          admonition.  You have not heard all of the

3          evidence so it's-- you're not even to discuss

4          among yourselves the case.  And naturally no

5          discussing the case with anyone else, any

6          participant in the trial, not your family,

7          not people at work, no text communications,

8          no E-mails about the case or the status of

9          the case.  And naturally don't try to access

10         any source looking for information about any

11         aspect of this case.

12                    So we will see you at 11 o'clock or

13         shortly after that and we'll be in recess

14         until then.

15                         (THEREUPON, the following

16         proceedings were had in the presence and

17         hearing of the defendant).

18                    THE COURT:  Counsel, we'll be in

19         recess until 11:00, and if you need something

20         let Ms. Garrett know and we'll take it up

21         before they come in.

22                         (THEREUPON, a recess was

23         taken).

24                         (THEREUPON, the following

25         proceedings were had in the presence and

1          hearing of the defendant).

2                    THE COURT:  Please.  Are you ready

3          for the jury?

4                    MS. KENNEY:  Yes, Your Honor.

5                    MR. FRANCIS:  Yes, sir.

6                    THE COURT:  All right.  Ms. Garrett,

7          will you bring the jury in, please?

8                    The record should reflect that we

9          are back in the courtroom in the presence of

10         the defendant and the jury will be joining

11         us.

12                    (THEREUPON, the following

13         proceedings were had in the presence and

14         hearing of the jury and the defendant).

15                    THE COURT:  You know the routine.

16         We'll sit when you sit.

17                    All right.  If the witness will

18         return to witness stand.  Ms. Kenney, I'll

19         ask you to continue your examination.

20                    MS. KENNEY:  Thank you, Your Honor.

21    Q.   (By Ms. Kenney)  Agent Casner, we saw on the

22         demonstration PowerPoint it appeared to be at

23         least three different vantage points from the

24         security camera.  Is that a fair statement?

25    A.   I believe there were four actually.

1    Q.   There were four, okay.

2    A.   Uh-huh.

3    Q.   And do you have-- can you give the jury an

4         idea of the volume of data that was contained

5         in this DVR?

6    A.   There was a lot of videos to go through for

7         each day and for each camera that was on the

8         system.  I would say there were probably

9         over-- for each 24-hour period, at least 200

10        videos to look through for each camera.  Some

11        of them were maybe an hour long.  Some of

12        them were 10 seconds long.  So it was a very

13        tedious process to look through all of the

14        footage from the DVR.

15   Q.   And is it fair to say that in your review you

16        only identified for this PowerPoint DVR

17        images that may have some relationship to the

18        E-mails that were sent to Detective Butler?

19   A.   Yes.  Yes.

20   Q.   And that-- is it also fair to say that not--

21        there wasn't corresponding video footage-- or

22        that's not the right way of saying it.  There

23        was some E-mails sent that didn't have

24        corresponding DVR footage?

25   A.   That's correct.

1    Q.    That you were able to identify?

2    A.    Yes.

3    Q.    Okay.

4              MS. KENNEY:  I don't have any

5         additional questions.

6              THE COURT:  All right.

7              Mr. Francis, do you wish to

8         cross-examine?

9              MR. FRANCIS:  Yes, sir.  Thank you.

10                  CROSS-EXAMINATION

11    BY MR. FRANCIS:

12    Q.    Ms. Casner, if we could begin, do you have

13         Exhibit 2 before you?

14    A.    Apologize.  These aren't in order.  Now I do.

15    Q.    All right.  And I understand the registration

16         IP address on that account was 99.18.221.137;

17         is that correct?

18    A.    Yes.

19    Q.    And appended to that management tool cover

20         sheet are about three or four or five-- three

21         or four pages of IP addresses that were used

22         with relation to the cheyenneandliberty.com

23         account; isn't that correct?

24    A.    Yes.

25    Q.    And the only time that particular

```
1              registration address is used is on it looks
2              like December 27th, 2012; is that correct?
3     A.       Yes.
4     Q.       All right.  And from then on out there's
5              other addresses that are used; isn't that
6              correct?
7     A.       Yes.
8                      MR. FRANCIS:  Ms. Garrett, is it
9              ready?
10                     THE COURTROOM DEPUTY:  Uh-huh.
11    Q.       (By Mr. Francis)  With that account in mind,
12             if you would, please, go to page-- I guess
13             it's the fourth page in which has that
14             registration address.  Let me put it down
15             here in front of the jury.  And do you see
16             that registration IP address right there--
17    A.       Yes.
18    Q.       --where my pen is?  Now if you would, take
19             the page that was right before that, I
20             believe at the bottom of the page it shows a
21             date of December 30, 2012.  Do you see where
22             I'm referring?
23    A.       Okay, yes.
24    Q.       Do you see where I'm referring?
25    A.       Yes.
```

1    Q.    And then if you would, move up that page.

2          And I'm putting my pen by a date January 21.

3          Do you see that date?

4    A.    Yes, I do.

5    Q.    And would you agree with me that the Yahoo

6          records don't show any activity on that

7          account from the time of January 21 until

8          April 4, 2013?  Is that correct?

9    A.    Yes.  Yes.

10   Q.    Did you do any investigation to determine why

11         it was there was a lapse in that particular

12         account being used?

13   A.    No, in that time period I did not do any

14         specific investigation regarding that

15         difference in time.

16   Q.    Let me ask you, did anybody regarding this

17         investigation do such a search to find out

18         why there was a lapse in that time?

19   A.    Not that I'm aware of.

20   Q.    Do you have Exhibit 4 before you?

21   A.    Yes.

22   Q.    As I look at that exhibit, there are three IP

23         addresses that are assigned on that

24         particular document that we're looking at

25         right now.  And the user name is

```
 1              foxysiepen@att.net; is that correct?
 2      A.      Yes.
 3      Q.      Did you determine what the origin of
 4              foxysiepen was at att.net?
 5      A.      No.
 6      Q.      You made no inquiry as to who might be using
 7              that name?
 8      A.      No.
 9      Q.      There was a comment made about some pictures
10              that were sent to Mr. Butler over in
11              Australia and I believe one of the pictures
12              that was sent was the picture of my client
13              and his daughters and they were in some
14              tie-dyed shirts.  Do you recall that picture?
15      A.      I do.
16      Q.      If you would, take a look at Government's
17              Exhibit 1-8.  Do you have that before you?
18              Do you have that before you?
19      A.      Yes.
20      Q.      Now, I believe you indicated this was a
21              picture that came off of Facebook; is that
22              correct?
23      A.      Yes, it was on his Facebook page.
24      Q.      And are you familiar with Facebook?
25      A.      I mean I'm-- I'm familiar with it, yes.
```

396

```
1    Q.   You got onto Facebook and got into

2         Mr. Kearn's Facebook page?

3    A.   Yes.

4    Q.   Right?  Were you aware that anybody that can

5         get on Facebook can download a picture that's

6         on Facebook to their own computer?

7    A.   Yes.

8    Q.   Okay.  So not only were you able to get on

9         Facebook and find this picture, anybody in

10        this courtroom that had access to Facebook

11        could get into Mr. Kearn's account just by

12        calling up Mr. Kearn's account could get on

13        that and download that picture?

14   A.   Yes, they should.

15   Q.   Okay.  Let me talk to you a little bit about

16        the search warrant that was executed at

17        Mr. Kearn's house.  We talked about an iPhone

18        that was seized which has been introduced as

19        evidence and we also talked about an Acer

20        computer which has been introduced in

21        evidence; is that correct?

22   A.   Yes.

23   Q.   And do you have Exhibit 8 before you?

24   A.   Yes.

25   Q.   Would you please pull out the last page of
```

1          that?  That's what I'm going to be talking

2          about at this time.  I think that oftentimes

3          it's referred to as a return?

4    A.    Yes.

5    Q.    All right.  And the purpose of the return is

6          to show the person who's being searched,

7          whose property has been searched, what

8          property was actually taken; isn't that

9          correct?

10   A.    Yes.

11   Q.    And this return that is now before you that

12         I'm showing the jury is the return of the--

13         the list of property that was taken from

14         Mr. Kearn's house.  For example, number 2 it

15         shows a bed sheet, number 3 is the comforter,

16         which we've introduced into evidence; isn't

17         that correct?

18   A.    Yes.

19   Q.    Now, there are a number of computers that are

20         listed on this document; isn't that correct?

21   A.    Yes.

22   Q.    There's a couple of iPhones and in addition

23         to that, like I said, there's a number of

24         computers.  But what we've referred to rather

25         loosely here as child pornography has only

1            been found on the iPhone; isn't that correct?

2    A.      I believe so.

3    Q.      And only on one item, correct?

4    A.      Yes.

5    Q.      You were present during the course of the

6            search at his house; were you not?

7    A.      I was not present at entry and for the--

8            maybe the first 20 minutes of the search.

9    Q.      Were you present at the time he was

10           interviewed by Officer Ladd from the Topeka

11           Police Department?

12   A.      No, I was not present at the interview.

13   Q.      Did you ever learn that there was a tape

14           recording made of that interview?

15   A.      Yes.

16   Q.      And did you listen to that tape?

17   A.      Yes.  It's been awhile, but, yes.

18   Q.      All right.  Well, let me ask you a few

19           questions about what Mr. Kearn told those

20           officers.

21                   MS. KENNEY:  Your Honor, I'm sorry,

22           I'm going to object as to hearsay.

23                   THE COURT:  I think I have to hear

24           the question to understand whether the

25           objection is well taken.

399

1              MS. KENNEY:  And I would be happy to

2         explain further if the Court would like.

3              MR. FRANCIS:  Could you read the

4         question back, please?

5              THE COURT:  I think where we are is

6         that you made that introductory comment.  It

7         gathered an objection, but I don't think you

8         had actually asked a question.  And so I

9         don't feel like I'm in a position to rule on

10        the objection until I hear your question.

11   Q.   (By Mr. Francis)  Let me ask you this.  Did

12        you hear on that tape where Jon told the

13        officers that sometimes neighbors used his

14        computer?

15             MS. KENNEY:  Your Honor, may we

16        approach?

17             THE COURT:  You may.

18             Ladies and gentlemen, sometimes

19        during the time of the trial there are

20        objections about evidence that need to be

21        taken up, and most of the time I hope to be

22        able to do it without interrupting the flow

23        of the trial, but sometimes we need to do it

24        in this fashion and so you get treated to the

25        noise machine again.

1                    (THEREUPON, a bench conference

2          was had out of the hearing of the jury and

3          the defendant).

4                    MS. KENNEY:  Your Honor, I started

5          to bring this up in a motion in limine but I

6          didn't-- I don't really think it was

7          necessary.  Essentially, I believe that we

8          are trying to introduce the defendant's

9          statements through cross-examination.  And

10         the hearsay rules only allow through a party

11         opponent to introduce those statements as an

12         exception to the hearsay rule.  So--

13                   THE COURT:  It is an out-of-court

14         statement and so it does-- I interrupted you.

15                   MS. KENNEY:  That's okay.

16                   THE COURT:  But I think I know where

17         you're going.  It's an out-of-court

18         statement.

19                   MR. FRANCIS:  I understand.

20                   THE COURT:  And so I guess the

21         question is what is your theory on why it is

22         excepted from the hearsay rule?

23                   MR. FRANCIS:  Well, I don't know

24         that I can think of what the exception would

25         be at this time, Judge.  He's here and I can

1          ask him the same question.

2                    THE COURT:  Yeah.  I think if it's

3          an out-of-court statement and you're offering

4          it for the truth of the proposition asserted

5          in the statement then it is a hearsay

6          statement and unless it qualifies for an

7          exception I have to sustain the objection and

8          so I do.

9                    MR. FRANCIS:  I can do that.  I'm

10         going to--

11                   THE COURT:  And if there is a theory

12         on why is it excepted from the rule, then

13         you'll need to bring that to my attention.

14         But at present I don't hear one so I'm going

15         to sustain the objection.

16                   MR. FRANCIS:  That's fine, Judge.

17                   (THEREUPON, the following

18         proceedings were had in the presence and

19         hearing of the jury and the defendant).

20    Q.   (By Mr. Francis)  In the course of your

21         investigation in this case I believe you

22         found that there were pictures that were sent

23         back and forth.  Some of the pictures,

24         though, you did not classify as being

25         pornographic pictures, correct?

```
 1    A.    That's correct.

 2    Q.    And those are the ones that would show the

 3          kids were primarily-- were dressed, the

 4          little girl that was sitting on like a merry

 5          go round in the amusement park, whatever it

 6          was, the girls on the blanket, the kids with

 7          the shirts on, those kinds of things?

 8    A.    Yes.

 9    Q.    What you found to be objectionable

10          particularly is one of the hand of my client

11          around the vaginal area of his young

12          daughter, correct?

13    A.    Yes.

14    Q.    And was any inquiry made of my client as to

15          how that picture came to be in your

16          investigation?

17    A.    I'm not sure what-- I-- did we question him

18          regarding that?

19    Q.    Yes.

20    A.    I wasn't present during the interview.  I'm

21          not sure if-- what the specific question was,

22          if it was a general question regarding having

23          child pornography or if there was anything

24          more specific about that particular image.

25    Q.    In your investigation regarding the
```

403

```
 1            cheyenneandliberty@yahoo.com account, you

 2            didn't interview either Cheyenne or Liberty

 3            regarding that account, did you?

 4    A.     I did not interview them, no.

 5    Q.     What agent did?

 6    A.     I believe they were interviewed in a safe

 7            talk by the Division of Family Services in

 8            Topeka.

 9    Q.     About that account?

10    A.     I don't think-- I don't know that they asked

11            them about this-- the account.

12    Q.     That was my particular question because it

13            does have their name on it.  Were any of the

14            children, to your knowledge, interviewed

15            about that account?

16    A.     Not that I'm aware of.

17    Q.     The pictures of my client's hand by his

18            daughter's diaper that we saw on film, was

19            there any more to that picture?  Did it show

20            any more of either the child or his arm that

21            was sent to the agent in Australia?

22    A.     No.

23    Q.     So that was the whole picture that we saw,

24            correct?

25    A.     Yes.
```

404

1    Q.    All right.  There was a couple of-- or I

2          guess it was three videos that were

3          discovered that involved apparently two

4          different girls that were underage according

5          to what you believe; is that correct?

