1          IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF KANSAS
2                  TOPEKA, KANSAS

3

   UNITED STATES OF AMERICA,    )  *ORIGINAL*
4  ------------------ Plaintiff,)
                                )  Case No.
5      vs.                      )  13-40057-DDC
                                )
6  JONATHAN KEARN,              )  App. No.
   ------------------ Defendant.)  15-3121
7

8              TRANSCRIPT OF JURY TRIAL
                      (VOLUME 3)
9

10        PROCEEDINGS had before the Honorable

11   Daniel D. Crabtree, United States District

12   Court Judge, for the District of Kansas,

13   Topeka, Kansas, and a jury of 12, on the 7th

14   day of May 2015.

15

   APPEARANCES:
16

   For the Plaintiff:  Christine E. Kenney
17                      Office of the U.S. Attorney
                        290 U.S. Courthouse
18                      444 S.E. Quincy Street
                        Topeka, KS  66683
19

   For the Defendant:  Michael E. Francis
20                      Attorney at Law
                        434 S.W. Topeka Boulevard
21                      Topeka, KS  66603

22                      Jonathan Kearn
                        Defendant
23

   Court Reporter:     Sherry A. Harris, C.S.R.
24

25

1                        I   N   D   E   X

2                      W   I   T   N   E   S   S

3

      TESTIMONY ON BEHALF OF DEFENDANT          PAGE
4

      JONATHAN E. KEARN
5     Direct Examination by Mr. Francis          516
      Cross-Examination by Ms. Kenney            540
6     Redirect Examination by Mr. Francis        555

7     EDWARD M. KEARN
      Direct Examination by Mr. Francis          558
8

      ANDREUX DOTY
9     Direct Examination by Mr. Francis          567
      Cross-Examination by Ms. Kenney            601
10    Redirect Examination by Mr. Francis        634

11    ANDY MERGEN
      Direct Examination by Mr. Francis          641
12    Cross-Examination by Ms. Kenney            651

13

14                    CLOSING ARGUMENTS

15    By Ms. Kenney                              667
      By Mr. Francis                             677
16

17                 FINAL CLOSING ARGUMENTS

18    By Ms. Kenney                              689

19

20

21

22

23

24

25

1          E X H I B I T S

2     DEFENDANT EX. NO.              OFFERED   RECEIVED

3     501                              564        564

4     502                              564        565

5     503                              644        649

6     504                              586        586

7

      Certificate ------------------------------ 705
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    PROCEEDINGS

2                    (THEREUPON, the following

3          proceedings were had in the presence and

4          hearing of the defendant).

5                    THE COURT:  Good morning, everyone.

6          Please be seated.  All right.  We're on the

7          record outside the hearing of the jury and

8          the defendant is present with his counsel

9          along with the counsel for the United States.

10                   Counsel, just a couple of things to

11         bring up.  First of all, Mr. Hinderks left

12         you copies of formatted instructions which

13         are, in large measure, replicas of what

14         Ms. Kenney submitted with her proposed

15         instructions.  I will confess a certain

16         stylistic impulse.  Whoever-- the composite

17         authors of the pattern instructions like the

18         phrase "as to" and I have yet to hear anyone

19         use that on the street or talking in normal

20         language other than lawyers.  And so I

21         reflectively replaced that with the word

22         "about" because I think that's what it means

23         and I think that's the way people are more

24         likely to speak.

25                   So I didn't mark each instance in

1           the instructions when I made that-- when I

2           took that editorial license.  If you in

3           review are concerned that it mutes or dilutes

4           or contorts the meaning of the instruction,

5           then I can be persuaded to go back to what

6           the pattern says.

7                    The more substantive question

8           about-- from my perspective, about the

9           proposed instructions is that as submitted

10          they included an instruction for each of the

11          three charges that largely repeated the

12          content of the statute under which Mr. Kearn

13          is charged.  I cob fess to you that your

14          experience is multiple times longer than

15          mine.  But in the criminal cases where we

16          have charged the jury and received

17          instructions, I have not seen an instruction

18          that had in instruction A, here's the content

19          of the statute and in instruction B, here are

20          the elements that you the jury must find in

21          order to convict under that statute.

22                   I had seen an introductory

23          commentary that explained what the statutes--

24          what the gravamen of the statute was and then

25          in that same instruction had the elements in

1          a, in effect, charging instruction.  And I

2          gave you an example of two of those from a

3          case that was tried in this courtroom last

4          fall.

5                    It was-- Ms. Kenney, it was Mr.

6          Mattivi's methamphetamine conspiracy trial.

7          I will give the instruction that you all-- or

8          you rather, Ms. Kenney, proposed if that's

9          what the parties want me to do.  If, on the

10         other hand, you think-- so what's in the

11         package you have reflects what Ms. Kenney

12         submitted.

13                   I honestly believe that in some ways

14         that as formatted currently it's a bit of an

15         invitation to mischief because it gives the

16         jury at least the raw material to create

17         their own charging instruction.  So that's my

18         reservation and I wanted to raise that issue

19         with you and present it as we did it-- as I

20         did it in the other case but it was on the

21         suggestion of the United States.  So what do

22         you think about all that?

23                   MS. KENNEY:  Your Honor, I am not

24         tied to the use of the statutory language.

25         As you point out, there's some courts who

1          historically have used it in that fashion,

2          some who have used it as an introductory

3          paragraph.  I have no preference how the

4          Court wants to do it.  I'm fine taking out

5          the extra instructions.

6                    THE COURT:  Okay.

7                    MS. KENNEY:  The only reason I

8          submitted it that way is there's a couple--

9          at least one other case that I did that was

10         how we did it.

11                   THE COURT:  I honestly think--

12                   MS. KENNEY:  It doesn't have to be

13         that way.

14                   THE COURT:  I think Judge Rogers had

15         a history of doing it that way and I think

16         that may be what's reflected in the set that

17         you used.  But that's my reservation.  You

18         know, now with a full year under my belt of

19         experience on the criminal docket I have come

20         to the view, of course, that I have insights

21         that others don't have.

22                   Mr. Francis, do you have a view on

23         this subject?

24                   MR. FRANCIS:  Judge, I believe-- I

25         don't have a fairness objection to the way

1      it's proposed.  But I think my preference

2      would be to remove the statutory language

3      instructions and let's go with the elemental

4      instructions that you have there.

5                THE COURT:  Okay.  I will-- I'll

6      tell you what I'll do.  I do think it

7      requires some preparatory introductory

8      language.

9                MR. FRANCIS:  I agree.

10               THE COURT:  And during a break this

11     morning or at some point I'll try-- or

12     Mr. Hinderks can take a run at what that

13     preface would be for each of the element

14     charging instructions and then let you see

15     that and we'll get busy trying to narrow that

16     down.

17               Anything else from you all?

18               MR. FRANCIS:  The only thing I had,

19     Judge-- I don't mean to butt in.  But the

20     only thing I had was there will be a colloquy

21     between you and my client and I don't know

22     when you plan on doing that.

23               THE COURT:  I'm ready to do that now

24     before we get the jury in.  It won't take but

25     a second, if you are ready to proceed with

1          that.

2                    MR. FRANCIS:  Yes, sir.

3                    THE COURT:  Mr. Kearn, here's the

4          questions and the subjects I need to raise

5          with you.  Under our Constitution a defendant

6          charged in a criminal case, as you are in

7          this one, has an absolute right to decline to

8          testify and to, by doing so, avoid the

9          possibility that you might incriminate

10         yourself by your testimony on the charges

11         against you.

12                   The other side of that coin is you

13         have an absolute right to testify if you

14         choose to.  And so this choice belongs to

15         you.  But I want to make sure, number one,

16         you are aware and understand your

17         constitutional right to refuse to take the

18         witness stand and testify in this trial.  Do

19         you understand that right?

20                   THE DEFENDANT:  I do, yes.

21                   THE COURT:  And I also want to make

22         sure you're aware, and I'm confident that you

23         and Mr. Francis have talked about this, but

24         that if you invoke that right and decline to

25         testify that the Court will instruct the jury

1          with the instructions at the end of the case

2          that in our system a defendant charged in a

3          criminal case has such a right and that

4          having-- they may not consider the fact that

5          you did not testify, if that is your choice,

6          as any basis for an inference of concluding

7          that you are guilty of any of the crimes

8          charged.  Do you understand I would give that

9          instruction to the jury?

10                    THE DEFENDANT:  I do understand,

11         Your Honor.

12                    THE COURT:  All right.  And so what

13         I leave you with is that this choice of

14         whether to testify or whether not to testify

15         and to claim your rights under the

16         Constitution against self-incrimination is a

17         decision that you must make.  No one can make

18         it for you.  I do encourage you to confer

19         closely with your attorney about that

20         decision and to consider his advice before

21         you make that decision.

22                    Let me ask then, have you discussed

23         this decision with Mr. Francis?

24                    THE DEFENDANT:  We have not at

25         length, but I understand the direction of the

1       Fifth Amendment.

2                 THE COURT:  Do you believe you need

3       more time to discuss with Mr. Francis the

4       question whether you should testify or not

5       testify before we proceed with the trial this

6       morning?

7                 THE DEFENDANT:  I do not.

8                 THE COURT:  All right.  And in your

9       conversations with Mr. Francis do you feel

10      like you have been provided sufficient

11      information and sufficient guidance that

12      allows you to make that decision on an

13      informed basis?  Is my--

14                THE DEFENDANT:  We have not entirely

15      discussed the testify or don't testify.  I--

16      I would like to testify in-- in this matter.

17                THE COURT:  All right.  What I would

18      like to do then before we get the jury in is

19      I'd like to wait a few minutes.  I'd like for

20      you two to go next door and to have that

21      discussion and then we'll come back and

22      continue this colloquy when you have.

23                THE DEFENDANT:  Okay.

24                THE COURT:  So we'll be in recess

25      just long-- however long you need to do that.

1          MR. FRANCIS:  Shouldn't take long.

2          THE COURT:  All right.

3               (THEREUPON, a recess was

4     taken).

5               (THEREUPON, the following

6     proceedings were had in the presence and

7     hearing of the defendant).

8          THE COURT:  All right.  After a

9     brief recess we're back on the record.

10    During the recess, Mr. Kearn, I hoped you

11    would speak with Mr. Francis about the choice

12    we discussed before the break, whether to

13    testify or not to testify and to claim and

14    invoke your rights under the Fifth Amendment

15    of the United States Constitution.  Did you

16    have a discussion about that decision with

17    Mr. Francis?

18          THE DEFENDANT:  Yes, we did, Your

19    Honor.

20          THE COURT:  And now do you feel like

21    you are fully informed of the rights that

22    that privilege against self-incrimination

23    gives you?

24          THE DEFENDANT:  I'm-- I am fully

25    informed.

1              THE COURT:  All right.  And you

2      understand that no one can compel you,

3      require you, to testify during this trial?

4              THE DEFENDANT:  I do understand.

5              THE COURT:  And if you are to

6      testify, it is a choice that only you can

7      make.  That's the only way you can get to the

8      witness stand, that is, by choosing to

9      testify?

10             THE DEFENDANT:  I understand, sir.

11             THE COURT:  And now that you have

12     had further conversation with Mr. Francis, do

13     you understand that you have the right to

14     refuse to testify and a coextensive right to

15     testify in this trial against you?

16             THE DEFENDANT:  Yes, I do.

17             THE COURT:  All right.  Thank you

18     very much.

19             Mr. Francis, thank you for taking

20     time and making the effort to make sure that

21     the-- that Mr. Kearn is informed of his

22     rights.

23             The Court finds that the defendant,

24     based on this colloquy and after consultation

25     with counsel, is fully informed about his

1      rights to refuse to testify and can make his

2      own decision on that subject.

3                   All right.  Is there anything else

4      we ought to take up before we get the jury in

5      the room?

6                   MS. KENNEY:  No, Your Honor.

7                   MR. FRANCIS:  No, sir.

8                   THE COURT:  All right.  Well, then

9      I'll ask Ms. Garrett to bring them in.

10                  (THEREUPON, the following

11     proceedings were had in the presence and

12     hearing of the jury and the defendant).

13                  THE COURT:  Good morning, everyone.

14     Please be seated when you're ready.  Good

15     morning, members of the jury.  Welcome back.

16     Sorry to keep you waiting for a few minutes.

17     We did have some legal issues to finish up

18     and now we are ready to proceed with the

19     trial.

20                  As you will recall, yesterday

21     afternoon before we broke for the day the

22     government, the prosecutor, had completed

23     presenting its evidence in the case and now

24     we're to the part of the case where the

25     defendant, if he chooses, has the right to

1           present evidence as part of his case.

2                    And, Mr. Francis, I turn to you and

3           ask if you have evidence you wish to present

4           at this time?

5                    MR. FRANCIS:  I do, Judge.  And I

6           would call my client, Jonathan Kearn.

7                    THE COURT:  Very well.  Mr. Kearn,

8           please come forward.  And before you're

9           seated if you will raise your right hand, and

10          the deputy clerk will administer the oath.

11                   JONATHAN E. KEARN,

12          called as a witness on behalf of the

13          defendant, was sworn, and testified as

14          follows:

15                   THE COURT:  If you will be seated,

16          sir, and please adjust the chair and the

17          microphone where you're comfortable and make

18          sure the microphone amplifies your voice.

19                   THE WITNESS:  Sorry.  I'm dried up

20          this morning.  Okay.

21                   DIRECT EXAMINATION

22          BY MR. FRANCIS:

23     Q.   For our record will you tell us what your

24          name is, please?

25     A.   My name's Jonathan Edward Kearn.

1    Q.   And, Mr. Kearn, you were in court yesterday,

2         were you not, when certain photographs of

3         your youngest daughter and two videos of your

4         youngest daughter were shown?  Is that

5         correct?

6    A.   Yes, I was.

7    Q.   Did you take those pictures and that video?

8    A.   Yes, I did.  Other than the picture in the

9         public rest-- what appeared to be a public

10        rest room.

11   Q.   All right.  Let me go into a little bit of

12        your background.  Can you tell this jury

13        where you grew up?

14   A.   I grew up in Central Topeka.  I lived at 1126

15        Garfield all except for the first year of my

16        life until I was 18.

17   Q.   Did you go to public schools here in Topeka?

18   A.   I did.  I went to Lowman Hill Elementary

19        School, kindergarten through 6th grade.  I

20        went to Robinson 7th and 8th grade.  And I

21        graduated from Topeka High.  Went there from

22        9th grade to 12th grade.

23   Q.   Tell us a little bit more.  Do you have a

24        family?

25   A.   I do.

1    Q.   We know you have children because we've seen
2         them.
3    A.   I do.  I have four daughters.
4    Q.   And can you tell us what their names and ages
5         are?
6    A.   Sure.  From oldest to youngest, my oldest is
7         Cemiya Hawk Kearn.  She is now 15 years old.
8         My twins are Liberty Janae Kearn and
9         Cheyenne Brook Kearn and they are 12 years
10        old.  And my youngest is Cassidy Annaliese
11        Kearn and she is six years old.
12   Q.   Mr. Kearn, we heard yesterday that the agents
13        of the government had executed a search
14        warrant on your house over on Taylor.  Were
15        those children living with you at that time?
16   A.   Yes, they were.
17   Q.   Were you a single parent?
18   A.   Yes, I was.
19   Q.   And up to that time how long had you been a
20        single parent?
21   A.   About a year and a half I had the kids full
22        time.
23   Q.   And as a single parent, would you do such
24        things as chauffeur them to and from school
25        and the like?

```
1    A.   Let me-- can I back up one question?  It was
2         actually I had had them full time just a
3         little bit less than one year.
4    Q.   Can you tell us, as a single parent, did you
5         chauffeur them to school and things like
6         that?
7    A.   I did.  I kept them in Shawnee Heights School
8         District because that was the district that
9         their mother and I lived in.  Just because of
10        things they'd been through, I wanted them to
11        maintain a stable school.  We-- I took them
12        to school every morning.  My oldest to the
13        junior high and then the twins to the
14        elementary school.  And then I picked them up
15        every afternoon.
16   Q.   All right, sir.  Let me talk a little bit
17        about your employment.  Are you currently
18        employed?
19   A.   Yes, I am.
20   Q.   And what is your line of business?
21   A.   My business is called All Services Heating
22        and Air.  It's an LLC.  I also work as a
23        subcontractor for Bruce Robinson with
24        Robinson Refrigeration.
25   Q.   And as a heating and air-conditioning person,
```

```
1              I guess I'll use, were you required to have

2              any kind of training or education?

3    A.        Yes.  I went to Kaw Area Technical School,

4              2003 to 2004.  Graduated National Honor

5              Society in electrical and heating and air.

6    Q.        Can you tell us, where did you work after you

7              got out of Kaw Valley?

8    A.        I worked for Mr. Ron Stryker at Latta Whitlow

9              up until about a month before he passed away.

10             Then I went to work for Chuck Lower at Lower

11             Heating & Cooling, and I worked for him for

12             almost exactly two years.  At that point I

13             started a business with a business partner,

14             another heating and air guy.  That lasted

15             about two years.  Then he decided to go out

16             and pursue his own business.  At which point

17             I started Kearn-Wood Heating & Cooling.

18   Q.        Let me go back.  With the business you were

19             in with the other gentleman, who went out on

20             his own, what was the name of that business?

21   A.        That was Sunflower Heating & Air, LLC.

22   Q.        The reason I raise that, do you recall seeing

23             some exhibits yesterday that had a Sunflower

24             Heating E-mail address?

25   A.        Yes.
```

```
1    Q.   Where did you operate your business when it

2         was Kearn Heating and Sunflower?

3    A.   Sunflower operated out of 500 Southwest

4         Washburn.  We rented a shop from the Potwin

5         Presbyterian Church.  Then when I just went

6         out solely on my own I operated it out of my

7         residence in my garage, 429 Southwest Taylor,

8         here in Topeka.

9    Q.   All right.  When did you first get into that

10        residence on Taylor?

11   A.   Would have been, I believe, October 1st of

12        2011.

13   Q.   And--

14   A.   Right around that date.  I'm not positive.

15   Q.   Did your children live with you there?

16   A.   They did not.

17   Q.   All right.  When did they move into that

18        residence?

19   A.   I had Cemiya-- my oldest daughter had some

20        difficulties at home with Mom, and she lived

21        with me for about three weeks.  And that

22        would have been in November of 2011 until

23        about December, I think it was actually the

24        3rd, of 2011 when we had our-- one of our

25        domestic court cases and the judge allowed
```

1        her to go back home with Mom.

2   Q.   All right.  When did the other kids move in?

3   A.   They all moved in on July the 15th, 2012,

4        kind of in an emergency situation.  Mom

5        didn't have power or water at the time and it

6        was hot outside.

7   Q.   All right.  Let me ask you, besides the

8        children that lived at that residence, did

9        anybody else live there?

10  A.   Robert Henry lived with me from about the

11       time I moved in until January of 2013.

12  Q.   All right.  We'll get back to that a little

13       bit later.  Getting to your businesses, can

14       you tell us how many employees you had when

15       you operated your business out of the Taylor

16       Street address?

17  A.   I had a total of five different employees

18       during that time.

19  Q.   And can you tell me who they were?

20  A.   Jamie Schmitz, Dewayne Zinn, Robert Henry,

21       Andrew Miller and William Rector.

22  Q.   Let me ask you about Dewayne Zinn.  Did he

23       live in your neighborhood there on Taylor?

24  A.   He did.  He lives-- lived and lives currently

25       at 435 Southwest Taylor.

1    Q.    And how far is that from your house?

2    A.    That's two houses down from-- two houses

3          south of my residence.

4    Q.    Did he remain employed with you, or did you

5          have to terminate him?

6    A.    I terminated Dewayne the first week-- between

7          the 7th and 9th, I think it was, of December

8          2012.

9    Q.    All right.  Let me ask you some questions

10         about Mr. Henry.  How long had you known

11         Mr. Henry?

12   A.    I first met Bob -- is what I call him -- I

13         met him in 1993.  So I'd known him

14         approximately 22 years.

15   Q.    When-- do you recall when he first became

16         employed by you?

17   A.    He worked on and off for me from about, let's

18         see, be-- well, let's see, from about 2009

19         until the very beginning of 2013.

20   Q.    What was Bob's duty there?  What was his job?

21   A.    Bob did lots of things.  He was a trained

22         electronics technician so he did work on

23         troubleshooting furnaces.  He had taken an

24         HVAC class at WTI so he did help on

25         installations of equipment.  Rarely went on a

```
 1            service call by himself but just mostly was a
 2            helper.  He did our IT work.  Our-- set up
 3            our computers, our cameras, security at our
 4            shop, and then later at the home.  Basically
 5            was our IT person.
 6   Q.   In regards to the IT work he did, was that
 7            for your company, your personal computers, or
 8            what?
 9   A.   It really ran together.  He-- he basically
10            did anything from fixing a microwave to
11            programming our alarms, keeping a record of
12            our passwords.  Things that we didn't have
13            good knowledge to do I guess would be the
14            best way to put that.
15   Q.   Regarding passwords, you said he kept records
16            of your passwords.  Would he be in a position
17            to know what your passwords were to your
18            computers?
19   A.   Yes, he did.
20   Q.   What about any other kind of electronic
21            devices besides computers?  Did he deal with
22            phones or laptops or anything?
23   A.   He did.  He synched our PS3 with our WiFi.
24            Set up our WiFi.  Got our Netflix account set
25            up so we could watch it on our TV.  He got
```

```
 1            our phones-- my daughters and I had iPhones.

 2            He got our phones programmed to iTunes on the

 3            computer.  We constantly had computer issues

 4            of all sorts and so he was busy.

 5    Q.      You mentioned that Bob left sometime in

 6            January of 2013; is that correct?

 7    A.      That's correct.

 8    Q.      Do you know about what date it was?

 9    A.      It was January 20th or the evening of the

10            19th.

11    Q.      All right.  After Bob left do you know where

12            Bob went?

13    A.      Bob moved in with Dewayne Zinn at 435 Taylor.

14    Q.      Is that the man that lived two doors down

15            from you?

16    A.      Two houses to the south, yes.

17    Q.      All right.  Did any of your employees have

18            access to any of your phones?

19    A.      Yes.  Dewayne Zinn had a line on my account

20            as well as Bob had access to our iPhones if

21            he needed them or if we were having a problem

22            connecting them to our WiFi, et cetera.

23    Q.      Let me talk a little bit about your phones.

24            How many cell phones did you have?

25    A.      We have five lines on our AT&T account.
```

```
 1    Q.   And how many-- did you have a landline phone
 2         that went in your house?
 3    A.   We also had a landline that did our-- the
 4         number was 235 COOL and what it did it
 5         basically forwarded directly to my cell
 6         phone.  So if somebody did call for the
 7         business and I wasn't home I could receive
 8         the call.  And then the landline also was for
 9         our internet most of all.
10    Q.   Who was your internet through?
11    A.   AT&T.
12    Q.   Was there ever a time that you discovered an
13         additional landline in your house?
14    A.   I did.  In March 2013 got a letter in the
15         mail.  I opened all the mail.  It was
16         addressed to Robert Henry, but I did open it.
17         And it was just letting-- letting him know
18         that they had disconnected his phone line per
19         his request.
20    Q.   Did you know that he had a phone line in your
21         house?
22    A.   No, did not know that.
23    Q.   When the agents came to your house, I believe
24         it was May 7 of 2013, did you talk to the
25         agents?
```

```
1    A.   Yes, I did.

2    Q.   Did you tell the agents anything about

3         whether employees had access to your phones

4         and computers?

5    A.   They did ask me about it.  I'm not sure what

6         my response was.

7    Q.   Did you tell them anything about anybody

8         living in your house that moved out?

9    A.   I did let them know that Bob lived there,

10        that he was-- did a net-- did networking IT

11        work.

12   Q.   Do you know-- did you have a Yahoo account?

13   A.   I did not.

14   Q.   All right.  In regard to your computers, did

15        the employees have access to the WiFi or the

16        internet through your computers?

17   A.   Yes, they did.

18   Q.   And did anybody else besides your employees?

19   A.   Yeah.  We shared our WiFi a little bit

20        liberally.  Our neighbors across the street,

21        my oldest daughter Cemiya, her best friend

22        Marie lived across the street, and Christmas

23        she got some kind of a-- I think it was

24        called a Garmin or a lap-- a little device

25        that she could get on the internet with.  But
```

528

```
 1              they didn't have internet, so we gave them
 2              our WiFi password for Christmas so she could
 3              get on the internet.  The-- Dewayne's
 4              daughter, son-in-law, niece and nephews lived
 5              in between us.  They also used our WiFi
 6              password, as well as Dewayne used it, for
 7              their Xbox so they could do their zombie game
 8              basically.
 9    Q.       Let me talk to you a little bit about this
10              cheyenneandliberty@yahoo.com account.  Do you
11              recall when you first became aware of its
12              existence?
13    A.       I believe it was May 10th when I was handed
14              paperwork to go to my child in need of care
15              case at the Shawnee County Courthouse, there
16              to hopefully get my children returned to me
17              three days after my house had been raided.
18    Q.       Have you ever sent any E-mail to anybody on
19              that account?
20    A.       No.
21    Q.       Have you, to your knowledge, ever received
22              any E-mail from anybody on that account?
23    A.       I have not.
24    Q.       There was some testimony that Cheyenne and
25              Liberty are your daughters; is that correct?
```

```
 1    A.    That is correct.
 2    Q.    Did you ever talk to your daughters about
 3          that account?
 4    A.    No.  But if I may add, my-- I-- my oldest
 5          daughter, Cemiya, had an E-mail account at
 6          one time called ckearn420, which was our
 7          address when we lived in Tecumseh, and we all
 8          had a talk about creating E-mail accounts
 9          with our names in them, with our house
10          addresses in them.  And I believe it's
11          something my children wouldn't do.
12    Q.    Let me talk about the specific charges that
13          are in this case.  When did you first learn
14          about the specifics of what you were being
15          charged?
16    A.    About 25 minutes after a bunch of soldiers
17          came through my door.
18    Q.    Bunch of what?
19    A.    Soldiers.
20    Q.    Officers?
21    A.    M16s, guns, police officers, whatever.
22    Q.    There was some mention of a website,
23          imagesource.ru, and it-- I believe it's
24          imgsrc.ru.  Did you ever visit that website?
25    A.    I did not.
```

1   Q.   Do you know a gentleman by the name of Ben

2        Parker?

3   A.   I do not.

4   Q.   Let me go back and talk to you about this

5        picture of Cassidy and I guess also the

6        E-mails, the videos.  The picture that was

7        taken of her that shows the hand and the

8        diaper.  Can you tell us about when that was

9        taken, to the best of your recollection?

