AO 243
(Rev. 02/07)

**FIRST AMENDED**

Page 1

# Motion to Vacate, Set Aside, or Correct a Sentence
## By a Person in Federal Custody

### (Motion Under 28 U.S.C. § 2255)

### Instructions

1. To use this form, you must be a person who is serving a sentence under a judgment against you in a federal court. You are asking for relief from the conviction or the sentence. This form is your motion for relief.

2. You must file the form in the United States district court that entered the judgment that you are challenging. If you want to challenge a federal judgment that imposed a sentence to be served in the future, you should file the motion in the federal court that entered that judgment.

3. Make sure the form is typed or neatly written.

4. You must tell the truth and sign the form. If you make a false statement of a material fact, you may be prosecuted for perjury.

5. Answer all the questions. You do not need to cite law. You may submit additional pages if necessary. If you do not fill out the form properly, you will be asked to submit additional or correct information. If you want to submit a brief or arguments, you must submit them in a separate memorandum.

6. If you cannot pay for the costs of this motion (such as costs for an attorney or transcripts), you may ask to proceed *in forma pauperis* (as a poor person). To do that, you must fill out the last page of this form. Also, you must submit a certificate signed by an officer at the institution where you are confined showing the amount of money that the institution is holding for you.

7. In this motion, you may challenge the judgment entered by only one court. If you want to challenge a judgment entered by a different judge or division (either in the same district or in a different district), you must file a separate motion.

8. When you have completed the form, send the original to the Clerk of the United States District Court at this address:

   Clerk, United States District Court for  Kansas
   Address
   City, State Zip Code

9. CAUTION: You must include in this motion all the grounds for relief from the conviction or sentence that you challenge. And you must state the facts that support each ground. If you fail to set forth all the grounds in this motion, you may be barred from presenting additional grounds at a later date.

10. CAPITAL CASES: If you are under a sentence of death, you are entitled to the assistance of counsel and should request the appointment of counsel.

FIRST AMENDED                          Page 2

MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT
SENTENCE BY A PERSON IN FEDERAL CUSTODY

| United States District Court | District of Kansas | |
|---|---|---|
| Name (under which you were convicted): Jonathan Kearn | | Docket or Case No.: |
| Place of Confinement: United States Penitentiary Marion | | Prisoner No.: 23150-031 |
| UNITED STATES OF AMERICA | | Movant (include name under which you were convicted) |
| v. | | Jonathan Kearn |

### MOTION

1. (a) Name and location of court that entered the judgment of conviction you are challenging: _____
   United States District Court
   District of Kansas
   444 SE Quincy, Topeka, KS  66683
   (b) Criminal docket or case number (if you know): 5:13-cr-40057-01-DDC

2. (a) Date of the judgment of conviction (if you know): May 8th, 2013

   (b) Date of sentencing: November 16th, 2013

3. Length of sentence: 292 months (23 1/3 years)

4. Nature of crime (all counts): 18 USC §2251(b) and 18 USC §2251(e),
   Production of Child Pornography by a Parent or Legal Guardian;
   and, 18 USC §2252(a)(2) and 18 USC §2252(b)(1), Distribution
   of Child Pornography;  and, 18 USC §2252(a)(4)(B) and 18 USC
   §2252(b)(2), Production of Child Pornography.

5. (a) What was your plea? (Check one)
   (1)  Not guilty ☒      (2)  Guilty ☐       (3)  Nolo contendere (no contest) ☐
   (b) If you entered a guilty plea to one count or indictment, and a not guilty plea to another count
   or indictment, what did you plead guilty to and what did you plead not guilty to? _____

6. If you went to trial, what kind of trial did you have? (Check one)      Jury ☒      Judge only ☐

Page 3

7. Did you testify at a pretrial hearing, trial, or post-trial hearing?   Yes ☒   No ☐

8. Did you appeal from the judgment of conviction?   Yes ☒   No ☐

9. If you did appeal, answer the following:

(a) Name of court: United States District Court for the District of Kansas

(b) Docket or case number (if you know): 15-3121

(c) Result: Judgment and Sentence Affirmed

(d) Date of result (if you know): July 21, 2017

(e) Citation to the case (if you know): 863 F.3d 1299; 2017 U.S.App. LEXIS 13132

(f) Grounds raised: 1. Did the district court commit plain error when it allowed the government to elicit hearsay testimony of a non-testifying expert, in violation of Mr. Kearn's Sixth Amendment Confrontation Clause rights and Federal Rule of Evidence 802? 2. Did the district court commit plain error when it allowed the government, though its witnesses and exhibits, to opine on the dispositive issues in the case, in violation of Rules of Evidence 701 and 702?

* see attached page 3.1 for Grounds 3 through 7 *

(g) Did you file a petition for certiorari in the United States Supreme Court?   Yes ☒   No ☐

If "Yes," answer the following:

(1) Docket or case number (if you know): 17-7210

(2) Result: denied

(3) Date of result (if you know): May 21, 2018

(4) Citation to the case (if you know): _____

(5) Grounds raised: 1. The Circuits are divided over whether the government's intentional decision not to invoke plain error review amounts to a waiver of that standard of review. 2. The Tenth Circuit's decision is incorrect. 3. The question presented is critically important to the administration of Federal appeals. 4. This case is an ideal vehicle to resolve the conflict.

10. Other than the direct appeals listed above, have you previously filed any other motions, petitions, or applications concerning this judgment of conviction in any court?

Yes ☐   No ☒

11. If your answer to Question 10 was "Yes," give the following information:

(a) (1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

Adding to Page 3, question 9.(f) Grounds raised:

3.  Did the district court commit plain error when it instructed the jury on reasonable doubt because of the instruction minimized the government's burden of proof, in violation of the Fifth and Sixth Amendments?

4.  Did the district court commit plain error in allowing the introduction of Rule 404(b) evidence without first articulating the precise reason for the evidence and without giving a unanimity instruction in light of the admission of this evidence?

5.  Did the district court's plain trial errors cumulatively deny Mr. Kearn his constitutional right to a fair trial?

6.  As an alternative remedy, should this case be remanded to the district court for an evidentiary hearing to explore trial counsel's obvious deficiencies before this Court rules on whether Mr. Kearn has satisfied plain, reversible error?

7.  Did the district court abuse its discretion in imposing a no-contact provision as a special condition of supervised release?

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?    Yes ❑  No ❑

(7) Result: _____

(8) Date of result (if you know): _____

(b) If you filed any second motion, petition, or application, give the same information:

(1) Name of court: _____

(2) Docket or case number (if you know): _____

(3) Date of filing (if you know): _____

(4) Nature of the proceeding: _____

(5) Grounds raised: _____

_____

_____

_____

_____

_____

_____

(6) Did you receive a hearing where evidence was given on your motion, petition, or

application?    Yes ❑  No ❑

(7) Result: _____

(8) Date of result (if you know): _____

(c) Did you appeal to a federal appellate court having jurisdiction over the action taken on your

motion, petition, or application?

(1) First petition:      Yes ❑   No ❑

(2) Second petition:   Yes ❑   No ❑

(d) If you did not appeal from the action on any motion, petition, or application, explain briefly

why you did not: _____

_____

_____

12. For this motion, state every ground on which you claim that you are being held in violation of the
Constitution, laws, or treaties of the United States.  Attach additional pages if you have more
than four grounds.  State the facts supporting each ground.

**GROUND ONE:** Counsel Failed to Hold a Competency Hearing.
Defendant Was Incompetent at Trial.

(a) Supporting facts (Do not argue or cite law.  Just state the specific facts that support your claim.):

_____

_____

_____

* attached *

_____

_____

_____

_____

_____

_____

_____

(b) **Direct Appeal of Ground One:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ☐    No ☒

(2) If you did not raise this issue in your direct appeal, explain why: Ineffective
assistance of counsel claims should be brought in collateral
proceedings, not on direct appeal.

(c) **Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ☐    No ☒

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Page 6

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ❏   No ❏

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ❏   No ❏

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ❏   No ❏

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or
raise this issue: _____

_____

_____

_____

_____

**GROUND TWO:** Ineffective Assistance of Counsel

               Failure to Investigate

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

                              * attached *

_____

_____

_____

_____

(b) **Direct Appeal of Ground Two:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ❑   No ☒

    (2) If you did not raise this issue in your direct appeal, explain why: <u>Ineffective</u>
<u>assistance of counsel claims should be brought in collateral</u>
<u>proceedings, not on direct appeal.</u>

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ❑   No ☒

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ❑   No ❑

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ❑   No ❑

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ❑   No ❑

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    _____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

**GROUND THREE:** __Ineffective Assistance of Counsel__

__Failure to Engage in Proper Trial Practice and/or Strategy__

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

_____

* attached *

_____

_____

_____

_____

_____

_____

**(b) Direct Appeal of Ground Three:**

(1) If you appealed from the judgment of conviction, did you raise this issue?

Yes ❑   No ☒

(2) If you did not raise this issue in your direct appeal, explain why: __Ineffective__ __assistance of counsel claims should be brought in collateral__ __proceedings, not on direct appeal.__

**(c) Post-Conviction Proceedings:**

(1) Did you raise this issue in any post-conviction motion, petition, or application?

