## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

**UNITED STATES OF AMERICA,**

**Respondent/Plaintiff,**

**v.**

**JONATHAN KEARN,**

**Movant/Defendant.**

**Case No. 13-40057-DDC**
**19-cv-4032-DDC**

---

## GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION UNDER § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE BY A PERSON IN FEDERAL CUSTODY AND FIRST AMENDED MOTION UNDER § 2255

The United States of America, by and through Stephen R. McAllister, United States Attorney for the District of Kansas, and Christine E. Kenney, Assistant United States Attorney for said District, hereby responds to the defendant's Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody (Doc. 157), and First Amended Motion Under § 2255 (Doc. 165).   For the reasons set forth below, the government requests the Court deny these motions.

1

## I.     Statement of the Case

On May 29, 2013, a Grand Jury charged the defendant/petitioner, Jonathan Kearn ("the defendant"), with:   producing a visual depiction of a minor engaged in sexually explicit conduct ("Production of Child Pornography"), in violation of 18 U.S.C. § 2251(b); distribution of a visual depiction of a minor engaged in sexually explicit conduct ("Distribution of Child Pornography"), in violation of 18 U.S.C. § 2252(a)(2); and possession of a visual depiction of a minor engaged in sexually explicit conduct ("Possession of Child Pornography"), in violation of 18 U.S.C. § 2252(a)(4)(B).   (Doc. 15, Indictment.)

On May 5, 2015, prior to opening statements, the Court held a "Lafler/Frye" hearing outside the presence of the potential jurors.   (Doc. 143, Transcript of Jury Trial (Volume 1), at 240 – 41.)   The following exchange occurred between the Court, counsel, and the defendant:

> THE COURT: The one thing that I haven't done that I meant to do is that I told you I wanted you to address any Lafler or Frye concerns by identifying the content of any plea offers that have been made available to the defendant.
>
> Mr. Francis, I have every confidence that you have relayed those, as I would expect a professional of your experience to do, but—
>
> MR. FRANCIS: We-- we did have an offer. It kind of came in through Mr. Slinkard actually because Ms. Kenney was preparing. And I forwarded that to my client, we discussed that, and we turned that down.

THE COURT: Ms. Kenney, can you just simply recite the terms of that offer, and then I'll ask Mr. Kearn to acknowledge whether he was advised of that offer.

MS. KENNEY: Yes, Your Honor. As I understand it -- and I confirmed this in an E-mail to Mr. Francis so I think he would have corrected me -- the offer was a (c)(1)(C), a binding plea agreement to a 10-year sentence to Count 3.

. . .

MS. KENNEY: Count 3, the possession charge.

THE COURT: And, Mr. Kearn, can you confirm for us that you were made aware of that plea offer from the government?

THE DEFENDANT: I was last week, yes, sir.

(*Id.*)

On May 8, 2015, the jury found the defendant guilty on all three counts.   On November 16, 2015, the Court sentenced the defendant to 292 months in prison on Count 1, 240 months in prison on Count 2, and 120 months in prison on Count 3 to run consecutive.   (Doc. 123, Judgment.)

The defendant directly appealed his convictions to the United States Court of Appeals for the Tenth Circuit.   *See United States v. Kearn*, 863 F.3d 1299 (10th Cir. 2017).   The defendant raised a number of issues on appeal, including various evidentiary issues, jury instruction challenges, and a cumulative error argument. *Id.* at 1304.   The Court affirmed his convictions on July 21, 2017.   *Id.* at 1313. The defendant subsequently filed a petition for panel rehearing and rehearing en

banc.   The Court denied the petition on October 2, 2017.   The defendant then

filed a petition for writ of certiorari with the Supreme Court, which it denied on

May 21, 2018.   (Doc. 156, Letter from Tenth Circuit.)

On April 25, 2019, the defendant filed the instant §2255 motion and

accompanying grounds (Docs. 157, 157-1 through 157-7), raising seven (7) claims

for relief based on ineffective assistance of counsel.   On May 24, 2019, the

defendant filed an amended motion under § 2255.   (Doc. 165.)   The defendant

filed the instant motion within the applicable one-year statute of limitations.   *See*

28 U.S.C. § 2255(f)(1) ("A 1-year period of limitation shall apply to a motion

under this section.   The limitation period shall run from . . . the date on which the

judgment of conviction becomes final."); *United States v. Prows*, 448 F.3d 1223,

1227 (10th Cir. 2006) ("In the context of the one-year limitation period for filing a

§ 2255 motion, a criminal conviction becomes final when the Supreme Court

affirms it on direct review, denies certiorari, or (in the absence of a certiorari

petition) the time for filing a certiorari petition expires.").

## II.    Legal Standards for Ineffective Assistance of Counsel

A successful claim of ineffective assistance of counsel must meet the two-

pronged test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, a

defendant must show that his counsel's performance was deficient in that it "fell

below an objective standard of reasonableness."   *Id.* at 688.   To meet this first

prong, a defendant must demonstrate that the omissions of his counsel fell "outside the wide range of professionally competent assistance."   *Id.* at 690.   This standard is "highly demanding."   *Kimmelman v. Morrison*, 477 U.S. 365, 382 (1986). Strategic or tactical decisions on the part of counsel are presumed correct, *Strickland*, 466 U.S. at 689, unless they were "completely unreasonable, not merely wrong, so that [they] bear no relationship to a possible defense strategy," *Fox v. Ward*, 200 F.3d 1286, 1296 (10th Cir. 2000) (quotation and citations omitted) (alteration in *Fox*).

> In formulating a defense strategy, counsel is entitled to balance limited resources in accord with *effective* trial tactics and strategies, or, in other words, to critically undertake a cost/benefit analysis of any proposed course of action.   Rarely, if ever, can we acquire from an appellate record a complete understanding of all the intangible factors that influenced a defense counsel's decision not to undertake a particular course of action.

*United States v. Rushin*, 642 F.3d 1299, 1308 (10th Cir. 2011) (internal quotation marks and internal citation omitted).   That counsel could have undertaken an action that could have possibly achieved a benefit for the defendant is not a cognizable measure of counsel's performance.   *Id*. at 1307 ("Because possibilities without proof are endless, they are no measure of counsel's performance.").

Judicial scrutiny of the adequacy of an attorney's performance must be strongly deferential:   "[A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."

5

*Strickland*, 466 U.S. at 689.   Moreover, the reasonableness of the challenged

conduct must be evaluated from counsel's perspective at the time of the alleged

error; "every effort should be made to 'eliminate the distorting effects of

hindsight.'"   *Edens v. Hannigan*, 87 F.3d 1109, 1114 (10th Cir. 1996) (quoting

*Strickland*, 466 U.S. at 689)).

Second, a defendant must also show that his counsel's deficient performance

actually prejudiced his defense.   *Strickland,* 466 U.S. at 687.   To prevail on this

prong, a defendant "must show there is a reasonable probability that, but for his

counsel's unprofessional errors, the result of the proceeding would have been

different."   *Id.* at 694.   A "reasonable probability" is a "probability sufficient to

undermine confidence in the outcome."   *Id.*   This, in turn, requires the court to

focus on "the question whether counsel's deficient performance render[ed] the

result of the trial unreliable or the proceeding fundamentally unfair."   *Lockhart v.*

*Fretwell*, 506 U.S. 364, 372 (1993).   "It is not enough for the defendant to show

that the errors had some conceivable effect on the outcome of the proceeding.

Virtually every act or omission of counsel would meet that test, and not every error

that conceivably could have influenced the outcome undermines the reliability of

the result of the proceeding."   *Strickland*, 466 U.S. at 693 (internal citation

omitted).   Rather, "[t]he likelihood of a different result must be substantial, not

just conceivable."   *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

A defendant is entitled to the effective assistance of counsel during plea negotiations. *Lafler v. Cooper*, ⸺ U.S. ⸺, 132 S.Ct. 1376, 1384 (2012). The two-part *Strickland* test applies to challenges involving rejection of a plea offer resulting in a conviction at trial and a more severe sentence. *Id*. "The performance prong of *Strickland* requires a defendant to show that counsel's representation fell below an objective standard of reasonableness." *Id*. (quotation marks omitted). To demonstrate prejudice in this context, a defendant "must show the outcome of the plea process would have been different with competent advice." *Id*. Where a defendant claims that his counsel's ineffective advice lead him to reject a plea and go to trial, he must show:

> that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court (i.e., that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances), that the court would have accepted its terms, and that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id*. at 1385.

