1                  UNITED STATES DISTRICT COURT
                         DISTRICT OF KANSAS
2

3    UNITED STATES OF AMERICA,

4      Plaintiff,                        Case No. 13-40057

5      v.
                                         Topeka, Kansas
6    JONATHAN KEARN,                     Date:  4/19/2021

7      Defendant.

8
     .........................
9
                 TRANSCRIPT OF EVIDENTIARY HEARING
10
           BEFORE THE HONORABLE DANIEL D. CRABTREE
11              UNITED STATES DISTRICT COURT JUDGE

12

13   APPEARANCES:

14   For the            Christine E. Kenney
     Plaintiff:         Office of United States Attorney
15                      290 US Courthouse
                        444 SE Quincy
16                      Topeka, KS 66683

17
     For the            Kirk C. Redmond
18   Defendant:         Lydia Krebs
                        Office of Federal Public Defender
19                      117 SW 6th Avenue
                        Suite 200
20                      Topeka, KS 66603

21

22

23

24   _____
        Proceedings recorded by machine shorthand, transcript
25   produced by computer-aided transcription.

1                          I N D E X

2
    Defendant's Witnesses:                              Page
3
   MICHAEL E. FRANCIS
4      Direct Examination By Mr. Redmond                   9
       Cross-Examination By Ms. Kenney                    31
5      Redirect Examination By Mr. Redmond               36

6   JONATHAN E. KEARN
       Direct Examination By Mr. Redmond                  40
7      Cross-Examination By Ms. Kenney                    47
       Redirect Examination By Mr. Redmond               49
8
    BRANDEN BELL
9      Direct Examination By Mr. Redmond                  50
       Cross-Examination By Ms. Kenney                    65
10     Redirect Examination By Mr. Redmond               67
       Examination By the Court                          69
11

12                        E X H I B I T S

13     Plaintiff's
       Exhibits              Offered          Received
14
          100                   6                6
15        101                   6                6
          102                   6                6
16
       Defendant's
17     Exhibits              Offered          Received

18         1                    6                6
           2                    6                6
19         3                    6                6
           4                    6                6
20         5                    6                6
           6                    6                6
21         7                    6                6
           8                    6                6
22         9                    6                6
          10                    6                6
23        11                    6                6
          12                    6                6
24        13                    6                6
          14                    6                6

25

13-40057   USA v Jonathan Kearn   4.19.21                    3

| | |
|---|---|
| 13:40:46 | 1 |

(Court called to order 1:40 a.m.)

13:40:46  2    THE COURT:  All right.  We're on the record in Case

13:40:48  3  No. 13-40057.  It's captioned the *United States of America*

13:40:52  4  *against Jonathan Kearn*.  I'll begin with appearances starting

13:40:56  5  with the United States.

13:40:58  6    MS. KENNEY:  May it please the court, the United

13:41:00  7  States appears by Christine Kenney, Assistant United States

13:41:03  8  Attorney.  Your Honor, with me at counsel table is our

13:41:06  9  paralegal, Sean Moore.

13:41:08  10    THE COURT:  All right.  Ms. Kenney, Mr. Moore, good

13:41:11  11  afternoon.

13:41:12  12    And for Mr. Kearn.

13:41:15  13    MR. REDMOND:  Good afternoon, Your Honor.  Jonathan

13:41:17  14  Kearn appears with Kirk Redmond and Lydia Krebs with the FPD.

13:41:23  15    THE COURT:  All right.  Good afternoon.

13:41:25  16    This is noticed as a hearing on Mr. Kearn's first

13:41:28  17  amended motion under Section 2255 to vacate, set aside, or

13:41:34  18  correct a sentence, and obviously the court has a prior

13:41:40  19  memorandum and order that focuses the issues for today, and Mr.

13:41:45  20  -- I perceive this to be an evidentiary hearing that the --

13:41:50  21  that there will be presentation of witnesses.

13:41:52  22    I confess this is the first time I've had a hearing in

13:41:55  23  this context, and so if there is a convention that's agreed

13:41:59  24  upon on, who will present what in what order, I'm interested to

13:42:03  25  hear about it.  If there's not, then we'll figure it out.  Is

13:42:07   1    there?

13:42:07   2          MR. REDMOND:  There is, Your Honor.  I believe I'll be

13:42:10   3    presenting the testimony of Mr. Francis, Mr. Kearn, and

13:42:14   4    Mr. Bell.  I'll be doing the direct for all three of those.

13:42:17   5          THE COURT:  All right.  That makes sense to me.  It

13:42:19   6    appears to me Mr. Kearn bears the burden on this motion, but

13:42:22   7    maybe you'll disabuse me of that.  I just want to make sure I

13:42:26   8    haven't pushed aside something you haven't agreed to.  It

13:42:28   9    sounds like we're on the same page.  Mr. Redmond, I'll turn to

13:42:31   10   your table to proceed as you see fit.

13:42:34   11         MR. REDMOND:  Thank you, Your Honor.  We have two

13:42:36   12   short preliminary matters.

13:42:37   13         THE COURT:  Please.

13:42:38   14         MR. REDMOND:  The first the parties --

13:42:45   15      (Court reporter interruption.)

13:42:45   16         THE COURT:  It's a challenge with masks, and so the

13:42:47   17   microphone becomes more important.  Certainly when you're at

13:42:51   18   the lectern, you're free to remove your face covering if you

13:42:56   19   feel safe doing that.  If you do not, of course, don't.  But

13:43:00   20   it's more important to be tethered to a microphone than ever.

13:43:04   21         MR. REDMOND:  Thank you very much, I will.  I'll just

13:43:05   22   start over.

13:43:07   23         Prior to the hearing, the parties conferred concerning

13:43:09   24   exhibits.  I believe the government has three, we have 14, and

13:43:14   25   neither party has any objection to -- to the other parties'

| | |
|---|---|
| 13:43:18 | 1 |

exhibits, and so we at this time would simply move those

13:43:21  2  exhibits into evidence; and if I could approach I have a copy

13:43:23  3  for the court.

13:43:24  4          THE COURT:  All right.  Please do.  And, by the way, I

13:43:28  5  just want to say, counsel, I'm grateful for the way you

13:43:31  6  interacted before this hearing so as to streamline the work we

13:43:35  7  have to do and also to enable the court to really focus on the

13:43:38  8  things that matter and not collateral things, so I'm grateful

13:43:41  9  to you for that high-quality professional work.  Thank you.

13:43:46  10         MR. REDMOND:  Thank you, Your Honor.  The only other

13:43:48  11  announcement we have --

13:43:49  12         THE COURT:  And do you want to narrate what

13:43:51  13  exhibits -- how these are numbered so the record will reflect

13:43:54  14  that information?

13:43:55  15         MR. REDMOND:  Yes, Your Honor.  Almost all court

13:43:57  16  documents, there are a number of plea petitions in other cases.

13:44:00  17  There are also three transcripts.  There is a copy of a CM/ECF

13:44:05  18  readout of Mr. Francis' cases, which is Exhibit 14, and then

13:44:09  19  there are three transcripts of hearings that I intend to

13:44:12  20  reference in the testimony of Mr. Bell.  I apologize I don't

13:44:15  21  have an exhibit list that I have printed off but I will

13:44:18  22  reference them.  I'll identify them individually during the

13:44:20  23  testimony.

13:44:20  24         THE COURT:  So you've offered what are Mr. Kearn's

13:44:23  25  Exhibits 1 through 14?

13:44:26   1          MR. REDMOND:  That's correct, Your Honor.

13:44:27   2          THE COURT:  And then without objection those exhibits

13:44:28   3  are received, Ms. Kenney?

13:44:30   4          MS. KENNEY:  Yes, Your Honor.

13:44:31   5          THE COURT:  When it's your turn, I assume you'll offer

13:44:33   6  your three and we'll deal with those then?

13:44:36   7          MS. KENNEY:  Your Honor, it might make more sense, I

13:44:39   8  guess, and I think that we agreed on we would just -- we would

13:44:41   9  just introduce all of our exhibits up front.

13:44:44  10          THE COURT:  Let's go ahead and do it then.

13:44:45  11          MS. KENNEY:  So I would like to move at this time to

13:44:47  12  introduce Government's Exhibit 100, 101, and 102.  Your Honor,

13:44:54  13  Government Exhibit 100 is a recording of a voice message from

13:45:00  14  Mr. Francis to Duston Slinkard in our office.  Exhibit 101 is a

13:45:09  15  portion of a transcript that -- from the *Lafler-Frye* hearing

13:45:14  16  this court conducted prior to trial, and then 102 is a separate

13:45:19  17  transcript in an unrelated case of a plea hearing that occurred

13:45:23  18  before this court.

13:45:26  19          THE COURT:  All right.  Any objection to

13:45:29  20  Government's 100, 101, and 102?

13:45:32  21          MR. REDMOND:  No, Your Honor.

13:45:33  22          THE COURT:  They're received as well.

13:45:34  23          MS. KENNEY:  Can I --

13:45:36  24          THE COURT:  Please, you can refer to them freely

13:45:39  25  without additional procedural folderol.

13:45:46  1    MR. REDMOND:  The only other thing I had, the Tenth

13:45:49  2  Circuit law is clear when a defendant places into issue the

13:45:51  3  communications between a client and his attorney that the

13:45:54  4  privilege is waived as to those communications.  Some -- some

13:45:58  5  testifying attorneys want a court order as well.  But just to,

13:46:00  6  I guess, streamline things, after consultation with Mr. Kearn,

13:46:05  7  he waives the privilege consistently with the court's order

13:46:10  8  that cabined the communications that were at issue in this

13:46:14  9  case.

13:46:14  10    THE COURT:  Yeah, that seems to be the prevailing law.

13:46:18  11    Ms. Kenney, do you anticipate concerns from

13:46:21  12  Mr. Francis on that front or do you know?

13:46:23  13    MS. KENNEY:  I -- we have not had that conversation

13:46:28  14  beyond what the court put in your order, I think the April 2020

13:46:33  15  order perhaps; but, no, we have not had that conversation.

13:46:35  16    THE COURT:  Well, I view that as consistent with what

13:46:38  17  I've written about in the past.  But if you have an issue,

13:46:42  18  Mr. Francis, we can address it and take it then, but I do

13:46:46  19  understand what I've said in that order and I do believe it to

13:46:48  20  be the state of the law.

13:46:49  21    MR. REDMOND:  Thank you, Your Honor.  And we will call

13:46:51  22  Mr. Francis.

13:46:51  23    THE COURT:  All right.  Mr. Francis, please come

13:46:53  24  forward.

13:47:05  25    Excuse me, for those --

| | | |
|---|---|---|
| 13:47:06 | 1 | Please, Mr. Francis, come forward. |
| 13:47:08 | 2 | For those of you in the gallery, the order in the |
| 13:47:11 | 3 | district from our chief judge is those appearing in the |
| 13:47:13 | 4 | courtroom do need to be wearing a face covering unless special |
| 13:47:17 | 5 | circumstances, such as testifying, warrants.  So I do ask you |
| 13:47:19 | 6 | to, please, keep those on while you're in here.  If you're a |
| 13:47:23 | 7 | person who needs a recess from wearing a mask because of health |
| 13:47:26 | 8 | issues or like, I'd encourage you to step outside.  Don't be |
| 13:47:30 | 9 | reluctant to do that.  But while you're in the courtroom, the |
| 13:47:34 | 10 | court's order does require those. |
| 13:47:35 | 11 | All right.  Thank you.  Can you, please, accept the |
| 13:47:38 | 12 | oath, Mr. Francis. |
| | 13 | MICHAEL E. FRANCIS, |
| | 14 | called as a witness on behalf of the Defendant, having first |
| 13:47:50 | 15 | been duly sworn, testified as follows: |
| 13:47:50 | 16 | THE COURT:  Please be seated, sir. |
| 13:47:52 | 17 | THE WITNESS:  Yes, sir. |
| 13:47:52 | 18 | THE COURT:  Would you say and spell your last name for |
| 13:47:54 | 19 | the record. |
| 13:47:54 | 20 | THE WITNESS:  My last name is Francis, F-R-A-N-C-I-S. |
| 13:47:58 | 21 | THE COURT:  And your full name is? |
| 13:48:01 | 22 | THE WITNESS:  Michael. |
| 13:48:02 | 23 | THE COURT:  Thank you, Mr. Francis. |
| 13:48:03 | 24 | THE WITNESS:  I'm sorry. |
| 13:48:03 | 25 | THE COURT:  Mr. Redmond, you may -- you may proceed. |

13-40057  USA v Jonathan Kearn  4.19.21                    9

| | | |
|---|---|---|
| 13:48:10 | 1 | MR. REDMOND:  Thank you, Your Honor.  And can I |
| 13:48:11 | 2 | approach the witness?  It will probably be easier to give him a |
| 13:48:14 | 3 | copy of the exhibits. |
| 13:48:15 | 4 | THE COURT:  Why don't you give him all the exhibits, |
| 13:48:17 | 5 | and you two can take care of each other on masks while you're |
| 13:48:19 | 6 | approaching if you would. |
| 13:48:20 | 7 | MR. REDMOND:  You got it. |
| 13:48:40 | 8 | THE WITNESS:  Is it okay to remove my mask? |
| 13:48:41 | 9 | THE COURT:  It is while testifying. |
| 13:48:42 | 10 | And, Mr. Redmond, at your discretion while questioning |
| 13:48:45 | 11 | the witness if you're comfortable. |
| 13:48:46 | 12 | MR. REDMOND:  Thank you very much, Your Honor. |
| 13:48:48 | 13 | THE COURT:  Thank you. |
| 13:48:49 | 14 | DIRECT EXAMINATION |
| | 15 | BY MR. REDMOND: |
| 13:48:50 | 16 | Q.  Mr. Francis, could you take a look at what's been admitted |
| 13:48:53 | 17 | as Defendant's Exhibit 14.  Sir, this was generated by entering |
| 13:49:07 | 18 | your name in the federal district court CM/ECF database.  Are |
| 13:49:11 | 19 | you the Michael E. Francis who these results summarize? |
| 13:49:15 | 20 | A.  I'll tell you, I recognize most of these cases.  I didn't |
| 13:49:18 | 21 | realize I was involved in this many of them. |
| 13:49:21 | 22 | Q.  Looks like the tally at the top is 48 total federal cases? |
| 13:49:25 | 23 | A.  Yes. |
| 13:49:25 | 24 | Q.  And does this appear to be an accurate list of the clients |
| 13:49:28 | 25 | that you represented in federal court? |

13:49:28   1    A.   It does.

13:49:29   2    Q.   And it looks like you've been appearing in federal court in

13:49:32   3    the District of Kansas since 1990?

13:49:34   4    A.   Probably so.

13:49:36   5    Q.   Okay.  And as that notation at the top indicates, it

13:49:40   6    appears you've appeared in 48 cases?

13:49:45   7    A.   It looks like it, yes.

13:49:46   8    Q.   Okay.  And many of those were civil cases?

13:49:48   9    A.   Many of them were, yes.

13:49:51  10    Q.   In fact, most were civil cases?

13:49:53  11    A.   I believe that's correct.

13:49:54  12    Q.   Now, I'm not going to ask you to put your finger on every

13:49:57  13    single one of these case and count it up, but it looks to me

13:50:00  14    like about 17 of the 48 were criminal cases; does that sound

13:50:03  15    about right?

13:50:03  16    A.   That's probably about right.  I haven't counted them, but

13:50:05  17    that's probably about right.

