# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

|  |  |
|---|---|
| **UNITED STATES OF AMERICA,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 13-40057-01-DDC** |
| **JONATHAN KEARN,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

This matter comes before the court on Jonathan Kearn's Amended Motion to Vacate, Set Aside, or Correct a Sentence Under 28 U.S.C. § 2255 (Doc. 165).  The court previously denied six of the seven claims Mr. Kearn raised in his motion, *see* Doc. 173, but left undecided Mr. Kearn's ineffective assistance of counsel claim based on his attorney's advice during the plea process, *see id.* at 24–25.  The court appointed counsel to assist Mr. Kearn on this remaining claim and conducted an evidentiary hearing on it.  *See* Doc. 180.  After the parties finished with the evidence, the parties submitted post-hearing briefing.  *See* Docs. 203, 206, 207, & 208.

The question presented by Mr. Kearn's motion is not about his guilt.  The jury decided that question several years ago.  Their 2015 verdict convicted Mr. Kearn of three federal child pornography charges stemming from pictures he took of his four-and-a-half-year-old daughter and then shared on the internet.  *See* Doc. 97.  And in affirming Mr. Kearn's conviction in 2017, the Tenth Circuit characterized "the evidence of [Mr.] Kearn's guilt [as] overwhelming[.]" *United States v. Kearn*, 863 F.3d 1299, 1312 (10th Cir. 2017), *cert. denied*, 138 S. Ct. 2025 (2018).

But no matter his guilt, Mr. Kearn had a constitutional right to effective assistance of counsel.  This Order addresses that right as it pertains to the critical stage of plea bargaining, which, as the Supreme Court has recognized, "'is not some adjunct to the criminal justice system; it *is* the criminal justice system.'"  *Missouri v. Frye*, 566 U.S. 134, 144 (2012) (quoting Scott & Stuntz, *Plea Bargaining as Contract*, 101 Yale L.J. 1909, 1912 (1992)).

Before trial, the government offered Mr. Kearn a plea deal under Fed. R. Crim. P. 11(c)(1)(C).  If accepted, Mr. Kearn would plead guilty to a single offense in exchange for the government's agreement to a sentence of 10 years in prison.  Mr. Kearn rejected that deal and proceeded to trial.  After his conviction, the court sentenced him to 292 months in prison—more than 24 years.  So, Mr. Kearn's decision was a costly one.  And it's that decision he now seeks to undo.  Specifically, Mr. Kearn argues that his trial counsel inadequately and inaccurately advised him during the plea process, and that but for that ineffective advice, he would've accepted the government's offer and pleaded guilty.

The court recognizes the difficulty with this claim.  It first requires the court to evaluate the performance of counsel with the benefit of hindsight.  Even more challenging, it requires the court to reach back in time and construct a counterfactual world to determine what Mr. Kearn would've done had he received the legal advice he claims he'd have received from effective assistance.  But after considering at great length the focused and admirable guidance from the parties on this difficult claim, the court concludes it must decide those daunting questions.  The court also concludes that Mr. Kearn didn't receive effective assistance of counsel and that this deficient legal advice prejudiced him substantially.  Thus, for reasons explained below, the court grants Mr. Kearn's § 2255 motion (Doc. 165), but only in part.

## I.      Background

### A.      Procedural Background

This case began many years ago.  On May 29, 2013, a grand jury indicted Mr. Kearn on three charges:  (1) permitting his minor children to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, violating 18 U.S.C. § 2251(b); (2) distributing a visual depiction of a minor engaged in sexually explicit conduct, violating 18 U.S.C. § 2252(a)(2); and (3) possessing a visual depiction of a minor engaged in sexually explicit conduct, violating 18 U.S.C. § 2252(a)(4)(B).  Doc. 15 at 1–3.  After a four-day trial in May 2015, a jury convicted Mr. Kearn on all three charges.  Doc. 97 at 1–3.  This court sentenced Mr. Kearn to 292 months' imprisonment on Count One, 240 months' imprisonment on Count Two, and 120 months' imprisonment on Count Three, all to run concurrently.  Doc. 123 at 2.  The court also ordered five years of supervised release.  *Id.* at 3.  Mr. Kearn appealed his convictions to the Tenth Circuit.  *See United States v. Kearn*, 863 F.3d 1299, 1302–03 (10th Cir. 2017).  The Tenth Circuit affirmed.  *Id.* at 1313; *see also* Doc. 152-1.  Mr. Kearn petitioned for a writ of certiorari from the United States Supreme Court, which it denied on May 21, 2018.  Doc. 156.

On April 25, 2019, Mr. Kearn filed a Motion for Relief under 28 U.S.C. § 2255 along with 70 exhibits, asking the court to vacate his sentence based on ineffective assistance of trial counsel.  *See* Doc. 157.  Mr. Kearn then filed an amended § 2255 motion (Doc. 165) and also filed a Motion to Correct (Doc. 167), asking the court to consider his previously filed exhibits with his amended § 2255 motion.  The court granted his Motion to Correct (Doc. 167) and considered Mr. Kearn's previously filed exhibits with his amended § 2255 motion.  *See* Doc. 173.

The court considered and rejected all but one of Mr. Kearn's claims of ineffective assistance of counsel. *See generally* Doc. 173. The lone surviving claim asserted that Mr. Kearn's counsel had advised him that he could not plead guilty because, if he did, he would commit perjury by accepting responsibility for something he asserted he didn't do. *See id.* at 20–21 (citing Doc. 165 at 37–38). The court concluded that—on the extant record—it couldn't determine whether Mr. Kearn had received constitutionally adequate representation from counsel about the government's plea offer. So, the court concluded that this claim "may warrant" an evidentiary hearing. *Id.* at 24. But, citing logistical constraints imposed by the COVID-19 pandemic, the court ordered the government to submit an affidavit from Mr. Kearn's former trial counsel addressing Mr. Kearn's remaining claim. *Id.* at 24–25. The court noted that "[a]fter all parties have reviewed the affidavit, the court will evaluate next steps and, if an evidentiary hearing is warranted, the steps required to facilitate Mr. Kearn's travel." *Id.* at 25.

The government then filed an Affidavit from Mr. Kearn's former trial counsel, Mr. Michael Francis, whom the court refers to throughout this Order as "counsel" or "trial counsel." Doc. 178; Doc. 178-1. Counsel's Affidavit contested Mr. Kearn's allegations of ineffective assistance of counsel during the plea process. *See* Doc. 178-1. The court thus determined that the factual dispute created by the Affidavit required an evidentiary hearing "solely on the issue of whether Mr. Kearn's trial counsel provided effective assistance of counsel when he advised Mr. Kearn about his available plea offers." Doc. 180 at 5–6. The court appointed the Office of the Federal Public Defender for the District of Kansas to represent Mr. Kearn in the evidentiary hearing. *Id.* at 6–7.

The evidentiary hearing took place on April 19, 2021. Mr. Kearn's counsel called three witnesses: (1) Mr. Kearn's trial counsel, (2) Mr. Kearn, and (3) Branden Bell, a criminal defense

attorney with many years of experience in federal court criminal cases.  *See generally* Doc. 204. The court summarizes their testimony in parts B, C, and D.  The court begins by summarizing the events surrounding the plea offer and Mr. Kearn's rejection of it, as gleaned from the testimony of Mr. Kearn and his trial counsel.  Then, the court summarizes the testimony of Mr. Kearn's trial counsel and Mr. Bell about their experiences with plea bargaining in federal court. These summaries comprise the court's findings providing the factual basis for this Order's ultimate conclusions.

### B.      The Government's Rule 11(c)(1)(C) Plea Offer

Before Mr. Kearn's criminal trial, the government offered him a Rule 11(c)(1)(C) "binding plea agreement to a 10-year sentence to Count [Three]."  Doc. 204 at 33.  In exchange for Mr. Kearn's guilty plea to the possession charge in Count Three, the government would've dismissed the production and distribution charges in Counts One and Two of the Indictment.  *Id.* at 37–38.  Mr. Kearn's trial counsel recognized this offer as a "huge" deal for Mr. Kearn, who faced a sentence exposure of 292 to 365 months (about 24 to 30 years).  *Id.* at 38.