6    A.    Yes.

7    Q.    One doing kind of a striptease and maybe two

8          in the shower or something like that?

9    A.    One in the shower and then one doing multiple

10         things.

11   Q.    None of those girls were my client's

12         daughters, were they?

13   A.    No.

14   Q.    In your searches in this case did you obtain

15         the AT&T broadband service records for the

16         account information that Mr. Kearn had that

17         would show what all devices were on the

18         broadband, when things were used and the

19         like?

20   A.    I mean, I'm not-- can you repeat the

21         question, please?

22   Q.    In your investigation did you get ahold of

23         the AT&T broadband service records for

24         Mr. Kearn's account?

25   A.    No, I did not.

405

```
 1    Q.   Did you get a detailed AT&T Wireless record

 2         for each of the cell phones that were on his

 3         account?

 4    A.   No.

 5    Q.   You have a cell phone?

 6    A.   Yes.

 7    Q.   All right.  And besides the government one

 8         which I presume you don't pay the bills on

 9         personally, but on your own cell phone, when

10         you get your cell phone bill it will show

11         you, if you want to look at it, exactly what

12         calls were made, to whom, when they were

13         made, what time; is that correct?

14    A.   Yes.

15    Q.   You also do that with wireless work on your

16         cell phone, what wireless messages were sent,

17         to whom they were sent, how long it took,

18         that kind of stuff; isn't that right?

19    A.   I guess I'll believe you.  I haven't looked

20         at one in a long time.

21    Q.   Well, but my point is is that there is a

22         wealth of information in those bills; isn't

23         there?

24    A.   Yes, there could be.

25    Q.   And you guys-- the government didn't get
```

1          those bills, did they?

2     A.   No.

3     Q.   Didn't search for them?  You got to the point

4          where you thought you had everything going

5          back to Mr. Kearn and you kind of stopped at

6          that point; is that right?

7     A.   I felt we have-- we had enough evidence in

8          what we had done.

9     Q.   Okay.  You didn't get any AT&T cell tower

10         records regarding any calls made by

11         Mr. Kearn, did you?

12    A.   No.

13    Q.   And I don't know if I mentioned this or not.

14         I know we have a Celebrite extraction record

15         for one of the phones but you don't for any

16         of the other phones that Mr. Kearn had; isn't

17         that right?

18    A.   No.

19    Q.   One of the things that was mentioned in I

20         believe your affidavit for your search

21         warrant at Mr. Kearn's address were such

22         things as modems and routers; isn't that

23         correct?

24    A.   What exhibit?

25    Q.   I believe the affidavit is-- well, I don't

1              know if I have it.

2      A.     I'm sorry, I don't recall.

3      Q.     It does have a list of things that are to be

4              taken.  For example, if you would look at

5              Exhibit 24 -- excuse me -- Exhibit 4 --

6              excuse me -- Exhibit 8, the search warrant,

7              attachment A has items to be seized.  Do you

8              see there where it has-- do you have that

9              before you?

10     A.     I have it in front of me.  Could you direct

11             me to the number of the paragraph?

12     Q.     I certainly will.  What I'm looking at, for

13             example, right here is modems in paragraph 1.

14     A.     Okay.

15     Q.     And you didn't seize the modem, did you?

16     A.     No.

17     Q.     And no routers were seized, were they?

18     A.     No.

19     Q.     What does a router do?  Do you know?

20     A.     I'm not a computer forensic agent--

21     Q.     If you don't feel--

22     A.     --so I really couldn't give you a very good

23             definition of that.

24     Q.     Okay.  You could or could not?

25     A.     I could not.

1    Q.   All right.  Well, then I won't ask you.  That

2         would be unfair of me to do so.  I believe--

3         oh, did you look at the breakdown of the

4         messages that were sent on the

5         cheyenneandliberty@yahoo.com exchanges of

6         E-mail other than just the ones that went to

7         Mr. Butler down in Australia?

8    A.   Are you asking me if I looked at the whole

9         content of the E-mail?  All the messages?

10   Q.   Yes.

11   A.   Yes.

12   Q.   Did you notice an E-mail that was sent on

13        December 29, 2009 at-- it looks like it's

14        7:32 Pacific standard time, which would be, I

15        guess, 9:32 our time?  I don't know that it's

16        the exhibit or not.

17   A.   I believe we did have one of the E-mail

18        content.

19   Q.   The one I'm referring to is from a Ben Parker

20        who goes under silverknight05@gmail.com.  If

21        you don't have it, why we can get--

22   A.   I think it's in 29.

23   Q.   Pardon?

24   A.   I was looking for the exhibit.

25   Q.   Okay.  I don't know that it's going to be in

409

```
 1            that exhibit.  I think that exhibit pertains
 2            to stuff that was sent to Mr. Butler.
 3     A.     It appears to be that.
 4     Q.     Do you remember anything in your review-- I
 5            think you said you looked at all those
 6            exchanges for that account.  Do you remember
 7            anything about a Ben Parker,
 8            silverknight@gmail.com.
 9     A.     That name sounds familiar to the E-mail.
10     Q.     Did you remember reading something about a
11            comment that was made in that E-mail that
12            sometimes your dad is on the cell phone so I
13            can't send you stuff unless I know it's you
14            who is on it?
15     A.     Yes.
16     Q.     And did you do any investigation to see who
17            this Ben Parker guy was?
18     A.     No.  There was no child pornography
19            exchanged-- or contained in the E-mail.
20     Q.     I understand that.  Did it strike you that--
21            by that E-mail that there would be a way that
22            a man or a person could tell whether a
23            particular person was on his cell phone
24            without actually seeing them with the phone?
25     A.     Could you repeat the question, please?
```

410

```
1    Q.   Well, it says, "Sometimes your dad is on the
2         cell phone so I can't send you stuff on it
3         unless I know who is on it."  How would one
4         know who is on a cell phone and--
5         particularly unless they could see the user
6         at the time of the call?
7    A.   I guess not.  I don't--
8    Q.   They would have to be-- they'd have to be
9         where they could see them, right?
10                  MS. KENNEY:  Objection.
11   Q.   (By Mr. Francis)  Well, that would be one
12        way, wouldn't it?
13                  THE COURT:  Hold on just a second.
14        There's been an objection.  What's the
15        objection?
16                  MS. KENNEY:  Speculation, Your
17        Honor.
18                  THE COURT:  It's cross-examination.
19        I'll allow it.
20   Q.   (By Mr. Francis)  If someone is in a position
21        where they could view a person on a cell
22        phone, they can see that they're on a cell
23        phone, correct?
24   A.   Yes.
25   Q.   All right.
```

1           MR. FRANCIS:  I have no further

2      questions, Judge.

3           THE COURT:  Very well.

4           Is there redirect for the witness?

5           MS. KENNEY:  Briefly.

6           REDIRECT EXAMINATION

7      BY MS. KENNEY:

8   Q.  Other ways you would know if somebody was

9       using a cell phone perhaps is to call them?

10      Call the phone I mean.

11  A.  Yes.

12  Q.  Text the phone?

13  A.  Yes.

14  Q.  E-mail the phone?

15  A.  Yes.

16           MS. KENNEY:  No further questions.

17           THE COURT:  Any recross?

18           RECROSS-EXAMINATION

19      BY MR. FRANCIS:

20  Q.  If I'm sending a message to somebody and I

21      don't want them to have it and I'm going to

22      E-mail them or send them a text message and I

23      know that somebody else has access to the

24      phone, I don't know who's going to be on that

25      phone that's going to see that text, do I?

1    A.    Probably not.

2    Q.    Unless I see they actually have the phone?

3    A.    Yes.

4    Q.    Thank you.

5              MR. FRANCIS:  Nothing further.

6              THE COURT:  Anything further for the

7    witness?

8              MS. KENNEY:  No, Your Honor.

9              THE COURT:  All right.  You may step

10   down.

11             Ms. Kenney, will you please call

12   your next witness, please?

13             MS. KENNEY:  Your Honor, we call

14   Patrick Ladd.

15             THE COURT:  Mr. Ladd, if you'll come

16   forward.  And when you reach the witness

17   chair if you'll pause and remain standing and

18   raise your right hand, the deputy clerk will

19   administer the oath.

20                  PATRICK LADD,

21   called as a witness on behalf of plaintiff,

22   was sworn, and testified as follows:

23             THE COURT:  Sir, if you will please

24   be seated and adjust the chair and the

25   microphone so that the microphone is

1          amplifying your voice.  And then if you will

2          say and spell your name for the court

3          reporter.

4                    THE WITNESS:  Detective Patrick

5          Ladd, L-A-D-D.

6                    THE COURT:  All right.  Ms. Kenney,

7          you may proceed.

8                    MS. KENNEY:  Thank you.

9                        DIRECT EXAMINATION

10    BY MS. KENNEY:

11    Q.   Detective, would you please tell the jury

12         what you do for a living?

13    A.   I'm a detective with the Topeka Police

14         Department here in Topeka.

15    Q.   How long have you been a detective with the

16         Topeka Police Department?

17    A.   I've been a detective for three years.

18    Q.   Were you with the police department prior to

19         that?

20    A.   I was.

21    Q.   How long have you total been with the Topeka

22         Police Department?

23    A.   16 and a half years.

24    Q.   Okay.  What are your current job

25         responsibilities as a detective with the

```
1            Topeka Police Department?
2   A.   My current job is that of cellular phone
3            forensics as well as cellular phone mapping
4            and record analysis.
5   Q.   Okay.  And I'm going to ask you, if you
6            would, to explain to us a little bit more
7            about what that means, cellular phone
8            forensics and cellular phone mapping.
9   A.   With cell phone forensics itself, that is in
10           dealing with the hardware, i.e., the cell
11           phone, the device itself.  And we are able to
12           extract information off of those phones and
13           recreate it into a report to then present to
14           investigators to read the data that was
15           contained on the device itself.
16  Q.   Okay.
17  A.   As far as the mapping and records analysis is
18           concerned, that's dealing with the actual
19           phone records provided by the phone-- cell
20           phone providers themselves.  And we're able
21           to then interpret those records and go
22           through and provide an analysis of the
23           records and in cases map those out as well.
24  Q.   Okay.  Do you have special training
25           pertaining to seizing and preserving
```

415

```
 1        electronic evidence as it pertains to cell

 2        phones?

 3   A.   I do.

 4   Q.   Tell us about that.

 5   A.   I've attended-- the tool that we most often

 6        use is known as a Celebrite universal

 7        forensic extraction device.  And in using

 8        that I've been trained in its use of the

 9        device itself, the hardware, as well as the

10        software suite that accompanies the device.

11        I've been trained by representatives of the

12        manufacturer in use of the device.

13   Q.   Okay.  And have you received training

14        regarding how particular cellular devices

15        store electronic data?

16   A.   I have.

17   Q.   And have you received training and

18        understanding how these particular tools

19        would retrieve that data?

20   A.   I have.

21   Q.   Okay.  Have you ever testified before

22        regarding extractions you've done using

23        Celebrite?

24   A.   I have.

25   Q.   Okay.  Now, just in general terms, can you
```

1          tell us how-- and when I say mobile device,

2          would you understand that to mean cell phones

3          and perhaps tablets?

4     A.   It's-- yeah, cellular phones, tablets such as

5          iPods, iPads, as well as the different

6          android devices that are in tablet.

7     Q.   So can you tell us how a mobile device stores

8          data?

9     A.   They store data on flash memory or external

10         memory cards inserted into the device.

11         That's how the data is stored.

12    Q.   Okay.  And how do forensic tools extract and

13         report that data?

14    A.   They connect to the device itself.  In some

15         cases it requires a boot loader to be loaded

16         onto the cellular device in order to

17         communicate with the device to then extract

18         the data from the device.  And then it

19         transfers the data from the device itself

20         onto a computer, which then uses the

21         corresponding software suite to parse out the

22         data, extract it from the device, and then

23         recreate that data into a format that we can

24         read.