10  A.   Would have been July or August of 2012.

11  Q.   Can you tell us what your purpose was in

12       taking that picture?

13  A.   Yeah.  Cassidy, on March-- I'm sorry, April

14       28th of 2000-- I believe it was April 28th,

15       29, right in there, of 2012, when I was

16       changing her diaper or her pullup, just

17       opened up and just started talking to me

18       about somebody that had touched her.  And

19       we-- my daughter Liberty was in the room at

20       the time.  Also Billy Rector was there.

21  Q.   Who's Billy Rector?

22  A.   Billy's one of my best friends.  He also was

23       assigned by, I think it was Judge Schmidt in

24       our domestic case, to be a supervisory person

25       with our children, basically because we had

```
 1              had a high-conflict divorce.
 2    Q.    Was-- was-- so why take the picture?
 3    A.    Well, I-- we did a few things.  I recorded
 4              her talking about this.  I gave it to the
 5              sheriff's department.  We made a report.  I
 6              confronted their mother about it, tried to
 7              talk to her.  Then they had after that made a
 8              DCF or SRS case about it, and that case was
 9              unsubstantiated.  Otherwise, DCF didn't
10              believe that-- or Cassidy did not disclose
11              that when she had her safe talk with them.
12                      And once I got the notice that the
13              DCF case had been unsubstantiated, my
14              daughter was still living with this man, and
15              I had my kids every weekend, I had for almost
16              a year at that point, and so I took that
17              picture and the video-- video to try to get a
18              picture of what basically is evidence, what
19              her vagina looked like in a normal
20              circumstance.  Never to be displayed in a
21              federal court.
22    Q.    Did you have any intention to use that to
23              send out to anybody?
24    A.    Never.
25    Q.    And same with the videos?
```

532

```
1    A.    Correct.

2    Q.    How come the videos?

3    A.    The picture that you guys have seen of my

4          daughter's private area is actually a still

5          taken out of a video.  And that is the way

6          that I did it with-- without-- I didn't want

7          Cassidy to see me, you know, just, you know,

8          here, honey, spread your legs, I'm going to

9          take a picture doesn't work very good,

10         especially when it's already sexual abuse

11         going on or at least her-- her word.  She was

12         pretty clear about what-- what was happening.

13         So I tried to do it without bringing it to

14         her attention I guess is the best way to say

15         that.

16   Q.    Now, you said you reported this to the

17         sheriff.  When did you report this to the

18         sheriff?

19   A.    We reported it Sunday night.  I believe it

20         was, which would have been the 30th of April,

21         I believe.  Yeah, I believe it was the 30th

22         of April.

23   Q.    Did you go to the sheriff's office and make a

24         report?

25   A.    No, we called and had them come to the house.
```

533

1    Q.    All right.  Do you know, was a report taken?

2    A.    Yes, it was.

3    Q.    And you mentioned something about a

4          recording.  Did you play a recording to the

5          sheriff's deputy?

6    A.    We did.  We-- we E-mailed them a copy of it

7          as well.  That was my divorce attorney's

8          advice was to take that recording.

9    Q.    There was testimony that when the officers

10         came to your house on May 7 of 2013, two

11         years ago today, that they had found some

12         clothing and bedding that was familiar to

13         them because it was depicted in the picture

14         of Cassidy; is that correct?

15   A.    Correct.

16   Q.    Insofar as that clothing is concerned, had

17         she worn that clothing before on other days?

18   A.    Yes.

19   Q.    And how--

20   A.    Lots of times.

21   Q.    Why do you say that?

22   A.    Well, the government has my iPhone photos.

23         You can see, I don't know, approximately 10

24         times in those pictures, 10 different days,

25         wearing that.  I know that on Facebook

1           probably a dozen times she's worn that.  My

2           bedsheets, I had two sets of bedsheets I use

3           so it's not bizarre to me that those were the

4           bedsheets on my bed at the time the picture

5           was taken, but it wasn't taken when they say

6           it was.

7     Q.    It's your recollection it was taken about a

8           year before they say it was taken?

9     A.    Nine to 10 months, yeah.

10    Q.    There was a picture that we saw of, I believe

11          your youngest daughter, leaning over the seat

12          of a car; is that correct?

13    A.    That is correct.

14    Q.    Can you tell us what your knowledge is of

15          that picture?

16    A.    I know that that picture came from the end of

17          a video that either Cemiya or I took of

18          Cassidy, and I believe the twins were in it--

19          a part of it as well.  At the end of it

20          Cemiya-- or Cassidy was climbing over the

21          seat, I believe in my minivan, it may have

22          been in my mother's car, I don't know.  And

23          because really her butt was sticking out we

24          deleted the video.

25    Q.    You deleted the video?

535

```
1    A.   I did delete the video.

2    Q.   There was a picture of you and your daughters

3         in some tie-dyed shirts.  Can you tell us

4         about that picture?

5    A.   We tried to make memories.  We-- we went-- we

6         bought a bunch of tie-dyed stuff and tie-dyed

7         shirts and sheets and pillowcases and our

8         front porch pretty much.

9    Q.   Were those-- did you ever post that picture

10        on Facebook?

11   A.   I did.

12   Q.   All right.  Are you familiar with Facebook?

13   A.   Yes.

14   Q.   Do you use Facebook?

15   A.   I have not since May 7th of 2013.

16   Q.   Prior to May 7, 2013, how much time do you

17        think you'd spend?

18   A.   A ridiculous amount of time.

19   Q.   A what?

20   A.   A lot of time.  Probably at times three to

21        four hours a day worth of posts.  I was

22        politically involved.  Goofy.  And just-- I

23        had my phone on me all the time so any

24        downtime, unfortunately, I wasted on

25        Facebook.
```

536

```
1    Q.   And those-- you saw the videos yesterday
2         where you're with your children going in and
3         out of the house at different hours and you
4         had your phone in your hand.  Would that be
5         pretty routine for you?
6    A.   Yeah.  I absolutely have caught a lot of flak
7         about that.
8    Q.   All right.  There were a number of security
9         disks that were viewed in this case.  Did you
10        review those disks?
11   A.   I did.
12   Q.   All right.  For what purpose?
13   A.   I reviewed them to see if I could see
14        somebody else coming into my house, to see my
15        kids, you know, to see us together.  I
16        reviewed it to try to determine where I was
17        at what time when these E-mails were sent to
18        Australia.
19   Q.   In regard to the-- to security, did you have
20        an alarm system on your house?
21   A.   Yes, I did.
22   Q.   Did that have a code on it?
23   A.   It did.
24   Q.   Who set the code on that?
25   A.   Originally Dewayne set it because he
```

537

```
 1              installed it.  And then Bob was the one that
 2              maintained it.  We did change our code.  We
 3              may have somebody stay with us for a week or
 4              two, the girls' mom stayed with us for a
 5              couple weeks.  After that we just changed the
 6              code as a practice.
 7      Q.     When Bob lived with you did he ever tamper
 8              with the security system to your knowledge?
 9      A.     There was a time when my work truck got
10              stolen that he tried to download what
11              happened at that time onto the computer.
12              Couldn't do it for some reason.  I think it
13              had some pretty specific way-- way to do
14              that.  There was another time-- well, other
15              times when he would-- the keypad was in our
16              dining room which was outside of my bedroom.
17              When you pushed the buttons on it, it would
18              make a beeping sound.  He would shut off the
19              tone on it frequently.  I would say in
20              December that was a problem.
21      Q.     What kind of hours did Bob keep when he lived
22              there?
23      A.     Really, since I've terminated Dewayne Zinn,
24              Bob spent most of his time with Dewayne.  He
25              would frequently come home approximately
```

```
 1            three or four in the morning and still be
 2            there when we left to go to school, which was
 3            7 a.m.
 4    Q.     The pictures that we saw yesterday of young
 5            girls not your children.
 6    A.     Uh-huh.
 7    Q.     When was the first time you ever saw those?
 8    A.     Yesterday.
 9    Q.     In this courtroom?
10    A.     Yes.  Even though I had requested to see them
11            just-- not-- because-- you know, because I
12            wanted to know if they were my daughters.
13    Q.     Okay.  And are you satisfied, at least the
14            ones you saw--
15    A.     Yes.
16    Q.     --they were not your daughters?
17    A.     They're not.
18    Q.     Did you know that those pictures were on your
19            phone?
20    A.     No.
21    Q.     Do you know how they got on your phone?
22    A.     I do not.
23    Q.     Did you send any texts to Australia?
24    A.     Absolutely not.
25    Q.     Did you send any pictures of your family to
```

```
 1           anybody in Australia?
 2   A.      No.  In Australia, no.
 3   Q.      Any videos of Cassidy?
 4   A.      No.
 5   Q.      When you took the pictures and the videos of
 6           Cassidy, did you take those with any idea
 7           that they were to be sexually explicit?
 8   A.      Absolutely not.
 9   Q.      All right.  Why didn't you just take her to
10           the hospital?
11   A.      Because I'm familiar with what they-- at the
12           hospital.  My daughter that's three years
13           old, she'd just been sexually abused, we're
14           talking about 2012, from her own words.  And
15           taking her to the hospital they do what's
16           called a rape exam.  They would have put--
17           from my understanding metal-- basically
18           clamps on her vagina and open it and look at
19           it.  And I didn't-- I wasn't going to do
20           that.
21   Q.      So you reported it to the sheriff?
22   A.      I did.
23               MR. FRANCIS:  I don't have any
24           further questions, Judge.
25               THE COURT:  Very well.
```

1                   Ms. Kenney, do you wish to

2        cross-examine?

3                   MS. KENNEY:  Yes, Your Honor.  If I

4        could just have a moment.

5                        CROSS-EXAMINATION

6        BY MS. KENNEY:

7    Q.  Mr. Kearn, have you had the opportunity to

8        see all of the discovery in this case with

9        the exception of the pictures that you just

10       mentioned?

11   A.  No, I have not.

12   Q.  Have you had an opportunity to review the

13       fingerprint report that identified it being

14       your hand in that image that was taken and

15       E-mailed to Australia?

16   A.  No, I have not.

17   Q.  You were present though when that report was

18       discussed in a hearing of May of 2013; were

19       you not?

20   A.  Yes, I was.

21   Q.  Okay.  Now, I just want to make sure that I

22       understand your testimony regarding all of

23       the pictures that were either E-mailed or on

24       your phone.

25   A.  Uh-huh.

541

1    Q.   This first picture, had you seen that picture

2         before this case started?

3    A.   Not in this form.

4              MR. FRANCIS:  Excuse me, Judge.

5         Could we have an exhibit number for the

6         record?

7              MS. KENNEY:  Oh, certainly.

8              MR. FRANCIS:  That's my fault.

9              MS. KENNEY:  Certainly.

10   Q.   (By Ms. Kenney)  The initial picture that was

11        part of Exhibit 1, what form had you seen it

12        in?

13   A.   I believe that this was part of a video taken

14        by Cemiya, my oldest daughter, of Cassidy on

15        the merry go round at Tecumseh Park.

16   Q.   Do you know when the picture was taken?

17   A.   I don't.  It wasn't-- it was a video.

18   Q.   When the video was taken?

19   A.   I don't.

20   Q.   And then if we look at the picture that is

21        page 3 of Exhibit--

22              THE COURT:  1-1?

23              MS. KENNEY:  1-1.  Thank you, Your

24        Honor.

25   Q.   (By Ms. Kenney)  Have you seen this picture

1           before?

2    A.     Yes, I have.

3    Q.     And where would this picture have been found?

4    A.     That was at 429 Taylor.

5    Q.     And I'm sorry, that was a bad question.

6           Where was this picture saved?  On what device

7           was this picture saved?

8    A.     I do not know for sure.  I know it was on

9           Face-- it was uploaded to Facebook.

10   Q.     It was uploaded to Facebook?

11   A.     Yeah.

12   Q.     Okay.  And you saw yesterday that that

13          particular picture, if you looked at the exif

14          data, it says that the date taken was April

15          1st of 2013.  Does that sound correct to you?

16   A.     May I concur with-- get a notebook that has

17          some dates in it and I could look and see

18          when I uploaded it to Facebook?

19   Q.     Let me just clarify.  Are these notes that

20          you've taken, made for yourself, or are you

21          talking about exhibits or-- I'm just trying

22          to understand because I don't have a copy

23          of--

24   A.     Well, I know that--

25   Q.     --anything that you're going to use.

543

```
 1    A.    --I uploaded it to my Facebook account, but I
 2          don't know the date off the top of my head.
 3    Q.    Okay, that's fine.  And then the picture that
 4          is part of Exhibit 1-2, page 3, do you know
 5          when this picture would have been--
 6    A.    That would have been taken on either my phone
 7          or Cemiya's phone.
 8    Q.    And Cemiya is your oldest daughter?
 9    A.    It is-- she is, yes.
10    Q.    Your oldest daughter-- I'm sorry.  Is your
11          oldest daughter's phone also an iPhone?
12    A.    Yes, it is.
13    Q.    Was it an iPhone 4S?
14    A.    I do not know.
15    Q.    And then Exhibit 1-3, page 3, this picture--
16    A.    Uh-huh.
17    Q.    --do you recognize where this picture would
18          have come from?
19    A.    I believe that would have been on our-- in
20          fact, I'm sure it was our house in Tecumseh
21          on 420 Baldwin Road.
22    Q.    And, I'm sorry, do you know what device this
23          picture may have been taken with or saved on?
24    A.    I don't know of that.
25    Q.    Okay.  And then we are-- Exhibit 1-4, page 4,
```

544

```
1              one of the pictures that was E-mailed to

2              Detective Butler in Australia?

3       A.     Uh-huh.

4       Q.     And you have to say yes or no because she's

5              taking down what you say.

6       A.     I'm sorry.

7       Q.     That's all right.  This is one of the

8              pictures that you say you took in July of

9              2012?

10      A.     It would have been a-- quite possibly a still

11             from a video.

12      Q.     Still from a video, okay.  And to clarify,

13             that was 2012?

14      A.     That was 2012.

15      Q.     This also would be a still from a video?

16      A.     Same.

17      Q.     Do you know how the still from the video was

18             created?

19      A.     When you record a video on an iPhone there's

20             a certain amount of frames per second.  You

21             can pause the video-- at the bottom is all

22             your frames, and you can take a frame from

23             that video.

24      Q.     And is that what you did?

25      A.     I believe so.  I don't recall these two
```

1          pictures at all.  But it would have been from

2          that same time period, I believe.

3                    THE COURT:  And, Ms. Kenney, for

4          purposes of the record can you identify the

5          picture you have displayed on the ELMO when

6          you reference it as "this"?

7                    MS. KENNEY:  Yes.  That was Exhibit

8          1-5, page 4.  Thank you, Your Honor.

9     Q.   (By Ms. Kenney)  And then this is from 1-6,

10         page 4.  This is the picture that you said

11         you took in July or August of 2012 to

12         document sexual abuse that occurred in April

13         of 2012?

14    A.   That's correct.  Well, I don't know if the

15         abuse actually occurred in April.  It was

16         reported to us by Cassidy as being in April.

17    Q.   The abuse was reported in April and the

18         picture was taken several months later?

19    A.   At least two months later.  I think the DCF

20         findings for the sexual abuse claim against

21         Nicholas came back around June 5th, I

22         believe.

23    Q.   And this is the picture you're aware that has

24         sufficient detail that was able to match

25         the-- your fingerprints to the forefinger in

546

1                  this picture?

2       A.    That's my hand.

3       Q.    Okay.  This is Exhibit 1-9, page 3.  Do you

4             recognize that picture?

5       A.    Yes, I do.

6       Q.    Did you take that picture?

7       A.    Yes, I did.

8       Q.    In fact, is that you?  There's a reflection

9             of an individual-- let me blow that up real

10            quick.  Is that you taking the picture?

11      A.    I think it is.  Yeah, looks like it.

12      Q.    Where was this picture taken?

13      A.    It's my mom and dad's back porch or deck.

14      Q.    And when was this picture taken?

15      A.    I don't know.

16      Q.    Was it taken on April 28th?

17      A.    I don't know that.

18      Q.    As indicated in the exif data?

19      A.    I could look at my notes and tell you.  I

20            know it was after we had gone to the zoo.

21      Q.    Okay.  And you saw the still shots from your

22            security system that showed you and the-- I

23            believe it was the four girls leaving, and

24            the three girls pictured in Exhibit 1-9, page

25            3, are wearing-- all three wearing the same

547

```
 1            items.  Do you agree with that?
 2       A.   If you could show it to me.  I imagine you
 3            are-- you wouldn't bring it up if it wasn't
 4            correct.
 5       Q.   Okay.
 6       A.   I've watched the video from those days, but I
 7            don't recall.
 8       Q.   Okay.
 9       A.   Probably.
10       Q.   And then the picture that was Exhibit 1-10,
11            page 3, when was this taken?
12       A.   The video would have been taken on the 20--
13            what we discovered from your discovery is it
14            would have been the 27th or the 28th of
15            April, 2013.
16       Q.   Okay.  Right about the time that that E-mail
17            was sent to Detective Butler?
18       A.   Which E-mail are you referring to?
19       Q.   I'm referring to Exhibit 1-10, page 2.
20       A.   Within probably 48 hours.
21       Q.   48 hours?
22       A.   I would say.  I know Cassidy wore that the
23            day before too so--
24       Q.   But she was definitely wearing that the day
25            that this E-mail was sent?
```

```
 1   A.   Yes, she was.
 2   Q.   Now, you testified that-- I think as of
 3        January, sometime January of 2013, the only
 4        people living in your house were you and your
 5        daughters?
 6   A.   Bob left January 20th, yeah.
 7   Q.   Okay.  And the other individual had left
 8        about a month earlier or so, Dewayne I think
 9        you said?
10   A.   Dewayne only stayed with us for maybe one
11        week during the summer before, which would
12        have been 2012 when the Olympics were
13        playing.  He got in a spat with his
14        girlfriend and stayed with us for about a
15        week.  But he had his own house and still
16        does, 435 Taylor.
17   Q.   And have you had any kind of a falling out
18        with either of those two men?
19   A.   With Dewayne, yes.  I terminated him as an
20        employee and lost a-- a friendship over that.
21   Q.   Okay.  Now, Mr. Kearn, how long before April
22        of 2013 had you had the phone that is
23        identified as Exhibit, I believe, 14?
24   A.   The iPhone, my iPhone?
25   Q.   Yes.
```

1    A.    Okay.  From--

2    Q.    I'm sorry.  Exhibit 15.  I didn't mean to

3          interrupt.

4    A.    Okay.  The summer of 2012.  I believe it was

5          the end of June when my other phone-- I don't

6          know if I ruined it.  I don't recall.  It was

7          replaced on a warranty though.  I do remember

8          that.

9    Q.    So is it fair to say that the picture that we

10         were talking about that was Exhibit 1-6, or

11         any of those pictures for that matter, that

12         you never turned those over to law

13         enforcement?

14   A.    What?

15   Q.    I'll show you again.  That's okay.  I--

16   A.    That's fine.

17   Q.    Exhibit 1-6, I'm just going to display page

18         5.  This is a picture that you said you took

19         in maybe July or August of 2012?

20   A.    Yeah.  I did not give those to law

21         enforcement.  Had she came over looking like

22         she did a few weeks before we took-- I took

23         this picture, then I was going to use this

24         against that to-- to take to law enforcement

25         or show a friend of ours that's a nurse.

550

1    Q.   Okay.  So you never turned that over to law

2         enforcement?

3    A.   No.

4    Q.   Okay.

5    A.   Not willingly.

6    Q.   I'm going to display Exhibit 21, page 27.

7         It's your testimony, if I'm correct, that you

8         also took these two video clips?

9    A.   That is correct.

10   Q.   Also in July or August of 2012?

11   A.   At the same time frame or same time that the

12        picture was taken were created from a video.

13   Q.   Okay.  And obviously Cassidy has a little

14        different attire on in the videos versus the

15        pictures that we've seen?

16   A.   Uh-huh.

17   Q.   She's wearing diapers in Exhibit 1-4, 1-5,

18        and 1-6?  Yes?

19   A.   Yes, she is.

20   Q.   And she's not wearing diapers but is wearing

21        a T-shirt in Exhibit 21, page 27?

22   A.   That's correct.

23   Q.   And in Exhibit-- I believe it's 1-4, we can

24        see that she's wearing that pink dress that's

25        in evidence, correct?

1    A.   Which exhibit is that?  I'm sorry.

2    Q.   That's all right.

3    A.   It's hard to keep straight.

4    Q.   And it's behind you if you want to look at

5         it.  It would be Exhibit 12 is the dress.

6    A.   Oh, okay.

7    Q.   And Exhibit 1-4, page 4, she's wearing that

8         dress?

9    A.   Yes.

10   Q.   Okay.  Can you-- do you have a fair

11        understanding of computers and electronic

12        evidence, electronic devices?

13   A.   I do now.

14   Q.   Okay.  So do you understand what an exif data

15        is?

16   A.   I do.

17   Q.   And we've been talking about that.  Do you

18        have an explanation as to why or how the exif

19        data on these pictures that were E-mailed

20        showed they were taken close in time to the

21        E-mail but you say that this was actually

22        taken eight or nine months earlier?

23   A.   I do have an explanation for that.  Exif-- or

24        ex-if data is not only easily manipulated,

25        the ex-if data in the picture of my twins in

552

1              a car on a road on Baldwin, the ex-if data

2              says it was taken on April the 16th in-- in

3              your discovery.  It had been 69 degrees the

4              day before.  It hadn't snowed in over four

5              weeks.  Obviously, that ex-if data had been

6              manipulated or the data that you have is

7              incorrect.

8     Q.    And I just want to make sure.  You're talking

9              about this picture?

10    A.    Yes, I am.

11                    THE COURT:  Can you describe it?

12                    MS. KENNEY:  I will.  I'm sorry,

13             Your Honor.

14    Q.    (By Ms. Kenney)  It is Exhibit 1-3, page 3.

15             It's a picture of your twin 10-year-olds.

16    A.    Wearing their Christmas dresses.

17    Q.    And would you agree there was no exif data

18             attached to this picture?