Yes ❑   No ☒

(2) If your answer to Question (c)(1) is "Yes," state:

Type of motion or petition: _____

Name and location of the court where the motion or petition was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(3) Did you receive a hearing on your motion, petition, or application?

    Yes ☐   No ☐

(4) Did you appeal from the denial of your motion, petition, or application?

    Yes ☐   No ☐

(5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

    Yes ☐   No ☐

(6) If your answer to Question (c)(4) is "Yes," state:

Name and location of the court where the appeal was filed: _____

_____

Docket or case number (if you know): _____

Date of the court's decision: _____

Result (attach a copy of the court's opinion or order, if available): _____

_____

_____

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

_____

GROUND FOUR:  Ineffective Assistance of Counsel

Maximum Sentence Not Advised and Plea Deal Not Communicated

(a) Supporting facts (Do not argue or cite law. Just state the specific facts that support your claim.):

_____

_____

_____

                                   * attached *

_____

_____

_____

_____

(b) **Direct Appeal of Ground Four:**

    (1) If you appealed from the judgment of conviction, did you raise this issue?

        Yes ☐ No ☒

    (2) If you did not raise this issue in your direct appeal, explain why: <u>Ineffective</u>
<u>assistance of counsel claims should be brought in collateral</u>
<u>proceedings, not on direct appeal.</u>

(c) **Post-Conviction Proceedings:**

    (1) Did you raise this issue in any post-conviction motion, petition, or application?

        Yes ☐ No ☒

    (2) If your answer to Question (c)(1) is "Yes," state:

    Type of motion or petition: _____

    Name and location of the court where the motion or petition was filed: _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

    (3) Did you receive a hearing on your motion, petition, or application?

        Yes ☐ No ☐

    (4) Did you appeal from the denial of your motion, petition, or application?

        Yes ☐ No ☐

    (5) If your answer to Question (c)(4) is "Yes," did you raise this issue in the appeal?

        Yes ☐ No ☐

    (6) If your answer to Question (c)(4) is "Yes," state:

    Name and location of the court where the appeal was filed: _____

    Docket or case number (if you know): _____

    Date of the court's decision: _____

    Result (attach a copy of the court's opinion or order, if available): _____

## Additional Grounds

GROUND FIVE:  <u>Brady V. Maryland Claim, Government at Fault and</u>
<u>Counsel Ineffective For Not Defending Against This Violation</u>

GROUND SIX:  <u>Blockburger v. United States Claim: Double Jeopardy,</u>
<u>(Vth Amendment), Ineffective Assistance of Counsel (VIth Amendment),</u>
<u>or both.</u>

GROUND SEVEN:  <u>Trial Counsel's Cumulative Errors Violated the</u>
<u>Trial's Fundamental Fairness</u>

 

 

None of Grounds Five, Six, or Seven were issues raised in my
direct appeal because ineffective assistance of counsel claims
should be brought in collateral proceedings, not on direct appeal.

None of Grounds Five, Six, or Seven have been raised in any
post-conviction motion, petition, or application.

 

Supporting Facts for Grounds Five, Six, and Seven also attached.

(7) If your answer to Question (c)(4) or Question (c)(5) is "No," explain why you did not appeal or raise this issue: _____

_____

_____

_____

13. Is there any ground in this motion that you have <u>not</u> previously presented in some federal court? If so, which ground or grounds have not been presented, and state your reasons for not presenting them: __All grounds have not been previously presented;__ __ineffective assistance of counsel claims should be brought__ __in collateral proceedings, not on direct appeal,__ __see United States v. Galloway, 56 F.3d 1239 (10th Cir. 1995)__ __(en banc)__

_____

_____

14. Do you have any motion, petition, or appeal <u>now pending</u> (filed and not decided yet) in any court for the judgment you are challenging?      Yes ☐  No ☒

If "Yes," state the name and location of the court, the docket or case number, the type of proceeding, and the issues raised. _____

_____

_____

_____

_____

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment you are challenging:

(a) At preliminary hearing: __Melody Evans (Brannon), Federal Public__ __Defender Office, 117 SW 6th Ave. Su. 200, Topeka, KS 66603__

(b) At arraignment and plea: __Melody Evans (Brannon), Federal Public__ __Defender Office, 117 SW 6th Ave. Su. 200, Topeka, KS 66603__

(c) At trial: __Michael Francis, 434 SW Topeka Blvd., Topeka, KS__ __66603__

(d) At sentencing: __Michael Francis, 434 SW Topeka Blvd., Topeka, KS__ __66603__

(e) On appeal: __Daniel T. Hansmeier, Kansas Federal Public__
__Defender, 500 State Ave. Room 201, Kansas City, KS  66101__

(f) In any post-conviction proceeding: _____

_____

(g) On appeal from any ruling against you in a post-conviction proceeding: _____

_____

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?      Yes ☒ No ☐

17. Do you have any future sentence to serve after you complete the sentence for the judgment that you are challenging?      Yes ☐ No ☒

(a)  If so, give name and location of court that imposed the other sentence you will serve in the future: _____

_____

(b) Give the date the other sentence was imposed: _____

(c) Give the length of the other sentence: _____

(d) Have you filed, or do you plan to file, any motion, petition, or application that challenges the judgment or sentence to be served in the future?   Yes ☐  No ☐

18. TIMELINESS OF MOTION: If your judgment of conviction became final over one year ago, you
    must explain why the one-year statute of limitations as contained in 28 U.S.C. § 2255 does not
    bar your motion.\* _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

---

\* The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") as contained in 28 U.S.C.
§ 2255, paragraph 6, provides in part that:
   A one-year period of limitation shall apply to a motion under this section. The limitation period
   shall run from the latest of —
      (1) the date on which the judgment of conviction became final;
      (2) the date on which the impediment to making a motion created by governmental action in
      violation of the Constitution or laws of the United States is removed, if the movant was
      prevented from making such a motion by such governmental action;
      (3) the date on which the right asserted was initially recognized by the Supreme Court, if
      that right has been newly recognized by the Supreme Court and made retroactively
      applicable to cases on collateral review; or
      (4) the date on which the facts supporting the claim or claims presented could have been
      discovered through the exercise of due diligence.

Page 14

Therefore, movant asks that the Court grant the following relief: Appoint Counsel: Vacate, Set Aside, or Correct Sentence,

or any other relief to which movant may be entitled.

_____

Signature of Attorney (if any)

I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct and that this Motion under 28 U.S.C. § 2255 was placed in the prison mailing system on _____ May 3, 2019 (month, date, year).

Executed (signed) on May 3rd, 2019 (date).

_____

Signature of Movant

If the person signing is not movant, state relationship to movant and explain why movant is not signing this motion. _____

_____

IN FORMA PAUPERIS DECLARATION

_____

[Insert appropriate court]

* * * * *

For purposes of this and all Grounds, all affidavits and other evidence are fully adopted into this § 2255 Motion as if set forth here.

### GROUND ONE

Under Godinez v. Moran, 509 U.S. 389 (1993), and the Due Process Clause of the United States Constitution:

(A) Was KEARN Able to Understand the Nature and Consequences of the Trial-Court Proceedings and Assist in the Defense, Where Witnesses Saw Him Use Significant Quantities of Methamphetamines and Marijuanna, Mixed With Prescription Medications, Before and During Trial (Including Lunch Breaks);

(B) There Was No Competency Hearing Under 18 U.S.C. § 4241;

(C) Defendant's Father Notified Counsel As to His Son's Inability to Understand or Assist in His Defense (an Observation Shared by Witnesses); and,

(D) There is a Reasonable Probability KEARN Would Have Been Found Incompetent to Stand Trial if Counsel Had Requested and Obtained a Competency Hearing?

If True, Then Under Strickland v. Washington, 466 U.S. 668 (1984), Was Counsel Constitutionally Ineffective at Trial, on Appeal, or Both For Not Acting on the Information and Clues Given or Implied?

Witness affidavits are attached (or are forthcoming). Essentially, KEARN was on a drug cocktail legally prescribed and illegal controlled substances both prior to and at trial, to include lunch breaks. The affidavits alone beg the question as to why a competency hearing was not requested by counsel. Counsel had at least one email from a third party, and KEARN himself. At trial, Mr. KEARN was incompetent and no hearing was held. He did not understand the nature of the consequences of the proceedings against him, and was unable to properly assist in his defense.