The defendant must satisfy both *Strickland* prongs, and failure to satisfy either prong should result in denial of his motion. *See United States v. Orange*, 447 F.3d 792, 796-97 (10th Cir. 2006) ("Because [a defendant] must demonstrate both *Strickland* prongs to establish his claim, a failure to prove either one is

dispositive.") (citations omitted); *Smith v. Robbins*, 528 U.S. 259, 286 (2000)

("The performance component need not be addressed first. 'If it is easier to dispose

of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we

expect will often be so, that course should be followed.'") (quoting *Strickland*, 466

U.S. at 697)); *see also Romano v. Gibson*, 239 F.3d 1156, 1181 (10th Cir. 2001)

("This court can affirm the denial of habeas relief on whichever *Strickland* prong is

the easier to resolve.").   Under § 2255, the district court is required to conduct an

evidentiary hearing "[u]nless the motion and the files and records of the case

conclusively show that the prisoner is entitled to no relief."[1]

---

[1]  In discharging his burdens to show deficient performance and prejudice under
*Strickland*, a defendant must present evidence and facts upon which a reviewing
court may conclude that he has shown by a preponderance of the evidence that he
is entitled to relief.   *See Beeler v. Crouse*, 332 F.2d 783, 783 (10th Cir. 1964)
("Habeas corpus is a civil proceeding and the burden is on the petitioner to show
by a preponderance of the evidence that he is entitled to relief.").   Indeed, "actual
ineffectiveness claims alleging a deficiency in attorney performance are subject to
a general requirement that the defendant affirmatively prove prejudice." *Strickland*,
466 U.S. at 693. This means that he has the burden to allege facts that would entitle
him to relief upon proof.   *Hatch v. Oklahoma*, 58 F.3d 1447, 1471 (10th Cir.
1995) ("To be entitled to an evidentiary hearing on claims raised in a habeas
petition, the petitioner must allege facts which, if proved, would entitle him to
relief.") (internal quotations omitted), *overruled in part on other grounds by
Daniels v. United States*, 254 F.3d 1180, 1188 n.1 (10th Cir. 2001) (en banc).
Further, "the allegations must be specific and particularized, not general or
conclusory."   *Id.*   *See also United States v. Quarterman*, 242 F.3d 392, *2 n.3
(10th Cir. 2000) (table) (noting, in considering petitioner's unsupported § 2255
claim: "Despite [Petitioner's] pro se status, this court will not sift through her brief
in an attempt to construct legal arguments or theories for her, *see Whitney v. New
Mexico*, 113 F.3d 1170, 1173-74 (10th Cir. 1997) nor consider unsupported,

28 U.S.C. § 2255(b); *United States v. Lopez,* 100 F.3d 113, 119 (10th Cir. 1996).

## III.    Facts Presented before District Court[2]

In April 2013, Detective Seargeant Suart Butler, Queensland, Australia Police Service, conducted an undercover online investigation pertaining to individuals engaged in the sexual exploitation of children.   (Doc. 143, Transcript of Jury Trial (Volume 1) at 275 – 76.)   Detective Butler worked in a special unit that targeted on-line child sex offenders.   (*Id.* at 266.)   Detective Butler posed as an individual using the email address, "man69girl@gmail.com," and user name "Neve Nightshade."   (*Id.* at 270 - 71, 277, 279.)   Many of Detective Butler's investigations involved a website known as Image Source, or imgsrc.ru.   (*Id.* at 268 - 69.)   An individual using the email address "cheyenneandliberty@yahoo.com" ("cheyenneandliberty"), began an email exchange with Detective Butler, expressing an interest in child exploitation.   (*Id.* at 292 - 93.)

Between April 16, 2013, and April 28, 2013, Detective Butler exchanged several emails with "cheyenneandliberty."   (*Id.* at 282 – 83.)   In his undercover

---

conclusory allegations on appeal, *see Wise v. Bravo*, 666 F.2d 1328, 1333 (10th Cir. 1981).").

[2]  References to the transcript will be to the district court docket report.   For example, the first day of trial is contained in "Doc. 143, Transcript of Jury Trial (Volume 1) at ___".

capacity, Detective Butler's goal was to quickly determine "cheyenneandliberty's"

intent.   (*Id.* at 290 – 91.)   Between April 19, 2013 and April 22, 2013, the

following exchange occurred:

> Cheyenneandliberty:        I'm from Kansas.   Get back to you soon :)

> Cheyenneandliberty:        Do you ever make it to the USA?

> Neve Nightshade:  I'm able to travel and very much willing if there is somebody waiting for me at the other end :); what do you have in mind?

> Cheyenneandliberty:        I am brand new to this thought process the beauty I see in the pictures on imgsru and all that. I wouldn't mind getting to know you. Are you by chance a photographer? I'm 38, single dad to four girls, 4 1/2, 10yo twins, and 13. Tell me a little about you and, if you have kids, yours.

> Neve Nightshade:  ime only an amateur. Not a professional photographer. I don't have any kids of my own, but my girlfriend has 2 girls which I have lots of fun with. Ive managed to slip my dick into both of them as well as teach them how to give head, so its all good for me; how about u? u getting any from yor kids? Can you send me some pics or vids cos I just love new material that no-one else has got; oh by the way, ime 45, single & bangin my bitch of a girlfriend to get to her 2 lovely girls 12 & 14 yrs! life is good!

(Ex. 1.)

Some of the emails sent by "cheyenneandliberty" included pictures of young

females, later identified as the defendant's daughters.   (Doc. 143 Transcript of

Jury Trial (Volume 1) at 293 - 95.)   In most of the images, the young females

were clothed.   (*Id.*)   However, four of the images focus on the defendant's

youngest daughter's genital area, including one image depicting the defendant

exposing his youngest daughter's genitals.   (*Id.* at 297 – 302; Ex. 1-6.)   The fingerprint examination conducted by Special Agent Brian Jones, Homeland Security, Homeland Security Investigations ("HSI"), positively identified the left index finger depicted in that image as the defendant's.   (*Id.* at 50 - 54; Exs. 26, 26-1.)

Detective Butler captured the EXIF data[3] imbedded in Ex. 1-6, which showed that the image was taken with an Apple iPhone 4s minutes prior to the time the email was sent.   (*Id.* at 302 – 303.)   Within minutes of sending the emails containing images of the defendant's youngest daughter, "cheyenneandliberty" sent an email that said, ":) just took a couple:)".   (*Id.* at 303 – 304; Ex. 1-7.)   This email was sent from the same IP address as the three emails containing images of the defendant's youngest daughter.   (*Id.* at 303.)

Also on April 28, 2013, "cheyenneandliberty" sent Detective Butler an email that contained a link to a "dropbox.com" folder.   (*Id.* at 304; Ex. 1.)   Detective Butler followed the link and discovered it contained three videos that would violate the child exploitation or child pornography laws in his country.   (*Id.*)

Later on April 28, 2013, "cheyenneandliberty" sent Detective Butler an email that contained an image of three minor females sitting on the deck of a

---

[3]   EXIF data is information embedded within the image, such as the device used, and the time and date the image was taken.   (*Id.* at 299.)

residence.    (*Id*. at 307; Ex. 1-9.)    The children were later identified as the

defendant's 10-year-old twins, and youngest daughter age four.    (Doc. 144,

Transcript of Jury Trial (Volume 2) at 33.)    The defendant's youngest daughter

was wearing the same pink boots as the child in the first image emailed to

Detective Butler.    (*Id*. at 73.)    The child was also wearing the same pink dress

shown in Ex. 1-4.    (*Id*. at 43.)    Comparing records from Yahoo! for

"cheyenneandliberty" with the EXIF data, the image was taken about 25 minutes

prior to the time the email was sent.    (*Id*. at 71; Exs. 1-9, 29.)

Finally on April 28, 2013, "cheyenneandliberty" sent Detective Butler an

email that contained an image of the defendant's youngest daughter, inside a

vehicle, bending over the back seat.    (Doc. 143, Transcript of Jury Trial (Volume

1) at 308; Ex. 1-10.)    The child is wearing the same pink boots as shown in the

images emailed in Exhibit 1 and Exhibit 1-9.    (Doc. 144, Transcript of Jury Trial

(Volume 2) at 74 – 75.)    Comparing the Yahoo! records to that EXIF data, the

image was taken about 17 minutes prior to the time the email was sent.    (Exs. 1-

10, 29.)