13:50:07  18    Q.   Okay, sir, thank you.

13:50:09  19         I'm going to ask you general questions about a number of

13:50:11  20    those criminal cases that are not going to require you to

13:50:15  21    divulge anything beyond what would appear on the docket.

13:50:18  22    A.   All right.

13:50:18  23    Q.   So it looks like the -- of those -- of those 17 criminal

13:50:26  24    cases, not all of them resolved by plea; is that fair to say?

13:50:30  25    A.   That's fair to say.

13:50:31    1    Q.  And did you withdraw from some of those cases before they

13:50:34    2    were resolved?

13:50:34    3    A.  I -- it sticks in my mind that I withdrew from a few of

13:50:38    4    those cases or other counsel was hired and replaced me.

13:50:41    5    Q.  Okay.  And did you, in some instances, enter on behalf of

13:50:45    6    an interested party instead of a defendant?

13:50:48    7    A.  I may have.

13:50:49    8    Q.  I'm thinking specifically of the Scott Becker, Brandy

13:50:56    9    Schmitt cases.

13:50:57   10    A.  Yes, I probably did and that would have been probably on

13:50:59   11    behalf of Mr. Wurm.

13:51:00   12    Q.  Okay.  So the -- and Wurm is W-U-R-M?

13:51:06   13    A.  Yes, I'm sorry.

13:51:07   14    Q.  So I'm going to talk about those cases by category.

13:51:10   15    A.  Okay.

13:51:10   16    Q.  In 1995 you represented a William Eldon Engel in Case

13:51:16   17    No. 95CR10047; is that right?

13:51:18   18    A.  The name is familiar but I cannot tell you what the case is

13:51:23   19    about.

13:51:23   20    Q.  Okay.  And is -- is it consistent with your memory that the

13:51:27   21    docket sheet reflected that that case was dismissed?

13:51:33   22    A.  If that's what the docket sheet says, I would not argue

13:51:36   23    with that.

13:51:36   24    Q.  That's fair enough.  Is that a case that you were retained

13:51:38   25    in?

13:51:38   1    A.   I believe I was.

13:51:39   2    Q.   And it appeared to me the vast majority of the federal

13:51:43   3    criminal cases in which you appeared you were retained; is that

13:51:45   4    fair?

13:51:46   5    A.   I was only appointed in one federal case that I know of and

13:51:50   6    I was --

13:51:50   7    Q.   Okay.

13:51:50   8    A.   -- retained on all the other ones.

13:51:51   9    Q.   So you were then not part of the sort of panel of attorneys

13:51:54  10    who volunteered to take some of these cases?

13:51:56  11    A.   I volunteered all the time every year when I'd fill out my

13:52:00  12    application for my renewal of my bar certificate, but I wasn't

13:52:04  13    called on until years ago they had a big drug raid and they

13:52:07  14    just ran out of other lawyers and said, "Hey, can you do this?

13:52:10  15    And I said, "Sure."

13:52:11  16    Q.   Fair enough.

13:52:14  17         The -- and Mr. Engle's case, because the case was

13:52:17  18    dismissed, you obviously didn't participate in a guilty plea;

13:52:21  19    is that fair?

13:52:21  20    A.   That's true.

13:52:22  21    Q.   Do you remember representing Jerry Lee Penner in Case

13:52:32  22    No. 96CR40049?

          23         (Court reporter interruption.)

          24         MR. REDMOND:   I'm sorry, I get going too fast.

          25    BY MR. REDMOND:

| | | |
|---|---|---|
| 13:52:35 | 1 | Q. 96CR40049. |
| 13:52:35 | 2 | A. I remember the name. I don't remember what the case was |
| 13:52:38 | 3 | about. |
| 13:52:39 | 4 | Q. Okay. Do you remember attending a plea hearing in that |
| 13:52:43 | 5 | case? |
| 13:52:44 | 6 | A. I don't have independent recollection of that. |
| 13:52:46 | 7 | THE COURT: Can you just repeat the name of the case? |
| 13:52:48 | 8 | I'm sorry, I'm catching up with you. |
| 13:52:50 | 9 | MR. REDMOND: Yes, Your Honor. Jerry Lee Penner is |
| 13:52:53 | 10 | the defendant. |
| 13:52:54 | 11 | THE COURT: Thank you. |
| 13:52:55 | 12 | BY MR. REDMOND: |
| 13:52:55 | 13 | Q. And, in fact, would it be inconsistent with your memory if |
| 13:52:58 | 14 | that were, in fact, a supervised release case? |
| 13:52:59 | 15 | A. I -- I just don't remember; that very well could have been. |
| 13:53:03 | 16 | Q. That's fair. |
| 13:53:05 | 17 | Do you remember representing Nathan William Burkholder in |
| 13:53:11 | 18 | 2002 in Case No. 02CR40135? |
| 13:53:15 | 19 | A. I do not remember that. |
| 13:53:17 | 20 | Q. Okay. It's a -- is that a case -- I think the docket in |
| 13:53:22 | 21 | that case indicates that you were fairly quickly -- he hired |
| 13:53:25 | 22 | another lawyer fairly quickly? |
| 13:53:27 | 23 | A. Okay. |
| 13:53:27 | 24 | Q. So but, in any event, you didn't participate in a plea |
| 13:53:31 | 25 | hearing in that case? |

| | | |
|---|---|---|
| 13:53:31 | 1 | A.  Not that I recall. |
| 13:53:32 | 2 | Q.  Okay.  Do you recall representing Michael R. Wunder, which |
| 13:53:39 | 3 | is W-U-N-D-E-R? |
| 13:53:41 | 4 | A.  I do remember that case. |
| 13:53:42 | 5 | Q.  Okay.  And that's Case No. 09CR40052? |
| 13:53:53 | 6 | A.  Yes, it is. |
| 13:53:54 | 7 | Q.  Were you retained in that case, Mr. Francis? |
| 13:53:56 | 8 | A.  I was. |
| 13:53:56 | 9 | Q.  And what -- how did the case resolve itself? |
| 13:54:00 | 10 | A.  It was a jury trial and he was found guilty and was |
| 13:54:03 | 11 | sentenced. |
| 13:54:04 | 12 | Q.  Okay.  And so, in any event, you did not participate in a |
| 13:54:07 | 13 | guilty plea because he didn't plead guilty? |
| 13:54:09 | 14 | A.  No, let me answer this:  He went to trial, was found |
| 13:54:12 | 15 | guilty, and there was no guilty plea. |
| 13:54:14 | 16 | Q.  Yes.  Thank you, sir. |
| 13:54:16 | 17 | In 2010 in Case No. 10CR40034, do you recall representing |
| 13:54:26 | 18 | Kent Joseph Gockel, which is G-O-C-K-E-L? |
| 13:54:31 | 19 | A.  I do not recall that name. |
| 13:54:32 | 20 | Q.  Would that have been a case where you may have represented |
| 13:54:36 | 21 | someone in a civil capacity as opposed to a criminal capacity? |
| 13:54:40 | 22 | A.  I may have but it -- it has a CR designation on it and I -- |
| 13:54:44 | 23 | so I may have represented somebody in a civil capacity on that |
| 13:54:49 | 24 | but I do not recall the name. |
| 13:54:50 | 25 | Q.  That's fair, sir. |

13:54:51  1       And along those lines, the -- we referenced earlier Scott

13:54:56  2   Becker --

13:54:57  3   A.   Yes.

13:54:57  4   Q.   -- which is Case No. 10CR40077.  Do you recall the nature

13:55:03  5   of your participation in the case?

13:55:05  6   A.   I suspect my participation in that case was one of two

13:55:09  7   things.  It was either on representation of Michael Wurm,

13:55:17  8   W-U-R-M as you said, which is 09-40008, or I did something,

13:55:24  9   because that would have involved some of Mr. Becker's property

13:55:28  10  and I am the recording secretary for a thing called the Fin and

13:55:35  11  Feather Club, which has a leasehold on that property since

13:55:38  12  about 1937 up to about I think 2036.

13:55:41  13  Q.   Would it help -- would it refresh your recollection if I

13:55:45  14  told you the interested party in that case that you represented

13:55:47  15  was the Fin and Feather Club?

13:55:50  16  A.   Oh, okay, then it would, yes.

13:55:52  17  Q.   And the same is true of Brandy Schmitt in the same case?

13:55:55  18  A.   Could have been.

13:55:56  19  Q.   But you did not represent her as -- her -- you were not her

13:56:00  20  defense attorney --

13:56:01  21  A.   No --

13:56:02  22  Q.   -- Brandy Schmitt?

13:56:03  23  A.   -- not that I recall.

13:56:04  24  Q.   And that case number is the same, 10CR40077-2.

13:56:11  25       You obviously also represented Jonathan Kearn?

| | | |
|---|---|---|
| 13:56:14 | 1 | A.  Yes, I did. |
| 13:56:15 | 2 | Q.  And that case was resolved by trial? |
| 13:56:17 | 3 | A.  Yes, it was. |
| 13:56:17 | 4 | Q.  So, by my math, you've entered your appearance in 17 |
| 13:56:21 | 5 | federal criminal cases and eight of those:  Mr. Engel, |
| 13:56:27 | 6 | Mr. Penner, Mr. Burkholder, Mr. Wunder, Mr. Gockel, Mr. Becker, |
| 13:56:33 | 7 | Ms. Schmitt, and Mr. Kearn were not resolved by a plea; is that |
| 13:56:38 | 8 | consistent with your memory? |
| 13:56:39 | 9 | A.  I believe that's correct. |
| 13:56:40 | 10 | Q.  Okay.  So I want to move to cases that were resolved by |
| 13:56:44 | 11 | plea. |
| 13:56:44 | 12 | A.  All right, sir. |
| 13:56:46 | 13 | Q.  I believe you already mentioned Michael Wurm, who again is |
| 13:56:49 | 14 | W-U-R-M? |
| 13:56:50 | 15 | A.  Yes. |
| 13:56:51 | 16 | Q.  Do you remember representing Mr. Wurm? |
| 13:56:53 | 17 | A.  Yes. |
| 13:56:53 | 18 | Q.  And was that in Case No. 09CR40008? |
| 13:56:59 | 19 | A.  Yes, it was. |
| 13:57:00 | 20 | Q.  And the -- did Mr. Wurm actually plead guilty? |
| 13:57:05 | 21 | A.  As I recall, he did. |
| 13:57:07 | 22 | Q.  Okay.  And the -- in that case did you prepare a plea |
| 13:57:14 | 23 | petition? |
| 13:57:14 | 24 | A.  I'm sure I did. |
| 13:57:17 | 25 | Q.  Okay.  Would you look at Exhibit 3 for me, please. |

13-40057   USA v Jonathan Kearn   4.19.21                    17

| | | |
|---|---|---|
| 13:57:20 | 1 | A.  Yes, I have it. |
| 13:57:30 | 2 | Q.  And is that, in fact, a plea petition? |
| 13:57:32 | 3 | A.  Yes, it is. |
| 13:57:32 | 4 | Q.  And is that a plea petition that was filed in Mr. Wurm's |
| 13:57:35 | 5 | case? |
| 13:57:35 | 6 | A.  Yes, it was. |
| 13:57:36 | 7 | Q.  And is that your handwriting, sir? |
| 13:57:39 | 8 | A.  It looks like it is. |
| 13:57:40 | 9 | Q.  Would you turn to page 6 of that exhibit. |
| 13:57:56 | 10 | A.  Okay. |
| 13:57:56 | 11 | Q.  And that's the certificate of counsel? |
| 13:57:57 | 12 | A.  It is. |
| 13:57:58 | 13 | Q.  Is that handwriting consistent? |
| 13:57:59 | 14 | A.  Yes. |
| 13:57:59 | 15 | Q.  And so that is your handwriting? |
| 13:58:02 | 16 | A.  Yes. |
| 13:58:03 | 17 | Q.  Okay.  And so, in Mr. Wurm's case, I direct your attention |
| 13:58:06 | 18 | to paragraph 5 on page 1.  You indicated that Mr. Wurm pled |
| 13:58:14 | 19 | guilty to Count 32; is that right? |
| 13:58:19 | 20 | A.  I was on page 6. |
| 13:58:22 | 21 | Q.  Oh, my bad; it's page 1. |
| 13:58:22 | 22 | A.  No, that's okay.  It looks like Count 32. |
| 13:58:25 | 23 | Q.  Yes, sir. |
| 13:58:26 | 24 |     And what is the three lines below that; could you read |
| | 25 | that? |

13-40057   USA v Jonathan Kearn   4.19.21                          18

| | |
|---|---|
| 13:58:28 | 1 |
| 13:58:32 | 2 |
| 13:58:42 | 3 |
| 13:58:45 | 4 |
| 13:58:51 | 5 |
| 13:58:55 | 6 |
| 13:58:55 | 7 |
| 13:58:55 | 8 |
| 13:59:00 | 9 |

1    A.   Yes.  It says, "Submitted checks on a construction project

2    knowing the funds went to Scott Becker, DBA Becker Bank," I

3    guess, who received the money.

4    Q.   So when you -- when Mr. Wurm pled guilty, you used the plea

5    petition to admit the conduct underlying Count 32; is that

6    correct?

7    A.   Yes.

8    Q.   Does the name Randall Lindsay ring a bell?

9    A.   Randall Lindsay?

10   Q.   Yes, sir.

11   A.   No, not off the top of my head.

12   Q.   Can I turn your attention to Exhibit 4, please.

13   A.   Yes.

14   Q.   Is this, in fact, a plea petition?

15   A.   Yes, sir.

16   Q.   And is that a plea petition in Case No. 10-40053?

17   A.   Yes, it is.

18   Q.   And the defendant in that case is Randall Lindsay?

19   A.   Yes, it is.

20   Q.   And it's okay if you don't have independent recollection of

21   this, but is -- in paragraph 5, is that your handwriting?

22   A.   It appears to be.

23   Q.   And it does -- in fact, in paragraph 5, did you identify

24   what count Mr. Lindsay plead guilty to?