Mr. Kearn's trial counsel discussed the government's 11(c)(1)(C) plea offer with him just once.  *Id.* at 42–43; *see also* Doc. 178-1 at 1 (Counsel Aff.).[1]  During an hour-long meeting in counsel's office, the two discussed the plea offer for about six minutes.  Doc. 204 at 43 (Kearn Testimony).  During those six minutes, counsel described the 10-year plea offer but advised Mr. Kearn that the court "d[idn't] have to go along with the plea agreement."  *Id.* at 38 (Counsel Testimony).  Counsel didn't advise Mr. Kearn to accept or reject the plea offer.  *Id.* at 31

---

[1]      Trial counsel testified that he didn't "remember specifically what [he] told" Mr. Kearn when he advised him of the plea offer.  Doc. 204 at 28.  As a result, the court relies mostly on Mr. Kearn's testimony for its factual findings about this meeting between Mr. Kearn and his trial counsel.  But for each moment in this important sequence of events, the court notes whose testimony it relies on for its factual finding.  And where counsel's testimony about his general advice to clients is relevant, the court relies on that testimony to corroborate Mr. Kearn's testimony about counsel's specific advice to him.

(Counsel Testimony), 45 (Kearn Testimony).  He didn't "weigh the pros and cons of that plea offer" with Mr. Kearn.  *Id.* at 45 (Kearn Testimony).  Nor did he discuss or explain to Mr. Kearn anything about Federal Rule of Criminal Procedure 11, specifically Rule 11(c)(1)(C).  *Id.* at 44 (Kearn Testimony).

In those six minutes, counsel also advised Mr. Kearn about the need to supply a factual basis for the guilty plea.  *Id.* (Kearn Testimony); *see also id.* at 30–31 (Counsel Testimony). According to Mr. Kearn, counsel advised him that if he accepted the guilty plea, he "would have to tell the judge [he] was guilty of the crime[.]"  *Id.* at 44.  And, counsel continued, because Mr. Kearn claimed he "was not guilty of the crime," he "couldn't honestly say . . . to the judge in good conscience" that he was guilty of the crime.  *Id.* (Kearn Testimony).  Counsel did not "talk about an option where [Mr. Kearn] would not have to personally state a factual basis for the plea[.]"  *Id.* 44–45 (Kearn Testimony); *see also id.* at 30–31 (Counsel Testimony) (agreeing that it's "likely" he would have advised Mr. Kearn that he would have to "admit [ ] the factual basis for the crime" himself).  Nor did counsel discuss the possibility that the government could supply the factual basis for the guilty plea and that Mr. Kearn simply could agree that the government's evidence "would be sufficient to support a guilty verdict beyond a reasonable doubt[.]"  *Id.* at 45 (Kearn Testimony).  Counsel devoted the rest of this one-hour meeting to trial strategy.  *Id.* at 43 (Kearn Testimony).

At the end of the meeting, Mr. Kearn told his counsel that "he would not plead guilty" because "he didn't do it—didn't do what he was charged with."  *Id.* at 31 (Counsel Testimony). Counsel noted in response that it was "too bad there's not a no contest plea" offered in federal court.  *Id.* at 44 (Kearn Testimony).

Later, Mr. Kearn's counsel called the prosecutor in the case and left a voicemail declining the government's plea offer. He explained that Mr. Kearn said "he didn't do it," so "that's a problem." Gov. Ex. 100; *see also* Doc. 178-1 at 3 (prosecutor email to counsel noting that Mr. Kearn had rejected "an offer of a c1C to 10 years"). Counsel testified that he did not believe at any point during his representation of Mr. Kearn that his client would plead guilty. Doc. 204 at 31.

Shortly before trial, during a *Lafler*/*Frye* colloquy, Mr. Kearn acknowledged that he was made aware of the government's "binding plea agreement to a 10-year sentence to Count [Three]." *See* Gov. Ex. 101; Doc. 143 at 240–41. He then proceeded to trial where he was convicted on all three charges and later sentenced to more than 24 years in prison. At the evidentiary hearing on the current motion, Mr. Kearn testified that had he known the government could supply the factual basis for the guilty plea, he would have accepted the government's plea offer. Doc. 204 at 46–47; *see also id.* at 49 (Mr. Kearn testified he could have stated the government's evidence was sufficient to prove him guilty beyond a reasonable doubt). But, on cross examination, the government asked Mr. Kearn if he could have admitted that he knowingly committed the crime and was, in fact, guilty of it. *Id.* at 48 (noting that the court has asked that question in the past to defendants during their change of plea hearings). Mr. Kearn said he could not. *Id.*

### C.    Trial Counsel's Testimony About Federal Plea Agreements

Mr. Kearn's trial counsel could not recall specifically how he advised Mr. Kearn about the government's plea offer. Doc. 204 at 28. But in his Affidavit, counsel listed the general advice he customarily provides clients about plea offers. *See* Doc. 204 at 26; Doc. 178-1 at 2

(Counsel Aff.).  And he testified about that general advice at the evidentiary hearing.  *See* Doc. 204 at 28–31.

In his practice, trial counsel advises his clients about supplying a factual basis for the plea at a hearing.  Counsel testified that he was aware of three potential ways that defendants could meet this requirement:  (1) "the judge will ask the client to tell the court the facts surrounding the offense[;]" (2) the judge "will ask the client if he has read the affidavits and pleadings alleging the offense and whether the client agrees an offense is stated[;]" or (3) the judge "will have the prosecutor present facts to the court constituting the offense and then ask[ ] the client if he agrees with the prosecutor's statements."  Doc. 178-1 at 2 (Counsel Aff.).  But, in all cases, counsel advises his clients "that the judge will ask if the client is pleading guilty because he is guilty." *Id.*

Before Mr. Kearn's 2015 trial, his counsel had represented nine criminal defendants who pleaded guilty in federal court.  Doc. 204 at 24.  In all nine, counsel or the defendant personally provided the factual basis for the guilty plea in the plea petition.  *Id.* at 16–25; *see also id.* at 29 (counsel testifying that in all nine cases the client "in some way had to acknowledge what the facts were" but noting that "in the majority of the cases, the client didn't tell the judge what the facts were").  Counsel regularly advised his clients that they would have to admit the facts surrounding the offense in the plea petition if they wanted to plead guilty.  *Id.* at 25; *see also id.* at 30–31.  He provided this advice because he believed the law required it.  *Id.* at 25.  As he testified, "if a client wants to plead guilty and admit to the facts, they can, but the alternative is trial."  *Id.* at 39.  At the hearing, counsel agreed he likely would have advised Mr. Kearn that he would have to supply and admit the factual basis for his guilty plea in his plea petition.  *Id.* at 30–31.

Counsel also testified about his knowledge of Rule 11(c)(1)(C) plea agreements.  Of his involvement in the nine federal court plea agreements that preceded Mr. Kearn's trial, none of them involved Rule 11(c)(1)(C).  *See* Def. Exs. 2–10.  While counsel recognized that such agreements were "binding," he testified that he wasn't aware of any enforcement mechanisms to ensure the court actually sentenced the defendant to the term of imprisonment from the plea offer because "a judge doesn't have to go along with the plea agreement."  Doc. 204 at 38.  Counsel testified that he believed he so advised Mr. Kearn.  *Id.*  Counsel also testified that he didn't know if Mr. Kearn would actually receive a 10-year sentence if he pleaded guilty because that would depend on the Sentencing Guidelines.  *See id.* ("Well, I don't know if it was actually going to be 10 years other than by looking at the schedule of—if you don't have 'x' number offenses and you plead to this offense, then I believe this is what it was.").