25    Q.   Okay.  So you said a boot loader?

417

```
1    A.   Yes, ma'am.

2    Q.   And what is that?

3    A.   It is just a piece of code that's inserted

4         onto the device to enable the universal

5         forensic extraction device to read the

6         contents of the target device.

7    Q.   And anything that you have just discussed, is

8         there any affect to the data on the target

9         device?

10   A.   There is not.  The boot loader itself is a

11        forensically sound boot loader that's been

12        tried and tested by Celebrite in that it does

13        not modify the data on the target device.

14   Q.   Okay.  And when we say forensic, when you use

15        the word forensic, what do you mean by that?

16   A.   It means that we don't actually alter the

17        information on the device in any way.  It's--

18        the data we get is the data that was on the

19        device.

20   Q.   So if I understand, you take-- we call it--

21        you're calling it a target device.  So the

22        cell phone?

23   A.   Correct.

24   Q.   You somehow use this boot loader to extract

25        the information or-- feel free to correct me
```

418

```
1              if I misstate something--
2      A.    The-- the-- the machine, the Celebrite, is
3            what actually extracts the information.
4      Q.    Celebrite extracts the data and then it
5            copies the data to some type of a storage
6            device and organizes it in a fashion that you
7            can read it?
8      A.    In simple terms, yes.
9      Q.    I'm going for simple.  Did I misstate it?
10     A.    No, that's-- that's actual.
11     Q.    Okay.  And I'm not making light.  I just want
12           to make sure I understand it.  Okay.  What
13           type of data might you expect to recover from
14           a target device or a cell phone?
15     A.    And then I-- every-- every phone is a little
16           bit different as to the machine's
17           capabilities.  But normally we can get
18           anything from call logs, contact lists,
19           E-mails, metadata stored on photos and videos
20           that were contained on the device, voice
21           mails, in some cases geolocations of the
22           device itself, chat history, as well as other
23           electronic data that may be present on the
24           device.
25     Q.    Okay.  How long have you or your department
```

419

```
 1          used Celebrite?
 2    A.    I've been involved with Celebrite since
 3          August of 2009.
 4    Q.    Do you have an estimate of the number of
 5          extractions you have done using this
 6          particular tool?
 7    A.    Hundreds.
 8    Q.    And you may have said this so I apologize,
 9          but do you have any certifications in the use
10          of Celebrite?
11    A.    I do, yes.
12    Q.    Is the Celebrite hardware and-- well, let me
13          back up.  Celebrite is hardware and a
14          software?
15    A.    Yes.  Celebrite itself, there's a machine,
16          basically a computer, and then the software
17          is its analytic component to the machine
18          itself.
19    Q.    Is this hardware and software generally
20          accepted as a valid forensic tool?
21    A.    It is.
22    Q.    Now, are there different types of extractions
23          that Celebrite can do?
24    A.    Yes.
25    Q.    Can you explain those to us?
```

420

1    A.    Celebrite does three extractions.  A logical

2          extraction, which is basically a snapshot of

3          the device; a file system extraction, which

4          is basically a logical extraction of the

5          device.  But that's where it actually goes in

6          a little bit deeper into the actual file

7          system of the device and can on occasion

8          capture hidden files as well as some deleted

9          files.  There's a third extraction, which is

10         a physical extraction, and that implies a

11         bit-by-bit copy of the device itself.

12                   The logical and file system does not

13         go into the unallocated partitions of the

14         device where the physical extraction can go

15         into the unallocated portions of the device.

16         Generally speaking, a physical extraction is

17         going to provide us with more deleted

18         images as well overcome some of the

19         limitations of a logical or file system

20         extraction.

21   Q.    Okay.  And does the type of extraction that

22         you can do using Celebrite depend on the

23         target device or the mobile device that you

24         are examining?

25   A.    It depends on both the hardware as well as

421

```
 1              the operating system of the actual device.
 2    Q.    Okay.  Okay.  Now, can you just explain for
 3          the jury generally how you would conduct an
 4          extraction using Celebrite?
 5    A.    Generally what I will do is I will take the
 6          device-- if I can get it into an airplane
 7          mode I will do that.  That prohibits the
 8          device from connecting to any outside
 9          sources.  Once that's completed, I will
10          connect the device to-- the-- the cellular
11          device to the Celebrite via its connecting
12          cable.  The Celebrite is then connected to a
13          computer with another USB style cable.  And I
14          go through a menu.  It's very user friendly.
15          I basically then just select the device from
16          a menu on the Celebrite machine itself and
17          start the software suite and, whala, it-- it
18          begins to extract the device.
19    Q.    Okay.  And does Celebrite create a report
20          that is easy to read?
21    A.    It does, yes.
22    Q.    Organizes the files in a particular fashion?
23    A.    Yes.
24    Q.    Okay.  Detective, I'm going to hand you
25          Government Exhibit 21 and also somewhere up
```

```
1            here is Exhibit, I believe it's 15.

2   A.   There is stuff, yes.

3   Q.   Take a look at those and let me know when

4        you're done.

5   A.   Okay.

6   Q.   Let's start with Exhibit 15, which has been

7        introduced into evidence.  Did you do any

8        type of an extraction on this device?

9   A.   I did.

10  Q.   And are you able to recognize that device?

11  A.   I am.

12  Q.   Okay.  Do you recognize that as the device

13       that was seized during this search at 429

14       Taylor, the residence of Jonathan Kearn?

15  A.   Yes.

16  Q.   And did you have an opportunity to seize--

17       come in contact with Jonathan Kearn at the

18       time of that search warrant?

19  A.   I did.

20  Q.   On May 7th of 2013?

21  A.   Yes.

22  Q.   Do you see him in the courtroom today?

23  A.   I do.

24  Q.   And would you just describe what he's wearing

25       for the jury?
```

1    A.    A blue blazer over a navy blue shirt, blue

2          tie, glasses.

3    Q.    Okay.  Seated at counsel table with

4          Mr. Francis?

5    A.    Yes, ma'am.

6    Q.    Okay.

7                MS. KENNEY:  Your Honor, I'd ask the

8          record reflect he's identified the defendant.

9                MR. FRANCIS:  No objection, Your

10         Honor.

11               THE COURT:  All right.  Very well.

12   Q.    (By Ms. Kenney)  Now I'd like you to take a

13         look at Exhibit 21.

14   A.    Okay.

15   Q.    You said-- and I think you testified-- let me

16         just ask this.  Did you do an extraction on

17         Exhibit 15, which is an iPhone 4S?

18   A.    I did.

19   Q.    And did you create-- or was a report created

20         of that extraction?

21   A.    It was.

22   Q.    Is that report or excerpts from that report

23         summarized in Exhibit 21?

24   A.    Yes.

25   Q.    Is it fair to say that the full report is

1          extremely large?

2     A.   The full report is several thousand pages

3          long, yes.

4     Q.   And that's not what's contained in Exhibit

5          21?

6     A.   Correct.

7               MS. KENNEY:  Your Honor, I'd move to

8          admit Exhibit 21.

9               MR. FRANCIS:  No objection, Your

10         Honor.

11              THE COURT:  Without objection,

12         Exhibit 21 is received as evidence.

13    Q.   (By Ms. Kenney)  Detective Ladd, have you had

14         the opportunity to compare Exhibit 21 to the

15         full report?

16    A.   I have.

17    Q.   And were you able to confirm that these items

18         in Exhibit 21 are part of the full report

19         that was generated from the extraction of the

20         iPhone 4S?

21    A.   Yes.

22    Q.   Let's just take a look at that.  And what is

23         the-- explain page 1 of Exhibit 21.  Can you

24         tell us what the information on that front

25         page shows us?

425

1    A.    The top portion, or the top half, is the date

2          and the time that I did the extraction with

3          the Celebrite, as well as the device

4          information.  In this case, an Apple iPhone

5          4S.  It goes on to identify the Celebrite

6          that I actually used.  And it goes on to

7          further identify the iPhone as far as some

8          information off of the phone as well as the

9          computer that the iPhone is reporting that it

10         was last synced with.

11   Q.    And this shows that the-- it says product

12         version 5.1.1.  Do you know what that is?

13   A.    That's going to be the iOS, the iPhone

14         operating system that's on the device at the

15         time.

16   Q.    Okay.  And there's a phone number, correct?

17   A.    Yes.

18   Q.    What is that phone number related to?

19   A.    It's going to be related to the device that

20         was extracted by the Celebrite.

21   Q.    Okay.  So in this case the iPhone 4S that's

22         Exhibit 15?

23   A.    Yes, ma'am.

24   Q.    Okay.  Did you-- let me back up.  Were you

25         involved in this investigation at all prior

```
1              to May 7th, 2013, the date that the search

2              warrant was executed?

3    A.   I was not.

4    Q.   Did you have any information regarding the

5              background of the information?  Or, excuse

6              me, the investigation?

7    A.   Not until the day of the event when we were

8              asked to go out to the scene to provide

9              assistance to HSI personnel.

10   Q.   Is that a fairly typical procedure with your

11             agency and federal agencies?

12   A.   Normally when a federal agency needs

13             assistance it's pretty last-minute with us.

14             We'll get a pre-brief overview to then go out

15             to a scene with them.  And we're asked to do

16             that because we're familiar with the city and

17             we also have contact-- radio contact with

18             emergency dispatchers as well as others

19             should any assistance needs arise.

20   Q.   Were you asked to perform any type of an

21             analysis on the data extracted from the

22             iPhone 4S?

23   A.   Not in a very specific sense.  I did a very

24             vague overview of the photos.  Once I became

25             a little bit more knowledgeable in the
```

1       investigation, I-- I was able to look at

2       photographs, but not communications, as I

3       wasn't aware of who-- the communications of

4       the device itself would have not made any

5       sense to me.

6   Q.  Okay.  And-- actually, Detective, I think

7       that's all the questions that I have.

8   A.  Okay.

9               THE COURT:  All right.  Ladies and

10      gentlemen, the completion of the direct

11      examination happens to sync up almost

12      perfectly with the noon hour.  And since I

13      was late getting you a break, I'm going to

14      give you a few minutes early on getting your

15      lunch.  So we'll take our noon recess, and

16      plan to be back in your jury room ready to

17      come back in the courtroom at 1 o'clock or

18      just a few minutes before.

19              During your lunch break-- I hope you

20      found your way to the various eating options

21      either in the courthouse or nearby.

22      Yesterday-- I did notice it had rained a

23      little bit during the morning, so if you

24      brought an umbrella or other cover you might

25      take it with you.

428

1              I would remind you of the usual

2       restrictions that I repeat at times like this

3       and ask you again, no communicating about the

4       case, not even with each other.  The evidence

5       is still in process and it would be unfair to

6       the parties to engage in a discussion, even a

7       limited discussion, until you've heard all

8       the evidence.  So please remember that.  No

9       communicating with anyone involved in the

10      trial or anybody at work or at home, your

11      friends, about the case in any fashion.  And,

12      of course, don't attempt to do any research

13      on any device or in any book that might

14      pertain to the trial or the issues that are

15      joined in it.

16              So we'll see you at 1 o'clock.  I

17      hope you have a good lunch and see you then.

18              Ms. Garrett, will you take charge of

19      the jury?

20              (THEREUPON, the following

21      proceedings were had in the presence and

22      hearing of the defendant).

23              THE COURT:  All right.  We'll be in

24      recess until 1 o'clock.  If you need to see

25      me before then, let Ms. Garrett know.

429

1              MS. KENNEY:  Thank you.

2              MR. FRANCIS:  Thank you, Judge.

3                   (THEREUPON, the lunch recess

4         was taken).

5                   (THEREUPON, the following

6         proceedings were had in the presence and

7         hearing of the defendant).

8              THE COURT:  Good afternoon,

9         everyone.  Please be seated.  We ready for

10        the jury?

11             All right.  Ms. Garrett, I'll ask

12        you to bring the jury in.

13             The record should reflect that the

14        defendant's present in the courtroom with

15        counsel as is a representative of the counsel

16        for the United States.

17                  (THEREUPON, the following

18        proceedings were had in the presence and

19        hearing of the jury and the defendant).

20             THE COURT:  On your signal.  Good

21        afternoon, members of the jury.  Welcome

22        back.  I think we are ready.

23             When we took our lunch recess,

24        Mr. Francis, it was your opportunity to

25        cross-examine the witness if you wish to.

430

1                    MR. FRANCIS:  Thank you, Your Honor.

2                         CROSS-EXAMINATION

3          BY MR. FRANCIS:

4     Q.    Detective Ladd, do you have the Government's

5          Exhibit 21 before you?

6     A.    I do.

7     Q.    Would you please turn to page 8 of that

8          exhibit?  And let me know when you have that

9          before you.

10    A.    I'm there.

11    Q.    I want to refer you to this area where my pen

12         is.  It says created 4-28-13, 12:26.  I guess

13         it's in the afternoon.  What does that mean?

14         What's being created?

15    A.    Typically that's going to be the date that an

16         image is created on a device in which the

17         Celebrite, while parsing out the data from

18         the device itself, comes up with a date and

19         then deciphers that date for us and presents

20         that here.