19    A.    Not according to this-- the Encase report.

20    Q.    Okay.

21    A.    The Encase report shows that that picture was

22             created on April the 16th.

23    Q.    And you're referring actually to the

24             Celebrite report, Exhibit 21, page 6,

25             correct?

553

1    A.    14.  I'm sorry.

2    Q.    April 14, 2013.

3    A.    That would be one circumstance, but I don't

4          know-- I believe it's in the Encase report as

5          well, the ex-if data for that picture.

6    Q.    Okay.  Now we talked a little bit about the

7          videos of Cassidy on the bed.  Those were

8          never E-mailed to anyone, correct?

9    A.    Not to my knowledge.

10   Q.    Okay.  And I'm going to go back to when you

11         say the exif data is easily manipulated.

12         What is your basis for saying that?

13   A.    Well, you can-- there's applications that you

14         can get for next to nothing, probably free, I

15         don't know, even on an android phone that

16         manipulate an iPhone.  Several of those

17         applications include manipulating the ex-if

18         data in a picture and any of that data.

19   Q.    So you have to have an application that would

20         actually do something to the image to change

21         the data?

22   A.    Unless you're a hacker probably.

23   Q.    Unless you're a hacker?  And you have-- in

24         this--

25   A.    I mean, to my knowledge.

1    Q.    I'm sorry.

2    A.    To the best of my knowledge.

3    Q.    Okay.  And in this case the hacker would have

4          had to have had access to your phone to get

5          to these pictures?

6    A.    I don't know.  Access electronically or

7          physically?

8    Q.    Electronic-- well, I'm assuming-- you said

9          you had-- it was your practice to carry your

10         phone all the time.

11   A.    Okay.

12   Q.    So I'm assuming electronically.

13   A.    I-- I would tell you that I carried my phone

14         most of the time.  When I was doing things I

15         would usually have my phone with me.  My kids

16         could use my phone.  Bob had my phone rarely.

17         My employee William-- Billy Rector had the

18         phone sometimes, but not very often.

19   Q.    And your phone was password locked, correct?

20   A.    Yeah.  According to some of the stuff in the

21         discovery, I think it was texts, I had

22         recently been locked because Cassidy had

23         tried to get on the phone or something and

24         locked out the phone.

25   Q.    So-- I'm sorry, I don't mean to interrupt.

555

1    A.    You're fine.

2    Q.    So you had recently password protected your

3          phone?

4    A.    I believe so, yes.

5    Q.    And the-- you're aware, at least from some

6          reports of examinations, that the application

7          that these pictures were found in was

8          password protected?

9    A.    I am aware of that.  According to the

10         reports.

11   Q.    According to the reports.  Need just one

12         minute.

13   A.    Sure.

14               MS. KENNEY:  Thank you, Mr. Kearn.

15         I don't have any additional questions.

16               THE WITNESS:  Thank you.

17               THE COURT:  Mr. Francis, do you wish

18         to redirect?

19               MR. FRANCIS:  I do.  Just a moment.

20                  REDIRECT EXAMINATION

21         BY MR. FRANCIS:

22   Q.    Mr. Kearn, you were asked about a picture,

23         1-6, which Ms. Kenney has and it's the one

24         with your hand on the diaper.

25   A.    Yes.

556

1    Q.    The enlargement of that.  If you were to be

2          sending out sexually explicit pictures of

3          minors, would you leave any evidence of your

4          fingerprint on the photo you were going to

5          send out, would you think?

6    A.    Yeah, I-- I mean, I wouldn't do that.  But if

7          I was going to commit a crime, no, I wouldn't

8          put my fingerprints on it, I wouldn't use my

9          kids' names in it, I certainly wouldn't do it

10         from my own house, you know, any crime, no.

11   Q.    And you didn't send any of these pictures or

12         videos?

13   A.    No.  Absolutely not.

14              MR. FRANCIS:  I have nothing

15         further, Judge.

16              THE COURT:  Anything further for

17         this witness?

18              MS. KENNEY:  No, Your Honor.  Thank

19         you.

20              THE COURT:  Sir, you may step down.

21              Mr. Francis, your next witness.

22              MR. FRANCIS:  May I step in the hall

23         to see if my second witness is here?

24              THE COURT:  Sure.

25              Ladies and gentlemen, just a little

1          logistical change here.  We're going to go a

2          little bit longer before we break, so if you

3          want to stand up and stretch while he's doing

4          that.  I personally get tired of sitting so

5          help yourselves.

6                    If you're ready, you may proceed.

7                    MR. FRANCIS:  Judge, I would call Ed

8          Kearn to the stand.

9                    THE COURT:  Sir, if you would please

10         come up to the witness chair.  And when you

11         arrive there we'll ask you to remain standing

12         and raise your right hand.

13                    EDWARD M. KEARN,

14         called as a witness on behalf of the

15         defendant, was sworn, and testified as

16         follows:

17                    THE COURT:  Sir, if you will please

18         be seated, and you can adjust the chair and

19         the microphone so it amplifies your voice.

20         And then would you just say and spell your

21         last name for the court reporter.

22                    THE WITNESS:  Yes.  Last name is

23         Kearn, K-E-A-R-N.

24                    THE COURT:  And your first name is?

25                    THE WITNESS:  Edward.

558

```
1                    THE COURT:  Thank you, sir.
2                    DIRECT EXAMINATION
3         BY MR. FRANCIS:
4    Q.   And for our record, would you again restate
5         your name?
6    A.   Edward M. Kearn.
7    Q.   And are you Jon Kearn's father?
8    A.   I am.
9    Q.   Would you tell us, Mr. Kearn, what your
10        employment is?
11   A.   Yes.  I work as a computer analyst as the
12        head of help desk for Capitol Federal
13        Savings.
14   Q.   How long have you been employed in that
15        position?
16   A.   Since-- not exactly that position, but been
17        employed there since 1982.
18   Q.   And have you been employed in the information
19        technology area of the bank--
20   A.   Yes.
21   Q.   --savings and loan since that time?
22   A.   The whole-- the complete time.
23   Q.   Mr. Kearn, did you and I have a
24        conversation-- became involved in this case
25        about doing some-- looking at some computer
```

1       discovery that we received from the

2       government?

3   A.   Yes, we did.

4   Q.   And as a part of that did you look into a

5       Celebrite report?

6   A.   I think so.

7   Q.   All right, sir.

8   A.   There were several things.  I believe that

9       was one of them.

10  Q.   All right.

11              MS. KENNEY:  Your Honor, may we

12      approach?

13              THE COURT:  Yes.

14                  (THEREUPON, a bench conference

15      was had out of the hearing of the jury and

16      the defendant).

17              MS. KENNEY:  And maybe I jumped the

18      gun here but if I understand, Mr. Kearn has

19      reviewed the discovery in this case?

20              MR. FRANCIS:  He-- the only thing

21      that I know he's done is he's looked at

22      the-- I had-- I asked him to look at the

23      Celebrite report because I couldn't make

24      heads or tails out of it.  And I put it on my

25      computer and what I was looking for was for

1          stuff about cheyenneandliberty.com.  So he's

2          looked at that.

3                    MS. KENNEY:  Well, Your Honor, I

4          don't know how this evidence-- I mean, first

5          of all, he's a biased witness.  Second of

6          all, I've not received any notice that anyone

7          other than Mr. Doty was going to testify

8          regarding any type of an examination.  And I

9          don't know if he's going to offer an opinion.

10                   MR. FRANCIS:  I can make a proffer.

11                   MS. KENNEY:  Okay.

12                   MR. FRANCIS:  I'm sorry.  I didn't

13         mean to blindside you.  I can see where

14         that-- that didn't enter my mind.

15                   THE COURT:  Why don't you just give

16         us--

17                   MR. FRANCIS:  I will.

18                   THE COURT:  --a forecast where we're

19         going.

20                   MR. FRANCIS:  I have two exhibits

21         that I'd asked him to-- well, that he found

22         that I was going to ask about.  One is the

23         501, which is a copy of the E-mail that was

24         sent to that cheyenneandliberty.com two days

25         after it was opened about, hey, I don't know

1        if your dad's on the phone or not.  And I

2        just wanted him to identify that that's where

3        he got that so I could get it in the record.

4        And that's all I'm going to ask him.  I'm not

5        asking technical stuff.

6                   And the other one was there was-- on

7        the Celebrite report it shows there is on

8        cheyenneandliberty like a 430 byte entry, and

9        I asked him if he would print that off.  And

10       Mr. Doty is going to be talking about that.

11       He's not doing any technical-- there's

12       nothing technical about what he's going to be

13       talking about.  It's just to identify the

14       documents.  And I could have Mr. Doty do it.

15                  THE COURT:  Go ahead, I'll hear you.

16                  MS. KENNEY:  I'm sorry.  I don't

17       have an objection to the entry of those-- for

18       the admission of those two exhibits because

19       they do come from the government's discovery.

20       I have no problem with that.  But I guess

21       I'm--

22                  THE COURT:  So I guess I'm not sure

23       what we're arguing about up here.

24                  MS. KENNEY:  I'm not sure of the

25       point of this witness.

1              THE COURT:  Well, that's for him to

2        decide.

3              MR. FRANCIS:  Well--

4              THE COURT:  He gets to decide on how

5        he wants to present his evidence, and he may

6        believe it's more persuasive for them to know

7        where it came from.  But I'm here sort of--

8        I'm glad you raised the question because I

9        understand you did not know where the

10        defendant's counsel was going with this.  But

11        I haven't heard anything from Mr. Francis

12        that makes me think that the witness is going

13        to offer an undisclosed opinion.  I think

14        he's going to testify about factual

15        experiences.

16              As for his bias, you certainly are

17        free to cross-examine on that.  But if you

18        think that the witness reaches a point where

19        he is rendering an opinion that was not

20        disclosed, as is required by the rule, then I

21        urge you to make your objection as you think

22        necessary.  All right?

23              MR. FRANCIS:  And I tell you my

24        plan, quite frankly, is once he identifies

25        that I'm going to move for their admission

1          and I'm not planning on publishing them at

2          this time.  I'm going to publish them when

3          Mr. Doty is on the stand.

4                    MS. KENNEY:  That's fine.

5                    THE COURT:  All right.  Okay.

6                         (THEREUPON, the following

7          proceedings were had in the presence and

8          hearing of the jury and the defendant).

9                    THE COURT:  No day in your life

10         would be complete without a little static so

11         thanks for indulging in that and that

12         discussion just allowed us to save a little

13         bit of time.  So though it took a little bit

14         of time it will save more elsewhere.

15                    Mr. Francis, you may continue.

16                    MR. FRANCIS:  Thank you.  May I

17         approach?

18                    THE COURT:  Please.

19    Q.   (By Mr. Francis)  Mr. Kearn, I'm going to

20         hand you an exhibit, Number 501, and ask-- I

21         want you to read that.  I just want to ask

22         you if you can identify that for me.  You

23         have to answer out loud yes or no.

24    A.   Yes, I have seen this.

25    Q.   And is that an extract you took off the

```
 1           Celebrite report?

 2      A.   It is.

 3                    MR. FRANCIS:  Judge, I would move

 4           for the admission of Defendant's Exhibit 501.

 5                    THE COURT:  Is there objection?

 6                    MS. KENNEY:  No objection, Your

 7           Honor.

 8                    THE COURT:  All right.  Then without

 9           objection, Exhibit 501 is received as

10           evidence.

11      Q.   (By Mr. Francis)  I'm going to hand you now

12           what's been marked as Defendant's Exhibit 502

13           and ask if you would look that over and

14           identify it if you're able to do so.

15      A.   Appears to be an E-mail account.

16      Q.   Have you seen that before?

17      A.   Yes.

18      Q.   Did that come from the Celebrite report you

19           looked at?

20      A.   I believe so.  Yahoo.com.

21                    MR. FRANCIS:  I have-- would move

22           for the admission of that document also.

23                    THE COURT:  Any objection?

24                    MS. KENNEY:  No, Your Honor.

25                    THE COURT:  Without objection,
```

565

1          Exhibit 502 is received.

2                    MR. FRANCIS:  And, Judge, that's all

3          the questions I have of this witness.

4                    THE COURT:  Would you like to

5          cross-examine?

6                    MS. KENNEY:  No, Your Honor.  Thank

7          you.

8                    THE COURT:  All right, sir, you may

9          step down.

10                   Mr. Francis, your next witness,

11         please.

12                   MR. FRANCIS:  We would call Mr. Doty

13         to the stand at this time.

14                   THE COURT:  And, counsel, can I see

15         you just a moment as Mr. Doty is taking--

16         coming to the witness stand?

17                   Ms. Kenney, may I see you for a

18         moment?

19                   MS. KENNEY:  Oh, I'm sorry, Your

20         Honor.

21                   THE COURT:  Mr. Doty, if you, when

22         you reach the witness stand, will your raise

23         your right hand and the deputy clerk will

24         administer the oath.

25                        ANDREUX DOTY,

1          called as a witness on behalf of the

2          defendant, was sworn, and testified as

3          follows:

4                    THE COURT:  All right.  If you will

5          be seated and then just give me a second with

6          the lawyers and just a moment of static for

7          you all.

8                         (THEREUPON, a bench conference

9          was had out of the hearing of the jury and

10         the defendant).

11                   THE COURT:  Ms. Garrett reminded me

12         this morning that the motion in limine that

13         the government filed about this witness is

14         still open.  My recollection is that it has

15         been resolved to the satisfaction of the

16         parties and so everybody's on the same page

17         there.  Is that true?

18                   MS. KENNEY:  Yes.

19                   MR. FRANCIS:  And we discussed that

20         again this morning.

21                   THE COURT:  All right.  Then I'm

22         going to ask Ms. Garrett to terminate that

23         motion as moot as I said I would if we worked

24         it out.  We did.  Good for you.  I just

25         wanted to make sure that I didn't need to

```
 1            address anything before we got going with

 2            this witness.  All right.  Thanks so much.

 3                        (THEREUPON, the following

 4            proceedings were had in the presence and

 5            hearing of the jury and the defendant).

 6                        THE COURT:  Sir, I interrupted the

 7            process midstream.  Would you say and spell

 8            your name for the court reporter?

 9                        THE WITNESS:  Yes.  My name is

10            Andreux Doty.  I go by Dreux.  The last name

11            is spelled D-O-T-Y.

12                        THE COURT:  Thank you, sir.

13                        DIRECT EXAMINATION

14       BY MR. FRANCIS:

15       Q.   Mr. Doty, will you tell me your employment,

16            please?

17       A.   Yes.  Currently I am the sole proprietor of a

18            professional IT consulting company called DNS

19            Solutions, and I've maintained that business

20            for the last five years.  I am also a

21            one-third partner of a forensic-- digital

22            forensic investigative company that I started

23            with a couple other gentlemen since 2013

24            called Private Digital Investigators, LLC.

25       Q.   Let me talk to you about your consulting
```

1          service that you do as opposed to the digital

2          forensic matters.  What does your-- what

3          services do you offer as a consultant for?

4     A.   Yes.  I provide IT consultative services for

5          small- and medium-sized companies that

6          perhaps aren't large enough to maintain their

7          own IT staff.  Companies such as Topeka

8          Foundry & Iron Works are my clients.  JM

9          Staffing, Most Pure Heart of Mary Church.

10         I-- I provide services there.  Entail desktop

11         support for problems with computers, server

12         support and local area network support, as

13         well as some configurations of their

14         smartphones and integrating that with E-mail.

15         And just maintaining day-to-day businesses

16         and their IT infrastructure.

17    Q.   Can you give the jury your background and

18         experience with computers and programming and

19         all that, please?

20    A.   Yes.  Approximately 1994 I started with a

21         company called New Tech, Incorporated here in

22         Topeka.  They are currently located in San

23         Antonio.  But I started there as an assistant

24         manager of technical support department

25         providing service to clients on the various

1          products that New Tech developed.  They were

2          a hardware and software company.

3                  From then I then became employed as

4          a contractor for a year and a half with

5          Westar Energy and then kind of, I guess,

6          proved my worth and was hired on full time as

7          a supervisor for the generation services

8          department with Westar Energy.  And that was

9          approximately 1997 to 2005.

10                 After my employment there, I went on

11         to be the director of IT for Midland Hospice

12         here in Topeka, which I spent about three and

13         a half years there.  And I was primarily in

14         charge of 150 clients, you know, nurses and

15         executive staff.  99 of their corporate cell

16         phone devices and mobile devices as well as

17         14 servers and four locations all over the

18         State of Kansas and the interconnectivity

19         between them.  And also the landline phone

20         system, I was responsible for that as well.

21   Q.    From Midland Hospice where did you go?

22   A.    From Midland Hospice I then decided to hang

23         my own shingle, so to speak, and started

24         developing my own, I guess, independent

25         business.

570

1    Q.    Let me talk to you about your other business

2          since you're in the business of forensic

3          examinations.  When did that start up?

4    A.    We-- we discussed yesterday kind of my-- how

5          I got into this industry.  Actually, I looked

6          back at my notes and 10 years ago, in 2005, I

7          was consulted by another defense attorney

8          here in Topeka to take a look at some Yahoo

9          instant messages for a case in Jackson

10         County.  And then from there I kind of-- I've

11         been retained on various occasions throughout

12         the last 10 years for expert witness

13         testimony regarding cases that involved

14         attempted murders, murders, rapes, child

15         pornography.  And that includes the

16         examination of cell phones when I have the

17         physical cell phones.

18                    In 2013 I was retained for a murder

19         trial with multiple defendants where we

20         actually had physical possession of the

21         defendant's phone, and part of the-- the

22         process required me to examine the evidence

23         on the phone.  At that time we didn't have

24         the forensic tools available much like what's

25         been referred to already in testimony by the

1          agents and Topeka Police Department called

2          Celebrite.  We didn't have that capability to

3          examine the phone with either Celebrite or

4          FTK Imaging or Encase has been testified to.

5                    So we ended up searching for about

6          two weeks for someone that wasn't law

7          enforcement only on the investigative, you

8          know, private side.  Finally found a

9          gentleman in California who we shipped the

10         phone to.  We ended up getting a hung jury on

11         that trial.  But for the next trial we wanted

12         to see if there was any exculpatory data we

13         could kind of get out of the phone.  He was

14         unable to find any data and hence a plea was

15         offered.

16                   But we-- we determined there was a

17         need for this kind of service that was

18         outside of the realm of law enforcement for,

19         you know, the-- the examination of what's

20         called ESI or electronically stored

21         information.

22    Q.   Did you take any courses on electronically

23         stored information?

24    A.   Yes.  The partnership that we developed,

25         myself and another-- there's a defense

572

1          attorney here in town as well as an SAIC

2          employee out of Fort Riley who are also

3          long-time friends.  The three of us jointly

4          invested in a forensic suite called Paraben.

5          And basically it's very similar to and

6          respected as well in the forensic community

7          as more of a full suite.  It doesn't

8          specifically deal with cell phone

9          extractions; it also can examine hard drives

10         and-- and any kind of digital media.

11                   And about-- let's see, I think it

12         was two years ago, right after we started the

13         company, I did go to training and got 24

14         hours of certification training on that full

15         suite of Paraben products.

16   Q.    Does the Paraben product pull data or

17         duplicate data off the phone as was explained

18         with Celebrite and Encase?

19   A.    Yes, it does.  In-- in the event that we do

20         have the physical device to extract data

21         from.

22   Q.    Are there instances where you do an

23         examination where you do not have the

24         particular electronic device itself?

25   A.    Yes.  Many of the cases that we get retained

```
 1              for do involve the summary reports provided

 2              by the-- you know, by the prosecuting, I

 3              guess, party.  Due to the nature of a lot of

 4              the, you know, cases and the fact that the

 5              chain of custody requires that the-- the

 6              devices stay in the-- I guess the possession

 7              of law enforcement, then oftentimes I am

 8              examining mostly summary reports and-- that

 9              the-- the prosecution provides.

10    Q.       Did you-- did you do any examination of

11             Mr. Kearn's computer or his cell phone in

12             this case?

13    A.       In this particular case, I was given, I

14             guess, free reign at the Heart of America

15             Regional Computer Forensic's lab, which is in

16             North Kansas City.  I believe that's a

17             department of-- or a division of Homeland

18             Security.  I'm not for certain.  But I spent

19             about five hours examining the actual image

20             file that Special Agent Beebe had created for

21             the-- the hard drive that was found.  I was

22             unable to physically examine the cell phone

23             image that was created due to the fact that

24             we don't have what's called a dongle or a

25             hardware protection key that would license us
```

```
 1            to use the-- the nature of the image that was

 2            created.

 3      Q.    Did you examine the reports that were

 4            provided through discovery from the agencies?

 5      A.    I did.

 6      Q.    All right.  Did you-- did you prepare any

 7            reports as a result of your examination?

 8      A.    Yes, I did.

 9      Q.    I'm going to hand you what's been marked

10            Defendant's Exhibit 504 and ask you if you

11            can identify that, please?

12      A.    Yes, I can.  This appears to be the report

13            that I generated on the 13th of November of

14            2014.

15      Q.    Let me ask you to take a look-- you should

16            have before you two exhibits up here, 501 and

17            502.  Let me hand you 501 first.  Have you

18            seen that exchange or E-mail?

19      A.    Yes, I have.

20      Q.    All right.  Where did you first see that?

21      A.    There was a-- a compressed file that was

22            provided by the United States in this case,

23            and it was actually a text file that included

24            all of the Yahoo mail file account for

25            cheyenneandliberty@yahoo.com.  This appears
```

```
 1            to be the first correspondence that was

 2            recorded within that entirety of the Yahoo

 3            message file.

 4   Q.    Mr. Doty, I'm going to put my pen down here

 5            by a paragraph that appears on page 501 and

 6            ask if you can read that paragraph into the

 7            record.  And give us the date and the time,

 8            please.

 9   A.    Yes.  On December 27th of 2012 at 9:30 a.m. a

10            Ben Parker, with the E-mail address

11            silverknight05@gmail.com wrote, "Hey!"  And

12            it appears that there is an attached JPEG

13            image called Mike on Trip to Russia that

14            would have been attached to this

15            correspondence.  "Hi, Chey," or Chey, I

16            guess.  "Course I don't want to break up with

17            you.  I love you lots."  Equal-- that's the

18            end of the line.  "I just wasn't online the

19            other day because I was sick all day.  I

20            would never just ignore ya.  Sometimes your

21            dad is on the cell phone so I can't send you

22            stuff on it unless I know it's you who is on

23            it.  I miss you lots and lots, I should be on

24            today and tomorrow.  Love you!  Hugs."

25   Q.    Did you come to learn through this that one
```

1           of my client's daughters is named Cheyenne?

2     A.    I did.

3     Q.    And that she was a 10-year-old girl?

4     A.    Yes.

5     Q.    Now, did you have any thoughts about-- well,

6           can you tell-- did you do any search for a

7           Ben Parker at any time in your--

8     A.    I did.  And this-- this correspondence and I

9           believe there was a reply back, but this was

10          the-- the only incident within the evidence

11          that referred to a Ben Parker.  Is that what

12          you're--

13    Q.    Yes.

14    A.    Okay.

15    Q.    And were you given to understand the date

16          when this Yahoo account was established?

17    A.    It appears to be December 27th of 2012.

18    Q.    So on the same day it was established this

19          E-mail came in?

20    A.    I-- I believe so.  From recollection, there

21          was a Yahoo record request that provided the

22          actual initial setup of the account, and if

23          memory serves it was on that date as well.

24    Q.    All right.  In searching through the

25          Celebrite or Encase report, did you discover

577

```
1              was there any reference to the

2              cheyenneandliberty@yahoo.com account?

3    A.    I found, when doing a key word search is what

4          was mentioned earlier, through the 1,400-page

5          PDF document, which is an Adobe Acrobat

6          reader file, that's how the report was

7          presented, doing a key word search in there I

8          found one trace file in the report that

9          referred to a plist entry, which is

10         essentially how iPhones save kind of data.

11         It's almost like their version of a little

12         mini database.  And the report did indicate

13         that-- it said IMAP, so it was referring to

14         cheyenneandliberty@yahoo.com.  The file size

15         was reported as 432 bytes, I believe.

16   Q.    Let me have you-- if you would, do you have

17         Exhibit 502 in front of you?

18   A.    I do.

19   Q.    Is that the entry that you viewed from the

20         government's report concerning the size of

21         that yahoo@liberty.com file?

22   A.    It is.

23   Q.    And it says size in bytes:432; is that

24         correct?

25   A.    That's correct.
```

578

1    Q.    Now, can you give the jury an idea of how big

2          a file 432 bytes would be?