Evidence of KEARN's drug use was to be found in many places:

a.) The interview given to an agent of I.C.E. and a Topeka Police Department (TPD) Officer in the first hour of the 05/07/13 raid on KEARN's home, KEARN says, quoting from the I.C.E. Report 003, pg. 5, "he was a "cannabis activist" and he will not give up the password to his cellphone unless there is a search warrant." (see Exhibit "52") Mike Francis was well aware of this as he included both the recorded interview and the I.C.E. Report in the case materials he sent KEARN in 2018.

b.) A photograph from the raid of KEARN's home documents marijuanna, rolling papers, and scissors on a shelf in KEARN's master bedroom. (see Exhibit "02") This photo and others of KEARN's home in disarray were the basis for a referral from TPD to the Department of Children and Families (DCF) which resulted in an investigation that Mike Francis was made well aware of by KEARN. This report stated in part, "...marijuanna and rolling papers..." (see Exhibit "60")

c.) KEARN's medical record of 02/11/15 shows he was prescribed alprazolam (Xanax), hydrocodone (Lortab), and Vyvanse (amfetamine). (see Exhibit "04")

d.) KEARN's urine analysis results on 03/31/15 show KEARN was positive for opiates, methamphetamine, and amphetamine. (see Exhibit "05")

e.) KEARN's father emailed counsel as to his son's inability to assist in his defense and mental state. (see Exhibit "06", see ED KEARN AFFIDAVIT) This was less than a month before trial. Counsel kept this information from the Court.

f.) KEARN appeared distraught, unengaged, with red and glassy eye's in court (see ED KEARN AFFIDAVIT), as well as exhibited behavior that was thought to be strange and out of character, staring down the prosecutor and not uttering a word to his attorney during this time. (see CONNIE KEARN AFFIDAVIT)

g.) Others witnessed KEARN's bizarre behavior during this week of trial and can

testify to this, as well as a noticable change in KEARN's appearance.

(see DAWN DITTEMORE AFFIDAVIT, MICHAEL WATKINS AFFIDAVIT, EVELYN EMERY

AFFIDAVIT, STEVEN SCRITCHFIELD AFFIDAVIT, JONATHAN KEARN AFFIDAVIT)

The effects of these drugs on KEARN's competence were obvious.

A D.E.A. Resource Guide listing the Controlled Substance Act shows KEARN's

marijuanna use was classified as a Schedule I drug, his hydrocodone use a Schedule

II drug, his methamphetamine use a Schedule II drug, and his alprazolam use a

Schedule IV drug. Confusion, anxiety, insomnia, and "psychotic features including

paranoia, agression, visual and auditory hallucinations, mood disturbances and

delusions-...", and "memory loss..." are all side effects KEARN experienced and

listed here. (see Exhibit "07")  Also shown in a U.S. Food and Drug Administration

Medication Guide for Xanax (alprazolam) Tablets, "XANAX may cause an increase in

activity and talking (hypomania [decrease] and mania) in people who have

depression", as KEARN did, and also experienced. (see Exhibit "09")

KEARN was in no way fit to go to trial, to understand or assist in his defense,

to comprehend the consequences, to understand or entertain a plea offer, nor to

take the stand and testify.  His trial counsel should have acted on the information

and clues given and informed the Court that a Competency Hearing under 18 U.S.C.

§ 4241 was neccessary.  By not doing so his counsel was constitutionally

ineffective and counsel prejudiced KEARN under Godinez.

In Pate v. Robinson, 383 U.S. 375, 378 (1966), it's stated "[T]he conviction

of an accused person while he is legally incompetent violates due process." And,

"[T]rial court's failure to conduct competency hearing in light of defendant's

"pronounced irrational behavior" violated due process." Pate,  385-86.

3

## GROUND TWO

Ineffective Assistance of Counsel
Failure to Investigate

KEARN's pretrial agreement, Order Setting Conditions of Release (see Exhibit "58"), prohibited him from contact with any potential witness(es) and therefore he relied entirely upon his counsel Michael (Mike) Francis to investigate on his behalf. KEARN maintains his attorney failed to do so to the extent that it prejudiced him at trial and violated his right to counsel. To-wit: his children's therapists, Stacy Johnson and others; his sister's, mother's and children's likely testimony about the clear candidate for distributing the porn, Robert (Bob) Henry; Bob Henry himself, (a neo-counterculture hacker); expert on unavailable evidence, "A-T" Williams (finding of KEARN's data corruption); KEARN's home security expert, Dwayne Zinn, (Bob Henry's partner in unlawful activity); to name a few.

KEARN sets forth the following to show that the investigation was lacking and prejudicial:

I.  Stacy Johnson MS LCPC was a therapist for all of KEARN's children following the raid of their home and their subsequent placement with KEARN's older sister, Sarah Parnell. She also supervised visits between KEARN and his daughters, pretrial.

On 06/19/14 KEARN gave his attorney a list of handwritten notes entitled "Mike Francis, questions, tasks". Number one on the list was "Get ahold of girls therapist & get her 'take' on the girls, their mother, Nickalaus Perez, etc.", followed by Stacy Johnson's cell number and email address. (see Exhibit "12") This contact information had already been given to counsel in a 05/30/14 email from Edward (Ed) Kearn. (see Exhibit "35")

4

On 11/03/14 Ed Kearn sent another email to Mike Francis stating, "Mike, it might be good to pursue this lead...", with the above-mentioned 05/30/14 email attached. (see Exhibit "36")

KEARN shared this information with counsel again in his 12/2014 'Notes from Discovery w/Mike Francis', on page 8, KEARN again listed under #4 Stacy Johnson and her contact information. (see Exhibit "13")

On 02/10/15 Ed Kearn sent an email to Mike Francis stating, "I am hopeful that you may get corroborating testimony from the social worker in K.C., Stacy Johnson." (see Exhibit "37")

Finally, post-trial, on 05/20/15 Ed Kearn sent Mike Francis an email including, "Anyway, if it has any value:", then attached Stacy Johnson's contact information once again. (see Exhibit "38")

On 08/19/15 Mike Francis responded to the numerous communications above by emailing Ed Kearn, "I found a cell number for Stacy Johnson and will call that number. I am not sure what all Stacy can tell the court other than Jon's interaction with the kids while she was there..." (see Exhibit "41")

A pretrial interview of Stacy Johnson would have provided valuable insight and information to KEARN's defense. She was aware of Sarah Parnell's testimony as to her advice to KEARN to photograph CAK in the summer of 2012 due to CAK's claim of abuse (the photograph being a central issue in this case) and had close interactions with KEARN's children as well as their foster parents during this time pretrial, Dr. Stephen and Sarah Parnell. The Parnells and Stacy Johnson talked in length about KEARN's close and healthy relationship with his children (see PARNELL AFFIDAVIT) and Ms. Johnson witnessed this firsthand.

Stacy Johnson volunteered to help facilitate an interview with KEARN's daughters during which counsel could've asked them to testify in regards to Bob Henry's hacking activities, "creepy behavior towards them", and that he lived

with them and their father.  Further, if any of them knew of the email used to
transfer contraband to Australia (it contained two of their names), or any other
relevant information. This interview with the social worker could have affirmed
to the jury why KEARN took the video(s) and photo of CAK, as well as to what type
of parent KEARN was.  Both important factors in this case.

Per the 02/10/15 and 05/20/15 emails from Ed Kearn to Mike Francis (see
Exhibits "37" and "38") Stacy Johnson had some therapy with CAK during which "she
had indentified Nick as the person who had molested her or "done something bad." "
(see also SARAH PARNELL AFFIDAVIT).  This information would have directly confirmed
KEARN's testimony to the jury and provided reasonable doubt as to the government's
charges in this case, and provided "completeness" to the county police officer
who testified at trial.

Mike Francis told KEARN in the summer of 2015 that he knew the jury coordinator
and had asked her "what was wrong" during KEARN's jury deliberations.  She told
him one thing the jurors really wanted to know was what kind of parent KEARN was
and what his relationship with his kids was like. (see JONATHAN KEARN AFFIDAVIT,
page 4, #28)  Mike Francis never contacted Stacy Johnson MS LCPC to obtain this
information before going to trial.

KEARN's rights were violated because trial counsel never interviewed his
children nor their social worker.  Stacy Johnson and KEARN's daughter's testimonies
would have provided exculpatory evidence and even more to the point, pointed to
Bob Henry.

II.    Robert (Bob) Henry lived with KEARN and his children and was pointed out by
       KEARN as the actual perpetrator of the crimes.

KEARN attempted multiple times to get Bob Henry interviewed by his trial
attorney.