According to records from Yahoo!, (Ex. 2), and AT&T, (Exs. 4 and 6),

investigators found that many of the IP addresses associated to the emails from

"cheyenneandliberty" were assigned by the service provider for the use of wireless

devices, and therefore could not be tied to any one account or address.    (Doc. 144,

Transcript of Jury Trial (Volume 2) at 47 48.)   However, these records did show that the IP address used to send Exs. 1-4, 1-5, 1-6, and 1-7 were assigned to the defendant at his home address during the time that the emails were sent.   (*Id.* at 28, 46, 50.)

Special Agent Cassidy Casner, HSI, received the investigation referral for "cheyenneandliberty."   (*Id.* at 20 – 22).   On May 7, 2013, investigators executed a search warrant at the defendant's residence in Topeka, Kansas.   (*Id.* at 30 - 31; Ex. 8.)   During the execution of the search warrant, the defendant's daughters were present.   Agent Casner recognized the three youngest daughters from the images "cheyenneandliberty" sent to Detective Butler.   (*Id.* at 32.)

Also during the execution of the search warrant, investigators seized an iPhone 4s from the defendant, as well as other electronic devices.   (*Id.* at 32 - 34, 140.)   Investigators also seized bedding, a pink dress, and diapers that matched items in some of the images "cheyenneandliberty" sent to Detective Butler.   (*Id.* at 136 – 39.)

Investigators also seized the defendant's home security system.   (*Id.* at 54.) Agent Casner testified that she reviewed the security system, and compared the events shown on the system to the dates and times "cheyenneandliberty" sent emails to Detective Butler and to the dates and times shown in images with EXIF data.   (*Id.* at 72 – 74; Exs. 18, 19.)   Using a Powerpoint presentation as a

demonstrative aid, Agent Casner explained how the defendant's security system related to the other evidence in the case.   (*Id.* at 60; Ex. 20.)   Information from the security system confirmed that the defendant was using his phone when the emails and images of his daughter were sent; that the defendant was with his daughters when the images were created, and the youngest daughter was wearing the same clothes as in the images on the dates and times when the images were taken.   (*Id.* at 62, 63, 64 – 67, 70, 73.)   During this time period, Detective Butler received a total of eight emails from "cheyenneandliberty."   (*Id.* at 67 – 69; Ex. 1, "Wow… :) I haven't gotten that far yet ;) but I'm starting out . . . ; Exs. 1-4; 1-5, 1-6, 1-7; Ex. 1, "https://www.dropbox.com . . .; Ex. 1, "It'd be cool to find someone like you to do a photo shoot of each of mine :). . . ; Ex. 1-8, image of the defendant and his four daughters.)

Finally, on April 28, 2013, at 6:17 p.m., the security system captured the defendant leaving the residence with his youngest daughter, who was wearing the pink boots, no leggings, and a multi-colored jacket.   (Doc. 144, Transcript of Jury Trial (Volume 2) at 73.)   The defendant returned to the residence with his youngest daughter at 6:54 p.m.   (*Id.* at 74.)   The defendant appeared to have a smart phone in his hand.   *Id.*   At 6:57 p.m., Detective Butler received Gov. Ex. 1-10, the image of the defendant's youngest daughter bent over the back seat of a vehicle wearing the same multi-colored jacket, pink boots, and no leggings.   (*Id.*

14

at 74 – 75; Ex. 1-10.)

Special Agent Craig Beebe, HSI, conducted an examination on the defendant's iPhone 4s and the defendant's Acer computer.   (*Id.* at 140, 146, 161 – 65.)   Agent Beebe also reviewed the Cellebrite report of the defendant's iPhone 4s prepared by Detective Patrick Ladd, Topeka Police Department.   (*Id.* at 157.)

Agent Beebe testified that the defendant's iPhone contained sexually explicit images of young females; evidence of the "cheyenneandliberty" email address; two videos of the defendant's youngest daughter, nude from the waist down as the camera zooms in on her genital area, with the defendant's voice in the background; and one of the images emailed to Detective Butler.   (*Id.* at 149 – 54; Ex. 21, pages 2, 4, 6, 8; Exs. 23, 502; Ex. 25.)   Agent Beebe also testified that the defendant's computer contained evidence of the "cheyenneandliberty" email address, reference to the website used to locate Detective Butler, and "ProudPapa" a name used in one of the early emails to Detective Butler.   (*Id.* at 162 – 64.)

**Defendant's case in chief**

The defendant took the stand and admitted that he took the images that were emailed to Detective Butler in Exhibits 1-4, 1-5, and 1-6.   (Doc. 145, Transcript of Jury Trial (Volume 3) at 16), but claimed that it was for an innocent purpose (*Id.* at 29 – 30).   The defendant testified that in April 2012, his youngest daughter reported to him that her mother's boyfriend had touched her inappropriately.   (*Id.*)

15

The defendant testified that the allegation was not substantiated so in July or August 2012 – eight months prior to the emails to Detective Butler – he took those images for future documentation.   (*Id.* at 30.)   The defendant admitted that he took the videos of his youngest daughter, but claimed he did it for the same innocent reason.   (*Id.*)

The defendant denied any knowledge of the "cheyenneandliberty" email address.   (*Id.* at 27 – 28.)   The defendant, who ran a heating and air-conditioning business with several employees, said that he had terminated two employees months prior to the emails to Detective Butler.   (*Id.* at 18, 21 – 23.)   One of these employees had set up all the defendant's computers, phones, and security system, and had all the passwords to his electronic devices and his wireless internet service.   (*Id.* at 23 – 24.)   The defendant admitted that it was fairly routine for him to have his phone in his hand as depicted in some of his home security footage.   (*Id.* at 53.)   The defendant did not know how the sexually explicit images of other children got on his phone.   (*Id.* at 37.)

The defendant presented the testimony of Andreux Doty, a partner in Private Digital Investigators.   (*Id.* at 66.)   Mr. Doty agreed with the conclusions from Agent Beebe's examination.   (*Id.* at 109, 121, 129.)   Mr. Doty also agreed that the emails to Detective Butler were sent using an iPhone device with the same operating system as the defendant's iPhone, and an IP address assigned to the

defendant's home internet service was used to send some of the emails to Detective Butler.   (*Id.* at 110 – 11.)

Mr. Doty testified that he found one very small file referencing "cheyenneandliberty."   (*Id.* at 76 – 77.)   Mr. Doty testified that nothing in the report prepared by Agent Beebe indicated that emails sent on the "cheyenneandliberty" account came from the defendant's phone.   (*Id.* at 99.)   In his report, Mr. Doty stated that he was "unable to definitively show viable evidence that the defendant . . . knowingly or unknowingly" sent the emails in question.   (Ex. 504.)

Prior to trial, the government filed a motion to restrict Mr. Doty's opinion testimony.   (Doc. 86, Government Motion *in limine* to Restrict Opinion Testimony of Defense Computer Examner.)   The government argued that Mr. Doty's "report offers improper opinion testimony, would not be helpful to the determination of a fact in issue, and amounts to improper vouching or substitution of the defendant's testimony."   *Id.*   At the limine conference, counsel for the defendant conceded the government's position and stated that the parties had discussed the prospect of reaching an agreement to redact the "offensive language."   (Doc. 142, Transcript of In Limine Conference at 3.)   However, the report introduced into evidence at trial retained the same "offensive language."   (Ex. 504.)

Mr. Doty testified on cross examination that as part of his review, he

17

received a report prepared by Tammy Loehrs.   (Doc. 145, Transcript of Jury Trial (Volume 3) at 106 – 107; Ex. 32, Ex. 504.)   Mr. Doty testified that Loehrs had been contacted early in the case to provide a forensic review of the defendant's devices.   (*Id.*)   Mr. Doty testified that Loehrs examined the mirror image of the physical devices seized from the defendant.   (*Id.* at 120.)   Mr. Doty agreed that, for the most part, the Loehrs report was consistent with Agent Beebe's findings. (*Id.* at 121.)   Mr. Doty was asked about Loehrs' finding over 1,000 hits for "cheyenneandliberty," and Mr. Doty agreed that was in the report.   (*Id.* at 122 – 23.)   Mr. Doty was asked about Loehrs' finding 45 hits for "ProudPapa," and Mr. Doty agreed that was in the report.   (*Id.* at 123.)