25   A.   Count 1.

| | | |
|---|---|---|
| 13:59:45 | 1 | Q.  And you, in paragraph 5, outlined the facts in support of |
| 13:59:52 | 2 | Mr. Lindsay's guilt on Count 5; is that right -- I'm sorry, on |
| 13:59:56 | 3 | Count 1? |
| 13:59:58 | 4 | A.  Yes. |
| 14:00:03 | 5 | Q.  Okay.  The -- |
| 14:00:04 | 6 | MR. REDMOND:  And I apologize, Your Honor, there are |
| 14:00:07 | 7 | two exhibits, No. 2 and No. 5, where I obtained the plea |
| 14:00:09 | 8 | petitions from the clerk's office, but it appears those plea |
| 14:00:12 | 9 | petitions are still under seal and so I would ask that the |
| 14:00:16 | 10 | court -- that those exhibits remain under seal, and I apologize |
| 14:00:20 | 11 | that I forgot. |
| 14:00:21 | 12 | THE COURT:  So that's Exhibits 2 and 5? |
| 14:00:23 | 13 | MR. REDMOND:  Yes, Your Honor. |
| 14:00:23 | 14 | THE COURT:  Any objection to Exhibits 2 and 5 being |
| 14:00:26 | 15 | treated as under seal? |
| 14:00:28 | 16 | MS. KENNEY:  No, Your Honor. |
| 14:00:28 | 17 | THE COURT:  All right.  They'll be so designated. |
| 14:00:30 | 18 | MR. REDMOND:  Thank you very much. |
| 14:00:31 | 19 | BY MR. REDMOND: |
| 14:00:31 | 20 | Q.  The -- would you turn to Exhibit No. 5, please. |
| 14:00:37 | 21 | A.  Five? |
| 14:00:38 | 22 | Q.  Yes. |
| 14:00:39 | 23 | A.  Yes. |
| 14:00:46 | 24 | Q.  And we're not going to talk on the record about the |
| 14:00:48 | 25 | specific content of Exhibit 5.  Okay? |

13-40057   USA v Jonathan Kearn   4.19.21                              20

| | | |
|---|---|---|
| 14:00:51 | 1 | A.   Okay. |
| 14:00:51 | 2 | Q.   Okay.   Thank you. |
| 14:00:52 | 3 |      Do you remember representing Jesus Alvarez-Mora? |
| 14:00:59 | 4 | A.   I do. |
| 14:00:59 | 5 | Q.   And that was in Case No. 10CR40121? |
| 14:01:04 | 6 | A.   Yes. |
| 14:01:05 | 7 | Q.   And Mr. Alvarez-Mora plead guilty? |
| 14:01:08 | 8 | A.   Yes, he did. |
| 14:01:09 | 9 | Q.   And you completed a plea petition? |
| 14:01:10 | 10 | A.   Yes. |
| 14:01:11 | 11 | Q.   And that plea petition in paragraph 5 supplied the factual |
| 14:01:14 | 12 | basis for the guilty plea? |
| 14:01:16 | 13 | A.   Yes, it appears it did. |
| 14:01:18 | 14 | Q.   And that paragraph was prepared by you? |
| 14:01:20 | 15 | A.   Yes. |
| 14:01:21 | 16 | Q.   Would you turn to Exhibit 2, please. |
| 14:01:36 | 17 | A.   Did you say two? |
| 14:01:37 | 18 | Q.   Yes, sir. |
| 14:01:38 | 19 | A.   Sorry, I grabbed the wrong one. |
| 14:01:41 | 20 | Q.   Do you remember representing Cynthia Moten, M-O-T-E-N? |
| 14:01:47 | 21 | A.   You know, I do, but for some reason I think I withdrew and |
| 14:01:52 | 22 | they got other counsel. |
| 14:01:53 | 23 | Q.   I think that's right.  I think that she -- that she got |
| 14:01:56 | 24 | other counsel after the guilty plea, but the docket will bear |
| 14:02:00 | 25 | us -- |

| | | |
|---|---|---|
| 14:02:01 | 1 | A.   Okay. |
| 14:02:01 | 2 | Q.   -- bear us out on that. |
| 14:02:03 | 3 | The -- that is Case No. 03CR40054.  And is this document, |
| 14:02:12 | 4 | does that appear to be a plea petition? |
| 14:02:13 | 5 | A.   It does. |
| 14:02:14 | 6 | Q.   And does that plea petition indicate that you were |
| 14:02:17 | 7 | representing Ms. Moten at the time of her guilty plea? |
| 14:02:24 | 8 | And I'm looking at paragraph 2, sir. |
| 14:02:27 | 9 | A.   Oh, yes, it does. |
| 14:02:30 | 10 | Q.   And the paragraph 5, again, contains a factual basis where, |
| 14:02:37 | 11 | without going into specifics, you lay out the facts that make |
| 14:02:43 | 12 | Ms. Moten guilty of the offense to which she pled? |
| 14:02:46 | 13 | A.   It appears it does. |
| 14:02:48 | 14 | Q.   Okay.  Can I turn your attention to Exhibit 6, please. |
| 14:03:03 | 15 | A.   Yes. |
| 14:03:03 | 16 | Q.   And did you -- does this appear to be a plea petition? |
| 14:03:07 | 17 | A.   Yes, it does. |
| 14:03:08 | 18 | Q.   And the defendant named in that plea petition, Jaryl, which |
| 14:03:13 | 19 | is J-A-R-Y-L, Wilson? |
| 14:03:17 | 20 | A.   Yes. |
| 14:03:17 | 21 | Q.   And you represented Mr. Wilson at that plea hearing? |
| 14:03:19 | 22 | A.   It appears I did. |
| 14:03:21 | 23 | Q.   And in paragraph 5 -- I'm sorry, did you complete this plea |
| 14:03:25 | 24 | petition? |
| 14:03:25 | 25 | A.   It looks as though I did.  I don't have recollection of |

| | | |
|---|---|---|
| 14:03:27 | 1 | Mr. Wilson, but it looks like I did. |
| 14:03:29 | 2 | Q.   And in paragraph 5 do you affirmatively specify the facts |
| 14:03:33 | 3 | that make Mr. Wilson guilty of the crime to which he pled? |
| 14:03:38 | 4 | A.   Yes. |
| 14:03:39 | 5 | Q.   Defendant's Exhibit 7 -- |
| 14:03:51 | 6 | A.   Yes. |
| 14:03:52 | 7 | Q.   -- is this a plea petition and was it prepared by you? |
| 14:03:55 | 8 | A.   Josh Burch.  Yes, I remember this gentleman.  Yes, it was. |
| 14:04:04 | 9 | Q.   And the defendant is Joshua Burch -- |
| 14:04:08 | 10 | A.   Yes. |
| 14:04:09 | 11 | Q.   -- B-U-R-C-H? |
| 14:04:11 | 12 | A.   Yes. |
| 14:04:11 | 13 | Q.   And the Case No. 11CR40102? |
| 14:04:16 | 14 | A.   Yes. |
| 14:04:16 | 15 | Q.   And Mr. Burch pled guilty? |
| 14:04:18 | 16 | A.   Yes. |
| 14:04:18 | 17 | Q.   And in paragraph 5 you specified the facts that made |
| 14:04:24 | 18 | Mr. Burch guilty? |
| 14:04:26 | 19 | A.   Yes. |
| 14:04:27 | 20 | Q.   Defendant's Exhibit 8 -- |
| 14:04:40 | 21 | A.   Yes. |
| 14:04:40 | 22 | Q.   -- does this appear to be a plea petition? |
| 14:04:42 | 23 | A.   It does.  Oh, I remember Mr. Bontrager. |
| 14:04:47 | 24 | Q.   And the defendant's name is what? |
| 14:04:49 | 25 | A.   Richard Bontrager. |

13-40057   USA v Jonathan Kearn   4.19.21                    23

| | | |
|---|---|---|
| 14:04:51 | 1 | Q.   That's B-O-N-T-R-A-G-E-R? |
| 14:04:54 | 2 | A.   Yes, it is. |
| 14:04:54 | 3 | Q.   Case No. 13CR40130? |
| 14:04:58 | 4 | A.   Yes, sir. |
| 14:04:59 | 5 | Q.   And you represented Mr. Bontrager at his plea hearing? |
| 14:05:03 | 6 | A.   Yes. |
| 14:05:04 | 7 | Q.   And you completed a plea petition? |
| 14:05:05 | 8 | A.   Yes. |
| 14:05:06 | 9 | Q.   And the plea petition in paragraph 5 supplied the factual |
| 14:05:08 | 10 | basis for the guilty plea? |
| 14:05:09 | 11 | A.   Yes, it does. |
| 14:05:10 | 12 | Q.   Defendant's Exhibit 9 -- |
| 14:05:23 | 13 | A.   Okay.  I remember Mr. Berroth also. |
| 14:05:27 | 14 | Q.   -- this is a plea petition? |
| 14:05:28 | 15 | A.   Yes, it is. |
| 14:05:29 | 16 | Q.   And the defendant's name is Marvin Berroth? |
| 14:05:33 | 17 | A.   Yes. |
| 14:05:34 | 18 | Q.   Berroth is B-E-R-R-O-T-H? |
| 14:05:38 | 19 | A.   Yes. |
| 14:05:38 | 20 | Q.   And it's Case No. 14 CR40006? |
| 14:05:43 | 21 | A.   Yes. |
| 14:05:43 | 22 | Q.   And similarly the plea petition in paragraph 5 supplies a |
| 14:05:48 | 23 | factual basis for the plea of guilty? |
| 14:05:50 | 24 | A.   Yes, it does. |
| 14:05:50 | 25 | Q.   One more. |

| | | |
|---|---|---|
| 14:05:53 | 1 | A.   That's fine. |
| 14:05:54 | 2 | Q.   Exhibit 10, please. |
| 14:05:57 | 3 | A.   All right. |
| 14:06:01 | 4 | Q.   Is this a plea petition? |
| 14:06:03 | 5 | A.   It is. |
| 14:06:03 | 6 | Q.   And is the defendant Dale Hull, H-U-L-L? |
| 14:06:08 | 7 | A.   Yes, it is. |
| 14:06:09 | 8 | Q.   And it's Case No. 14CR40090? |
| 14:06:14 | 9 | A.   Yes, it is. |
| 14:06:14 | 10 | Q.   And did, in paragraph 5, or -- |
| 14:06:18 | 11 |      First, did you prepare this plea petition? |
| 14:06:19 | 12 | A.   Yes. |
| 14:06:20 | 13 | Q.   And, in paragraph 5, do you lay a factual basis that |
| 14:06:25 | 14 | Mr. Hull embezzled union funds from the Brotherhood of |
| 14:06:28 | 15 | Locomotive Engineers and Trainmen? |
| 14:06:30 | 16 | A.   Yes, I did. |
| 14:06:31 | 17 | Q.   And the -- so you, on behalf of the defendant, supplied a |
| 14:06:34 | 18 | factual basis for the guilty plea? |
| 14:06:36 | 19 | A.   Yes, I did. |
| 14:06:37 | 20 | Q.   Okay.  So by my math you've identified -- or you |
| 14:06:40 | 21 | represented nine defendants in criminal cases who pled guilty |
| 14:06:43 | 22 | in federal court; is that right? |
| 14:06:44 | 23 | A.   It sounds like it. |
| 14:06:46 | 24 | Q.   Okay.  And, in every one of those nine guilty pleas, you |
| 14:06:49 | 25 | supplied the factual basis of guilt? |

13-40057   USA v Jonathan Kearn   4.19.21                    25

| | | |
|---|---|---|
| 14:06:50 | 1 | A.  Yes. |
| 14:06:52 | 2 | Q.  And you supplied it in the plea petition? |
| 14:06:54 | 3 | A.  Yes. |
| 14:06:54 | 4 | Q.  Always in paragraph 5? |
| 14:06:55 | 5 | A.  In these, yes. |
| 14:06:57 | 6 | Q.  So to be -- to belabor it, I suppose, a hundred percent of |
| 14:07:03 | 7 | the time you represented federal criminal clients in a plea |
| 14:07:05 | 8 | hearing, you supplied the factual basis for that? |
| 14:07:07 | 9 | A.  Yes, I believe so. |
| 14:07:08 | 10 | Q.  Okay.  And you chose that course based on your knowledge |
| 14:07:10 | 11 | and experience? |
| 14:07:11 | 12 | A.  Yes. |
| 14:07:11 | 13 | Q.  And you chose the course -- that course because you |
| 14:07:15 | 14 | understood the law to require it? |
| 14:07:16 | 15 | A.  Yes. |
| 14:07:17 | 16 | Q.  And did you share your client -- with your clients your |
| 14:07:20 | 17 | knowledge and experience concerning guilty plea hearings in |
| 14:07:23 | 18 | federal court? |
| 14:07:23 | 19 | A.  Yes, I did. |
| 14:07:24 | 20 | Q.  And so, based on your knowledge and experience and the |
| 14:07:27 | 21 | advice to your clients, every time somebody pled guilty who you |
| 14:07:31 | 22 | represented, the factual basis for guilt was supplied in the |
| 14:07:34 | 23 | plea petition? |
| 14:07:34 | 24 | A.  Yes. |
| 14:07:35 | 25 | Q.  Would you turn your attention to Exhibit 1, please. |

| | |
|---|---|
| 14:07:47 | 1 |
| 14:07:47 | 2 |
| 14:07:51 | 3 |
| 14:07:53 | 4 |
| 14:07:54 | 5 |
| 14:07:57 | 6 |
| 14:07:58 | 7 |
| 14:08:00 | 8 |
| 14:08:03 | 9 |
| 14:08:04 | 10 |
| 14:08:06 | 11 |
| 14:08:10 | 12 |
| 14:08:12 | 13 |
| 14:08:16 | 14 |
| 14:08:21 | 15 |
| 14:08:23 | 16 |
| 14:08:27 | 17 |
| 14:08:29 | 18 |
| 14:08:32 | 19 |
| 14:08:34 | 20 |
| 14:08:37 | 21 |
| 14:08:38 | 22 |
| 14:08:39 | 23 |
| 14:08:41 | 24 |
| 14:08:46 | 25 |

A.   Yes.

Q.   And is that -- is Exhibit 1 the affidavit you supplied in this litigation?

A.   It appears so.

Q.   And does that look to be a true and accurate copy of the affidavit that you prepared and signed?

A.   I believe it is.

Q.   Okay.  I'd like to direct your attention to the top of page 2.

         THE COURT:  Page 2?

         MR. REDMOND:  Yes.

BY MR. REDMOND:

Q.   The first paragraph on page 2 begins with, "My practice in dealing with clients and plea offers."  Tell me if I'm reading this wrong, but I don't see this as saying here's what I told Mr. Kearn in this case.

A.   I did not put that in there.

Q.   Okay.  And, I mean, the affidavit doesn't ever say what you told Mr. Kearn; is that right?

A.   It doesn't say what I told Mr. Kearn.  It just tells what my practice was.

Q.   Sure.  Sure.

     And I received your file in this case, and thank you very much.  I reviewed it but I didn't find anything documenting the conversation with Mr. Kearn that we're discussing today.  Did I

14:08:49  1   miss something?

14:08:50  2   A.   The conversation that I would have had with him would have

14:08:54  3   been around the time that this e-mail, which is attached as

14:08:59  4   Exhibit A, was made.

14:09:00  5   Q.   What I'm asking is was there documentation in the file that

14:09:03  6   I just didn't find of this conversation?

14:09:05  7   A.   I -- no, I believe I provided everything that I'd done, and

14:09:09  8   I don't think I sat down and wrote down everything I said or

14:09:12  9   what I advised him of other than what's pretty much in here.

14:09:16  10  Q.   And that's fair.

14:09:18  11       The -- did you not represent in the affidavit what you told

14:09:25  12  Mr. Kearn because you didn't have a specific recollection of

14:09:28  13  the contours of that conversation?

14:09:32  14  A.   Well, I can tell you I didn't have a completely -- complete

14:09:37  15  recollection because it was some years afterwards that all this

14:09:40  16  came up.

14:09:41  17  Q.   Right.

14:09:41  18       You did your best in the affidavit that you provided?

14:09:43  19  A.   I did my best based on -- as you can see, I talk about what

14:09:46  20  my practice was and I remember discussing it with Mr. Kearn.

14:09:52  21  And I -- I think the way I came up with the dates on that was

14:09:55  22  either through a billing statement or through this e-mail

14:09:59  23  that's dated 4/28/15.

14:10:02  24  Q.   So I guess a shorter way to put my very long question was

14:10:06  25  you don't remember what you told Mr. Kearn?

14:10:08   1    A.   I don't remember specifically what I told him.  I generally

14:10:18   2    would have told him what was in the -- in that paragraph on

14:10:21   3    page 2, although we generally would have discussed the plea.

14:10:24   4    Q.   Right, right, I don't think there's any dispute about that.