### D.      Mr. Bell's Testimony About Federal Plea Agreements

Mr. Kearn also offered testimony by Branden Bell, a criminal defense attorney based in Kansas City.  Mr. Bell has practiced primarily in federal court for 12 years.  Doc. 204 at 51.  By the time of the hearing on this motion, he had represented some 240 clients in federal court, many of them while a member of the Office of the Federal Public Defender for this judicial district.  *Id.*

Mr. Bell testified that it is common for criminal defendants to profess their innocence to him when charged with sensitive crimes, like sex cases or child abuse cases.  *Id.* at 52.  But in cases like these, "if there's a plea offer that substantially reduces their exposure, [his] goal is to make sure that [defendants] have all the information available to them but make the prospect of a plea hearing seem as painless as possible[.]"  *Id.*

When it comes to supplying the requisite factual basis for a plea, Mr. Bell testified that there are several options.  One involves working with the government to change the language of the plea agreement to provide that his "client agrees that the government has evidence that would show" a certain fact.  *Id.* at 59.  Mr. Bell testified that he regularly uses this approach in conspiracy cases where a plea agreement asks his client to admit facts outside the scope of their personal knowledge.  *Id.*  But he also testified that this practice works for clients who are "reluctant" to plead guilty because a "psychological hurdle" prevents them from personally admitting the facts of the offense.  *See id.* at 60.  To overcome this hurdle, Mr. Bell explained that he shows clients "that the language in the plea agreement says you're not saying that you know this, you're saying that the government has evidence to prove it."  *Id.*  And, at the plea hearing itself, Mr. Bell explained that the defendant doesn't have to supply the factual basis for the plea.  *Id.* at 62.  The defendant certainly can provide it, but it is not legally required.  *Id.*  In Mr. Bell's experience, the factual basis for a guilty plea may come from the government or even a presentence report.  *Id.*[2]

Mr. Bell also testified about his knowledge of Rule 11(c)(1)(C) agreements, like the one the government offered to Mr. Kearn.  Mr. Bell explained that Rule 11(c)(1)(C) agreements, in his experience, are "incredibly popular with clients."  *Id.* at 61.  This is so because of the certainty they provide.  If the court accepts the plea agreement, the "court is bound to sentence the defendant" to the term of imprisonment set by the plea agreement.  *Id.* at 61.  And if the court rejects the 11(c)(1)(C) agreement, then "defendant is given the option to withdraw his guilty plea and essentially the parties go back to the position that they [occupied] before . . . the change of

---

[2]    Mr. Bell acknowledged that the presentence report can serve as the factual basis for the guilty plea only "if the court reserves judgment on whether to accept a plea and then later looks at the presentence report and then is satisfied . . . from that document that there is a factual basis[.]"  Doc. 204 at 62.

plea hearing." *Id.* at 61.  In Mr. Bell's view, the "certainty of a (c)(1)(C) puts clients' minds at ease . . . because now they know what's going to happen to them." *Id.* at 61–62.  He testified that Rule 11(c)(1)(C)'s binding nature was "in [his] experience, the most attractive feature of the plea agreement to a client." *Id.* at 63.  He opined that in cases where defendant faces a large sentence and overwhelming evidence, nothing is more important to convey than "the fact that this is a binding plea, which means, by virtue of your guilty plea, [defendant] will not get one more day in prison . . . than what's in this agreement." *Id.*  In Mr. Bell's experience, simply stating a plea offer is "binding" is insufficient to convey the value of a Rule 11(c)(1)(C) agreement to a client. *Id.*  In his view, without "explaining the particular mechanics of how [a Rule 11(c)(1)(C) agreement] constrains the court and what the defendant's options are" if the court doesn't accept the agreement, then the word "binding" in the term binding plea agreement "almost has no meaning." *Id.* at 64.

Finally, Mr. Bell explained his practice with clients who have professed their innocence. In his words, "when the evidence is overwhelming and a client is still persisting in their innocence, that is always an indication to me that . . . there's a psychological stumbling block that is not . . . allowing the client to come out and explicitly say what the evidence strongly suggests occurred." *Id.* at 53–54.  In these situations, Mr. Bell believes his role is "to try and lower that psychological hurdle[.]" *Id.* at 54.  This involves repeatedly explaining the plea offer and its structure to help defendants make an informed decision. *Id.* at 54–55.  Specifically, in Mr. Bell's view when the government has presented a "very good plea offer," then he will spend more time than usual discussing the plea offer with a defendant. *Id.* at 54.  Mr. Bell testified that he spends about an hour to an hour and a half discussing a plea offer with a client. *Id.* at 58. And, depending on how reluctant a client is to accept a plea deal, these conversations may take

place over multiple visits and multiple hours. *Id.* at 57. Mr. Bell testified that he never has completed a plea offer discussion in six minutes. *Id.* at 56–57.

At all times, Mr. Bell views his role as providing his clients with all the information they need so they can make an informed decision. *Id.* at 54–55. At minimum, Mr. Bell believes, competent counsel should spend sufficient time with clients to allow them to review the plea agreement and its pros and cons, as well as to explain the nature of a Rule 11(c)(1)(C) agreement. *Id.* at 67–71.

## II.   Legal Standard

A prisoner in federal custody may move to vacate his sentence if such "sentence was imposed in violation of the Constitution or laws of the United States[.]" 28 U.S.C. § 2255(a). The Sixth Amendment of the United States Constitution guarantees a right to counsel "that extends to the plea-bargaining process." *Lafler v. Cooper*, 566 U.S. 156, 162 (2012). So, if a prisoner in federal custody was denied that right—specifically, if he receives ineffective advice causing him to reject a favorable plea deal and go to trial, only to receive a much harsher sentence—then he is entitled to relief under § 2255. *See In re Graham*, 714 F.3d 1181, 1182 (10th Cir. 2013) (per curiam) (citing *Lafler*, 566 U.S. at 174). The Supreme Court has "held 'the two-part *Strickland v. Washington* test applies to challenges to guilty pleas based on ineffective assistance of counsel.'" *Lafler*, 566 U.S. at 162–63 (quoting *Hill v. Lockhart*, 474 U.S. 52, 58 (1985)); *see also Strickland v. Washington*, 466 U.S. 668 (1984).

To prevail on *Strickland*'s first prong—constitutionally deficient performance— defendant "must show 'that counsel's representation fell below an objective standard of reasonableness[.]'" *United States v. Moya*, 676 F.3d 1211, 1213 (10th Cir. 2012) (quoting *Strickland*, 466 U.S. at 688). But there is a "a strong presumption that counsel provided effective

assistance." *United States v. Holloway*, 939 F.3d 1088, 1103 (10th Cir. 2019) (quotation cleaned up); *see also Strickland*, 466 U.S. at 689 ("Judicial scrutiny of counsel's performance must be highly deferential."). "A fair assessment of attorney performance requires" the court to make every effort "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "[T]o show that his counsel was deficient, [defendant] must demonstrate that the errors were so serious that 'counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.'" *Hanson v. Sherrod*, 797 F.3d 810, 826 (10th Cir. 2015) (quoting *Strickland*, 466 U.S. at 687); *see also Wilson v. Sirmons*, 536 F.3d 1064, 1083 (10th Cir. 2008) ("Counsel's performance must be completely unreasonable to be constitutionally ineffective, not merely wrong." (quotation cleaned up)).

The Supreme Court has recognized the deficient performance prong "is necessarily linked to the practice and expectations of the legal community" as well as the "prevailing norms of practice as reflected in American Bar Association standards and the like[.]" *Padilla v. Kentucky*, 559 U.S. 356, 366 (2010) (quotation cleaned up). In the context of plea agreements, counsel has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'" *Id.* at 370 (quoting *Libretti v. United States*, 516 U.S. 29, 50–51 (1995)). And counsel's "ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

*Strickland*'s second prong—prejudice—requires a defendant to "'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *Lafler*, 566 U.S. at 163 (quoting *Strickland*, 466 U.S. at 694). "In

the context of pleas a defendant must show the outcome of the plea process would have been different with competent advice." *Id.*  When a defendant alleges ineffective assistance led the defendant to reject a plea offer, a defendant must establish that "but for the ineffective advice of counsel there is a reasonable probability" that:

> [1] defendant would have accepted the plea . . . [2] the prosecution would not have withdrawn it in light of intervening circumstances . . . [3] the court would have accepted its terms, and . . . [4] the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed.

*Id.* at 164.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  This standard "does not require that the [defendant] show that counsel's deficient conduct more likely than not altered the outcome in the case[.]"  *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (quotation cleaned up).  But "mere speculation is not sufficient to satisfy this burden."  *Id.*

The court's analysis, following, applies this legal standard to Mr. Kearn's ineffective assistance of counsel claim.

## III.   Analysis

Mr. Kearn argues that his trial counsel provided ineffective assistance because he failed to explain adequately and accurately two aspects of his specific plea offer:  "(1) the key benefits conveyed by Rule 11(c)(1)(C)'s binding-plea provision;" and "(2) the true nature of the burdens imposed by Rule 11(b)(3)'s factual-basis requirement."  Doc. 206 at 5.  Mr. Kearn argues that this deficient advice skewed his cost-benefit analysis of the government's plea offer and deprived him of "the ability to make a rational and informed choice" when he decided to reject the plea offer and go to trial.  *Id.* at 15.  And, Mr. Kearn contends, but for this deficient advice, there's a reasonable probability he would've made a different choice—he would've accepted the government's offer, pleaded guilty, and not proceeded to trial.