21    Q.    Is that the date the picture was taken?

22    A.    That I do not know.

23    Q.    So this could have been taken years before?

24    A.    It's possible, yes.

25    Q.    The other thing I wanted to talk about very

431

```
 1              briefly was you indicated that one of your

 2              jobs dealing with computers involves mapping?

 3      A.      Cell phones, yes.

 4      Q.      And again, would you explain to me what you

 5              mean by mapping?

 6      A.      We'll get records from cellular telephone

 7              providers.  And based on those records we are

 8              then able to interpret the data that they

 9              give us and then map out the-- a cellular

10              device within a cell tower and in most cases

11              what sector the device was actually connected

12              in at the time.

13      Q.      Do those records from phone companies include

14              like broadband service records?

15      A.      Not normally, no.

16      Q.      Would they include like cell phone records,

17              telephone records?

18      A.      Yes.

19      Q.      And on those cell phone telephone records one

20              would find the dates and times calls were

21              made; is that correct?

22      A.      Yes.

23      Q.      And they would also find the destination of

24              the call?

25      A.      Yes.
```

432

```
1    Q.   And it would also show incoming calls that
2         were received, correct?
3    A.   Yes.
4    Q.   And the date and time those were received?
5    A.   Yes.  As long as the call was routed through
6         the actual cell phone provider as opposed to
7         like a voiceover IP type call.
8    Q.   And if text messages were sent off of an
9         iPhone, for example, that bill would also
10        show when messages were sent and what the
11        destination was; would they not?
12   A.   It can.  Although iMessenger itself, there is
13        occasionally anomalies in that in which it
14        will, especially if it's over data, can
15        bypass a cell phone provider and go and set
16        over internet protocol through Apple servers
17        and then complete the communication that way.
18   Q.   Okay.  And I believe you mentioned something
19        about cell towers.  What was the significance
20        of cell towers?
21   A.   In the case of mapping?
22   Q.   Yes.
23   A.   That's going to tell us where the physical
24        location of a device was at a given time of a
25        phone call or a text message.
```

```
1    Q.    Do you have any other responsibility in the

2          case other than the extraction of the

3          information from the cell phone, the

4          Celebrite?

5    A.    I do not.

6    Q.    Okay.

7                    MR. FRANCIS:  I don't have any

8          further questions.

9                    THE COURT:  All right.  Ms. Kenney,

10         is there redirect examination?

11                   MS. KENNEY:  No, Your Honor.

12                   THE COURT:  Sir, you may step down.

13                   You may call your next witness.

14                   MS. KENNEY:  Your Honor, we call

15         Craig Beebe.

16                   Your Honor, may this witness be

17         excused?

18                   MR. FRANCIS:  As far as we're

19         concerned, Your Honor.

20                   THE COURT:  Without objection, you

21         are excused, sir.

22                   Mr. Beebe, before you take your seat

23         if you would pause and raise your hand, the

24         deputy clerk will administer the oath.

25                        CRAIG BEEBE,
```

434

1          called as a witness on behalf of plaintiff,

2          was sworn, and testified as follows:

3                    THE COURT:  If you would adjust the

4          chair and the microphone so that it will

5          amplify your voice, and then if you would for

6          the court reporter please say and spell at

7          least your last name.

8                    THE WITNESS:  Sure.  Craig Beebe.

9          And my last name is spelled B-E-E-B-E.  Craig

10         is C-R-A-I-G.

11                   THE COURT:  Ms. Kenney, you may

12         proceed.

13                   MS. KENNEY:  Thank you.

14                        DIRECT EXAMINATION

15         BY MS. KENNEY:

16    Q.   Sir, tell us what you do for a living.

17    A.   I am a special agent with Homeland Security

18         Investigations.  I'm out of the Chicago

19         office.  And presently I am a full-time

20         computer forensic agent in our forensic lab.

21    Q.   How long have you been with the Department of

22         Homeland Security?

23    A.   I was hired by the Department of Homeland

24         Security in March of 2010.  And I was-- I

25         went through our academy in March of 2010

1           until May of 2010 and then I reported to HSI

2           Kansas City, where I was an agent there from

3           basically end of May of 2010 until June of

4           2013 when I transferred to HSI Chicago.

5           Prior to that I was a special agent with the

6           U.S. Secret Service in Chicago from 2004

7           until 2010.

8    Q.    Do you consider Chicago home?

9    A.    Yes.

10   Q.    Okay.  As a federal agent, have you

11          investigated crimes involving child

12          exploitation or child pornography?

13   A.    Yes, I have.

14   Q.    Now, I guess I should divide that up perhaps.

15          As an agent, either with Secret Service or

16          with Homeland Security, do you have an

17          estimate of the number of investigations that

18          you would have been involved with?

19   A.    Child exploitation, I would say a little bit

20          different.  When I was in Kansas City I did

21          both the investigator side, much like Agent

22          Casner, and I also did computer forensics.

23          In Chicago I'm strictly in a support role

24          where I do the computer forensics or cell

25          phone forensics.  But as an investigator, I

```
1            would say at least 10 child exploitation

2            investigations where I was the investigator.

3            And I've probably conducted over 60

4            examinations for computer forensics.  Both

5            child exploitation and other disciplines

6            within HSI of the core violations.

7    Q.     Okay.  So let's just talk a little bit about

8            as a forensic examiner.  What are your job

9            responsibilities in a criminal investigation

10           that I think you used the term you're

11           assisting with?

12   A.     Right.  As a computer forensic agent, I'm

13           offering a support role to the case agent to

14           help them find evidence that will help

15           further their case.  And as a computer

16           forensic agent, my responsibility is to

17           conduct examinations with good, sound

18           forensics, not altering data, not connecting

19           my examination machine to the internet while

20           I'm doing an examination, securing evidence.

21           And when I do an examination and I'm making

22           what's called an image of a computer hard

23           drive or some type of electronic media

24           device, that I'm putting it on forensically

25           clean hard drives for storage.
```

1          So that's kind of my safeguards that

2     I take before I do an exam.  And then it's

3     based on the type of examination that the

4     case agent is looking for, whether it's

5     pictures, videos, documents.  Depends on the

6     type of case and it depends on the request

7     from the computer forensic agent-- or the

8     case agent through the computer forensic

9     agent.

10  Q.   So does that sometimes require you to

11     accompany the case agent or the investigating

12     agent on search warrants?

13  A.   Yeah.  Almost-- almost always the lead CFA,

14     which is computer forensic agent, accompanies

15     the consent search, or in this case the

16     search warrant.  Because a lot of times in

17     this day and age there's multiple computing

18     devices in a home or business.  And sometimes

19     encryption is employed, and there's special

20     steps that need to be taken before you shut

21     down a machine or try to collect encrypted

22     evidence.  That's why a computer forensic

23     agent comes with and accompanies on search

24     warrants and consent searches and things as

25     such.

1    Q.    Okay.  Agent, I'm going to put three exhibits

2          in front of you.  Exhibit 23, Exhibit 24, and

3          Exhibit 25.  We're going to talk about those.

4    A.    Okay.

5    Q.    If you would-- I'm sorry.  Start with Exhibit

6          24.  Take a look at that and let me know when

7          you're done.

8    A.    Okay.

9    Q.    Do you recognize Exhibit 24?

10   A.    Yes.

11   Q.    What is Exhibit 24?

12   A.    This is basically my professional résumé as a

13         computer forensic agent.  We're required,

14         through our program with the Cyber Crimes

15         Center, to kind of keep track of the

16         trainings that we attend, how many exams that

17         we conduct and things of that nature.  And

18         this basically lays out my-- my

19         certifications and my education and things of

20         that nature, as well as the amount of

21         forensic exams that I completed in the years,

22         in this case 2012 and 2013.

23              MS. KENNEY:  Your Honor, I'd move to

24         admit Exhibit 24.

25              MR. FRANCIS:  No objection, Your

439

1          Honor.

2                    THE COURT:  Without objection,

3          Exhibit 24 is received as evidence.

4     Q.   (By Ms. Kenney)  So we've sort of at least

5          hinted to this, but do you-- you do have

6          special training and education in examining

7          electronic devices, correct?

8     A.   That is correct.

9     Q.   And do you have any-- is there a subcategory

10         of training for examining-- conducting

11         forensic examinations in child pornography or

12         child exploitation crimes?

13    A.   With the basic training that-- that we

14         receive in the academy -- and when I say the

15         academy, the HSI academy -- we go over all of

16         HSI's core violations that we investigate and

17         one of them, obviously, is-- is child

18         exploitation.  That's where I received my

19         training as far as conducting investigations

20         regarding child exploitation investigations.

21                    And then with-- in regards to

22         computer forensics, basically computer

23         forensics, it's the same broad scope of the

24         techniques and practices that you'll employ

25         whether it's-- if you're looking for a

440

1          financial fraud case or if you're doing a

2          forensic exam on a financial fraud case or a

3          child pornography case.  Either one you

4          employ the same practices.  You just look for

5          different things in both types of cases.

6    Q.    So what type of tools do you use when you are

7          conducting a forensic examination on

8          electronic devices?

9    A.    The-- for the majority of the time I use a

10         software program, it's called Encase.  And

11         what Encase allows me to do is allows me to

12         create a forensic image of a device, whether

13         it be a hard drive, a thumb drive, a

14         smartphone.  And then what it lets me do is

15         it allows me to preview, or parse, I should

16         say, parse out data within the image I

17         create.

18                   A little bit of computer forensics.

19         For example, if I have a computer to look at,

20         the first thing I do is I create an image of

21         that hard drive.  And it's a bit-for-bit

22         image of the hard drive.  Once I create that,

23         the original evidence I don't touch.  I don't

24         want to alter it.  And what I use to make

25         sure that I don't alter any evidence is a

441

1         device-- and it can be either hardware or

2         software.  Generally I use the hardware

3         version of the device, it's called a write

4         blocking device, and it prevents the addition

5         of data to the suspect's computer hard drive

6         or to their wireless handset or smartphone.

7                 And after I create that image,

8         that's what I work off of.  And depending on

9         the type of case, if it's a child

10        exploitation case, I'm going to be looking

11        more for graphics, for images, for pictures,

12        I might be looking for movies and things of

13        that nature.  So that's what I'm going to

14        concentrate on.

15                Whereas in a document-based case I

16        might be looking for spreadsheets, for

17        Microsoft Word documents and things of that

18        nature.  That's more of a text involved

19        computer forensic examination.

20                But in this case I was looking for

21        pictures and videos.

22   Q.   Okay.  Now let me just ask you about Encase.

23        How long have you been using Encase?

24   A.   I've been using Encase-- when I went through

25        training in March of 2012 to May of 2012 they

442

1          taught us basically two different software

2          platforms.  The first was Encase and the

3          second was the forensic tool kit made by exif

4          data.  Both of them are good tools; however,

5          it's my opinion Encase is what I think I feel

6          more comfortable with as far as for a

7          graphics investigation, for an investigation

8          with pictures and videos.  So for the most

9          part I use-- the majority of my cases are

10         cases like this case and I use Encase

11         primarily.

12    Q.   Okay.  And is Encase an accepted forensic

13         tool in law enforcement circles?

14    A.   Yes.  In-- where I work in Chicago in the lab

15         that I am in there's five agents, and pretty

16         much Encase is used 80 percent of the time by

17         the other forensic agents as well.

18    Q.   Okay.  Now, you've mentioned bit-for-bit.

19         And although I think I know what you're

20         talking about, can you explain what you mean

21         when you're talking about a bit-for-bit copy?

22    A.   It's-- a bit-for-bit copy is the data that is

23         extracted from the hard drive.  I'm using a

24         hard drive as an example.  It is a copy, an

25         exact copy of what is on the suspect's

```
1              machine.  It puts it into a different type of
2              format.  It's called an EO1 file.  But it's
3              basically whatever is on the suspect's-- the
4              target device is what is in my EO1 file.
5         Q.   Okay.  Now, what type of devices would you
6              anticipate you'd be asked to conduct a
7              forensic examination of?
8         A.   Typically it's any type of electronic storage
9              media, hard drive, flash drive, external hard
10             drive, DVDs.  And then also any type of a
11             mobile device that would have any storage
12             capabilities.  Generally in today's-- it's
13             crazy but most smartphones out there have
14             more processing power and more hard drive
15             space than, you know, a computer of 10 years
16             ago or 15 years ago.  So generally when I go
17             on a search warrant I have tools available to
18             me to look at hard drives as well as
19             smartphones.
20        Q.   Okay.  Now, does your training and education
21             include the learning to recognize what is
22             child pornography?
23        A.   You know, to a certain extent.  But I mean,
24             for the most part, at least with me, child
25             pornography would be anyone that appears to
```

444

1          be underaged participating in some type of

2          sexual act, whether it's with an adult or

3          with another minor.  And, I mean, that's the

4          basis that I go off of.

5     Q.   Okay.  And maybe I asked this, but do you

6          have an estimate of how many devices you have

7          conducted of-- you have done forensic

8          examinations on?

9     A.   I would say it's probably-- from thumb drives

10         to, you know, servers and I would say each

11         device is each hard drive that would be

12         contained in a server, over 250 at this

13         point.

14    Q.   Okay.  Is there a general process that you go

15         through when you participate in an

16         investigation that involves the seizure of

17         electronic evidence?

18    A.   Yes.  Basically I document -- and we'll use a

19         hard drive for example -- I'll document the

20         machine, I'll document the serial number, the

21         model number of the machine and what it

22         contained.  So, for example, Acer desktop

23         computer bearing serial number X, Y, Z 123,

24         model number 1234, containing a Seagate hard

25         drive with this model number and the serial

1          number.  All that's documented and it's

2          placed in my report that I-- that I submit.

3                  I also, as far as documenting, if

4          anything comes up within the exam that seems

5          odd, I'll either take a picture or a note.

6          And that usually is if a system time or date

7          is off from the actual time.  I'm not talking

8          by like a couple minutes but I'm talking

9          about like days, something like that.  I'll

10         document that as well.

11    Q.   And what steps-- you mentioned-- I think you

12         touched on it briefly.  But what steps, if

13         any, do you take to preserve the integrity of

14         the electronic evidence?