3    A.    Yes.  Last night I-- on my own computers I

4          created a text file with the program that's

5          in everybody's Windows operating system

6          called Notepad.  Essentially it's a very

7          stripped down version of Microsoft Word.  And

8          I proceeded to type, "This is a test of file

9          size."  And I repeated that line 12 times.

10         And then added, I think, seven more

11         characters, saved the file.  Of course I had

12         to do some tweaking to get it, you know,

13         precisely too.  But with 12 lines of that one

14         sentence, that essentially gave me a file

15         size of 432 bytes.

16   Q.    Is that a big file or a small file?

17   A.    That is incredibly small.

18   Q.    Compared to what you have before you, based

19         on your experience as a computer-- excuse me,

20         an IT person, how many bytes of information

21         do you suppose is consumed in this note

22         itself?

23   A.    On Exhibit 501?

24   Q.    502.

25   A.    Oh, 502.  I would guess, based on the amount

1          of characters that I see, it looks to be

2          maybe even a little larger than 432 bytes.

3                    THE COURT:  Mr. Francis, tell me

4          when you reach a breaking point.  I owe the

5          court reporter and the jury a break.  I'm

6          sorry to interrupt this.  If you're close to

7          finishing we should proceed.  But--

8                    MR. FRANCIS:  I've got a ways to go.

9          This would be a good time.

10                   THE COURT:  It is a good time?

11                   MR. FRANCIS:  Yes, sir.

12                   THE COURT:  All right.  Very well.

13                   Ladies and gentlemen, we'll take our

14         midmorning break.  Remember the instruction

15         not to talk about the case, not among each

16         other, not with anyone else, or do research

17         on the case, no contact with anyone involved

18         in the trial.  You know all of the points of

19         that by now.

20                   We'll ask you to be back in your

21         room ready to come into court at 11 o'clock.

22         And we'll be more faithful to that time

23         standard than we were this morning.  All

24         right?  Have a good break.

25                   (THEREUPON, a recess was

1          taken).

2                    (THEREUPON, the following

3          proceedings were had in the presence and

4          hearing of the defendant).

5                    THE COURT:  All right.  Please stay

6          seated.  Before the jury comes-- I'm sorry.

7          We're back on the record in the presence of

8          defendant and his counsel and the Assistant

9          United States Attorney.  Everyone, I hope you

10         saw that our law clerk was able to reformat

11         the six instructions into three and what you

12         have is the old and the new.  I know you're

13         occupied at the moment, but I'll want your

14         insights on that maybe as we get back from

15         the lunch hour.

16                   MS. KENNEY:  Your Honor, I've had a

17         chance to look through them, and I'm fine

18         with the revised version.

19                   MR. FRANCIS:  Me too.

20                   THE COURT:  Okay.  Well, they were--

21         I think-- I think that's the better course.

22         All right.  Ready for the jury?

23                   MR. FRANCIS:  Yes, sir.

24                   THE COURT:  Ms. Garrett, please.

25                   I thank you for your quick review of

1            that.  That will make it easier for us to get

2            the instructions reassembled and ready to go

3            when we're ready.

4                      (THEREUPON, the following

5            proceedings were had in the presence and

6            hearing of the jury and the defendant).

7                      THE COURT:  Please, at your leisure.

8                      All right.  Mr. Francis, you may

9            continue with your examination of Mr. Doty.

10                     Mr. Doty, if you will come back to

11           the witness chair.

12   Q.   (By Mr. Francis)  Mr. Doty, do you have

13           behind you perhaps Government's Exhibit

14           Number 21?  It's probably going to be in a

15           manila folder.

16   A.   Yes, I do.

17   Q.   Take a moment and go through that exhibit.  I

18           have a few questions I want to ask you.

19   A.   Okay.

20   Q.   Does that consist of 27 pages?

21   A.   Yes, it does.

22   Q.   All right, sir.  You mentioned earlier that

23           you had reviewed a Celebrite report.  How

24           many pages was that report that you reviewed?

25   A.   The entire Celebrite report that I reviewed

582

```
 1              was 1,400 and, I believe, 31 pages.
 2    Q.    All right, sir.  Now, I want to ask you some
 3          questions about a couple of those pages.  And
 4          primarily I want to draw your attention not
 5          in that Exhibit 21 there, because as I
 6          understand your testimony that is not the
 7          complete Celebrite report by about 1,400 and
 8          some odd pages; is that correct?
 9    A.    That's correct.
10    Q.    But on the complete Celebrite report, do you
11          have a recollection of looking to see how
12          many E-mails had been sent on that phone?
13    A.    Yes, I do.
14    Q.    And where would one go on the original
15          Celebrite full report to find that summary?
16    A.    That would be on pages 2 and 3 from the
17          report I was provided.
18    Q.    And did you find where any E-mails had been
19          sent?
20    A.    I did.
21    Q.    And what was the total number of E-mails that
22          had been sent according to the Celebrite
23          report?
24    A.    There were 13 E-mails total as found on the--
25          or the data extracted from the iPhone 4S.
```

583

```
1    Q.    And were those drawn on the

2          cheyenneandliberty@yahoo.com E-mail address?

3    A.    No, they were not.

4    Q.    Were they all on the same address?

5    A.    Yes.

6    Q.    What was the address?

7    A.    It was, I believe, sunflowerhvac785@gmail.com

8          if memory serves.

9    Q.    Did you find where any yahoo.com E-mails had

10         been sent, according to the Celebrite report,

11         on the iPhone?

12   A.    No, I did not.

13   Q.    Did you find any other accounts of

14         Mr. Kearn's where E-mails were sent on that?

15   A.    None that messages were sent.

16   Q.    Were you aware that he had other accounts on

17         that phone?

18   A.    There were five accounts listed in another

19         section.  I believe it was the account

20         information section of the Celebrite report.

21         Of those five there are actually three unique

22         E-mail accounts that were configured on that

23         phone, none of which were the

24         cheyenneandliberty@yahoo.com.

25   Q.    Do you have Government's Exhibit 1 before you
```

584

```
 1        or available up there?
 2   A.   Yes, I do.
 3   Q.   I want you to turn to page 3 of that exhibit,
 4        if you would.  Do you have that before you?
 5   A.   Yes, I do.
 6   Q.   I'm going to display this and I'm going to
 7        draw your attention to this highlighted
 8        portion where my pen is.  Do you see that?
 9   A.   I do.
10   Q.   Can you read that into the record for us,
11        please?
12   A.   Yes.  The highlighted first line is
13        "boundary-Apple-mail-" and I'm going to guess
14        1 9.  There's a series of alphanumeric string
15        data.  The next line starts with "X-mailer."
16        X like X-ray.
17   Q.   All right.
18   A.   And it specifies an iPhone mail
19        parenthetically 9B, like baker, 206, end
20        parentheses.
21   Q.   What is the significance of X-mailer?
22   A.   The X-mailer is-- within the header
23        information is basically an identifier of the
24        originating source of an E-mail.  This would
25        indicate that an iPhone with operating
```

585

```
 1            system-- the 9B 206 is identified by Apple as
 2            IOS or the Apple operating system of 5.1.1.
 3       Q.   In your review of the records and documents
 4            did you find where that E-mail had been sent
 5            by Mr. Kearn's phone?
 6       A.   I absolutely did not.
 7       Q.   Did you determine that there were other
 8            E-mail accounts that-- user accounts on his
 9            phone?
10       A.   Yes, I did.
11       Q.   And did you make note of that in any reports
12            that you made?
13       A.   Yes, I did.  In my summary report.
14       Q.   And I believe you have before you Defendant's
15            Exhibit 504; do you not?  Which is I believe
16            your report.
17       A.   What was that again?  I'm sorry?
18       Q.   Do you have Exhibit 504 before you, which I
19            believe is your report?  No, it won't be in a
20            notebook, it will be--
21       A.   Oh, right, it won't be.  Yes, I do.
22       Q.   And did you-- did you make any note of the
23            various E-mail accounts that were on
24            Mr. Kearn's phone?
25       A.   I did.
```

1          MR. FRANCIS:  Judge, I would move

2     for the admission of 504, by the way.

3          THE COURT:  Is there objection?

4          MS. KENNEY:  No objection, Your

5     Honor.

6          THE COURT:  Exhibit 504 is received.

7  Q.  (By Mr. Francis)  Have you had a chance to

8     look over to see whether or not there were

9     any other accounts on Mr. Kearn's phone

10    besides the one just referred in-- a few

11    minutes ago that was, I believe, from Kearn

12    Heating & Cooling, or something like that,

13    785?

14 A.  Yes, I've reviewed.

15 Q.  How many-- how many accounts did you find on

16    Mr. Kearn's phone?

17 A.  There-- the Celebrite report is reporting

18    five user accounts; however, there are only

19    three unique accounts.

20 Q.  What are the unique accounts?

21 A.  One is the one-- the

22    sunflowerhvac785@gmail.com of which the

23    summary on page 2 of the Celebrite report

24    reported 13 E-mails were found on the phone

25    from that account.  The second unique E-mail

```
 1           account is kearnwood@at&t.net.  And the third
 2           unique is sunflowerhvac@att.net.
 3     Q.    On that last one, the sunflowerhvac@att.net,
 4           you indicate in your report an account name.
 5           And let me put that before the jury so they
 6           can see that to which I make reference.  What
 7           I'm referring to, Mr. Doty, is this entry
 8           right down -- that was bold -- right down
 9           there where it says service type, Yahoo.  Do
10           you see that?
11     A.    I do.
12     Q.    Does that have anything to do with the
13           cheyenneandliberty@yahoo.com account?
14     A.    No, it does not.
15     Q.    And can you explain what the significance of
16           that Yahoo is as it pertains to
17           sunflowerhvac@att.net?
18     A.    A few years back my understanding is that
19           Yahoo was actually purchased by AT&T.  And my
20           assumption, based on this information, is
21           that the account name is either randomly
22           generated or can be specified by the user
23           when they're setting up that E-mail account
24           on their phone.  And I-- I can only assume
25           that the att.net attributed itself to Yahoo
```

588

```
 1              in that AT&T purchased Yahoo.
 2   Q.    Where did this information come from that is
 3         displayed in your report here about these
 4         accounts that we just referenced?
 5   A.    It-- this information came from page 12-- or
 6         1,210 of the Celebrite report.
 7   Q.    So it came from the government's own report?
 8   A.    Yes, it did.
 9   Q.    Did you take a look at the information
10         provided the government from Yahoo?
11   A.    With regard to the E-mail addresses in
12         question?
13   Q.    Yes, sir.
14   A.    Yes, I did.
15   Q.    Do you have before you Exhibit 2,
16         Government's Exhibit 2?
17   A.    Yes, I do.
18   Q.    Would you tell us what Government's Exhibit 2
19         is?
20   A.    Government's Exhibit 2 appears to be the
21         Yahoo response for the request for
22         information pertaining to user account
23         cheyenneandliberty@yahoo.com.
24   Q.    In the process of going through the records
25         provided by the government to us, did you go
```

589

```
 1              through the Yahoo management-- Yahoo account
 2              management tool that's now identified as
 3              Exhibit 2?
 4    A.   You said-- repeat the question, I'm sorry.
 5    Q.   Did you go through that particular document
 6              that was provided to us by the government?
 7    A.   Yes.  Yes, I did.
 8    Q.   And did that assist you in coming to any
 9              conclusions that you may have reached?
10    A.   Yes, it did.
11    Q.   Can you tell-- what's the purpose of
12              reviewing a document such as this?
13    A.   IP addresses are-- what is commonly referred
14              to as IP addresses stand for internet
15              protocol addresses.  They are identifiers
16              of-- in this case a geographic location or--
17              or not necessarily devices but with regard to
18              the first entry on page 7 of-- of this report
19              on the initial creation, I'm assuming, of the
20              cheyenneandliberty@yahoo.com it refers to an
21              IP address of 99.18.221.137.
22    Q.   Bear with me just a minute, Mr. Doty.  I'm
23              going to display the page of that report to
24              which I believe you made reference.  Does
25              that appear to be this address right here
```

1        where my pen is pointed?

2    A.   Yes, it is.

3    Q.   And is there an indication as to when that

4        address was used by Yahoo?

5    A.   Yes.  It appears to be from the 27th of

6        December, 2012 at 3:25 p.m. Greenwich Mean

7        Time.

8    Q.   And is that the very first use of the Yahoo

9        account that we've been discussing?

10   A.   Yes, it appears to be.

11   Q.   All right.  That was December 27th, correct?

12   A.   Correct.

13   Q.   And I believe I showed you the state's-- or

14       Defendant's Exhibit 502, which was the Ben

15       Parker E-mail.

16   A.   501, I believe.

17   Q.   501.

18   A.   Yes.

19   Q.   And what was the date that E-mail was sent?

20   A.   That E-mail was sent on December 27th, 2012

21       at 2:34 p.m.

22   Q.   In your review of the Yahoo document that you

23       have before you, did you notice that there

24       was a break in time from the usage of that

25       account from the time it was opened to the

591

1          time it was closed?

2     A.   Yes, I did.

3     Q.   Did you do any search to find out if there

4          were any E-mails that were sent out on that

5          account between-- I believe it was January 20

6          and the first part of April?

7     A.   With the data that was provided by the

8          government, I did search and was unable to

9          find anything.

10    Q.   Well, we've talked about the opening IP

11         address that was at the bottom of that page.

12         Can you tell us about the other addresses

13         that appear in that report?  And, for

14         example, let me locate it for you.  It

15         appears to be maybe the last message sent and

16         that was on April 29, 2013.  So can you talk

17         to the jury about the significance of these

18         various IP addresses?

19    A.   Yes.  The-- the significance of-- of these IP

20         addresses basically is a record of the

21         originating IP address from when the account

22         was accessed.  Essentially it's kind of a-- I

23         guess an-- an indication of sorts as to from

24         where the-- the account was-- was accessed.

25    Q.   Let's talk about, for example, in your review

592

```
 1              of the documents did you find that all of the
 2              E-mails that were sent from this-- on this
 3              account from the time it opened to the time
 4              it closed were from Topeka, Kansas?
 5     A.       No, I did not.
 6     Q.       Did you find that all of them were assigned
 7              particularly to Mr. Kearn or his business?
 8     A.       No, I did not.
 9     Q.       Can you give us kind of a synopsis of what
10              you did find?
11     A.       Yes.  If I can review-- I'm reviewing my
12              report, Exhibit 504.  And it appears there
13              are one, two, three, four-- four IP
14              addresses -- let me check back here -- that I
15              verified.  And-- and this also refers back to
16              a-- an AT&T request for information on the
17              user account is how I verified those as being
18              originating at the residence at 429 Taylor.
19     Q.       And so how many-- you found five out of all
20              of those?
21     A.       It appears there are one, two, three, four,
22              yes, five.
23     Q.       And can you tell us for the rest of the
24              addresses that appear where those were
25              assigned?
```

1    A.    Seems to be predominately assigned out of

2          Doylestown, Pennsylvania, which are the IPs

3          that begin with the 166.

4    Q.    We have some that begin with 99.  Did you

5          come to some conclusion as to where those may

6          have come from?

7    A.    They do appear to emanate or originate from

8          Topeka, Kansas.  Although it was not

9          definitively determined that they were

10         associated with Jonathan Kearn.

11   Q.    When you say they weren't associated with

12         Mr. Kearn, what do you mean by that?

13   A.    It means that with the information provided

14         by AT&T with regards to his home DSL or

15         broadband internet service, and I don't know

16         if you can bring that exhibit up, but the

17         only four IP addresses that I determined that

18         actually came from the residence or were

19         assigned to the account at 429 Taylor were

20         highlighted on my report.  And the other

21         Topeka, Kansas IP addresses are unknown as to

22         who they belong to.  But they are defined as

23         Topeka, Kansas.

24   Q.    Let me have you take a look at Government's

25         Exhibit Number 6.  Do you have that before

1          you?

2    A.    Yes, I do.

3    Q.    Would you take a look at page 2 of that

4          exhibit?

5    A.    I've got it.

6    Q.    Is there a-- information that's contained in

7          a box on that page?

8    A.    Yes, there is.

9    Q.    Let me put this in front of the jury here.

10         Would you-- did you read this information as

11         you were preparing to determine what was on

12         Jon's phone and what was not?

13   A.    Yes, I did.

14   Q.    Tell us what the significance of this

15         information on page 2 means.

16   A.    The IP address in question I believe came

17         from the state's (sic) evidence of the-- the

18         header E-mail that would have had an

19         identifying IP address from where the-- the

20         E-mail was sent.  This particular IP was, I

21         guess, inquired to AT&T as to who it belongs

22         to, and the IP address is-- appears to be

23         from-- from this comment back from AT&T that

24         it is, "No records responsive."  Meaning that

25         they -- if I could read directly from it --

595

```
1            they are blocks of IPs used by AT&T Wireless
2            for internet access and web-based
3            applications for wireless devices such as
4            web-enabled cell phones or aircards.  "Your
5            request has been processed by the correct
6            AT&T compliance organization, however, the
7            requested wireless IP assignment records are
8            not created or retained in the normal course
9            of business and AT&T is unable to isolate or
10           identify any individual account or device."
11   Q.     Does that have any significance to you as a
12          person trying to match a particular IP
13          address where a message was sent or received
14          to a particular instrument that received it
15          or sent it?
16   A.     Yes.  Significance being there's no way to
17          determine the origin.
18   Q.     Earlier I had shown you that header
19          information I believe that had the iPhone as
20          the X-mailer?
21   A.     Yes.
22   Q.     And I believe somewhere in your discussion of
23          that you used a term called IMAP?
24   A.     Yes, I did.
25   Q.     What is IMAP?
```

596

1    A.    If memory serves me, it is internet message--

2          internet messaging access protocol, and

3          essentially it is one of two primary ways

4          that an E-mail account can be set up.  The

5          other is what's called POP, or post office

6          protocol.  POP3 is commonly found.  Anyone

7          that's set up E-mail on an iPhone or any

8          device has probably seen the term IMAP or--

9          or POP3.

10              IMAP is somewhat different from POP

11         in that it is more of a-- it's-- it's

12         designed for multiple accounts to access-- or

13         multiple clients to access the same account

14         and basically be able to see any sent mail

15         that was sent from another client on that

16         same account or likewise any mail that was

17         received.  That data is dynamically updated

18         for any client that would be attached to that

19         E-mail account.

20   Q.    Did you find in the documents we were

21         provided by the government any evidence that

22         showed that an IMAP account was established

23         on Mr. Kearn's iPhone?

24   A.    With regard to cheyenneandliberty--

25   Q.    Yes.

```
 1    A.    --@yahoo.com?  I did not.

 2    Q.    Would there be any way a person could tell

 3          whether they used an iPhone, for example, for

 4          a given purpose on a certain date at a

 5          certain time?

 6    A.    I don't quite understand the--

 7    Q.    Well, I guess what I'm referring to is the

 8          phone bill.

 9    A.    Oh, yes.  And-- and typically on-- on many

10          cases on which I've been consulted I've

11          received data in the form of detailed account

12          information which would include calls out,

13          calls in, text messages in and out, and on

14          several occasions as well cell tower data

15          information from the provider, which in this

16          case would have been AT&T.

17    Q.    Were you provided in discovery any AT&T cell

18          phone bills?

19    A.    No, I was not.

20    Q.    How many cell phones did you understand

21          Mr. Kearn had?

22    A.    I understand five total cell phones on that

23          AT&T Wireless account.

24    Q.    And how many Celebrite reports were run on

25          the phones that you're aware of?
```

598

1    A.   I was provided with one Celebrite report.

2    Q.   Do you know if reports were made on the other

3         four?

4    A.   I understand that none were.

5    Q.   You also mention something about AT&T

6         broadband account reports.  What does that

7         mean?  What's an AT&T broadband report?

8    A.   So it's a little confusing because AT&T is

9         the cell phone provider, but AT&T also offers

10        what's called broadband or high-speed

11        internet.  DSL it's commonly called.  It

12        would be similar to Cox Cable high-speed

13        access for a home environment.  And my

14        understanding is that AT&T did provide a DSL

15        line as well as a phone number, a landline

16        number if you will, to the residence at 429

17        Taylor in Topeka.

18   Q.   What would one expect to find if they were

19        looking at an AT&T broadband bill pertaining

20        to the DSL?

21   A.   There's various data detailed that could have

22        been requested and provided by the-- by the

23        provider, AT&T.  I'm not quite certain how

24        much data, but I have not seen a-- a

25        broadband detailed summary from AT&T either.

1    Q.    In your responses to some of my questions you

2          used the term cell tower.  What's the

3          significance of cell towers in the scheme of

4          things here?

5    A.    In-- in many cases-- I guess originally

6          before GPS technology really became kind of

7          the-- the standard with smartphones, there

8          was-- there's always been cell phone

9          communication via cell towers and those are,

10         you know, basically antennas that are set up

11         scattered over, you know, residential,

12         commercial areas.  And basically when a phone

13         makes a call it is determined which tower,

14         maybe not necessarily it's closest to, but

15         there's a-- a whole algorithm of-- of

16         processes that go on to determine which tower

17         that the-- the call will actually be made to

18         and-- and received from.

19                 And in many cases, again since the

20         advent of GPS enabled cell phones, which

21         actually can track your, you know, from your

22         phone itself and not have to actually report

23         to a tower, but it was commonly used as a way

24         to determine approximate area in which a cell

25         phone was-- was used.

1    Q.   So if a person was in McPherson, Kansas, for

2         example, and was accused of making a phone

3         call at a McPherson phone-- cell phone and it

4         pinged up a tower from Topeka, Kansas, would

5         there be some way to maybe show that wasn't

6         quite what happened?

7    A.   Yeah.  Just logistically I don't think--

8         through the cell tower data that would be

9         able to be established that-- just wouldn't

10        logistically happen.

11   Q.   Do you have your report in front of you?

12   A.   I do.

13   Q.   May I see it, please, for one moment?  Were

14        you able to determine, based on your review

15        of-- did you review the Encase reports?

16   A.   I did.

17   Q.   And was there anything on the Encase reports

18        that indicated to you that E-mails had been

19        sent on the yahoo.com account from

20        Mr. Kearn's phone?

21   A.   No, there was not.

22   Q.   Did you find any evidence that indicated that

23        yahoo.com E-mails had been sent from his

24        phone on any of the documents, reports,

25        physical things you looked at provided by the

1          government?

2     A.   No, I did not.

3                    MR. FRANCIS:  I don't believe I have

4          any further questions, Judge.

5                    THE COURT:  Cross-examination,

6          Ms. Kenney?

7                    MS. KENNEY:  Yes, Your Honor.

8                    Could I have a moment, Your Honor?

9                    THE COURT:  Yes.

10                   This is an opportunity to stand and

11         stretch if you wish.  It's not required.  And

12         it looks like we've missed our window.

13                   MS. KENNEY:  I'll wait.

14                   THE COURT:  No, thank you.

15                   MS. KENNEY:  Okay.  All right.

16                        CROSS-EXAMINATION

17         BY MS. KENNEY:

18    Q.   Mr. Doty, you said you did do-- are you

19         organizing?  Because I'll wait.