6

In "Mike Francis questions, tasks", this 06/19/14 list asks, "Can Robert Henry be interviewed? Can we find out why he had a phone line installed in my home, what dates it was installed & any activity that occurred on it?" (see Exhibit "12") KEARN also gave his trial attorney additional handwritten notes pertaining to KEARN's firsthand knowledge of Bob and specifics about Bob that he wanted Mike Francis to investigate: (see Exhibit "13")

1. "Proof of additional Landline from ATT", at the KEARN residence.   -pg. 1

2. Have Bob as a witness?   -pg. 1

3. Computer training at Wichita Technical Institute (W.T.I.)   -pg. 3

4. "especially talented in ... hacking, and electronics.   -pg. 3

5. "Got Disability approved for mental reasons in the summer of 2012. Lived with me from January 2012(?) to January 21st, 2013."   -pg. 3

6. Two incidences in which Bob was suspected of assaulting CAK, stated as, "Two incidences w/[CAK]; one of which Billy Rector witnessed."   -pg. 4

7. Two known phone numbers for Bob Henry.   -pg. 6

8. "Still think someone, police/Dreux/ or Mike should interview Bob Henry. It is possible that if it was all him that he would admit to it and give me an explaination [sic] for all my kids and I have been through. That may be optomistic [sic], but I think possible."   -pg. 15

9. "Very willing to impress, would do anything, should have Dreux talk to him." -pg. 20

On 05/29/14 Ed Kearn sent Mike Francis an email with a document attached detailing items Mike should look into.  Bob is referred to several times. (see Exhibit "14")

Again and again Defendant KEARN asked his attorney to contact, interview and investigate Bob Henry, as well as interview those who knew about Bob's mental health, criminal history, obsession with KEARN, schooling in computers, hacking abilities, reputation, and so forth. Bob even bragged he could "hack the Pentagon" and many people knew of his claims.  A list of people who could have testified to

to this are included in the attached JONATHAN KEARN AFFIDAVIT. (see pg. 5 and 6 of Exhibit "63")

Mike Francis told KEARN he attempted to subpoena the phone line Bob had surreptitiously installed in KEARN's residence, unbeknownest to KEARN, and claimed the subpoena was denied. But, no subpoena of this sort appears on KEARN's criminal docket.

It stands to reason that Bob Henry should have been investigated as KEARN pointed to him as the perpetrator and Bob was motivated by vindiction, was capable, and KEARN as well as his kid's reactions to Bob showed cause for serious concern.

But for counsel's ineffectiveness, the jury would have been moved to a conclusion of reasonable doubt. Furthermore, due process includes a right to a meaningful opportunity to present a complete defense. That constitutional right is violated by the exclusion of probative admissable evidence that another person may have committed the crime.

III.    Antwaun (A-T) Williams worked on KEARN's computer in the days shortly before the 05/07/13 raid on KEARN's home in which this computer was seized, evidence within used against KEARN, and was the only other person (besides KEARN) who could have testified about this unavailable evidence as an expert.

KEARN presented to counsel and forensic investigator Andreux (Dreux) Doty a letter from A-T Williams regarding repairs to his home computer. (see Exhibit "22") He mentions A-T several times in Notes From Discovery w/Mike Francis, specifically on pages 9, 18, and 23. (see Exhibit "13")

On 05/06/14 Ed Kearn emailed Mike Francis, mentioning A-T, and, "if the desktop had iTunes [which it did] ... a remote program to access the iPhone." Attached was a text message between KEARN and A-T. (see Exhibit "24")(emphasis added)

On 05/29/14 Ed Kearn emailed Mike Francis that A-T had found malware on KEARN's desktop. (see Exhibit "14")

Five years after KEARN's counsel should have performed this investigation, Ed Kearn contacted A-T. A-T recalled that the computer was wiped clean because of multiple corruptions. (see Exhibit "27") Specific details could have been obtained had A-T Williams been contacted in 2014, less than one year after he worked on KEARN's ACER Aspire AX1 300. These specifics would have provided more evidence on hacking and/or an alibi link to Defendant's iPhone or the email in question.

Importantly, even half a decade later in 2019, A-T <u>still</u> recalls the severity of viruses on KEARN's computer, to the point it was wiped clean and started over. Since he remembers this much half a decade later even moreso would he have remembered details of hacking and corruption at the time, and he was willing to testify.

IV.    Failure to engage in material discovery, i.e. Queensland Police Service (QPS) Agent Stuart Butler's report and his subsequent referral to Homeland Security (the genesis for the government's investigation).

No Drop Box Link or Evidence From KEARN's Property

According to the report, an email on 04/16/13 to the undercover agent used the IPN 166.147.97.232 mentioning "found you in imgsru." When a search was conducted on this IP through IMGSRC.RU historical data, Butler identified user 'tsears' and 'tsears123' as the only users using this IPN. This indicates current use as a few lines down on the same report it shows "IMGSRC TARGETS PREVIOUSLY USING IPN 166.147.97.232" which does show additionally a "tsears102966@yahoo.com" as well as a "tsears1029@hushmail.com". Noteworthy is next listed, "back on 28 May 2012... [two vulgar email addresses suggesting pedophilia] ... banned: 14 July 2012 for indecent comments (VERY EXPLICITLY SEXUALISED & VIOLENT TOWARDS CHILDREN)."

The report then mentions a Drop Box link that was never found on anything in the raid of KEARN's home. (see Exhibit "29", the entire Butler Report)  The Drop Box link, nor Tsears were ever investigated by counsel.

## Expert Doty Demands Subpoenas by Defense

On 01/20/15 Dreux Doty, the investigator who worked directly with KEARN's counsel, emailed Mike Francis and Ed Kearn stating that the "QPS Report requires us to perform due diligence and significant further investigation:" and, "To wit, it is my professional opinion that subpoenas should be submitted..." He references three emails and says, "it is imperative that we need to perform due diligence..." (see Exhibit "32")  A follow up email on this same day from Doty to Ed Kearn and Mike Francis uses strong language reaffirming this:  Dreux Doty says, "Specifically, we are requesting to expose lack of defendant relevance regarding the associated account names to the alleged incriminating IP Addresses provided by Butler in his report.  That being said, more time is necessary to investigate..." Also stating, "We are not seeking subpoenas for information from AT&T, rather, from Yahoo and Hushmail regarding the originating data relevant to the accounts referred to in the Butler report." (see Exhibit "33")

## Counsel Agrees as to Yahoo and Hushmail Subpoenas

The following day, 01/21/15, a Motion Hearing was held before the Honorable Judge Daniel D. Crabtree.  Mike Francis confirmed Doty's words by stating in open court, "I'm expecting to look at Yahoo and Hushmail and see if there's anything in those addressess..." (see pg. 15, lines 12-14 of record) KEARN's counsel also stated, "But what's not done and the government wouldn't have done because they didn't get this information till last Thursday, is to find out about these two other Yahoo addressess and the one Hushmail address. And that's what I'd like to take a look at." (pg. 15, lines 19-25)

### Prosecution Agrees

Ms. Kenney, for the government, admits the aforementioned notes/report was important when she says, "This was the basis for his referral to Homeland Security back in May of 2013." (pg. 17, lines 17,18 of 01/21/15 Motion Hearing) She further states, "As soon as I saw it -- I didn't really examine what it was, I just felt like there was enough potential Jencks Act material in these notes that I wanted to turn it over to counsel..." (pg. 18, lines 7-11)

### Defense Counsel Commits Prejudicial Gaffe

Mike Francis asked for, and the Attorney for the U.S. agreed for more time to engage in discovery, but the "case materials" counsel sent to KEARN in prison show Francis accessed a subpoena form; however, the docket clearly shows no subpoenas were actually filed on KEARN's behalf.

This investigation was essential. It was agreed by Mike Francis and Dreux Doty to be important, requiring "due diligence" to be performed, and significant enough to move the Court to postpone KEARN's trial for several months. Yet, nothing was done to actually investigate this issue. Nothing.

This violated KEARN's right to effective counsel and due process. Reasonable performance of counsel includes an adequate investigation of the facts of the case and consideration of viable theories, as well as the development of evidence in support thereof.

V.   Dwayne A. Zinn worked for KEARN, lived two houses down, used KEARN's wifi, and had an iPhone on KEARN's business account. Of note, Zinn was a security expert and co-founder of the local security company, D&D Security.

Dwayne Zinn's firsthand knowledge about Bob Henry, KEARN, and KEARN's computer, phones, and alarm system are relevant. He ran KEARN's phone lines and worked on KEARN's security system at four of KEARN's residences over the decade

leading up to this case.  Due to his getting fired by KEARN for drug use, Zinn had the means and the motive to see KEARN harmed and combined with the skillset of Bob Henry likely assisted in the events that led up to KEARN's arrest. (see Exhibits "12", "13", and "62")

Counsel did not investigate or pursue the possibility that another person or persons were the actual actors involved in the crimes his client was tried for, even though Francis stated his belief that others were the perpetrator(s).  Had counsel interviewed Zinn, there is a reasonable probability that had the jury heard this relevant testimony, the outcome would have been different, perhaps even implicating Bob Henry and/or Zinn.

VI.     In addition to those listed above, the following people should have been interviewed:

1.  Bradley Rhodd was KEARN's divorce attorney from 2011 to 2013.  Counsel listed him as a witness on defense's witness list but he did not appear at trial. Rhodd could've testified to the following:

   a.  KEARN was a caring, involved father who put his kids first and worked hard to assure his children were well provided for and healthy.

   b.  KEARN reported CAK's claims of abuse by Nickalaus J. Perez in April 2012 to Mr. Rhodd and acting on Rhodd's advice, KEARN recorded audio of his daughter speaking of this and made a police report.

2.  Connie Kearn (defendant's mother).  Contrary to what the jury heard, it was Mrs. Kearn who advised KEARN to photograph CAK in the summer of 2012 due to her declaration of abuse by her mom's boyfriend.  Mrs. Kearn also could have enlightened trial counsel about her son's mental health and drug history after her husband had notified counsel pretrial that KEARN was struggling mentally. (see CONNIE KEARN AFFIDAVIT)

3. Judy Polinskey-Perez had firsthand knowledge of KEARN's relationship with his children as well as CAK's claims of abuse by her x-husband. Contrary to what the jury heard, she advised KEARN to not take CAK to the hospital for a rape exam as she believed it could further traumatize CAK.