On re-direct, Mr. Doty testified that he "re-reviewed" the entire Loehrs report.   (*Id.* at 135.)   Mr. Doty testified that based on an incorrect premise in the Loehrs report pertaining to the biographical data on the computer and her failure to validate the claim of 1155 hits for "cheyenneandliberty," he did not give much credence to the report.   (*Id.* at 138 – 39.)

## IV.   Discussion

The defendant seeks relief under 28 U.S.S.C. § 2255 on seven (7) grounds, alleging that his trial counsel, Michael Francis, performed deficiently in various phases of his prosecution.   The government addresses each ground below, and explains why each ground is insufficient to vacate his conviction and sentence.

18

## A.    Ground One:   Counsel Failed to Raise the Question of Compentency

The defendant claims that Mr. Francis was ineffective for failing to request and obtain a competency hearing.   The defendant further claims that prior to and during trial he was under the influence of a combination of drugs, both legal and illegal, was unable to understand the nature and consequences of the proceedings against him, and was unable to properly assist in his defense.   (Doc. 157-1 at 1.)

During the course of the trial, the Court had two opportunities to converse directly with the defendant.   The first was during the *Lafler/Frye* colloquy when the defendant confirmed that he had been advised of the government's plea offer. (Doc. 143, Transcript of Jury Trial (Volume 1) at 241.)   The second was when the Court inquired about the defendant's decision to testify.   (Doc. 145, Transcript of Jury Trial (Volume 3) at 9 – 14.)   Further, the defendant testified in his own defense, and although the jury rejected it, put forth a defense to the charges and testified consistent with that defense.

Competence is a question of fact.   *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. 1998).   Moreover, the Court may properly rely on its own observations of the "defendant's comportment."   *See Bryson v. Ward*, 187 F.3d 1193, 1201 (10th Cir. 1999) (rejecting defendant's claim that after having been found competent to stand trial he took medication that impaired his thinking).

19

The defendant now claims that he was under the influence of legal and illegal drugs prior to and at trial.   However, the record belies this claim.   In particular, the defendant's trial testimony demonstrated that he understood the evidence and followed the defense strategy designed to address the government's evidence.   The defendant presents no evidence that he was incompetent to stand trial.   To the contrary, the defendant followed his trial strategy of attempting to explain or discredit the government's theory and evidence.   The defendant cannot meet the highly demanding standard to establish that counsel's omissions fell outside the wide range of professionally competent assistance.   *Strickland,* 466 U.S. at 690.

The defendant admitted that he took the image of his daughter that a fingerprint expert concluded his hand exposed her genital area.   (Doc. 145, Transcript of Jury Trial (Volume 3) at 16; Exs. 1-6, 26, 26-1.)   However, the defendant claimed he took the image for an innocent reason.   (Transcript of Jury Trial (Volume 3) at 30.)   The defendant testified that his youngest daughter disclosed possible sexual abuse in April of 2012.   (*Id.* at 29.)   But, after authorities found the abuse unsubstantiated, the defendant took the image in July 2012, "to try to get a picture of what basically is evidence, what her vagina looked like in a normal circumstance."   (*Id.* at 30, 43.)   The defendant never turned the photos over to law enforcement.   (*Id.* at 48.)   The defendant also admitted that he

took the two videos of his youngest daughter depicting her nude from the waist down, jumping on the bed, but that he did not intend those to be "sexually explicit."   (*Id.* at 16, 38.)

The defendant further admitted that he, or one of his other daughters, took a video of his youngest daughter bending over the backseat of a vehicle, but he deleted the video "because her butt was sticking out."   (*Id.* at 33; Ex. 1-10.)   The defendant also admitted taking the picture of his three daughters sitting on his parents' back deck.   (*Id.* at 45; Ex. 1-9.)

The defendant was careful to deny any criminal activity.   For example, the defendant denied that he emailed any of the images to Det. Butler.   (Transcript of Jury Trial (Volume 3) at 55.)   The defendant denied any knowledge of the email address, "cheyenneandliberty@yahoo.com," the website "imgsrc.ru," or the sexually explicit images of minor females located in an app on his iPhone.   (*Id.* at 27, 28, 37.)

The defendant attempted to show how someone else could have committed these crimes.   The defendant explained how someone else had the motive and opportunity to hack his electronic devices and send the emails to Det. Butler.   The defendant testified that Dewayne Zinn was a former neighbor and employee (*id.* at 21), and had a phone line on the defendant's account (*id.* at 24, 36).   The defendant terminated Mr. Zinn's employment in December 2012.   (*Id.* at 22.)

Bob Henry was a former employee who set up the computers, cameras, security at the business and the defendant's home, and kept records of all the passwords.  (*Id.* at 21-23.)   Mr. Henry lived with the defendant and accessed the home security system at some point.  (*Id.* at 36.)   After the defendant terminated Mr. Zinn's employment, Mr. Henry spent most of his time with him (*id.*), and moved in with Mr. Zinn on January 20, 2013 (*id.* at 24).   Mr. Henry had an undisclosed landline in the defendant's house (*Id.* at 25), and had access to the defendant's iPhone (*Id.* at 24).

The defendant appropriately responded to the questions asked.   However, the jury rejected his defense.   Given the defendant's clear and coherent testimony, he cannot show that he was prejudiced by counsel's failure to raise competency. The defendant cannot show a reasonable probability that, had counsel raised competency, the result of the proceeding would have been different.   The likelihood of a different result must be substantial, not just conceivable.   In any event, the defendant was clearly competent at trial.   He demonstrated a command of the facts and the defense strategy.   There is little likelihood that the defendant would have been found incompetent.   Counsel's decision not to raise competency was manifestly reasonable.   Moreover, the defendant cannot show how the results of the proceeding would have been different had counsel raised the competency issue. *Strickland,* 466 U.S. at 684.   There is no substantial likelihood that the trial

results would be different.   *Richter*, 562 U.S. at 112.   Thus, the Court should deny

the defendant's motion on this ground.

### B.      Ground Two:   Counsel Failed to Investigate

The defendant claims that Mr. Francis was ineffective by failing to

investigate a number of areas.   The defendant faults Mr. Francis for failing to

interview or investigate the following:

- failure to interview Stacey Johnson, his children's therapist;
- failure to interview the defendant's daughters regarding to Bob Henry, knowledge of the email used to transfer contraband to Australia, the photo of the youngest daughter, and the type of parent the defendant was;
- failure to interview and investigate Bob Henry as the true perpetrator of the crimes;
- failure to interview Antwaun Williams;
- failure to investigate email accounts associated to IP address one year prior to offense conduct in the instant case;
- failure to investigate Dwayne Zinn as a possible accomplice to Bob Henry;
- failure to interview the defendant's divorce attorney
- failure to interview the defendant's mother as a witness;
- failure to interview Judy Polinskey-Perez;
- failure to interview the defendant's neighbors;
- failure to interview the defendant's daughters' school teachers and school secretary;
- failure to interview witnesses with "insight" into Bob Henry's hacking abilities and mental state;
- failure to interview other witnesses close to the defendant and his children.

These claims all fail under both *Strickland* prongs.   Most of these claims pertain to

counsel's failure to interview someone.   But, the defendant fails to provide an

affidavit for the proposed witnesses to substantiate the individual would testify,

and that the testimony would be favorable.   *See, United States v. Jordan*, 461

23

Fed.Appx. 771, 775 (10th Cir. 2012) (the defendant must show both that the witness would testify, and testify favorably), unpublished, quoting *Snow v. Sirmons*, 474 F.3d 693, 731 n.42 (10th Cir. 2007).   The defendant did provide affidavits from eight individuals, but none of these potential witnesses offer information that would have changed the outcome of the trial.   The defendant cannot show that counsel's strategic and tactical decisions were completely unreasonable and unrelated to a possible defense strategy.   *Ward*, 200 F.3d at 1296.