14:10:26   5         So the -- I'd like to keep our focus on the same

14:10:29   6    paragraph of the affidavit.

14:10:30   7    A.   All right.

14:10:31   8    Q.   You first say that your practice is to tell the client at

14:10:35   9    the time of the plea the judge will ask the client to tell the

14:10:38   10   court -- to tell the court the facts surrounding the offense.

14:10:42   11   Did I accurately state that?

14:10:43   12   A.   Yes.

14:10:43   13   Q.   And then second your affidavit says or the judge will ask

14:10:47   14   the client whether the client agrees an offense is stated.  Did

14:10:52   15   I accurately state that?

14:10:53   16   A.   Or will ask the client if he's read the affidavit and

14:10:56   17   pleadings alleging the offense.

14:10:58   18   Q.   Yes, sir.

14:10:59   19   A.   Yes.

14:10:59   20   Q.   And third did you say that or the prosecutor may present

14:11:04   21   facts to the court constituting the offense and then ask the

14:11:07   22   client if he agrees with the prosecutor's statements?

14:11:09   23   A.   Yes, and that might have been not put correctly.  But

14:11:14   24   generally, in those situations where the prosecutor has gone

14:11:17   25   ahead and recited the facts, then the judge would ask the

14:11:19  1   client:  Having heard the facts, would you agree those were the

14:11:23  2   facts?

14:11:23  3   Q.   Okay.  So you'd agree with me that those are three

14:11:26  4   different ways that a plea hearing can go?

14:11:28  5   A.   Yes.

14:11:29  6   Q.   All three of those can't be true in the same plea hearing?

14:11:32  7   A.   They're generally not true in the same plea.

14:11:34  8   Q.   Right.

14:11:35  9        So if the client relates to the court the facts surrounding

14:11:41  10  the offense, there's not a necessity that the prosecutor do it?

14:11:46  11  A.   No, unless there's something, an element that the client

14:11:50  12  would have left out that was necessary.

14:11:51  13  Q.   Fair enough.

14:11:52  14       It looks to me that of the three options:  one, client

14:11:56  15  states the factual basis; two, judge asks client whether the --

14:12:01  16  an offense is stated; or, three, the prosecutor does it, in all

14:12:06  17  of the cases that you've had in federal practice that proceeded

14:12:10  18  to a guilty plea, you used that first alternative where the

14:12:13  19  client related the facts surrounding the offense to the court;

14:12:16  20  is that right?

14:12:16  21  A.   The client in some way had to acknowledge what the facts

14:12:22  22  were.

14:12:22  23  Q.   And --

14:12:23  24  A.   But, in the majority of the cases, the client didn't tell

14:12:25  25  the judge what the facts were, in my experience.

14:12:29  1   Q.   So, in nine cases where you've pled a defendant guilty in
14:12:33  2   federal court, in all nine cases, paragraph 5 of the factual
14:12:37  3   basis admits the facts in support of the offense; is that fair?
14:12:41  4   A.   Right.
14:12:41  5   Q.   So when you talk about the practice, you also -- your
14:12:50  6   pattern and practice, you also had a significant or maybe still
14:12:53  7   have a significant state court practice; is that right?
14:12:55  8   A.   Yes, uh-huh.
14:12:56  9   Q.   The state court rules, in many instances, are different?
14:12:59  10  A.   Yes.
14:13:00  11  Q.   You didn't necessarily limit the experience that you
14:13:02  12  described in your affidavit to federal cases; is that fair?
14:13:05  13  A.   That's correct.
14:13:06  14  Q.   Okay.  And is it -- would it be fair to say that because
14:13:21  15  your practice in federal court was to have the client admit the
14:13:27  16  facts surrounding the offense in the plea petition, that it's
14:13:30  17  likely that you would have given consistent advice to any
14:13:33  18  federal client?
14:13:34  19  A.   I believe that's true because I -- it was my understanding
14:13:37  20  that we were going to fill out a petition to enter a plea in
14:13:42  21  those cases.
14:13:43  22  Q.   So given that, as we said, a hundred percent of the clients
14:13:48  23  that you had in federal court themselves admitted the factual
14:13:51  24  basis for the crime, it's likely that you would have given that
14:13:56  25  same advice to any other client you had who had a federal plea

| | | |
|---|---|---|
| 14:14:00 | 1 | offer? |
| 14:14:00 | 2 | A.  I believe I would, yes. |
| 14:14:02 | 3 | MR. REDMOND:  Thank you.  Can I have just a moment, |
| 14:14:04 | 4 | Your Honor? |
| 14:14:05 | 5 | THE COURT:  You can. |
| 14:14:16 | 6 | (Counsel conferring with defendant.) |
| 14:14:42 | 7 | MR. REDMOND:  Thank you very much, Your Honor.  That's |
| 14:14:44 | 8 | all. |
| 14:14:44 | 9 | THE COURT:  All right.  Cross-examination. |
| 14:14:54 | 10 | CROSS-EXAMINATION |
| | 11 | BY MS. KENNEY: |
| 14:15:00 | 12 | Q.  Good afternoon. |
| 14:15:01 | 13 | A.  Good afternoon. |
| 14:15:01 | 14 | Q.  Mr. Francis, did you ever advise Jonathan Kearn not to |
| 14:15:07 | 15 | accept the plea agreement that was offered in this case? |
| 14:15:09 | 16 | A.  No. |
| 14:15:10 | 17 | Q.  Did Mr. Kearn ever tell you that he would accept the plea |
| 14:15:15 | 18 | offer and plead guilty? |
| 14:15:17 | 19 | A.  He told me that he would not plead guilty. |
| 14:15:20 | 20 | Q.  Okay.  What was the defendant's attitude about pleading |
| 14:15:25 | 21 | guilty to the charges in this case? |
| 14:15:27 | 22 | A.  That he didn't do it -- didn't do what he was charged with. |
| 14:15:30 | 23 | Q.  And, at any point during your representation, did you |
| 14:15:34 | 24 | believe the defendant would plead guilty? |
| 14:15:38 | 25 | A.  I didn't think he would.  After we had the hearing right |

14:15:47  1    before we started our trial when Judge Crabtree inquired about

14:15:52  2    have there been plea negotiations in this case, and from then

14:15:57  3    on I was confident he was not going to enter a guilty plea.

14:16:01  4    Q.   Okay.  I'm going to --

14:16:02  5    A.   I mean, there's always a time they might, but I was

14:16:05  6    confident by then we were ready to go to trial.

14:16:18  7            MS. KENNEY:  Can I get Government's Exhibit 101?  I'm

14:16:23  8    sorry, I didn't make enough copies.

14:16:26  9            THE COURT:  By the way, Mr. Redmond, I just have an

14:16:28 10    extra of Exhibit 9.  I don't know if that's just a bonus or

14:16:31 11    maybe shorted someone.  Did you short yourself?

14:16:39 12            MR. REDMOND:  I got a nine.

14:16:42 13            THE COURT:  I'll put it up here.  If somebody turns up

14:16:45 14    short, we got an extra.

14:16:46 15            All right.  Ms. Kenney, please.

14:16:53 16            MS. KENNEY:  All right.  Thank you.

14:16:54 17    BY MS. KENNEY:

14:16:55 18    Q.   Mr. Francis, I have in front of me Exhibit 101, a brief --

14:17:02 19    it's an excerpt from the transcript of the hearings that

14:17:04 20    occurred right around the jury trial.

14:17:05 21    A.   All right.

14:17:06 22    Q.   And this is what we have been referring to as the

14:17:08 23    *Lafler-Frye* hearing.  Does that sound familiar to you?

14:17:10 24    A.   Yes, it does.

14:17:11 25    Q.   Okay.  And during this hearing the court asked about any

| | |
|---|---|
| 14:17:18 | 1 |
| 14:17:24 | 2 |
| 14:17:29 | 3 |
| 14:17:30 | 4 |
| 14:17:31 | 5 |
| 14:17:35 | 6 |
| 14:17:37 | 7 |
| 14:17:39 | 8 |
| 14:17:44 | 9 |
| 14:17:48 | 10 |
| 14:17:51 | 11 |
| 14:17:51 | 12 |
| 14:17:54 | 13 |
| 14:17:55 | 14 |
| 14:17:56 | 15 |
| 14:18:00 | 16 |
| 14:18:03 | 17 |
| 14:18:04 | 18 |
| 14:18:05 | 19 |
| 14:18:06 | 20 |
| 14:18:14 | 21 |
| 14:18:17 | 22 |
| 14:18:21 | 23 |
| 14:18:22 | 24 |
| 14:18:23 | 25 |

1  plea offers that had been extended, and you said, "We did have

2  an offer.  It came -- it kind of came in through

3  Mr. Slinkard" --

4      I'm sorry, let me take this off.

5      "It kind of came in through Mr. Slinkard, actually, because

6  Ms. Kenney was preparing, and I forwarded that to my client.

7  We discussed that and we turned that down."

8      And then the court asked me if I could simply recite the

9  terms of that offer, and I said, "Yes, Your Honor.  As I

10  understand it -- and I confirmed this in an e-mail to

11  Mr. Francis" --

12      Which I believe is attached to your affidavit; correct?

13  A.   I believe that's it.

14  Q.   Okay.

15      -- "so I think he would have corrected me -- the offer was

16  a (c)(1)(C), a binding plea agreement to a 10-year sentence to

17  Count 3."

18      Does that sound correct to you?

19  A.   It does.

20  Q.   Okay.  And the court asked your client if he could confirm

21  that he was made aware of the plea offer from the government,

22  and the defendant said -- Mr. Kearn (sic) said, "I was last

23  week, yes, sir."

24      Does that sound familiar?

25  A.   Yes.

14:18:24  1   Q.   Okay.  Now, Mr. Redmond went through several plea petitions

14:18:41  2   that you had filled out for clients in federal court; correct?

14:18:44  3   A.   Yes.

14:18:45  4   Q.   And each one had a very succinct factual statement; is that

14:18:55  5   correct?

14:18:55  6   A.   That's correct.

14:18:55  7   Q.   There were some of those had a plea agreement attached;

14:18:58  8   correct?

14:18:58  9   A.   Yes, I believe I saw plea agreements.

14:19:00  10  Q.   Let me just -- I was looking specifically at Exhibit No. 2.

14:19:06  11  Would you agree that the factual basis of the plea agreement is

14:19:12  12  generally, if not always, more elaborate than the factual basis

14:19:17  13  stated in the plea petition?

14:19:19  14  A.   I believe the plea agreement is always more in-depth than

14:19:23  15  what the plea petition is.

14:19:26  16  Q.   Okay.  And then I'm looking just quickly at Exhibit 3,

14:19:39  17  which is the plea petition and plea agreement for Michael Wurm.

14:19:43  18  Do you have that in front of you still?

14:19:44  19  A.   I do.

14:19:45  20  Q.   Looking at what would be page 1 of the plea agreement, the

14:19:51  21  ECF page number is 8.

14:19:56  22  A.   Yes.

14:19:56  23  Q.   And under paragraph 1 of the defendant's guilty plea,

14:20:00  24  there's a sentence that says, "By entering into this plea

14:20:03  25  agreement, the defendant admits to knowingly committing this

14:20:06   1    offense and to being guilty of this offense."

14:20:08   2        Do you see that?

14:20:09   3    A.   Yes.

14:20:10   4    Q.   Is it your practice -- or is it your experience that that

14:20:13   5    is standard language in all federal plea agreements in this

14:20:17   6    district?

14:20:18   7    A.   I believe it is.

14:20:19   8    Q.   Okay.  And then if you look at the very last page of that

14:20:22   9    exhibit, it's ECF page 19.

14:20:28  10    A.   Yes.

14:20:28  11    Q.   The last -- I'm sorry, the last sentence says, "The

14:20:30  12    defendant acknowledges that the defendant is entering into this

14:20:34  13    agreement and is pleading guilty because the defendant is

14:20:37  14    guilty and is doing so freely and voluntarily."

14:20:41  15    A.   Yes.

14:20:45  16    Q.   And then, Mr. Francis, just looking back at your affidavit,

14:20:52  17    when this question first came up, Mr. Kearn raised the issue --

14:21:02  18    and this is in your affidavit -- that you told him he could not

14:21:06  19    plead guilty because he would commit perjury by accepting

14:21:09  20    responsibility for illegal activity he had not actually

14:21:12  21    committed; do you see that?  It's the last paragraph of page 1

14:21:15  22    of Exhibit 1.

14:21:23  23    A.   Yes.

14:21:25  24    Q.   Okay.  And you -- and you included the statement -- the

14:21:28  25    sentence, "I never advised a client of that."

14:21:31  1  A.  I don't recall ever advising a client of that.  If a client

14:21:33  2  wants to plead guilty and admit to the facts, they understand

14:21:36  3  they're pleading guilty and admitting to the facts.  And, you

14:21:43  4  know, if they don't want to, then they don't have to.  But I

14:21:47  5  don't -- I don't recall telling him that he'd be committing

14:21:50  6  perjury if he did that.

14:21:52  7  Q.  Okay.  So do you still -- and I guess I should have started

14:21:56  8  with have you read your affidavit since you submitted it to me

14:22:00  9  for filing with the court?

14:22:01  10  A.  I haven't seen it for quite a while.  I probably read it

14:22:05  11  since I filed it, but I haven't seen it for quite a while.

14:22:08  12  Q.  My question for you is:  Do you still stand by the

14:22:11  13  information in that affidavit?

14:22:12  14  A.  Yes.

14:22:14  15      MS. KENNEY:  Your Honor, I don't have any additional

14:22:15  16  questions.

14:22:16  17      THE COURT:  Redirect for the witness?

14:22:17  18      MR. REDMOND:  Yes, Your Honor.  Thank you.

14:22:22  19                    REDIRECT EXAMINATION

14:22:23  20  BY MR. REDMOND:

14:22:33  21  Q.  Mr. Francis, when you just discussed the nature of the plea

14:22:36  22  offer with Ms. Kenney --

14:22:37  23  A.  Yes.

14:22:38  24  Q.  -- that was a 10-year plea offer; right?

14:22:41  25  A.  Oh, you mean the sentence aspect of it?

| | | |
|---|---|---|
| 14:22:44 | 1 | Q.  Yes. |
| 14:22:45 | 2 | A.  Yes, it was. |
| 14:22:46 | 3 | Q.  And explain what the -- the discussion was it was a binding |
| 14:22:50 | 4 | plea.  Explain what that means. |
| 14:22:52 | 5 | A.  I'm not sure I understand what you -- |
| 14:22:54 | 6 | Q.  What was the nature of the plea offer that was made to you? |
| 14:22:58 | 7 | A.  I'd have to go back and look through some of my notes to |
| 14:23:05 | 8 | figure out particularly what it was and look through the |
| 14:23:08 | 9 | affidavits and pleadings to find out, but it was that he would |
| 14:23:11 | 10 | plead guilty to possessing and -- |
| 14:23:15 | 11 | You want me to tell you what that was? |
| 14:23:16 | 12 | Q.  Yes, sir. |
| 14:23:17 | 13 | A.  He'd plead guilty to possessing and accessing with the |
| 14:23:21 | 14 | intent to view at least one matter which contained any visual |
| 14:23:25 | 15 | depiction that had been shipped and transported using any means |
| 14:23:30 | 16 | and facility of interstate and foreign commerce, including by |
| 14:23:35 | 17 | computer, and the production of such visual depiction involved |
| 14:23:38 | 18 | the use of a minor engaging in sexually explicit conduct as |
| 14:23:43 | 19 | defined by the code, and such visual depiction of such conduct |
| 14:23:48 | 20 | in violation -- and cite the code section -- in exchange for |
| 14:23:52 | 21 | the dismissal of the remaining -- I think there were two counts |
| 14:23:54 | 22 | that were going to be dismissed. |
| 14:23:55 | 23 | Q.  But there was a reference to this was a deal for a 10-year |
| 14:23:59 | 24 | sentence; right? |
| 14:23:59 | 25 | A.  Yes, as I understand it. |

13-40057  USA v Jonathan Kearn  4.19.21                    38

14:24:01  1   Q.  How did you know that Mr. Kearn was going to receive a

14:24:04  2   10-year sentence?