14

In response, the government argues that Mr. Kearn's trial counsel didn't provide deficient performance in either respect.  To the contrary, the government contends, counsel provided sufficient information for Mr. Kearn to understand that he was rejecting a "binding" plea deal to 10 years in prison.  *See* Doc. 207 at 10.  And more importantly, the government continues, Mr. Kearn can't show that he would've pleaded guilty to the offense because he was unwilling to admit that he was, in fact, guilty.  *Id.* at 19–20.

The court agrees with Mr. Kearn.  When viewed in the aggregate, the totality of trial counsel's legal advice during the plea process fell below an objective standard of reasonableness.  In short, trial counsel understated the benefits of Rule 11(c)(1)(C)'s binding nature while overstating the burdens imposed by Rule 11(b)(3)'s factual basis requirement.  And, given the complex mix of legal and personal issues involved in this case, *i.e.*, Mr. Kearn's victims were his daughters, the court is confident that trial counsel couldn't have provided constitutionally adequate advice on these topics in the six minutes he devoted to the government's plea offer.

To be sure, the court is unwilling to conclude that any individual aspect of counsel's performance was deficient.  His testimony in this case shows that his understanding of each legal issue relevant here was, at worst, incomplete and imprecise.  But, when viewed as a whole, counsel's incomplete and imprecise advice amounted to deficient performance.  The advice skewed Mr. Kearn's ability to make an informed choice whether to accept the government's plea offer or proceed to trial.  And this advice prejudiced Mr. Kearn.  It clouded the narrow path to a guilty plea he now says he would've accepted.  The court is thus persuaded that Mr. Kearn's Sixth Amendment rights were violated, entitling him to relief.  The court explains how it reaches this conclusion below.

### A.    *Strickland* Prong One:  Deficient Performance

The court discusses trial counsel's deficient performance in two individual aspects:  his failure to advise Mr. Kearn adequately about (1) the benefits of Rule 11(c)(1)(C), and (2) the burdens of Rule 11(b)(3).  But the court again emphasizes that it considers these two aspects in tandem to determine whether counsel performed deficiently.

### 1.    Benefits of Rule 11(c)(1)(C)

A plea agreement under Fed. R. Crim. P. 11(c)(1)(C) is an interesting animal.  It's commonly called a "binding" plea agreement.  While that terminology is true in some sense, it's not the entire truth.  Rule 11(c)(1)(C) provides that a plea agreement under this part of Rule 11 may recommend to the court "a specific sentence or sentencing range" that the government believes will provide "the appropriate disposition of the case[.]"  But the court isn't bound to accept that recommendation.  Indeed, the Supreme Court has instructed that when "deciding whether to accept an agreement" under Rule 11(c)(1)(C), "the district court must consider the Sentencing Guidelines."  *Hughes v. United States*, 138 S. Ct. 1765, 1773 (2018).  But if the court does accept the agreement, it is bound by the agreement, and "the agreed-upon sentence is the only sentence the court may impose."  *Id.* at 1778; *see also* Fed. R. Crim. P. 11(c)(1)(C) (noting that the agreement's recommendation "binds the court once the court accepts the plea agreement").

On the other hand, if the court chooses not to accept the plea agreement, the court must inform the defendant that the court isn't bound by the recommended sentence.  Fed. R. Crim. P. 11(c)(5)(B).  And, importantly, the court then must give the defendant the opportunity to withdraw his guilty plea.  *Id.*  Also, it must inform the defendant that if he chooses not to withdraw his guilty plea, the court "may dispose of the case less favorably" than the plea

agreement recommends.  Fed. R. Crim. P. 11(c)(5)(C).  So, a Rule 11(c)(1)(C) agreement

provides the defendant with a significant level of certainty no matter what the court decides.  The

defendant either will receive the agreed-upon sentence or have the right to withdraw the guilty

plea and return the case to its pre-plea posture.  In either outcome, the defendant retains

substantial control over his fate.  *See Freeman v. United States*, 564 U.S. 522, 540 n.5 (2011)

(Sotomayor, J., concurring) ("Rule 11(c)(1)(C)'s entire purpose is to allow the parties' intent to

determine sentencing outcomes.").[3]

Here, the government offered Mr. Kearn such a plea agreement under Rule 11(c)(1)(C).

Specifically, the government offered to drop Counts One and Two of the Indictment (the

production and distribution charges), in exchange for his guilty plea to Count Three (the

possession charge).  The agreement also would've recommended a sentence of 10 years in

prison, the statutory maximum for Count Three.  *See* 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2);

*see also* Doc. 106 at 11 (Presentence Report).

When trial counsel discussed this offer with Mr. Kearn, he devoted just six minutes to the

subject.  While it isn't entirely clear what Mr. Kearn's counsel told him, it's apparent that he

didn't discuss the contours of Rule 11(c)(1)(C) in much depth.  He explained that the plea offer

was a "binding" one for 10 years.  But, he qualified, the 10-year sentence wasn't guaranteed

because the "judge doesn't have to go along with the plea agreement."  Doc. 204 at 38.  And,

when asked at the hearing how he knew Mr. Kearn would receive a 10-year sentence under the

plea offer, counsel responded, "Well, I don't know if it was actually going to be 10 years other

---

[3]     Contrasting this process with a plea under Rule 11(c)(1)(B) only further underscores the certainty
an 11(c)(1)(C) agreement provides.  Under Rule 11(c)(1)(B), the court is not bound by the recommended
sentence *at all*.  And, significantly, if the court rejects the agreement, a defendant has no right to withdraw
the plea.  *See* Fed. R. Crim. P. 11(c)(3)(B).  Thus, under that subsection of Rule 11, a defendant has
almost no control over his sentencing fate.

than by looking at the schedule of—if you don't have 'x' number offenses and you plead to this offense, then I believe this is what it was.  Either that or else [the prosecutor] had told me that that was what it was going to be." *Id.*

Mr. Kearn argues that this testimony reveals his trial counsel's misunderstanding of how Rule 11(c)(1)(C) agreements work.  While the court understands his argument, the court concludes that counsel's testimony during the hearing was, at worst, incomplete or imprecise. Trial counsel is correct that the court doesn't have to accept a Rule 11(c)(1)(C) agreement.  And it's true that the court considers—indeed, it must consider the Sentencing Guidelines (or, as trial counsel called it, "the schedule") to determine whether to accept an 11(c)(1)(C) agreement.

Nevertheless, in the plea agreement context, counsel has a "critical obligation . . . to advise the client of 'the advantages and disadvantages of a plea agreement.'"  *Padilla v. Kentucky*, 559 U.S. 356, 370 (2010) (quoting *Libretti v. United States*, 516 U.S. 29, 50–51 (1995)).  And here, the court finds, trial counsel failed to convey the extraordinary value of a Rule 11(c)(1)(C) agreement to Mr. Kearn, who was facing enormous sentencing exposure and overwhelming evidence of guilt.  Instead, the evidence establishes that trial counsel provided Mr. Kearn only with the downsides of such agreements.  He told Mr. Kearn that the court didn't have to accept the agreement, and so there wasn't an absolute guarantee of a 10-year sentence.  But he didn't clarify that Mr. Kearn, by accepting the plea agreement, either would receive the agreed-upon 10-year sentence, or he would have the opportunity to withdraw his guilty plea and return to the status quo.  In other words, trial counsel didn't advise Mr. Kearn about the certainty the government's plea agreement offered.

Courts across the country have recognized the benefits that flow from the certainty of a Rule 11(c)(1)(C) agreement.  *See, e.g.*, *United States v. Starks*, No. 06 CR 324-22, 2021 WL

18

496399, at *4 (N.D. Ill. Feb. 10, 2021) (noting that a defendant "reaped substantial benefits—principally certainty and reduction of risk" from his plea agreement under Rule 11(c)(1)(C)); *Evans v. United States*, No. 1:14-CR-52-TWT-JSA-3, 2018 WL 2326132, at *16 (N.D. Ga. Mar. 28, 2018), *report and recommendation adopted*, No. 1:14-CR-52-3-TWT, 2018 WL 2321983 (N.D. Ga. May 22, 2018) (explaining how a Rule 11(c)(1)(C) agreement "provides certainty and security for a Defendant who might otherwise face the risk of a sentencing judge imposing something higher than what the parties recommended"); *see also United States v. DeFronzo*, 281 F. Supp. 3d 243, 247 (D. Mass. 2017) (contrasting "the certainty of a binding plea agreement over the uncertainty of a jury trial").   And Mr. Bell testified that, in his experience, Rule 11(c)(1)(C) agreements are "incredibly popular" with clients because of the certainty they provide.  Doc. 204 at 61.  Without adequately explaining the mechanics behind the certainty of a Rule 11(c)(1)(C) agreement, trial counsel materially understated its benefits.