15    A.   Well, like I was saying, when I do a forensic

16         image, the image is placed on forensically

17         prepared media, which is a hard drive that

18         has been zeroed out of all data.  So if I

19         used the hard drive in a prior case, all of

20         that data would be taken off.  And it's

21         basically a sterile hard drive where there's

22         no data.  And then what happens is that image

23         is placed onto that-- that hard drive and the

24         original data is back in the piece of

25         equipment that it came out of and it's

446

1              secured in our evidence vault and the image

2              is secured in our lab.  At least in Chicago,

3              our lab is accessed only by the computer

4              forensic agents and a couple of the bosses

5              and everything's stored inside the lab where

6              no one could alter or do anything to it.

7     Q.    Okay.  So in terms of seizing and preserving

8              the integrity of electronic evidence, are

9              there differences between desktop computers,

10             laptop computers, tablets, and mobile phones?

11    A.    Well, there-- just like the nature of the

12             beast of mobile devices, as far as doing the

13             extraction, a lot of the mobile devices, and

14             especially this applies to the time of this

15             investigation, the type of acquisition that

16             is performed is a logical acquisition where

17             the device is actually running; whereas, a

18             computer hard drive the device generally is

19             not running.  The computer is shut down.  The

20             hard drive is taken out of the machine.  The

21             forensic steps though still apply as far as

22             preserving the data, putting it on

23             forensically prepared media and things of

24             that nature.  So across the board it's pretty

25             much the same, but doing the actual

```
 1            acquisition is where the changes come into
 2            play.
 3    Q.      Okay.  Would you agree that the storage on a
 4            mobile phone is more volatile or fragile than
 5            it would be on a desktop computer?
 6    A.      Oh, absolutely, because it's running.  I
 7            mean, if it's still connected to the network
 8            it could still be changing.  And the
 9            difference also is a hard drive in-- the
10            newer hard drives are now this technology
11            which is called solid state technology, but
12            on mobile phones the solid state or SSD is
13            basically the storage device within the
14            mobile phone.  So, yes, the cellular or
15            wireless handsets, they are a little bit more
16            volatile.
17    Q.      Okay.  Agent Beebe, did you participate in an
18            investigation involving an individual named
19            Jonathan Kearn?
20    A.      Yes, I did.
21    Q.      And during your role in the investigation did
22            you actually come in contact with Jonathan
23            Kearn?
24    A.      Yes, I did.
25    Q.      Do you see him in the courtroom?  Could you
```

448

```
 1            recognize him if you saw him again?
 2    A.      Oh, yes, absolutely.  He's the gentleman
 3            sitting with Mr. Francis at the counsel table
 4            wearing a blue blazer, blue shirt, blue tie,
 5            brown hair, glasses.
 6    Q.      Okay.
 7                     MS. KENNEY:  Your Honor, I'd ask the
 8            record to reflect he has identified the
 9            defendant.
10                     MR. FRANCIS:  No objection.
11    Q.      (By Ms. Kenney)  What was your role-- let me
12            start with this.  We're talking about the
13            date May 7th of 2013, correct?
14    A.      Uh-huh.
15    Q.      The date-- yes?
16    A.      Yes.
17    Q.      The date that the search warrant was
18            executed?
19    A.      My role-- I had a couple different roles.
20            Primarily it was being a computer forensic
21            agent on the search warrant, but I
22            participated in the entry to-- to the
23            residence.  We did have a search warrant, we
24            did an entry, I want to say like eight agents
25            that made the initial entry into the
```

449

1              residence.

2    Q.    She's doing a pretty good job keeping track

3          of you but slow down just a little bit so she

4          can keep up.

5                    Eight agents sounds like a lot when

6          you're going out on a search warrant.  Can

7          you explain why you have so many?

8    A.    Well, it's basically to ensure the safety of

9          the residents inside the-- the home as well

10         as our agents' safety.  We also, depending on

11         the size of the-- the residence, in this case

12         it had three stories, so that's a lot of area

13         for us to clear.  And we also have to

14         preserve the perimeter of the residence.  So

15         when you start thinking in those terms and

16         not getting into our tactics, but, you know,

17         eight people is about average.

18   Q.    Okay.  Can you explain to us what you did

19         during the execution?  And would you agree

20         the address is 429 Taylor here in Topeka?

21   A.    Yes.

22   Q.    What did you do-- what was your role during

23         the execution of this particular search

24         warrant?

25   A.    I was on the entry team and I was actually

450

1          designated to be the breacher if the door

2          was-- if the door was secured.  The door was

3          not secured.  We were able to make entry and

4          I was-- I want to say I was the second person

5          in the-- in the door threshold.  And I

6          encountered Mr. Kearn initially and I went

7          ahead and secured him for his safety and our

8          safety.

9    Q.    Okay.  Now, during the execution of the

10         search warrant a number of electronic items

11         were seized, correct?

12   A.    That is correct.

13   Q.    And in fact, let's just take a look at that

14         real quick.  I'm looking at the last page of

15         Exhibit 8, which you probably did not fill

16         out, but would you agree that this is a list

17         of the items that were seized during the

18         execution of that search warrant?

19   A.    Yes.

20   Q.    And you understood at the time you went in

21         that you were looking for particular devices?

22   A.    Yes, I did.

23   Q.    Which devices were you particularly

24         interested in?

25   A.    Well, I knew, based on my discussions with

1              the case agent, that an Apple iPhone was

2              being used.  So with that being said, as well

3              as the nature of the investigation, I knew

4              that there were pictures and videos being

5              discovered-- or-- or being transmitted to--

6              to Detective Sergeant Butler.  I knew that we

7              were going to be looking for smartphones and

8              storage devices.

9     Q.    Okay.  And did you personally seize all of

10           the electronic devices, or was this--

11    A.    It was a group effort.

12    Q.    Okay.  All right.  Now, we can see from this

13           list that is the last page of Exhibit 8 that

14           there were more than one iPhone seized; is

15           that correct?

16    A.    Yes.  There were three.

17    Q.    Okay.  Was one of those phones seized that

18           resulted in some evidence that you thought

19           was relevant to this case?

20    A.    Yes.

21    Q.    Which phone?

22    A.    It was the phone that was-- that was in the

23           defendant's possession.  I believe he had

24           that on him at the time of the search

25           warrant.

452

1    Q.    Okay.  Did you take possession of that phone?

2    A.    I had the phone and I know it was password

3          protected.  But I did not get the password.

4          My-- our group supervisor, that also

5          participated in the warrant, was able to get

6          the password from Mr. Kearn.

7    Q.    Okay.  Now, there were other-- two other

8          iPhones seized?

9    A.    Yes.

10   Q.    Were those-- did you examine those as well?

11   A.    Yes, I did.

12   Q.    And what did you find as a result?

13   A.    On one of them there-- on one there was no

14         contraband, there was no child pornographic

15         contraband located.  And then the second

16         iPhone had a broken screen and it wouldn't

17         even power up so I couldn't even do an

18         examination with the tools that I had with

19         my-- or at my disposal.

20   Q.    Okay.  So in front of you I believe is a

21         package that is Exhibit 14.  Could you take a

22         look at that?  It's been admitted into

23         evidence as an item seized during the search

24         warrant.  Do you need to open it?  If you

25         do--

1  A.   This is 15.  Is that--

2  Q.   15.

3  A.   Yeah, okay.  And there's an iPhone inside of

4       it.  I got it.  Okay.

5  Q.   Do you recognize this exhibit?

6  A.   Well, it's the black iPhone that was in the

7       defendant's possession at the time of the

8       search warrant.

9  Q.   Okay.  What, if anything, did you do with

10      this particular device?

11 A.   What I did after-- after it was unlocked I

12      was able to hook it up to my forensic laptop

13      and conduct the preview of the device.  And

14      with Encase to conduct a preview I have to

15      hook up the device to my forensic laptop.

16      And what I do is it's called a logical

17      acquisition of a device which-- and I know

18      that Detective Ladd was kind of explaining

19      the differences in the type of Celebrite

20      extractions, with logical, the file system,

21      and then the physical.  This is just a

22      logical.

23            And that's all Encase can do is a

24      logical acquisition, which is basically just

25      a snapshot of what's on the smartphone.

```
1          There's no hidden files and I can't see

2          things that have been deleted or an

3          unallocated space with this type of

4          extraction.  So I did the logical extraction

5          and I previewed it for images.

6    Q.    Okay.  And did you prepare a report of your

7          findings of the-- from your investigation of

8          Exhibit 15?

9    A.    Yes.  In my preview I reported that I saw

10         images that were child pornographic in

11         nature.

12   Q.    And I'm sorry, I may have confused that.  Did

13         you do a preview and then was there a

14         subsequent?

15   A.    Yes.

16   Q.    Okay.

17   A.    I did a preview.  And with the amount of

18         electronic devices that were-- that were in

19         the home and the nature of the investigation

20         with children being present, I just did a

21         logical just to see if anything was on the

22         device.  And that's where I saw the images

23         that were child pornographic in nature.  And

24         then when I got back to my office the

25         following day I started to dig deeper into
```

455

```
 1          the phone to look a little bit more into what
 2          else was on the phone.
 3    Q.    Well, then let's stop with the iPhone right
 4          there and then talk about-- somewhere near
 5          you is an exhibit that's been introduced as
 6          Exhibit 14, a computer hard drive.  It might
 7          be on the floor.  Do you need to be able--
 8    A.    Yeah, here it is.
 9    Q.    --to open that?
10    A.    Here it is right here.
11    Q.    Do you recognize Exhibit 15?
12    A.    Yes.  This was the-- this was the machine
13          that was inside of the master bedroom.
14    Q.    Okay.  Now, while I still have this list up,
15          it appears that there were a couple of
16          laptops, maybe a tablet, and I'm thinking
17          there was a phone that was not an iPhone,
18          maybe two.  Does that sound familiar to you?
19    A.    Yeah.  I know those were the items that were
20          seized, and I looked at the majority of the
21          items and I did not find anything of
22          investigative relevance on those items except
23          for one other device, which is Exhibit 14.
24    Q.    Okay.  We'll talk about that in a minute.
25    A.    Okay.
```

456

1    Q.   But for now, were there devices, other than

2         the iPhone with the cracked screen, that

3         were-- you were not able to do any kind of

4         examination of?

5    A.   No.  The only other item I-- the only other

6         item was there was a flip phone.  And I just

7         did not conduct any examination on it.

8    Q.   Okay.  All right.  Now, let's talk about

9         Exhibit 15, just your preliminary.  Did you

10        do a preview of-- I'm sorry, Exhibit 14, the

11        computer.  Did you do a preview of that--

12   A.   Yes, I did.

13   Q.   --as well?

14   A.   I'm sorry.  And I didn't find anything.

15   Q.   On-site?

16   A.   On-site.

17   Q.   Okay.  Now, let's talk more specifically

18        about the iPhone, which is Exhibit 15.  Can

19        you explain-- you did a full examination or

20        as full as you--

21   A.   I did a logical acquisition and a-- a full

22        examination with Encase.

23   Q.   With Encase.  Okay.  Can you explain the

24        process that you went through to examine this

25        particular iPhone, Exhibit 15?

```
1    A.    Sure.  Once I-- once I performed the logical
2          acquisition and-- and how Encase works is
3          Encase-- I don't know how many of you have
4          iPhones, but there's-- iTunes is an
5          application.  I have to have iTunes installed
6          on my computer because the app-- there's a
7          small-- it's called an app that Encase places
8          on the-- the mobile device, in this case the
9          iPhone, in order to communicate with the
10         iPhone.  It doesn't put any evidence on there
11         or any contraband.  It's just strictly an
12         application that allows the software to talk
13         to the iPhone.  So that's the basis of the
14         logical acquisition.
15                  I created a logical acquisition,
16         unplugged the phone from my forensic laptop,
17         and then I did an examination on the logical
18         acquisition.  And basically-- since I knew
19         the background of the case, I knew that I was
20         looking for images and I was looking for
21         videos.  And the software is very intuitive.
22         It's very easy, I think, to find pictures and
23         videos.  I could probably sit down with
24         anybody that's computer savvy and just tell
25         them how the software works and how to find
```

```
 1              pictures.

 2                      So what I did is basically selected

 3              the entire device, all of the folders, and

 4              selected the ability to look at all the

 5              images.  So it's every image that's on the

 6              device.  And I went through those and I

 7              discovered images that were child

 8              pornographic in nature.  Once I found those,

 9              I would bookmark those and then use those

10              bookmarks to create a report.  I also looked

11              at the videos as well.

12         Q.   Okay.  I'm going to stop you.

13         A.   Sure.

14         Q.   That's fine.  You said you prepared a report?

15         A.   Correct.

16         Q.   I would like you to take a look at Exhibit

17              23, I believe I placed in front of you.

18         A.   Yes.

19         Q.   Would you take a look at that and let me know

20              when you're done?

21         A.   Okay.

22         Q.   Okay.  Do you recognize Exhibit 23?

23         A.   Yes.  It's my Encase report.

24         Q.   Is it your full report or extracts from your

25              report?
```

459

1    A.    It-- it's extracts from-- from my report.

2    Q.    Okay.  And when we say from your report, your

3          report of both the iPhone 4S seized from the

4          defendant and the hard drive that we've

5          identified as Exhibit 14?

6    A.    Right.  This is for the Encase report for the

7          phone.

8    Q.    For the phone, okay.

9                MS. KENNEY:  Your Honor, I would

10         move to admit Exhibit 23.