20    A.   Yeah, I'm sorry.

21    Q.   No, no, no, I'll wait.

22    A.   I'm just trying to get all these in order.

23                   THE COURT:  Your window is back.

24    A.   Okay, I'm ready.

25    Q.   (By Ms. Kenney)  You testified that you did

```
1              do an examination of the defendant's hard

2              drive in this case?

3    A.   Yes.  My understanding from the-- I believe

4              it was an Acer computer.

5    Q.   There is a computer on the ground next to

6              you, I believe it's marked Exhibit 14.  I

7              keep getting that wrong.  14 or 15.  It's 14.

8              Can you tell whether or not that's the same

9              computer that you examined?

10   A.   Well, I didn't physically examine the

11             computer.  I examined the image of the

12             computer at Heartland.

13   Q.   Okay.  You did do that?

14   A.   But it seems to be consistent with what was

15             reported.

16   Q.   Okay.  And did you find the individuals that

17             you worked with to get these examinations set

18             up helpful?

19   A.   Very.

20   Q.   Were they responsive to your requests?

21   A.   Very.

22   Q.   Were you able to look at whatever it was you

23             felt you could and needed to look at?

24   A.   Yes, I was.

25   Q.   And when you examined-- and I guess to back
```

```
1              up.  You directly said you examined a-- what
2              we call a mirror image or a copy of the
3              actual hard drive?
4    A.        Correct.
5    Q.        What tools did you use to examine that
6              device?
7    A.        Basically a-- their-- the lab is basically
8              set up where the image is viewable as I guess
9              a-- a sterile environment, as they call it.
10             And it was described by a-- another witness
11             earlier.  And within that-- the course of the
12             five hours that I was there I was able to
13             actually search the-- the various directories
14             and the-- the files located on the computer
15             itself.
16   Q.        Okay.  And you said you were not able to do
17             an examination of the phone itself because
18             you didn't have the right equipment?
19   A.        Correct, yes.  It--
20   Q.        So--
21   A.        --requires a dongle.
22   Q.        I'm sorry.  So you did not-- so you reviewed
23             a Celebrite report?
24   A.        The Celebrite and the Encase recently, yes.
25   Q.        And the Encase.  You recently reviewed the
```

1               Encase report?

2      A.   Correct, yeah.  I was just recently provided

3           that.

4      Q.   Have you reviewed all of the discovery in

5           this case?

6      A.   To the best of my knowledge I have, since

7           August.

8      Q.   Have you reviewed the exhibits that the

9           government has introduced in this trial and

10          provided copies to counsel?

11     A.   With the exception of any of the images.  The

12          actual images are to be viewed I believe in

13          here.  So that's not to leave this building.

14     Q.   Okay.  What else have you reviewed?  And I'm

15          looking at the second page of Exhibit 504.

16          Actually I'm just going to put that on the

17          overhead so we can look at it together.  I'm

18          looking at the bottom of the second page

19          right now.

20     A.   Okay.

21     Q.   Tell us all the information that you have

22          reviewed.

23     A.   All these items labeled with Roman numerals

24          are scans that I made of the hard copy of the

25          entire case file.  The nomenclature, the how

```
1              I named the file was entirely my-- my own
2         design.
3    Q.   Okay.  And so Kearn affidavit was the
4         affidavit in support of the search warrant?
5    A.   If memory serves me, I believe that's right.
6    Q.   Okay.  The case charges, so that would be the
7         formal charging document?
8    A.   Correct.
9    Q.   Actually I'm not going in the correct order.
10        DHHSS summary-- let me try that again.  DHS
11        summary, were those official reports?  I
12        should say law enforcement reports?
13   A.   Yes, they seemed to be.
14   Q.   Okay.  Kearn discovery, was that information
15        that was provided by the government to
16        Mr. Francis?
17   A.   Yes, I believe it was.
18   Q.   Or--
19   A.   Yes.
20   Q.   Kearn case M. Works, correspondence.  What is
21        that?
22   A.   That's the-- I believe one of the original
23        attorneys that was retained by Mr. Kearn.
24        Matt-- it was either Matt or Mark Works.
25   Q.   That's fine.  I didn't understand that
```

606

```
 1            notation.  Kearn, Ed correspondence?
 2   A.   That would have been E-mails or-- I think
 3        they were handwritten pages of notes that
 4        Jonathan's father, Ed, made with regards to
 5        the case.
 6   Q.   Okay.  What type of notes were those?
 7   A.   I have not reviewed those in-- since probably
 8        late last year.  So--
 9   Q.   I guess my question probably better put is
10        were they notes pertaining to particular
11        evidence items, questions that you should be
12        asking?
13   A.   I think they were.  If memory serves me
14        right, they were questions regarding the--
15        probably the Celebrite report and maybe areas
16        that needed to be looked into.
17   Q.   Okay.  How closely did you work with the
18        defendant's father on this case in terms of
19        reviewing the evidence?
20   A.   I didn't.  I would provide him with summaries
21        of-- you know, via E-mail but-- and then,
22        yeah, there was really no contact.
23   Q.   Well, but even E-mail contact--
24   A.   Well--
25   Q.   --how much--
```

1    A.    Yeah.

2    Q.    --communication?

3    A.    Right.  Yeah, there was E-mail summary.

4    Q.    Okay.  Kearn case report DHS, I assume that's

5          additional investigative reports?

6    A.    I believe so.

7    Q.    Okay.  Kearn IP and E-mail summary?

8    A.    That is probably the AT&T, I'm assuming.  And

9          I might have bundled it with the Yahoo

10         records.

11   Q.    I'm going to skip over the next three because

12         I believe those have to do with the

13         information pertaining to the daughters?

14   A.    Correct.

15   Q.    So I'm looking at 12; is that right?

16   A.    Correct.

17   Q.    Kearn Loehrs summary.  What is that?

18   A.    My understanding is when he-- when the

19         defendant originally was charged and-- and

20         chose for state-appointed or

21         government-appointed counsel, that counsel

22         then sought to have a company by the name of

23         Loehrs provide some kind of a forensic phone

24         information with regards to the case.

25   Q.    And you said that you've at least reviewed

1           that report?

2      A.   I have.

3      Q.   And then the other items, TPD supplemental

4           report, that would have been the report

5           prepared by Detective Ladd?

6      A.   I believe so.

7      Q.   And I'm skipping over the other one that

8           appears that's it related to the daughter-- a

9           daughter.  Conditions of release, that was a

10          formal document?

11     A.   Correct.

12     Q.   Witness list.  That was probably provided by

13          the government?

14     A.   I believe it was provided to the government

15          by way of Jonathan.  It seemed to be.  If

16          memory serves me, it was a handwritten list

17          of potential witnesses.

18     Q.   Okay.  Yahoo records, those are in evidence?

19     A.   Yes.

20     Q.   Another investigative report by DHS?

21     A.   Correct.

22     Q.   And finally-- well, I shouldn't say finally.

23          The Celebrite report that we've discussed?

24     A.   Correct.

25     Q.   And then additional information relating to--

```
 1              I believe that would be the E-mail address
 2              that we've been discussing?
 3    A.   Yes.  My understanding it's a-- a very huge
 4              text file that includes all of the Yahoo
 5              message file data from that account,
 6              cheyenneandliberty@yahoo.com.
 7    Q.   I want to just go back to your testimony
 8              regarding the Celebrite report.  You've
 9              testified, I think, that it was somewhere in
10              the neighborhood of 1,400 pages?
11    A.   That was the copy that I was provided, yes.
12    Q.   And you're aware that the copy you were
13              provided was a redacted copy so--
14    A.   Yes.
15    Q.   --the actual copy there's been testimony that
16              it was thousands of pages?
17    A.   Right.  I believe it was over 4,000, from
18              memory.
19    Q.   Okay.  Thank you.  Now, I want to just look
20              at your report, Exhibit 504.  And I'm looking
21              at, I think, the third page.  And I
22              apologize, I didn't put page numbers on it.
23    A.   I apologize, I didn't either.
24    Q.   Okay.  You testified on direct regarding
25              information that was not provided to you?
```

610

```
1    A.   Correct.

2    Q.   But you agree you had no concerns regarding

3         any of the data that actually was provided to

4         you?

5    A.   Correct.

6    Q.   And on the next page of Exhibit 501, excuse

7         me, 504, your report, you highlighted -- I

8         think that's your highlight as opposed to my

9         highlight -- the iPhone device that you

10        reviewed, correct?  And please take time to

11        look at your report and make sure I'm not

12        confusing you.

13   A.   Can you repeat the question, too?  I'm sorry.

14   Q.   Sure.  The information that you highlighted

15        in your report on the page that I'm

16        displaying--

17   A.   Um-hum.

18   Q.   --that is the-- is that the iPhone that

19        belonged to the defendant?

20   A.   Yes.  That-- well, from--

21   Q.   Or is this the-- this is from the E-mail

22        header, correct?

23   A.   Right.  This is from the E-mail header.  This

24        is not from the defendant's iPhone.

25   Q.   Okay.  And you agreed-- or you testified that
```

1              the-- according to E-mail header, the iPhone

2              used was an iPhone 4S with operating system

3              5.1.1?

4     A.       No, there's no indication it was an iPhone

5              4S, but it did have IOS 5.1.1.

6     Q.       Is there any other devices that run IOS?

7     A.       Any iPad, iPod Touch, any iPhone device,

8              that-- that operating system update was

9              released May 6th of 2012.

10    Q.       Okay.  So 5.1.1, you agree that the Celebrite

11             report identified that as the operating

12             system that was on the defendant's iPhone?

13    A.       Yes.  Curiously, the version I was first

14             provided did not have that operating system

15             listed.  However, the more recent-- I don't

16             know, can't say it's a definite-- a different

17             version, but it does specify 5.1.1.

18    Q.       Okay.  So you have no reason to believe that

19             the first page of Government Exhibit 21 where

20             the operating system-- or basically summary

21             information about the extraction, the

22             Celebrite extraction, you have no reason to

23             believe that's inaccurate?

24    A.       No.  It just doesn't jibe with the original

25             file that I was provided in August.

```
1    Q.    It doesn't jibe with the redacted report.

2          Were you invited to come review the full

3          report?

4    A.    I believe that invitation was provided.

5    Q.    Okay.  And you didn't-- you never came to

6          look at the report?

7    A.    I did not.

8    Q.    Okay.  And you agree in your report -- and I

9          have lost track of the pages but it's where

10         you identified the usage of the IP

11         addresses -- you agree that the ones that you

12         have highlighted in green were addresses that

13         AT&T had assigned to the defendant's home

14         service at some point?

15   A.    That's correct.

16   Q.    Okay.  And you listed-- I think you said that

17         the 166 blocks which AT&T indicated were for

18         wireless devices?

19   A.    Correct.

20   Q.    And that they didn't track with specific

21         users?

22   A.    Correct.

23   Q.    Was assigned out of Doylestown, Pennsylvania?

24   A.    That is the information I was able to find on

25         the internet.
```

613

1   Q.   But that information doesn't really have any

2        significance as to where the IP address was

3        being used?

4   A.   No, it's just a-- a mobile block of numbers,

5        from my understanding.

6   Q.   Okay.  And then on the page in your report

7        where you discuss the response from AT&T, you

8        also discuss the IP addresses that were used

9        that were assigned to defendant's home

10       address, correct?  Feel free to take a look.

11  A.   Yeah.  On this page that you have up on

12       the--

13  Q.   Yes.

14  A.   Right.  I believe I'm referring to the blocks

15       that start with 166 that I stated.

16  Q.   Oh, okay.  All right.  Did you also conclude

17       in this report that it was not possible to

18       relate the use of those IP addresses assigned

19       to the defendant's residence to the

20       defendant's sending of an E-mail?

21  A.   Correct.

22  Q.   Okay.  And it could have been somebody using

23       a device with operating system 5.1.1?

24  A.   Correct.  Or an iPhone.  I mean, I can

25       specify to that regard.

1    Q.    An iPhone?

2    A.    Yes, with that operating system.

3    Q.    Such as the defendant had?

4    A.    It would, yeah.

5    Q.    Okay.  And that person would also have to be

6          in possession of the images of the

7          defendant's daughter that were found on the

8          iPhone, correct?

9    A.    Right.  Which could be going from the iTunes

10         backup that was made on the computer.

11   Q.    Okay.  Now, would you agree that in reviewing

12         the Loehrs report that she was able to find

13         multiple incidents of the use of

14         cheyenneandliberty on both the hard drive and

15         the cell phone?

16   A.    From my recollection of that report, she had

17         indicated that she did find, but in summary

18         there didn't seem to be any indication.

19   Q.    Any indication of?

20   A.    Or any data that would support that-- that

21         claim.

22   Q.    In summary-- I'm sorry.  Let me--

23   A.    In summary of her report.

24   Q.    In the summary of her report?

25   A.    Yeah.

1    Q.    Are you aware of the type of examination that

2          Ms. Loehrs did?

3    A.    I believe it was a physical extraction.

4    Q.    She actually had access to the-- a mirror

5          image as you did?

6    A.    Um-hum.

7    Q.    And she also had access to a phone-- I want

8          to say-- I want to say recording, but that's

9          not the word I'm looking for-- a copy of the

10         cell phone?

11   A.    The image, yes.

12   Q.    The image of the cell phone?

13   A.    Um-hum.

14   Q.    Thank you.  And she was actually able to do--

15         when you say a physical examination, she was

16         actually looking through those two devices?

17   A.    I-- I can't recall, to be honest with you.

18         It's been--

19   Q.    Would it help your memory if I showed you a

20         copy of Ms. Loehrs' report?

21   A.    I could probably benefit from that.

22   Q.    I'm going to show you what's been marked as

23         Government Exhibit 32.  Take whatever time

24         you need and let me know when you're done.

25                   MS. KENNEY:  Does the Court have a

616

1          copy to review at this point?

2                    THE COURT:  I'll take whatever you

3          have if you have one extra.  And I might just

4          ask while the witness is catching up with you

5          your cross still has a ways to go, I take it?

6          That's fine.

7                    MS. KENNEY:  Could be.

8                    THE COURT:  Yeah.  Why don't you

9          tell us when you're to an appropriate

10         stopping point and we'll stop for our lunch

11         recess.

12                   MS. KENNEY:  Your Honor, this might

13         be a good time and then would give Mr. Doty

14         an opportunity to look at this report.

15                   THE COURT:  Wonderful idea.

16                   Ladies and gentlemen, we're going to

17         break here for the lunch recess.  And you

18         remember that you're not to talk about the

19         case with each other, not with anybody else

20         either.  No researching anything touching on

21         the case.  That includes the temptation to go

22         find out about a variety of computer things

23         that may or may not be published and may or

24         may not be published correctly on publicly

25         available sources.  Your oath requires you to

1          limit your consideration in this case to the

2          evidence that's presented in this room.  So I

3          ask you to be mindful and faithful to that

4          oath.

5                    We'll resume-- why don't you be back

6          and ready to come into court at five after

7          one.  And it's raining out.  It rained

8          earlier this morning so you might want to

9          think about taking whatever umbrella or the

10         like you have with you.  All right.  We'll

11         see you at five after one.

12                    (THEREUPON, the following

13         proceedings were had in the presence and

14         hearing of the defendant).

15                    THE COURT:  You can step down, sir.

16                    THE WITNESS:  Thank you.

17                    THE COURT:  Do you want to talk just

18         a second about making the trains run on time?

19         You have what I think will be close to the

20         final instruction set.  We will over the

21         lunch hour add a Court's proposed jury

22         instructions label to that and put it on

23         CM/ECF so that we'll have a record of what we

24         will be working from at the instructions

25         conference when we reach that point.

618

1              I don't know whether-- I know you

2     have a lot going on.  I don't know whether

3     there will be time during the lunch hour to

4     consider the instructions as they are almost

5     finally configured.  Can you just help me

6     manage in my mind how much time you think

7     we'll need to devote to the instructions

8     conference?  Am I to expect there will be

9     substantial discussion and objection making,

10    or is this going to be a largely pro forma

11    sort of event?

12              MS. KENNEY:  I would expect the

13    latter.

14              THE COURT:  They're your

15    instructions.

16              MS. KENNEY:  They-- exactly.  No, I

17    don't think, Your Honor, that the issues in

18    the case are anything that's going to really

19    substantively change the proposed

20    instructions.

21              THE COURT:  Mr. Francis.

22              MR. FRANCIS:  I agree with that,

23    Judge.  And the revision that was made on the

24    6 down to 3 is acceptable and I think the

25    rest are really, as I said, boilerplate

619

1          pretty much.  I don't find that there's going

2          to be a big argument.

3                    THE COURT:  All right.  We'll see.

4          At the end of the case it's sort of like

5          trying to get all of the orders from the

6          kitchen out at the same time.  And we'll see

7          how we do.  But you have one more witness?

8                    MR. FRANCIS:  Yes.  And I imagine--

9          that's just to get another exhibit in and to

10         talk about it a little bit.  And so I maybe

11         will have him for I wouldn't think more than

12         10 minutes.

13                   THE COURT:  All right.  Well, we'll

14         see where we are by maybe midafternoon break

15         and scratch out a plan then.  All right.

16         Enjoy your lunch and I'll see you in an hour.

17                        (THEREUPON, the lunch recess

18         was taken).

19                        (THEREUPON, the following

20         proceedings were had in the presence and

21         hearing of the defendant).

22                   THE COURT:  Please be seated.

23         Mr. Hinderks is making a set of the

24         instructions-- the Court's proposed jury

25         instructions.  He will give them to you when

620

1          he comes in and those will go up on the

2          CM/ECF as the basis for our jury instruction

3          conference.  Anything we need to do before we

4          see them again?

5                    MS. KENNEY:  No, Your Honor.  I

6          might just advise the Court, I have not

7          really looked at the instructions yet.  I

8          just don't think I can be responsive.

9                    THE COURT:  No, no, I-- they're

10         largely yours with my aversion to as to.

11                   MS. KENNEY:  Got you.

12                   THE COURT:  And with the

13         consolidation of those six instructions into

14         three.

15                   All right.  So, Ms. Garrett, can you

16         bring the jury in, please?

17                   (THEREUPON, the following

18         proceedings were had in the presence and

19         hearing of the jury and the defendant).

20                   THE COURT:  Please, when you're

21         ready.  All right.  Welcome back, members of

22         the jury.  I hope you had a good lunch and

23         you got your hair put back in place from the

24         wind, as I tried to do.

25                   Ms. Kenney, I think we were in the

1          cross-examination of Mr. Doty.

2                    Mr. Doty, if I can ask you to resume

3          the witness stand.

4                    And, Ms. Kenney, when he's ready and

5          you're ready you may resume your

6          cross-examination.

7     Q.   (By Ms. Kenney)  Mr. Doty, I think where we

8          left it was you were reviewing what has been

9          marked as Exhibit 32.  Have you had a chance

10         to look at that?

11    A.   Yes, I did over lunch.

12    Q.   And is this the same report or summary or

13         memorandum that you referred to in Exhibit

14         504 that is your report of examination?

15    A.   Yes, it appears to be.

16    Q.   And would you agree that this summary of the

17         case involved Loehrs & Associate's review of

18         the hard drive and the iPhone 4S that has

19         been admitted into evidence in the case?

20    A.   Upon reviewing it, it appears as though they

21         examined the images taken by Special Agent

22         Beebe.  So I was incorrect earlier by saying

23         it was the physical devices.

24    Q.   Okay.  All right.  And we talked a little bit

25         about the findings in that report.  In

622

1          general would you agree that the Loehrs'

2          report is consistent with Special Agent

3          Beebe's findings?

4     A.   For the most part, yes.

5     Q.   And there was on the iPhone 4S -- I can't

6          remember the -- Exhibit 15 -- there was an

7          application on that phone that was for

8          storing a photograph; is that correct?

9     A.   I believe so.

10    Q.   Okay.  And at least according to the Loehrs'

11         report there was?

12    A.   Yes.  They did go into depth on tests of that

13         application and that it was found on the

14         phone.

15    Q.   Okay.  And that this application was a user

16         defined folder so that the files in that

17         location would have been knowingly possessed

18         by a user; is that correct?

19    A.   Not knowing enough about the application, I

20         can't speak to that I'm afraid.

21    Q.   Did you look for the application or find that

22         application during your examination?

23    A.   I did do a cursory search for it and found

24         that it is a-- seems to be a viable

25         application from-- available from the Apple

1          Store.

2    Q.    And you know from Special Agent Beebe's

3          testimony in his Encase report that the--

4          most of the images that we've been discussing

5          during the course of this trial were found in

6          that application?

7    A.    Yes.  That appears to be consistent in this

8          report.

9    Q.    And that that application was password

10         protected?

11   A.    That's my understanding.

12   Q.    And would you agree that the Loehrs'

13         examination also determined that the E-mail

14         cheyenneandliberty.com was being used on the

15         iPhone with other accounts but that she was

16         unable to recover any actual E-mails?

17   A.    She appears to have found the same trace file

18         that I referred to earlier in testimony.

19   Q.    And she conducted some specific key word

20         searches, correct?

21   A.    Correct.

22   Q.    She specifically did a key word search for

23         cheyenneandliberty?

24   A.    It appears as though she did.

25   Q.    And she-- and the search resulted in over

624

```
 1              1,000 hits located in numerous folders on

 2              both evidence items, meaning both the phone

 3              and the hard drive?

 4    A.        She did report that.

 5    Q.        Okay.  And some of the-- would you agree that

 6              some of the information she found was in --

 7              and I think you just mentioned it before the

 8              break -- the iTunes account?

 9    A.        The images in question seemed to-- that were

10              found on the hard drive of the Acer computer,

11              I believe there were only two files and they

12              were located within the iTunes backup file.

13    Q.        Backup file.  Thank you.  And she also did a

14              search for ProudPapa?

15    A.        Yes, it appears as though she did.

16    Q.        And she located 45 hits from data exclusively

17              from the iPhone that she examined?

18    A.        If you will give me a second.

19    Q.        Sure.

20    A.        I don't know that she specified exclusivity.

21    Q.        And if it would help, I'm looking at page 5

22              of her report.

23    A.        Yes, I'm on that.

24    Q.        Okay.

25    A.        Okay.  Exclusively from there it appears
```

```
 1              that's what she is reporting.
 2  Q.    Okay.  And that she noted several references
 3        to E-mails on the iPhone that contained the
 4        term and referred to Kearn.  By that did you
 5        understand her to mean the term ProudPapa and
 6        referring to Mr. Kearn?
 7  A.    We're still on page 5--
 8  Q.    Yes.
 9  A.    --on the ProudPapa section?  Yes, it appears
10        as though ProudPapa is within a data path
11        belonging to a Google account.
12  Q.    Okay.  And did you prepare a report of your
13        review or examination of the Exhibit 14 which
14        is the-- I think it's the Acer hard drive
15        from the computer?
16  A.    I think I referenced it.  I didn't produce an
17        explicit report or specific report.
18  Q.    Mr. Doty, would you agree that you could use
19        a web browser like the-- actually let me get
20        Exhibit 31 in the demonstrative exhibits.
21        And this has been introduced only for
22        demonstrative purposes.  And I should have
23        made this reference-- you recall I showed
24        this to Special Agent Beebe?
25  A.    Yes, I do.
```

626

```
1    Q.    And I should have referenced at that time
2          that this is just a picture of an iPhone that
3          I found on the internet.
4    A.    Correct, yeah, I understand.
5    Q.    And listed as an iPhone 4S?
6    A.    Yes.
7    Q.    So you agree you could use a web browser like
8          Safari to access a web-- an E-mail such as
9          Yahoo?
10   A.    Yes, that's correct.
11   Q.    Without using this--
12   A.    Mail--
13   Q.    --mail--
14   A.    --application, yes.
15   Q.    Mail application?  Thank you.
16   A.    Yes.
17   Q.    And that-- using-- accessing a Yahoo E-mail
18         account that way would not have to-- you
19         would not have to set that Yahoo E-mail as an
20         account on the phone in order to access it
21         that way?
22   A.    That's correct.
23   Q.    Now, you are at least now somewhat familiar
24         with Celebrite?
25   A.    Yes, from various cases and reporting thereof
```

1          and studying the-- we considered purchasing

2          it before we made the Paraben purchase.  So--

3    Q.    And you heard Detective Ladd testify that it

4          is an accepted forensic tool?

5    A.    Yes, I did.

6    Q.    And you would agree with that?

7    A.    I totally agree.

8    Q.    Would you agree that Celebrite would not

9          capture E-mail sent through a website using

10         Safari or Internet Explorer?

11   A.    Sure, I agree with that.

12   Q.    And couldn't that explain the fact that

13         Celebrite only identified, at least according

14         to your testimony if I understood it, 13

15         E-mails on the phone?

16   A.    It would not have captured E-mails sent from

17         a web browser, that's correct.

18   Q.    Okay.  Now, isn't it correct-- isn't it

19         correct that the .plist is a file that is the

20         equivalent to Windows registry?

21   A.    Yeah.  More like a-- yeah, I guess because

22         registry is a database of sorts that-- that

23         holds information from-- account information.