4. KEARN's neighbors on SW Taylor St. The jury was kept in the dark that at least four different homes used KEARN's wifi service. Trial counsel spoke with none of these 10+ people, other than KEARN himself. KEARN's neighbors also saw firsthand how KEARN interracted and cared for his daughters.

5. KEARN's daughter's school teachers and school secretary were willing to be interviewed and give their testimony as to how KEARN was an active parent in his children's lifes, kept them in the same school by petitioning the school to allow so in order to minimize the damaging effects of the divorce of their parents, picked them up from school each day and participated in all of the extracurricular school activities.

6. Counsel ignored the names of KEARN's children's social workers and counselors, all of whom should have been interviewed as KEARN requested this by counsel. (see Exhibits "12" and "13") Each could have provided important insight.

7. Stephanie Roberts, Cemiya Kearn, David E. Wood III, Kyle Jay Smith, Matthew Carl Cullen, and Stephanie Schnegelsiepen all could've provided insight into Robert Henry's hacking abilities and/or mental state. (see JONATHAN KEARN AFFIDAVIT.)

8. Other people close to KEARN and his children, including Edna, William (Bill), and Teresa Rector all had firsthand knowledge of KEARN and his children's relationships, as well as of Bob living in KEARN's home, and CAK's April 2012 claims of abuse. These names, as well as others in this category were given to counsel but counsel made little, if any, effort to contact them. (see Exhibits "12" and "13")

## GROUND THREE

### Ineffective Assistance of Counsel
### Failure to Engage in Proper Trial Practice and/or Strategy

I. Counsel failed to provide expert witness, Andruex (Dreux) Doty, with conditions for success.

KEARN's counsel filed a motion on 10/09/2014 to "Inspect Computers and Other Property Seized" in order to allow the computer forensics expert he had hired to assist with the defense. Dreux was to inspect the computer and iPhone the government claimed contained contraband. (see Exhibits "16" and "31", also the 10/20/14 Status Conference on record)

Mr. Doty visited the facility holding evidence in late 2014 and emailed Ed Kearn and Mike Francis on 12/14/14 stating, "I plan on returning in the next couple of weeks for another day onsite to hopefully examine the image of iPhone. They used a program we currently don't have and require a dongle to unlock the contents therein. The dongle and respective software runs around $4000 but I hope to finagle another angle or means by which to get the work completed." (see Exhibit "34") A copy of this email is included in the 'case materials' sent to KEARN by Mike Francis in 2018.

Counsel made no further attempts to access the evidence mentioned above. Mr. Doty testifies, "I was unable to physically examine the cell phone image that was created due to the fact we don't have what's called a dongle or a hardware protection key that would license us..." (Vol. III, pg. 573, lines 21-24) Counsel never asked KEARN for the money to buy this dongle nor asked the Court to intervene and provide access to KEARN's iPhone in order for his expert to conduct this necessary investigation. Dreux also testified at trial that, on his decision, he had not reviewed the unredacted 4500 page Cellubrite Report. Counsel failed to make sure this investigation was done.

14

Mr. Doty was not allowed to use his full testimony as KEARN's counsel agreed with the government that Doty change the wording in his expert report to the words suggest by the prosecution. (see Exhibits "43", "44", and "45") At the same time KEARN's counsel allowed the government to state "Email from Defendant to Queensland Police Service in eleven titles/descriptions of their own exhibits. (see Exhibit "55") This was erroneous because it addressed the ultimate issue before the jury: whether the conduct observed on the government's end of the computer screen could be imputed to KEARN. Trial counsel allowed the limiting of his expert's testimony to avoid what he in turn allowed the prosecution; improper opinion, accusatory and prejudicial information put in front of the jurors.

Mr. Doty's introduction of the LOEHR's REPORT, an entity not available for cross-examination should've been advised against prior to Doty's testimony and objected to if it came up under cross examination.

II.  Failure in the Discovery Process

Counsel relied on KEARN's previous attorney's Discovery Order and didn't request his own Discovery Order. The "case materials" he sent KEARN in 2018 are jumbled, incomplete and innacurate to the point of containing another party's case filing. Counsel admitted to KEARN in May 2018 that he had searched again and was unable to locate KEARN's file but he had found files from the same period. Counsel has a duty to maintain these records.

At the heart of an effective defense is an adequate investigation and without sufficient discovery, counsel renders deficient performance and jeopardizes his client's defense. Mike Francis acquired only a portion of the actual discovery in KEARN's case and this prejudiced KEARN by preventing an adequate investigation, an essential part of proper trial practice and strategy.

15

III.  Failure to Move for a Supression Hearing to File a Motion to Suppress under the
      IVth Amendment and <u>Riley v. California.</u>

a.)  KEARN's DVR Security system was seized during the May 7, 2013 raid·of his home.
     Because it was not included in the scope of the search it should not have been
     allowed at trial.  According to the Search Warrant issued under Case No. 13-mj-
     5033-KGS on 05/07/13, under Attachment A, Items to be Seized, paragraph 1, any
     and all electronic media "used to visually depict child pornography..." or any
     other definition defined therein.  KEARN's cameras were mounted to the outside
     of his residence.  I.C.E. verifies this in their Report 014, on page 3. (see
     Exhibit "10")  A suppression was warranted.

b.)  KEARN's iPhone 4s which contained the evidence used at trial was taken out of his
     pant's pocket during the first minutes of the 05/07/13 raid of his home.  "It was
     the phone that was -- that was in the defendant's possession.  I believe that he
     had that on him at the time of the search warrant," says Mr. Beebe, the government's
     forensics expert, at trial. (see Vol. II, pg. 451, lines 22-25)

     Under <u>Riley v. California</u>, 134 S. Ct. 2473, 189 L.Ed 2d 430 (2014), which
     explains that a cell phone seized while in a persons possession may not be searched
     incident to arrest and that a warrant must be obtained for a constitutionally valid
     search.  Trial counsel should have moved to suppress KEARN's iPhone 4S from
     evidence.  Counsel was aware of <u>Riley v. California</u> and told KEARN it wouldn't
     apply here because KEARN's home had been raided in 2013, not 2014 when <u>Riley</u> was
     decided.  However,  KEARN's trial wasn't for another year.·  This was an appropriate
     case for <u>Riley</u>.

     Facedown on the floor in his foyer, getting cuffed, KEARN handed over his
     iPhone by telling the officers it was located in his front pants pocket.

16

The cell phone's password would eventually be coerced from KEARN after he had envoked his right to his attorney, Billy Rork.

KEARN relented to an interview and again refused his cell phone password and again asked for his attorney, at which point the interview was ended. This is detailed in ICE Report No. 003. (see Exhibit "52") ICE Supervisory Special Agent (SSA) Gibson told him hours later that the cell phone was on the warrant and while standing over KEARN while KEARN was sitting on his stairs, that, "he had recently busted a ring of pedophiles who microwaved and ate babies", and there was nothing on his iPhone that would be shocking to him, to which KEARN snapped, "don't talk like that in my home, " and, "it's 1987", thus giving up his password under duress. Moments later, about 8:30 pm, SSA Gibson gave KEARN a copy of the Search Warrant and Inventory List, again being threatening to KEARN, leaning into KEARN and stating, "you dodged a bullet today." Some of this is detailed in ICE Report No. 002, pages 6 and 7, although SSA Gibson's account is partially wrong. (see Exhibit "53"; also compare with Exhibit "54" for discrepancies)

Prior to this beating and berating, KEARN had repeatedly asked for counsel. He did not wish for the government to have access to his conversations with a patriotic group, nor to pictures of his girlfriend.