The defendant simply posits that a possibility exists that some of the above witnesses or avenues of investigation might have led to favorable evidence.   These assumptions are insufficient to show counsel's performance was deficient.   *See Rushin*, 642 F.3d at 1307 ("Because possibilities without proof are endless, they are no measure of counsel's performance.")

Moreover, "[t]he burden is with the defendant to allege facts which, if proven, would entitle him or her to relief."   *United States v. Gill*, 382 F. Supp. 2d 1229, 1231 (D. Kan. 2005), citing *Hatch,* 58 F.3d at 1471.   "[T]he allegations must be specific and particularized, not general or conclusory." *Id.*   In the instant case, the defendant's factual allegations are merely conclusory, and in some instances speculative or irrelevant.

For example, the defendant asserts that Stacy Johnson offered to facilitate an

interview with the defendant's daughters and "counsel could've asked them to testify in regards to Bob Henry's hacking activities, 'creepy behavior towards them' . . . or any other relevant information."   (Doc. 157-1 at 5 – 6.)   The defendant fails to show counsel was deficient by failing to interview either Ms. Johnson or his daughters.

The defendant also asserts that "It is possible that if it was <u>all</u> [Bob Henry] that he would admit to it and give me an explaination [sic] for all my kids and I have been through.   That may be optimistic [sic], but I think possible."   (*Id.* at 7 (emphasis in original).)   By his own admission, the defendant cannot show counsel was deficient for failing to interview Mr. Henry.   Moreover, the defendant cannot show Mr. Henry would have testified as demonstrated by the affidavit of Evelyn Emery.   (Doc. 157-7 at 37.)   Ms. Emery states that she confronted Mr. Henry at a laundrymat in 2018, and told him to "man-up and confess to the crime." (*Id.*)   According to Ms. Emery, Mr. Henry did not respond, retrieved his wet clothes, and left.   (*Id.*)

In addition, testimony of the defendant's sister would have damaged his defense.   As noted above, the defendant claimed that he took the image in Ex. 1-6 approximately three months after his youngest daughter indicated she had been sexually abused by his ex-wife's boyfriend.   (Doc. 145, Transcript of Jury Trial (Volume 3) at 29-30.)   However, the defendant's sister, Sarah Parnell, submitted

an affidavit that undermines the defendant's version of these events.   (Doc. 157-7 at 41-43.)   Ms. Parnell reports that the defendant said when his youngest daughter returned from a visit with her mother, she had "*bruising on her privates.*"   (*Id.* at 41 (emphasis added).)   The defendant "was also concerned that his estranged wife would make accusation against him."   (*Id.*)   Ms. Parnell further reported that she "encouraged [the defendant] to document any injury and report everything [his youngest daughter] told him about the injury to the proper authorities."   (*Id.*)   Ms. Parnell followed up by telling the defendant "that any photo taken for the purpose of documenting possible abuse should be taken to the authorities lest the purpose of the photo be misconstrued and use against him."   (*Id.*)   The defendant did not testify that he observed injuries, did not take the photos to document any injury, and never turned the photos over to any authorities.   Clearly, Ms. Parnell's testimony would not have tipped the evidentiary balance in the defendant's favor, and likely would have demonstrated the fallacy of the defendant's testimony. Thus, counsel was not deficient by failing to interview Ms. Parnell.

The defendant also claims that had counsel contacted Antwaun ("A-T") Williams, "Specific details could have been obtained" that "would have provided more evidence on hacking and/or an alibi link to Defendant's iPhone or the email in question."   (*Id.* at 9.)   The defendant does not substantiate this claim, and failed to provide an affidavit showing that Mr. Williams would testify, and that his

26

testimony would have been favorable or material.   Mr. Williams, on an

unspecified date, merely "noticed that the computer was infected from some

questionable websites," and installed virus protection.   (Doc. 157-5 at 11.)   In

2019, the defendant's father emailed Mr. Williams asking if the "'suspicious

websites' you referenced might have referred to [the defendant's] system being

hacked."   (*Id.* at 19.)   Mr. Williams apparently responded that he did not recall,

and due to multiple virus alerts he decided to wipe everything clean and start from

scratch.   (*Id.* at 23.)   In any event, the evidence in this case was overwhelming,

and easily overcomes any argument that the defendant's devices were hacked.

There is no evidence that the defendant's computer was hacked, and counsel was

not deficient for failing to pursue Mr. Williams as a witness.

As to the defendant's claim regarding an investigation of "tsears" and

"tsears123," the evidence at trial dispelled this possible defense.   The IP address

associated to these users, captured a year prior to the offense conduct in the instant

case, was the same as an IP address used by "cheyenneandlibery" on April 16,

2013.   However, according to AT&T, the IP address was part of a block of IP

addresses used by AT&T Wireless for internet access and web-based applications

for wireless devices.   (Ex. 6.)   There was no indication that a subpoena to AT&T

for the IP addresses connected to the users above would have born any useful

information.

The closest the defendant comes to satisfying *Strickland* is his assertion that counsel failed to "investigate or pursue the ***possibility*** that another person or persons were the actual actors involved in the crimes" of which the defendant was convicted.   (Doc. 157-1 at 12 (emphasis added).)   All of the defendant's complaints against counsel are simply "possibilities without proof," and is insufficient to show he was prejudiced.   The defendant has a duty to provide details to establish how any of the purported witnesses or evidence would have changed the outcome of the trial.   He fails to do so.   Even if counsel had pursued all of those possible witnesses, not one person's information would change the overwhelming evidence of the defendant's guilt.

The defendant cannot demonstrate that had counsel pursued these witnesses, the likelihood of a different result would be substantial, not just conceivable. *Richter*, 562 U.S. at 112.   The defendant cannot show that any of these possible witnesses would testify, or would testify favorably for him.   In any event, the defendant presented some of this information during his testimony, but the jury rejected his theory of defense.

The defendant fails to show prejudice under *Strickland*, which requires him to show that his counsel's alleged deficiencies "actually had an adverse effect on the defense," as opposed to "some conceivable effect on the outcome of the proceeding."   *Strickland,* 466 U.S. at 693.   The evidence of the defendant's guilt

was overwhelming.   All the evidence taken as a whole identified the defendant as the only person who could have committed these crimes.   For example, on April 28, 2013, the defendant sent the following emails from the associated IP addresses:

| Time | IP Address | Ex. No. |
|---|---|---|
| 00:35:54 | 108.92.13.21 | Ex. 1-4 |
| 00:36:18 | 108.92.13.21 | Ex. 1-5 |
| 00:37:13 | 108.92.13.21 | Ex. 1-6 (defendant's hand exposing youngest daughter's genitals |
| 00:38:34 | 108.92.13.21 | Ex. 1-7 ":) Just took a couple :)" |
| 10:27:22 | 108.200.162.253 | Ex. 1-8 (image of defendant and four daughters) |
| 12:27:52 | 166.147.99.60 | Ex. 1-9 (image of defendant's three daughters – youngest wearing clothes seen in security video |
| 16:58:33 | 166.147.96.182 | Ex. 1-10 (image of defendant's youngest daughter bending over backseat wearing clothes seen in security video |

Based on the overwhelming evidence of guilt, the defendant fails to bear his burden of affirmatively proving prejudice.   *See id.* ("ineffectiveness claims alleging a deficiency in attorney performance are subject to a general requirement that the defendant affirmatively prove prejudice").   "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," *id.*; rather, "[t]he likelihood of a different result must be

substantial, not just conceivable," *Harrington*, 562 U.S. at 112.

"In the specific context of an uncalled witness, [a defendant] must show 'that the testimony of an uncalled witness would have been favorable' and that 'the witness would have testified at trial.'" *Jordan*, 461 Fed.Appx. at 775, quoting *Snow*, 474 F.3d at 731 n.42 (brackets and quotation omitted).   Further, "the decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney."   *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir.2008); *see also Valenzuela v. United States*, 261 F.3d 694, 699-700 (7th Cir.2001) (holding that "a lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review" (quotation and alteration omitted)); *United States v. Smith*, 198 F.3d 377, 386 (2d Cir.1999) ("The decision whether to call any witnesses on behalf of the defendant, and if so which witnesses to call, is a tactical decision of the sort engaged in by defense attorneys in almost every trial." (quotation omitted)). "Whether to call a particular witness is a tactical decision and, thus, a matter of discretion for trial counsel."   *Id.* (quotation omitted); *and see*, *Parker v. Scott*, 394 F.3d 1302, 1322 (10th Cir. 2005) (failure to call a witness was not unreasonable where child was four years old at the time of the events and may have been able to corroborate detrimental evidence).