14:24:05  3   A.  Well, I don't know if it was actually going to be 10 years

14:24:08  4   other than by looking at the schedule of -- if you don't have

14:24:15  5   "x" number offenses and you plead to this offense, then I

14:24:17  6   believe this is what it was.  Either that or else Mr. Slinkard

14:24:20  7   had told me that that was what it was going to be.  I don't

14:24:23  8   have an independent recollection at this time.

14:24:25  9   Q.  So are you aware of any enforcement mechanism for -- to

14:24:30  10  ensure that the only sentence from that plea would be 10 years?

14:24:33  11  A.  No, I'm not, because a judge doesn't have to go along with

14:24:37  12  the plea agreement.

14:24:38  13  Q.  Okay.  The -- and you would have so advised Mr. Kearn?

14:24:44  14  A.  I believe I did.

14:24:46  15  Q.  Okay.  The -- and, in fact, this was quite the deal because

14:24:52  16  the sentencing exposure in this case for Mr. Kearn to proceed

14:24:56  17  to trial was 292 to 365 months?

14:25:00  18  A.  It was huge.

14:25:01  19  Q.  Right.

14:25:03  20      He also, by pleading to that particular agreement, would

14:25:07  21  have avoided a number of mandatory minimum sentences; right?

14:25:10  22  A.  I believe so.

14:25:11  23  Q.  Two more quick topics.

14:25:15  24      One, you testified that it's standard language in all

14:25:18  25  federal plea agreements that the defendant is pleading guilty

13-40057  USA v Jonathan Kearn  4.19.21                    39

14:25:20  1   because the defendant is guilty?

14:25:24  2   A.  Let me take a look here.

14:25:26  3   Q.  Something along those lines.

14:25:27  4   A.  I think language to that effect is in there:  I'm saying

14:25:31  5   I'm guilty because I'm guilty.

14:25:32  6   Q.  Are you sure about that, that it's in every federal plea

14:25:37  7   agreement?

14:25:37  8   A.  If I said "every," I might have overstated.  It's been in

14:25:41  9   the ones as I recall I've been involved in.

14:25:43  10  Q.  And, finally, I think at the end of your testimony you told

14:25:46  11  us that if a client wants to plead guilty and admit to the

14:25:49  12  facts, they can, but the alternative is trial; is that a fair

14:25:55  13  summation of your testimony?

14:25:56  14  A.  I think it is.

14:25:57  15  Q.  And is that a fair summation of the advice that you gave

14:26:01  16  clients who are considering a guilty plea?

14:26:02  17  A.  It is in federal court.

14:26:05  18       MR. REDMOND:  Those are all my questions, Your Honor.

14:26:07  19  Thank you.

14:26:08  20       Thank you, Mr. Francis.

14:26:09  21       THE COURT:  Recross?

14:26:10  22       MS. KENNEY:  No, Your Honor.  Thank you.

14:26:11  23       THE COURT:  You may step down, sir.

14:26:13  24       May the witness be released?

14:26:14  25       MR. REDMOND:  He may, Your Honor.

14:26:15   1          MS. KENNEY:  He may.

14:26:16   2          THE COURT:  Thank you, Mr. Francis.  You're free to

14:26:18   3   leave.

14:26:18   4          THE WITNESS:  Let me get wound up here.

14:26:34   5          THE COURT:  Mr. Redmond, you want to announce your

14:26:38   6   next witness?

14:26:39   7          MR. REDMOND:  Yes, Your Honor, we call Mr. Kearn.

14:26:41   8          THE COURT:  Mr. Kearn, come to the witness chair.

14:26:58   9   Before you're seated, will you raise your right hand for the

14:27:01  10   oath.

          11                       JONATHAN E. KEARN,

          12   called as a witness on behalf of the Defendant, having first

14:27:07  13   been duly sworn, testified as follows:

14:27:07  14          THE COURT:  Sir, if you would be seated, please.  Can

14:27:16  15   you just say your name for the record.

14:27:18  16          THE WITNESS:  Jonathan Edward Kearn.

14:27:20  17          THE COURT:  Thank you, Mr. Kearn.

14:27:23  18          Mr. Redmond.

14:27:24  19          MR. REDMOND:  Thank you, Your Honor.

14:27:26  20                       DIRECT EXAMINATION

14:27:26  21   BY MR. REDMOND:

14:27:26  22   Q.  Mr. Kearn, where do you live?

14:27:28  23   A.  I'm currently housed at CCA Leavenworth in Q Building.

14:27:31  24   Q.  And why is that?

14:27:32  25   A.  I'm on a writ of habeas corpus from the Bureau of Prisons.

13-40057   USA v Jonathan Kearn   4.19.21                    41

14:27:38   1    Q.   And so you're currently under conviction for production of

14:27:42   2    child pornography by a parent or legal guardian, distribution

14:27:46   3    of child pornography, and possession of child pornography?

14:27:48   4    A.   That is correct.

14:27:49   5    Q.   And you're serving a 292-month sentence?

14:27:51   6    A.   I am.

14:27:52   7    Q.   And did you file a direct appeal?

14:27:55   8    A.   Yes, I did.

14:27:55   9    Q.   And was that appeal successful?

14:27:57   10   A.   It was not.

14:27:58   11   Q.   Did you read the opinion?

14:27:59   12   A.   Yes, I did.

14:28:00   13   Q.   Are you aware that the Tenth Circuit characterized the

14:28:02   14   evidence against you as overwhelming?

14:28:05   15   A.   Yes, I am.

14:28:05   16   Q.   And the -- did you file a 2255 petition?

14:28:10   17   A.   Yes.

14:28:11   18   Q.   Is that why we're here today?

14:28:12   19   A.   It is.

14:28:13   20   Q.   Did you listen to the testimony of Mr. Francis?

14:28:19   21   A.   Yes, I did.

14:28:19   22   Q.   And he was your lawyer at trial?

14:28:21   23   A.   Yes, he was.

14:28:22   24   Q.   Was he appointed or retained?

14:28:24   25   A.   He was retained.

13-40057  USA v Jonathan Kearn  4.19.21                    42

| | | |
|---|---|---|
| 14:28:25 | 1 | Q.  And so did you consistently consult with Mr. Francis |
| 14:28:29 | 2 | concerning the trial? |
| 14:28:30 | 3 | A.  Yes. |
| 14:28:32 | 4 | Q.  I want to talk about a particular conversation that you |
| 14:28:35 | 5 | had.  Did you ever consult with him concerning a plea offer? |
| 14:28:38 | 6 | A.  Yes. |
| 14:28:39 | 7 | Q.  And where did that consultation occur? |
| 14:28:41 | 8 | A.  At his office. |
| 14:28:42 | 9 | Q.  Where is his office? |
| 14:28:43 | 10 | A.  5th and Topeka Boulevard in a brick -- 19th century brick |
| 14:28:51 | 11 | house been turned into lawyers' offices. |
| 14:28:55 | 12 | Q.  And Mr. Francis' office is in this brick building that you |
| 14:29:00 | 13 | described? |
| 14:29:00 | 14 | A.  Yes. |
| 14:29:01 | 15 | Q.  Where did you meet with Mr. Francis that day? |
| 14:29:03 | 16 | A.  In a conference room on the first floor.  It would have |
| 14:29:08 | 17 | been originally probably the formal dining room.  It was right |
| 14:29:13 | 18 | beside his regular office. |
| 14:29:15 | 19 | Q.  Okay.  When you say "would have been the formal dining |
| 14:29:19 | 20 | room," you mean before it was converted into law offices? |
| 14:29:21 | 21 | A.  Correct. |
| 14:29:22 | 22 | Q.  And so what did the room look like? |
| 14:29:23 | 23 | A.  It was rectangular, had French doors, had a large meeting |
| 14:29:30 | 24 | table in it surrounded by chairs. |
| 14:29:32 | 25 | Q.  Okay.  Offered you an opportunity for a private |

| | | |
|---|---|---|
| 14:29:34 | 1 | conversation? |
| 14:29:35 | 2 | A.   Yes. |
| 14:29:35 | 3 | Q.   And how long was the meeting that day with Mr. Francis? |
| 14:29:39 | 4 | A.   Less than one hour. |
| 14:29:44 | 5 | Q.   Okay.  And is that the meeting in which you discussed the |
| 14:29:48 | 6 | plea offer that had been made by the government? |
| 14:29:50 | 7 | A.   Yes, it is. |
| 14:29:50 | 8 | Q.   What portion of the meeting concerned the plea offer? |
| 14:29:53 | 9 | A.   A minute or so at the beginning to let us know why we're |
| 14:30:01 | 10 | there, and then approximately five minutes at the end of our |
| 14:30:05 | 11 | conversation. |
| 14:30:06 | 12 | Q.   Okay.  What else did you talk about? |
| 14:30:08 | 13 | A.   Trial strategy.  We talked about the DVD surveillance of |
| 14:30:20 | 14 | the home and the difficulties I'd been having coming through |
| 14:30:24 | 15 | the CCTV. |
| 14:30:25 | 16 | Q.   So if I'm understanding you correctly, you met for |
| 14:30:28 | 17 | approximately an hour, and about five minutes of that |
| 14:30:31 | 18 | conversation concerned the government's plea offer? |
| 14:30:33 | 19 | A.   That's correct. |
| 14:30:34 | 20 | Q.   Okay.  So I want to talk more specifically about that |
| 14:30:36 | 21 | conversation and what you did or did not talk about.  Did you |
| 14:30:40 | 22 | talk about no contest pleas? |
| 14:30:45 | 23 | A.   Yes, that did come up. |
| 14:30:47 | 24 | Q.   How did that come up? |
| 14:30:48 | 25 | A.   At the very end of our conversation, Mike Francis told me |

14:30:52  1    there was -- it's too bad there's not a no contest plea offered

14:30:56  2    in the feds like there is in the state.

14:30:58  3    Q.   And why did he say that was too bad?

14:31:00  4    A.   Because a no contest plea is something that somebody can

14:31:04  5    plea if they did not have a part in the client -- in the crime

14:31:08  6    and are maintaining their innocence.

14:31:10  7    Q.   It's a way you plead guilty but don't admit the facts

14:31:15  8    underlying the offense?

14:31:16  9    A.   That's correct.

14:31:16  10   Q.   Okay.  Did you talk about Rule 11 of the Federal Rules of

14:31:21  11   Criminal Procedure?

14:31:21  12   A.   No, we did not.

14:31:23  13   Q.   Did you talk about the factual basis for the guilty plea?

14:31:27  14   A.   By factual basis, if you're saying would I have to say I

14:31:35  15   was guilty of the -- of the crime, then, yes, we did.

14:31:39  16   Q.   And what was the advice that you received?

14:31:41  17   A.   That I would have to tell the judge that I was guilty of

14:31:45  18   the crime if I took a guilty plea.  And since I was not guilty

14:31:49  19   of the crime, I couldn't honestly say that to the judge in good

14:31:54  20   conscience.

14:31:54  21   Q.   Is that what Mr. Francis is saying to you or what you were

14:31:57  22   saying to Mr. Francis?

14:31:58  23   A.   Mr. Francis is saying to me.

14:32:01  24   Q.   Okay.  And the -- did you talk about an option where you

14:32:05  25   would not have to personally state a factual basis for the

14:32:08  1    plea?

14:32:09  2    A.  We did not.

14:32:10  3    Q.  Did you --

14:32:12  4    A.  Other -- I'm sorry, other than the no -- when we talked

14:32:15  5    about no contest.  I mean, we did -- we did talk about no

14:32:19  6    contest.

14:32:19  7    Q.  Okay.  Did you discuss the possibility that the factual

14:32:23  8    basis could be supplied by the government?

14:32:25  9    A.  No.

14:32:25  10   Q.  Did you talk about the possibility that the factual basis

14:32:28  11   could be supplied by the presentence report?

14:32:30  12   A.  No.

14:32:31  13   Q.  Did Mr. Francis -- or did you discuss that you could agree

14:32:39  14   merely that the government's evidence against you would be

14:32:41  15   sufficient to support a guilty verdict beyond a reasonable

14:32:45  16   doubt?

14:32:45  17   A.  No.

14:32:46  18   Q.  Did Mr. Francis counsel you to accept the plea offer?

14:32:49  19   A.  No.

14:32:52  20   Q.  Did you weigh the pros and cons of that plea offer with

14:32:57  21   Mr. Francis?

14:32:57  22   A.  No.

14:32:59  23   Q.  And you never have been in any real trouble before, had

14:33:03  24   you?

14:33:03  25   A.  I had not.

13-40057  USA v Jonathan Kearn  4.19.21                    46

| | | |
|---|---|---|
| 14:33:04 | 1 | Q.  You were pretty scared? |
| 14:33:06 | 2 | A.  Yeah. |
| 14:33:07 | 3 | Q.  And you didn't want to go to prison? |
| 14:33:09 | 4 | A.  No, sir. |
| 14:33:10 | 5 | Q.  And you knew that if you were convicted, that a substantial |
| 14:33:15 | 6 | prison sentence was essentially inevitable? |
| 14:33:19 | 7 | A.  Yeah.  Yes. |
| 14:33:20 | 8 | Q.  You specifically selected Mr. Francis as your lawyer? |
| 14:33:24 | 9 | A.  I did. |
| 14:33:25 | 10 | Q.  And did you trust him? |
| 14:33:28 | 11 | A.  I did. |
| 14:33:28 | 12 | Q.  And did you rely on his advice? |
| 14:33:30 | 13 | A.  Yes. |
| 14:33:33 | 14 | Q.  This is difficult conduct to admit to; is that fair to say? |
| 14:33:36 | 15 | A.  Absolutely. |
| 14:33:37 | 16 | Q.  And especially having to stand up before your friends and |
| 14:33:42 | 17 | family and say I'm guilty of this? |
| 14:33:44 | 18 | A.  Yes, it would be. |
| 14:33:45 | 19 | Q.  But you didn't know you didn't have to do it exactly like |
| 14:33:48 | 20 | that? |
| 14:33:50 | 21 | A.  Correct. |
| 14:33:50 | 22 | Q.  Did you know that you could have pled guilty and had the |
| 14:33:56 | 23 | government supply the factual basis? |
| 14:33:58 | 24 | A.  I did not know that. |
| 14:34:00 | 25 | Q.  If you knew that, would you have pled guilty? |

13-40057   USA v Jonathan Kearn   4.19.21                    47

14:34:03   1   A.   Yes.

14:34:03   2   Q.   If you knew that, would you have accepted the government's

14:34:07   3   offer?

14:34:08   4   A.   The 11(c)(1)(C) offer, yes.

14:34:10   5   Q.   Now, you say 11(c)(1)(C), you know that now?

14:34:15   6   A.   Right.

14:34:16   7   Q.   Did you know that then?