In a related context, our Circuit has explained that knowledge "of the comparative sentence exposure between standing trial and accepting a plea offer will often be crucial to the decision whether to plead guilty."  *United States v. Washington*, 619 F.3d 1252, 1259–60 (10th Cir. 2010) (quotation cleaned up).  And so, where counsel displays a failure "to understand the basic structure and mechanics of the sentencing guidelines[,]" such that the defendant is "incapable" of "mak[ing] reasonably informed decisions[,]" that failure amounts to deficient performance under *Strickland*.  *Id.* at 1260.

Mindful of this guidance, the court likewise concludes that a failure to understand the basic structure and mechanics of this important aspect of the Federal Rules of Criminal Procedure can amount to deficient performance.  To be sure, trial counsel hasn't displayed "complete unfamiliarity" with Rule 11(c)(1)(C).  *See id.* at 1259.  But his failure to provide the

full picture about the benefits of Rule 11(c)(1)(C) nonetheless deprived Mr. Kearn of a meaningful chance to assess the government's plea offer. *See Byrd v. Skipper*, 940 F.3d 248, 259 (6th Cir. 2019) (concluding that, given counsel's deficient advice about a plea offer, defendant's "'choice' to forgo [the] plea was no choice at all").

### 2.  Burdens of Rule 11(b)(3)

Counsel's advice also materially overstated the burdens imposed on Mr. Kearn to provide the factual basis for a guilty plea under Fed. R. Crim. P. 11(b)(3).  This errant advice imposed an unnecessary roadblock in Mr. Kearn's assessment of the government's plea offer.

"Before entering judgment on a guilty plea, the court must determine that there is a factual basis for the plea."  Fed. R. Crim. P. 11(b)(3).  Rule 11(b)(3) requires courts to take this step "to prevent a defendant who committed no crime from pleading guilty to one, and to prevent a defendant who is guilty of a lesser offense from pleading guilty to a higher charge."  1A, Charles Alan Wright, Arthur R. Miller & Andrew D. Leipold, *Federal Practice and Procedure*, *Federal Rules of Criminal Procedure* § 180 (5th ed. 2021) (citing *McCarthy v. United States*, 394 U.S. 459, 467 (1969)).

Often, the court makes this determination after questioning the defendant about the facts of his offense.  But "nothing in Rule 11(b)(3) restricts a district court's consideration of a factual basis to its plea colloquy with the defendant alone."  *United States v. Landeros-Lopez*, 615 F.3d 1260, 1263 (10th Cir. 2010).  Indeed, the court "can look to a variety of sources to satisfy the [factual basis] requirement."  Wright, Miller & Leipold, *supra*, § 180.  As our Circuit has explained, district courts "may look to answers provided by counsel for the defense and government, the presentence report,[4] or whatever means is appropriate in a specific case—so

---

[4]     To be more precise, a presentence report typically doesn't provide the requisite factual basis for accepting a guilty plea during the plea hearing because such reports customarily are prepared after that

long as the factual basis is put on the record." *United States v. Moran*, 452 F.3d 1167, 1171 (10th Cir. 2006) (quotation cleaned up).

From his Affidavit and testimony, it appears that trial counsel was aware of these multiple paths to supplying a factual basis for a guilty plea. His Affidavit describing his general advice to clients explains three such paths that a plea colloquy can follow: (1) "the judge will ask the client to tell the court the facts surrounding the offense[;]" (2) the judge "will ask the client if he has read the affidavits and pleadings alleging the offense and whether the client agrees an offense is stated[;]" or (3) the judge "will have the prosecutor present facts to the court constituting the offense and then ask[ ] the client if he agrees with the prosecutor's statements." Doc. 178-1 at 2 (Counsel Aff.); *see also* Doc. 204 at 28–29 (counsel testimony acknowledging "three different ways that a plea hearing can go").

But in his testimony, counsel conceded that he regularly advised his clients to take the first path. Doc. 204 at 29–30. Indeed, in all nine federal court guilty pleas trial counsel had

---

hearing concludes. *See Landeros-Lopez*, 615 F.3d at 1264 ("Because the PSR was not prepared until after [defendant's] guilty plea was accepted, we cannot look to it in considering whether the district court correctly determined there was a factual basis for accepting the plea."). But the federal rules don't require the parties to provide the factual basis during the plea hearing itself. *See* Fed. R. Crim. P. 11(b)(3) (requiring court to determine that there is a factual basis for the plea "[b]efore *entering judgment* on a guilty plea" (emphasis added)); *see also United States v. Moran*, 452 F.3d 1167, 1171 (10th Cir. 2006) ("[A]ny finding of an adequate factual basis at the initial plea hearing is necessarily preliminary[.]" (quoting *Howard v. United States*, 135 F.3d 506, 509 (7th Cir. 1998)).

Thus, presentence reports are relevant to the factual basis requirement, but only when the court enters *judgment* on the guilty plea. Such reports likely aren't relevant to accepting the factual basis for a plea at the change of plea hearing. But the court knows of nothing requiring courts to decide whether to accept a defendant's guilty plea during the change of plea hearing. *See* Wright, Miller & Leipold, *supra*, § 177 ("At the conclusion of the plea colloquy the district court may accept the guilty plea, reject it, or may defer a decision pending further consideration of the accompanying plea agreement or the presentence report."). So, to make a long story short, presentence reports *can* supply the factual basis for a plea, but only when: (a) the court delays its decision to accept the plea until sometime after the plea hearing concludes but accepts it before entering judgment; or (b) the relatively rare circumstance where the United States Probation Office conducts a pre-plea investigation and prepares a presentence report before the change of plea hearing.

participated in before Mr. Kearn's case, the defendant had supplied the factual basis for the guilty plea in the plea petition. *Id.* at 16–25. And while counsel couldn't recall the specific advice he gave Mr. Kearn, he testified that he likely would've advised him to do the same. *See id.* at 30–31. He testified that he would've done so because he believed the law required defendants to admit the facts. *Id.* at 25.

But the law doesn't require defendants to admit the facts. Relevant here, the government could've satisfied the factual basis requirement by reciting a summary of the evidence it had adduced of Mr. Kearn's guilt. Mr. Kearn then could've acknowledged that the government possessed evidence sufficient to support a conviction beyond a reasonable doubt. As explained above, Rule 11(b)(3) allows such a procedure. And the Tenth Circuit impliedly has approved of it. *See United States v. Sandoval*, 427 F. App'x 621, 624 (10th Cir. 2011) (noting how district court accepted a guilty plea where defendant "agreed the government could prove a factual basis to support each charge"); *see also United States v. Rodriguez*, 45 F. App'x 522, 523 (7th Cir. 2002) (approving plea colloquy where "the government presented to the court a specific factual basis that adequately support[ed] each essential element of the drug offense, and [defendant] agreed that the government would be able to prove the scenario presented").

Also, the undersigned judicial officer has followed this procedure for establishing a factual basis when circumstances required it. *See* Def. Ex. 12 (Transcript of Change of Plea Hearing, *United States v. Martinez-Martinez*, No. 18-20090 (D. Kan. Sept. 19, 2019), ECF No. 46 at 22–23). And, Mr. Bell testified that he regularly follows this process for establishing a factual basis when a client maintains innocence even after receiving a favorable plea offer. In this situation, Mr. Bell explained, he'll work with the government to change the language of a plea agreement to state that the "client agrees that the government has evidence that would

show" a certain fact.  Doc. 204 at 59.  In Mr. Bell's experience, this lowers any "psychological hurdle" preventing clients from personally admitting the facts of their charged offense.  *Id.* at 60. It allows clients to satisfy the factual basis requirement for a guilty plea, but also abides their desire not to admit the facts of the charged offense in open court.  *See id.*

Given Mr. Kearn's protests of innocence before trial and his unwillingness to admit to a factual basis in open court, advice about this option for a plea colloquy was decidedly relevant to Mr. Kearn's decision whether to accept the government's plea offer.  But the evidence adduced at the hearing established that trial counsel didn't advise Mr. Kearn about any alternatives to supplying a factual basis for the guilty plea.  Instead, counsel advised Mr. Kearn that he would have to admit the facts of his charged offense.  And if he were unwilling to do that, he couldn't plead guilty.  As counsel agreed at the hearing, "if a client wants to plead guilty and admit to the facts, they can, but the alternative is trial." *Id.* at 39.