11               MR. FRANCIS:  No objection, Your

12         Honor.

13               THE COURT:  Without objection,

14         Exhibit 23 is received as evidence.

15   Q.    (By Ms. Kenney)  Agent Beebe, I'm just going

16         to display the front page for now.

17   A.    Sure.

18   Q.    We're looking at the introductory page, would

19         that be fair, the summary page of your Encase

20         report?

21   A.    Yes.

22   Q.    And you indicated it's an iPhone 4S?

23   A.    Uh-huh.

24   Q.    Yes?

25   A.    Yes.

460

1     Q.    Okay.

2     A.    Sorry.

3     Q.    That's all right.  Did you do any type of

4           preexam verification of the phone?  And I

5           guess particularly I'm thinking of whether or

6           not it was set correct-- to the correct date,

7           time, that kind of thing.

8     A.    You know, that I-- on the actual phone, that

9           I don't recall.  I know that on the home

10          screen that if the time and date were wrong I

11          would have noted that.

12    Q.    Okay.

13    A.    But I didn't document-- I only document it if

14          it's wrong.

15    Q.    Okay.  All right.  That's what I need to

16          know.  Now, if you look at the-- well, just

17          tell me how you structure an Encase report.

18    A.    Well, based-- based on the case, with this

19          being a child exploitation exam, talking with

20          the case agent and discussing what we were

21          looking for, I knew there were going to be

22          videos, it was going to be images primarily.

23          But I also knew that there was an E-mail

24          address that was in question, which was the

25          cheyenneandliberty@yahoo.com.  So I was

 1           looking for any type of relevance, any type

 2           of evidence on the phone with that as well.

 3           And as I started looking at some of the

 4           browsing history, I saw some-- some internet

 5           sites that the titles were kind of

 6           questionable so I just bookmarked that in my

 7           report as contraband.  All it is is just a

 8           website that was, you know, viewed within

 9           the-- the iPhone.

10  Q.   Okay.  So you specifically looked for the

11       E-mail address cheyenneandliberty@yahoo.com?

12  A.   Correct.

13  Q.   And did you find anything indicating that

14       that address had been on that phone or been

15       used by that phone?

16  A.   Well, with ISPs, with internet service

17       providers, there's-- there's different

18       protocols.  One is called iMap.  And iMap is

19       a protocol that is employed.  And within an

20       iPhone you can create-- and I'm sure if you

21       have an iPhone you might have your home

22       E-mail address that's able-- you're able to

23       access your home E-mail from your iPhone.  If

24       it's an iMap account, it's created and stored

25       in a home domain.  And I did what's called a

1          key word search for-- for that, as well as

2          just browsing through the different folders

3          on the logical acquisition that I performed,

4          and I found cheyenneandliberty@yahoo.com and

5          that was in the raw data home domain library

6          data access.

7                    And there were a couple other iMap

8          accounts in there.  One of them was

9          sunflowerHVAC785.  I want to say there was--

10         I think two like that.  And I don't recall

11         the fourth one that was on there.  But I--

12         I-- I just remember the only one that was

13         relevant to-- to at least that investigation

14         was the cheyenneandliberty@yahoo.com.

15    Q.   Now, did you also find any applications of

16         significance-- well, let me let me back up

17         and ask this question.  Did you find any

18         images that you believed were relevant to

19         this particular investigation?

20    A.   Yeah, I found-- I found several of them.  And

21         in a-- in an iPhone generally, at least in my

22         iPhone, the pictures that are taken are

23         stored in a camera roll is the name of the

24         folder.  And the photos, the images that

25         are-- that are questionable that I found

463

```
 1            weren't found there.  They were found in a--
 2            a folder that was under the application
 3            domain and it was called
 4            com.galaxystudios.pictureprivacy.
 5                   And I had never heard of that before
 6            so I just Googled it and I discovered via
 7            Google what type of application it was.  And
 8            it's an application that allows a user to
 9            basically store photos and videos into this
10            application that is password protected.
11   Q.   Okay.
12   A.   So that's what I discovered when I Googled
13            the galaxy studios.
14   Q.   Did you find images that you believed were
15            possibly child pornography on the iPhone?
16   A.   Yes.
17   Q.   Were they all in this galaxy studio picture
18            privacy application?
19   A.   Just let me just review my report.
20   Q.   Certainly.
21   A.   But I-- I believe they were all-- they were
22            all in there except for there was-- there's
23            one that's in an org.jimmy.taproom-- itaproom
24            that I'm looking on my report right now.  But
25            the majority of them were all in that galaxy
```

```
 1              com picture privacy folder.

 2    Q.    Okay.  Now, let's just take a look at your

 3              report.  And I'm switching to page 2 of your

 4              report now.

 5    A.    Okay.

 6    Q.    And I'm looking-- I want to look first at the

 7              bottom picture.  How familiar are you with

 8              the E-mail communication between

 9              cheyenneandliberty@yahoo.com and Detective

10              Butler from the Queensland Police Service?

11    A.    Not as familiar with Agent Casner, but I'm

12              familiar enough to know that-- that images of

13              the defendant's daughter as far as the

14              pictures-- as far as what was exchanged.

15    Q.    Okay.  Now, this is a picture-- and do you

16              know what this is a picture of?

17    A.    It's a-- it's a picture of the defendant's

18              daughter, I want to say in the minivan.  And

19              she's-- she's one of the big aspects of the

20              case was the boots because they're

21              very-- they're-- they're very noticeable.

22    Q.    The pink boots?

23    A.    Yes.

24    Q.    Okay.  This indicates-- or at least in this

25              path-- tell me what an item path is.
```

465

```
1    A.    An item path is where the data is stored.

2          It's the file structure of the device.  And

3          in this case it's on the-- the iPhone.

4    Q.    Okay.  And then it references a reference to

5          this com.galaxyvideo.pictureprivacy?

6    A.    Correct.

7    Q.    And this is the application that you were

8          discussing?

9    A.    Correct.

10   Q.    And there were images on the iPhone that were

11         not the defendant's daughter.  Would that be

12         correct?

13   A.    Correct.

14   Q.    And you bookmarked those images as well?

15   A.    The ones that I thought were suspected child

16         pornography.

17   Q.    Okay.  And if we look at page 3.  And again

18         if I come to a picture that is not in this

19         galaxy studio picture privacy app, draw my

20         attention to that, please.

21   A.    I will.

22   Q.    So we're looking at page 3.  There are

23         additional pictures that appear to be of a

24         child wearing a red dress that's been

25         introduced into evidence.  Are you aware of
```

466

1           that?

2    A.     Yes.

3    Q.     Okay.  And then an additional picture that is

4           not one of the defendant's daughters?

5    A.     Yes.

6    Q.     Again, on page 4, a picture that is not one

7           of the defendant's daughters?

8    A.     Correct.

9    Q.     On page 5, the first image a picture that is

10          not one of the defendant's daughters?

11   A.     Correct.

12   Q.     Okay.  And then the third picture on that

13          page, are you able to say whether or not that

14          is the defendant's daughter wearing the pink

15          boots?

16   A.     I know the pink boots is what--

17   Q.     Pink boots.  Okay.  Page 6 a picture that you

18          bookmarked, the top picture not a defendant's

19          daughter?

20   A.     Correct.

21   Q.     Okay.  Now, I'm going to just point out or

22          discuss with you.  The bottom picture is--

23          again appears to be the defendant's daughter

24          wearing the pink boots bent over the backseat

25          of a vehicle, correct?

1    A.   That's correct.

2    Q.   Would you agree with me that all of the

3         pictures that are similar to this actually

4         have a different image number?  And if you

5         need to look through your report, that's

6         fine.

7    A.   Yeah.  One was 15 and one was 16.  There was

8         a 13 as well.

9    Q.   Okay.  Now I'm going to page 9.  And at the

10        top of page 9 would you describe the picture?

11   A.   The picture is of a female minor with the

12        focus on her genitalia.

13   Q.   Okay.  And again, this is a picture found on

14        the-- in the-- this picture was not found in

15        the Galaxy Studios, correct?

16   A.   Correct.

17   Q.   Where was this picture found?

18   A.   This was found in the org.jimmy.itaproom.

19   Q.   Okay.  Now, you also found videos; did you

20        not?

21   A.   Yes, I did.

22   Q.   Can you describe those videos?

23   A.   The videos were found -- both videos -- once

24        again in the com.galaxystudio.pictureprivacy

25        folder, and they were videos of the

1          defendant's daughter jumping up and down on a
2          bed.  She's wearing a shirt but no-- no
3          pants.  At least in one of the videos I
4          remember no pants.  And you could see her
5          genitalia in-- I want to say the beginning of
6          the video.  And it wasn't a long video.  I'd
7          say one was about 10 seconds and the other
8          one was 21 seconds.
9     Q.   Okay.  I'm going to stop you there.
10    A.   Sure.
11    Q.   Did you-- well, take a look at the contents
12         of Exhibit 25 and let me know when you are
13         done with that.
14    A.   Okay.  Okay.  It's a CD.
15    Q.   Have you seen the contents of that?
16    A.   Yes, I have.
17    Q.   And do the videos on that CD, are they the
18         same as the videos that you identified?
19    A.   Yes, they are.
20    Q.   Okay.  All right.
21              MS. KENNEY:  Your Honor, I would
22         move to admit Exhibit 25.
23              MR. FRANCIS:  No objection, Your
24         Honor.
25              THE COURT:  All right.  Without any

1       objection, Exhibit 25 is received as

2       evidence.

3                   MS. KENNEY:  And, Your Honor, I'd

4       like to play those for the jury now.  They're

5       not very long.

6                   THE COURT:  You may proceed.

7                       (THEREUPON, the video was

8       viewed in open court).

9    Q.  (By Ms. Kenney)  Agent Beebe, in front of you

10      or somewhere near you are items-- other items

11      that were taken from the search warrant.  And

12      I'm specifically talking about Exhibit 10,

13      which is a sheet, and Exhibit 11, which is a

14      comforter.

15   A.  Yes.

16   Q.  Do you see those items?

17   A.  Yes.

18   Q.  Were you able to recognize whether or not

19      those items were depicted in the videos that

20      we just watched?

21   A.  They were the sheets on the bed.

22   Q.  Okay.  And, I'm sorry, did you look at 11

23      also?  Exhibit 11.

24   A.  And then the-- the checkered bedspread or

25      comforter was on the bed.

1    Q.    Okay.  Agent Beebe, have you also reviewed

2          the full Celebrite report of the file

3          extraction that was completed by Detective

4          Ladd?

5    A.    Yes, I did.

6    Q.    And I believe in front of you is Exhibit 21.

7          There's a folder that has Exhibit 21 up

8          there.

9    A.    Yes, this is Detective Ladd's Celebrite

10         report.

11   Q.    This Exhibit 21 has been admitted as a-- some

12         extracts from the Celebrite report.  Would

13         you agree that it's not the full report?

14   A.    Oh, absolutely it's not.  I want to say it's

15         4,300 pages?

16   Q.    The full report?

17   A.    Yes.  The full report is 2,300 pages.

18   Q.    Is it accepted practice in the area of

19         electronic evidence seizure to validate

20         results using other tools?

21   A.    Yes, it is.

22   Q.    And is it fair to say that the Celebrite

23         report confirms much of what you found during

24         your examination?

25   A.    Yes, it does.  In regards to the images and

1          the movies.

2     Q.   Would it be more accurate to say that

3          the-- that your report confirmed information

4          in the Celebrite report?

5     A.   I-- yes, I would have to say that.

6     Q.   That the Celebrite report perhaps has more

7          detail than your Encase report?

8     A.   Well, as Detective Ladd had explained prior,

9          he did what is called a file extraction,

10         which will give us a complete file as well as

11         some other information.  Whereas the Encase

12         report, it's-- it's more used for computer

13         hard drives and things of that nature.

14         Especially then, in 2013, when I conducted

15         the exam.  It was more of a tool for

16         electronic media hard drives, thumb drives,

17         things of that nature, than for smartphones.

18    Q.   Okay.  You just used the term smartphone, and

19         I think I've used it too.  What do you mean

20         by a smartphone?

21    A.   Smartphone is a -- I won't even say cellular

22         because things have changed -- a wireless

23         handset that allows the storing of data,

24         multimedia, more process driven applications.

25    Q.   Would you agree that there's more than one

472

1              way to send an E-mail from the iPhone 4S?

2              And what I mean by that is-- well, let me

3              back up.  The iPhone 4S, does it have an

4              application specifically for E-mail?

5    A.       There is a-- when you create an iMap

6              account on your iPhone, at least on my iPhone

7              I have a small icon of an envelope which

8              tells me when I get messages in my personal

9              E-mail account.  And that is created by the

10             user with an iPhone at least prior to iOS

11             version 6.

12                     But there's also another way that

13             you can check E-mail if you have a web

14             browsing device.  We'll use iPhone as an

15             example.  You have the built-in web browser

16             of Safari where you can go to get Yahoo or

17             Gmail or Hotmail and enter in your mail

18             credentials to access your E-mail that way as

19             well.

20   Q.       Okay.  I'm just going to show you what's

21             marked as Exhibit 31 for demonstrative

22             purposes.  Just take a look at that.

23   A.       Sure.  Okay.  It's a picture of the home

24             screen on an iPhone.

25   Q.       Would that help assist the jury in

473

1       understanding your testimony as you're

2       discussing the applications?

3  A.   Yeah.  I think it would be great to show

4       that, the envelope icon at the bottom.

5              MS. KENNEY:  Your Honor, I'd move to

6       admit Exhibit 31 for demonstrative purposes

7       only.