24         There's actually one called Account

25         Information plist.  But several-- just about

```
1            anything on a cell phone is contained within

2            a plist, which would-- could be attributed to

3            a registry on a Windows device.

4    Q.     And a plist file would not contain E-mail

5            content or at least-- let me back up.  501,

6            do you have that in front of you?  I'm sorry,

7            502.

8    A.     502, yes, I do.

9    Q.     Do you have that in front of you?

10   A.     Yes.

11   Q.     I'm just going to put this back.  Simply

12           referring to it.

13   A.     Um-hum.

14   Q.     And this has been admitted and you identified

15           this as the only reference that you found to

16           cheyenneandliberty@yahoo?

17   A.     Correct.

18   Q.     And that this is a plist past and then--

19           excuse me, plist and then past and then

20           just-- this particular entry or information

21           was 432 bits?

22   A.     Bytes.

23   Q.     Bytes.

24   A.     Yes.

25   Q.     Bytes, thank you.
```

629

1    A.    Um-hum.

2    Q.    Now, this file that is Exhibit 502 would not

3          contain E-mail content, correct?

4    A.    That's hard to say without being able to

5          physically examine the plist file itself.

6    Q.    Well, you and Mr. Francis pointed out that

7          the single E-mail that was Exhibit 501 would

8          actually be much larger than 432 bytes,

9          correct?

10   A.    Yes, it would.

11   Q.    And wouldn't the plist account contain basic

12         setup information?

13   A.    It has a hash identifier that is kind of a

14         unique ID to the specific event or I guess

15         the creation at one point of possibly that

16         account.

17   Q.    Now, in your report-- I think at the

18         beginning-- the second page of your report

19         your stated purpose of the examination was to

20         find any and all inculpatory and/or

21         exculpatory-- I see ESI so much can't

22         remember what it stands for.

23   A.    Electronically stored information.

24   Q.    Electronically stored information therein

25         retained, correct?

630

```
1    A.    Correct.

2    Q.    That's your stated purpose?

3    A.    Yes.

4    Q.    Did you look at anything beyond the

5          electronic evidence?

6    A.    I don't-- oh, yes.  Actually we did find the

7          Netgear router that was not seized at the

8          time of the search warrant and we examined

9          that.  But as was testified to due to the

10         consumer level natures Special Agent Beebe

11         alluded, when you shut the device off it does

12         flush out any log information.  So we were

13         unable to find any other data on that Netgear

14         device, the router device.

15   Q.    So--

16   A.    Did that answer your question?  I'm sorry.

17   Q.    It did.  That's okay.  You made me go off in

18         another direction.  So on page, I believe it

19         would be 3 of your report, you have a list of

20         items that were absent.  You would now remove

21         that Netgear router as one of those items?

22   A.    No, I wouldn't remove it because it was not

23         provided by the plaintiff.  That was my

24         statement.

25   Q.    Okay.  But your testimony now is that you
```

```
 1          have reviewed it and there was nothing of

 2          evidentiary value on it?

 3     A.   Correct.  But that's not my statement in my

 4          report.

 5     Q.   Well, I-- believe me, I'm not trying to--

 6     A.   Oh, I understand.

 7     Q.   I'm not trying to--

 8     A.   I understand.

 9     Q.   --trick you here.

10     A.   No, I know.

11     Q.   Did you review the security footage?

12     A.   I reviewed the day of the-- the search to

13          provide a-- I guess a time correlation with

14          what the defendant was reviewing on his own.

15          So knowing what time the search was actually

16          executed provided us with kind of the time

17          offset, if there was one on the security.

18     Q.   Is that the only part-- I'm sorry, you only

19          reviewed--

20     A.   Yes, that was the only--

21     Q.   --the day of the search?

22     A.   Yes, May--

23     Q.   7th?

24     A.   7th, yes.

25     Q.   Of 2013?
```

632

1    A.    Yes.

2    Q.    Would it have been of any value to you in

3          forming your opinion for you to have reviewed

4          other sections of the DVR report that may

5          have shown for one thing that the defendant

6          was actually at his home during relevant

7          times, that he was with his daughters during

8          relevant times and that he had his phone

9          during relevant times?

10   A.    Without being able to specifically identify

11         what activity was going on other than

12         inhabiting the residence, I suppose it could

13         have been beneficial, but I-- I didn't deem

14         ultimately necessary.

15   Q.    Okay.  Would you agree-- and I call it exif

16         data, I know Mr. Kearn pronounced it

17         differently and I have no idea how it's

18         supposed to be pronounced--

19   A.    That's correct.

20   Q.    --but would you agree that the exif data on

21         some of the images that were E-mailed to the

22         undercover officer in Australia, the exif

23         data was consistent with the dates and times

24         on those E-mails?

25   A.    Yes.  The data provided seemed to be.

633

```
 1    Q.   Do you-- are you familiar with the steps that

 2         you would need to take to alter exif data on

 3         an image?

 4    A.   Yes.  I've done it several times.

 5    Q.   You've done it?

 6    A.   Uh-huh.

 7    Q.   Would you agree that in order to change the

 8         exif data you would first have to have a

 9         program that could do it?

10    A.   Correct.  Either on a computer or on the

11         device itself.

12    Q.   Okay.  And you would--

13    A.   Or mobile device.

14    Q.   I'm sorry.

15    A.   That's all right.

16    Q.   And you would have to hack-- in this case you

17         would have had to have hacked into the

18         defendant's iPhone 4S to get to the pictures?

19    A.   No.  The-- the iTunes backup is certainly

20         suspect for a restoration to another device.

21    Q.   Okay.  You'd have to download the picture

22         using your program, you'd have to scrub and

23         then edit the exif data?

24    A.   Syncing the device with iTunes would

25         essentially download the data.
```

1    Q.   Okay.  And then, of course, you'd also have

2         to access the defendant's wireless internet

3         service, which was password protected?

4    A.   Well, or have access to the computer that the

5         iTunes backup, have direct access.

6    Q.   Did you find any evidence that ruled out the

7         defendant as a person who could use the-- who

8         could have sent these E-mails to Detective

9         Butler?

10   A.   Not so much ruled out as not being able to

11        rule in.

12   Q.   Okay, Mr. Doty.  Thank you.  I don't have any

13        additional questions.

14   A.   Thank you, Ms. Kenney.

15              THE COURT:  Redirect, Mr. Francis.

16              MR. FRANCIS:  Thank you, Judge.

17                  REDIRECT EXAMINATION

18        BY MR. FRANCIS:

19   Q.   Mr. Doty, I think I understood-- I heard you

20        say that exif data can be changed; is that

21        correct?

22   A.   Yes.

23   Q.   And other applications that can be obtained

24        and placed on computers and cell phones that

25        are on the internet--

635

```
1    A.    Right.

2    Q.    --to allow that to be accomplished?

3    A.    Right.  Either on a computer or on a mobile

4          device, android or Mac-- or iPhone.

5    Q.    Does it take any time at all to change the

6          data?

7    A.    No, not-- it's a fairly simple procedure.

8          It's as easy as browsing to the file--

9    Q.    Did you--

10   A.    --and clicking and change it.

11   Q.    Did you hear Mr. Kearn say that a lot of

12         people had access to his internet?

13   A.    Yes, I did.

14   Q.    Including neighbors?

15   A.    Yes.

16   Q.    I want to talk to you a little bit about this

17         report from Loehrs.  If you have that Exhibit

18         32 in front of you, could you turn to page 32

19         -- excuse me -- page 19 of Exhibit 32?  Do

20         you have that before you?

21   A.    Yes, I do.

22   Q.    And where I've highlighted that on the screen

23         is that not the same information that appears

24         in Defense Exhibit 502?

25   A.    That is correct.
```

636

```
1    Q.   And that was just a minuscule amount of
2         information that was contained on it; is that
3         correct?
4    A.   That's correct.
5    Q.   Also I want to discuss with you a comment
6         that's made in your report on page 5.  If you
7         would go to that page, please.  Do you see
8         where I've highlighted that information?
9    A.   I do.
10   Q.   Under cheyenneandliberty it says, "The search
11        resulted in over 1,000 hits and I located
12        numerous folders on both evidence items
13        indicating the E-mail had been used on both
14        items.  These E-mail folders are discussed in
15        greater detail below under each evidence
16        item."  Did I read that correctly?
17   A.   Yes, you did.
18   Q.   Did you review that report to see if
19        Ms. Loehrs ever got back to describing in
20        more detail what she put in just that couple
21        of sentences in her report?
22   A.   Yes, I re-reviewed the entire report, all 93
23        pages of it over lunch, and nowhere
24        throughout the report is that ever referenced
25        again or validated.
```

```
1    Q.   Last but not least, would you turn to page 21

2         of that report.  And I'm going to draw your

3         attention to the two paragraphs under Last

4         Access.

5                   THE COURT:  This is Exhibit 502?

6                   MR. FRANCIS:  I'm sorry, Judge,

7         we're still on Exhibit 32.  I just had him

8         compare the language on 502 with what was in

9         32.

10                  THE COURT:  I don't know-- are you

11        displaying 32?

12                  MR. FRANCIS:  I'm going to.

13                  THE COURT:  I don't believe there

14        has been an offer of Exhibit 32.

15                  MS. KENNEY:  I had not.  I was using

16        it just with the witness.  But if Mr. Francis

17        wants to offer it, I have no objection.

18                  MR. FRANCIS:  If we're just going to

19        discuss it I can do it this way.

20                  THE COURT:  That's fine.  I don't

21        mean to suggest either outcome.  But if it--

22        it needs to be admitted before it's displayed

23        itself.

24                  MR. FRANCIS:  All right.

25                  THE COURT:  Thank you.
```

638

```
 1    Q.   (By Mr. Francis)  Does it indicate in there--
 2              MR. FRANCIS:  Thank you, Judge.  I
 3         apologize.
 4    Q.   (By Mr. Francis)  Does it indicate in there
 5         that she had looked at the-- all the files on
 6         the hard drive or the disk of the computer
 7         and it appeared to her that it was last
 8         accessed on May 20, 2013 at 6:51 p.m.?
 9    A.   Yes, that's what it indicates.
10    Q.   And does it say that according to one of the
11         reports prepared by Agent Beebe on June 17,
12         2013, the Hitachi hard drive on the Acer
13         computer had been in evidence since May 7th,
14         2013?
15    A.   Yes, it indicates that.
16    Q.   So is she indicating then that sometime after
17         Agent Beebe took the computer into custody
18         that it was accessed a thousand times?  Is
19         that how you read that?
20    A.   Is that the same paragraph?
21    Q.   That's the first paragraph I just read.
22    A.   Oh.  I don't see a thousand times.
23    Q.   Well, she said it was accessed a thousand
24         times until the 20th of May.
25    A.   Oh, on the second paragraph?
```

1    Q.    In the first paragraph.

2    A.    Oh.

3    Q.    They took it into custody on the 7th of May?

4    A.    Correct.

5    Q.    And between-- and up to the 20th of May, from

6          the 7th of May, is she appearing to say that

7          it was accessed a thousand times?  Oh, I'm

8          sorry, doesn't make sense.

9                    She says a timeline analysis for the

10         computer from the 8th of May to the 30th of

11         May revealed how many files were accessed?

12   A.    She reports over 24,000 files were accessed.

13   Q.    And she said in addition she found over 7,000

14         files were created on that computer during

15         that time frame?

16   A.    Yes, that's what she reports.

17   Q.    And that's supposedly when it was in Special

18         Agent Beebe's custody?

19   A.    Yes.

20   Q.    Now, that didn't happen, did it?

21   A.    I wouldn't guess that it would based on

22         Special--

23   Q.    Did you find that the biographical data on

24         the computer was off by a number of days?

25         And by biographical I mean date and time on

1           that.

2    A.     Just being able to access the image I was

3           unable to determine.  The image, not the

4           physical device itself, the computer.  Is

5           that what you're asking or--

6    Q.     I was asking did you find that the device,

7           the computer device, had different dates on

8           it than should have been?

9    A.     Oh, I believe that was testified to or

10          submitted in a report earlier.  That was my

11          understanding, yes.

12   Q.     All right.  And based on the knowledge that

13          it had been off and that she relied on it

14          being correct, did you give much credence to

15          her report?

16   A.     No.  And also based on the failure to

17          validate the claim of 1155 references to

18          cheyenneandliberty as well.

19                   MR. FRANCIS:  No further questions.

20                   THE COURT:  Is there any more

21          examination for this witness, Ms. Kenney?

22                   MS. KENNEY:  No, Your Honor.

23                   THE COURT:  Sir, you may step down.

24                   THE WITNESS:  Thank you, Your Honor.

25                   THE COURT:  Mr. Francis, do you have

641

1      any additional evidence?

2               MR. FRANCIS:  I have one last

3      witness.

4               THE COURT:  All right.  Very well.

5      You may call him.

6               This is a stand and stretch moment.

7      It's optional.

8               If you would raise your right hand,

9      the deputy clerk will administer the oath.

10                   ANDY MERGEN,

11     called as a witness on behalf of the

12     defendant, was sworn, and testified as

13     follows:

14               THE COURT:  Sir, if you would take

15     the witness chair and adjust the chair and

16     the microphone so that we'll hear you.  And

17     then if you would, would you give us your

18     first and last name and spell your last name,

19     please.

20               THE WITNESS:  My first name is Andy,

21     my last name is Mergen, spelled M-E-R-G-E-N.

22               THE COURT:  Thank you, sir.  You may

23     proceed.

24                   DIRECT EXAMINATION

25     BY MR. FRANCIS:

642

```
1   Q.   Mr. Mergen, you're dressed in the garb of a
2        Shawnee County sheriff's deputy; is that a
3        correct assessment?
4   A.   Yes, sir.
5   Q.   How long have you been employed by the
6        Shawnee County Sheriff's Department?
7   A.   About eight years.
8   Q.   What are your duties with the department?
9   A.   I work on patrol on the second shift.  Just
10       take calls to service and reports and
11       traffic, I guess.
12  Q.   In your employment and profession as a deputy
13       sheriff, did you ever have an occasion to
14       have any discussions with Jon Kearn?
15  A.   Yes.
16  Q.   Do you recognize him?  Is he in the courtroom
17       here today?
18  A.   Yes, he is.
19  Q.   Can you identify him by what he has on
20       perhaps?
21  A.   He has a gray shirt on and a tie, I believe.
22            MR. FRANCIS:  Judge, I'll have the
23       record reflect he's identified the client if
24       I could.
25  Q.   (By Mr. Francis)  What was your purpose for
```

643

```
 1            seeing Mr. Kearn?
 2    A.    He had called the sheriff's office to make a
 3          report about something that had gone on with
 4          his daughter.
 5    Q.    Did it appear-- was it like a child
 6          molestation report?
 7    A.    That's what was reported.
 8    Q.    And was such a report made?
 9    A.    Yes.
10    Q.    And did you bring a copy of that report with
11          you?
12    A.    I did.
13    Q.    I'm going to show you what I have marked as
14          Defendant's Exhibit 503.  If you compare them
15          I'll have a question for you.  Have you had a
16          chance to look those over?
17    A.    Yes.
18    Q.    Is that a true and correct copy that I gave
19          you of the document that you brought with
20          yourself?
21    A.    Yes, it would appear to be.
22    Q.    And is that a record that's maintained in the
23          ordinary course of your business as a
24          sheriff's deputy?
25    A.    Yes, it is.
```

644

1    Q.   And does it reflect and record information

2         that is taken by your agency?

3    A.   Yes.

4    Q.   Was it transcribed at or about the time it

5         was given to you?

6    A.   Yes, it was.

7                   MR. FRANCIS:  Judge, I would move

8         for the admission of that report.

9                   MS. KENNEY:  Your Honor, I would

10        object to the admission of this report.  It's

11        not only hearsay because the witness will be

12        here to testify as to its contents, but in

13        addition to the same concerns that I raised

14        yesterday as to a different matter.

15                   THE COURT:  Can you come up, please?

16                   You can stretch while you get the

17        static.

18                   (THEREUPON, a bench conference

19        was had out of the hearing of the jury and

20        the defendant).

21                   THE COURT:  I don't have a copy of

22        this report.

23                   MS. KENNEY:  Oh, I'm sorry.

24                   MR. FRANCIS:  I thought I gave that

25        to the agent.

645

1           THE COURT:  You may have, but-- I
2      think the error is mine.
3           MR. FRANCIS:  Pardon?
4           THE COURT:  I think the error is
5      mine.  I think you provided it.  And I
6      sometimes can't find my mittens.  So this is
7      the report from April of 2012 when, just to
8      give me some context, Mr. Kearn reported his
9      suspicions that one of his daughters had been
10     mistreated in a sexual way?
11          MR. FRANCIS:  I believe it's July of
12     2012.
13          THE COURT:  Right.  And you're
14     objecting to the report, as I heard it, based
15     on hearsay, number one.
16          MS. KENNEY:  Correct.
17          THE COURT:  I'm going to overrule
18     that objection.  I think a business record
19     foundation has been laid for it.
20          MS. KENNEY:  May I--
21          THE COURT:  You may.
22          MS. KENNEY:  The problem--
23          THE COURT:  I'm not used to being
24     treated so courteously.  Have at it.
25          MS. KENNEY:  The problem is is that

646

1              although it may be a business record, a

2              business record exception isn't going to

3              allow hearsay within hearsay.

4                        THE COURT:  Okay.

5                        MS. KENNEY:  And my concern is that

6              this is a statement of the defendant that is

7              being offered by the defendant.  Again, the

8              801(d)(2) exception only applies to a party

9              opponent.

10                        THE COURT:  Well, the hearsay within

11             hearsay objection I did not-- can I have a

12             moment to read this so that I can catch up?

13                        MS. KENNEY:  Sure.

14                        THE COURT:  You guys can stay right

15             there.  And so the hearsay at the second

16             level that is the subject of your hearsay

17             within hearsay is what?

18                        MS. KENNEY:  Well, it is--

19                        THE COURT:  I understand that you

20             contend the report itself is hearsay.

21                        MS. KENNEY:  Right.

22                        THE COURT:  That objection I think

23             I've dealt with--

24                        MS. KENNEY:  Right.

25                        THE COURT:  --overruling it as a

647

1          business record.

2                    MS. KENNEY:  Well, and my concern

3          with the report coming in on top of the

4          witness testifying to it, I mean, first of

5          all, this is his reporting.  And unless he

6          can't remember the event, then the report

7          would be cumulative of his testimony.  But

8          the hearsay concern I have is that these are

9          statements of the defendant that is being

10         offered by the defendant.  The statements to

11         the officer are being offered by the

12         defendant.  And, Your Honor, the bottom line

13         is I don't believe the report is helpful and

14         just unduly duplicates this witness's

15         testimony.

16                    MR. FRANCIS:  Judge, I had not

17         anticipated asking questions about what was

18         reported.  I wanted to get before the jury

19         that there were claims of molestation and he

20         just didn't take a picture of his child.  He

21         went to the sheriff's officer and made a

22         report and that's my only reason.  Although

23         he did bring with him an attachment to his

24         report that I was unaware he had and that is

25         he did have a copy of the recorded statement

1              also that I had mentioned.

2                        THE COURT:  He has an electronically

3              stored copy of the recorded statement by the

4              girl?

5                        MR. FRANCIS:  Yes, they have one in

6              evidence.  He didn't bring it with him but

7              it's on an evidence custody sheet that's

8              appended to the report that he brought with

9              him, and I was going to ask him about if he's

10             got a copy of it.

11                       THE COURT:  Yeah.  I'm going to

12             overrule the objection.  I don't-- in my-- as

13             I understand the nature of the offer, this

14             evidence is not being offered to prove the

15             truth of the matter asserted that the little

16             girl was molested or to prove the truth that

17             she told Mr. Kearn that.  It's being offered

18             to prove that he made a report, that he took

19             the physical act of calling this witness-- or

20             actually calling his office, and eventually

21             having a conversation with this witness in

22             which he presented his existing view that his

23             daughter had been or may have been molested.

24             And I think that conversation is not being

25             offered for the truth here.  And so I'm going

1          to overrule the objection.

2                    MS. KENNEY:  Thank you.

3                         (THEREUPON, the following

4          proceedings were had in the presence and

5          hearing of the jury and the defendant).

6                    THE COURT:  All right.  Mr. Francis.

7                    Our apologies for the delay.

8                    Mr. Francis, you may continue.

9                    MR. FRANCIS:  I presume this is

10         admissible at this time?

11                   THE COURT:  I'm sorry.  We left off

12         with you offering Exhibit 503.

13                   MR. FRANCIS:  Yes, sir.

14                   THE COURT:  And that exhibit is

15         received in evidence.

16                   MR. FRANCIS:  Thank you, sir.

17                   MS. KENNEY:  Your Honor, there is

18         one concern and that is that the exhibit as

19         is needs to be redacted.

20                   THE COURT:  Yeah.  And I think what

21         we will do is proceed with the examination

22         and we'll substitute one that has-- that

23         addresses the privacy concerns that our rules

24         requires to deal with.  We do that during a

25         break and not keep the jury waiting.

1                    MR. FRANCIS:  That's fine, sir.

2    Q.   (By Mr. Francis)  Deputy, let me ask you,

3         what date did you take that report?

4    A.   April 30th of 2012.

5    Q.   April 30 of 2012?

6    A.   Correct.

7    Q.   And I believe you told me when we were in the

8         hallway and you showed me your report that

9         you brought with you, you had a page appended

10        to your report that I don't have on mine.

11        Could you tell me what that page was?

12   A.   Yes.  That was a property receipt.  It would

13        have been a digital copy of a recording that

14        he-- Jonathan had given to me.

15   Q.   Of a recorded-- of a recording?

16   A.   Yes.

17   Q.   All right.  So he gave you a recording of

18        comments made by whom?  Was it the daughter?

19   A.   His daughter.

20                   MR. FRANCIS:  I don't have any

21        further questions.

22                   THE COURT:  All right.  Ms. Kenney,

23        cross-examination?

24                   MS. KENNEY:  Yes, Your Honor, just

25        very briefly.

1                        CROSS-EXAMINATION

2         BY MS. KENNEY:

3    Q.   Deputy Mergen, do you have any training, and

4         whether that be the academy or subsequent, in

5         the investigation of child abuse crimes?

6    A.   Nothing specific other than just standard

7         investigation.

8    Q.   Were you ever taught any safeguards

9         specifically to interviewing children?

10   A.   I understand that safe talks are done to be

11        easier on the children during that

12        investigation.  I did not do that.  I offered

13        that to him as what that needs to take place

14        and that a detective would be involved with

15        that.

16   Q.   So even as a trained law enforcement officer

17        you yourself would not conduct a safe talk

18        with a small child?

19   A.   Not unless there was immediate need for it to

20        be done.

21   Q.   And in this case do you know whether or not a

22        safe talk was conducted?

23   A.   I was not present when-- during one, no.

24                  MS. KENNEY:  I don't have any

25        additional questions.

1          THE COURT:  Any redirect?

2          MR. FRANCIS:  I have nothing

3     further, Judge.

4          THE COURT:  All right.  Sir, you may

5     step down.

6          May this witness be released?

7          MR. FRANCIS:  Yes, he may.

8          THE COURT:  All right, sir.  You're

9     free to go and you're released from your

10    subpoena.

11         Mr. Francis, do you have any

12    additional evidence on behalf of the

13    defendant?

14         MR. FRANCIS:  No, sir.  The defense

15    rests.

16         THE COURT:  Very well.  Can I see

17    you for just a moment for a scheduling

18    discussion?

19         Put up with a little static.  It may

20    save a little wear and tear on your tires on

21    the in and out of the courtroom.  So give us

22    just a second.

23              (THEREUPON, a bench conference

24    was had out of the hearing of the jury and

25    the defendant).

1              THE COURT:  All right.  So you've

2      rested on your evidence.  Do you have a

3      motion to make at this time?

4              MR. FRANCIS:  No, I don't, Judge.

5      Not one I think would fly.

6              THE COURT:  And do you have rebuttal

7      evidence?

8              MS. KENNEY:  I don't think so.  I

9      would like just a brief conversation with my

10     examiner.  But I don't think so, Your Honor.

11             THE COURT:  It's pretty early to

12     have a break but we better have one anyway

13     because I think what we will learn is if you

14     don't have any rebuttal we would proceed to

15     the instructions conference, and I would

16     think we could get them instructed and argue

17     the case today.

18             MS. KENNEY:  I think so.

19             THE COURT:  Is that consistent--

20             MR. FRANCIS:  I'd be pleased to do

21     that.  We're way ahead.

22             MS. KENNEY:  And, Your Honor, if I

23     could just step out in the hall, maybe five

24     minutes, maybe not that long.  Keep the jury

25     close.

1              THE COURT:  Why don't I tell them to

2       hang around, recess, I'll send them out, hang

3       around the jury room for five minutes.  We'll

4       be able to give them a fuller estimate at the

5       end of that time.