IV.    Failure to Object

At no time pretrial, during trial, nor at sentencing did KEARN's counsel object to anything. It is counsel's duty to object and by not doing so counsel failed to preserve arguments for appeal, thus forcing KEARN to argue Plain Error on direct appeal, a higher standard. Mr. Daniel Hansmeier, Appellant Attorney for KEARN speaks to this as well as counsel's "woefully deficient performance." (see Exhibit "57")

Specifically, Mike Francis should have objected to:

a.) Use of LOEHR Report during trial. The author was not there to cross-examine/confront. This would've preserved this issue for appeal and could've been argued to an easier standard than Plain Error.

b.) The district court's reasonable-doubt instruction which minimized the government's burden of proof, in violation of the Vth and VIth Amendments.

c.) The government allowing the introduction of other acts of evidence without first identifying its non-propensity purpose. This could've been preserved for appeal.

d.) The no-contact provision as a special condition of supervised release. This is where counsel should've argued reasonable relationship or familial association. Objecting here would've clarified the path for KEARN's appeal.

e.) The projection of images and descriptions of such obtained from the Dropbox link, as evidence of this link was never found on any items linked to KEARN.

f.) The use of KEARN's security footage throughout trial, shown to the jury and included in the prosecution's closing. This footage should've been suppressed and since it was not should've at least been objected to.

g.) The wording on exhibits put forth by the government that stated KEARN sent emails to Australia. KEARN repeatedly denies this and it was a central issue in the case, something the jury should've decided in order to allow KEARN a fair trial.

h.) The use of any and all information from KEARN's iPhone 4S, taken off his person while KEARN was cuffed and asking for his attorney. Counsel should've repeatedly objected to all evidence that came through this "fruit of the poisonous tree" as the item was taken in violation of Riley v. California and the passowrd coerced from KEARN after he had envoked his right to counsel. KEARN's interview during his raid, ICE Reports, notes with counsel, and the Topeka Police Dept.'s Supplemental Report all confirm this. (see Exhibits "52", "53", "12", "13", and "54" respectively)

18

i.)  Stuart Butler's, investigator from QPS, testimony:

    1.) Mr. Butler claims EXIF shows picture taken within a few minutes to when it was mailed. (Vol. I, pg. 300, lines 19-20)  The government's expert Craige Beebe's testimony directly contradicts any testimony that claims EXIF data is when the photo was taken by stating EXIF data is when the picture is put on the device. (Vol. II, pg. 479, lines 20-21)

    2.) Mr. Butler saying, "...realized that this guy was a contact sex offender." (Vol. I, pg. 303, lines 14-15)

    3.) That the 3 Dropbox videos were child porn under Australian law. (Vol. I, pg. 305, lines 6-10)

    4.) Butler's testimony, "the picture was taken with an Apple iPhone 4S on the 28th of April, 2013 at 2:01 p.m." (Vol. I, pg. 307, lines 17-19)

j.)  Cassidy Casner's, Lead Investigator for Homeland Security, testimony:

    1.) Casner gives her own definition of child pornography. (Vol. II, pg. 335, lines 12-21)

    2.) Heresay testimony of Brian Jones, a DHS fingerprint specialist. (Vol. II, pg. 366, lines 13-15)

    3.) Casner's testimony, "The photo was taken on April 28th at 6:40 p.m. with an iPhone 4S." (Vol. II, pg. 384, line 7)

    4.) Casner saying, "I believe they were interviewed [KEARN's children] in a Safe Talk by the Division of Family Services in Topeka." (Vol. II, pg. 403, lines 6-8)

k.)  Craige Beebe's, forensic expert for the government, testimony:

    1.) Beebe gives his own definition of child pornography as, "child pornography would be anyone that appears to be underage participating in some type of sexual act..." (Vol. II, pages 443, 444, lines 24, 25, and 1, 2)

    2.) Commented he knew what Detective Ladd's testimony was. (Vol. II, pg. 453, lines 17-21) And again at (Vol. II, pg. 471, lines 8-11)

3.) Beebe testifies that he found "images that were child pornographic in nature. (Vol. II, pg. 454, lines 9-11) And again at (Vol. II, pg. 458, lines 6-8)

4.) Beebe testifies, "as I started looking at some of the browsing history, I saw some -- internet sites that the titles were kind of questionable so I just bookmarked that in my report as contraband." (Vol. II, pg. 461, lines 3-7)

V.   Failure to discuss with KEARN his right to testify or not testify and didn't advise KEARN on his testimony nor the strategy therein.  (see Vol. III, pages 511, 512, lines 22-25 and lines 2-16)

KEARN talked to Mike Francis about why the picture of CAK was taken and repeatedly let his counsel know the reasons, as well as that he had sought advise from several people close to him at the time in June and July of 2012.

These people included Judy Polinskey-Perez, Connie Kearn and Sarah Parnell. Both Connie Kearn and Sarah Parnell advised Kearn to document everything to include taking photographs of CAK's privates. (see CONNIE KEARN AFFIDAVIT, pg. 1, #6, and pg. 2, #7) (see SARAH PARNELL AFFIDAVIT, pg. 1, #4 and pg. 3, #6) This should've been brought forth in KEARN's testimony, as well as in testimony from Connie Kearn and Sarah Parnell.  Judy Polinskey-Perez advised KEARN not to take his daughter to the hospital for a rape exam, as KEARN intended prior to their conversation, as she said it would further traumatize CAK.

KEARN not only took the stand under the influence of illegal drugs mixed with prescription drugs (see Count One) he had no advice on what to say or not to say while testifying.  KEARN's testimony was never discussed with him in a meaningful way and the jury never heard the fact-building testimony that was needed to substantiate KEARN's innocence.

## GROUND FOUR

Ineffective Assistance of Counsel

Under Lafler v. Cooper, 566 U.S. 156 (2012),

and Missouri v. Frye, 566 U.S. 134 (2012), Maximum Sentence Not Advised

and Plea Deal Not Communicated

Assuming KEARN would not have been incompetent (see Ground One), even then KEARN's counsel improperly advised him that the crime he was charged with carried a sentence of 10 to 15 years. (see JONATHAN KEARN AFFIDAVIT, pg. 2, #12) In fact, KEARN could have received a sentence in excess of 54 years. He ultimately received a 24 year and 4 month sentence, as all counts are being served concurrently. KEARN was not given adequate advice regarding his plea offer and was unable to make a fair decision in this process. KEARN argues that he was prejudiced by counsel's incorrect information and lack of knowledge of Federal Plea procedures and Sentencing Guidelines.

Counsel's misinterpretation of the Federal Sentencing Guidelines and sentencing enhancements is evident on the record where Francis states, "...a thirty year sentence will no more promote respect for the law than would the minimum sentence of fifteen years." (see 10/08/15 Defendant's Sentencing Memorandum, 2.(A) ) Even though KEARN asked his attorney about a downward departure and Mike Francis agreed, saying, "The Judge may make a downward departure," and KEARN asked again a month before sentencing, counsel never requested the Court do this in the Sentencing Memorandum. (see Exhibits "40" and "42") KEARN himself had become aware that his counsel didn't have the knowledge to help him in the penalty phase and repeatedly attempted to get a Mitigation Specialist.

Based on counsel's advice, KEARN believed he could not plea guilty because a pretrial discussion with counsel had confirmed he would essentially be lying

to the Court and thus committing perjury by accepting responsibility for criminal actions he had no part of.

KEARN only discovered a no contest, or nolo contendere plea was even an option after trial and would have been likely to take a plea had this and/or the fact he could potentially serve a sentence that would only allow his release after decades.

Furthermore, KEARN was never advised that the plea deal included dropping Count 1, Production, against him. KEARN argues that this is especially damaging because this charge spurned the no contact condition of release between him and his daughter CAK even after his projected release in 2036. He first heard of this at trial.

A defense lawyer in a criminal case has the duty to advise his client fully on whether a particular plea to a charge appears to be desirable, to include any sentencing considerations. KEARN was left unaware of the possible sentencing exposure of proceeding with trial and counsel's performance during both the plea offer stage and sentencing stage violated KEARN's constitutional rights.

## GROUND FIVE

### Brady v. Maryland Claim

Counsel Ineffective For Not Defending Against This Violation

Under Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194 (1963), "The suppression by the prosecution of evidence favorable to and requested by an accused violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The 10th Circuit recognizes this in United States v. Webb, 651 Fed. Appx. 740 (10th Cir. 2016).

In KEARN's criminal prosecution the government violated this Brady doctrine in the following:

As early as October 29, 2013, I.C.E. had finished their review of KEARN's Bunker Hill Digital Video Recorder (DVR) seized in the raid of KEARN's home. Despite a portion used against him at trial, KEARN was never given access to the entirety of his home security footage. The missing portion contains exculpatory evidence. The government made an effort to delay KEARN's review of this material and withheld the remaining. To date, these remaining portions are unaccounted for.

On 12/12/13 Prosecutor Christine Kenny sent Melody Evans of the Public Defender's Office (representing KEARN at the time) an email stating, "I'm meeting with the case agent today. She is bringing over the security video machine/dvr and we will keep it in the Topeka Office so it will be available if you wish to review." (see Exhibit "11")

KEARN repeatedly requests access to this DVR footage. (see Exhibits "12", "14", "15", and "18")

On 11/10/14, Christine Kenney emailed Mike Francis stating, "The agent spent all day Friday working on your request for the security video footage and was able to pull the files you requested for the 16th. She estimated it would take all day today to complete the rest of the request..." (see Exhibit "16")

23

Two months go by.  On 01/08/15, Kenney emailed Francis stating, "We were finally able to get the DVR to Topeka, and we have figured out how to run it if you want to come to our office to view it.  We have not figured out whether we can make a copy of the entire contents, and have ordered a particular cable to see if that will assist... it appears that there is footage from 4/14/13 to 5/7/13." (see Exhibit "19")