The defendant not only testified in support of his defense theory, but also

presented other evidence to support his defense.   The defendant called his father,
Edward Kearn, to testify that he looked at some of the discovery, including the
Celebrite report.   (*Id.* at 57-58.)   Mr. Kearn identified two items located in the
discovery that were introduced into evidence.   (*Id.* at 62-63.)

The defendant then presented the testimony of Andreux Doty, his computer
examiner.   Mr. Doty testified that an email sent the day that the account was
activated to "cheyenneandliberty" from a person identifying himself as "Ben
Parker" appeared to be communicating with one of the defendant's twins.   (*Id.* at
74-75; Ex. 501.)   Mr. Doty also testified that he located a single trace file
referencing "cheyenneandliberty."   (Transcript of Jury Trial (Volume 3) at 76; Ex.
502.)   That file was "incredibly small."   (Transcript of Jury Trial (Volume 3) at
77.)   Mr. Doty also testified that he only found 13 emails sent on the defendant's
phone, and none of those related to the "cheyenneandliberty" email account.   (*Id.*
at 81-82.)   Counsel was not ineffective in his interaction with Mr. Doty, and the
defendant cannot show the trial outcome would have been different if Mr. Doty
had the proper equipement to conduct his examination, or reviewed the unredacted
Celebrite report.

The defense in this case was that the defendant was not responsible for the
email communications with Detective Butler, was responsible for taking the
sexually explicit images of his minor daughter, but for an innocent purpose.   None

of the purported witness testimony would change the trial's outcome.   Thus, the Court should deny the defendant's motion on this ground.

### C.   Ground Three:   Counsel Failed to Engage in Proper Trial Practice and/or Strategy

The defendant claims that Mr. Francis was ineffective because he failed to engage in proper trial practice and/or strategy.   (Doc. 157-1, at 14.)   The defendant complains that counsel failed to provide his expert witness, Andreux Doty, with the proper equipment to conduct his examination, failed to ensure that Doty reviewed the complete Cellebrite report, and failed to allow Doty to offer an improper expert opinion.[4]   Further, the defendant complains that counsel did not acquire full discovery, failed to file a motion to suppress, failed to object during trial, and failed to discuss with the defendant his right whether or not to testify. These claims all fail under both *Strickland* prongs.   The defendant cannot meet the highly demanding standard to establish that counsel's performance was deficient. *Strickland,* 466 U.S. at 690.

As to the defendant's claim that counsel failed to ensure Mr. Doty had the

---

[4]  It is important to note that although the parties agreed to modify the language in Mr. Doty's report, the original opinion that he was "*unable to definitely show viable evidence that the Defendant, Jonathan Kearn, did, in fact, knowingly or unknowingly send the emails in question*" was submitted to the jury.   (Ex. 504, emphasis in original.)

proper equipment to conduct his examination and to ensure Mr. Doty reviewed the complete Cellebrite report, the defendant fails to establish how this affected his defense strategy.   The defendant cannot show that counsel's omissions fell outside the wide range of professionally competent assistance.

As to the defendant's claim regarding Mr. Doty's opinion testimony, this improper opinion was presented to the jury.   Further, the defendant raised this claim and numerous others on direct appeal, and the appellate court fairly resolved all against him.   *United States v. Kearn*, 863 F.3d 1299 (2017).   "It is well-settled that absent an intervening change in the law of the circuit, a petitioner may not raise issues in a § 2255 petition that were raised and fairly resolved on direct appeal."   *United States v. Warner*, 23 F.3d 287, 291 (10th Cir.1994); *United States v. Prichard*, 875 F.2d 789, 791 (10th Cir.1989).

As far as the defendant's other claims of counsel's deficiencies, including his failure to obtain full discovery, failure to file a motion to suppress, and failure to object, "[i]f [an] omitted issue is without merit, counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel."   *United States v. Cook*, 45 F.3d 388, 393 (10th Cir.1995) (internal quotation marks omitted); *Cargle v. Mullin*, 317 F.3d 1196, 1202 (10th Cir.2003) (concluding that appellate counsel did not perform deficiently in failing to raise a patently meritless legal issue"); *United States v. Orange*, 447 F.3d 792, 797 (10th Cir. 2006) ("If the omitted issue

is without merit, then counsel's failure to raise it is not prejudicial, and thus is not ineffective assistance.") (internal citation omitted).

It is worth noting that the defendant's appellant counsel, despite attacking Mr. Francis's performance, in fact agreed with some of Mr. Francis's trial strategy. For example, Daniel Hansmeier, Kansas Federal Public Defender Appellate Chief, opined that a motion to suppress the search of his cell phone would be unsuccessful.   (Doc. 157-6 at 50.)   Mr. Hansmeier also opined that it was not "possible to draw inferences from any IP address that began with 166" because "[t]he testimony at trial established that those IP addresses were random and could have been assigned to anyone" and "it would not seem all that relevant that one particular individual used that IP address some years before the instant offense conduct."   (*Id.* at 52.)

The defendant is not entitled to relief based on these purported omitted issues.   In addition, the defendant fails to show prejudice under *Strickland*.   He cannot show that counsel's alleged deficiencies "actually had an adverse effect on the defense," as opposed to "some conceivable effect on the outcome of the proceeding."   *Strickland*, 466 U.S. at 693.   Given the weight of the evidence against him, and the highly speculative nature of the allegations to support his ineffectiveness claims, there was "no reasonable probability that, had counsel not committed the errors [the defendant] now claims were committed, the outcome of

the case would have been different." *See Boyd v. Ward*, 179 F.3d 904, 915 (10th Cir. 1999).

The defendant cannot show that counsel's failure to file any suppression motions was unreasonable. An attorney does not provide ineffective assistance of counsel by failing to raise a meritless claim. *United States v. Young*, 862 F.2d 815, 820 (10th Cir. 1988) (counsel not ineffective for failing to file motion to suppress that probably would not have been granted). Law enforcement searched the residence pursuant to a warrant issued by a neutral and detached magistrate. Suppression is not appropriate "when police act in "objectively reasonable good faith belief that their conduct is lawful." *Davis v. United States,* 564 U.S. 229, 238 (2011) (citations and quotations omitted.) When police act in "objectively reasonable reliance on a subsequently invalidated search warrant" obtained from a neutral and detached magistrate, "the marginal or nonexistent benefits produced by suppressing evidence cannot justify the substantial costs of exclusion." *United States v. Leon*, 468 U.S. 897, 922 (1984).

The defendant also cannot show that counsel's failure to object during trial was unreasonable. The defendant cannot say that any objections would have been successful, or that any objections would have changed the outcome of the trial. Failure to make a particular objection does not usually constitute ineffectiveness because objections necessarily fall within trial strategy. *See, Lundgren v.*

*Mitchell*, 440 F.3d 754, 774–75 (6th Cir. 2006) (noting that in any trial, "numerous potentially objectionable events occur," and that "experienced trial counsel learn that objections . . . could act to their party's detriment"). The evidence in this case was overwhelming.

The defendant also cannot show that counsel's failure to move for Judgment of Acquittal was unreasonable.   The defendant fails to establish any basis that such a motion at the close of the government's case, or at the close of all the evidence, would have been successful given the overwhelming evidence of his guilt.

Finally, the defendant's claim that counsel failed to discuss with him whether or not to testify is disputed by the trial record.   The discussion pertaining to the defendant's testimony began at the end of the second day of trial, on May 6, 2013.   (Doc. 144, Transcript of Jury Trial (Volume 2) at 175.)   Mr. Francis advised, "I would like to have a few extra minutes to check with my – I plan on putting him on – I had planned on putting my client on first thing tomorrow, but in the economy of time I'd kind of like to chat with him to see if we can put him on this afternoon and keep going.   (*Id.*)   The Court took a recess to give counsel time to consult with the defendant.   (*Id.* at 176.)   After the recess, Mr. Francis advised the Court that the defendant had a headache that was distracting him.   (*Id.* at 179.) The Court exercised its discretion in fairness to the defendant to allow him to

36

testify when he was not under the weather.   (*Id.* at 180.)