14:34:17   8   A.   I knew that I was looking at a 10-year plea offer is what

14:34:22   9   Mike Francis told me.

14:34:24   10   Q.   Okay.   What --

14:34:24   11   A.   I didn't know the name of it at that point, no.

14:34:26   12   Q.   Okay.   So but also did you listen to Mr. Francis'

14:34:32   13   testimony?

14:34:32   14   A.   Yes, I did.

14:34:33   15   Q.   Indicated that he -- you know, the judge is not bound by

14:34:36   16   the offer?

14:34:36   17   A.   Correct.

14:34:37   18   Q.   And was that communicated to you as well?

14:34:40   19   A.   I do not recall --

14:34:44   20   Q.   Okay.

14:34:46   21   A.   -- no.

14:34:46   22        MR. REDMOND:   That's all I have, Your Honor.

14:34:47   23   Thank you.

14:34:48   24        THE COURT:   Cross-examine.

14:35:11   25                      CROSS-EXAMINATION

1    BY MS. KENNEY:

14:35:14    2    Q.   Mr. Kearn, you may or may not have heard me reading from

14:35:20    3    what's been marked as Government Exhibit 101.  I refer to that

14:35:24    4    as the transcript from the *Lafler-Frye* hearing.  Does that

14:35:26    5    sound familiar to you?

14:35:27    6    A.   Yes, ma'am.

14:35:28    7    Q.   And the court had asked me to state the terms of the plea

14:35:33    8    agreement --

14:35:33    9    A.   Uh-huh.

14:35:34    10   Q.   -- and I told him that the offer was a (c)(1)(C), a binding

14:35:41    11   plea agreement to a 10-year sentence to Count 3; correct?

14:35:45    12   A.   Yes, that's what the transcript says.

14:35:47    13   Q.   That's what the transcript says?

14:35:48    14   A.   Yes.

14:35:49    15   Q.   Now, I don't have the Elmo, so I apologize.  I don't have

14:35:58    16   an extra copy of this particular exhibit, but what's --

14:36:04    17   Exhibit 102, which was a government exhibit, has been

14:36:07    18   introduced and it's a plea transcript.  It's a transcript of a

14:36:11    19   change of plea hearing in a totally separate case, but one that

14:36:15    20   occurred before Judge Crabtree.  And during that plea colloquy,

14:36:21    21   the court asked that particular defendant, "And your plea

14:36:26    22   agreement says that you admit that you knowingly committed this

14:36:29    23   crime and you are, in fact, guilty of it.  Are those things

14:36:34    24   true?"

14:36:34    25        Had Judge Crabtree asked you at a plea hearing, would you

| | | |
|---|---|---|
| 14:36:41 | 1 | have been able to say you were guilty of the crime and that |
| 14:36:44 | 2 | those things were true? |
| 14:36:45 | 3 | A.   No, ma'am. |
| 14:36:46 | 4 | Q.   Okay. |
| 14:37:08 | 5 | MS. KENNEY:  Your Honor, I think that was the only |
| 14:37:09 | 6 | question I had. |
| 14:37:11 | 7 | Thank you, sir. |
| 14:37:12 | 8 | THE WITNESS:  Thank you. |
| 14:37:12 | 9 | THE COURT:  Redirect. |
| 14:37:14 | 10 | MR. REDMOND:  Thank you, Your Honor. |
| 14:37:15 | 11 | REDIRECT EXAMINATION |
| 14:37:16 | 12 | BY MR. REDMOND: |
| 14:37:20 | 13 | Q.   At a guilty plea hearing, could you have said that the |
| 14:37:25 | 14 | government's evidence is sufficient to prove you guilty beyond |
| 14:37:28 | 15 | a reasonable doubt? |
| 14:37:31 | 16 | A.   Yes, the evidence is strong before the court as it stands |
| 14:37:36 | 17 | now, yeah. |
| 14:37:37 | 18 | Q.   And after making that statement, would you have been |
| 14:37:40 | 19 | willing to plead guilty? |
| 14:37:42 | 20 | A.   Yes. |
| 14:37:42 | 21 | MR. REDMOND:  That's all I have, Your Honor. |
| 14:37:43 | 22 | THE COURT:  Anything else, Ms. Kenney? |
| 14:37:45 | 23 | MS. KENNEY:  No, Your Honor. |
| 14:37:46 | 24 | THE COURT:  You may step down, Mr. Kearn. |
| 14:37:48 | 25 | THE WITNESS:  Thank you. |

| | | |
|---|---|---|
| 14:38:53 | 1 | THE COURT:  Mr. Redmond, please. |
| 14:38:55 | 2 | MR. REDMOND:  Thank you, Your Honor.  We call Branden |
| 14:38:58 | 3 | Bell. |
| 14:38:58 | 4 | THE COURT:  Mr. Bell, please.  Please. |
| | 5 | BRANDEN BELL, |
| | 6 | called as a witness on behalf of the Defendant, having first |
| 14:39:20 | 7 | been duly sworn, testified as follows: |
| 14:39:20 | 8 | THE COURT:  Mr. Bell, though you're well-known in this |
| 14:39:22 | 9 | courtroom, would you say your full name for the record. |
| 14:39:24 | 10 | THE WITNESS:  Certainly.  Branden Bell, last name B as |
| 14:39:28 | 11 | in boy, E-L-L. |
| 14:39:30 | 12 | THE COURT:  And first name is with an E in there; |
| 14:39:33 | 13 | right? |
| 14:39:33 | 14 | THE WITNESS:  Correct, Your Honor. |
| 14:39:34 | 15 | THE COURT:  Please be seated. |
| 14:39:35 | 16 | Mr. Redmond. |
| 14:39:38 | 17 | MR. REDMOND:  Thank you, Your Honor. |
| 14:39:38 | 18 | DIRECT EXAMINATION |
| | 19 | BY MR. REDMOND: |
| 14:39:39 | 20 | Q.  Mr. Bell, you graduated law school in 2005? |
| 14:39:41 | 21 | A.  Yes. |
| 14:39:42 | 22 | Q.  Where have you worked since? |
| 14:39:43 | 23 | A.  I was a solo practitioner for a few years, then I worked |
| 14:39:47 | 24 | with Carl Folsom at Bell Folsom.  I was then a partner at |
| 14:39:52 | 25 | Sandage Bell with Lance Sandage.  I was also at -- a partner at |

| | | |
|---|---|---|
| 14:39:59 | 1 | Brown & Ruprecht, an assistant federal public defender, and now |
| 14:40:04 | 2 | work at a law firm in Kansas City, Kansas named Morgan Pilate. |
| 14:40:08 | 3 | Q.  Do you practice in federal court or state court? |
| 14:40:10 | 4 | A.  Federal court. |
| 14:40:11 | 5 | Q.  And for how long have you been primarily federal focused? |
| 14:40:15 | 6 | A.  Probably for about the last 12 years. |
| 14:40:17 | 7 | Q.  And if I told you CM/ECF says that you represented |
| 14:40:21 | 8 | approximately 240 clients in federal court, would you disagree |
| 14:40:24 | 9 | with that? |
| 14:40:24 | 10 | A.  I would not. |
| 14:40:25 | 11 | Q.  And have you practiced in the federal courts of appeal? |
| 14:40:28 | 12 | A.  I have. |
| 14:40:29 | 13 | Q.  Have you done post-conviction work? |
| 14:40:31 | 14 | A.  Yes. |
| 14:40:31 | 15 | Q.  Are you regularly asked to present at local and national |
| 14:40:34 | 16 | training events? |
| 14:40:35 | 17 | A.  Yes. |
| 14:40:36 | 18 | Q.  And in addition you worked with some of the most |
| 14:40:39 | 19 | experienced federal criminal defense attorneys in the District |
| 14:40:43 | 20 | of Kansas? |
| 14:40:43 | 21 | A.  I think some of them would take offense with "experienced" |
| 14:40:46 | 22 | because they would equate that with old; but, yes, I would |
| 14:40:49 | 23 | agree with that. |
| 14:40:50 | 24 | Q.  And you've had the opportunity to incorporate some of their |
| 14:40:52 | 25 | knowledge and experience in your practice and vice versa? |

14:40:55  1   A.   Yes.

14:40:55  2   Q.   So the question:  So you have a client who has professed

14:41:02  3   his innocence.  It appears to you the evidence against that

14:41:04  4   client is overwhelming.  The government makes a plea offer that

14:41:08  5   substantially reduces the client's sentencing exposure.  What

14:41:11  6   do you do?

14:41:12  7   A.   In general if the evidence is overwhelming and the client

14:41:22  8   continues to protest -- or protest their innocence, there's one

14:41:28  9   of two things I consider.

14:41:29  10      Either there's something that makes them incompetent to

14:41:33  11  stand trial, and usually that will have presented itself sooner

14:41:37  12  than a plea deal being offered.

14:41:40  13      The other side of it is that -- in my cases if the client

14:41:45  14  has professed his innocence to me it's not something that I

14:41:48  15  asked him or her about, because I stay well aware (sic) from

14:41:56  16  that area.  So if they brought it up to me, that tells me that

14:41:59  17  for whatever reason this client needs me to believe that they

14:42:02  18  are innocent.

14:42:04  19      That happens a lot, particularly in cases that involve

14:42:13  20  heinous allegations or particularly sensitive allegations such

14:42:16  21  as sex cases, child abuse cases, things of that nature.

14:42:22  22      So if there's a plea offer that substantially reduces their

14:42:30  23  exposure, my goal is to make sure that they have all the

14:42:36  24  information available to them but make the prospect of a plea

14:42:41  25  hearing seem as painless as possible so that there isn't some

14:42:45   1   additional psychological hurdle for my client to have to go

14:42:49   2   over where they have to essentially admit to me that they were

14:42:52   3   not honest with me at the outset.

14:42:55   4   Q.   So defense counsel's goal is to serve their client's

14:43:04   5   interests.  So if a client tells you they're innocent, why

14:43:07   6   don't you just set the case for trial if that's what they want

14:43:10   7   to do?

14:43:11   8   A.   Well, unfortunately, there are several reasons other than

14:43:15   9   actual innocence that can prompt a client to tell you that they

14:43:18   10   are innocent.

14:43:21   11        There is folklore that a defense attorney won't defend you

14:43:31   12   as well if they don't believe that you're innocent.

14:43:35   13        There is also -- when you first meet a client, you're

14:43:41   14   strangers.  They don't know you, you don't know them, and

14:43:47   15   there's some embarrassment or shame, which is natural, for

14:43:51   16   admitting to committing any sort of offense and especially to a

14:43:55   17   stranger who they've never really met.  And once that statement

14:43:59   18   is made, that innocence statement is made, just like anything

14:44:02   19   else as human beings, you become wedded to it, right.  You've

14:44:08   20   taken a position and it becomes psychologically difficult for

14:44:13   21   anyone to come off of that position.

14:44:17   22        But particularly when the evidence is overwhelming and a

14:44:20   23   client is still persisting in their innocence, that is always

14:44:23   24   an indication to me that there is -- if there's not a

14:44:27   25   competency issue that there's a psychological stumbling block

14:44:31  1    that is not allowing the court -- or not allowing the client to

14:44:37  2    come out and explicitly say what the evidence strongly suggests

14:44:43  3    occurred.

14:44:45  4         So my role at that point -- or I see as my role is to try

14:44:48  5    and lower that psychological hurdle as much that I can so that,

14:44:55  6    as I tell clients during these conversations, don't -- don't

14:44:58  7    feel like you're going to hurt my feelings, right, by taking

14:45:02  8    this plea because it's inconsistent with something that you

14:45:05  9    told me earlier.

14:45:07  10        So that's why I don't automatically set them for trials if

14:45:13  11   that's what I hear.

14:45:14  12   Q.   So if a client has told you that they are innocent and you

14:45:19  13   have what to you appears to be a very -- very good plea offer,

14:45:26  14   does that mean you're going to spend more time or less time

14:45:29  15   with that client on the structure and effect of the plea offer?

14:45:37  16   A.   More time.

14:45:38  17   Q.   What do you mean by more time?

14:45:40  18   A.   Well, I'm going to -- I'll begin by telling them there's a

14:45:49  19   plea offer and I have an obligation to convey that to you.

14:45:52  20        Some clients that have previously professed their

14:45:55  21   innocence, they might put their hands up and say, "I don't want

14:45:58  22   to hear it.  I don't want to know about it."  That's a

14:46:01  23   manifestation of that sort of psychological obstacle.

14:46:04  24        So what I usually do is say, "I understand that but listen,

14:46:08  25   my job is to make sure that you have all of the information at

14:46:11  1    your disposal so you can make an informed decision.  So even if

14:46:15  2    you, you know, you don't want to hear it, I need you to hear

14:46:18  3    it.  I need you to understand it so at least you make an

14:46:21  4    informed decision about where you're going."

14:46:22  5          And then I will tell them, you know, "These are the choices

14:46:25  6    in front of you.  You have a -- you know, a trial choice,

14:46:28  7    right, and you're -- the consequences for that are likely

14:46:31  8    either a straight acquittal" -- and I'll tell them I see that

14:46:35  9    as very low -- "or if you have a conviction and the punishment

14:46:39  10   is very high, or there is this option which is the deal that's

14:46:44  11   been offered."  And I'll tell them what the range of -- you

14:46:49  12   know, potential range of punishments they could get under that

14:46:51  13   deal if it's not a (c)(1)(C).  And the primary thing I try to

14:47:01  14   do at that point is to take me out of it and take sort of

14:47:07  15   anything the client's told me in the past out of it, right.

14:47:10  16         These are -- it's -- I'm -- I view myself as a waiter in a

14:47:15  17   restaurant, right.  I'm there to tell them what's on the menu

14:47:20  18   and tell them about the dishes, but they're the ones that make

14:47:23  19   the choice.  Even if, when they first came into the restaurant,

14:47:28  20   they told me they were vegetarian and they order a

14:47:31  21   cheeseburger, it's not my job to point a finger at them and

14:47:34  22   tell them, "You told me you were a vegetarian."  They're the

14:47:37  23   customer; they make the choice.