In this situation, counsel's advice was, again, incomplete and imprecise.  No statute, rule, or other legal authority required Mr. Kearn to admit the facts in open court.  But his belief—based on trial counsel's advice—that he must do so to plead guilty foreclosed accepting the plea deal as a viable option.  In short, counsel's failure to advise adequately about any alternatives to supply the factual basis closed Mr. Kearn's narrow path to a guilty plea before he even knew it existed.

In the end, Mr. Kearn provides a compelling and persuasive theory of deficient performance.  Counsel understated the benefits of the Rule 11(c)(1)(C) agreement, while overstating the burdens of Rule 11(b)(3)'s factual basis requirement.  And even if counsel's understanding of both rules is more complete than his testimony gives him credit for (which very well may be the case), the court is confident of this much:  in the difficult personal circumstances

facing Mr. Kearn, counsel could not have informed Mr. Kearn adequately about the effect of these rules in six minutes.  Mr. Bell testified that situations like this one often require multiple visits over multiple hours to advise a client adequately about an 11(c)(1)(C) agreement.  Doc. 204 at 57.  While the court does not suggest Mr. Bell's specific practices represent the constitutionally required standard, they do demonstrate the ineffectiveness of counsel's assistance here.  The court concludes that devoting just six minutes to walking this client through a plea offer and the procedures required to accept it amounts to deficient performance under the Sixth Amendment.  This deficient performance understandably skewed the cost-benefit calculation in Mr. Kearn's mind and deprived him of the ability to make an informed, rational choice about whether to accept the government's plea offer or go to trial.  The question then becomes whether this deficient advice prejudiced Mr. Kearn.  And that's the question the court turns to next.

> **B.**    ***Strickland* Prong Two:  Prejudice**

In a case like this, *Strickland*'s prejudice inquiry is a difficult one.  The court must first imagine a world different from the one described above—the real facts where Mr. Kearn received deficient advice from his counsel.  That is, the court must construct a counterfactual world in which Mr. Kearn's counsel adequately had advised him about the immense benefits of the government's plea offer and the relatively light burden of supplying a factual basis for a guilty plea.  *See Lafler*, 566 U.S. at 163 ("To establish *Strickland* prejudice a defendant must 'show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" (quoting *Strickland*, 466 U.S. at 694)); *see also Mayfield v. United States*, 955 F.3d 707, 713 (8th Cir. 2020) (explaining that, under *Lafler*, the prejudice inquiry requires district courts "to make findings about what likely would have

transpired in . . . a counterfactual scenario" where counsel adequately advised the defendant). The court must then determine how Mr. Kearn would've responded to this counterfactual scenario. Or, more precisely, the court must determine whether there is a reasonable probability that things would've gone as Mr. Kearn now says they would have—that he would have accepted the government's plea offer, acknowledged at the plea hearing that the government had sufficient evidence to convict him, and then, pleaded guilty in open court. *See Lafler*, 566 U.S. at 164.

In this situation—where choosing "to stand trial, [and] not choosing to waive it, is the prejudice alleged"—the Supreme Court has required defendants to establish four things. *Id.* at 163–64. A defendant must demonstrate that "but for the ineffective advice of counsel there is a reasonable probability that" (1) "the defendant would have accepted the plea[,]" (2) "the prosecution would not have withdrawn it in light of intervening circumstances," (3) "that the court would have accepted its terms," and (4) "that the conviction or sentence, or both, under the offer's terms would have been less severe than under the judgment and sentence that in fact were imposed." *Id.* at 164.

The government doesn't dispute Mr. Kearn's ability to satisfy the second and fourth requirements. *See* Doc. 207 at 19 (arguing only that Mr. Kearn "cannot establish the first or third o[f] these requirements"). And the court agrees. Mr. Kearn has made those two required showings. Nothing suggests that the government would've withdrawn its Rule 11(c)(1)(C) plea offer because of intervening circumstances. *See Smith v. Allbaugh*, 921 F.3d 1261, 1272 (10th Cir. 2019) (concluding that the second prejudice requirement weighed in defendant's favor where there was "nothing in the record to indicate the state would have withdrawn or canceled the offer" once the defendant accepted it). And the government's concession in its papers that it

wouldn't have withdrawn the offer suffices for *Lafler*'s second prejudice requirement.  Also, it's apparent that the plea offer's terms (10 years in prison and a dismissal of Counts One and Two in exchange for a guilty plea on Count Three alone) were far less severe than the judgment and sentence that the court actually imposed (a conviction on all three counts and a sentence of more than 24 years in prison).  So, the court concludes Mr. Kearn has made the requisite showing on *Lafler*'s fourth requirement as well.

That leaves the most difficult inquiry—whether there's a reasonable probability that Mr. Kearn would've accepted the plea deal but for his counsel's deficient advice.  As one would expect, Mr. Kearn contends there is.  While he maintains that he could not and would not have admitted to the facts of the charged offense, he asserts that he would've pleaded guilty in one narrow circumstance:  one where the government would supply the factual basis for the plea and he would acknowledge that the government had sufficient evidence to convict him.   The government responds in form, arguing that no such thing would have happened.  In its view, even if the government had supplied the factual basis for the plea, Mr. Kearn still would've had to admit his guilt in open court.  And, the government contends, that's something Mr. Kearn just couldn't do, given the specific questions this court has asked defendants in the past when they entered their guilty pleas.

The court concludes otherwise.  It agrees with Mr. Kearn that there is a reasonable probability that, but for his counsel's deficient advice, he would've accepted the government's plea offer.  To reach this finding, the court relies heavily on the recent opinion from the D.C. Circuit in *United States v. Knight*, 981 F.3d 1095 (D.C. Cir. 2020).  This case explored at length the difficulties of the prejudice inquiry in a case like this one.  But before summarizing that decision, the court explains why it relies so heavily on it here.

While neither party cited *Knight* in their papers, their arguments led the court to it.  In his post-hearing brief, Mr. Kearn cited one of the Supreme Court's latest decisions about ineffective assistance of counsel in the plea process, *Lee v. United States*, 137 S. Ct. 1958 (2017).  That case dealt with the inverse of Mr. Kearn's situation.  Unlike Mr. Kearn, the *Lee* defendant chose to plead guilty and waived his right to a trial.  But after learning about the deportation consequences of his guilty plea, the defendant later argued that—but for the ineffective assistance of counsel—he would've instead taken his chances at trial even though the evidence against him was overwhelming.  The Supreme Court agreed with the defendant for reasons that don't matter here.  But in reaching its conclusion, the Supreme Court provided clear instruction for courts facing ineffective assistance of counsel claims arising from the plea process:  "Courts should not upset a plea solely because of *post hoc* assertions from a defendant about how he would have pleaded but for his attorney's deficiencies.  Judges should instead look to *contemporaneous evidence* to substantiate a defendant's expressed preferences."  *Id.* at 1967 (second emphasis added).

This direction from the Supreme Court isn't new, at least not in our Circuit.  Long ago, the Tenth Circuit cautioned district courts to "remain suspicious of bald, post hoc and unsupported statements that a defendant would have changed his plea absent counsel's errors[.]" *Heard v. Addison*, 728 F.3d 1170, 1184 (10th Cir. 2013); *see also United States v. Watson*, 766 F.3d 1219, 1226 (10th Cir. 2014) (explaining that defendants need something more than a "self-serving statement" that "does no more than open the door to conjecture").  But what counts as contemporaneous evidence after *Lee*?  Conducting its own research while looking for an answer to that question led the court to *Knight*.