8              THE COURT:  Is there objection?

9              MR. FRANCIS:  There is no objection,

10      Judge.

11             THE COURT:  Exhibit 31 is received

12      for the purposes of demonstrative use.

13 Q.   (By Ms. Kenney)  So I know you went through a

14      long explanation.  So at the bottom of the

15      screen there appears to be an envelope?

16 A.   Yeah.

17 Q.   And that's where you're talking if you set up

18      iMap account or an account on the phone you

19      click that button and it would use your

20      E-mail account?

21 A.   Correct.

22 Q.   Okay.  And then you also said something

23      about-- I think you said web-based

24      applications?

25 A.   Correct.

474

1    Q.    You could push the button that's for Safari?

2    A.    Right.  Which is Apple's-- the Apple

3          equivalent to Internet Explorer.  It's a web

4          browser which will open up where you can go

5          to any website you want and if it's your mail

6          account, enter in your mail credentials,

7          which is typically your user name and your

8          password, then you can gain access to your

9          mailbox that way.

10   Q.    So would you agree that you could use a web

11         browser like Safari to access a web-based

12         E-mail account such as Yahoo?

13   A.    Yes, you could.

14   Q.    Without that E-mail being set as an account

15         on the phone?

16   A.    Yes, you could.

17   Q.    Okay.  Now, Detective -- sorry -- Agent

18         Beebe, I'd like to go back to the computer,

19         Exhibit -- I don't know why I can't keep

20         these straight -- 14?

21   A.    Yes.

22   Q.    Did you conduct any type of preexamination

23         verification process in terms of, for

24         example, the dates and times on that machine?

25   A.    Yes.  When I-- the computer was not powered

475

```
1              when I discovered it in the master bedroom.
2              I removed the hard drive.  And I connected it
3              to a write blocking device on my forensic
4              laptop and I took a look at just the file
5              structure and I saw that the dates were a
6              couple weeks in the future, which I thought
7              was weird so I just-- I documented that
8              on-site.  I did a quick review of the images
9              and there were over 1,000 images on the-- on
10             the device on the hard drive, none of which
11             were child pornographic in nature.  But being
12             that the computer was in the master bedroom
13             of the defendant, we seized it to do a
14             complete examination in our office.
15      Q.     Okay.  Did you find any files-- well, let me
16             ask this.  Did you search specifically for
17             the use of the E-mail address
18             cheyenneandliberty@yahoo.com?
19      A.     Yeah.
20      Q.     Did you find any indication of that E-mail
21             address?
22      A.     A text string of cheyenneandliberty@yahoo.com
23             was discovered on the hard drive.
24      Q.     Did you do a search for the term Image
25             Source?
```

476

1    A.    I did but in a different software.

2    Q.    Okay.

3    A.    In a program called Internet Evidence Finder.

4    Q.    Okay.  So why don't you explain to us what

5          Internet Evidence Finder is.

6    A.    Internet Evidence Finder is a software tool

7          that is a very-- it's more of a specialty

8          tool.  It looks for the remnants of internet

9          browsing.  There's certain parts-- there's

10         certain folders on a computer where that

11         internet browsing history is stored and if

12         it's in unallocated, which is deleted space,

13         it knows, based on the file structure, of

14         what to look for.  So I use the forensic

15         image that I create of the target device and

16         I run Internet Evidence Finder against that

17         and it basically parses through the data and

18         it gives me the results that I enter in.

19         Much like Encase, it's very intuitive and

20         user friendly.  So I can put in Internet

21         Explorer browser history, social media apps

22         or social media remnants and things of that

23         nature.  And that's where I discovered Image

24         Source, that RU in a couple different

25         instances.  And though that's not contraband,

```
1              it's still a text search of what's involved

2              in this investigation.

3      Q.      Okay.  If you give me just a minute.

4      A.      Sure.

5      Q.      Going back to the Celebrite report, did

6              you-- was this a full report?  Was it

7              searchable?

8      A.      It was.  What I was-- what I was provided I

9              went and I looked-- looked through it and I

10             actually did a-- in-- the report was provided

11             to me in Adobe Acrobat, which is what I used

12             to view the report, and I was able to briefly

13             go through every aspect of the report.  I

14             mean, it was a very large report so I didn't

15             spend a lot of time particularly on any

16             aspect.  I just kind of went through more

17             importantly the pictures and the videos, and

18             I actually did a-- just a search for

19             cheyenneandliberty and I discovered that

20             within the report.

21     Q.      Did you also do a search for ProudPapa?

22     A.      Yes, I did.

23     Q.      Were you able to find that?

24     A.      Yes, I did.  It was ProudPapa and it had the

25             characters the greater than and a 3.  It's
```

```
 1            like it's-- online it's a heart.  So it's
 2            ProudPapa with the greater than and 3 next to
 3            it.  I saw that as well.
 4    Q.     Okay.  Just to go back to Exhibit 1 for a
 5            minute.  The initial-- this is the initial
 6            communication from cheyenneandliberty to
 7            Detective Butler.  And is this the search
 8            term that you used?
 9    A.     Yes.
10    Q.     ProudPapa, one word?
11    A.     Actually I just used ProudPapa--
12    Q.     Oh.
13    A.     --and it went to that part of the report that
14            had the greater than and 3 next to it.
15    Q.     All right.  Thank you.  Thank you for that
16            clarification.
17                   Now, we talked a little bit, at
18            least I think I asked you, about the-- well,
19            let me just ask it.  Would you agree that
20            mobile device storage and data is somewhat
21            volatile or fragile?
22    A.     Yes, it is in the fact that the cell phone or
23            wireless handset is always changing.  There's
24            always like different updates and things of
25            that nature where the contents could change
```

479

1          or be overwritten.

2     Q.   Okay.  Now, I'm going to show you what's

3          entered into evidence, it's Exhibit 21, page

4          8.  And you are welcome to go to the hard

5          copy.

6     A.   Okay.

7     Q.   Okay.  There has been testimony that this

8          image, the image of the defendant and his

9          four daughters, was found on a Facebook page?

10    A.   That is correct.

11    Q.   But there's also-- the Celebrite report

12         indicates that this image was created on

13         April 28th of 2013.  In your training and

14         experience are you able to explain the

15         discrepancy in that date?  Or maybe it's not

16         a discrepancy.

17    A.   Well, all the dates are the same, which-- and

18         created, modified and access dates, those can

19         sometimes be a little confusing.  But the way

20         that I know it as is it's the date and time

21         that it was placed on the device.

22    Q.   On the device?

23    A.   Yes.

24    Q.   Okay.  Now, Agent Beebe, we talked about your

25         examination of electronic devices and your

480

1           role in participating in search warrants or

2           actually going out with the investigators on

3           search warrants.  Are there benefits to

4           examining other devices such as, let's say

5           specifically, is there any benefit in

6           examining the wireless router?

7      A.   It depends on the investigation at hand.

8           If-- if the investigation was a network

9           intrusion investigation, so if something

10          along the lines of somebody hacking into,

11          let's say, a bank or some other financial

12          institution, we would want to preserve the

13          router and the server's log files to see when

14          access was granted, what ports were accessed

15          on the-- the server, what IP addresses and

16          things of that-- in that-- for that nature--

17          things of that nature.

18                    In this investigation, based on what

19          I knew going in, that we had an IP address

20          that was coming back to the defendant's

21          residence, that there were pictures exchanged

22          and I was to be looking for pictures and

23          videos, the wireless router as far as seizing

24          it wasn't going to help us out in the fact

25          that at least I know, based on experience of

1       doing other investigations where there's a

2       home router, if we unplug that router and

3       take it to our office the data that's

4       generally stored on most home routing devices

5       is-- is volatile.  It's almost basically like

6       RAM on a computer.  That when you unplug it

7       and it loses power, what's inside of it

8       disappears.  When it powers back up, at least

9       the router that I have at my house even, when

10      I power it back up I have to enter the time

11      and date back into it.

12              I also know that most home routers

13      only contain data for usually a short period

14      of maybe a day or two at the most.  And it

15      keeps overwriting.  So any data that we would

16      have been able to grab if it was a different

17      type of investigation would only have been a

18      day or two at best.

19  Q.  Okay.  And so just so I'm clear, you draw a

20      distinction between a home use router and

21      something that would be used by a large bank

22      or a large institution?

23  A.  Right.  Like an industrial grade router has

24      more storage on it.  There's log files that

25      are created on servers and there is more of a

482

```
1              digital footprint of the activity-- the
2              network activity specifically that goes on.
3     Q.    Okay.  Just one minute.
4                    MS. KENNEY:  Thank you, Agent Beebe.
5              I don't have any additional questions.
6                    THE COURT:  Mr. Francis,
7              cross-examination.
8                    MR. FRANCIS:  I just have a few,
9              Judge.
10                        CROSS-EXAMINATION
11    BY MR. FRANCIS:
12    Q.    Do you know what kind of router Mr. Kearn had
13           at his home?
14    A.    I believe it was an AT&T router.  The only
15           reason why I know that is based on a report
16           that was generated by the defense.
17    Q.    You mentioned that the iPhone had a password
18           on it; is that correct?
19    A.    That is correct.
20    Q.    And did you get that password from my client?
21    A.    I did-- I did not, but my-- at that time my
22           supervisor did, Shawn Gibson.  He asked him
23           for it and I believe he gave it to him.  He
24           gave it to him because we were able to unlock
25           it.
```

483

1   Q.   Was-- to your knowledge, was my client

2        cooperative with your agents that were there?

3   A.   Oh, yeah.  No, he-- he was.  I mean, in the--

4        when we made entry-- I mean, everything

5        happens very fast, I mean, obviously, so--

6   Q.   Do you have that Exhibit 31 before you?  I

7        can display it here.

8   A.   Oh, yeah.  Okay.  I don't have it in front of

9        me but I can see it on the screen.  We're

10       good.

11  Q.   You mentioned that by Safari my client could

12       go into something like Yahoo and get his

13       E-mail; is that correct?

14  A.   That is correct.

15  Q.   I suppose if he had a Google application on

16       his phone he could do that also?

17  A.   If he had like for Google mail?

18  Q.   Yes.

19  A.   He could depending on the application and

20       what it's designed to do.

21  Q.   Let me go to the face of the phone.  There

22       are a number of icons that are above kind of

23       a dotted line.  Do you see that?

24  A.   Yes.

25  Q.   Where-- I'll point right here, too.  Do you

1          see those right here?

2     A.   Yes.

3     Q.   All right.  The icons that are below the line

4          generally are static and will stay there

5          regardless of whether you move the screen to

6          the left or the right; isn't that correct?

7     A.   To my knowledge I'd say that is correct.

8     Q.   And by moving the screen to the left, to the

9          right, you can take your finger and actually

10         put it on the screen of the phone, move your

11         finger from right to left and you will show

12         what's under or above the next little dot

13         that's down here; isn't that right?

14    A.   That is correct if you have-- if you actually

15         have other applications that populate those

16         screens.

17    Q.   And would you suspect since he has three dots

18         he at least had three screens of applications

19         on there?

20    A.   Yeah.

21    Q.   Did you look through those other screens to

22         see if he had any kind of an application on

23         there specifically--

24              MS. KENNEY:  Your Honor, I am so

25         sorry.  I probably should have clarified that

485

```
1              this is just an iPhone 4S.
2                     MR. FRANCIS:  Yeah.
3                     MS. KENNEY:  It's not--
4                     MR. FRANCIS:  It's not--
5                     MS. KENNEY:  --the iPhone that's in
6         evidence.  I'm sorry.  It's just a picture of
7         an iPhone 4s.
8                     THE COURT:  I think that's why it
9         was offered as a demonstrative device.  So
10        will you clarify, please?
11                    MR. FRANCIS:  I will.
12   Q.   (By Mr. Francis)  Let me ask you this.  Did
13        you know whether or not there was more than
14        one screen populated on the front of his
15        iPhone?
16   A.   No, I did not.  And the reason behind that is
17        when I'm dealing with any type of live
18        device, I try not to mess around with it any
19        more than I have to.  So I just wanted to do
20        the logical, you know, acquisition of the
21        device, which basically all it entails me to
22        do is plug the connection cable into the port
23        on the iPhone and then the male end is a USB
24        connection that goes into my forensic laptop.
25   Q.   Right.
```

1    A.   That's basically all I want to do when I'm

2         dealing with any type of live device.  Even

3         if it's a live computer.  Because I've had to

4         do live acquisitions and when it's in a live

5         state it's more volatile.

6    Q.   But when you're pulling that off the phone it

7         would pull everything that's on the phone?

8    A.   Encase pulls everything that is on that

9         telephone.  That is correct.

10   Q.   So one could go to everything that was under

11        the settings on that phone and find all the

12        applications on that phone, couldn't they?

13   A.   It's not under-- settings is more of a-- like

14        reset the time or date, WiFi.  You can put

15        some of your account settings in there.  But

16        the applications are generally on the home

17        screen or the subsequent screens if you have

18        tons of applications.

19   Q.   Well, Facebook would be under settings?

20   A.   It would be one of your accounts, yes.

21   Q.   So if he had an account with Yahoo, that

22        would be under one of his settings; would it

23        not?

24   A.   Correct.  There's a-- there's a section that

25        just says accounts and it will have your

1          E-mail accounts.  At least for me, if I

2          looked on settings right now I could see my

3          Yahoo account.

4                    MR. FRANCIS:  I don't have any

5          further questions, Judge.