6              MR. FRANCIS:  All right.

7                 (THEREUPON, the following

8       proceedings were had in the presence and

9       hearing of the jury and the defendant).

10             THE COURT:  Well, ladies and

11      gentlemen, to make up for the late breaks

12      that I've given you now we're going to give

13      you an earlier break today.  And here's how I

14      would like to leave the timing.  Just a

15      little bit of work that the lawyers need to

16      do to determine whether we've completed all

17      the evidence or whether there's a little bit

18      more to do.  So that will take four, five,

19      six minutes.  If you could just hang in

20      earshot of the jury room.  If the evidence is

21      all in, then we need to do a little legal

22      work that you're not required to sit here for

23      and you could be released for a longer break

24      and then we would come back at the end of the

25      that break, probably on the nature of 20 or

655

1      25 minutes, we would-- I would read the

2      instructions to you and we would-- you would

3      hear closing arguments from the parties.  So

4      if you could just idle nearby.  In five

5      minutes Ms. Garrett will give you a truer

6      report on exactly how long this break is

7      going to be.

8             The evidence may be completed, it

9      may not, but until we're sure that you've

10     heard all the evidence and you've heard

11     instructions and the parties' arguments the

12     admonition not to talk about the case, even

13     among yourselves, not with any third parties,

14     all remain in effect.  Stay on your good

15     behavior and behave consistently with your

16     oath.  Thank you very much for your patience

17     with us.  We'll be in recess.  Stay nearby

18     and we'll get you an update.

19             (THEREUPON, the following

20     proceedings were had in the presence and

21     hearing of the defendant).

22             THE COURT:  You take your time.  You

23     have a conversation with your brain trust and

24     if you'll let Ms. Garrett know whether we're

25     going to do more evidence, then I'll come

656

1          back on the bench.  And whether it's to hear

2          that witness or to do the instruction

3          conference, we'll distribute-- have we

4          distributed a copy of the set that we're

5          going to argue from?

6                    THE LAW CLERK:  No, we will.

7                    THE COURT:  We will give you that

8          and if we're going to move to the instruction

9          conference you're going to need a little bit

10         of time to review the set that we'll argue

11         from.  So will you update Ms. Garrett,

12         Ms. Kenney, when you know whether you're

13         going to call an additional witness, and

14         we'll distribute the proposed instruction at

15         this time.

16                    Very well.  We'll be in recess for

17         the time being.

18                    (THEREUPON, a recess was

19         taken).

20                    (THEREUPON, the following

21         proceedings were had in the presence and

22         hearing of the defendant).

23                    THE COURT:  Please keep your seats.

24         All right.  Counsel, you have, I believe, a

25         set of the Court's proposed jury instructions

1           which has been filed on CM/ECF and docketed

2           as document 91.  And so I would-- let me just

3           as an overview find out whether there are

4           discussions about any of these and then I

5           will simply let you take me through the

6           document and hear any objections you want to

7           present or preserve.

8                     But are there any sort of general

9           discussion items we should have before we get

10          to the record making of the instructions

11          conference?

12                    MS. KENNEY:  Your Honor, just to

13          share with you, I think both Mr. Francis and

14          I-- I'm sorry-- were-- and I know that this

15          was my language because I submitted the

16          instruction.  But on the definition

17          instruction-- I can't put my finger on it

18          right now.  There's a paragraph in there that

19          talks about joint-- it's Instruction Number

20          15.

21                    THE COURT:  Yes.

22                    MS. KENNEY:  And on page 19 of that

23          instruction there's this paragraph about

24          possession may be sole or joint.

25                    THE COURT:  Yes.

658

1              MS. KENNEY:  And that may not really

2     apply under the facts of this particular

3     case.  We-- neither of us have a strong

4     opinion about it one way or the other, but--

5              THE COURT:  So the thinking -- and

6     I'll hear from you in just a moment,

7     Mr. Francis -- is the paragraph that begins,

8     "The law also recognizes that possession may

9     be sole or joint," really doesn't have a role

10    in this case and for clarity's sake it might

11    be appropriate to strike that paragraph?

12             MS. KENNEY:  Yes.

13             THE COURT:  Mr. Francis, what's your

14    view?

15             MR. FRANCIS:  I concur, Judge.

16             THE COURT:  All right.  Then what I

17    will do is I'm going to strike that first

18    paragraph on page 19.  And so that

19    instruction will skip from the paragraph that

20    begins, "A person who," on page 18 and then

21    we'll skip to, "You may find that the element

22    of possession," as shown on page 19.

23             MR. FRANCIS:  Judge, you might want

24    to-- you have a clause, "either alone or

25    joint with others," that you might address on

659

1                  that.

2                       THE COURT:  You've lost me.

3                       MR. FRANCIS:  On page 19.

4                       THE COURT:  Yes, sir.

5                       MR. FRANCIS:  The very last clause

6       is, "either alone or jointly."  "You may find

7       the element of possession as that term is

8       used in these instructions was present at the

9       time beyond a reasonable doubt."  Possession

10      period, I think.

11                      THE COURT:  In that instruction at

12      the word possession striking "either alone or

13      jointly with others"?

14                      MR. FRANCIS:  I think that would

15      mesh with what you've done.

16                      THE COURT:  Makes sense to me.

17                      Ms. Kenney.

18                      MS. KENNEY:  I would agree, Your

19      Honor.

20                      THE COURT:  All right.  Then

21      Instruction 15 will be modified in the

22      fashion we've just discussed.

23                      Other general discussion items that

24      you have found that we ought to talk about

25      before we make the record on objections?

1              MS. KENNEY:  Honestly, Your Honor, I

2       had-- there's nothing else that Dreux my

3       attention.

4              THE COURT:  Mr. Francis.

5              MR. FRANCIS:  I don't have any

6       objection.  But I did have a-- I guess it's

7       more of a question because I haven't seen it

8       before.  But on the verdict form, is this a

9       unanimous verdict, yes or no, is that kind of

10      a preemptory challenge-- or polling of the

11      jury type thing?  I've not seen that before.

12      I don't have any objection to it.  It's the

13      last page and it's--

14             THE COURT:  You have not seen it

15      before, that's interesting to me.

16             MR. FRANCIS:  I don't object to it,

17      Judge.  I was just curious.  I hadn't seen it

18      before.  Didn't know if that was a substitute

19      for a poll.

20             THE COURT:  You know, I think it may

21      be a residue of a conspiracy trial.  Well,

22      I'm interested in your views because there's

23      a world of experience out there in the

24      criminal practice.  Is it your preference

25      that that question remain in or come out?

1           Ms. Kenney?

2           MS. KENNEY:  I don't have a

3     preference, Your Honor.

4           THE COURT:  Mr. Francis?

5           MR. FRANCIS:  I don't either, Judge.

6     I was just asking out of curiosity because I

7     hadn't seen it before.  You can leave it in.

8           THE COURT:  I think I will.  It will

9     at least highlight the importance of

10    unanimity and so I think I'll leave it in.

11    And so what I'll do is, Mr. Hinderks, can you

12    run and make these final changes, come back

13    out, we'll make our record on apparently the

14    absence of objections.  Let me think about

15    this.  Well actually, I'd rather do the

16    instructions conference from this set because

17    it's of record on CM/ECF.  But can you go

18    ahead and make those changes and finalize the

19    instructions?

20          So let me ask you now formally,

21    Ms. Kenney, does the United States have

22    objections to the proposed-- the Court's

23    proposed jury instructions as reflected in

24    document 91, understanding that we have made

25    the changes jointly approved by the parties

1          on page 19?

2                    MS. KENNEY:  With that

3          understanding, no objection, Your Honor.

4                    THE COURT:  All right.  And,

5          Mr. Francis, does Mr. Kearn have objection to

6          any of the instructions that are reflected in

7          document 91, again understanding that the

8          changes jointly requested by the parties will

9          be made to page 19, a part of Instruction 15?

10                   MR. FRANCIS:  No, sir.

11                   THE COURT:  All right.  And then

12         I'll ask you separately on the verdict form.

13                   Ms. Kenney, does the United States

14         have an objection to the verdict form that

15         will be-- that is proposed as part of

16         document 91?

17                   MS. KENNEY:  No objection.

18                   THE COURT:  And, Mr. Francis, the

19         same question to you.  Does Mr. Kearn have

20         any objection to the verdict form that is

21         shown by document--

22                   MR. FRANCIS:  No, sir.

23                   THE COURT:  --91?

24                   MR. FRANCIS:  No.

25                   THE COURT:  All right.  So

663

1           Mr. Hinderks will make that one change-- or
2      the change on that one page.  We'll get a set
3      to hand to you.  And so that you'll know what
4      I plan to do is not to delay to make 14 sets
5      because that will take upwards of an hour.
6      Ms. Garrett will display the instruction as I
7      read them because it is, of course, a
8      fascinating thing for everyone to do to
9      listen to someone read the instruction.  But
10     I do think that the display of it will make
11     it more engaging for the jury.  And then as
12     soon as I finish those instructions I will
13     turn to you for your closing argument.
14               And so that I have the timeline
15     down, Ms. Kenney, you want to do-- you plan
16     to do no more than 30 in a 20 and a 10
17     segment?
18               MS. KENNEY:  That's my goal.
19               THE COURT:  And do you want me to
20     give you a notice or the 20-minute-- or on
21     either part of it for that matter?
22               MS. KENNEY:  No.  If the Court
23     would-- on the second half if I'm getting
24     close if the Court would let me know, but on
25     the first part I'm fine with whatever I use.

664

1                    THE COURT:  So with two minutes left

2          on the last--

3                    MS. KENNEY:  Yeah, that would be

4          great.

5                    THE COURT:  Mr. Francis, do you want

6          a wake-up call from me on your 30 minutes?

7                    MR. FRANCIS:  Yes, if I could.

8                    THE COURT:  What would you like?

9                    MR. FRANCIS:  If you would give me

10         two.  But I sincerely do not believe I'll go

11         that long.

12                   THE COURT:  All right.  We'll get

13         the instructions finalized and when the

14         jury's reassembled we'll bring them back in,

15         I'll instruct, and then we'll hear from you

16         on your arguments.

17                    Thank you, counsel, for your

18         terrific preparation and processing the case

19         so quickly.  I'm really grateful for it.

20         We'll be in recess until then.

21                        (THEREUPON, a recess was

22         taken).

23                        (THEREUPON, the following

24         proceedings were had in the presence and

25         hearing of the defendant).

1                    THE COURT:  Please be seated.

2                    Just to complete our record,

3         Ms. Kenney, can I ask you formally to state

4         whether the government has rebuttal evidence

5         it wishes to present?

6                    MS. KENNEY:  We do not, Your Honor.

7                    THE COURT:  Very well.  Thank you.

8                    The parties have been provided the

9         instructions that the Court, based on our

10        instructions conference, plans to give to the

11        jury.  It was my intention that they reflect

12        the changes, plural, to document 91 that we

13        used in our instruction conference.  Have you

14        had an opportunity to do that comparison?

15                   MS. KENNEY:  Yes, Your Honor.

16                   THE COURT:  And can you tell me, do

17        you agree that the set that's been

18        distributed as the jury instructions conforms

19        to the parties' positions as stated at the

20        jury instruction conference, Ms. Kenney?

21                   MS. KENNEY:  Yes, Your Honor.

22                   THE COURT:  And, Mr. Francis?

23                   MR. FRANCIS:  I concur.

24                   THE COURT:  All right.  Very well.

25        Then I will ask Ms. Garrett to bring in the

666

1      jury and I will start the instructions and

2      then I will turn to you for argument.

3                  (THEREUPON, the following

4      proceedings were had in the presence and

5      hearing of the jury and the defendant).

6                  THE COURT:  Ladies and gentlemen,

7      please be seated.  Members of the jury, the

8      parties have confirmed that they have

9      completed their presentation of the evidence,

10     and now it is time for me to give you the

11     Court's instructions in this case.  By both

12     tradition and rule, the instructions are read

13     aloud.  It is not on the premise that the

14     jury cannot read, but that is the tradition

15     and the premise.  And to make it a little bit

16     more engaging Ms. Garrett will display the

17     jury instructions to you as I read them.  So

18     Instruction Number 1.

19                  (THEREUPON, the jury

20     instructions were read in open court).

21                  THE COURT:  These are the Court's

22     instructions to you and I am signing them at

23     this time and you will have them in the jury

24     room.  In addition, you have a verdict form

25     which I will not read to you but it has four

1          questions for you to answer and it will be

2          attached to the instructions when you receive

3          them.

4                  All right.  Let me ask, Ms. Kenney,

5          do you have any objection to the manner in

6          which the instructions were read to the jury?

7                  MS. KENNEY:  No, Your Honor.

8                  THE COURT:  And do you, Mr. Francis?

9          Do you have any such objections?

10                 MR. FRANCIS:  No, sir.

11                 THE COURT:  All right.  With that,

12         we will proceed to the parties' closing

13         argument.

14                 Ms. Kenney, you're recognized and

15         you may proceed.

16                 MS. KENNEY:  Thank you, Your Honor.

17         If we could have just a moment?

18                 THE COURT:  Yes.

19                      CLOSING ARGUMENTS

20         BY MS. KENNEY:

21                 May it please the Court, counsel,

22         members of the jury.  Now is the part of the

23         trial where we turn this case over to you.

24         And now is your opportunity to examine all

25         the evidence, to apply the law as the Court

1        has just instructed you to that evidence, and

2        return a verdict based on the law and

3        evidence.

4                Now, in addition to the evidence and

5        the law, you take back to that jury

6        deliberation room one very important tool.

7        And that is your common sense.  As you

8        deliberate you should ask yourself:  Does

9        this make sense?

10               Now, I should have warned you in

11       opening, I should have done a better job

12       giving you an idea of how tedious the

13       evidence in this case was going to be to get

14       through.  But it was not complicated.  And

15       since this was a short trial and you will

16       have the exhibits when you go back into the

17       jury room, I won't spend too much time now on

18       the facts of this case.

19               Now, I suggest to you that there are

20       several key items for you to consider in your

21       deliberation.  One, the dates and times that

22       the E-mails were sent.  Two, the exif data

23       from the E-mails' images.  Three, the IP

24       address on some of those images.  Four,

25       evidence that was found on the defendant's

1          iPhone 4S.  And five, the clips and the

2          videos that were taken from the defendant's

3          surveillance system.

4                  Now, this is an example of what I'm

5          talking about, Exhibit 1 and 18.  And you

6          heard Agent Casner testify how she spent time

7          reconciling the different dates that we have

8          recipients of these E-mails in Australia, 14

9          or 15 hours difference.  We have the Topeka

10         times and then we have the Topeka time in

11         standard time or Daylight Savings Time.  Plus

12         there was a Greenwich Mean Time that was on

13         the Yahoo exhibits.

14                 So here we have the first-- the very

15         initial E-mail sent to Detective Sergeant

16         Butler in Australia, "Dad of four, found you

17         in Image Source, be fun to talk, swap or

18         whatnot."  And you may remember Exhibit 18

19         was the video clip that showed the

20         defendant's four daughters leaving the house,

21         the defendant following behind and spending a

22         fair amount of time on a smartphone or device

23         before he also exits the residence.

24                 Now there's not going to be a video

25         clip to correspond with every one of the

670

1    E-mails.  But there is, for example, several

2    images that you should look to on the date of

3    April 28th.  On April 28th there were six

4    E-mails sent, including the four E-mails that

5    were sent using the defendant's home IP

6    address.

7            Now, this is-- I believe the

8    testimony was that the defendant had come

9    home with one of his daughters, he'd come

10    back out on the porch, and for about nine

11    minutes he's out on the porch with his phone

12    smoking.  During that time period Exhibit

13    1-4, 1-5, 1-6, which were the E-mails that we

14    now know are-- contain the pictures that the

15    defendant took of his

16    four-and-a-half-year-old daughter, these

17    E-mails were sent to Detective Butler from

18    the defendant's home IP address.

19            I mentioned the exif data.  If you

20    look at the exif data on the photographs for

21    which there was exif data, you're going to

22    find that that exif data corresponds very

23    closely in date and time to the date and time

24    of the E-mails that were sent to Detective

25    Butler.  We've noted on all of these that the

1          item was sent-- or excuse me, the picture was

2          taken using an iPhone 4S.

3                    And this is the fourth E-mail that

4          was sent during this time frame from the

5          defendant's home IP internet account and this

6          is the E-mail that doesn't have a picture

7          attached, it's just the message that says,

8          "Just took a couple."

9                    Now, later that day on April 28th --

10         and as I mentioned, during this time frame it

11         wasn't just these four E-mails, there were a

12         couple of other E-mails sent during this time

13         frame -- later that day on April 28th we see

14         -- and this is just one of the still clips --

15         we see the defendant leaving the house with

16         his daughters at 1306 hours, which is 1:06 in

17         the afternoon.  And you see the dress that

18         the youngest daughter is wearing.  You see

19         the dress.  We have not taken this out of the

20         bag.  You may do so.  There's no reason other

21         than you're able to see the color of the

22         dress and you heard Agent Casner testify that

23         this is the same dress.

24                    About an hour and 20 minutes later

25         Detective Butler-- or I should say this

1          E-mail, Exhibit 1-9, is sent to Detective

2          Butler and it's a picture of the three girls

3          on the front porch and you see the youngest

4          daughter wearing the same outfit that she was

5          wearing as she exited her home with her dad.

6          The pink boots, the leggings, and the dress.

7          The exif data on that picture corresponds

8          very closely to the date and the time that

9          the E-mail was sent to Detective Butler.

10              We see later that afternoon the time

11         stamp on the DVR, the 3:30, we have learned

12         that that is an hour off.  So this would be

13         2:30 in the afternoon.  We see the defendant

14         returning home.  I would suggest to you that

15         it appears he once again has his phone in his

16         hands as he's walking into the house.  And he

17         testified, he told you that that was his

18         routine, that he would have his phone and he

19         would be on his phone.

20              Shortly after this, at 2:32, an

21         E-mail is sent to Detective Butler, "Well, I

22         think we are far away from each other, like

23         way far.  Can I see some pics of your little

24         sweeties there?"  We see-- if we look a

25         little further into the DVR, we see the

673

1          defendant leaving the house at 6:17 p.m. with

2          his youngest daughter wearing virtually the

3          same outfit except now she has on a

4          multicolored jacket and the pink cowboy

5          boots.

6                    We see the defendant return and from

7          about 6:54 to 6:57 he is going back and forth

8          from the front porch.  And then at 6:57 an

9          E-mail is sent to Detective Butler containing

10         a picture of the defendant's youngest

11         daughter wearing the pink cowboy boots

12         without the leggings.  You can make out the

13         jacket and you can make out the little red

14         dress.

15                    Now, we know that on April 28th the

16         defendant was with his daughters and in

17         possession of his iPhone 4S.  We know that

18         the dress the youngest child was wearing all

19         day matches what was in those E-mails.  We

20         know that the four E-mails sent using the

21         defendant's AT&T IP address assigned to his

22         house was sent-- the four E-mails were sent

23         from that IP address while the defendant was

24         at his house.

25                    And we know that all the E-mail

1       images except the three of the youngest

2       daughter laying on her bed were found on the

3       defendant's password protected iPhone in a

4       password protected app.  We know that all the

5       images were taken with the same phone as the

6       defendant's.  We know that the exif data on

7       most of the April 28th images closely

8       corresponds to the date and time that the

9       E-mails were sent.  And we know that it is

10      the defendant's hand holding back the diaper

11      and taking the picture of his youngest

12      daughter that was E-mailed to Detective

13      Butler.

14              We know that the bed sheet and the

15      comforter as seen in the images E-mailed on

16      April 28th were found during the execution of

17      the search warrant in the master bedroom.  We

18      also know-- I'm sorry, this is-- the password

19      protected app was

20      com.galaxystudio.pictureprivacy.  And if you

21      look at Exhibit 23, page 6 is just an example

22      of the images that were found in that

23      password protected app.

24              We also know that two short video

25      clips of the defendant's youngest daughter

1          were also found in this password protected

2          app on the defendant's password protected

3          iPhone.

4                    Now, I want to back up and discuss

5          just a little bit about the definition of

6          what is sexually explicit conduct and what it

7          is that you have to find in order to find the

8          defendant-- that these images meet the

9          definition of sexually explicit conduct and

10         that the defendant is guilty of producing,

11         distributing, or possessing images that meet

12         the definition.

13                    And you're told that sexually

14         explicit conduct is the lascivious exhibition

15         of the genital or pubic area of any person.

16         The factors to consider are the context and

17         the setting in which the genitalia or pubic

18         area is being displayed.  And in this case

19         many of the pictures were taken in the

20         bedroom, the overall content of the material,

21         the focal point of the visual depiction on

22         the minor's genitalia or pubic area.

23                    Clearly in Exhibit 1-4, the picture

24         that has the defendant's hand in it, clearly

25         that is-- the focal point is the young girl's

676

1           pubic area.  Clearly in the two video clips

2           of the defendant's youngest daughter the

3           focal point of those videos is on that

4           child's pubic area.  Whether the setting of

5           the depiction is such as to make it appear to

6           be sexually inviting or suggestive, again the

7           bedroom scene, the picture bending over the

8           backseat of the car, these are all factors

9           for you to take into consideration.

10                    Whether the minor appears to be

11          displayed in an unnatural pose.  Whether the

12          minor is partially clothed or nude.  Whether

13          the depiction appears to convey sexual

14          coyness or apparent willingness to engage in

15          sexual activity.  And whether the depiction

16          appears to have been designed to elicit a

17          sexual response in the viewers.

18                    You do not have to find all of these

19          factors to find any one of these images meets

20          the definition of sexually explicit conduct.

21          And I would suggest to you that you can take

22          into consideration the context of the E-mail,

23          the conversations that were occurring between

24          Detective Butler and cheyenneandliberty to

25          decide whether or not these images meet the

1           definition of sexually explicit conduct.

2                      Now, I will have another opportunity

3           to speak with you again before you begin your

4           deliberations.  But based on all the

5           evidence, I would ask that you find the

6           defendant guilty of the three charges against

7           him.

8                      THE COURT:  Mr. Francis, we'll now

9           recognize you.

10                     MR. FRANCIS:  I'm going to need the

11          ELMO.

12                     THE COURT:  Ms. Garrett, may I ask

13          you to help, please.

14                     MR. FRANCIS:  I'm going to get an

15          exhibit, if I might.

16                     THE COURT:  Sure.  Will you be

17          needing Ms. Garrett's assistance with the

18          ELMO during your argument?

19                     MR. FRANCIS:  I should not.

20                     THE COURT:  Okay.

21                         CLOSING ARGUMENTS

22          MR. FRANCIS:

23                     Ladies and gentlemen, on behalf of

24          myself and my client and Ms. Kenney and the

25          staff and Court's staff I do appreciate your

1        patience and your understanding and the

2        attention that you're giving this case.  It's

3        most important to Jon, as you, I'm sure, are

4        aware.

5              There is no question that Jon Kearn

6        took the picture of his daughter with the

7        diaper exposing the vaginal area and there's

8        no question that Jon took the videos.  He

9        told you as much.  We told you that that was

10       going to happen in opening statement.  And

11       the reason that he did that was to preserve

12       potential evidence of her condition because

13       of allegations that she had made of being

14       molested by her mother's current boyfriend.

15       That would be Jon's ex-wife's boyfriend.

16             Jon told you that he did not take

17       her to the hospital because it was his

18       understanding that the hospital would be more

19       intrusive and that might be more of a problem

20       for the child than what he wanted to impose

21       at that time and that's why the pictures were

22       taken.

23             What did he do with it?  Well, what

24       he did with it is what Deputy Sheriff Mergen

25       told you that he did.  That is, he took it to

679

1          the sheriff's department and he reported a

2          possible sexual abuse of a child.  And when

3          did that happen, ladies and gentlemen?  When

4          did he report this?  Well, if you look over

5          in the upper left-hand corner you can see

6          that it was on the 30th, in the center, is

7          when it was reported.  But it occurred on the

8          27th through the 30th of April of 2012.  So

9          these pictures that went out to the officer

10          on the 28th of April, 2013 must have been

11          some kind of an anniversary date.