Nearly a month more, on 01/28/15, Kenny sent Francis an email and also forwarded an email to counsel from Sean Moore, Litigation Support Specialist for US Attorneys Office.  These emails state, in part, "Mike, Sean has figured out how we can make copies of the data on the security DVR, but we have to copy it to DVDs, and it takes about 4 DVDs per 24 hour day.  To record everything from 4/14 through 5/7 will take about 88 DVDs and several weeks as the copies can only be made in real time...", and from the 03/03/15 email from Sean Moore to Francis, "we are in a position today to give you 40 DVDs that contain the material from the defendant[] Security DVR from 4/14/2013 through approximately the end of the 10 p.m. hour on 4/23/2013.  Each DVD will play on a standard DVD player that you would use for movies at home, but they will not play on a computer.  We plan on continuing to copy the Security DVR for you up to and including the end of the day of 4/27/2013.  From prior discovery, you should have the entire day on 4/28/2013.  We estimate that it will take approximately 6 more days to complete copying of the remainder until the end of day on 4/27/2013... If you wish to pick up the 40 DVDs that we have ready, please let me know..." (see Exhibit "20")

KEARN received the remaining six days mentioned above in April of 2015, the month before trial.  KEARN did not receive any footage from 04/29/13 to 05/07/13, as the prosecutor admitted knowing we wanted in the email to counsel when she said, "...everything from 4/14 to 5/7 will take about 88 DVDs and several weeks as the copies can only be made in real time", and, "If you still want these copies, could you please provide us with an unopened package of DVD-R Plus.." (see Exhibit "20")

Investigator for the government, Cassidy Casner, testifies at trial, "There was a lot of videos to go through for each day and for each camera that was on the system. I would say there were probably over-- for each 24-hour period, at least 200 videos to look through for each camera. Some of them were maybe an hour long. Some of them were 10 seconds long. So it was a very tedious process to look through all of the footage from the DVR." (Vol. II, pg. 391, lines 6-14) (Exhibit "21")

Casner's testimony and KEARN only getting about a month to review this footage, as opposed to the government having it for over 18 months, didn't allow KEARN a proper amount of time to thoroughly review the portion of the data he did receive. Furthermore, KEARN did not receive, and has never received, **the portion of the data that KEARN believes includes exculpatory footage; specifically, video footage of someone entering his home to gain access to KEARN's cell phone, computer, and/or other evidentiary items.**

Even on gobs of meth before trial, with 720 hours in a month, without sleeping, there were 528 hours of footage on 88 DVDs. An impossible task.

It should have been a simple task to copy the DVR footage for the defense and the government's many statements appear as a stall tactic, or worse, a deliberate attempt to avoid giving KEARN his discovery, including exculpatory evidence. This DVR was purchased locally at Harbor Freight and an Owner's Manual that includes an email and a phone number for technical support is listed on page 1 of this manual, as well as detailed instructions within. (see Exhibit "17") This manual was, and still is, easily accessible online. There was no reason that this footage should not have been copied and given to KEARN in a timely manner. Even supposing the government acted in good faith the suppression of the evidence favorable to and requested by KEARN violates due process as the evidence is material either to guilt or punishment.

25

## GROUND SIX

Under Blockburger v. United States, 284 U.S. 299 (1932), and
the Double Jeopardy Clause of the United States Constitution;
(A) Did the Proof of Fact Necessary to Prove the Elements
of Each Offense Constitute a Violation of More Than One
Statute, Where That Proof of Fact Was Based on the Same,
Non-Distinct Visual Depictions of Child Pornography;
(B) If Yes, then Under Strickland v. Washington, 466 U.S.
668 (1984), Was Counsel Constitutionally Ineffective at
Trial, on Appeal, or Both For Not Defending Against the
Violation?

If the same act or transaction constitutes a violation of two distinct
statutory provisions, the test to be applied to determine whether there are
two [or more] offenses or only one, is whether each provision requires proof
of a fact which the other does not. "Because a court must assume that Congress
legislated with Blockburger in mind, we presume, absent express Congressional
intent to the contrary, that Congress intended multiple convictions and sentences
for the same criminal behavior which violates more than one statute when each
statute requres proof of a fact that the other does not. The United States
Supreme Court has recognized that the Blockburger test focuses on the proof
necessary to prove the statutory elements of each offense, rather than on
the actual evidence to be presented at trial. And the test articulated in
Blockburger can be met even with substantial overlap in the proof offered
to establish the crimes." United States v. Benoit, 713 F.3d 1 (10th Cir. 2013).

26

## A. THE CONVICTIONS IN THIS CASE ARE RELATED TO THE SAME DEPICTIONS

The jury convicted Kearn of three child pornography charges: (1) permitting a minor child to engage in sexually explicit conduct in violation of 18 U.S.C. § 2251(b); (2) distributing child pornography in violation of 18 U.S.C. § 2252(a)(2); and (3) possessing child pornography in violation of 18 U.S.C. § 2252(a)(4)(B).

Based on the entire record, the jury convicted Kearn of both distribution and possession based on the same visual depictions. Several factors support this conclusion: the indictment, both the prosecutor and defense counsel stated to the jury that the two counts were based on identical conduct, and the jury was not instructed that the two counts referred to distinct visual depictions. This also affects the production/distribution comparison.

The indictment is attached (see Exhibit 01 ). It uses identical language in both counts. Count Two of the indictment charged that Kearn "knowingly distributed any visual depiction ... and the production of such visual depictions involved the use of a minor engaging in sexually explicit conduct." Count Three charges that Kearn "knowingly possessed and accessed with the intent to view at least one (1) matter which contained any visual depiction ... and the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct."

This is not a case like United States v. Sturm, 673 F.3d 1274 (10th Cir. 2012) (indictment specifically alleged distinct dates for receipt and possession, where the possession post-dated the receipt). Rather, in Kearn's case, the indictment charged "on or about April 28, 2013"[**] for the distribution count, and "on or about May 7, 2013" for the possession count.

[**] According to Black's Law Dictionary, "on or about" concerning this nine day spread of charging language is uncertain: "approximately; at or around the time specified ... usu. when there is any uncertainty about the exact date of a pivitol event." Black's, Ninth Ed. 2009.

## What the Jury Heard From Counsel

In addition, both the prosecutor and defense counsel each stated to the jury that the counts were based on identical conduct:

1. The government did not identify the precise images at issue for each of the three counts. (see Vol. I, at 257-258)[Trial Transcript "TT"]

2. The goverment asked the jury to find that Mr. KEARN "used his iPhone to produce sexual images of his youngest daughter," and that he "possessed other sexually explicit images of children that he had stored on that iPhone 4S." Id. at 258.

3. In closing, the government asked the jury to convict Mr. KEARN, but it did not specify which images it thought were sufficient to convict on each count. (TT, Vol. III, at 166-177)

4. The government initially referred to the images Mr. KEARN took of his youngest daughter, and argued that he distributed the possessed images to Detective Butler.  Id. at 169.

5. On appeal, the government's brief claimed that "in cases involving sexually explicit images of children, the jury is not required to choose which particular image or images it found to support the conviction." (United States v. Kearn, 10th Cir. Appeal No. 15-3121:  Brief of Appellee, 01/04/2017 at page 56).  (Citing United States v. Nelson, 38 F. Appx 386 (9th Cir. 2002) ).

6. The government went on to explain that "courts have found that possession of sexually explicit images on the same date at different locations were properly charged as a single offense."  Id. (Citing United States v. Polizzi, 564 F.3d 142 (2d Cir. 2009).

28

Further, the jury was not instructed that the counts referred to distinct visual depictions. Unlike Sturm, where at 1288 ("The jury was specifically instructed as to which images were associated with which count....."). At bar, Instruction No. 12 for Count One, asked the jury to "find the defendant guilty of Count 1, the government must prove each of the following elements beyond a reasonable doubt: ... Fourth, ... the visual depiction was actually mailed or transported across state lines or in foreign commerce."

Instruction No. 13 for Count Two, asked the jury to "find the defendant guilty of Count 2, the government must prove each of the following elements beyond a reasonable doubt: ... Third, the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;" This, after first asking that the jury find essentially the same element as element Four in Count One, namely "First, the defendant knowingly distributed a visual depiction;" and "Second, such visual depiction was shipped or transported in interstate or foreign commerce by any means, including computer[.]"

Instruction No. 14 for Count Three, asked the jury to find "the production of the visual depictions involved the use of a minor engaging in sexually explicit conduct." (Element 2). And "Fourth, the visual depiction had been either: a) mailed, shipped or transported in interstate or foreign commerce, or b) produced using material that had been mailed, shipped or transported in interstate or foreign commerce by computer or other means." Notably, the jury had to find "First, the defendant knowingly possessed one or more visual depictions of minors engaged in sexually explicit conduct."

# Instruction No. 12
## [Production, 18 U.S.C. § 2251(b)]

1. On or about the date alleged in the indictment, the victim was under the age of eighteen years;

2. The defendant was a parent or person having custody or control of the victim;

3. The defendant knowingly permitted the victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and

4. The defendant knew or had reason to know that the visual depiction would be mailed or transported across state lines or in foreign commerce, or the visual depiction was actually mailed or transported across state lines or in foreign commerce.