On the morning of May 7, 2013, the Court engaged in a colloquy with the defendant regarding his right to testify.   (Doc. 145, Transcript of Jury Trial (Volume 3) at 9.)   The pertinent exchange is as follows:

> THE COURT: Mr. Kearn, here's the questions and the subjects I need to raise with you.   Under our Constitution a defendant charged in a criminal case, as you are in this one, has an absolute right to decline to testify and to, by doing so, avoid the possibility that you might incriminate yourself by your testimony on the charges against you.
>
> The other side of that coin is you have an absolute right to testify if he choose to.   And so this choice belongs to you.   But I want to make sure, number one, you are aware and understand your constitutional right to refuse to take the witness stand and testify in this trial.   Do you understand that right?

(*Id.*)   The defendant confirmed that he did.   The Court then advised the defendant:

> THE COURT: And I also want to make sure you're aware, and I'm confident that you and Mr. Francis have talked about this, but that if you invoke that right and decline to testify that the Court will instruct the jury with the instructions at the end of the case that in our system a defendant charged in a criminal case has such a right and that having-- they may not consider the fact that you did not testify, if that is your choice, as any basis for an inference of concluding that you are guilty of any of the crimes charged. Do you understand I would give that instruction to the jury?

(*Id.* at 9 – 10.)   The defendant again confirmed that he did.   The Court and the defendant then had the following exchange:

> THE COURT: All right.   And so what I leave you with is that this choice of whether to testify or whether not to testify and to claim your rights under the

Constitution against self-incrimination is a decision that you must make. No one can make it for you.   I do encourage you to confer closely with your attorney about that decision and to consider his advice before you make that decision.

Let me ask then, have you discussed this decision with Mr. Francis?

THE DEFENDANT: We have not at length, but I understand the direction of the Fifth Amendment.

THE COURT: Do you believe you need more time to discuss with Mr. Francis the question whether you should testify or not testify before we proceed with the trial this morning?

THE DEFENDANT: I do not.

THE COURT: All right. And in your conversations with Mr. Francis do you feel like you have been provided sufficient information and sufficient guidance that allows you to make that decision on an informed basis?   Is my—

THE DEFENDANT: We have not entirely discussed the testify or don't testify. I-- I would like to testify in-- in this matter.

THE COURT: All right. What I would like to do then before we get the jury in is I'd like to wait a few minutes. I'd like for you two to go next door and to have that discussion and then we'll come back and continue this colloquy when you have.

THE DEFENDANT: Okay.

(*Id.* at 10-11.)   After the recess, the Court again addressed the defendant and his

understanding of his right:

THE COURT: All right.   After a brief recess we're back on the record. During the recess, Mr. Kearn, I hoped you would speak with Mr. Francis about the choice we discussed before the break, whether to testify or not to testify and to claim and invoke your rights under the Fifth Amendment of

38

the United States Constitution.    Did you have a discussion about that decision with Mr. Francis?

THE DEFENDANT: Yes, we did, Your Honor.

THE COURT: And now do you feel like you are fully informed of the rights that that privilege against self-incrimination gives you?

THE DEFENDANT: I'm-- I am fully informed.

THE COURT: All right. And you understand that no one can compel you, require you, to testify during this trial?

THE DEFENDANT: I do understand.

THE COURT: And if you are to testify, it is a choice that only you can make. That's the only way you can get to the witness stand, that is, by choosing to testify?

THE DEFENDANT: I understand, sir.

THE COURT: And now that you have had further conversation with Mr. Francis, do you understand that you have the right to refuse to testify and a coextensive right to testify in this trial against you?

THE DEFENDANT: Yes, I do.

(*Id.* at 12-13.)

It is clear from the record that the defendant was fully informed of his right whether or not to testify.    Not only was the defendant fully informed by the Court, but also was given ample opportunity to discuss his right with his attorney before testifying.    Even if counsel somehow failed to fully explain this right, the Court fully covered the right and potential consequences.    Therefore, counsel's

performance was not deficient and the defendant cannot show prejudice.   Thus, the Court should deny the defendant's motion on this ground.

**D.    Ground Four:   Counsel Failed to Advise the Defendant of the Maximum Sentence and Plea Offer**

On May 13, 2013, the defendant appeared before the Honorable K. Gary Sebelius on the Complaint initially filed in this case, charging the same crimes as later were incorporated into the Indictment.   (Doc. 1.)   The Court summarized the charges in the Complaint, and advised the defendant of the potential penalties as follows:

> Count 1 – Not less than 15 years, and not more than life imprisonment;
> Count 2 – Not less than 5 years, and not more than 20 years imprisonment;
> Count 3 – Not more than 10 years imprisonment.

(Doc. 10.; Recording of Rule 5 Hearing held on May 13, 2013.)

On June 6, 2013, the defendant appeared before the Judge Sebelius for Arraignment on the Indictment, which included the same three charges as the Complaint.   (Doc. 15.)   At that time, Judge Sebelius again summarized the charges, and advised the defendant of the potential penalties for each count.   (Doc. 17; Recording of Arraignment held on June 6, 2013.)   Mr. Francis was not counsel of record at that time.

On May 5, 2015, the first day of trial and prior to opening statements, the

Court held a "Lafler/Frye" hearing outside the presence of any potential jurors. (Doc. 143, Transcript of Jury Trial (Volume 1) at 240 – 41.)   The parties confirmed in the presence of the defendant that the government offered to let the defendant plead guilty to Count 3 of the Indictment under a binding plea agreement to a 10 year sentence.   Mr. Francis, said that he forwarded the offer to the defendant and the defendant turned the offer down.   The defendant then acknowledged in open court that he was made aware of the government's plea offer.

The defendant now claims that counsel was ineffective for failing to correctly advise him of the maximum sentence he was facing, and failed to give him adequate advice regarding the plea offer.   No basis exists to credit these claims of deficient performance.   First, as noted above, the Court ensured that the defendant was advised of the plea offer and had sufficient time to consider such. Thus, the defendant fails to show counsel's representation was deficient on this ground.

Second, even if counsel failed to advise the defendant of the sentencing consequences of losing at trial versus accepting the plea offer, the defendant was not prejudiced because Judge Sebelius twice advised him of the penalties if he were convicted of Count 1 or Count 2, as opposed to Count 3.   "A miscalculation or erroneous sentence estimation by defense counsel is not a constitutionally

41

deficient performance rising to the level of ineffective assistance of counsel."
*United States v. Norwood*, 487 F. App'x 431, 435 (10th Cir. 2012) (unpublished, quoting *United States v. Gordon,* 4 F.3d 1567, 1570 (10th Cir.1993)).

The defendant further admits that he could not plead guilty because "he would essentially be lying to the Court and thus committing perjury by accepting responsibility for criminal actions he had no part of."   (Doc. 157-1, at 25.)   The defendant then suggests that counsel committed error for failing to advise him of the ability to plead "no contest, or nolo contendere."   However, the defendant would have entered such a plea over the government's objection, and the government would be under no obligation to dismiss the remaining charges of the indictment.   *See* Fed. R. Crim. P. 11(a)(3) ("Before accepting a plea of nolo contendere, the court must consider the parties' views and the public interest in the effective administration of justice.")

The defendant cannot show that, but for counsel's deficient performance, the was a reasonable probability that the defendant would have accepted the plea and the prosecution would not have withdrawn it in light of intervening circumstances, such as defendant's demand for a no contest plea.   *Lafler*, 132 S.Ct. at 1385.   In fact, it is highly likely that the government would have withdrawn its offer under those circumstances.

The defendant cannot show that he was actually prejudiced under these

circumstances.   Thus, the Court should deny the defendant's motion on this ground.

### E.    Ground Five:   Counsel Failed to Raise a Violation of *Brady v. Maryland*

The defendant claims that Mr. Francis was ineffective by failing to obtain the security videos timely, and for failing to obtain the entire content of the security system's recordings.   The defendant again claims that Mr. Francis was ineffective by not ensuring Mr. Doty had the proper equipment to review the electronic evidence in this case.   These claims fail under both *Strickland* prongs.