14:47:38  24   Q.  So the clients you represented and you said it was a common

14:47:41  25   occurrence to say that they are innocent at the beginning of

| | | |
|---|---|---|
| 14:47:44 | 1 | the case, do any of those clients ever plead guilty? |
| 14:47:49 | 2 | A.  Yes. |
| 14:47:50 | 3 | Q.  How often? |
| 14:47:50 | 4 | A.  Very often. |
| 14:47:52 | 5 | Q.  Okay.  It just requires a lot of work? |
| 14:47:58 | 6 | A.  It does require a lot of work and it requires a lot of, |
| 14:48:04 | 7 | again, sensitivity to have the phenomenon that people don't |
| 14:48:08 | 8 | want to explicitly admit that they were not honest with you at |
| 14:48:12 | 9 | the beginning in conjunction with admitting that they committed |
| 14:48:14 | 10 | a crime, particularly when the crime is deemed as sensitive. |
| 14:48:20 | 11 | So the more you can depersonalize that away from the |
| 14:48:23 | 12 | conversation, the more success you can have.  And it might not |
| 14:48:27 | 13 | just be one conversation, it might take more than one |
| 14:48:30 | 14 | conversation. |
| 14:48:31 | 15 | I mean, almost every time I have that conversation with the |
| 14:48:37 | 16 | type of client we've been talking about, I tell them at the |
| 14:48:39 | 17 | outset, "I don't want you to make a decision right now," right. |
| 14:48:42 | 18 | "I want you to think about it.  I'm going to give you the |
| 14:48:44 | 19 | information.  I'm going to tell you what your options are, but |
| 14:48:47 | 20 | I don't want you to answer me right now.  I want you to think |
| 14:48:50 | 21 | about it." |
| 14:48:50 | 22 | Q.  Have you ever gotten that done in six minutes? |
| 14:48:52 | 23 | A.  No. |
| 14:48:53 | 24 | THE COURT:  I didn't hear the question, I'm sorry. |
| 14:48:55 | 25 | MR. REDMOND:  I asked Mr. Mr. Bell had he ever gotten |

| | | |
|---|---|---|
| 14:48:58 | 1 | that done in six minutes. |
| 14:49:00 | 2 | THE WITNESS:  No. |
| 14:49:02 | 3 | BY MR. REDMOND: |
| 14:49:02 | 4 | Q.  Are we talking multiple visits over multiple hours? |
| 14:49:05 | 5 | A.  Yes. |
| 14:49:05 | 6 | Q.  Is it your practice to initiate plea negotiations or wait |
| 14:49:10 | 7 | for the government to make a plea offer? |
| 14:49:12 | 8 | A.  I almost always initiate them. |
| 14:49:14 | 9 | Q.  And is that the typical approach for federal criminal |
| 14:49:20 | 10 | defense counsel if you know? |
| 14:49:21 | 11 | A.  In my experience, yes. |
| 14:49:22 | 12 | Q.  But sometimes the government does make an offer first? |
| 14:49:25 | 13 | A.  Yes. |
| 14:49:26 | 14 | Q.  And so what are your obligations in such a circumstance? |
| 14:49:30 | 15 | A.  Again, my obligations are to take the offer to the client |
| 14:49:36 | 16 | and, again, explain to them what the implications of taking |
| 14:49:39 | 17 | that offer are versus what their other options are, right. |
| 14:49:44 | 18 |     When the government makes an offer, you know, there's |
| 14:49:47 | 19 | essentially a third branch or third road on the crossroads that |
| 14:49:50 | 20 | has opened up.  And so my job is to tell the client if you |
| 14:49:55 | 21 | take, you know, Road A this is what's -- what can happen, |
| 14:49:59 | 22 | Road B this is what can happen, or Road C this is what can |
| 14:50:03 | 23 | happen. |
| 14:50:03 | 24 | Q.  So set aside even clients who have made protestations of |
| 14:50:10 | 25 | innocence.  In any claim in any case, do you have a way to |

14:50:13  1   ballpark the average amount of time you spend with a client

14:50:16  2   talking about a plea offer?

14:50:18  3   A.   I would say it's almost always -- I would say the

14:50:32  4   over-under is probably about an hour to an hour-and-a-half.

14:50:35  5        And I should also point out that I won't typically convey

14:50:41  6   an offer and start that conversation with my client until I

14:50:44  7   have a draft plea agreement from the government.  Because there

14:50:53  8   are times when they -- the line prosecutor has said, "Would

14:50:58  9   your client take this?" and I have gone and had my client --

14:51:03  10  asked my client about that and the client agreed after, you

14:51:08  11  know, however long it took.  But then I would later learn that

14:51:12  12  that line prosecutor actually didn't have authority to extend

14:51:15  13  that offer, which is bad all around.  It erodes trust between

14:51:23  14  the client and the defense attorney and the client and the

14:51:26  15  government.  And so my practice is usually to ask a prosecutor

14:51:30  16  for a draft plea agreement so that, when I walk in with the

14:51:33  17  client, I can go over that with him.

14:51:35  18  Q.   So of the topics that you're going to discuss, will it --

14:51:40  19  with a client about a plea agreement, will one of these things

14:51:43  20  -- those things be the structure of the plea agreement?

14:51:45  21  A.   The structure of the plea agreement?

14:51:47  22  Q.   Yes, which portion of Rule 11 it falls under?

14:51:52  23  A.   Yes.

14:51:53  24  Q.   And are there -- I say Rule 11.  Rule 11 of the Federal

14:52:00  25  Rules of Criminal Procedure, what is the purpose of that rule?

| | | |
|---|---|---|
| 14:52:01 | 1 | A.   It governs pleas.  Essentially -- among other things, it |
| 14:52:07 | 2 | essentially makes sure that a defendant's plea is knowingly -- |
| 14:52:11 | 3 | made knowingly, intelligently, and voluntarily and that there's |
| 14:52:14 | 4 | a factual basis for the plea. |
| 14:52:15 | 5 | Q.   Are there different species of guilty pleas? |
| 14:52:20 | 6 | A.   Yes. |
| 14:52:20 | 7 | Q.   And what are those? |
| 14:52:21 | 8 | A.   There is either a traditional guilty plea, a no contest |
| 14:52:30 | 9 | plea, and there is an Alford plea. |
| 14:52:33 | 10 | Q.   And if it's a traditional guilty plea are there different |
| 14:52:39 | 11 | ways to plead guilty, meaning are there different kinds of |
| 14:52:43 | 12 | structures of plea agreements? |
| 14:52:44 | 13 | A.   Yes.  There are plea agreements that I've received in the |
| 14:52:49 | 14 | District of Kansas that have -- these are, particularly in |
| 14:52:53 | 15 | conspiracy cases where you have a factual basis that's |
| 14:52:57 | 16 | essentially five pages, single spaced long where it asks the |
| 14:53:02 | 17 | client to admit that someone the client doesn't know but is |
| 14:53:06 | 18 | alleged to be part of the conspiracy was doing something on a |
| 14:53:08 | 19 | different day and the client has no way of knowing that, right, |
| 14:53:14 | 20 | so in those cases I would go back to the prosecutor and say, we |
| 14:53:17 | 21 | need to change this to state that he -- my client agrees that |
| 14:53:22 | 22 | the government has evidence that would show, right, or we're |
| 14:53:26 | 23 | going to have to start marking out all -- parts of this factual |
| 14:53:29 | 24 | basis. |
| 14:53:29 | 25 | Q.   And is part of the purpose of doing that because the client |

14:53:35   1   doesn't necessarily know some of the facts and is part of the

14:53:38   2   purpose of doing that to make the plea agreement more palatable

14:53:42   3   to the client?

14:53:43   4   A.   Yes.

14:53:44   5   Q.   Could you elaborate on the second?

14:53:47   6   A.   Well, a lot of times -- I've spoken a little bit about that

14:53:54   7   psychological hurdle about getting a client over.  You can

14:54:01   8   lower the hurdle but it never fully goes away.  And so on some

14:54:05   9   occasions the client can still be reluctant and that reluctance

14:54:10  10   can manifest itself in nitpicking the factual basis such as,

14:54:15  11   "How can they ask me to admit to this thing, you know, I didn't

14:54:20  12   -- I don't know where Johnny Stevens was at this time," right.

14:54:23  13        And, in order to go around that -- that hurdle or go over

14:54:29  14   it, I'll point out that the language in the plea agreement says

14:54:33  15   you're not saying that you know this, you're saying that the

14:54:36  16   government has evidence to prove it.  And if you want, I will

14:54:41  17   -- you will have gone over this discovery -- but I can show you

14:54:43  18   where the government has evidence that Johnny Stevens was at

14:54:50  19   that place at that time.

14:54:51  20   Q.   The -- what's a binding plea agreement?

14:54:55  21   A.   A binding plea agreement is under Federal Rule of Criminal

14:55:00  22   Procedure 11(c)(1)(C).  We typically just refer to them as

14:55:03  23   (c)(1)(C)s.  What it is is essentially a conditional plea where

14:55:13  24   the defendant is saying I will plead guilty only if the court

14:55:16  25   will give me this set -- this certain sentence, and it has to

14:55:21  1    be done with the consent of the government as well.

14:55:25  2        The court is bound to sentence the defendant to that term

14:55:31  3    if the court accepts the guilty plea.  The court can determine,

14:55:37  4    usually after reading the presentence report, that it is not

14:55:42  5    going to accept the sentence in an 11(c)(1)(C) agreement.  In

14:55:45  6    that case if that happens, the defendant is given the option to

14:55:49  7    withdraw his guilty plea and essentially the parties go back to

14:55:53  8    the position that they were before -- before the change of plea

14:55:56  9    hearing.

14:55:57  10   Q.  So are guilty -- are (c)(1)(C) plea agreements very popular

14:56:02  11   with clients?

14:56:02  12   A.  They're incredibly popular with clients.

14:56:05  13   Q.  Why?

14:56:07  14   A.  Because there's so much uncertainty with how the guidelines

14:56:14  15   work and will work in their particular case and because of the

14:56:18  16   ceilings -- the statutory ceilings of a lot of the offenses

14:56:21  17   that we have are also so high.  What clients, just like any

14:56:27  18   human being, usually wants is some certainty, right:  if I do

14:56:31  19   this, this is what will happen.

14:56:33  20       And, in some of the most difficult cases or negotiations

14:56:38  21   I've had, it's been a (c)(1)(C) that has made all the

14:56:40  22   difference.  Even if it was a (c)(1)(C) to something that I

14:56:44  23   thought that I anticipated was higher than what the guideline

14:56:48  24   range would be and even having told the client that, the

14:56:52  25   certainty of a (c)(1)(C) puts clients' minds at ease for lack

| | |
|---|---|
| 14:57:02 | 1 | of a better term because now they know what's going to happen |
| 14:57:05 | 2 | to them. |
| 14:57:05 | 3 | Q.  In your experience, have you resolved cases that were |
| 14:57:07 | 4 | headed to trial with (c)(1)(C)s? |
| 14:57:09 | 5 | A.  Yes. |
| 14:57:09 | 6 | Q.  When the -- we talked about different structures of plea |
| 14:57:20 | 7 | agreements.  You -- have you seen cases where a defendant |
| 14:57:24 | 8 | provided a factual basis for a guilty plea? |
| 14:57:26 | 9 | A.  Yes. |
| 14:57:27 | 10 | Q.  Is that legally required? |
| 14:57:28 | 11 | A.  No. |
| 14:57:29 | 12 | Q.  Can the factual basis come from the government? |
| 14:57:31 | 13 | A.  Yes. |
| 14:57:31 | 14 | Q.  Can the factual basis come from the presentence report? |
| 14:57:35 | 15 | A.  Yes.  If the -- if the court reserves judgment on whether |
| 14:57:39 | 16 | to accept a plea and then later looks at the presentence report |
| 14:57:42 | 17 | and then is satisfied from -- from that document that there is |
| 14:57:46 | 18 | a factual basis, then yes. |
| 14:57:48 | 19 | Q.  How do you know? |
| 14:57:49 | 20 | A.  I'm sorry? |
| 14:57:53 | 21 | Q.  How do you know these things? |
| 14:57:54 | 22 | A.  There are Tenth Circuit opinions that state them. |
| 14:57:58 | 23 | Q.  And I apologize, I got ahead of myself. |
| 14:58:02 | 24 | You talked about the utility of (c)(1)(C)s in resolving |
| 14:58:06 | 25 | cases.  Would it be effective assistance not to relate the |

14:58:11   1    (c)(1)(C) nature of a particular plea offer?

14:58:14   2    A.   I think the -- the fact that a plea is a (c)(1)(C) binding

14:58:24   3    agreement is, in my experience, the most attractive feature of

14:58:29   4    the plea agreement to a client.  So I cannot -- especially with

14:58:35   5    a large sentencing exposure and overwhelming evidence, I can't

14:58:40   6    think of a more important thing to convey to a client than the

14:58:44   7    fact that this is a binding plea, which means, by virtue of

14:58:49   8    your guilty plea, you will not get one more day in prison --

14:58:53   9    Q.   Okay.

14:58:53   10   A.   -- than what's in this agreement.

14:58:57   11        MR. REDMOND:   Could I have just a second, Your Honor?

14:58:59   12        THE COURT:   You may.

14:59:00   13        MR. REDMOND:   Thank you.

14:59:01   14     (Counsel conferring with defendant.)

15:00:29   15        MR. REDMOND:   Thank you very much, Your Honor.

15:00:34   16   BY MR. REDMOND:

15:00:35   17   Q.   Would it be fair to say that, when discussing a binding

15:00:39   18   plea or a (c)(1)(C) plea with a client, you would need to

15:00:42   19   explain what that meant?

15:00:45   20   A.   Yes.

15:00:46   21   Q.   Simply terming it a "binding plea" is not going to convey

15:00:49   22   the necessary information to the client?

15:00:51   23   A.   No.  I mean, for people that don't practice in federal

15:00:57   24   court, a binding plea can mean almost anything, right.  The

15:01:01   25   government's bound to recommend a sentence, right.

15:01:04  1       Without explaining the particular mechanics of how it

15:01:09  2   constrains the court and what the defendant's options are, if

15:01:13  3   the court does not agree to be so constrained, then the term

15:01:16  4   almost has no meaning.

15:01:18  5   Q.   Okay.  Final couple of questions.  I talked about no

15:01:23  6   contest pleas.  Is that like the Sasquatch or does it actually

15:01:30  7   exist on the ground?

15:01:31  8   A.   I've seen it once.

15:01:33  9   Q.   Where?

15:01:34  10  A.   In this -- in this courtroom actually.

15:01:35  11  Q.   And what were the circumstances?

15:01:37  12  A.   That was a particular case where there were no

15:01:47  13  protestations of innocence, but due to a -- due to a host of

15:01:56  14  factors the client credibly stated consistently and all the

15:02:01  15  parties agreed that he had no memory of the event.

15:02:06  16  Q.   And was that client's name John McNett?

15:02:10  17  A.   Yes.

15:02:11  18  Q.   And is the transcript of that hearing the subject of

15:02:14  19  Exhibit 13?

15:02:15  20  A.   Yes.

15:02:18  21           MR. REDMOND:  Your Honor, that's all I have.  Thank

15:02:20  22  you.

15:02:22  23           THE COURT:  Ms. Kenney, do you wish to cross-examine?

15:02:32  24           MS. KENNEY:  Yes, Your Honor.