In that case, the D.C. Circuit contemplated a situation analogous to Mr. Kearn's:  one where defendant received constitutionally inadequate advice that led him to reject a favorable plea offer.  The sole question in *Knight* asked whether there was a reasonable probability that, but for that deficient advice, the defendant would've accepted the offer and pleaded guilty. Confronting that issue, the D.C. Circuit began by acknowledging *Lee*'s direction about contemporaneous evidence.  *See Knight*, 981 F.3d at 1101–02.  But, the D.C. Circuit emphasized, "the Supreme Court did not suggest in *Lee* that a defendant must hypothesize his counsel's advice might be erroneous and state contemporaneously that his plea decision would differ if that were so."  *Id.* at 1106 (quotation cleaned up).  Instead, the D.C. Circuit stressed, when courts go looking for contemporaneous evidence of what a defendant would've done in a counterfactual world, courts must consider "the direct negative impact that counsel's shortcomings had on [a defendant's] understanding of his circumstances at the time he was deciding whether to accept the plea offer."  *Id.* at 1102.  As a result, the "choices that the defendant *actually made* do not necessarily shed any useful light on the choices that he *would have made* if he had been properly advised."  *Id.* at 1105–06 (quotation cleaned up); *see also Byrd v. Skipper*, 940 F.3d 248, 258 (6th Cir. 2019) (explaining that because the defendant "lacked the requisite information to weigh the options in front of him" due to counsel's deficient advice, "whatever desire [defendant] exhibited before trial is not dispositive of what he would have done if he were properly educated about the charges against him"), *cert. denied*, 140 S. Ct. 2803 (2020).

All that makes sense.  Courts can't rationally expect defendants to theorize contemporaneously about the decisions they would make if they were receiving different advice. If courts required this kind of evidence, no defendant could show prejudice.  And that can't be

what *Lafler* and *Lee* intended. *Lafler* envisions a world—albeit a limited one—where defendants can show that they would've pleaded guilty had they not received constitutionally inadequate advice. Applying a standard that effectively forecloses defendants from making the requisite showing would ignore *Lafler* and leave only a shell of a constitutional right. It would mean defendants could receive constitutionally inadequate advice but never secure any relief. The court doesn't take that path here because, in its judgment, that's not what the Supreme Court or our Circuit intended. So, absent clear direction from the Supreme Court or the Tenth Circuit about what qualifies as sufficient "contemporaneous evidence," the court follows the trail blazed by the D.C. Circuit in *Knight*. And the court thus predicts that the Tenth Circuit, if presented with the question, would do the same.

Using that approach, *Knight* highlighted two key pieces of contemporaneous evidence corroborating the defendant's post hoc testimony that he would have pleaded guilty had he received different advice.

*First*, there was an extreme disparity in sentencing exposure between accepting the plea offer and going to trial. The plea offer required *Knight*'s defendant to plead guilty to a single charge with a guideline range of two to six years. But proceeding to trial "risked a ten-count indictment in federal court, dramatically greater sentencing exposure, and an actual imposed sentence of more than twenty-two years." *Id.* at 1103. The D.C. Circuit held that this severe disparity and the generosity of the plea offer itself qualified as "contemporaneous evidence" that the defendant would've accepted the offer "had counsel correctly apprised him of how favorable it was[.]" *Knight*, 981 F.3d at 1103 (noting the characterization of the plea offer as "incredibly sweet"). In so concluding, the D.C. Circuit relied on post-*Lee* decisions from other circuits recognizing that "severe disparity" in sentencing exposure between a plea offer and a sentence

after trial was "compelling evidence that the defendant would have accepted a plea offer but for counsel's constitutionally deficient performance." *Id.* (first citing *Dodson v. Ballard*, 800 F. App'x 171, 181 (4th Cir. 2020); then citing *Byrd v. Skipper*, 940 F.3d 248, 259 (6th Cir. 2019)).

*Second*, there also was evidence that *Knight*'s defendant, at the time of the plea offer, was "amenable to accepting the plea offer" and "not otherwise . . . dead-set on going to trial[.]" *Id.* at 1104.  The defendant testified at the § 2255 evidentiary hearing that "when his counsel informed him the government had extended a plea offer, his first question was 'how much time does the government want for that?'" *Id.* (quotation cleaned up).  The D.C. Circuit concluded that this "question suggest[ed] that [defendant's] decision whether to accept the plea offer was calibrated to the sentence that he would receive as a result of pleading guilty." *Id.*  Also, at an earlier hearing when the plea offer still was open to defendant, counsel incorrectly informed him in open court that the guilty plea would require 10 years in prison.  At first, the defendant was resistant.  But when counsel said he would talk to defendant some more about the offer, the defendant replied "okay." *Id.*  This exchange, the D.C. Circuit reasoned, "indicates that . . . [defendant] was amenable to further discussion and possibly to changing his mind[.]" *Id.*  And nothing in the record otherwise suggested that the defendant "was dead-set on going to trial no matter its risks and consequences[.]" *Id.*  So, the D.C. Circuit determined, a "reasonable probability" existed "that [the defendant] would have changed his mind" and pleaded guilty if his counsel had advised him properly.  *Id.*; *see also Byrd*, 940 F.3d at 259 (concluding that defendant showed contemporaneous evidence that he would've pleaded guilty because "he specifically asked [his counsel] about the possibility of pleading" but his counsel "convinced him to stay the course" and proceed to trial).

In sum, the D.C. Circuit was persuaded by two key pieces of contemporaneous evidence: (1) the significant disparity in sentencing exposure between the plea offer and going to trial; and (2) evidence from the period when the plea was available to defendant showing that the defendant was amenable to pleading guilty and not otherwise dead-set on going to trial. When "[c]ombined with [defendant's] after-the-fact testimony" that he would've accepted the plea deal had his counsel adequately advised him, these two pieces of contemporaneous evidence "suffice[d] to show a reasonable probability that [defendant] would have accepted the plea offer" but for his counsel's deficient advice. *Knight*, 981 F.3d at 1103.

Applying *Knight*'s reasoning to this case's facts, the court concludes that Mr. Kearn likewise has established a reasonable probability that he would've accepted the government's plea offer but for his counsel's deficient advice. This is a close and difficult call. Mr. Kearn acknowledges that he would've pleaded guilty only in a very narrow circumstance: where the government supplied the factual basis for the guilty plea, and he acknowledged that the government had sufficient evidence to convict him at trial. *See* Doc. 204 at 46–47, 49. And he lacks the same kind of contemporaneous evidence present in *Knight*, *i.e.*, evidence suggesting that he was amenable to pleading guilty. But, as explained fully below, nothing in the record suggests that Mr. Kearn was dead set on going to trial and that no plea offer, no matter how advantageous, could deter him. On close facts such as these, where Mr. Kearn need only show a "reasonable probability" that he would've chosen differently, the court concludes that Mr. Kearn has done enough to make the required showing. The court explains that finding in more detail below, focusing on the two kinds of contemporaneous evidence identified by the D.C. Circuit in *Knight*.

*First*, there's no doubt.  There was a significant and material disparity between the government's plea offer and Mr. Kearn's sentencing exposure if convicted at trial.  The plea deal offered a 10-year sentence in exchange for a guilty plea on Count Three of the Indictment, but dropped the charges in Counts One and Two.  In contrast, by going to trial Mr. Kearn risked conviction on all three counts, a dramatically higher sentencing exposure of more than 30 years in prison, and a guidelines range sentence of 292 to 365 months in prison.  *See* Doc. 106 at 12 (Presentence Report).

*Second*, nothing in the record suggests that Mr. Kearn was so intent on going to trial that no plea deal could convince him to do otherwise.  On the contrary, the record suggests that he resisted the guilty plea because of his reluctance to admit the facts of his charged offense, personally and in open court.  He testified at the evidentiary hearing on the current motion that it would've been difficult for him to admit the facts of his offense "before [his] friends and family[.]"  Doc. 204 at 46.  Trial counsel testified that Mr. Kearn rejected the plea deal because Mr. Kearn said "he didn't do it—didn't do what he was charged with."  *Id.* at 31.  And in the voicemail message counsel used to inform the prosecutor of Mr. Kearn's decision, he confirmed Mr. Kearn's refusal to admit the facts of his offense.  *See* Gov. Ex. 100 (rejecting plea offer because Mr. Kearn said "he didn't do it," so "that's a problem").  Nowhere does the record suggest that Mr. Kearn's objection to the plea offer was an objection to the fact of a guilty plea itself.  Mr. Kearn testified that had he known the government could supply the factual basis for a plea, he would've accepted the deal, and would've pleaded guilty.  *See* Doc. 204 at 46–47, 49. And while that's a post-hoc assertion, the contemporaneous evidence comports with it.