6                    THE COURT:  Ms. Kenney, do you wish

7          to redirect?

8                    MS. KENNEY:  No, Your Honor.

9                    THE COURT:  All right.  Sir, you may

10         step down.

11                   You may call your next witness.

12                   MS. KENNEY:  Your Honor, may we

13         approach?

14                   THE COURT:  You may.

15                        (THEREUPON, a bench conference

16         was had out of the hearing of the jury and

17         the defendant).

18                   MS. KENNEY:  I just wanted to advise

19         the Court that that was my last witness.  I

20         think I probably need to take a few minutes

21         to see that-- I think I've got all the

22         exhibits in that I wanted to get in.  There's

23         some that I held back.  Wasn't going to

24         introduce.  But at this time I'm ready to

25         announce that the government rests.

488

1           THE COURT:  As soon as you do a--

2           MS. KENNEY:  Yeah.

3           THE COURT:  --double-check?  So you

4      don't have any more live witnesses to put on?

5      She clarifies her records--

6           MR. FRANCIS:  I don't have any

7      motions to make as soon as she does.  I would

8      like you to--

9           THE COURT:  You said you don't?

10          MR. FRANCIS:  I do not have a

11     motion.  I would like to have a few extra

12     minutes to check with my-- I plan on putting

13     him on-- I had planned on putting my client

14     on first thing tomorrow, but in the economy

15     of time I'd kind of like to chat with him to

16     see if we can put him on this afternoon and

17     keep going.

18          MS. KENNEY:  This went faster--

19          THE COURT:  No, no.  I--

20          MS. KENNEY:  --than I expected.

21          THE COURT:  That's the good news.

22     And I will tell them that we're ahead of

23     schedule and as a result I think we're going

24     to take our midafternoon recess a little

25     earlier than normal because I'd like to-- for

1          you all to figure out, if you can, in

2          fairness to him, since we're moving ahead of

3          schedule put him on today.  If so, I'd like

4          to go into that.  If you convince me that

5          it's-- really puts him in a bad spot, I do

6          want him to have a fair trial.

7                    MR. FRANCIS:  All he told me was

8          that he had a headache that he's been working

9          on.  But I will talk to him about that.

10                    THE COURT:  Why don't we send them

11         out on a break.  You all take inventory about

12         what you need inventoried.  I'll come back on

13         the bench, you tell me where we stand, we'll

14         bring them in, we'll either go to-- you'll

15         announce you rest in front of them, I will

16         look at you and I'll know by then what you're

17         going to do.

18                    MR. FRANCIS:  I will also tell you

19         that in the event we don't get that on today,

20         the number of-- I have three witnesses who

21         are going to testify.  Mr. Doty, who's here,

22         won't last any longer than Agent Beebe did

23         I'm sure; my client; and then I do have

24         Detective Mergen and he's a very, very short

25         witness.

490

1              THE COURT:  We ought to get the case

2      to them tomorrow.

3              MR. FRANCIS:  Even if we started at

4      nine I think we would have the case to them

5      easily tomorrow.

6              THE COURT:  All right.  We'll go

7      take our break.  I'll tell them it will be a

8      little bit long, 20 minutes or so, so they'll

9      have time to get their wits about them.

10             (THEREUPON, the following

11     proceedings were had in the presence and

12     hearing of the jury and the defendant).

13             THE COURT:  Ladies and gentlemen,

14     well, the good news is that the evidence has

15     progressed quickly and we're running ahead of

16     schedule.  And so to-- this requires

17     adjustment at the lawyering end of this

18     because when the process moves faster they

19     have to stop and take count of where they are

20     and just check their notes.  A very

21     appropriate and common thing to do.

22             So we're going to take our afternoon

23     break a little earlier than normal.  It's

24     going to be a little longer than normal.  Are

25     you liking this news so far?  And so why

1          don't you plan to be in your jury room 20

2          minutes from now, which would be a quarter

3          till the hour, and we'll be able to come back

4          and give you a little bit of an update that

5          looks forward to the rest of the trial and

6          gives you some judgment about when the

7          evidence might be complete.

8                    So we'll be in recess.  Though we're

9          moving ahead of schedule, you still have not

10         heard all of the evidence by any means and so

11         it would be unfair to the parties and

12         inconsistent with your oath for you to

13         discuss the case with anyone, even among

14         yourselves.  And so I instruct you not to do

15         that and not to communicate or do research on

16         anything that touches in the case.  And so

17         enjoy your break and think about everything

18         but this case and don't talk to anyone about

19         it.  All right?

20                    (THEREUPON, the following

21         proceedings were had in the presence and

22         hearing of the defendant).

23              THE COURT:  All right.  We'll be in

24         recess.

25                    (THEREUPON, a recess was

1          taken).

2                        (THEREUPON, the following

3          proceedings were had in the presence and

4          hearing of the defendant).

5                        THE COURT:  Please be seated.  Okay.

6          We're back on the record in the presence of

7          Mr. Kearn and his counsel and counsel for the

8          United States.

9                        Ms. Kenney, just give me a scouting

10         report.  Have you completed your review and

11         are you going to formally rest this

12         afternoon?

13                       MS. KENNEY:  We have and I plan to,

14         yes.

15                       THE COURT:  All right.  And,

16         Mr. Francis, there was, I know, the issue of

17         Mr. Kearn not feeling well, and so tell me

18         what the outcome of that issue was.

19                       MR. FRANCIS:  He explained to me

20         that he has a pretty good headache that's a

21         distraction to him at this time.  I think

22         with the number of witnesses I have and with

23         the extent of this testimony and

24         cross-examination based on Ms. Kenney's

25         abilities, I think we can probably be done

493

1           this time tomorrow if we stop right now.

2                   THE COURT:  Ms. Kenney, I'm going to

3           exercise my discretion.  I do-- in fairness

4           to Mr. Kearn, I do want him to be able to

5           testify at a time when he is not under the

6           weather.  So I plan to bring the jury back in

7           and I'll ask you if you have additional

8           evidence and you can tell them that you have

9           completed yours and you're resting your case.

10          I will tell them that this happened quicker

11          than normal and so we have a little break in

12          the evidence and so we're going to recess

13          early this afternoon, devote some time to

14          some legal issues, and we'll see them at nine

15          in the morning.  Sound fair?

16                  MR. FRANCIS:  Yes, Judge.

17                  THE COURT:  Very well.

18                  Ms. Garrett, will you bring in the

19          jury, please?

20                  (THEREUPON, the following

21          proceedings were had in the presence and

22          hearing of the jury and the defendant).

23                  THE COURT:  All right.  Ladies and

24          gentlemen, please be seated.

25                  All right.  Ms. Kenney, does the

1          government have additional evidence that it

2          wishes to present as part of its case?

3                    MS. KENNEY:  We do not, Your Honor.

4          We have presented all of our evidence and at

5          this time the government rests.

6                    THE COURT:  All right.  Ladies and

7          gentlemen, the government has completed-- the

8          prosecution has completed its presentation of

9          the evidence and so we are-- as I said, the

10         good news is that moved along at a brisk

11         pace.  It catches us at a little before three

12         in the afternoon.  And so I think because of

13         some legal work that I need to do with the

14         lawyers to make sure we're ready to give you

15         instructions when you get the case about the

16         law that governs your deliberations, I think

17         we're going to recess for the afternoon,

18         which is sort of a short way of saying you

19         get a couple extra hours of time today.

20         Whether you devote that time to making the

21         most of the spring day outdoors or racing

22         back to your point of work is a personal

23         decision that I commission to your good

24         consciences.

25                    So we are-- and just to forecast a

1          little bit, and it's just a forecast,

2          Mr. Francis, on behalf of the defendant, has

3          indicated that his presentation of the

4          evidence is unlikely to take more than

5          tomorrow.  In fact, may be completed by some

6          time in the afternoon.  And so there is a

7          decent chance that we will be able to

8          submit-- to argue the case to you and submit

9          it to you for you to begin your deliberations

10         sometime tomorrow.

11                  That's not a promise.  These things

12         happen at the pace they happen.  Sometimes

13         they happen faster, sometimes they happen

14         slower.  But it's just the present projection

15         of experienced, capable lawyers about where

16         the case stands.  So we'll recess for the day

17         today.

18                  I'll remind you yet again of the

19         instruction that you are not to discuss this

20         case among yourselves even-- certainly not

21         with anybody who's outside the process.

22         You're just not to talk about the case.  If

23         you do go back to work I promise you there

24         will be people there who will want to, well,

25         just tell me what the case is about.  And you

1           have me to blame; the mean, stern looking

2           judge said that we couldn't and forbid us

3           from doing that.  And I do.  So blame me.

4           Tell them after you finish your service

5           you'll be in a position to talk about it if

6           you want to.  If you prefer never to talk to

7           them about it, you don't have to.  But for

8           now, you are forbidden from that.  Don't talk

9           about it with your family at home because it

10          inevitably leads to a discussion and that's

11          what your oath requires you to avoid.

12                  So we'll be in recess at this time

13          and we'll plan to see you at nine in the

14          morning.  If you'd be here-- aim to be here

15          at quarter till, give yourselves a few fudge

16          minutes in case the parking's bad or the

17          elevator's crowded, if you'd be in your jury

18          room by 8:45 I would be grateful for that.

19                  Thank you very much for your service

20          and we'll see you in the morning.

21                  (THEREUPON, the following

22          proceedings were had in the presence and

23          hearing of the defendant).

24                  THE COURT:  Please be seated.  Just

25          a couple of housekeeping things.  You

1          mentioned this at the bench, Mr. Francis.

2          Let me ask in open session.  Does the

3          defendant have a motion that it wishes to

4          make?

5                    MR. FRANCIS:  Not at this time,

6          Judge.

7                    THE COURT:  All right.  Very well.

8          And then what I will look for you all to do

9          is to be here at your usual time tomorrow,

10         we'll start with the defendant's evidence.

11         My plan is to devote the time you've given

12         back to me to work on the instructions in the

13         case.  Right now, as I recall the filings, we

14         have a virtually complete set from the

15         government.

16                    Mr. Francis, I don't think you

17         tendered any proposed--

18                    MR. FRANCIS:  I have not tendered

19         any proposed instructions.

20                    THE COURT:  And what I think I will

21         do in that context is we'll make the

22         government's submission as the starting point

23         for a set that I hope we'll be in a position

24         to share with you tomorrow morning when you

25         get in as a draft so that if we do reach the

1          instruction conference tomorrow, we can do

2          that in fairly quick order and get the case

3          maybe argued and submitted tomorrow.  And if

4          we don't, we don't.

5                     MR. FRANCIS:  All right.

6                     THE COURT:  Let me just ask around

7          the instructions, are there any particular

8          legal issues or concerns that either of you

9          have that you think I ought to be studying up

10         on?

11                    MS. KENNEY:  I can't think of

12         anything, Your Honor.  And I think-- it's

13         been a little while since I've looked at

14         them, but I think what we submitted is

15         probably not a complete set in terms of-- I

16         don't think I included my boilerplate

17         introductory type language.  But I do think

18         that I suggested an expert witness

19         instruction.  I don't think I suggested one

20         way or the other regarding the defendant's

21         testimony.  So-- but I don't have any-- I

22         don't think there's any legal concerns to

23         raise.

24                    THE COURT:  Yeah.  No, we

25         will-- Mr. Hinderks and I will spend some

1           time looking at our standard complete set and

2           try to make sure that anything that we

3           normally instruct on that's not in there

4           we'll fold into it if it's appropriate.  And

5           then if you all have an inspiration about

6           other kinds of background instructions that

7           you think are particularly appropriate here,

8           I'd like to know that tomorrow so that we

9           would have some time during the trial to try

10          to meld that in.

11                   Mr. Francis, from your perspective

12          are there legal issues there lurking on the

13          content of the instructions?

14                   MR. FRANCIS:  None that come to

15          mind, Judge.

16                   THE COURT:  Very well.  Well, thanks

17          for your good work and being so prepared that

18          the case moved along.  And if you get to your

19          point quickly, I know the jury appreciates it

20          and I'm confident to tell you that I

21          certainly appreciate it.

22                   So plan to see you in the morning.

23          We'll be in recess till nine.  If something

24          comes up overnight that you think we ought to

25          take up and so as not to keep the jury

500

1     waiting, be here by 8:15 or 8:30.  Thank you

2     all.  We'll be in recess.

3                    (THEREUPON, the proceedings

4     concluded for the day).

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

501

```
 1          UNITED STATES OF AMERICA   )
                                       )      ss:
 2          DISTRICT OF KANSAS         )

 3

 4                     C E R T I F I C A T E

 5

 6          I, Sherry A. Harris, Certified Shorthand

 7     Reporter in and for the State of Kansas, do

 8     hereby certify that I was present at and

 9     reported in machine shorthand the proceedings

10     had the 6th day of May, 2015, in the

11     above-mentioned court; that the foregoing

12     transcript is a true, correct, and complete

13     transcript of the requested proceedings.

14          I further certify that I am not attorney

15     for, nor employed by, nor related to any of

16     the parties or attorneys in this action, nor

17     financially interested in the action.

18          IN WITNESS WHEREOF, I have hereunto set

19     my hand and official seal at Topeka, Kansas,

20     this 23rd day of May, 2016.

21

22                    /s/ Sherry A. Harris
                      Certified Shorthand Reporter
23

24

25
```