12                   But coincidences like these just

13          don't happen.  And he did not take these

14          pictures to have them published in a federal

15          court nor did he take these pictures to have

16          them sent to Australia and become involved in

17          child pornography.  He took them because his

18          daughter had been molested, and he told the

19          sheriff that.  And also the deputy told us

20          that he got something-- brought something to

21          court that I didn't have in my exhibit that I

22          gave to him and that's an evidence custody

23          sheet of the recorded statement of the child.

24          So Jon did not take that picture, according

25          to the testimony, for the purpose of sexually

680

1          exploiting the child.

2                    And what a coincidence that it would

3          be an anniversary date, a year to the day

4          almost since this happened.  Well, his lawyer

5          told him that he ought to make a report and

6          he did.  And as I said and as the sheriff

7          said, that got over to the sheriff's

8          department.  It's in their custody right now.

9          But what he did not do is he did not send

10         those pictures out and he did not send those

11         videos out.  He was unaware that there was

12         any child pornography on his phone and the

13         first time he saw those photos was yesterday,

14         the very same time you saw those photographs.

15                   That's the first time he saw that

16         child pornography appearing on his phone

17         other than the pictures that he had taken of

18         his own children, which was not taken for the

19         purpose of child pornography and is not child

20         pornography, I submit to you.

21                   Now, the government is also dwelling

22         upon this cheyenneandliberty@yahoo.com E-mail

23         address.  And that's a reason to focus on

24         Exhibit 501 that we presented a little bit

25         earlier today.  And the particular language

1              in that is the language where it says-- oh,

2         and by the way, this was sent on the 27th of

3         December, 2012 at 9:30 in the morning.  If

4         you go to Exhibit 2 of the government's

5         you'll find out that this was sent almost

6         immediately after that account was opened on

7         December 27th, 2012.  Almost immediately

8         after that was opened.

9              And the language that is interesting

10        is-- in here is, "Sometimes your dad is on

11        the cell phone so I can't send you stuff on

12        it unless I know it's you who is on it."  How

13        in the world would anyone know who was on a

14        cell phone unless they could see the person

15        on the phone?  If you had one cell phone

16        between the 14 of you and someone was to call

17        and didn't want one of the 14 of you to know

18        and had no way of knowing who was going to

19        answer the phone, one would suspect they

20        would be reluctant calling you.  But if the

21        call was made by another of you in the 14

22        that actually could see who had the cell

23        phone, there would be no reluctance.

24             And that gets us down to another

25        question that has arisen.  How did

682

1          silverknight know when Cheyenne's dad would

2          be on the phone?  And keep in mind Agent

3          Casner told you she did no investigation of

4          this silverknight, this Ben Parker.  And she

5          knew that he existed out there because she

6          had seen that E-mail, that it was sent there.

7                    But the thing you need to consider

8          also, I submit to you, is that Yahoo's

9          records, this Exhibit 2, will show you that

10         there's traffic and exchanges of E-mails on

11         that address from the 27th of December up

12         through the 20th or so of January.  Well,

13         what's the deal about that?  Because it stops

14         and then it doesn't start again until April.

15         So whoever is using that has just given up on

16         it.  Well, if it's Jon, Jon's still there.

17         Jon, if he was using that E-mail address,

18         would have no reason to stop.  If Cheyenne,

19         his daughter, or Liberty, his other daughter,

20         was using it, they were still there.  Why

21         would they stop?  There's no reason to.

22                    The coincidental thing again, like

23         the anniversary date of the films that were

24         taken before, is that Bob is gone.  Bob's

25         been kicked out of the house and moved down

1      the street two doors with the guy who was

2      fired.  Bob is the one who set everything up.

3      He put all the passwords on the phones.  He

4      put the passwords on the computers.  He set

5      up the alarm system.  He set up the security

6      system.  And if anybody's around that might

7      be able to see what's going on, a guy who

8      would come in between 4 o'clock and 7 o'clock

9      in the morning, he's a night owl, might be

10     that person.  And you can consider that also.

11              Because, remember, the E-mail says,

12     "I don't want to call you unless I know you

13     have the phone and it's not your dad."  So if

14     it's going to be somebody who has to see

15     that, then I submit to you it's somebody in

16     that neighborhood who knows those computers,

17     who knows how to get into them, and can see

18     when people are coming and going in that

19     house.

20              The activity stops until sometime in

21     April.  It's almost like you're led to

22     believe that Jon says to himself sometime in

23     April, I think I'm going to enter the dark

24     world of child pornography.  You know,

25     there's all this child pornography that's

684

1      supposedly on his phone, but when does it all

2      pop up?  It pops up in April.  One would

3      think if there was child pornography that he

4      was involved with, it might go back before

5      more than a week or so that these E-mails

6      starting going on.

7                But there's no evidence of any dates

8      going back past April of 2013.  So at the

9      time all of the E-mails start going down to

10     Australia all the E-mails pop up on his

11     phone.  Jon has told you he was not aware

12     that was on his phone, did not know it was on

13     his phone, did not send that stuff out, did

14     not download that stuff.

15               Again, the picture that was taken of

16     his daughter that is offensive, supposedly,

17     was not taken with an offensive attitude.  It

18     was taken with the idea that he was going to

19     report it to the sheriff.  Which he did.

20               There are some things that you do

21     not have before you to consider and we've

22     talked about that with not only the law

23     enforcement people but also with Mr. Doty.

24     You don't have the AT&T broadband service

25     records for the account on Taylor Street and

685

1        you don't have the phone records.  Those of

2        you who have cell phones I'm sure have seen

3        the amount of the paperwork that can come

4        with a cell phone record at the end of the

5        month showing all the calls, all the text

6        messages, all the E-mails that you've made

7        unless it's truncated and shortened down.

8                You don't have cell phone tower

9        records.  You don't have a Celebrite report

10       from the law enforcement people on the other

11       cell phones that were present.  The police--

12       although Mr. Doty agrees that once that

13       Netgear router was unplugged we lose the

14       information that's on it, Agent Beebe said

15       that he had equipment where they could pull

16       that off of there, but for some reason chose

17       not to do that.  So that's something else

18       that was not done.

19                Again, as Mr. Doty testified, he

20       searched Jon's phone records that were on the

21       mirror image held by law enforcement, could

22       not find where there was a

23       cheyenneandliberty.com account that was

24       associated with that phone.  Mr. Doty's

25       testimony was such that he looked at the

686

1          computer extracts and the phone extracts and

2          concluded that he could not tell what the

3          source of the E-mails were.

4                    The instructions in this case will

5          tell you, for example Instruction Number 12,

6          that the first thing you have to do is decide

7          whether or not on or about the 28th day of

8          April that's alleged in the indictment that

9          there was a victim under the age of 18 years.

10                   Next, that she was-- that the

11         defendant was a parent or person having

12         custody, which he was, and she was under 18,

13         there's no doubt about that.

14                   Third, that he knowingly permitted

15         the victim to engage in sexually explicit

16         conduct.  Again, ladies and gentlemen, I will

17         harken you back to this report that was made

18         almost a year exactly before these E-mails

19         started going out.  It was not made for the

20         purpose of sexually explicit photos being

21         distributed; it was made for the purpose to

22         report something that was very troubling.

23                   Fourth, that the defendant knew or

24         had reason to know that the visual depiction

25         would be mailed, transported across state

1       lines or foreign commerce.  And he had no

2       clue that anything like that was going to

3       happen.

4               As to the charge in Count 3, first

5       you have to find that the defendant knowingly

6       distributed the visual depiction.  And he's

7       told you, he said, absolutely not.

8               Second, that the visual depiction

9       was shipped or transported by any means,

10      including computer.  Well, apparently it was.

11      Remember we have all the ingoing stuff that's

12      coming from Australia with the headers on it

13      saying it's coming from an iPhone.  We have

14      all that.  We don't have the outgoing stuff

15      from Jon's phone that we've seen.

16              Third, that the production or visual

17      depiction involved the use of a minor

18      engaging in sexually explicit conduct.

19      Again, he's told you that that's not why that

20      picture was taken.  That the defendant knew

21      or that at least one of the performers in

22      such visual depiction was a minor and knew

23      that the depiction was of a minor engaged in

24      sexually explicit conduct.  And again, it

25      goes back to the very first part of the

1          equation.  Was this taken for sexually

2          explicit purposes and conduct?  And it was

3          not.

4                    Again, as to Count 3, we have much

5          of the same elements except now it's been

6          mailed, shipped, or transported in interstate

7          commerce and-- or produced using material

8          that's been mailed.  Again, it requires that

9          you find a visual depiction of minors engaged

10         in sexually explicit conduct.  And Jon has

11         refuted that steadfastly.

12                   Ms. Kenney has told you that she

13         will have an opportunity to speak with you

14         again and make comments, if she chooses, on

15         what I have told you.  I will not have that

16         opportunity because our system provides that

17         since the state-- or the government has the

18         burden of proof, they get to go first and

19         they get to have the last word.  And that's

20         the way it is and that's the way it probably

21         should be.  So I won't have an opportunity to

22         engage you again in conversation and tell you

23         what I think Ms. Kenney said that maybe you

24         ought to take a look at.  That's why I will

25         ask you if you will listen on my behalf and

1          on Jon's behalf and consider the evidence

2          completely and wholly, as I know you will.

3          Again, we appreciate your time and your

4          attention and thank you for your service.

5                    Thank you, Judge.

6                    THE COURT:  Ms. Kenney, will you

7          close the argument, please.

8                    FINAL CLOSING ARGUMENTS

9      BY MS. KENNEY:

10                    Members of the jury, I'm not going

11         to take up much more of your time.  As I

12         mentioned, this was a fairly quick trial.

13         It's a trial based very heavily on the

14         physical exhibits that you'll have back there

15         with you and considering those with the

16         testimony and the law.  But I just wanted to

17         touch base just a little bit on the defenses

18         that, at least as I interpret them, have been

19         put forward.

20                    And the first one is that whoever

21         sent these images or E-mails to Detective

22         Butler was not the defendant.  And I would

23         encourage you again to look at the IP

24         addresses.  Look at the timing of when the

25         E-mails were sent.  Look at the DVR and

690

1      consider whether or not that assists you in

2      making any determination.  Look at the exif

3      data on those pictures.  Look at that exif

4      data and compare it to what was in the

5      E-mails.

6              Now, there has been discussion that

7      the exif data can be changed.  But it is

8      significant that the data on each picture is

9      not all the same.  It is similar to the

10     particular E-mail that went out.  And the

11     significant images are found in a password

12     protected photo album on the defendant's

13     password protected iPhone.

14             Now in terms of this being-- there's

15     an innocent explanation for the images that

16     were taken of the youngest daughter, as

17     Mr. Francis pointed out, that sexual abuse

18     was supposedly reported a year earlier or a

19     report was made a year earlier.  But the

20     defendant's testimony was not that he took

21     the picture at around that time to document

22     the abuse; it was that he took it two or

23     three months later to show any changes that

24     might occur down the road.

25             So he's taking this picture in July

1        or August of his daughter's pubic area and he
2        also takes the videos at about the same time.
3        Which in those videos the daughter is dressed
4        differently.  She doesn't have a diaper on.
5        She has a shirt on and she doesn't have the
6        pink dress on.
7                 The defendant never turned these
8        photos or videos over to law enforcement.
9        Then what's the point in taking them?  What
10       is the point in having this information?  And
11       in any event, it's really unclear how these
12       photos or videos would be any kind of
13       evidence in a sexual abuse investigation
14       unless it was an investigation into the
15       person who took the pictures.
16                And what was the purpose of the
17       other pictures?  You have the two pictures of
18       the child's backside, thigh and then an area
19       taken of her diapered vaginal area.  What was
20       the purpose of those pictures?  And what was
21       the purpose of those videos where she's
22       bouncing on the bed and he's talking to her?
23       What's the purpose of those?  Does the
24       innocent explanation make any sense in light
25       of all the other evidence that you have to

1          consider in this case?

2                    Now finally, there was some

3          testimony about-- I called it missing

4          evidence.  That's a little strong.  But

5          evidence that the government did not consider

6          and did not review.  And you heard Special

7          Agent Beebe's testimony regarding the

8          evidence that was seized, what was reviewed.

9          The reason that the router, for example, was

10         not taken.  And in addition to the fact that

11         memory would have been lost when it was

12         unplugged, he also testified that a home

13         router wouldn't store information for more

14         than a day.

15                   And you recall the search warrant

16         was conducted on May 7th.  The E-mail

17         evidence that we're talking about stopped on

18         April 28th.  And in any event, Mr. Doty

19         agreed that he looked at that router and

20         there was-- there was nothing on there that

21         was of evidentiary value.

22                   Now, I have talked several times

23         about the exif data.  And you have to

24         consider how exactly would someone get to the

25         images in the first place to change that

1        data?  And how would that person have time to

2        change the exif data prior to sending out the

3        E-mail?

4                And another question.  Why, if

5        you're changing exif data to the date at or

6        about the time that the E-mails are being

7        sent, why the exif data was not changed on

8        Exhibit-- I believe it's 23, page-- it's in

9        Exhibit 23.  Is it a coincidence that the

10       exif data on the three images of the

11       defendant's youngest daughter laying on the

12       bedsheet is the same date and time as the

13       E-mails and that the exif data on those

14       images of the youngest child bent over the

15       backseat of the vehicle is the same date and

16       time, approximately, very close, to the time

17       the E-mails were sent?

18                Is it a coincidence that the

19       youngest daughter is wearing the same dress--

20       or excuse me, the same dress she was wearing,

21       the sheet, the comforter, and the diaper in

22       the images found during the search of the

23       defendant's residence are in those-- are in

24       those E-mails?

25                And we're talking about a young girl

694

1          that was four and a half at the time.  If all

2          of this had occurred a year earlier, would a

3          three-and-a-half-year-old be wearing the same

4          things that a four-and-a-half-year-old would

5          be able to wear?

6                    And is it a coincidence that the

7          photos were all sent using an IP address

8          assigned to the defendant's residence?  I

9          suggest to you, members of the jury, that it

10         is not and ask that you take all of this into

11         consideration when you are deliberating on

12         this case and when you reach your verdict and

13         ask that you find a verdict of-- the

14         defendant guilty as charged.

15                    THE COURT:  Members of the jury,

16         that completes the presentation of the

17         evidence and the parties' arguments and so we

18         are now ready to entrust the case to you for

19         your deliberations.  Let me remind you of the

20         admonition that I presented in Instruction

21         Number 33.  You are released from the

22         admonition that I have repeatedly imposed on

23         a limited basis.  You are free to talk about

24         the case, but the only time you can do that

25         is when all 12 of you are present in the jury

695

1          room together.  11 of you is not sufficient.

2          Has to be all 12 and it has to be in the jury

3          room.  Otherwise, the admonition remains in

4          effect.

5                    The other aspect of the admonition,

6          the no consulting of any source or attempting

7          to research, remains in effect until your

8          verdict is returned and you are discharged

9          from your service.

10                   I am at present going to send you

11         the original set of instructions that I read

12         to you and that I have signed, and as soon as

13         they are completed, as I said to you, you

14         will each have a set of instructions for your

15         personal use in the jury room.  But I have

16         marked the original set and the one that I

17         ask you to use to return your verdict with a

18         pink Post-it that says "Original" on it.

19                   You will also have access to the

20         exhibits that were admitted, and it will take

21         us a moment to get those assembled and to you

22         in the jury room.  So if I can, at this time

23         I would like to-- oh, let me-- one more

24         thing.

25                   Alternate Juror 1 and Alternate

696

1          Juror 2, you have been our insurance policy.

2          You are-- you were selected as alternates in

3          this case.  A jury in our system consists of

4          12 people and so the rules do not permit me

5          to allow you to join the others in the jury

6          room and participate in the jury

7          deliberations.

8                   You are not, however, released at

9          this time and you will remain in your role as

10         alternates until the time that a verdict is

11         returned and I can discharge you at that

12         time.  But please do not think you are

13         unimportant to us.  You have been an

14         important insurance policy to us.

15                   Can I ask Ms. Garrett and

16         Mr. Hinderks, please, to rise and I will now

17         administer the oath to them.

18                      (THEREUPON, the bailiffs were

19         sworn in open court).

20              THE COURT:  All right.  Ms. Garrett,

21         Mr. Hinderks, would you please take charge of

22         the jury and take them to the jury room.

23              MR. FRANCIS:  Judge, may we

24         approach?

25              THE COURT:  Yes.  Can we get them

1          out--

2                    MR. FRANCIS:  Yes, sir.

3                    THE COURT:  --and then I would like

4          to visit with counsel, please.

5                         (THEREUPON, the following

6          proceedings were had in the presence and

7          hearing of the defendant).

8                    THE COURT:  Alternate Juror 2 and

9          Alternate Juror 1, let me just have a

10         practical conversation with you.

11                   I recall you're from-- you're from

12         Manhattan.

13                   ALTERNATE JUROR 1:  Yes.

14                   THE COURT:  So you're an hour away.

15                   And your town is how far from here?

16         It's out by Alma?

17                   ALTERNATE JUROR 2:  It's 122 miles

18         one way.

19                   THE COURT:  One way?

20                   ALTERNATE JUROR 2:  Uh-huh.

21                   THE COURT:  Oh, my goodness.  Well,

22         sit a second, please.  I can't release you

23         from your service because if one of the

24         jurors were to fall ill, then one of you

25         would slide into that spot and fill it.  And

1          I haven't talked about this with the parties

2          but my inclination, given the time of the day

3          it is, is to let these ladies start toward

4          home now.

5                    And then in terms of tomorrow, I'm

6          prepared to let you not return-- not to make

7          the drive needlessly, but I have to get cell

8          numbers from you so that if we need to call

9          you to the courthouse to insert you into a

10         jury role that we would be able to reach you

11         and you would be able to answer that summons.

12         Would you be able to do that?

13                   ALTERNATE JUROR 2:  Yeah.  You'll

14         just be waiting two hours, but I can do that.

15                   THE COURT:  And I think I'm willing

16         to accept that risk that the others would

17         have to idle as opposed to imposing on you to

18         make a drive that's that long that

19         needlessly.  So I think I'm prepared to take

20         that risk.  If I can ask you to step out into

21         the hall, we've got a few legal matters to

22         clean up.  Remember your admonition full

23         force and effect for you all.  No talking

24         with anyone about the case.  If you run into

25         your fellow jurors, you can't talk to them

1          because you're not in that room, part of that

2          12.  You can't talk to family about it, can't

3          talk to work, can't read or listen to any

4          media accounts.

5                    But if you will just excuse us, if

6          you will wait in the hall, let Ms. Garrett

7          get the jury situated and then we'll get cell

8          numbers for you and we'll proceed that way.

9          All right?  So give us just a few minutes and

10         we'll be right out.

11                   And, counsel, you wanted to

12         approach, please.

13                   MR. FRANCIS:  I need to redact an

14         exhibit.

15                   THE COURT:  Yeah, that was one of

16         the things--

17                   MR. FRANCIS:  I didn't know if the

18         bailiffs were going to leave with the

19         exhibits and I didn't want that to occur.

20                   THE COURT:  You're talking about

21         Exhibit 503?

22                   MR. FRANCIS:  Yes, sir.

23                   THE COURT:  Yeah.  We won't send any

24         exhibits in until we get that one redacted.

25         So you have a copy-- you have the original of

700

1          that that you want to get and replace with a

2          restickered one?

3                    MR. FRANCIS:  I have one.  Actually

4          that's a copy.  I have a stickered one.

5                    THE COURT:  I'm going to commission

6          you two to sit together and redact what you

7          think needs to be redacted.  You can show it

8          by blacklining through it; or if you need us

9          to do a blackline heavy through it, we can

10         copy it in chambers.

11                   MR. FRANCIS:  If we can borrow this,

12         I bet we can get it done.

13                   THE COURT:  I bet you can do it.

14         Can you approach, please?

15                        (THEREUPON, a bench conference

16         was had in the presence but out of the

17         hearing of the defendant).

18                   THE COURT:  One other thing that I

19         had on my-- did you have other things you

20         wanted to bring up?

21                   MR. FRANCIS:  I did not.

22                   THE COURT:  First of all, thank you

23         both for being so well prepared and trying

24         the case so efficiently.  I'm grateful to you

25         and I know they will be.  I don't have any

1      idea what they're going to decide; but I did

2      want to raise with you that as I read the

3      statute, if they do return a guilty verdict

4      on any of these charges, it's a mandatory

5      detention charge.

6                  MR. FRANCIS:  Okay.

7                  THE COURT:  And I think-- I just

8      wanted you to have the chance-- I didn't want

9      to talk about that with you now-- before now

10     while you're doing your best to get your

11     client's defense assembled, but I didn't want

12     him to be surprised by it because I will have

13     a marshal in the courtroom when they come

14     back with a verdict and if it is a guilty

15     verdict I'm statutorily required to detain

16     him.

17                  MR. FRANCIS:  I understand that.

18                  THE COURT:  Anything else from you

19     all?

20                  MS. KENNEY:  I don't think so.

21     Thank you.

22                  MR. FRANCIS:  No, sir.  Thank you.

23                  THE COURT:  All right.  Thanks so

24     much.

25                  (THEREUPON, the following

1            proceedings were had in the presence and

2            hearing of the defendant).

3                    THE COURT:  Can I ask you before we

4            go off the record to audit the exhibits with

5            one another and make sure you agree on what

6            ought to go to the jury room.  And if you

7            have a dispute, let me know and I'll come in

8            and settle it.

9                    MS. KENNEY:  Okay.

10                    THE COURT:  Okay, Ms. Kenney and

11            Mr. Francis?

12                    MR. FRANCIS:  Yes, sir.

13                    THE COURT:  I think I am likely to

14            call them in at 5 o'clock and send them on

15            home if they haven't finished given the hour

16            tonight.  Do you have a different view of

17            that?

18                    MS. KENNEY:  No.

19                    THE COURT:  Mr. Francis?

20                    MR. FRANCIS:  I don't have an

21            objection.

22                    THE COURT:  I think we ought to

23            let-- given when they started, I think that

24            makes more sense than sort of suggesting that

25            they ought to stay here because I don't think

1           they should.

2                    MS. KENNEY:  Works for me.

3                    THE COURT:  There's-- at least one

4           of them is driving all the way to Strong

5           City.  God bless her for that.  She and I

6           live three hours apart.

7                         (THEREUPON, a recess was

8           taken).

9                         (THEREUPON, the following

10          proceedings were had in the presence and

11          hearing of the defendant).

12                   THE COURT:  We're back on the record

13          outside the presence of the jury, and I'll

14          read the question.  "Can we leave in 15

15          minutes?  How early can we be here in the

16          morning?"  Signed by the foreperson.  So I'm

17          inclined to tell them that they are free to

18          leave now.  They would like to get ahead of

19          the traffic.

20                    And then what did we learn about how

21          early they're going to report in the morning?

22          I think I'm inclined to say they can be here

23          at 8:30 because that's the time I can get

24          myself here.  I'm not inclined to bring them

25          in this evening and dismiss them from the

704

1          courtroom.  Do you wish to make that happen?

2                    MR. FRANCIS:  No.

3                    MS. KENNEY:  No.

4                    THE COURT:  Nor am I inclined to

5          bring them in in the morning.

6                    MR. FRANCIS:  Would you like us to

7          leave our cell phone number with Megan?

8                    THE COURT:  That's fine.  I'm going

9          to tell them they're released and they can

10         report at 8:30 and when they're assembled

11         they can begin deliberation.  All right.

12         We'll make this important question a part of

13         the record.  Thank you.

14                   MS. KENNEY:  Thank you.

15                        (THEREUPON, the proceedings

16         concluded for the day).

17

18

19

20

21

22

23

24

25

705

1    UNITED STATES OF AMERICA )
              ) ss:
2    DISTRICT OF KANSAS   )

3

4        C E R T I F I C A T E

5

6     I, Sherry A. Harris, Certified Shorthand

7    Reporter in and for the State of Kansas, do

8    hereby certify that I was present at and

9    reported in machine shorthand the proceedings

10    had the 7th day of May, 2015, in the

11    above-mentioned court; that the foregoing

12    transcript is a true, correct, and complete

13    transcript of the requested proceedings.

14     I further certify that I am not attorney

15    for, nor employed by, nor related to any of

16    the parties or attorneys in this action, nor

17    financially interested in the action.

18     IN WITNESS WHEREOF, I have hereunto set

19    my hand and official seal at Topeka, Kansas,

20    this 26th day of May, 2016.

21

22        /s/ Sherry A. Harris
          Certified Shorthand Reporter
23

24

25