# Instruction No. 13
## [Distribution, 18 U.S.C. § 2252(a)(2)]

1. The defendant knowingly distributed a visual depiction;

2. Such visual depiction was shipped or transported in interstate or foreign commerce by any means, including computer;

3. The production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. Such visual depiction is of a minor engaged in sexually explicit conduct;

5. The defendant knew that at least one of the performers in such visual depiction was a minor and knew that the visual depiction was of such minor engaged in sexually explicit conduct.

31

# Instruction No. 14

## [Possession, 18 U.S.C. § 2252(a)(4)(B)]

1. The defendant knowingly possessed one or more visual depictions of minors engaged in sexually explicit conduct;

2. The production of the visual depictions involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct;

3. The defendant knew that such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. The visual depiction had been either:

- a) mailed, shipped or transported in interstate or foreign commerce, or
- b) Produced using material that had been mailed, shipped or transported in interstate or foreign commerce by computer or other means.

33

## Instruction No. 12
### [Production, 18 U.S.C. § 2251(b)]

1. On or about the date alleged in the indictment, the victim was under the age of eighteen years;

2. The defendant was a parent or person having custody or control of the victim;

3. The defendant knowingly permitted the victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and

4. The defendant knew or had reason to know that the visual depiction would be mailed or transported across state lines or in foreign commerce, or the visual depiction was actually mailed or transported across state lines or in foreign commerce.

Blockburger Violation **Theory 1**, Production Swallows Distribution

## Instruction No. 13
### [Distribution, 18 U.S.C. § 2252(a)(2)]

1. The defendant knowingly distributed a visual depiction;

2. Such visual depiction was shipped or transported in interstate or foreign commerce by any means, including computer;

3. The production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. Such visual depiction is of a minor engaged in sexually explicit conduct;

5. The defendant knew that at least one of the performers in such visual depiction was a minor and knew that the visual depiction was of such minor engaged in sexually explicit conduct.

## Instruction No. 14
### [Possession, 18 U.S.C. § 2252(a)(4)(B)]

1. The defendant knowingly possessed one or more visual depictions of minors engaged in sexually explicit conduct;

2. The production of the visual depictions involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct;

3. The defendant knew that such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. The visual depiction had been either:
- a) mailed, shipped or transported in interstate or foreign commerce; or
- b) Produced using material that had been mailed, shipped or transported in interstate or foreign commerce by computer or other means.

## Instruction No. 12
### [Production, 18 U.S.C. § 2251(b)]

1. On or about the date alleged in the indictment, the victim was under the age of eighteen years;

2. The defendant was a parent or person having custody or control of the victim;

3. The defendant knowingly permitted the victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and

4. The defendant knew or had reason to know that the visual depiction would be mailed or transported across state lines or in foreign commerce, or the visual depiction was actually mailed or transported across state lines or in foreign commerce.

Blockburger Violation **Theory 2,** Production Swallows Possession

... And one *necessarily* **possesses** an image he **produces**

34

## Instruction No. 13
### [Distribution, 18 U.S.C. § 2252(a)(2)]

1. The defendant knowingly distributed a visual depiction;

2. Such visual depiction was shipped or transported in interstate or foreign commerce by any means, including computer;

3. The production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. Such visual depiction is of a minor engaged in sexually explicit conduct;

5. The defendant knew that at least one of the performers in such visual depiction was a minor and knew that the visual depiction was of such minor engaged in sexually explicit conduct.

## Instruction No. 14
### [Possession, 18 U.S.C. § 2252(a)(4)(B)]

1. The defendant knowingly possessed one or more visual depictions of minors engaged in sexually explicit conduct;

2. The production of the visual depictions involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct;

3. The defendant knew that such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. The visual depiction had been either:
- a) mailed, shipped or transported in interstate or foreign commerce, or
- b) Produced using material that had been mailed, shipped or transported in interstate or foreign commerce by computer or other means.

35

## Instruction No. 12
### [Production, 18 U.S.C. § 2251(b)]

1. On or about the date alleged in the indictment, the victim was under the age of eighteen years;

2. The defendant was a parent or person having custody or control of the victim;

3. The defendant knowingly permitted the victim to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct; and

4. The defendant knew or had reason to know that the visual depiction would be mailed or transported across state lines or in foreign commerce, or the visual depiction was actually mailed or transported across state lines or in foreign commerce.

**Blockburger Violation Theory 3: Distribution Swallows Possession**

... And one *necessarily* **possesses** an image he **distributes**

## Instruction No. 13
### [Distribution, 18 U.S.C. § 2252(a)(2)]

1. The defendant knowingly distributed a visual depiction;

2. Such visual depiction was shipped or transported in interstate or foreign commerce by any means, including computer;

3. The production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. Such visual depiction is of a minor engaged in sexually explicit conduct;

5. The defendant knew that at least one of the performers in such visual depiction was a minor and knew that the visual depiction was of such minor engaged in sexually explicit conduct.

## Instruction No. 14
### [Possession, 18 U.S.C. § 2252(a)(4)(B)]

1. The defendant knowingly possessed one or more visual depictions of minors engaged in sexually explicit conduct;

2. The production of the visual depictions involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct;

3. The defendant knew that such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4. The visual depiction had been either:
- a) mailed, shipped or transported in interstate or foreign commerce; or
- b) Produced using material that had been mailed, shipped or transported in interstate or foreign commerce by computer or other means.

## B.   ARGUMENT

Most of the caselaw surrounding this issue deals with a  receipt/possession
Blockburger analysis.  See, Benoit, and Sturm from the Tenth Circuit, above,
and the cases cited within them.  See also, United States v. Dudeck, 657 F.3d
424 (6th Cir. 2011);  United States v. Miller, 527 F.3d 54 (3rd Cir. 2008);
United States v. Muhlenbruch, 634 F.3d 987 (8th Cir. 2011);  United States
v. Bobb, 577 F.3d 1366 (11th Cir. 2009). What about production/distribution/possession?

The analysis is the same.  It is not clear from the face of the indictment,
jury instructions, or evidence at trial with prosecutorial explanation, that
the charges at bar were based on the very same conduct.  Nor is it clear they
were based on different conduct.  The record before the Court also does not
reflect whether Kearn's convictions rested on different types of images.
Indeed, the prosecutor's talismanic use of the image of Mr. Kearn's youngest
daughter was the case-in-chief of having been produced, distributed, and possessed
by Mr. Kearn.  All images were lumped together.

In addition, element 4 of the production count requires the jury to find
Mr. Kearn distributed the (non-distinct) image(s) of child pornography, making
it multiplicitous with distribution.  Distribution appears as a lesser-included
offense of production at bar.  What is more, the same image(s) or proof of
fact    makes possession a lesser-included offense of distribution.  Element
2 of possession overlaps with element 3 of distribution ("the production of
such visual depiction involved the use of a minor engaging in sexually explicit
conduct").  In fact, they are identical.  Element 4 of possession overlaps
substantively with element 2 of distribution ("visual depiction" was, or had
been shipped or transported in interstate or foreign commerce [or produced
using material that had been mailed, shipped or transported in interstate
or foreign commerce by computer]).

36

And finally, element 4 of production is broader and encompasses the same proof of fact that elements 1 and 2 of distrubution do: ("the defendant knew or had reason to know" ["knowingly distributed"] a "visual depiction" either "would be" or "was actually" (production element) ["distributed" (distribution element)] "mailed or transported across state lines or in foreign commerce" (production) / "was shipped or transported in interstate or foreign commerce by any means, including computer" (distribution).

Nothing in the statutory text shows congressional rejection of the Blockburger presumption. Here, Instruction 12 (Count 1, Production), element 4 literally "swallows" all the elements of Distribution. Possession may be covered by either distribution or production, concerning the identical images and overlapping, uncertain dates.

Sometimes, our Tenth Circuit has found a clear distinction from the record which comports to Congress' intent to identify separate harms "flowing from the possession and distribution of child pornography." Sturm, 673 F.3d at 1279-80 (quoting Pub. L. No. 104-208, Div. A., Title I, § 101(a), 110 Stat. 3009-26). In addition, "we note Congress has prohibited the knowing reproduction of child pornography 'for distribution' in § 2252A(a)(3)[.] Id. (Emphasis added).

There are two distinguishing characteristics between Sturm's lesson about Congressional intent and both Benoit & Kearn at bar. First, Sturm's case was about receipt and possession under § 2252A, not § 2252(a) (Benoit and Kearn). Second, Kearn's case deals with production, not "re"-production of non-distinct images on uncertain charging dates. Sturm's charging dates were specific, lacking the "on or about" language of Kearn's case here.

## GROUND SEVEN

Trial Counsel's Cumulative Errors

According to <u>Grissom v. Carpenter</u>, (10th Cir. 2018) 2018 U.S. App. LEXIS 24922, "When a habeas petitioner raises a cumulative error argument under due process principles the argument is reviewable because United States Supreme Court authority clearly establishes the right to a fair trial and due process. The cumulative-error analysis addresses the possibility that the cumulative effect of two or more individually harmless errors has the potential to prejudice a defendant to the same extent as a single reversible error. In conducting this analysis, the court aggregates the federal consititional errors and consider whether those errors, collectively, so fatally infected the trial that they violated the trial's fundamental fairness."

38