The defendant cannot establish counsel's performance was completely unreasonable and had no relationship to the defense strategy.   *Ward*, 200 F.3d at 1296.   First, the defendant does not explain what relevant evidence would be on the security system that would exonerate him, and the existence of any such evidence is speculative.   Second, the defendant does not explain what new evidence Mr. Doty would locate, that would change the trail result, if he had conducted a full forensic examination of the electronic devices.   Mr. Doty testified that he examined an image of the defendant's computer.   (Doc. 145, Transcript of Jury Trial (Volume 3), at 601 – 602.)   As he conceded during his testimony, the examiners at the RCFL were helpful and responsive to Mr. Doty's requests, and he was able to look at whatever he felt he needed to review.   (*Id.*, at 602.)   Further,

Mr. Doty agreed with Agent Beebe's conclusions.   (*Id.* at 109, 121, 129.)

The defendant fails to show prejudice.   The defendant cannot show that counsel's deficient performance actually prejudiced his defense.   The defendant cannot show that counsel's alleged deficiencies "actually had an adverse effect on the defense," as opposed to "some conceivable effect on the outcome of the proceeding."   *Strickland*, 466 U.S. at 693.   The defendant has the burden to affirmatively prove prejudice, and "[i]t is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding," *id.*; rather, "[t]he likelihood of a different result must be substantial, not just conceivable," *Harrington*, 562 U.S. at 112.   Thus, the Court should deny the defendant's motion on this ground.

### F.   Ground Six:   Counsel Failed to Raise a Violation of *Blockburger v. United States*

The defendant claims that Mr. Francis was ineffective for failing to challenge the Indictment under *Blockburger v. United States*, 284 U.S. 161 (1977). This claim fails under both *Strickland* prongs.

The *Blockburger* test asks whether crimes charged under different statutes for the same conduct "require[ ] proof of an additional fact which the other does not."   284 U.S. at 304.   If not, double jeopardy bars prosecution under both statutes.   *Id*.   In the instant case, there is no double jeopardy bar, and the

defendant cannot show that counsel's performance was deficient.

The elements to prove production of child pornography in violation of 18

U.S.C. § 2215(b) include:

1.     the victim was under the age of 18 years;
2.     the defendant was a parent or person having custody or control of the victim;
3.     the defendant knowingly permitted the victim to engage in sexually explicit conduct *for the purpose of producing a visual depiction* of such conduct; and
4.     the defendant knew or had reason to know that the visual depiction would be mailed or transported across state lines, or was actually mailed or transported across state lines.

(Doc. 95, Instruction No. 12 (emphasis added).)

The elements to prove distribution of child pornography in violation of 18 U.S.C. §

2252(a)(2) include:

1.     the defendant *knowingly distributed a visual depiction*;
2.     such visual depiction was shipped or transported in interstate or foreign commerce by any means including computer;
3.     the production of such visual depiction involved the use of a minor engaging in sexually explicit conduct;
4.     such visual depiction is of a minor engaged in sexually explicit conduct;
5.     the defendant knew that at least one of the performers in such vixual depiction was a minor and that the visual depiction was of such minor engaged in sexually explicit conduct.

(*Id.*, Instruction No. 13 (emphasis added).)

The elements to prove possession of child pornography in violation of 18 U.S.C. §

2252(a)(4)(B) include:

1.     the defendant *knowingly possessed* one or more visual depictions of minors engaged in sexually explicit conduct;

2.    the production of the visual depiction involved the use of a minor engaging in sexually explicit conduct and the visual depictions were of such conduct;

3.    the defendant knew that such visual depiction involved the use of a minor engaging in sexually explicit conduct;

4.    the visual depiction had been either:   a) mailed, shipped or transported in interstate or foreign commerce, or b) produced using material that had been mailed, shipped or transported in interstate or foreign commerce by computer or other means.

(*Id.*, Instruction No. 14 (emphasis added).)   Each count requires an additional fact that the other counts do not.   "Under the *Blockburger* test for a double jeopardy violation, when one offense is a lesser-included offense of another, the two offenses are the same."   *United States v. Isabella*, 918 F.3d 816 (10th Cir. 2019).

"Possession of child pornography includes at least one element that production of child pornography does not: possession."   *United States v. Gomez-Diaz*, 911 F.3d 931, 934 (8th Cir. 2018); *United States v. Shouse*, 2015 WL 150237, at *4 (D. Mont. Jan 12, 2015) (unpublished, finding no double jeopardy violation when the defendant was simultaneously convicted of producing child pornography and possessing the same material).

Moreover, possession and distribution require proof of different facts.   *See United States v. Chiaradio*, 684 F.3d 265, 280 (1st Cir.2012) (holding that possession of child pornography is not a lesser-included offense of distribution of the same); *United States v. Woerner*, 709 F.3d 527, 539 (5th Cir.2013) (following Chiaradio ); *United States v. McElmurry*, 776 F.3d 1061, 1065 (9th Cir. 2015)

("Neither possession nor distribution of child pornography is necessarily a lesser-included offense of the other").

Assuming for the sake of argument that either Count 2 or Count 3 were lesser included offenses, the sentence in Count 1 would still control.   Assuming the counts were multiplicitous, the Court would simply vacate one of the convictions.   *United States v. Benoit*, 713 F.3d 1, 18 (10th Cir. 2013).   In *Benoit*, the defendant was convicted of both receipt and possession of child pornography. The Tenth Circuit determined these to be multiplicitous.   *Id.* at 18.   On remand, the district court vacated the lesser charge of possession.   *United States v. Benoit*, 605 F. App'x 704, 706 (10th Cir. 2015).

In the instant case, the production charge in Count 1 is the greater offense; therefore, the defendant would still be facing the same sentence.   The defendant cannot show that the results of the proceedings would have been different. *Richter*, 562 U.S. at 112.

Double jeopardy does not apply to the convictions in the instant case.   Thus, counsel's performance was not defective and the defendant was not prejudiced. The Court should deny the defendant's motion on this ground.

### G.   Ground Seven:   Cumulative Trial Errors

The defendant claims that Mr. Francis's trial errors collectively affected the "trial's fundamental fairness."   (Doc. 157-1.)   The defendant fails to identify any actual errors that occurred in connection with his conviction or his sentence. Therefore, this claim should fail under both *Strickland* prongs.

A cumulative error inquiry "aggregates all the errors that individually might be harmless, and it analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Wood*, 207 F.3d 1222, 1237 (10th Cir. 2000) (internal quotation marks omitted).   Cumulative error analysis is applicable only where there are two or more actual errors.   *Workman v. Mullin*, 342 F.3d 1100, 1116 (10th Cir. 2003). "[A] cumulative-error analysis should evaluate only the effect of matters determined to be error, not the cumulative effect of non-errors."   *United States v. Rivera*, 900 F.2d 1462, 1471 (10thCir. 1990).

In this case, the defendant fails to identify any actual errors, much less two or more.   Counsel was not deficient for failing to raise this issue.   There is no basis for a cumulative error analysis, and the defendant has failed to demonstrate he was prejudiced on this claim of cumulative error.   Thus, the Court should deny the defendant's motion on this ground.


**V.     Conclusion**

48

It is the defendant's burden to show that counsel's performance was deficient and that the deficient performance caused prejudice under *Strickland*. *Beeler,* 332 F.2d 783.   It is the defendant's burden to present evidence to show by a preponderance that he is entitled to relief.   *Id.*   The defendant has failed to meet this burden.

Because none of the defendant's claims are meritorious, this Court should deny each one for the reasons argued above.   Moreover, because the files and the records of this case conclusively show that the defendant is entitled to no relief, this Court should deny the defendant's request for an evidentiary hearing.

Respectfully submitted,

STEPHEN R. MCALLISTER
UNITED STATES ATTORNEY

/s/ Christine E. Kenney
Christine E. Kenney, #13542
Assistant U.S. Attorney
444 SE Quincy, Room 290
Topeka, KS    66683
(785) 295-2850
christine.kenney@usdoj.gov

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 13, 2019, the foregoing was electronically filed with the clerk of the court by using the CM/ECF system, which will send a copy of the foregoing to the defendant's last attorney of record, and a copy via first-class U.S. Mail to the following:

Jonathan Kearn
23150-031
MARION - USP
U.S. Penitentiary
Inmate Mail/Parcels
PO Box 1000
Marion, IL 62959

<u>s/ <i>Christine E. Kenney</i></u>
CHRISTINE E. KENNEY