15:02:33  25           THE COURT:  Please.

|          |    |                                                       |
|----------|----|-------------------------------------------------------|
| 15:02:35 | 1  | CROSS-EXAMINATION                                     |
|          | 2  | BY MS. KENNEY:                                        |
| 15:02:42 | 3  | Q.  Good afternoon, Mr. Bell.                         |
| 15:02:43 | 4  | A.  Good afternoon, Ms. Kenny.                        |
| 15:02:46 | 5  | Q.  Is it fair to say that there is no singular way to |
| 15:02:51 | 6  | represent a client through a guilty plea process?     |
| 15:02:53 | 7  | A.  That's fair.                                      |
| 15:02:54 | 8  | Q.  And I don't even have a guess, maybe you do.  How many |
| 15:03:00 | 9  | practitioners are eligible to represent criminal defendants in |
| 15:03:06 | 10 | federal district court in the District of Kansas?     |
| 15:03:09 | 11 | A.  I don't know how many are eligible to.  It would certainly |
| 15:03:13 | 12 | be a larger number than those qualified to.           |
| 15:03:17 | 13 | Q.  I understand.                                     |
| 15:03:18 | 14 | But there is a process for dealing with attorneys who are |
| 15:03:26 | 15 | not competent to represent clients in federal court?  |
| 15:03:28 | 16 | A.  If there is one, I'm not aware of it unless it happens |
| 15:03:32 | 17 | after the fact.                                       |
| 15:03:34 | 18 | Q.  Okay.  All right.  So on the McNett plea, I believe that's |
| 15:03:40 | 19 | Exhibit No. 13 in front of you.  There is -- Exhibit No. 13 is |
| 15:03:50 | 20 | marked as the transcript of a change of plea hearing. |
| 15:03:53 | 21 | A.  Correct, I have it.                                |
| 15:03:57 | 22 | Q.  And that was a single count indictment; correct?  |
| 15:04:01 | 23 | A.  That's my recollection, yes.                      |
| 15:04:02 | 24 | Q.  And there was no plea agreement in that case?     |
| 15:04:04 | 25 | A.  There was no plea agreement during the change of plea. |

15:04:08  1    There was a plea agreement that had been extended and then I
15:04:13  2    went over it with Mr. McNett.
15:04:15  3    Q.   Okay.  But during the change of plea, the actual guilty
15:04:19  4    plea, there was no plea agreement involved?
15:04:23  5    A.   Correct.  I'm going to -- I have to speak somewhat in the
15:04:31  6    hypothetical if you're going to ask what produced this.
15:04:34  7    Q.   No, I wasn't, but thank you.
15:04:37  8         Actually, my question is is you understand the offer in
15:04:41  9    this case was a guilty plea in exchange for dismissal of the
15:04:43  10   remaining counts of the indictment?
15:04:46  11   A.   In?
15:04:47  12   Q.   In Mr. Kearn's case.
15:04:49  13   A.   As -- as I have heard today, the offer was a plea to a
15:04:53  14   specific count under Rule 11(c)(1)(C) for a term of 10 years or
15:05:00  15   120 months and dismissal of the remaining counts.
15:05:02  16   Q.   Okay.  So it was a multi-count indictment in this?  And
15:05:05  17   maybe you didn't know that.
15:05:06  18   A.   I assumed because it was Count 3 that there was a Count 1
15:05:09  19   and 2, but that's all I knew.
15:05:10  20   Q.   Okay.  And if the defendant in this case, Mr. Kearn, had
15:05:13  21   tried to plead no contest, the government would have been
15:05:16  22   within its right to withdrawal that plea offer?
15:05:21  23   A.   I don't know if the -- if there was a -- when the
15:05:26  24   government made the offer if there was a time limit or other
15:05:30  25   restrictions about when it could be withdrawn.  Absent any of

15:05:36  1   those restrictions, I would say the government has the right to

15:05:39  2   withdraw a plea offer if there is something that happens

15:05:45  3   inconsistent unless -- I mean, as you know, these plea

15:05:47  4   negotiations can take many forms.  So unless there's been an

15:05:54  5   absolute rejection, the way I always look at it is the offer is

15:05:57  6   still on the table until it's explicitly taken off or rejected

15:06:01  7   by one of the parties.

15:06:02  8   Q.  Either rejected or withdrawn?

15:06:04  9   A.  Yes, ma'am.

15:06:06  10            MS. KENNEY:  I don't have any additional questions,

15:06:08  11  Your Honor.

15:06:08  12            THE COURT:  Redirect for the witness?

15:06:09  13            MR. REDMOND:  Thank you, Your Honor.

15:06:14  14                     REDIRECT EXAMINATION

15:06:14  15  BY MR. REDMOND:

15:06:15  16  Q.  You testified that there's no singular way to represent a

15:06:19  17  client in guilty plea proceedings; is that accurate?

15:06:23  18  A.  Yes.

15:06:23  19  Q.  But aren't there a few irreducible minimums any competent

15:06:29  20  counsel is going to employ during that process?

15:06:32  21  A.  Yes.

15:06:32  22  Q.  And is one of those spending sufficient time with your

15:06:36  23  client?

15:06:36  24  A.  Yes.

15:06:37  25  Q.  Is one of those explaining the law accurately?

| | |
|---|---|
| 15:06:40 | 1 |

A.   Yes.

Q.   Is one of those explaining the pros and cons of the plea
agreement actually discussed?

A.   Yes.

Q.   You were asked if the government could have withdrawn an
offer if Mr. -- if the -- Mr. Kearn had announced his intent to
plead no contest.  The -- could defense counsel have advocated
for that as a possibility?

A.   Yes.  So the government doesn't have to sign off on a plea
to no contest.  It has a right to be heard about whether a
defendant can plead no contest or not.  The court has the --
the ultimate authority about whether to accept a no contest
plea, but that is -- in some cases that is an option to give to
your client.

     And if that option is presented to your client, then it's
your job -- and your client wants to exercise that option, it's
your job to advocate for that in front of the court.  Even if
it's -- even if it's -- subjectively you don't think it's going
to be a successful one -- item of advocacy, that's one of those
decisions it's not up to you as the lawyer; it's up to the
client.

Q.   But to engage in that advocacy, you have to first know a
no contest plea is a possibility in federal court?

A.   And -- that and accurately advise your client about the
rules that surround it.

| | | |
|---|---|---|
| 15:08:05 | 1 | MR. REDMOND:  Those are my questions, Your Honor.  We |
| 15:08:07 | 2 | have no more witnesses. |
| 15:08:07 | 3 | THE COURT:  Ms. Kenney, recross? |
| 15:08:09 | 4 | MS. KENNEY:  No, thank you, Your Honor. |
| | 5 | EXAMINATION |
| | 6 | BY THE COURT: |
| 15:08:11 | 7 | Q.  Mr. Bell, I want to clear up one thing.  It was during near |
| 15:08:14 | 8 | the end of Mr. Mr. Redmond's original direct examination and |
| 15:08:20 | 9 | there was a question.  I think this is the way it was phrased. |
| 15:08:26 | 10 | "Is it effective assistance not to relate the 11(c)(1)(C) |
| 15:08:32 | 11 | nature of a plea offer -- of a particular plea offer?"  Do you |
| 15:08:36 | 12 | remember that question? |
| 15:08:37 | 13 | A.  Yes. |
| 15:08:39 | 14 | Q.  Okay.  And I think your answer was, no, it's not.  I want |
| 15:08:42 | 15 | to be sure I understand what question you were answering. |
| 15:08:46 | 16 | A.  Thank you, Your Honor. |
| 15:08:47 | 17 | I would deem it ineffective if you were to fail to advise a |
| 15:08:53 | 18 | client of the nature of an 11(c)(1)(C) plea offer. |
| 15:08:56 | 19 | Q.  So if you get an offer from the government and it's couched |
| 15:08:59 | 20 | as an 11(c)(1)(C) offer, you have an obligation, as a defense, |
| 15:09:05 | 21 | lawyer to explain to the client this is what that means? |
| 15:09:09 | 22 | A.  Correct, that this is how this is different from other plea |
| 15:09:12 | 23 | offers that you might get and here are the differences. |
| 15:09:15 | 24 | Q.  And I'm trying to understand.  Is that the question you |
| 15:09:19 | 25 | were answering? |

15:09:21   1    A.   Yes, Your Honor.

15:09:22   2    Q.   And so are you giving testimony today that it is -- we get

15:09:28   3    into kind of a tumble here of double negatives.  But is it

15:09:33   4    effective assistance if a defense lawyer neglects to inform a

15:09:37   5    client of the availability of an 11(c)(1)(C) option for

15:09:44   6    purposes of discussions with the government?

15:09:48   7         That question make sense to you?

15:09:50   8    A.   I believe it does.

15:09:51   9         I think it assumes that there have been no other plea

15:09:55   10   offers at that point.

15:09:59   11   Q.   It does; you're right.

15:10:01   12   A.   Yeah, that would probably be more fact dependent.  I

15:10:06   13   wouldn't be as comfortable saying that.  I would say I usually

15:10:11   14   inform clients about them, but that --

15:10:14   15   Q.   About their existence?

15:10:17   16   A.   Correct.  And but I also warn them that they're incredibly

15:10:20   17   rare and likely unobtainable.

15:10:29   18   Q.   And what you were telling the court in your direct

15:10:31   19   examination is an offer comes to you as a defense lawyer and it

15:10:36   20   is couched or expressed in -- as a binding plea offer under

15:10:41   21   Rule 11(c)(1)(C).  An effective defense lawyer has an

15:10:46   22   obligation to explain to the client this is what that

15:10:51   23   designation means?

15:10:53   24   A.   Correct.  And it's one that's probably just in common

15:10:56   25   parlance here in this -- in this district in federal court.  If

15:11:00  1    you didn't practice very often here, you probably wouldn't

15:11:02  2    automatically know what the "binding" and "a binding plea"

15:11:07  3    meant.

15:11:08  4              THE COURT:  It's a little bit of a misnomer?

15:11:11  5              THE WITNESS:  It is and it's kind of the jargon that

15:11:15  6    we use in this district.  And I can easily see how someone who

15:11:19  7    doesn't spend a lot of time in federal court, unless it was

15:11:24  8    clarified for them, wouldn't understand what that meant.  They

15:11:31  9    should, but I can see how that would go past someone who

15:11:34  10   doesn't practice that often here.

15:11:36  11             THE COURT:  Thank you very much.  I know I've asked in

15:11:39  12   more detail about some things, so I want to give each party the

15:11:42  13   chance to examine within the scope of the court's question to

15:11:46  14   the witness.

15:11:46  15             MR. REDMOND:  Your Honor, we have nothing further.

15:11:48  16             THE COURT:  All right.  Ms. Kenney?

15:11:50  17             MS. KENNEY:  No, Your Honor.  Thank you.

15:11:51  18             THE COURT:  All right.  Mr. Bell, you may step down.

15:11:53  19             THE WITNESS:  Thank you, Your Honor.

15:11:54  20             THE COURT:  I trust Mr. Bell is free to go?

15:11:57  21             MR. REDMOND:  He is, Your Honor.

15:11:58  22             THE COURT:  Ms. Kenney?

15:11:59  23             MS. KENNEY:  Yes.  I'm sorry, he's free to go.

15:12:01  24             THE COURT:  You've been released.

15:12:02  25             THE WITNESS:  Thank you, Your Honor.

13-40057  USA v Jonathan Kearn  4.19.21

| | | |
|---|---|---|
| 15:12:04 | 1 | THE COURT:  Mr. Redmond, does the defendant have |
| 15:12:12 | 2 | additional witnesses or evidence? |
| 15:12:13 | 3 | MR. REDMOND:  We have nothing else, Your Honor. |
| 15:12:14 | 4 | THE COURT:  All right.  Ms. Kenney, does the United |
| 15:12:16 | 5 | States wish to present evidence? |
| 15:12:17 | 6 | MS. KENNEY:  No, Your Honor. |
| 15:12:18 | 7 | THE COURT:  Counsel, let me talk to you a little bit. |
| 15:12:22 | 8 | I need to find my notes.  Well, I can't -- I'm not putting my |
| 15:12:46 | 9 | hand on the exact schedule that the defendant had proposed for |
| 15:12:49 | 10 | post-hearing briefing, so I don't mean to, I guess, truncate |
| 15:12:54 | 11 | this artificially.  Do you want to argue today orally in |
| 15:12:58 | 12 | addition to submitting post-hearing briefs? |
| 15:13:00 | 13 | MR. REDMOND:  No.  Thank you. |
| 15:13:01 | 14 | THE COURT:  And so just recite for me, since I can't |
| 15:13:03 | 15 | put my hands on my own notes, what's the timetable you outline? |
| 15:13:07 | 16 | MR. REDMOND:  As soon as the transcript is prepared, |
| 15:13:09 | 17 | we'd like three weeks from that date and then the government |
| 15:13:13 | 18 | would like three weeks thereafter and then we could file a |
| 15:13:17 | 19 | reply within one week. |
| 15:13:19 | 20 | THE COURT:  All right.  And so, Ms. Kenney, what's the |
| 15:13:23 | 21 | government's view of that timetable? |
| 15:13:24 | 22 | MS. KENNEY:  We would agree with that, Your Honor. |
| 15:13:26 | 23 | THE COURT:  So I'll ask you to communicate more |
| 15:13:29 | 24 | formally and fully to the court reporter that you're formally |
| 15:13:32 | 25 | requesting the transcript.  She's fast; I think you'll get it |

| | | |
|---|---|---|
| 15:13:35 | 1 | in short order. |
| 15:13:36 | 2 | MR. REDMOND:  Very good. |
| 15:13:37 | 3 | THE COURT:  And then you'll go on your clock. |
| 15:13:39 | 4 | Ms. Kenney, you know when your clock will start. |
| 15:13:41 | 5 | I'll tell you, I view this as a -- well, I don't need |
| 15:13:45 | 6 | to tell you it's a substantial matter.  There are significant |
| 15:13:50 | 7 | interests at stake.  I'm going to read the briefs closely and |
| 15:13:54 | 8 | then determine where -- whether I want to have the chance to |
| 15:13:58 | 9 | interact with you again about questions I may have, and I can't |
| 15:14:04 | 10 | predict that for you now. |
| 15:14:06 | 11 | Let me just say this:  I hope your briefs will be as |
| 15:14:13 | 12 | focused as the materials that you've submitted so far, because |
| 15:14:18 | 13 | this is, as I say, something that presents a substantial |
| 15:14:22 | 14 | question and I'm mindful of that.  So let me urge you not to be |
| 15:14:28 | 15 | -- sometimes I feel like lawyers are too subtle in |
| 15:14:32 | 16 | communicating exactly what they're trying to say.  You won't |
| 15:14:37 | 17 | hurt my feelings.  You need to say this directly as you can. |
| 15:14:41 | 18 | Summon a way to say it so I can understand your arguments as |
| 15:14:45 | 19 | carefully as they need to be understood. |
| 15:14:47 | 20 | All right.  Anything else we'll need to take up today, |
| 15:14:50 | 21 | Ms. Kenney? |
| 15:14:50 | 22 | MS. KENNEY:  Nothing from the government. |
| 15:14:51 | 23 | THE COURT:  Mr. Redmond? |
| 15:14:51 | 24 | MR. REDMOND:  No.  Thank you. |
| 15:14:52 | 25 | THE COURT:  Let me make sure Ms. Garrett has what she |

15:14:54  1    needs for our hearing.  I think we're good.

15:14:56  2            All right.  Thank you all for your presentations.

15:14:57  3    We'll go ahead and close the record.

15:14:58  4            MS. KENNEY:  Your Honor, I apologize.  I don't -- I

15:15:00  5    meant to play Exhibit 100 when Mr. Francis was testifying.  I

15:15:05  6    don't think that's necessary.  It's very brief, yes.

15:15:09  7            THE COURT:  You want that back?

15:15:10  8            MS. KENNEY:  No, that is the court's copy.

15:15:13  9            THE COURT:  Because this was received without

15:15:14 10    objection.

15:15:14 11            MS. KENNEY:  Yes, yes.  I just wanted to make a note

15:15:18 12    that I forgot to play it, so...

15:15:19 13            THE COURT:  So that's evidence that if it's going to

15:15:22 14    be considered I'm free to consider on my own.

15:15:24 15            MS. KENNEY:  Yes.

15:15:24 16            MR. REDMOND:  Precisely.

15:15:25 17            THE COURT:  All right.  Thanks very much.

15:15:48 18        (Proceedings adjourned.)

         19                          CERTIFICATE

         20        I certify that the foregoing is a true and correct

         21    transcript from the stenographically reported proceedings in

         22    the above-entitled matter.

         23        DATE:  April 23, 2021

         24

         25                    /s/Kimberly R. Greiner
                               KIMBERLY R. GREINER, RMR, CRR, CRC, RDR
                               United States Court Reporter