Also, counsel's testimony at the hearing suggests that Mr. Kearn potentially was amenable to accepting the government's plea offer.  When questioned whether he thought at any

point during his representation that Mr. Kearn would plead guilty, counsel testified that he "didn't think he would," but that he was only confident of this belief after the *Lafler*/*Frye* colloquy—moments before the trial began.  Doc. 204 at 31–32.  Crucially, counsel immediately qualified his testimony, and said "there's always a time they might" plead guilty.  *Id.* at 32.  While this statement didn't implicate Mr. Kearn specifically, the court finds it significant that counsel offered this testimony on his own, unprompted.  *See id.*

The court is mindful that this evidence must bear a lot of weight.  But the evidence in *Knight* suggesting the defendant was amenable to pleading guilty—though a bit stronger than here—was no slam dunk.  Still, the D.C. Circuit concluded that evidence showed a "reasonable probability" of a different outcome.  And that's all a defendant needs to show in these circumstances to secure relief.  The "absence of unequivocal contemporaneous evidence that [the defendant] affirmatively wanted a plea deal" does not mean "that he cannot show a *reasonable probability* that he would have accepted the plea offer if he had been provided the effective assistance of counsel."  *Knight*, 981 F.3d at 1106 (emphasis added).

As more support for this conclusion, the court compares Mr. Kearn's case to *United States v. Watson*, 766 F.3d 1219 (10th Cir. 2014).  There, the Tenth Circuit held that the defendant had "fail[ed] to point to any evidence" suggesting he would've accepted a plea deal had his counsel adequately advised him about it.  *Id.* at 1227.  In fact, the *Watson* record supported the opposite inference:  that "under no circumstances" would the defendant have pleaded guilty because that would have required the defendant to forfeit his insurance license, something the defendant "repeatedly" told his counsel he would not do.  *Id.*

Here, no such independent factor dictated Mr. Kearn's choice even if his counsel had provided constitutionally adequate advice.  To the contrary, counsel easily could have alleviated

the main sticking point for Mr. Kearn—his unwillingness to admit the facts of his charged

offense in open court—had he informed Mr. Kearn that he didn't have to admit the facts

personally.  In other words, Mr. Kearn didn't demonstrate "a stubborn insistence on proceeding

to trial[.]"  *United States v. Barajas*, No. 10-20077-02-JWL, 2015 WL 2165300, at *7 (D. Kan.

May 8, 2015) (recognizing that evidence of such behavior might foreclose a finding of prejudice

under *Watson*).  That is a meaningful distinction from *Watson*.

Finally, the court notes that it would've accepted both Mr. Kearn's desired procedure for

supplying a factual basis for the guilty plea and the Rule 11(c)(1)(C) agreement itself.

Obviously, the parties can't do much to argue this point.  But the government highlights an

important issue that, the court believes, it should address.

The government argues that even though it certainly could have supplied the factual basis

for the guilty plea, and Mr. Kearn could have admitted that the government had the evidence to

convict him at trial, he still would've had to admit his guilt to enter a guilty plea.  *See* Doc. 207

at 17, 19–20.  And, the government contends, Mr. Kearn couldn't do that because he testified

that he couldn't answer a specific question this court has asked defendants in the past.  But the

government ignores Mr. Kearn's other testimony on this question.  It's true that in our court,

judges frequently asks defendants during plea colloquies whether they "knowingly committed

this crime" and "are, in fact, guilty of it."  Doc. 204 at 48 (reciting a question the court asked

during a plea colloquy).  And Mr. Kearn did testify that he could not say that he knowingly

committed the crime and was, in fact, guilty of it.  *See id.* at 48–49.  But, importantly, Mr. Kearn

also testified that he could have acknowledged the government had evidence to convict him at

trial, and that after "making that statement," he would "have been willing to plead guilty[.]"  *Id.*

at 49.  In other words, as long as the plea hearing played out in the narrow circumstances Mr.

Kearn describes, he would've pleaded guilty.  And had Mr. Kearn's trial counsel provided the explanation Mr. Kearn now has made, it's extremely likely that the court would have accepted Mr. Kearn's plea on that basis.  That is—had Mr. Kearn confirmed that the government possessed sufficient evidence to convict him and presented Circuit authority opining that he need not admit his guilt to supply the requisite factual basis—it's far more likely than not that the court would have accepted his guilty plea.  The court expresses special confidence about that prediction here because of the dramatic difference in sentencing exposure.

The court also concludes that it would've accepted the Rule 11(c)(1)(C) agreement.  Two circumstances make that conclusion an easy one.  *First*, the proposed 10-year sentence on the remaining count for possession of child pornography represented the statutory maximum.  *See* 18 U.S.C. §§ 2252(a)(4)(B), 2252(b)(2); *see also* Doc. 106 at 11 (Presentence Report).  And *second*, the court finds it significant that the government believed 10 years in prison was the "appropriate disposition" of Mr. Kearn's case.  *See* Fed. R. Crim. P. 11(c)(1)(C).  So, the court concludes that it would've accepted the plea agreement under Rule 11(c)(1)(C).  And, bound by that agreement, the court would've sentenced Mr. Kearn to 10 years in prison on the single possession conviction.

In sum, Mr. Kearn adequately has demonstrated prejudice under *Strickland*.  He has shown a reasonable probability that but for the deficient advice by his counsel, he would have accepted the plea offer, the prosecution would not have withdrawn it, the court would have accepted its terms, and both the conviction and sentence under the offer's terms would have been less severe than the sentence the court in fact imposed.  *Lafler*, 566 U.S. at 164.  Mr. Kearn thus has established a violation of his Sixth Amendment right to effective assistance of counsel.  He is entitled to relief.

## C.      Remedy

"Sixth Amendment remedies should be 'tailored to the injury suffered from the constitutional violation[.]'" *Lafler*, 566 U.S. at 170 (quoting *United States v. Morrison*, 449 U.S. 361, 364 (1981)).  That is, the remedy must "'neutralize the taint'" of any such violation without "grant[ing] a windfall to the defendant or needlessly squander[ing] the considerable resources the [government] properly invested in the criminal prosecution[.]"  *Id.* (quoting *Morrison*, 449 U.S. at 365).  So, in a situation like this, where the government offered a plea deal "to a count or counts less serious than the ones for which a defendant was convicted after trial," the Supreme Court has suggested that the proper remedy is for the court "to require the prosecution to reoffer the plea proposal."  *Id.* at 171.  And then, the court can "exercise discretion in deciding whether to vacate the conviction from trial and accept the plea or leave the conviction undisturbed."  *Id.*

Both Mr. Kearn and the government agree that this procedure—should the court find a Sixth Amendment violation—is the proper remedy.  In fact, the government was the first to suggest this remedy.  *See* Doc. 207 at 22.  While *Lafler* made clear that the court has considerable discretion to fashion a remedy in a case like this one, *see* 566 U.S. at 171, the court concludes that ordering the government to reoffer the plea deal is the appropriate remedy here.  That was the remedy the D.C. Circuit ordered in *Knight*.  981 F.3d at 1107 ("[T]he appropriate remedy calls upon the government to reoffer the original plea deal to [the defendant].").  And, as the government highlights, this remedy would restore the parties to their positions before trial without granting Mr. Kearn an undue windfall.  It also would avoid imposing the expense of conducting a new trial on the government.  *See Lafler*, 566 U.S. at 170 (outlining these specific considerations for courts determining a remedy).  The court thus concludes that this remedy

"neutralizes the taint" of the constitutional violation while appropriately balancing the parties' competing interests.

The court thus orders the government to re-offer the Rule 11(c)(1)(C) plea agreement that would drop the production and distribution charges in Counts One and Two of the Indictment and recommend a 10-year sentence in exchange for a guilty plea on the possession charge in Count Three of the Indictment.  Once the government re-offers the plea deal, the court then will set the case for a status conference to discuss Mr. Kearn's decision, and, if necessary, schedule a change of plea hearing.

## IV.     Conclusion

**IT IS THEREFORE ORDERED BY THE COURT THAT** Mr. Kearn's Amended Motion to Vacate Sentence under § 2255 (Doc. 165) is granted in part.

**IT IS FURTHER ORDERED BY THE COURT THAT** the government, as remedy for the constitutional violation found in this Order, must re-offer its Rule 11(c)(1)(C) plea agreement to Mr. Kearn within 20 days of the date of this Order.

**IT IS SO ORDERED.**

**Dated this 4th day of January, 2022, at Kansas City, Kansas.**

**s/ Daniel D. Crabtree**
**Daniel D. Crabtree**
**United States District Judge**